COPY

CHILDREN'S ADVOCACY INSTITUTE
University of San Diego School of Law
Robert C. Fellmeth (State Bar No. 49897)
Edward Howard (State Bar No. 151936)
Christina McClurg Riehl (State Bar No. 216565)
Elisa D'Angelo Weichel (State Bar No. 149320)
5998 Alcala Park
San Diego, CA 92110
Telephone: (619) 260-4806
Facsimile: (619) 260-4753
cpil@sandiego.edu

MORRISON & FOERSTER LLP
Kimberly N. Van Voorhis (State Bar No. 197486)
Marc David Peters (State Bar No. 211725)
755 Page Mill Road
Palo Alto, California 94304-1018
Telephone: (650) 813-5600
Facsimile: (650) 494-0792
KVanVoorhis@mofo.com

MORRISON & FOERSTER LLP
Steve Keane (State Bar No. 247588)
12531 High Bluff Drive, Suite 100
San Diego, California 92130
Phone: (858) 720-5100
Fax: (858) 720-5125

**Attorneys for Plaintiffs**

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

**SAN FRANCISCO DIVISION**

| | |
|---|---|
| California State Foster Parent Association, California State Care Providers Association, and Legal Advocates for Permanent Parenting,<br><br>                 Plaintiffs,<br><br>   v.<br><br>JOHN A. WAGNER, Director of the California Department of Social Services, in his official capacity; MARY AULT, Deputy Director of the Children and Family Services Division of the California Department of Social Services, in her official capacity,<br><br>                 Defendants. | Case No. C-07 5086<br><br>**COMPLAINT FOR DECLARATORY JUDGMENT AND PERMANENT INJUNCTIVE RELIEF**<br>**42 U.S.C. § 1983**<br><br>**DEMAND FOR JURY TRIAL** |

---

1

COMPLAINT FOR DECLARATORY JUDMENT AND PERMANENT INJUNCTIVE RELIEF

**PRELIMINARY STATEMENT**

This case is brought on behalf of licensed foster parents who elect to care for abused and neglected children who have been removed from the custody of their parents by operation of state law. The Child Welfare Act, a federal law, requires states that receive federal funds for foster care to provide foster care maintenance payments to cover the "cost of (and the cost of providing) food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance with respect to a child, and reasonable travel to the child's home for visitation."

California applied for and willingly accepts this federal funding, but does not cover the costs incurred by foster parents as required by federal law. Even as the costs to feed, clothe, house, and transport foster children have risen every year, California's foster care payment rates have not kept pace.

According to a new study by the University of Maryland, California's foster care payments need to increase by as much as 61% before they will begin to cover the actual costs of raising a foster child. California pays less to licensed foster parents than does Texas, a state with a significantly lower cost of living. In fact, on average, California pays less to foster parents than it costs to kennel a dog in the state.

The inadequacy of the foster care maintenance payments in California has caused a steep and steady decline in the number of Californians willing to become foster parents. Some counties have reported losses of more than 50% of their foster parents in the last few years. This is a double tragedy, since not only are foster parent placements the ones most likely to lead to permanent adoption for a child, but also are less expensive than alternative placements.

This action seeks to prevent further violation of federal law by the State of California and obtain proper payment to the licensed foster parents sufficient to provide these abused and neglected children the care and shelter to which they are lawfully entitled. Without the State's compliance, the foster children will continue to live in inappropriate placements and foster parents will be forced to choose between providing inadequate care or closing their doors to foster children, to the great detriment of the affected children.

## PARTIES

### *The California State Foster Parent Association*

1. The California State Foster Parent Association ("CSFPA") is a California corporation with its principal place of business at 24414 Marigold Ave, Harbor City, California 90710. CSFPA is a non-profit organization that, among other pursuits, represents the interests of foster parents that provide care and supervision for foster children as described below.

2. CSFPA is comprised of approximately 75 chapters throughout the state representing close to four thousand foster parents. DSS licenses, audits, and provides funding to these foster parents through the Aid to Families with Dependent Children – Foster Care ("AFDC-FC") program.

3. CSFPA represents the interests of foster parents with respect to matters relating to the State of California and DSS'S administration of the AFDC-FC program.

4. CSFPA is authorized to file this action on behalf of its members, who are and will continue to be affected adversely by the unlawful actions of Defendants, and each of them, alleged herein. Through this Complaint, CSFPA seeks to protect interests that are germane to its purpose and affiliation with member foster parents. Each foster parent that is a member of CSFPA has independent standing to bring an action. Nevertheless, CSFPA asserts the claims alleged in this Complaint without the participation of an individual member of CSFPA. Should it be deemed necessary for a foster parent to participate in this action, CSPFA will seek leave to amend this Complaint to name specific foster parents as parties-in-interest.

### *Legal Advocates for Permanent Parenting*

5. Legal Advocates for Permanent Parenting ("LAPP") is a California corporation with its principal place of business at 3182 Campus Drive Suite 175, San Mateo, California 94403. LAPP is a non-profit organization that, among other pursuits, represents the interests of foster parents who provide care and supervision for foster children as described below.

6. LAPP is comprised of experienced dependency lawyers who have cared for foster children in their own homes as foster, adoptive and kinship parents. LAPP ensures successful futures for children in foster care by increasing the capacity of their caregivers, including foster

3
COMPLAINT FOR DECLARATORY JUDMENT AND PERMANENT INJUNCTIVE RELIEF

parents, to meet their needs. LAPP is authorized to file this action on behalf of its supporters, who are and will continue to be affected adversely by the unlawful actions of Defendants, and each of them, alleged herein. Through this Complaint, LAPP seeks to protect interests that are germane to its purpose and affiliation with member foster parents. Each foster parent that is a member of LAPP has independent standing to bring an action. Nevertheless, LAPP asserts the claims alleged in this Complaint without the participation of an individual member of LAPP. Should it be deemed necessary for a foster parent to participate in this action, LAPP will seek leave to amend this Complaint to name specific foster parents as parties-in-interest.

7. LAPP represents the interests of foster parents with respect to matters relating to the State of California and DSS'S administration of the AFDC-FC program.

*The California State Care Providers Association*

8. The California State Care Providers Association ("CSCPA") is a California corporation with a principal place of business at 1040 W. 46th Street, Los Angeles, California 90037. CSCPA works with foster and adoptive parents and a variety of caregivers and educators to ensure positive outcomes for adoptive and foster children of all ages.

9. CSCPA is authorized to file this action on behalf of its members, who are and will continue to be affected adversely by the unlawful actions of Defendants, and each of them, alleged herein. Through this Complaint, CSCPA seeks to protect interests that are germane to its purpose and affiliation with member foster parents. Each foster parent that is a member of CSCPA has independent standing to bring an action. Nevertheless, CSCPA asserts the claims alleged in this Complaint without the participation of an individual member of CSCPA. Should it be deemed necessary for a foster parent to participate in this action, CSCPA will seek leave to amend this Complaint to name specific foster parents as parties-in-interest.

10. CSCPA represents the interests of foster parents with respect to matters relating to the State of California and DSS'S administration of the AFDC-FC program.

*The Defendants*

11. John A. Wagner ("Wagner") is the Director of the California Department of Social Services ("DSS"). Wagner is responsible in his official capacity for the administration of the Child

Welfare Act, 42 U.S.C. §§ 670-679b, and the programs related to that Act in California. Further, Wagner is responsible for implementing the policies contained in the approved state plans and assuring DSS'S compliance with state and federal law. Wagner is sued only in his official capacity.

12. Mary Ault ("Ault") is the Deputy Director of the Children and Family Services Division of DSS ("CFS"). Ault is responsible in her official capacity for implementing the policies contained in the approved state plans. Ault is sued only in her official capacity.

## JURISDICTION AND VENUE

13. Plaintiffs bring this civil action under 42 U.S.C. § 1983 and seek a declaratory judgment, pursuant to 28 U.S.C. § 2201, that the basic foster care rates implemented and applied by Defendants, and each of them, and/or Welfare and Institutions Code § 11461 which establishes the rates of payment to foster homes on behalf of foster children, violates the Child Welfare Act and its implementing regulations. Further, Plaintiffs seek provisional and permanent injunctive relief prohibiting Defendants, and each of them, in their official capacities from using the basic foster care rates to establish payment rates. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1343(a)(3).

14. Plaintiffs are informed and believe and on that basis allege that Wagner in his official capacity is a resident of California and works in California.

15. Plaintiffs are informed and believe and on that basis allege that Ault in her official capacity is a resident of California and works in California.

16. Plaintiffs are informed and believe and on that basis allege that venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims in this Complaint occurred in this district.

## INTRADISTRICT ASSIGNMENT

17. This Complaint arises in the County of San Francisco, among other places. Consequently, this action should be assigned to either the San Francisco Division or the Oakland Division. Civil Local Rule 3-2 (c)-(d).

## GENERAL ALLEGATIONS

18. In each and every subdivision of the "General Allegations," Plaintiffs incorporate Paragraphs 1-17 as though fully set forth herein.

### *The Child Welfare Act*

19. The Child Welfare Act is Title IV-E of the Social Security Act, 42 U.S.C. §§ 670-679b. Congress enacted the Child Welfare Act in 1980 to address the need for providing an appropriate setting for children who are dependents or wards of the state: "foster children." 42 U.S.C. § 672a.

20. The Child Welfare Act establishes a cooperative federal-state program that assists states in meeting the costs of providing foster care to foster children. Pursuant to this cooperative program, the federal government and state and county governments share the cost of providing funds for licensed third parties (*e.g.*, foster parents) who care for these children.

21. The Child Welfare Act and related federal regulations require states receiving federal aid to provide foster care and transitional independent living programs for a child when a court has determined that it is necessary under applicable law that the child be removed from his or her home and placed in out-of-home care. Part of the foster care program includes foster care maintenance payments provided to licensed foster parents, such as those represented by Plaintiffs in this case.

22. To become eligible for federal funding, a state must submit a plan for financial assistance to the Secretary of the U.S. Department of Health and Human Services ("DHHS") for approval. As a prerequisite for DHHS approval, the submitting state must agree, among other conditions, to administer its foster care program pursuant to the Child Welfare Act, related regulations, and policies promulgated by the Secretary of DHHS. 42 U.S.C. § 671(a); 45 C.F.R. §§ 233.110, 1355.21, 1356.20, 1356.21.

23. Pursuant to the Child Welfare Act, a state must designate a state agency to administer and/or supervise the administration of the approved state plan. 42 U.S.C. § 671(a)(2).

24. Pursuant to the Child Welfare Act, a state must also amend its approved plan by appropriate submission to the Secretary of DHHS whenever, among other instances, necessary to

comply with alterations to the Child Welfare Act and/or federal regulations or policies. 45 C.F.R. § 1356.20(e)(1).

25. Most centrally for this action, the Child Welfare Act requires that states participating in the cooperative program provide "foster care maintenance payments" to licensed foster parents such as those represented by the plaintiffs. 42 U.S.C. §§ 671(a)(2), 672(b)(1); 675(4); 45 C.F.R. § 1356.21(a).

26. According the Child Welfare Act, the "term 'foster care maintenance payments' means payments to cover the cost of (and the cost of providing) food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance with respect to a child, and reasonable travel to the child's home for visitation." 42 U.S.C. § 675(4)(A).

27. The Child Welfare Act requires that states participating in the cooperative program have a plan which provides for a "case review system." 42 U.S.C. § 671(a)(16).

28. "The term 'case review system' means a procedure for assuring that each child has a case plan designed to achieve placement in a safe setting that is the least restrictive (most family like) and most appropriate setting available and in close proximity to the parents' home, consistent with the best interest and special needs of the child." 42 U.S.C. § 675(5)(A).

*California's Basic Foster Care Rates*

29. For all periods relevant to this Complaint, California has agreed to administer its foster care program pursuant to the Child Welfare Act, related regulations, and policies promulgated by the Secretary of DHHS. DSS has been the state agency that received the federal funding intended to cover a portion of the foster care maintenance payment made to foster parents on behalf of eligible children. Cal. Wel. & Inst. Code §§ 11229, 11460(a), 11461.

30. For all periods of time relevant to this Complaint, DSS, through CFS, has established payment levels for foster care providers. The payments established by the basic foster care rates are paid by the county that placed the child with the foster care provider. Each foster care provider who participates in California's foster care program executes an agreement with the county placement agency to provide and be compensated for the care and supervision of the foster child.

31. The basic foster care rate levels for California were established by state statute in 1991 and are codified at California Welfare and Institutions Code § 11461.

### *The Basic Foster Care Rates Do Not Comply with the Federal Child Welfare Act*

32. The current monthly rates paid to foster care families per child are $425 for children ages 0-4, $462 for children ages 5-8, $494 for children ages 9-11, $546 for children ages 12-14, and $597 for children ages 15-20. Cal. Wel. & Inst. Code § 11461. The Legislature has passed a five percent rate increase that is to take effect January 1, 2008. After this rate increase, the monthly rates paid to foster care families per child will still only be $446 for children ages 0-4, $485 for children ages 5-8, $519 for children ages 9-11, $573 for children ages 12-14, and $627 for children ages 15-20.

33. Welfare and Institutions Code § 11461 requires that "beginning with the 1991-92 fiscal year, the schedule of basic rates . . . shall be adjusted by the percentage change in the California Necessities Index . . . subject to the availability of funds."

34. Between July 2001 and 2007, California did not adjust the schedule of basic rates, even though the California Necessities Index (CNI) has increased by 24.9 percent in that time. Even the five percent increase that is part of the new state budget will not cover the rising cost of living according to the CNI.

35. Thus California has failed to cover the rising cost of and cost of providing the foster child's food, clothing, shelter, daily supervision, school supplies, incidentals, liability insurance with respect to the foster child, and reasonable travel to the child's home for visitation as required by 42 U.S.C. § 675(4)(A).

36. The rates now in effect do not cover the actual cost of (and cost of providing) food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance with respect to a child, and reasonable travel to the child's home for visitation as required § 675(4)(A). Thus these rates violate the Child Welfare Act.

37. Furthermore, the provision of state law stating that rates be increased "subject to the availability of funds" on its face does not ensure the ability of the basic rate to cover the cost of or

the cost of providing the foster child's food, clothing, shelter, daily supervision, school supplies, and incidentals, liability insurance with respect to the foster child, and reasonable travel to the child's home for visitation as required by 42 U.S.C. § 675(4)(A).

### The Rates That California Should Be Paying But Does Not

38. California currently pays less to care for a foster child than a kennel charges to board and feed a dog. Kennels charge an average of $620 per month to care for a dog. In sad contrast, California's average reimbursement for basic board and care for a foster child is $505 per month.

39. Had basic foster care rates been increased each year for the past six years according to the 24.9 percent CNI increase between 2001-02 and 2007-08, the current monthly rates paid to foster care families per child would be $531 for children age 0-4, $577 for children age 5-8, $617 for children age 9-11, $682 for children age 12-14, and $745 for children age 15-20. Thus, assuming, *arguendo*, that the foster care rates in the 2001-02 fiscal year actually covered the cost of the foster child's food, clothing, shelter, daily supervision, school supplies, and incidentals, liability insurance with respect to the foster child, and reasonable travel to the child's home for visitation as required by 42 U.S.C. § 675(4)(A), current actual rates need to be increased by more than $100 per month for every age group of children in order to properly account for just the ***recent*** increases in the cost of living.

40. The U.S. Department of Agriculture estimates that the average family earning between $43,400 and $73,100 per year spends approximately $11,551.67 per year, per child. This amounts to $962.64 per month per child. This is a nationwide average. Typically, costs in many California locations far exceed national averages due to higher housing costs, energy costs and other basic living and dependency related costs.

41. According to the California Budget Project report, *Making Ends Meet, How Much Does It Cost to Raise a Family in California*, November 2005, the minimal cost to raise a child in California's Bay Area counties (per child and based on a family of five – one working parent, one stay-at-home parent, two children, and one foster child) is at least $709. This exceeds the average basic foster care maintenance rate by over 33 percent. The monthly cost of food for a child in California is at least $205.60. The monthly cost of housing and utilities ("shelter") for a child in

COMPLAINT FOR DECLARATORY JUDMENT AND PERMANENT INJUNCTIVE RELIEF

California is at least $334.20. The monthly cost of transportation for a child in California is $66.60. The monthly miscellaneous costs to raise a child in California are at least $103.00. According to the *2005 Child Care Portfolio* by the California Child Care Resource and Referral Network, for a family who is not able to have one person stay at home to watch the children, the average cost of "supervision" for a preschooler in a licensed child care center is $623.75 per month.

42. A new report by the University of Maryland School of Social Work, Children's Rights, and the National Foster Parent Association entitled "Hitting the MARC: Establishing Foster Care Minimum Adequate Rates for Children" presents a calculation of the real expenses of caring for a child in foster care based on expenditures that are allowable under the Title IV-E Foster Care Maintenance Program of the Social Security Act. The costs were calculated by analyzing consumer expenditure data reflecting the costs of caring for a child; identifying and accounting for additional costs particular to children in foster care; and applying a geographic cost-of-living adjustment, thereby developing specific rates for each of the 50 states and the District of Columbia. The study did not include travel and child care expenses, which are to be reimbursed by the states, because of the case-to-case variability of these costs. Even excluding travel and child care expenses, California falls seriously short.

| California Data from University of Maryland's "Hitting the MARC" ||||
|---|---|---|---|
| Child's Age | Current CA rates | Minimum Adequate CA Rate | Percentage increase needed |
| 2 | $ 425 | $ 685 | 61% |
| 9 | $ 494 | $ 785 | 59% |
| 16 | $ 597 | $ 861 | 44% |

43. The percentage of actual costs that foster parents recoup through the basic foster care rates has diminished substantially over time due primarily to (1) an increase in the actual costs associated with factors required to be compensable under the Child Welfare Act and (2) "new" costs that foster parents incur to satisfy added state and county requirements, such as the

requirement added in 2003 that foster parents assure their foster child is afforded the opportunity to participate in extracurricular, enrichment, and social activities. (*See* Welfare and Institutions Code § 362.05.)

44. The rates paid to licensed foster parents in California are less than the rates paid to foster parents in Texas, where the cost of living is significantly lower. Even before Texas' recent four and one-third percent rise in rates, the lowest-paid foster parent in Texas received a higher foster care rate than a licensed foster parent in California providing care to a child under the age of fifteen.

45. As of January 1, 2006, California had 77,723 children in foster care. Of these, only 47 percent have been placed in the most preferred types of placements – 37 percent with relatives and only 10 percent with licensed foster families; only 46.8% have been placed in foster homes with all of their siblings, and only 2.5% have attained "pre-adopt" status.

46. When kinship placement is not available, licensed foster family and adoptive homes are the next best and most preferred placements for children. Certified foster family agencies and group homes are intended to be the placements of last resort as both are intended for children and youth who need a higher level of therapeutic service. These placements are significantly more costly than foster family homes. California foster children and youth are unnecessarily placed in these higher-level settings due to a serious shortage of licensed foster family homes, in direct violation of the federal requirement to place children in the most family-like setting possible. 42 U.S.C. § 675(5).

47. Numerous existing licensed foster parents no longer open their homes to foster children due, in substantial part, to the increasing costs that are not covered by payments established by the basic foster care rates. The persistently decreasing percentage of actual costs of care covered by the basic foster care rates jeopardizes the ability of foster parents to provide care to foster children and contravenes the requirement of 42 U.S.C. § 675(5) that foster children be in the "least restrictive" (most family-like) placement possible. Current foster care rates in California are set too low to generate a sufficient supply of loving family foster care parents able to give an acceptable number of foster children a stable home life. The low rates preclude many thousands of

children from placement consistent with the requirements of law. Such preclusion unlawfully prevents such children from contact with siblings, continuation in existing schools, opportunities for adoption, and other consequences consistent with stated Congressional intent.

48. Counties are impeded from recruiting and retaining foster family homes due to the low basic foster care rates. Inadequate board and care rates are a significant barrier in the Bay Area and other high cost regions of the state. California counties have experienced an average decline of 30 percent in licensed foster family homes. Sacramento, Santa Clara, San Mateo, and Sonoma Counties report losses as high as 45 to 50 percent. San Bernardino County reports a decline of 61 percent.

49. Congressional intent, expert opinion, and outcome measures are consistent with providing foster children with personal parents rather than institutional settings where staff members work in shifts and frequently change jobs. Children placed in group homes are often unable to form a consistent relationship with a caregiver and are at serious risk for developmental problems and long-term personality disorders. A larger supply of foster family homes would lead to less foster care drift (*i.e.*, multiple placements) and a greater opportunity for foster children to be placed in the same foster home as their biological siblings. In addition, the vast majority of non-kin adoptions come from family foster care providers who bond with their foster children. Outcome measures after emancipation in terms of mental health, high school graduation, college education, poverty (including unwed pregnancy and Temporary Aid for Needy Families ("TANF") welfare claims), homelessness, and arrest incidence are all substantially improved with adoptions and family foster care placements as compared to group homes. Such negative results impose substantial costs on federal and state public accounts, making the regulations that send foster children to group home settings instead of family placements both arbitrary and capricious without any cognizable justification.

50. A $100 increase in the basic monthly foster care payment would reduce the probability that a child would be placed in a group home by approximately 6.7 percent, with more children instead going to non-relative foster homes. The 6.7 percent decrease would mean that approximately 451 children would be moved from group homes to foster family homes and would

further the goal of 42 U.S.C. § 675(5) that foster children be placed in the most family-like setting possible. This shift would also save the state approximately $1.4 million per month, as foster home rates are significantly lower than group home rates.

51. Fifty-one and one-half percent of children adopted from the foster care system in California are adopted by their foster parent(s). An increase in the basic foster care rate would stimulate adoptions, improving the State's chance of collecting federal adoptive incentive monies. Such adoptions are inhibited where family foster supply is low because more children are placed in group home/institutional settings.

52. There is no administrative process or remedy available for Plaintiffs to challenge the propriety of the basic foster care rates.

## COUNT I

*Declaratory Relief*

53. Plaintiffs incorporate Paragraphs 1-52 as though fully set forth herein.

54. There is currently an actual controversy between Plaintiffs and Defendants, and each of them, that is ripe for adjudication as to whether the basic foster care rates fail to comply with federal law in setting rates for foster care maintenance payments.

55. The failure of Defendants, and each of them, to comply with the Child Welfare Act's mandated factors in setting rates for foster care maintenance payments deprives the Plaintiffs and the foster parents they represent of their federal rights, privileges and immunities under color of state law in violation of 42 U.S.C. § 1983.

## COUNT II

*Permanent Injunctive Relief*

56. Plaintiffs incorporate Paragraphs 1-55 as though fully set forth herein.

57. Plaintiffs are informed and believe and on that basis allege that Defendants, and each of them, will continue to provide foster care maintenance payments that fail to comply with the Child Welfare Act.

58. Plaintiffs have suffered injury that is irreparable in nature as the proximate result of the failure of Defendants, and each of them, to establish lawful foster care maintenance payments

in a manner that complies with the Child Welfare Act. Plaintiffs are without adequate remedy at law.

**PRAYER FOR RELIEF**

Wherefore, Plaintiffs request relief as follows:

1. That the Court declare that Defendants, and each of them, violated, continue to violate, and/or will violate the Child Welfare Act by failing to pay amounts sufficient to cover the costs of (and the costs of providing) food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance with respect to a child, and reasonable travel to the child's home for visitation that are incurred by licensed foster parents in accordance with federal and state laws and regulations;

2. That the Court declare that Defendants' former, current, and continued use of the basic foster care rates violated, continues to violate, and/or will violate the Plaintiffs' federal rights, privileges and immunities under color of state law;

3. That Defendants, and each of them, be temporarily and permanently enjoined from currently and continually using the basic foster care rates to establish foster care maintenance payments to foster family homes;

4. That Defendants, and each of them, prepare and implement a payment system that complies with the Child Welfare Act by paying licensed foster parents the costs of (and the costs of providing) food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance with respect to a child, and reasonable travel to the child's home for visitation in an amount subject to proof and by adjusting that amount each year by the percentage change in the California Necessities Index;

5. That Defendants be required to adjust payments made between the time that (1) the Court grants provisional relief in favor of Plaintiffs and (2) Defendants, and each of them, prepare and implement a payment system that complies with the Child Welfare Act;

6. That Plaintiffs be awarded the full costs of this action and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988; and

7. That this Court award Plaintiffs such other relief as is warranted by the facts and the law as is just under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a jury trial for all issues that are so triable.

Dated: October 3, 2007

Respectfully submitted,

**MORRISON & FOERSTER LLP**

By: _____
Kimberly N. Van Voorhis
Marc David Peters, Ph.D.
755 Page Mill Road
Palo Alto, California 94304-1018
Tel: (650) 813-5600
Fax: (650) 494-0792

Steve Keane
**Morrison & Foerster LLP**
12531 High Bluff Drive, Suite 100
San Diego, California 92130
Phone: (858) 720-5100
Fax: (858) 720-5125

Robert C. Fellmeth
Edward Howard
Christina McClurg Riehl
Elisa D'Angelo Weichel
**Children's Advocacy Institute**
**University of San Diego School of Law**
5998 Alcala Park
San Diego, CA 92110
Telephone: (619) 260-4806
Facsimile: (619) 260-4753

ATTORNEYS FOR PLAINTIFFS
California State Foster Parent Association,
California State Care Providers Association, and
Legal Advocates for Permanent Parenting

pa-1198193