# SUBCHAPTER G—THE ADMINISTRATION ON CHILDREN, YOUTH AND FAMILIES, FOSTER CARE MAINTENANCE PAYMENTS, ADOPTION ASSISTANCE, AND CHILD AND FAMILY SERVICES

## PART 1355—GENERAL

Sec.
1355.10  Scope.
1355.20  Definitions.
1355.21  State plan requirements for titles IV-E and IV-B.
1355.25  Principles of child and family services.
1355.30  Other applicable regulations.
1355.31  Elements of the child and family services review system.
1355.32  Timetable for the reviews.
1355.33  Procedures for the review.
1355.34  Criteria for determining substantial conformity.
1355.35  Program improvement plans.
1355.36  Withholding Federal funds due to failure to achieve substantial conformity or failure to successfully complete a program improvement plan.
1355.37  Opportunity for Public Inspection of Review Reports and Materials.
1355.38  Enforcement of section 471(a)(18) of the Act regarding the removal of barriers to interethnic adoption.
1355.39  Administrative and judicial review.
1355.40  Foster care and adoption data collection.
1355.50  Purpose of this part.
1355.52  Funding authority for statewide automated child welfare information systems (SACWIS).
1355.53  Conditions for approval of funding.
1355.54  Submittal of advance planning documents.
1355.55  Review and assessment of the system developed with enhanced funds.
1355.56  Failure to meet the conditions of the approved APD.
1355.57  Cost allocation.
APPENDIX A TO PART 1355—FOSTER CARE DATA ELEMENTS.
APPENDIX B TO PART 1355—ADOPTION DATA ELEMENTS.
APPENDIX C TO PART 1355—ELECTRONIC DATA TRANSMISSION FORMAT.
APPENDIX D TO PART 1355—FOSTER CARE AND ADOPTION RECORD LAYOUTS.
APPENDIX E TO PART 1355—DATA STANDARDS.
APPENDIX F TO PART 1355—ALLOTMENT OF FUNDS WITH 427 INCENTIVE FUNDS TITLE IV-B CHILD WELFARE SERVICES FISCAL YEAR 1993.

AUTHORITY: 42 U.S.C. 620 et seq., 42 U.S.C. 670 et seq.; 42 U.S.C. 1302.

## § 1355.10  Scope.

Unless otherwise specified, part 1355 applies to States and Indian Tribes and contains general requirements for Federal financial participation under titles IV-B and IV-E of the Social Security Act.

[61 FR 58653, Nov. 18, 1996]

## § 1355.20  Definitions.

(a) Unless otherwise specified, the following terms as they appear in 45 CFR parts 1355, 1356 and 1357 of this title are defined as follows—

*Act* means the Social Security Act, as amended.

*ACYF* means the Administration on Children, Youth and Families, Administration for Children and Families (ACF), U. S. Department of Health and Human Services.

*Adoption* means the method provided by State law which establishes the legal relationship of parent and child between persons who are not so related by birth, with the same mutual rights and obligations that exist between children and their birth parents. This relationship can only be termed "adoption" after the legal process is complete.

*Child abuse and neglect* means the definition contained in 42 U.S.C. 5106(g)(2).

*Child care institution* means a private child care institution, or a public child care institution which accommodates no more than twenty-five children, and is licensed by the State in which it is situated or has been approved by the agency of such State or tribal licensing authority (with respect to child care institutions on or near Indian Reservations) responsible for licensing or approval of institutions of this type as meeting the standards established for such licensing. This definition must not include detention facilities, forestry camps, training schools, or any other facility operated primarily for the detention of children who are determined to be delinquent.

**EXHIBIT A**

*Commissioner* means the Commissioner on Children, Youth and Families, Administration for Children and Families, U.S. Department of Health and Human Services.

*Date a child is considered to have entered foster care* means the earlier of: The date of the first judicial finding that the child has been subjected to child abuse or neglect; or, the date that is 60 calendar days after the date on which the child is removed from the home pursuant to § 1356.21(k). A State may use a date earlier than that required in this paragraph, such as the date the child is physically removed from the home. This definition determines the date used in calculating all time period requirements for the periodic reviews, permanency hearings, and termination of parental rights provision in section 475(5) of the Act and for providing time-limited reunification services described at section 431(a)(7) of the Act. The definition has no relationship to establishing initial title IV–E eligibility.

*Department* means the United States Department of Health and Human Services.

*Detention facility* in the context of the definition of child care institution in section 472(c)(2) of the Act means a physically restricting facility for the care of children who require secure custody pending court adjudication, court disposition, execution of a court order or after commitment.

*Entity*, as used in § 1355.38, means any organization or agency (*e.g.*, a private child placing agency) that is separate and independent of the State agency; performs title IV–E functions pursuant to a contract or subcontract with the State agency; and, receives title IV–E funds. A State court is not an "entity" for the purposes of § 1355.38 except if an administrative arm of the State court carries out title IV–E administrative functions pursuant to a contract with the State agency.

*Foster care* means 24-hour substitute care for children placed away from their parents or guardians and for whom the State agency has placement and care responsibility. This includes, but is not limited to, placements in foster family homes, foster homes of relatives, group homes, emergency shelters, residential facilities, child care institutions, and preadoptive homes. A child is in foster care in accordance with this definition regardless of whether the foster care facility is licensed and payments are made by the State or local agency for the care of the child, whether adoption subsidy payments are being made prior to the finalization of an adoption, or whether there is Federal matching of any payments that are made.

*Foster care maintenance payments* are payments made on behalf of a child eligible for title IV–E foster care to cover the cost of (and the cost of providing) food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance with respect to a child, and reasonable travel for a child's visitation with family, or other caretakers. Local travel associated with providing the items listed above is also an allowable expense. In the case of child care institutions, such term must include the reasonable costs of administration and operation of such institutions as are necessarily required to provide the items described in the preceding sentences. "Daily supervision" for which foster care maintenance payments may be made includes:

(1) *Foster family care*—licensed child care, when work responsibilities preclude foster parents from being at home when the child for whom they have care and responsibility in foster care is not in school, licensed child care when the foster parent is required to participate, without the child, in activities associated with parenting a child in foster care that are beyond the scope of ordinary parental duties, such as attendance at administrative or judicial reviews, case conferences, or foster parent training. Payments to cover these costs may be: included in the basic foster care maintenance payment; a separate payment to the foster parent, or a separate payment to the child care provider; and

(2) *Child care institutions*—routine day-to-day direction and arrangements to ensure the well-being and safety of the child.

*Foster family home* means, for the purpose of title IV–E eligibility, the home of an individual or family licensed or

**EXHIBIT A**

approved as meeting the standards established by the State licensing or approval authority(ies) (or with respect to foster family homes on or near Indian reservations, by the tribal licensing or approval authority(ies)), that provides 24-hour out-of-home care for children. The term may include group homes, agency-operated boarding homes or other facilities licensed or approved for the purpose of providing foster care by the State agency responsible for approval or licensing of such facilities. Foster family homes that are approved must be held to the same standards as foster family homes that are licensed. Anything less than full licensure or approval is insufficient for meeting title IV-E eligibility requirements. States may, however, claim title IV-E reimbursement during the period of time between the date a prospective foster family home satisfies all requirements for licensure or approval and the date the actual license is issued, not to exceed 60 days.

*Full review* means the joint Federal and State review of all federally-assisted child and family services programs in the States, including family preservation and support services, child protective services, foster care, adoption, and independent living services, for the purpose of determining the State's substantial conformity with the State plan requirements of titles IV-B and IV-E as listed in § 1355.34 of this part. A full review consists of two phases, the statewide assessment and a subsequent on-site review, as described in § 1355.33 of this part.

*Legal guardianship* means a judicially-created relationship between child and caretaker which is intended to be permanent and self-sustaining as evidenced by the transfer to the caretaker of the following parental rights with respect to the child: protection, education, care and control of the person, custody of the person, and decision-making. The term *legal guardian* means the caretaker in such a relationship.

*National Child Abuse and Neglect Data System (NCANDS)* means the voluntary national data collection and analysis system established by the Administration for Children and Families in response to a requirement in the Child

Abuse Prevention and Treatment Act (Pub. L. 93–247), as amended.

*Partial review* means:

(1) For the purpose of the child and family services review, the joint Federal and State review of one or more federally-assisted child and family services program(s) in the States, including family preservation and support services, child protective services, foster care, adoption, and independent living services. A partial review may consist of any of the components of the full review, as mutually agreed upon by the State and the Administration for Children and Families as being sufficient to determine substantial conformity of the reviewed components with the State plan requirements of titles IV-B and IV-E as listed in § 1355.34 of this part; and

(2) For the purpose of title IV-B and title IV-E State plan compliance issues that are outside the prescribed child and family services review format, *e.g.,* compliance with AFCARS requirements, a review of State laws, policies, regulations, or other information appropriate to the nature of the concern, to determine State plan compliance.

*Permanency review* means:

(1) The hearing required by section 475(5)(C) of the Act to determine the permanency plan for a child in foster care. Within this context, the court (including a Tribal court) or administrative body determines whether and, if applicable, when the child will be:

(i) Returned to the parent;

(ii) Placed for adoption, with the State filing a petition for termination of parental rights;

(iii) Referred for legal guardianship;

(iv) Placed permanently with a fit and willing relative; or

(v) Placed in another planned permanent living arrangement, but only in cases where the State agency has documented to the State court a compelling reason for determining that it would not be in the best interests of the child to follow one of the four specified options above.

(2) The permanency hearing must be held no later than 12 months after the date the child is considered to have entered foster care in accordance with the definition at § 1355.20 of this part or

265

**EXHIBIT A**

within 30 days of a judicial determination that reasonable efforts to reunify the child and family are not required. After the initial permanency hearing, subsequent permanency hearings must be held not less frequently than every 12 months during the continuation of foster care. The permanency hearing must be conducted by a family or juvenile court or another court of competent jurisdiction or by an administrative body appointed or approved by the court which is not a part of or under the supervision or direction of the State agency. Paper reviews, *ex parte* hearings, agreed orders, or other actions or hearings which are not open to the participation of the parents of the child, the child (if of appropriate age), and foster parents or preadoptive parents (if any) are not permanency hearings.

*State* means, for title IV–B, the 50 States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, the Virgin Islands, the Commonwealth of the Northern Mariana Islands, and American Samoa. For title IV–E the term "State" means the 50 States, the District of Columbia, the Commonwealth of Puerto Rico, the United States Virgin Islands, Guam, and American Samoa.

*State agency* means the State agency administering or supervising the administration of the title IV–B and title IV–E State plans and the title XX social services block grant program. An exception to this requirement is permitted by section 103(d) of the Adoption Assistance and Child Welfare Act of 1980 (Pub. L. 96–272). Section 103(d) provides that, if on December 1, 1974, the title IV–B program (in a State or local agency) and the social services program under section 402(a)(3) of the Act (the predecessor program to title XX) were administered by separate agencies, that separate administration of the programs could continue at State option.

*Statewide assessment* means the initial phase of a full review of all federally-assisted child and family services programs in the States, including family preservation and support services, child protective services, foster care, adoption, and independent living services as described in § 1355.33(b) of this

part, for the purpose of determining the State's substantial conformity with the State plan requirements of titles IV–B and IV–E as listed in § 1355.34 of this part.

(b) Unless otherwise specified, the definitions contained in section 475 of the Act apply to all programs under titles IV–E and IV–B of the Act.

[48 FR 23114, May 23, 1983, as amended at 57 FR 30429, July 9, 1992; 58 FR 67924, Dec. 22, 1993; 61 FR 58653, Nov. 18, 1996; 65 FR 4076, Jan. 25, 2000; 66 FR 58675, Nov. 23, 2001]

## § 1355.21  State plan requirements for titles IV-E and IV-B.

(a) The State plans for titles IV–E and IV–B must provide for safeguards on the use and disclosure of information which meet the requirements contained in section 471(a)(8) of the Act.

(b) The State plans for titles IV–E and IV–B must provide for compliance with the Department's regulations listed in 45 CFR 1355.30.

(c) The State agency and the Indian Tribe must make available for public review and inspection the Child and Family Services Plan (CFSP) and the Annual Progress and Services Reports. (See 45 CFR 1357.15 and 1357.16.) The State agency also must make available for public review and inspection the title IV–E State Plan.

[48 FR 23114, May 23, 1983, as amended at 61 FR 58654, Nov. 18, 1996]

## § 1355.25  Principles of child and family services.

The following principles, most often identified by practitioners and others as helping to assure effective services for children, youth, and families, should guide the States and Indian Tribes in developing, operating, and improving the continuum of child and family services.

(a) The safety and well-being of children and of all family members is paramount. When safety can be assured, strengthening and preserving families is seen as the best way to promote the healthy development of children. One important way to keep children safe is to stop violence in the family including violence against their mothers.

(b) Services are focused on the family as a whole; service providers work with families as partners in identifying and

**EXHIBIT A**

meeting individual and family needs; family strengths are identified, enhanced, respected, and mobilized to help families solve the problems which compromise their functioning and well-being.

(c) Services promote the healthy development of children and youth, promote permanency for all children and help prepare youth emancipating from the foster care system for self-sufficiency and independent living.

(d) Services may focus on prevention, protection, or other short or long-term interventions to meet the needs of the family and the best interests and need of the individual(s) who may be placed in out-of-home care.

(e) Services are timely, flexible, coordinated, and accessible to families and individuals, principally delivered in the home or the community, and are delivered in a manner that is respectful of and builds on the strengths of the community and cultural groups.

(f) Services are organized as a continuum, designed to achieve measurable outcomes, and are linked to a wide variety of supports and services which can be crucial to meeting families' and children's needs, for example, housing, substance abuse treatment, mental health, health, education, job training, child care, and informal support networks.

(g) Most child and family services are community-based, involve community organizations, parents and residents in their design and delivery, and are accountable to the community and the client's needs.

(h) Services are intensive enough and of sufficient duration to keep children safe and meet family needs. The actual level of intensity and length of time needed to ensure safety and assist the family may vary greatly between preventive (family support) and crisis intervention services (family preservation), based on the changing needs of children and families at various times in their lives. A family or an individual does not need to be in crisis in order to receive services.

[61 FR 58654, Nov. 18, 1996]

**§ 1355.30  Other applicable regulations.**

Except as specified, the following regulations are applicable to all pro-

grams funded under titles IV-B and IV-E of the Act.

(a) 45 CFR Part 16—Procedures of the Departmental Grant Appeals Board.

(b) 45 CFR Part 30—Claims Collection.

(c) 45 CFR Part 74—Administration of Grants (Applicable only to title IV-E foster care and adoption assistance, except that: (1) Section 74.23 Cost Sharing or Matching, and (2) section 74.52 Financial Reporting Requirements, will not apply.)

(d) 45 CFR Part 76—Governmentwide Debarment and Suspension (Nonprocurement) and Governmentwide Requirements for Drug-Free Workplace (Grants).

(e) 45 CFR Part 80—Nondiscrimination Under Programs Receiving Federal Assistance Through the Department of Health and Human Services Effectuation of Title VI of the Civil Rights Act of 1964.

(f) 45 CFR Part 81—Practice and Procedure for Hearings Under Part 80 of This Title.

(g) 45 CFR Part 84—Nondiscrimination on the Basis of Handicap in Programs and Activities Receiving Federal Financial Assistance.

(h) 45 CFR Part 91—Nondiscrimination on the Basis of Age in HHS Programs or Activities Receiving Federal Financial Assistance.

(i) 45 CFR Part 92—Uniform Administrative Requirements for Grants and Cooperative Agreements to State and Local Governments (Applicable only to the title IV-B programs and the Independent Living Program under Section 477 of the Act).

(j) 45 CFR Part 93—New Restrictions on Lobbying.

(k) 45 CFR Part 95—General Administration—Grant Programs (Public Assistance and Medical Assistance). (Applicable to title IV-B and title IV-E except that, notwithstanding 45 CFR 95.1a), Subpart A, Time Limits for States to File Claims, does not apply to title IV-B (subparts 1 and 2) and the Independent Living Program.)

(l) 45 CFR Part 97—Consolidation of Grants to the Insular Areas. (Applicable only to the title IV-B programs).

(m) 45 CFR Part 100—Intergovernmental Review of Department of Health and Human Services Programs

and Activities. (Only one section is applicable: 45 CFR 100.12, How may a State simplify, consolidate, or substitute federally required State plans?).

(n) 45 CFR Part 201—Grants to States for Public Assistance Programs. Only the following sections are applicable:

(1) §201.5—Grants. (Applicable to title IV-E foster care and adoption assistance only.)

(2) §201.6—Withholding of payment; reduction of Federal financial participation in the costs of social services and training. (Applicable only to an unapprovable change in an approved State plan, or the failure of the State to change its approved plan to conform to a new Federal requirement for approval of State plans.)

(3) §201.15—Deferral of claims for Federal financial participation. (Applicable only to title IV-E foster care and adoption assistance.)

(4) §201.66—Repayment of Federal funds by installments. (Applicable only to title IV-E foster care and adoption assistance.)

(o) 45 CFR Part 204.1—Submittal of State Plans for Governor's Review.

(p) 45 CFR Part 205—General Administration—Public Assistance Programs. Only the following sections are applicable:

(1) §205.5—Plan amendments.

(2) §205.10—Hearings.

(3) §205.50—Safeguarding information for the financial assistance programs.

(4) §205.100—Single State agency.

[61 FR 58654, Nov. 18, 1996, as amended at 66 FR 58675, Nov. 23, 2001]

### § 1355.31 Elements of the child and family services review system.

*Scope.* Sections 1355.32 through 1355.37 of this part apply to reviews of child and family services programs administered by States under subparts 1 and 2 of title IV-B of the Act, and reviews of foster care and adoption assistance programs administered by States under title IV-E of the Act.

[65 FR 4076, Jan. 25, 2000]

### § 1355.32 Timetable for the reviews.

(a) *Initial reviews.* Each State must complete an initial full review as described in §1355.33 of this part during the four-year period after the final rule becomes effective.

(b) *Reviews following the initial review.* (1) A State found to be operating in substantial conformity during an initial or subsequent review, as defined in §1355.34 of this part, must:

(i) Complete a full review every five years; and

(ii) Submit a completed statewide assessment to ACF three years after the on-site review. The statewide assessment will be reviewed jointly by the State and the Administration for Children and Families to determine the State's continuing substantial conformity with the State plan requirements subject to review. No formal approval of this interim statewide assessment by ACF is required.

(2) A State program found not to be operating in substantial conformity during an initial or subsequent review will:

(i) Be required to develop and implement a program improvement plan, as defined in §1355.35 of this part; and

(ii) Begin a full review two years after approval of the program improvement plan.

(c) *Reinstatement of reviews based on information that a State is not in substantial conformity.* (1) ACF may require a full or a partial review at any time, based on any information, regardless of the source, that indicates the State may no longer be operating in substantial conformity.

(2) Prior to reinstating a full or partial review, ACF will conduct an inquiry and require the State to submit additional data whenever ACF receives information that the State may not be in substantial conformity.

(3) If the additional information and inquiry indicates to ACF's satisfaction that the State is operating in substantial conformity, ACF will not proceed with any further review of the issue addressed by the inquiry. This inquiry will not substitute for the full reviews conducted by ACF under §1355.32(b).

(4) ACF may proceed with a full or partial review if the State does not provide the additional information as requested, or the additional information confirms that the State may not be operating in substantial conformity.

**EXHIBIT A**

(d) *Partial reviews based on noncompliance with State plan requirements that are outside the scope of a child and family services review.* When ACF becomes aware of a title IV-B or title IV-E compliance issue that is outside the scope of the child and family services review process, we will:

(1) Conduct an inquiry and require the State to submit additional data.

(2) If the additional information and inquiry indicates to ACF's satisfaction that the State is in compliance, we will not proceed with any further review of the issue addressed by the inquiry.

(3) ACF will institute a partial review, appropriate to the nature of the concern, if the State does not provide the additional information as requested, or the additional information confirms that the State may not be in compliance.

(4) If the partial review determines that the State is not in compliance with the applicable State plan requirement, the State must enter into a program improvement plan designed to bring the State into compliance, if the provisions for such a plan are applicable. The terms, action steps and timeframes of the program improvement plan will be developed on a case-by-case basis by ACF and the State. The program improvement plan must take into consideration the extent of noncompliance and the impact of the noncompliance on the safety, permanency or well-being of children and families served through the State's title IV-B or IV-E allocation. If the State remains out of compliance, the State will be subject to a penalty related to the extent of the noncompliance.

(5) Review of AFCARS compliance will take place in accordance with 45 CFR 1355.40.

[65 FR 4076, Jan. 25, 2000, as amended at 66 FR 58675, Nov. 23, 2001]

### § 1355.33  Procedures for the review.

(a) The full child and family services reviews will:

(1) Consist of a two-phase process that includes a statewide assessment and an on-site review; and

(2) Be conducted by a team of Federal and State reviewers that includes:

(i) Staff of the State child and family services agency, including the State and local offices that represent the service areas that are the focus of any particular review;

(ii) Representatives selected by the State, in collaboration with the ACF Regional Office, from those with whom the State was required to consult in developing its CFSP, as described and required in 45 CFR part 1357.15(l);

(iii) Federal staff of HHS; and

(iv) Other individuals, as deemed appropriate and agreed upon by the State and ACF.

(b) *Statewide assessment.* The first phase of the full review will be a statewide assessment conducted by the internal and external State members of the review team. The statewide assessment must:

(1) Address each systemic factor under review, including the statewide information system; case review system; quality assurance system; staff training; service array; agency responsiveness to the community; and foster and adoptive parent licensing, recruitment and retention;

(2) Assess the outcome areas of safety, permanence, and well-being of children and families served by the State agency using data from AFCARS and NCANDS. For the initial review, ACF may approve another data source to substitute for AFCARS, and in all reviews, ACF may approve another data source to substitute for NCANDS. The State must also analyze and explain its performance in meeting the national standards for the statewide data indicators;

(3) Assess the characteristics of the State agency that have the most significant impact on the agency's capacity to deliver services to children and families that will lead to improved outcomes;

(4) Assess the strengths and areas of the State's child and family services programs that require further examination through an on-site review;

(5) Include a listing of all the persons external to the State agency who participated in the preparation of the statewide assessment pursuant to §§ 1355.33(a)(2)(ii) and (iv); and

(6) Be completed and submitted to ACF within 4 months of the date that ACF transmits the information for the statewide assessment to the State.

(c) *On-site review.* The second phase of the full review will be an on-site review.

(1) The on-site review will cover the State's programs under titles IV-B and IV-E of the Act, including in-home services and foster care. It will be jointly planned by the State and ACF, and guided by information in the completed statewide assessment that identifies areas in need of improvement or further review.

(2) The on-site review may be concentrated in several specific political subdivisions of the State, as agreed upon by the ACF and the State; however, the State's largest metropolitan subdivision must be one of the locations selected.

(3) ACF has final approval of the selection of specific areas of the State's child and family services continuum described in paragraph (c)(1) of this section and selection of the political subdivisions referenced in paragraph (c)(2) of this section.

(4) Sources of information collected during the on-site review to determine substantial conformity must include, but are not limited to:

(i) Case records on children and families served by the agency;

(ii) Interviews with children and families whose case records have been reviewed and who are, or have been, recipients of services of the agency;

(iii) Interviews with caseworkers, foster parents, and service providers for the cases selected for the on-site review; and

(iv) Interviews with key stakeholders, both internal and external to the agency, which, at a minimum, must include those individuals who participated in the development of the State's CFSP required at 45 CFR 1357.15(l), courts, administrative review bodies, children's guardians ad litem and other individuals or bodies assigned responsibility for representing the best interests of the child.

(5) The sample will range from 30–50 cases. Foster care cases must be drawn randomly from AFCARS, or, for the initial review, from another source approved by ACF and include children who entered foster care during the year under review. In-home cases must be drawn randomly from NCANDS or from another source approved by ACF. To ensure that all program areas are adequately represented, the sample size may be increased.

(6) The sample of 30–50 cases reviewed on-site will be selected from a randomly drawn oversample of no more than 150 foster care and 150 in-home services cases. The oversample must be statistically significant at a 90 percent compliance rate (95 percent in subsequent reviews), with a tolerable sampling error of 5 percent and a confidence coefficient of 95 percent. The additional cases in the oversample not selected for the on-site review will form the sample of cases to be reviewed, if needed, in order to resolve discrepancies between the statewide assessment and the on-site reviews in accordance with paragraph (d)(2) of this section.

(d) *Resolution of discrepancies between the statewide assessment and the findings of the on-site portion of the review.* Discrepancies between the statewide assessment and the findings of the on-site portion of the review will be resolved by either of the following means, at the State's option:

(1) The submission of additional information by the State; or

(2) ACF and the State will review additional cases using only those indicators in which the discrepancy occurred. ACF and the State will determine jointly the number of additional cases to be reviewed, not to exceed 150 foster care cases or 150 in-home services cases to be selected as specified in paragraph (c)(6) of this section.

(e) *Partial review.* A partial child and family services review, when required, will be planned and conducted jointly by ACF and the State agency based on the nature of the concern. A partial review does not substitute for the full reviews as required under § 1355.32(b).

(f) *Notification.* Within 30 calendar days following either a partial child and family services review, full child and family services review, or the resolution of a discrepancy between the statewide assessment and the findings of the on-site portion of the review, ACF will notify the State agency in writing of whether the State is, or is

**EXHIBIT A**

not, operating in substantial conformity.

[65 FR 4077, Jan. 25, 2000, as amended at 66 FR 58675, Nov. 23, 2001]

**§ 1355.34 Criteria for determining substantial conformity.**

(a) *Criteria to be satisfied.* ACF will determine a State's substantial conformity with title IV-B and title IV-E State plan requirements based on the following:

(1) Its ability to meet national standards, set by the Secretary, for statewide data indicators associated with specific outcomes for children and families;

(2) Its ability to meet criteria related to outcomes for children and families; and

(3) Its ability to meet criteria related to the State agency's capacity to deliver services leading to improved outcomes.

(b) *Criteria related to outcomes.* (1) A State's substantial conformity will be determined by its ability to substantially achieve the following child and family service outcomes:

(i) *In the area of child safety:*

(A) Children are, first and foremost, protected from abuse and neglect; and,

(B) Children are safely maintained in their own homes whenever possible and appropriate;

(ii) *In the area of permanency for children:*

(A) Children have permanency and stability in their living situations; and

(B) The continuity of family relationships and connections is preserved for children; and

(iii) *In the area of child and family well-being:*

(A) Families have enhanced capacity to provide for their children's needs;

(B) Children receive appropriate services to meet their educational needs; and

(C) Children receive adequate services to meet their physical and mental health needs.

(2) A State's level of achievement with regard to each outcome reflects the extent to which a State has:

(i) Met the national standard(s) for the statewide data indicator(s) associated with that outcome, if applicable; and,

(ii) Implemented the following CFSP requirements or assurances:

(A) The requirements in 45 CFR 1357.15(p) regarding services designed to assure the safety and protection of children and the preservation and support of families;

(B) The requirements in 45 CFR 1357.15(q) regarding the permanency provisions for children and families in sections 422 and 471 of the Act;

(C) The requirements in section 422(b)(9) of the Act regarding recruitment of potential foster and adoptive families;

(D) The assurances by the State as required by section 422(b)(10)(C)(i) and (ii) of the Act regarding policies and procedures for abandoned children;

(E) The requirements in section 422(b)(11) of the Act regarding the State's compliance with the Indian Child Welfare Act;

(F) The requirements in section 422(b)(12) of the Act regarding a State's plan for effective use of cross-jurisdictional resources to facilitate timely adoptive or permanent placements; and,

(G) The requirements in section 471(a)(15) of the Act regarding reasonable efforts to prevent removals of children from their homes, to make it possible for children in foster care to safely return to their homes, or, when the child is not able to return home, to place the child in accordance with the permanency plan and complete the steps necessary to finalize the permanent placement.

(3) A State will be determined to be in substantial conformity if its performance on:

(i) Each statewide data indicator developed pursuant to paragraph (b)(4) of this section meets the national standard described in paragraph (b)(5) of this section; and,

(ii) Each outcome listed in paragraph (b)(1) of this section is rated as "substantially achieved" in 95 percent of the cases examined during the on-site review (90 percent of the cases for a State's initial review). Information from various sources (case records, interviews) will be examined for each outcome and a determination made as to the degree to which each outcome

271

**EXHIBIT A**

has been achieved for each case reviewed.

(4) The Secretary may, using AFCARS and NCANDS, develop statewide data indicators for each of the specific outcomes described in paragraph (b)(1) of this section for use in determining substantial conformity. The Secretary may add, amend, or suspend any such statewide data indicator(s) when appropriate. To the extent practical and feasible, the statewide data indicators will be consistent with those developed in accordance with section 203 of the Adoption and Safe Families Act of 1997 (Pub. L. 105–89).

(5) The initial national standards for the statewide data indicators described in paragraph (b)(4) of this section will be based on the 75th percentile of all State performance for that indicator, as reported in AFCARS or NCANDS. The Secretary may adjust these national standards if appropriate. The initial national standard will be set using the following data sources:

(i) The 1997 and 1998 submissions to NCANDS (or the most recent and complete 2 years available), for those statewide data indicators associated with the safety outcomes; and,

(ii) The 1998b, 1999c, and 2000a submissions to AFCARS (or the most recent and complete report periods available), for those statewide data indicators associated with the permanency outcomes.

(c) *Criteria related to State agency capacity to deliver services leading to improved outcomes for children and families.* In addition to the criteria related to outcomes contained in paragraph (b) of this section, the State agency must also satisfy criteria related to the delivery of services. Based on information from the statewide assessment and onsite review, the State must meet the following criteria for each systemic factor in paragraphs (c)(2) through (c)(7) of this section to be considered in substantial conformity: All of the State plan requirements associated with the systemic factor must be in place, and no more than one of the state plan requirements fails to function as described in paragraphs (c)(2) through (c)(7) of this section. The systemic factor in paragraph (c)(1) of this

section, is rated on the basis of only one State plan requirement. To be considered in substantial conformity, the State plan requirement associated with statewide information system capacity must be both in place and functioning as described in the requirement. ACF will use a rating scale to make the determinations of substantial conformity. The systemic factors under review are:

(1) *Statewide information system:* The State is operating a statewide information system that, at a minimum, can readily identify the status, demographic characteristics, location, and goals for the placement of every child who is (or within the immediately preceding 12 months, has been) in foster care (section 422(b)(10)(B)(i) of the Act);

(2) *Case review system:* The State has procedures in place that:

(i) Provide, for each child, a written case plan to be developed jointly with the child's parent(s) that includes provisions: for placing the child in the least restrictive, most family-like placement appropriate to his/her needs, and in close proximity to the parent' home where such placement is in the child's best interests; for visits with a child placed out of State at least every 12 months by a caseworker of the agency or of the agency in the State where the child is placed; and for documentation of the steps taken to make and finalize an adoptive or other permanent placement when the child cannot return home (sections 422(b)(10)(B)(ii), 471(a)(16) and 475(5)(A) of the Act);

(ii) Provide for periodic review of the status of each child no less frequently than once every six months by either a court or by administrative review (sections 422(b)(10)(B)(ii), 471(a)(16) and 475(5)(B) of the Act);

(iii) Assure that each child in foster care under the supervision of the State has a permanency hearing in a family or juvenile court or another court of competent jurisdiction (including a Tribal court), or by an administrative body appointed or approved by the court, which is not a part of or under the supervision or direction of the State agency, no later than 12 months from the date the child entered foster care (and not less frequently than every 12 months thereafter during the

**Office of Human Development Services, HHS**                    **§ 1355.34**

continuation of foster care) (sections 422(b)(10)(B)(ii), 471(a)(16) and 475(5)(C) of the Act);

(iv) Provide a process for termination of parental rights proceedings in accordance with sections 422(b)(10)(B)(ii), 475(5)(E) and (F) of the Act; and,

(v) Provide foster parents, preadoptive parents, and relative caregivers of children in foster care with notice of and an opportunity to be heard in permanency hearings and six-month periodic reviews held with respect to the child (sections 422(b)(10)(B)(ii), 475(5)(G) of the Act, and 45 CFR 1356.21(o)).

(3) *Quality assurance system:* The State has developed and implemented standards to ensure that children in foster care placements are provided quality services that protect the safety and health of the children (section 471(a)(22)) and is operating an identifiable quality assurance system (45 CFR 1357.15(u)) as described in the CFSP that:

(i) Is in place in the jurisdictions within the State where services included in the CFSP are provided;

(ii) Is able to evaluate the adequacy and quality of services provided under the CFSP;

(iii) Is able to identify the strengths and needs of the service delivery system it evaluates;

(iv) Provides reports to agency administrators on the quality of services evaluated and needs for improvement; and

(v) Evaluates measures implemented to address identified problems.

(4) *Staff training:* The State is operating a staff development and training program (45 CFR 1357.15(t)) that:

(i) Supports the goals and objectives in the State's CFSP;

(ii) Addresses services provided under both subparts of title IV-B and the training plan under title IV-E of the Act;

(iii) Provides training for all staff who provide family preservation and support services, child protective services, foster care services, adoption services and independent living services soon after they are employed and that includes the basic skills and knowledge required for their positions;

(iv) Provides ongoing training for staff that addresses the skills and knowledge base needed to carry out their duties with regard to the services included in the State's CFSP; and,

(v) Provides training for current or prospective foster parents, adoptive parents, and the staff of State-licensed or State-approved child care institutions providing care to foster and adopted children receiving assistance under title IV-E that addresses the skills and knowledge base needed to carry out their duties with regard to caring for foster and adopted children.

(5) *Service array:* Information from the Statewide assessment and on-site review determines that the State has in place an array of services (45 CFR 1357.15(n) and section 422(b)(10)(B)(iii) and (iv) of the Act) that includes, at a minimum:

(i) Services that assess the strengths and needs of children and families assisted by the agency and are used to determine other service needs;

(ii) Services that address the needs of the family, as well as the individual child, in order to create a safe home environment;

(iii) Services designed to enable children at risk of foster care placement to remain with their families when their safety and well-being can be reasonably assured;

(iv) Services designed to help children achieve permanency by returning to families from which they have been removed, where appropriate, be placed for adoption or with a legal guardian or in some other planned, permanent living arrangement, and through post-legal adoption services;

(v) Services that are accessible to families and children in all political subdivisions covered in the State's CFSP; and,

(vi) Services that can be individualized to meet the unique needs of children and families served by the agency.

(6) *Agency responsiveness to the community:*

(i) The State, in implementing the provisions of the CFSP, engages in ongoing consultation with a broad array of individuals and organizations representing the State and county agencies responsible for implementing the CFSP and other major stakeholders in

273

the services delivery system including, at a minimum, tribal representatives, consumers, service providers, foster care providers, the juvenile court, and other public and private child and family serving agencies (45 CFR 1357.15(1)(4));

(ii) The agency develops, in consultation with these or similar representatives, annual reports of progress and services delivered pursuant to the CFSP (45 CFR 1357.16(a));

(iii) There is evidence that the agency's goals and objectives included in the CFSP reflect consideration of the major concerns of stakeholders consulted in developing the plan and on an ongoing basis (45 CFR 1357.15(m)); and

(iv) There is evidence that the State's services under the plan are coordinated with services or benefits under other Federal or federally-assisted programs serving the same populations to achieve the goals and objectives in the plan (45 CFR 1357.15(m)).

(7) *Foster and adoptive parent licensing, recruitment and retention:*

(i) The State has established and maintains standards for foster family homes and child care institutions which are reasonably in accord with recommended standards of national organizations concerned with standards for such institutions or homes (section 471(a)(10) of the Act);

(ii) The standards so established are applied by the State to every licensed or approved foster family home or child care institution receiving funds under title IV-E or IV-B of the Act (section 471(a)(10) of the Act);

(iii) The State complies with the safety requirements for foster care and adoptive placements in accordance with sections 471(a)(16), 471(a)(20) and 475(1) of the Act and 45 CFR 1356.30;

(iv) The State has in place an identifiable process for assuring the diligent recruitment of potential foster and adoptive families that reflect the ethnic and racial diversity of children in the State for whom foster and adoptive homes are needed (section 422(b)(9) of the Act); and,

(v) The State has developed and implemented plans for the effective use of cross-jurisdictional resources to facilitate timely adoptive or permanent placements for waiting children (section 422(b)(12) of the Act).

(d) *Availability of review instruments.* ACF will make available to the States copies of the review instruments, which will contain the specific standards to be used to determine substantial conformity, on an ongoing basis, whenever significant revisions to the instruments are made.

[65 FR 4078, Jan. 25, 2000, as amended at 66 FR 58675, Nov. 23, 2001]

§ 1355.35   **Program improvement plans.**

(a) *Mandatory program improvement plan.* (1) States found not to be operating in substantial conformity shall develop a program improvement plan. The program improvement plan must:

(i) Be developed jointly by State and Federal staff in consultation with the review team;

(ii) Identify the areas in which the State's program is not in substantial conformity;

(iii) Set forth the goals, the action steps required to correct each identified weakness or deficiency, and dates by which each action step is to be completed in order to improve the specific areas;

(iv) Set forth the amount of progress the statewide data will make toward meeting the national standards;

(v) Establish benchmarks that will be used to measure the State's progress in implementing the program improvement plan and describe the methods that will be used to evaluate progress;

(vi) Identify how the action steps in the plan build on and make progress over prior program improvement plans;

(vii) Identify the technical assistance needs and sources of technical assistance, both Federal and non-Federal, which will be used to make the necessary improvements identified in the program improvement plan.

(2) In the event that ACF and the State cannot reach consensus regarding the content of a program improvement plan or the degree of program or data improvement to be achieved, ACF retains the final authority to assign the contents of the plan and/or the degree of improvement required for successful completion of the plan. Under such circumstances, ACF will render a

**EXHIBIT A**

**Office of Human Development Services, HHS**    **§ 1355.35**

written rationale for assigning such content or degree of improvement.

(b) *Voluntary program improvement plan.* States found to be operating in substantial conformity may voluntarily develop and implement a program improvement plan in collaboration with the ACF Regional Office, under the following circumstances:

(1) The State and Regional Office agree that there are areas of the State's child and family services programs in need of improvement which can be addressed through the development and implementation of a voluntary program improvement plan;

(2) ACF approval of the voluntary program improvement plan will not be required; and

(3) No penalty will be assessed for the State's failure to achieve the goals described in the voluntary program improvement plan.

(c) *Approval of program improvement plans.* (1) A State determined not to be in substantial conformity must submit a program improvement plan to ACF for approval within 90 calendar days from the date the State receives the written notification from ACF that it is not operating in substantial conformity.

(2) Any program improvement plan will be approved by ACF if it meets the provisions of paragraph (a) of this section.

(3) If the program improvement plan does not meet the provisions of paragraph (a) of this section, the State will have 30 calendar days from the date it receives notice from ACF that the plan has not been approved to revise and resubmit the plan for approval.

(4) If the State does not submit a revised program improvement plan according to the provisions of paragraph (c)(3) of this section or if the plan does not meet the provisions of paragraph (a) of this section, withholding of funds pursuant to the provisions of § 1355.36 of this part will begin.

(d) *Duration of program improvement plans.*

(1) ACF retains the authority to establish time frames for the program improvement plan consistent with the seriousness and complexity of the remedies required for any areas determined

not in substantial conformity, not to exceed two years.

(2) Particularly egregious areas of nonconformity impacting child safety must receive priority in both the content and time frames of the program improvement plans and must be addressed in less than two years.

(3) The Secretary may approve extensions of deadlines in a program improvement plan not to exceed one year. The circumstances under which requests for extensions will be approved are expected to be rare. The State must provide compelling documentation of the need for such an extension. Requests for extensions must be received by ACF at least 60 days prior to the affected completion date.

(4) States must provide quarterly status reports (unless ACF and the State agree upon less frequent reports) to ACF. Such reports must inform ACF of progress in implementing the measures of the plan.

(e) *Evaluating program improvement plans.* Program improvement plans will be evaluated jointly by the State agency and ACF, in collaboration with other members of the review team, as described in the State's program improvement plan and in accordance with the following criteria:

(1) The methods and information used to measure progress must be sufficient to determine when and whether the State is operating in substantial conformity or has reached the negotiated standard with respect to statewide data indicators that failed to meet the national standard for that indicator;

(2) The frequency of evaluating progress will be determined jointly by the State and Federal team members, but no less than annually. Evaluation of progress will be performed in conjunction with the annual updates of the State's CFSP, as described in paragraph (f) of this section;

(3) Action steps may be jointly determined by the State and ACF to be achieved prior to projected completion dates, and will not require any further evaluation at a later date; and

(4) The State and ACF may jointly renegotiate the terms and conditions of the program improvement plan as needed, provided that:

275

**EXHIBIT A**

(i) The renegotiated plan is designed to correct the areas of the State's program determined not to be in substantial conformity and/or achieve a standard for the statewide data indicators that is acceptable to ACF;

(ii) The amount of time needed to implement the provisions of the plan does not extend beyond three years from the date the original program improvement plan was approved;

(iii) The terms of the renegotiated plan are approved by ACF; and

(iv) The Secretary approves any extensions beyond the two-year limit.

(f) *Integration of program improvement plans with CFSP planning.* The elements of the program improvement plan must be incorporated into the goals and objectives of the State's CFSP. Progress in implementing the program improvement plan must be included in the annual reviews and progress reports related to the CFSP required in 45 CFR 1357.16.

[65 FR 4080, Jan. 25, 2000, as amended at 66 FR 58675, Nov. 23, 2001]

### § 1355.36 Withholding Federal funds due to failure to achieve substantial conformity or failure to successfully complete a program improvement plan.

(a) *For the purposes of this section:*

(1) The term ''title IV-B funds'' refers to the State's combined allocation of title IV-B subpart 1 and subpart 2 funds; and

(2) The term ''title IV-E funds'' refers to the State's reimbursement for administrative costs for the foster care program under title IV-E.

(b) *Determination of the amount of Federal funds to be withheld.* ACF will determine the amount of the State title IV-B and IV-E funds to be withheld due to a finding that the State is not operating in substantial conformity, as follows:

(1) A State will have the opportunity to develop and complete a program improvement plan prior to any withholding of funds.

(2) Title IV-B and IV-E funds will not be withheld from a State if the determination of nonconformity was caused by the State's correct use of formal written statements of Federal law or policy provided the State by DHHS.

(3) A portion of the State's title IV-B and IV-E funds will be withheld by ACF for the year under review and for each succeeding year until the State either successfully completes a program improvement plan or is found to be operating in substantial conformity.

(4) The amount of title IV-B and title IV-E funds subject to withholding due to a determination that a State is not operating in substantial conformity is based on a pool of funds defined as follows:

(i) The State's allotment of title IV-B funds for each of the years to which the withholding applies; and

(ii) An amount equivalent to 10 percent of the State's Federal claims for title IV-E foster care administrative costs for each of the years to which withholding applies;

(5) The amount of funds to be withheld from the pool in paragraph (b)(4) of this section will be computed as follows:

(i) Except as provided for in paragraphs (b)(7) and (b)(8) of this section, an amount equivalent to one percent of the funds described in paragraph (b)(4) of this section for each of the years to which withholding applies will be withheld for each of the seven outcomes listed in § 1355.34(b)(1) of this part that is determined not to be in substantial conformity; and

(ii) Except as provided for in paragraphs (b)(7) and (b)(8) of this section, an amount equivalent to one percent of the funds described in paragraph (b)(4) of this section for each of the years to which withholding applies will be withheld for each of the seven systemic factors listed in § 1355.34(c) of this part that is determined not to be in substantial conformity.

(6) Except as provided for in paragraphs (b)(7), (b)(8), and (e)(4) of this section, in the event the State is determined to be in nonconformity on each of the seven outcomes and each of the seven systemic factors subject to review, the maximum amount of title IV-B and title IV-E funds to be withheld due to the State's failure to comply is 14 percent per year of the funds described in paragraph (b)(4) of this section for each year.

**EXHIBIT A**

**Office of Human Development Services, HHS**          **§ 1355.36**

(7) States determined not to be in substantial conformity that fail to correct the areas of nonconformity through the successful completion of a program improvement plan, and are determined to be in nonconformity on the second full review following the first full review in which a determination of nonconformity was made will be subject to increased withholding as follows:

(i) The amount of funds described in paragraph (b)(5) of this section will increase to two percent for each of the seven outcomes and each of the seven systemic factors that continues in nonconformity since the immediately preceding child and family services review;

(ii) The increased withholding of funds for areas of continuous nonconformity is subject to the provisions of paragraphs (c), (d), and (e) of this section;

(iii) The maximum amount of title IV–B and title IV–E funds to be withheld due to the State's failure to comply on the second full review following the first full review in which the determination of nonconformity was made is 28 percent of the funds described in paragraph (b)(4) of this section for each year to which the withholding of funds applies.

(8) States determined not to be in substantial conformity that fail to correct the areas of nonconformity through the successful completion of a program improvement plan, and are determined to be in nonconformity on the third and any subsequent full reviews following the first full review in which a determination of nonconformity was made will be subject to increased withholding as follows:

(i) The amount of funds described in paragraph (b)(5) of this section will increase to three percent for each of the seven outcomes and each of the seven systemic factors that continues in nonconformity since the immediately preceding child and family services review;

(ii) The increased withholding of funds for areas of continuous nonconformity is subject to the provisions of paragraphs (c), (d), and (e) of this section;

(iii) The maximum amount of title IV–B and title IV–E funds to be withheld due to the State's failure to comply on the third and any subsequent full reviews following the first full review in which the determination of nonconformity was made is 42 percent of the funds described in paragraph (b)(4) of this section for each year to which the withholding of funds applies.

(c) *Suspension of withholding.* (1) For States determined not to be operating in substantial conformity, ACF will suspend the withholding of the State title IV–B and title IV–E funds during the time that a program improvement plan is in effect, provided that:

(i) The program improvement plan conforms to the provisions of §1355.35 of this part; and

(ii) The State is actively implementing the provisions of the program improvement plan.

(2) Suspension of the withholding of funds is limited to three years following each review, or the amount of time approved for implementation of the program improvement plan, whichever is less.

(d) *Terminating the withholding of funds.* For States determined not to be in substantial conformity, ACF will terminate the withholding of the State's title IV–B and title IV–E funds related to the nonconformity upon determination by the State and ACF that the State has achieved substantial conformity or has successfully completed a program improvement plan. ACF will rescind the withholding of the portion of title IV–B and title IV–E funds related to specific goals or action steps as of the date at the end of the quarter in which they were determined to have been achieved.

(e) *Withholding of funds.* (1) States determined not to be in substantial conformity that fail to successfully complete a program improvement plan will be notified by ACF of this final determination of nonconformity in writing within 10 business days after the relevant completion date specified in the plan, and advised of the amount of title IV–B and title IV–E funds which are to be withheld.

(2) Title IV–B and title IV–E funds will be withheld based on the following:

277

(i) If the State fails to submit status reports in accordance with §1355.35(d)(4), or if such reports indicate that the State is not making satisfactory progress toward achieving goals or actions steps, funds will be withheld at that time for a period beginning October 1 of the fiscal year for which the determination of nonconformity was made and ending on the specified completion date for the affected goal or action step.

(ii) Funds related to goals and action steps that have not been achieved by the specified completion date will be withheld at that time for a period beginning October 1 of the fiscal year for which the determination of nonconformity was made and ending on the completion date of the affected goal or action step; and

(iii) The withholding of funds commensurate with the level of nonconformity at the end of the program improvement plan will begin at the latest completion date specified in the program improvement plan and will continue until a subsequent full review determines the State to be in substantial conformity or the State successfully completes a program improvement plan developed as a result of that subsequent full review.

(3) When the date the State is determined to be in substantial conformity or to have successfully completed a program improvement plan falls within a specific quarter, the amount of funds to be withheld will be computed to the end of that quarter.

(4) A State agency that refuses to participate in the development or implementation of a program improvement plan, as required by ACF, will be subject to the maximum increased withholding of 42 percent of its title IV-B and title IV-E funds, as described in paragraph (b)(8) of this section, for each year or portion thereof that the withholding of funds applies.

(5) The State agency will be liable for interest on the amount of funds withheld by the Department, in accordance with the provisions of 45 CFR 30.13.

[65 FR 4081, Jan. 25, 2000, as amended at 66 FR 58675, Nov. 23, 2001]

§ 1355.37 Opportunity for Public Inspection of Review Reports and Materials.

The State agency must make available for public review and inspection all statewide assessments (§1355.33(b)), report of findings (§1355.33(e)), and program improvement plans (§1355.35(a)) developed as a result of a full or partial child and family services review.

[65 FR 4082, Jan. 25, 2000]

§ 1355.38 Enforcement of section 471(a)(18) of the Act regarding the removal of barriers to interethnic adoption.

(a) *Determination that a violation has occurred in the absence of a court finding.* (1) If ACF becomes aware of a possible section 471(a)(18) violation, whether in the course of a child and family services review, the filing of a complaint, or through some other mechanism, it will refer such a case to the Department's Office for Civil Rights (OCR) for investigation.

(2) Based on the findings of the OCR investigation, ACF will determine if a violation of section 471(a)(18) has occurred. A section 471(a)(18) violation occurs if a State or an entity in the State:

(i) Has denied to any person the opportunity to become an adoptive or foster parent on the basis of the race, color, or national origin of the person, or of the child, involved;

(ii) Has delayed or denied the placement of a child for adoption or into foster care on the basis of the race, color, or national origin of the adoptive or foster parent, or the child involved; or,

(iii) With respect to a State, maintains any statute, regulation, policy, procedure, or practice that on its face, is a violation as defined in paragraphs (a)(2)(i) and (2)(ii) of this section.

(3) ACF will provide the State or entity with written notification of its determination.

(4) If there has been no violation, there will be no further action. If ACF determines that there has been a violation of section 471(a)(18), it will take enforcement action as described in this section.

(5) Compliance with the Indian Child Welfare Act of 1978 (Pub. L. 95–608) does

**EXHIBIT A**

**Office of Human Development Services, HHS**    **§ 1355.38**

not constitute a violation of section 471(a)(18).

(b) *Corrective action and penalties for violations with respect to a person or based on a court finding.* (1) A State or entity found to be in violation of section 471(a)(18) of the Act with respect to a person, as described in paragraphs (a)(2)(i) and (a)(2)(ii) of this section, will be penalized in accordance with paragraph (g)(2) of this section. A State or entity determined to be in violation of section 471(a)(18) of the Act as a result of a court finding will be penalized in accordance with paragraph (g)(4) of this section. The State may develop, obtain approval of, and implement a plan of corrective action any time after it receives written notification from ACF that it is in violation of section 471(a)(18) of the Act.

(2) Corrective action plans are subject to ACF approval.

(3) If the corrective action plan does not meet the provisions of paragraph (d) of this section, the State must revise and resubmit the plan for approval until it has an approved plan.

(4) A State or entity found to be in violation of section 471(a)(18) of the Act by a court must notify ACF within 30 days from the date of entry of the final judgement once all appeals have been exhausted, declined, or the appeal period has expired.

(c) *Corrective action for violations resulting from a State's statute, regulation, policy, procedure, or practice.* (1) A State found to have committed a violation of the type described in paragraph (a)(2)(iii) of this section must develop and submit a corrective action plan within 30 days of receiving written notification from ACF that it is in violation of section 471(a)(18). Once the plan is approved the State will have to complete the corrective action and come into compliance. If the State fails to complete the corrective action plan within six months and come into compliance, a penalty will be imposed in accordance with paragraph (g)(3) of this section.

(2) Corrective action plans are subject to ACF approval.

(3) If the corrective action plan does not meet the provisions of paragraph (d) of this section, the State must revise and resubmit the plan within 30

days from the date it receives a written notice from ACF that the plan has not been approved. If the State does not submit a revised corrective action plan according to the provisions of paragraph (d) of this section, withholding of funds pursuant to the provisions of paragraph (g) of this section will apply.

(d) *Contents of a corrective action plan.* A corrective action plan must:

(1) Identify the issues to be addressed;

(2) Set forth the steps for taking corrective action;

(3) Identify any technical assistance needs and Federal and non-Federal sources of technical assistance which will be used to complete the action steps; and,

(4) Specify the completion date. This date will be no later than 6 months from the date ACF approves the corrective action plan.

(e) *Evaluation of corrective action plans.* ACF will evaluate corrective action plans and notify the State (in writing) of its success or failure to complete the plan within 30 calendar days. If the State has failed to complete the corrective action plan, ACF will calculate the amount of reduction in the State's title IV-E payment and include this information in the written notification of failure to complete the plan.

(f) *Funds to be withheld.* The term "title IV-E funds" refers to the amount of Federal funds advanced or paid to the State for allowable costs incurred by a State for: foster care maintenance payments, adoption assistance payments, administrative costs, and training costs under title IV-E and includes the State's allotment for the Chafee Foster Care Independence Program under section 477 of the Act.

(g) *Reduction of title IV-E funds.* (1) Title IV-E funds shall be reduced in specified amounts in accordance with paragraph (h) of this section under the following circumstances:

(i) A determination that a State or entity is in violation of section 471(a)(18) of the Act with respect to a person as described in paragraphs (a)(2)(i) and (a)(2)(ii) of this section, or:

(ii) After a State's failure to implement and complete a corrective action

279

**EXHIBIT A**

plan and come into compliance as described in paragraph (c) of this section.

(2) Once ACF notifies a State (in writing) that it has committed a section 471(a)(18) violation with respect to a person, the State's title IV–E funds will be reduced for the fiscal quarter in which the State received written notification and for each succeeding quarter within that fiscal year or until the State completes a corrective action plan and comes into compliance, whichever is earlier. Once ACF notifies an entity (in writing) that it has committed a section 471(a)(18) violation with respect to a person, the entity must remit to the Secretary all title IV–E funds paid to it by the State during the quarter in which the entity is notified of the violation.

(3) For States that fail to complete a corrective action plan within 6 months, title IV–E funds will be reduced by ACF for the fiscal quarter in which the State received notification of its violation. The reduction will continue for each succeeding quarter within that fiscal year or until the State completes the corrective action plan and comes into compliance, whichever is earlier.

(4) If, as a result of a court finding, a State or entity is determined to be in violation of section 471(a)(18) of the Act, ACF will assess a penalty without further investigation. Once the State is notified (in writing) of the violation, its title IV–E funds will be reduced for the fiscal quarter in which the court finding was made and for each succeeding quarter within that fiscal year or until the State completes a corrective action plan and comes into compliance, whichever is sooner. Once an entity is notified (in writing) of the violation, the entity must remit to the Secretary all title IV–E funds paid to it by the State during the quarter in which the court finding was made.

(5) The maximum number of quarters that a State will have its title IV–E funds reduced due to a finding of a State's failure to conform to section 471(a)(18) of the Act is limited to the number of quarters within the fiscal year in which a determination of nonconformity was made. However, an uncorrected violation may result in a subsequent review, another finding, and additional penalties.

(6) No penalty will be imposed for a court finding of a violation of section 471(a)(18) until the judgement is final and all appeals have been exhausted, declined, or the appeal period has expired.

(h) *Determination of the amount of reduction of Federal funds.* ACF will determine the reduction in title IV–E funds due to a section 471(a)(18) violation in accordance with section 474(d)(1) and (2) of the Act.

(1) State agencies that violate section 471(a)(18) with respect to a person or fail to implement or complete a corrective action plan as described in paragraph (c) of this section will be subject to a penalty. The penalty structure will follow section 474(d)(1) of the Act. Penalties will be levied for the quarter of the fiscal year in which the State is notified of its section 471(a)(18) violation, and for each succeeding quarter within that fiscal year until the State comes into compliance with section 471(a)(18). The reduction in title IV–E funds will be computed as follows:

(i) 2 percent of the State's title IV–E funds for the fiscal year quarter, as defined in paragraph (f) of this section, for the first finding of noncompliance in that fiscal year;

(ii) 3 percent of the State's title IV–E funds for the fiscal year quarter, as defined in paragraph (f) of this section, for the second finding of noncompliance in that fiscal year;

(iii) 5 percent of the State's title IV–E funds for the fiscal year quarter, as defined in paragraph (f) of this section, for the third or subsequent finding of noncompliance in that fiscal year.

(2) Any entity (other than the State agency) which violates section 471(a)(18) of the Act during a fiscal quarter must remit to the Secretary all title IV–E funds paid to it by the State in accordance with the procedures in paragraphs (g)(2) or (g)(4) of this section.

(3) No fiscal year payment to a State will be reduced by more than 5 percent of its title IV–E funds, as defined in paragraph (f) of this section, where the State has been determined to be out of compliance with section 471(a)(18) of the Act.

(4) The State agency or entity, as applicable, will be liable for interest on

**Office of Human Development Services, HHS**    **§ 1355.40**

the amount of funds reduced by the Department, in accordance with the provisions of 45 CFR 30.13.

[65 FR 4082, Jan. 25, 2000, as amended at 66 FR 58676, Nov. 23, 2001]

### § 1355.39 Administrative and judicial review.

States determined not to be in substantial conformity with titles IV-B and IV-E State plan requirements, or a State or entity in violation of section 471(a)(18) of the Act:

(a) May appeal, pursuant to 45 CFR part 16, the final determination and any subsequent withholding of, or reduction in, funds to the HHS Departmental Appeals Board within 60 days after receipt of a notice of nonconformity described in §1355.36(e)(1) of this part, or receipt of a notice of noncompliance by ACF as described in §1355.38(a)(3) of this part; and

(b) Will have the opportunity to obtain judicial review of an adverse decision of the Departmental Appeals Board within 60 days after the State or entity receives notice of the decision by the Board. Appeals of adverse Department Appeals Board decisions must be made to the district court of the United States for the judicial district in which the principal or headquarters office of the agency responsible for administering the program is located.

(c) The procedure described in paragraphs (a) and (b) of this section will not apply to a finding that a State or entity has been determined to be in violation of section 471(a)(18) which is based on a judicial decision.

[65 FR 4083, Jan. 25, 2000]

### § 1355.40 Foster care and adoption data collection.

(a) *Scope of the data collection system.* (1) Each State which administers or supervises the administration of titles IV-B and IV-E must implement a system that begins to collect data on October 1, 1994. The first transmission must be received in ACF no later than May 15, 1995. The data reporting system must meet the requirements of §1355.40(b) and electronically report certain data regarding children in foster care and adoption. The foster care

data elements are listed and defined in Appendix A to this part and the adoption data elements are listed and defined in Appendix B to this part.

(2) For the purposes of foster care reporting, each State's data transmission must include all children in foster care for whom the State title IV-B/IV-E agency has responsibility for placement, care, or supervision. This includes American Indian children covered under the assurances in section 422(b)(10) of the Act on the same basis as any other child. For children in care less than 30 days, only a core set of information will be required, as noted in appendix A to this part. For children who enter foster care prior to October 1, 1995 and who are still in the system, core data elements will be required; in addition, States will also be required to report on the most recent case plan goal affecting those children. For children in out-of-State placement, the State placing the child and making the foster care payment submits and continually updates the data.

(3) For the purposes of adoption reporting, data are required to be transmitted by the State on all adopted children who were placed by the State title IV-B/IV-E agency, and on all adopted children for whom the State agency is providing adoption assistance (either ongoing or for nonrecurring expenses), care or services directly or by contract or agreement with other private or public agencies. Full adoption data as specified in appendix B to this part are required only for children adopted after the implementation date of October 1, 1994. For children adopted prior to October 1, 1994, who are continuing to receive title IV-E subsidies, aggregate data are to be reported. For a child adopted out-of-State, the State which placed the child submits the data.

(b) *Foster care and adoption reporting requirements.* (1) The State agency shall transmit semi-annually, within 45 days of the end of the reporting period (i.e., by May 15 and November 14), information on each child in foster care and each child adopted during the reporting period. The information to be reported consists of the data elements found in appendices A and B to this part. The data must be extracted from the data

281

system as of the last day of the reporting period and must be submitted in electronic form as described in appendix C to this part and in record layouts as delineated in appendix D to this part.

(2) For foster care information, the child-specific data to be transmitted must reflect the data in the information system when the data are extracted. Dates of removal from the home and discharge from foster care must be entered in accordance with paragraph (d)(1) of this section. The date of the most recent periodic review (either administrative or court) must be entered for children who have been in foster care for more than nine months. Entry of this date constitutes State certification that the data on the child have been reviewed and are current.

(3) Adoption data are to be reported during the reporting period in which the adoption is legalized or, at the State's option, in the following reporting period if the adoption is legalized within the last 60 days of the reporting period. For a semi-annual period in which no adoptions have been legalized, States must report such an occurrence.

(4) A summary file of the semi-annual data transmission must be submitted and will be used to verify the completeness of the State's detailed submission for the reporting period.

(5) A variety of internal data consistency checks will be used to judge the internal consistency of the semi-annual detailed data submission. These are specified in Appendix E to this part.

(c) *Missing data standards.* (1) The term "missing data" refers to instances where no data have been entered, if applicable, for a particular data element. In addition, all data elements which fail a consistency check for a particular case will be converted to missing data. All data which are "out of range" (i.e., the response is beyond the parameters allowed for that particular data element) will also be converted to missing data. Details of the circumstances under which data will be converted to missing data are specified in appendix E to this part. Data elements with responses of "can-

not be determined" or "not yet determined" are not considered as having missing data.

(2) For missing data in excess of 10 percent for any one data element, the penalty will be applied.

(3) The penalties for missing data are specified in paragraph (e) of this section.

(d) *Timeliness of foster care data reports.* (1) For each child, a computer generated transaction date must reflect the actual date of data entry and must accompany the date of latest removal from the home and the date of exit from foster care. Ninety percent of the subject transactions must have been entered into the system within 60 days of the event (removal from home or discharge from foster care).

(2) Penalties shall be invoked as provided in paragraph (e) of this section.

(e) *Penalties.* (1) Failure by a State to meet any of the standards described in paragraphs (a) through (d) of this section is considered a substantial failure to meet the requirements of the title IV-E State plan. Penalties for substantial noncompliance will be assessed semi-annually against a State's title IV-E administrative cost reimbursement in an amount that is equal to no more than 10 percent of the State's annual share of title IV-B funds above the base appropriation of $141 million. The amount of incentive funds, section 427 of the Act, against which a penalty can be assessed will remain the same as the amount promulgated as being available to the States as of June 30, 1993, the date of issuance of the amount of section 427 funds for fiscal year 1993 (see Appendix F to this part). The penalties will be calculated and applied regardless of any determination of compliance with the requirements of section 427, and regardless of whether any State has withdrawn its certification with respect to section 427. Years One through three (October 1, 1994 through September 30, 1997) will be three penalty-free years of operation. Year Four (October 1, 1997 through September 30, 1998) will be at half penalty and Year Five (October 1, 1998 through September 30, 1999) and thereafter will be at full penalty. The maximum annual penalty is 20 percent.

**EXHIBIT A**

(2) Penalties will be assessed semi-annually against a State's title IV-E administrative cost reimbursement for the period in which the noncompliance occurred and any subsequent period of noncompliance. Following a decision sustaining ACYF's proposed action, funds will be recovered until the State demonstrates, by submitting an acceptable report, that it will no longer fail to comply.

(3) Half of the maximum allowable assessed penalty for a given reporting period is applicable to foster care reporting and half to adoption reporting.

(4) The penalty for foster care reporting will be applied for any semi-annual period when a State fails to meet one or more of the following criteria:

(i) Fails to submit the report within 45 days of the end of the reporting period as specified in paragraphs (b)(1) and (b)(2) of this section; or

(ii) There is one or more element which exceeds the level of tolerance for missing data as specified in paragraphs (c)(1) and (c)(2) of this section; or

(iii) Fails to meet the timeliness standards as specified in paragraph (d)(1) of this section.

(5) The penalty for adoption reporting will be applied for any semi-annual period when a State fails to meet one or more of the following criteria:

(i) Fails to submit the report within 45 days of the end of the reporting period as specified in paragraphs (b)(1) and (b)(3) of this section; or

(ii) There is one or more element which exceeds the level of tolerance for missing data as specified in paragraphs (c)(1) and (c)(2) of this section.

(This requirement has been approved by the Office of Management and Budget under OMB Control Number 0980–0267. In accordance with the Paperwork Reduction Act of 1995, an agency may not conduct or sponsor, and a person is not required to respond to, a collection of information unless it displays a currently valid OMB control number.)

[58 FR 67924, Dec. 22, 1993, as amended at 60 FR 40507, Aug. 9, 1995; 65 FR 4084, Jan. 25, 2000; 66 FR 58676, Nov. 23, 2001]

### § 1355.50  Purpose of this part.

This part sets forth the requirements and procedures States must meet in order to receive Federal financial participation for the planning, design, de-velopment, installation and operation of statewide automated child welfare information systems authorized under section 474(a)(3)(c) of the Act.

[58 FR 67945, Dec. 22, 1993]

### § 1355.52  Funding authority for state-wide automated child welfare infor-mation systems (SACWIS).

(a) States may receive Federal reimbursement at the 75 percent match rate for FY 1994, FY 1995 and FY 1996, and at the 50 percent level thereafter for expenditures related to the planning, design, development and installation of a statewide automated child welfare information system, to the extent such system:

(1) Provides for the State to collect and electronically report certain data required by section 479(b) of the Act and § 1355.40 of this part;

(2) To the extent practicable, provides for an interface with the State data collection system for child abuse and neglect;

(3) To the extent practicable, provides for an interface with and retrieval of information from the State automated information system that collects information relating to the eligibility of individuals under title IV-A of the Act; and

(4) Provides for more efficient, economical and effective administration of the programs carried out under a State plan approved under title IV-B and title IV-E.

(b) States may also be reimbursed for the full amount of expenditures for the hardware components for such systems at the rates provided under paragraph (a) of this section.

(c) Expenditures for the operation of the automated information system described in paragraph (a) of this section are eligible for FFP at the 50 percent matching rate.

[58 FR 67945, Dec. 22, 1993]

### § 1355.53  Conditions for approval of funding.

(a) As a condition of funding, the SACWIS must be designed, developed (or an existing system enhanced), and installed in accordance with an approved advance planning document

**EXHIBIT A**

(APD). The APD must provide for a design which, when implemented, will produce a comprehensive system, which is effective and efficient, to improve the program management and administration of the State plans for titles IV–B and IV–E as provided under this section.

(b) At a minimum, the system must provide for effective management, tracking and reporting by providing automated procedures and processes to:

(1) Meet the Adoption and Foster Care reporting requirements through the collection, maintenance, integrity checking and electronic transmission of the data elements specified by the Adoption and Foster Care Analysis and Reporting System (AFCARS) requirements mandated under section 479(b) of the Act and § 1355.40 of this part;

(2) Provide, for electronic exchanges and referrals, as appropriate, with the following systems within the State, unless the State demonstrates that such interface or integration would not be practicable because of systems limitations or cost constraints:

(i) Systems operated under title IV–A,

(ii) National Child Abuse and Neglect Data Systems (NCANDS),

(iii) Systems operated under title XIX, and

(iv) Systems operated under title IV–D;

(3) Support the provisions of section 422(a) by providing for the automated collection, maintenance, management and reporting of information on all children in foster care under the responsibility of the State, including statewide data from which the demographic characteristics, location, and goals for foster care children can be determined;

(4) Collect and manage information necessary to facilitate the delivery of client services, the acceptance and referral of clients, client registration, and the evaluation of the need for services, including child welfare services under title IV–B Subparts 1 and 2, family preservation and family support services, family reunificication and permanent placement;

(5) Collect and manage information necessary to determine eligibility for:

(i) The foster care program,

(ii) The adoption assistance program, and

(iii) The independent living program;

(6) Support necessary case assessment activities;

(7) Monitor case plan development, payment authorization and issuance, review and management, including eligibility determinations and redeterminations; and

(8) Ensure the confidentiality and security of the information and the system.

(c) A system established under paragraph (a) of this section may also provide support in meeting the following program functions:

(1) Resource management, including automated procedures to assist in managing service providers, facilities, contracts and recruitment activities associated with foster care and adoptive families;

(2) Tracking and maintenance of legal and court information, and preparation of appropriate notifications to relevant parties;

(3) Administration and management of staff and workloads;

(4) Licensing verification; and

(5) Risk analysis.

(d) The system may also provide for interface with other automated information systems, including, but not limited to, accounting and licensing systems, court and juvenile justice systems, vital statistics and education, as appropriate.

(e) If the cost benefit analysis submitted as part of the APD indicates that adherence to paragraphs (c) and (d) of this section would not be cost beneficial, final approval of the APD may be withheld until resolution is reached on the level of automation appropriate to meet the State's needs.

(f) A Statewide automated child welfare information system may be designed, developed and installed on a phased basis, in order to allow States to implement AFCARS requirements expeditiously, in accordance with section 479(b) of the Act, as long as the approved APD includes the State's plan for full implementation of a comprehensive system which meets all functional and data requirements as specified in paragraphs (a) and (b) of this section, and a system design which

**EXHIBIT A**

will support these enhancements on a phased basis.

(g) The system must perform Quality Assurance functions to provide for the review of case files for accuracy, completeness and compliance with Federal requirements and State standards.

[58 FR 67945, Dec. 22, 1993, as amended at 60 FR 26839, Mar. 19, 1995]

§ 1355.54 **Submittal of advance planning documents.**

The State title IV-E agency must submit an APD for a statewide automated child welfare information system, signed by the appropriate State official, in accordance with procedures specified by 45 CFR part 95, subpart F.

[58 FR 67946, Dec. 22, 1993]

§ 1355.55 **Review and assessment of the system developed with enhanced funds.**

(a) ACF will, on a continuing basis, review, assess and inspect the planning, design, development, installation and operation of the SACWIS to determine the extent to which such systems:

(1) Meet § 1355.53 of this chapter,

(2) Meet the goals and objectives stated in the approved APD,

(3) Meet the schedule, budget, and other conditions of the approved APD, and

(4) Comply with the automated data processing services and acquisitions procedures and requirements of 45 CFR part 95, subpart F.

(b) [Reserved]

[58 FR 67946, Dec. 22, 1993]

§ 1355.56 **Failure to meet the conditions of the approved APD.**

(a) If ACF finds that the State fails to meet any of the conditions cited in § 1355.53, or to substantially comply with the criteria, requirements and other undertakings prescribed by the approved APD, approval of the APD may be suspended.

(b) If the approval of an APD is suspended during the planning, design, development, installation, or operation of the system:

(1) The State will be given written notice of the suspension. This notice shall state:

(i) The reason for the suspension,

(ii) The date of the suspension,

(iii) Whether the suspended system complies with criteria for 50 percent FFP, and

(iv) The actions required by the State for future enhanced funding.

(2) The suspension will be effective as of the date the State failed to comply with the approved APD;

(3) The suspension shall remain in effect until ACF determines that such system complies with prescribed criteria, requirements, and other undertakings for future Federal funding.

(4) Should a State cease operation of an approved system, either by voluntary withdrawal or as a result of Federal suspension, all Federal incentive funds invested to date that exceed the normal administrative FFP rate (50 percent) will be subject to recoupment.

[58 FR 67946, Dec. 22, 1993]

§ 1355.57 **Cost allocation.**

(a) All expenditures of a State to plan, design, develop, install, and operate the data collection and information retrieval system described in § 1355.53 of this part shall be treated as necessary for the proper and efficient administration of the State plan under title IV-E, without regard to whether the system may be used with respect to foster or adoptive children other than those on behalf of whom foster care maintenance payments or adoption assistance payments may be made under the State plan.

(b) Cost allocation and distribution for the planning, design, development, installation and operation must be in accordance with § 95.631 of this title and section 474(e) of the Act, if the SACWIS includes functions, processing, information collection and management, equipment or services that are not directly related to the administration of the programs carried out under the State plan approved under title IV-B or IV-E.

[58 FR 67946, Dec. 22, 1993]

APPENDIX A TO PART 1355—FOSTER CARE DATA ELEMENTS

*Section I—Foster Care Data Elements*

Data elements preceded by ''**\***'' are the only data elements required for children who

**EXHIBIT A**

**Pt. 1355, App. A**                     **45 CFR Ch. XIII (10–1–07 Edition)**

have been in care less than 30 days. For children who entered care prior to October 1, 1995, data elements preceded by either ''**'' and ''***'' are the only data elements required. This means that, for these two categories of children, these are the only data elements to which the missing data standard will be applied.

I. General Information
   **A. State _____
   **B. Report date____ (mo.) ____ (yr.)
   **C. Local Agency (County or Equivalent Jurisdiction) _____
   **D. Record Number _____
   E. Date of Most Recent Periodic Review (If Applicable)____ (mo.) ____ (day) ____ (yr.)
II. Child's Demographic Information
   **A. Date of Birth ____ (mo.) ____ (day) ____ (yr.)
   **B. Sex _____
   Male: 1
   Female: 2
   C. Race/Ethnicity
   1. Race
   a. American Indian or Alaska Native
   b. Asian
   c. Black or African American
   d. Native Hawaiian or Other Pacific Islander
   e. White
   f. Unable to Determine
   2. Hispanic or Latino Ethnicity_____
   Yes: 1
   No: 2
   Unable to Determine: 3
   D. Has this child been clinically diagnosed as having a disability(ies)? _____
   Yes: 1
   No: 2
   Not Yet Determined: 3
   1. If yes, indicate each type of disability found with a ''1''
   Mental Retardation ____
   Visually or Hearing Impaired ____
   Physically Disabled ____
   Emotionally Disturbed (DSM III) ____
   Other Medically Diagnosed Condition Requiring Special Care ____
   E. 1. Has this child ever been adopted? _____
   Yes: 1
   No: 2
   Unable to Determine: 3
   2. If yes, how old was the child when the adoption was legalized? _____
   Less than 2 years old: 1
   2 to 5 years old: 2
   6 to 12 years old: 3
   13 years old or older: 4
   Unable to Determine: 5
III. Removal/Placement Setting Indicators
   A. Removal Episodes
   Date of First Removal From Home ____ (mo.) ____ (day) ____ (yr.)
   Total Number of Removals From Home to Date _____

Date Child was Discharged From Last Foster Care Episode (If Applicable) ____ (mo.) ____ (day) ____ (yr.)
   **Date of Latest Removal From Home ____ (mo.) ____ (day) ____ (yr.)
   ** Transaction Date ____ (mo.) ____ (day) ____ (yr.)
   B. Placement Settings
   Date of Placement in Current Foster Care Setting ____ (mo.) ____ (day) ____ (yr.)
   Number of Previous Placement Settings During This Removal Episode ____
IV. Circumstances of Removal
   A. Manner of Removal From Home for Current Placement Episode _____
   Voluntary: 1
   Court Ordered: 2
   Not Yet Determined: 3
   B. Actions or Conditions Associated With Child's Removal: (Indicate all that apply with a ''1'')
   Physical Abuse (Alleged/Reported) _____
   Sexual Abuse (Alleged/Reported) _____
   Neglect (Alleged/Reported) _____
   Alcohol Abuse (Parent) _____
   Drug Abuse (Parent) _____
   Alcohol Abuse (Child) _____
   Drug Abuse (Child) _____
   Child's Disability _____
   Child's Behavior Problem _____
   Death of Parent(s) _____
   Incarceration of Parent(s) _____
   Caretaker's Inability to Cope Due to Illness or Other Reasons _____
   Abandonment _____
   Relinquishment _____
   Inadequate Housing _____
**V. Current Placement Setting
   **A. Pre-Adoptive Home: 1
   Foster Family Home (Relative): 2
   Foster Family Home (Non-Relative): 3
   Group Home: 4
   Institution: 5
   Supervised Independent Living: 6
   Runaway: 7
   Trial Home Visit: 8
   **B. Is Current Placement Out-of-State?
   Yes (Out-of-State Placement): 1
   No (In State Placement): 2
***VI. Most Recent Case Plan Goal
   Reunify With Parent(s) or Principal Caretaker(s): 1
   Live With Other Relative(s): 2
   Adoption: 3
   Long Term Foster Care: 4
   Emancipation: 5
   Guardianship: 6
   Case Plan Goal Not Yet Established: 7
VII. Principal Caretaker(s) Information
   A. Caretaker Family Structure
   Married Couple: 1
   Unmarried Couple: 2
   Single Female: 3
   Single Male: 4
   Unable to Determine: 5
   B. Year of Birth
   1st Principal Caretaker _____

286

**EXHIBIT A**

**Office of Human Development Services, HHS**     **Pt. 1355, App. A**

2nd Principal Caretaker (If Applicable) ____

VIII. Parental Rights Termination (If Applicable)

A. Mother ____ (mo.) ____ (day) ____ (yr.)

B. Legal or Putative Father ____ (mo.) ____ (day) ____ (yr.)

IX. Foster Family Home—Parent(s) Data (To be answered only if Section V., Part A. CURRENT PLACEMENT SETTING is 1, 2 or 3)

A. Foster Family Structure _____

Married Couple: 1

Unmarried Couple: 2

Single Female: 3

Single Male: 4

B. Year of Birth

1st Foster Caretaker

2nd Foster Caretaker (If Applicable) ____

C. Race/Ethnicity

1. Race of 1st Foster Caretaker

a. American Indian or Alaska Native

b. Asian

c. Black or African American

d. Native Hawaiian or Other Pacific Islander

e. White

f. Unable to Determine

2. Hispanic or Latino Ethnicity of 1st Foster Caretaker____

Yes: 1

No: 2

Unable to Determine: 3

3. Race of 2nd Foster Caretaker (If Applicable)

a. American Indian or Alaska Native

b. Asian

c. Black or African American

d. Native Hawaiian or Other Pacific Islander

e. White

f. Unable to Determine

4. Hispanic or Latino Ethnicity of 2nd Foster Caretaker (If applicable)____ ____

Yes: 1

No: 2

Unable to Determine: 3

X. Outcome Information

**A. Date of Discharge From Foster Care ____ (mo.) ____ (day) ____ (yr.)

**Transaction Date ____ (mo.) ____ (day) ____ (yr.)

**B. Reason for Discharge

Reunification With Parents or Primary Caretakers: 1

Living With Other Relative(s): 2

Adoption: 3

Emancipation: 4

Guardianship: 5

Transfer to Another Agency: 6

Runaway: 7

Death of Child: 8

XI. Source(s) of Federal Financial Support/Assistance for Child (Indicate all that apply with a ''1'')

Title IV-E (Foster Care) ____

Title IV-E (Adoption Assistance) ____

Title IV-A (Aid to Families with Dependent Children) ____

Title IV-D (Child Support) ____

Title XIX (Medicaid) ____

SSI or Other Social Security Act Benefits ____

None of the Above ____

XII. Amount of the monthly foster care payment (regardless of sources). ____

*Section II—Definitions of and Instructions for Foster Care Data Elements*

*Reporting population.* The population to be included in this reporting system includes all children in foster care under the responsibility of the State agency administering or supervising the administration of the title IV-B Child and Family Services State plan and the title IV-E State plan; that is, all children who are required to be provided the assurances of section 422(b)(10) of the Social Security Act.

This population includes all children supervised by or under the responsibility of another public agency with which the title IV-B/IV-E agency has an agreement under title IV-E and on whose behalf the State makes title IV-E foster care maintenance payments.

Foster care is defined as 24 hour substitute care for children outside their own homes. The reporting system includes all children who are or had been in foster care at least 24 hours. The foster care settings include, but are not limited to:

—Family foster homes

—Relative foster homes (whether payments are being made or not)

—Group homes

—Emergency shelters

—Residential facilities

—Child care institutions

—Pre-adoptive homes

Foster care does not include children who are in their own homes under the responsibility of the State agency. However, children who are at home on a trial basis are included even though they are not considered to be in foster care. If they are included, element number V. CURRENT PLACEMENT SETTING must be given the value of ''8''.

I. General Information

A. State**—U.S. Postal Service two letter abbreviation for the State submitting the report.

B. Report Date**—The last month and the year for the reporting period.

C. Local Agency**—Identity of the county or equivalent unit which has responsibility for the case. The 5 digit Federal Information Processing Standard (FIPS) must be used.

D. Record Number**—The sequential number which the State uses to transmit data to

287

the Department of Health and Human Services (DHHS) or a unique number which follows the child as long as he or she is in foster care. The record number cannot be linked to the child's case I.D. number except at the State or local level.

E. Date of Most Recent Periodic Review (If applicable)—For children who have been in care seven months or longer, enter the month, day and year of the most recent administrative or court review, including dispositional hearing. For children who have been in care less than seven months, leave the field blank. An entry in this field certifies that the child's computer record is current up to this date.

II. Child's Demographic Information

A. Date of Birth**—Month, day and year of the child's birth. If the child is abandoned or the date of birth is otherwise unknown, enter an approximate date of birth. Use the 15th as the day of birth.

B. Sex**—Indicate as appropriate.

C. Race/Ethnicity**

1. Race—In general, a person's race is determined by how they define themselves or by how others define them. In the case of young children, parents determine the race of the child. Indicate all races (a through e) that apply with a "1." For those that do not apply, indicate a "0." Indicate "f. Unable to Determine" with a "1" if it applies and a "0" if it does not.

American Indian or Alaska Native—A person having origins in any of the original peoples of North or South America (including Central America), and who maintains tribal affiliation or community attachment.

Asian—A person having origins in any of the original peoples of the Far East, Southeast Asia, or the Indian subcontinent including, for example, Cambodia, China, India, Japan, Korea, Malaysia, Pakistan, the Philippine Islands, Thailand, and Vietnam.

Black or African American—A person having origins in any of the black racial groups of Africa.

Native Hawaiian or Other Pacific Islander—A person having origins in any of the original peoples of Hawaii, Guam, Samoa, or other Pacific Islands.

White—A person having origins in any of the original peoples of Europe, the Middle East, or North Africa.

Unable to Determine—The specific race category is "unable to determine" because the child is very young or is severely disabled and no person is available to identify the child's race. "Unable to determine" is also used if the parent, relative or guardian is unwilling to identify the child's race.

2. Hispanic or Latino Ethnicity—Answer "yes" if the child is of Mexican, Puerto Rican, Cuban, Central or South American origin, or a person of other Spanish cultural origin regardless of race. Whether or not a

person is Hispanic or Latino is determined by how they define themselves or by how others define them. In the case of young children, parents determine the ethnicity of the child. "Unable to Determine" is used because the child is very young or is severely disabled and no person is available to determine whether or not the child is Hispanic or Latino. "Unable to determine" is also used if the parent, relative or guardian is unwilling to identify the child's ethnicity.

D. Has the child been clinically diagnosed as having a disability(ies)? "Yes" indicates that a qualified professional has clinically diagnosed the child as having at least one of the disabilities listed below. "No" indicates that a qualified professional has conducted a clinical assessment of the child and has determined that the child has no disabilities. "Not Yet Determined" indicates that a clinical assessment of the child by a qualified professional has not been conducted.

1. Indicate Each Type of Disability With a "1"

Mental Retardation—Significantly subaverage general cognitive and motor functioning existing concurrently with deficits in adaptive behavior manifested during the developmental period that adversely affect a child's/youth's socialization and learning.

Visually or Hearing Impaired—Having a visual impairment that may significantly affect educational performance or development; or a hearing impairment, whether permanent or fluctuating, that adversely affects educational performance.

Physically Disabled—A physical condition that adversely affects the child's day-to-day motor functioning, such as cerebral palsy, spina bifida, multiple sclerosis, orthopedic impairments, and other physical disabilities.

Emotionally Disturbed (DSM III)—A condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree: An inability to build or maintain satisfactory interpersonal relationships; inappropriate types of behavior or feelings under normal circumstances; a general pervasive mood of unhappiness or depression; or a tendency to develop physical symptoms or fears associated with personal problems. The term includes persons who are schizophrenic or autistic. The term does not include persons who are socially maladjusted, unless it is determined that they are also seriously emotionally disturbed. The diagnosis is based on the Diagnostic and Statistical Manual of Mental Disorders (Third Edition) (DSM III) or the most recent edition.

Other Medically Diagnosed Conditions Requiring Special Care—Conditions other than those noted above which require special medical care such as chronic illnesses. Included are children diagnosed as HIV positive or with AIDS.

**EXHIBIT A**

**Office of Human Development Services, HHS**                  **Pt. 1355, App. A**

E. 1. Has this child ever been adopted? If this child has ever been legally adopted, enter "yes." If the child has never been legally adopted, enter "no". Enter "Unable to Determine" if the child has been abandoned or the child's parent(s) are otherwise not available to provide the information.

2. If yes, how old was the child when the adoption was legalized? Enter the number which represents the appropriate age range. If uncertain, use an estimate. If no one is available to provide the information, enter "Unable to Determine."

III. Removal/Placement Setting Indicators

A. Removal Episodes—The removal of the child from his/her normal place of residence resulting in his/her placement in a foster care setting.

Date of First Removal From Home— Month, day and year the child was removed from home for the first time for purpose of placement in a foster care setting. If the current[1] removal is the first removal, enter the date of the current removal.

Total Number of Removals from Home to Date—The number of times the child was removed from home, including the current removal.

Date Child was Discharged From Last Foster Care Episode (If Applicable)—For children with prior removals, enter the month, day and year they were discharged from care for the episode immediately prior to the current episode. For children with no prior removals, leave blank.

Date of Latest Removal From Home**— Month, day and year the child was last removed from his/her home for the purpose of being placed in foster care. This would be the date for the current episode or, if the child has exited foster care, the date of removal for the most recent removal.

Transaction Date**—A computer generated date which accurately indicates the month, day and year the response to "Date of Latest Removal From Home" was entered into the information system.

B. Placement Settings.

Date of Placement in Current Foster Care Setting—Month, day and year the child moved into the current foster home, facility, residence, shelter, institution, etc. for purposes of continued foster care.

Number of Previous Placement Settings During This Removal Episode—Enter the number of places the child has lived, including the current setting, during the current removal episode. Do not include trial home visits as a placement setting.

---

[1] For children who have exited foster care, "current" refers to the most recent removal episode and the most recent placement setting.

IV. Circumstances of Removal

A. Manner of Removal From Home for Current Placement Episode.

Voluntary Placement Agreement—An official voluntary placement agreement has been executed between the caretaker and the agency. The placement remains voluntary even if a subsequent court order is issued to continue the child in foster care.

Court Ordered—The court has issued an order which is the basis of the child's removal.

Not Yet Determined—A voluntary placement agreement has not been signed or a court order has not been issued. This will mostly occur in very short-term cases. When either a voluntary placement agreement is signed or a court order issued, the record should be updated to reflect the manner of removal at that time.

B. Actions or Conditions Associated With Child's Removal (Indicate all that apply with a "1".)

Physical Abuse—Alleged or substantiated physical abuse, injury or maltreatment of the child by a person responsible for the child's welfare.

Sexual Abuse—Alleged or substantiated sexual abuse or exploitation of a child by a person who is responsible for the child's welfare.

Neglect—Alleged or substantiated negligent treatment or maltreatment, including failure to provide adequate food, clothing, shelter or care.

Alcohol Abuse (Parent)—Principal caretaker's compulsive use of alcohol that is not of a temporary nature.

Drug Abuse (Parent)—Principal caretaker's compulsive use of drugs that is not of a temporary nature.

Alcohol Abuse (Child)—Child's compulsive use of or need for alcohol. This element should include infants addicted at birth.

Drug Abuse (Child)—Child's compulsive use of or need for narcotics. This element should include infants addicted at birth.

Child's Disability—Clinical diagnosis by a qualified professional of one or more of the following: Mental retardation; emotional disturbance; specific learning disability; hearing, speech or sight impairment; physical disability; or other clinically diagnosed handicap. Include only if the disability(ies) was at least one of the factors which led to the child's removal.

Child's Behavior Problem—Behavior in the school and/or community that adversely affects socialization, learning, growth, and moral development. These may include adjudicated or nonadjudicated child behavior problems. This would include the child's running away from home or other placement.

Death of Parent(s)—Family stress or inability to care for child due to death of a parent or caretaker.

289

**EXHIBIT A**

**Pt. 1355, App. A**                                    **45 CFR Ch. XIII (10–1–07 Edition)**

Incarceration of Parent(s)—Temporary or permanent placement of a parent or caretaker in jail that adversely affects care for the child.

Caretaker's Inability to Cope Due to Illness or Other Reasons—Physical or emotional illness or disabling condition adversely affecting the caretaker's ability to care for the child.

Abandonment—Child left alone or with others; caretaker did not return or make whereabouts known.

Relinquishment—Parent(s), in writing, assigned the physical and legal custody of the child to the agency for the purpose of having the child adopted.

Inadequate Housing—Housing facilities were substandard, overcrowded, unsafe or otherwise inadequate resulting in their not being appropriate for the parents and child to reside together. Also includes homelessness.

### V. Current Placement Setting**

A. Identify the type of setting in which the child currently lives.

Pre-Adoptive Home—A home in which the family intends to adopt the child. The family may or may not be receiving a foster care payment or an adoption subsidy on behalf of the child.

Foster Family Home (Relative)—A licensed or unlicensed home of the child's relatives regarded by the State as a foster care living arrangement for the child.

Foster Family Home (Non-Relative)—A licensed foster family home regarded by the State as a foster care living arrangement.

Group Home—A licensed or approved home providing 24-hour care for children in a small group setting that generally has from seven to twelve children.

Institution—A child care facility operated by a public or private agency and providing 24-hour care and/or treatment for children who require separation from their own homes and group living experience. These facilities may include: Child care institutions; residential treatment facilities; maternity homes; etc.

Supervised Independent Living—An alternative transitional living arrangement where the child is under the supervision of the agency but without 24 hour adult supervision, is receiving financial support from the child welfare agency, and is in a setting which provides the opportunity for increased responsibility for self care.

Runaway—The child has run away from the foster care setting.

Trial Home Visit—The child has been in a foster care placement, but, under State agency supervision, has been returned to the principal caretaker for a limited and specified period of time.

B. Is current placement setting out of State?

"Yes" indicates that the current placement setting is located outside of the state making the report.

"No" indicates that the child continues to reside within the state making the report.

NOTE: Only the state with placement and care responsibility for the child should include the child in this reporting system.

### VI. Most Recent Case Plan Goal***

Indicate the most recent case plan goal for the child based on the latest review of the child's case plan—whether a court review or an administrative review. If the child has been in care less than six months, enter the goal in the case record as determined by the caseworker.

Reunify With Parents or Principal Caretaker(s)—The goal is to keep the child in foster care for a limited time to enable the agency to work with the family with whom the child had been living prior to entering foster care in order to reestablish a stable family environment.

Live With Other Relatives—The goal is to have the child live permanently with a relative or relatives other than the ones from whom the child was removed. This could include guardianship by a relative(s).

Adoption—The goal is to facilitate the child's adoption by relatives, foster parents or other unrelated individuals.

Long Term Foster Care—Because of specific factors or conditions, it is not appropriate or possible to return the child home or place her or him for adoption, and the goal is to maintain the child in a long term foster care placement.

Emancipation—Because of specific factors or conditions, it is not appropriate or possible to return the child home, have a child live permanently with a relative or have the child be adopted; therefore, the goal is to maintain the child in a foster care setting until the child reaches the age of majority.

Guardianship—The goal is to facilitate the child's placement with an agency or unrelated caretaker, with whom he or she was not living prior to entering foster care, and whom a court of competent jurisdiction has designated as legal guardian.

Case Plan Goal Not Yet Established—No case plan goal has yet been established other then the care and protection of the child.

### VII. Principal Caretaker(s) Information

A. Caretaker Family Structure—Select from the four alternatives—married couple, unmarried couple, single female, single male—the category which best describes the type of adult caretaker(s) from whom the child was removed for the current foster care episode. Enter "Unable to Determine" if the child has been abandoned or the child's caretakers are otherwise unknown.

**EXHIBIT A**

**Office of Human Development Services, HHS**      **Pt. 1355, App. A**

B. Year of Birth—Enter the year of birth for up to two caretakers. If the response to data element VII. A.—Caretaker Family Structure, was 1 or 2, enter data for two caretakers. If the response was 3 or 4, enter data only for the first caretaker. If the exact year of birth is unknown, enter an estimated year of birth.

### VIII. Parental Rights Termination

Enter the month, day and year that the court terminated the parental rights. If the parents are known to be deceased, enter the date of death.

### IX. Family Foster Home—Parent(s) Data

Provide information only if data element CURRENT PLACEMENT SETTING is 1, 2, or 3.

A. Foster Family Structure—Select from the four alternatives—married couple, unmarried couple, single female, single male—the category which best describes the nature of the foster parents with whom the child is living in the current foster care episode.

B. Year of Birth—Enter the year of birth for up to two foster parents. If the response to data element IX. A.—Foster Family Structure, was 1 or 2, enter data for two caretakers. If the response was 3 or 4, enter data only for the first caretaker. If the exact year of birth is unknown, enter an estimated year of birth.

C. Race—Indicate the race for each of the foster parent(s). See instructions and definitions for the race categories under data element II.C.1. Use ''f. Unable to Determine'' only when a parent is unwilling to identify his or her race. Hispanic or Latino Ethnicity—Indicate the ethnicity for each of the foster parent(s). See instructions and definitions under data element II.C.2. Use ''f. Unable to Determine'' only when a parent is unwilling to identify his or her ethnicity.

### X. Outcome Information

Enter data only for children who have exited foster care during the reporting period.

A. Date of Discharge From Foster Care**—Enter the month, day and year the child was discharged from foster care. If the child has not been discharged from care, leave blank.

Transaction Date**—A computer generated date which accurately indicates the month, day and year the response to ''Date of Discharge from Foster Care'' was entered into the information system.

B. Reason for Discharge**.

Reunification With Parents or Primary Caretakers—The child was returned to his or her principal caretaker(s)' home.

Living With Other Relatives—The child went to live with a relative other than the one from whose home he or she was removed.

Adoption—The child was legally adopted.

Emancipation—The child reached majority according to State law by virtue of age, marriage, etc.

Guardianship—Permanent custody of the child was awarded to an individual.

Transfer to Another Agency—Responsibility for the care of the child was awarded to another agency—either in or outside of the State.

Runaway—The child ran away from the foster care placement.

Death of Child—The child died while in foster care.

### XI. Source(s) of Federal Support/Assistance for Child (Indicate All That Apply With a ''1''.)

Title IV-E (Foster Care)—Title IV-E foster care maintenance payments are being paid on behalf of the child.

Title IV-E (Adoption Subsidy)—Title IV-E adoption subsidy is being paid on behalf of the child who is in an adoptive home, but the adoption has not been legalized.

Title IV-A (Aid to Families With Dependent Children)—Child is living with relative(s) whose source of support is an AFDC payment for the child.

Title IV-D (Child Support)—Child support funds are being paid to the State agency on behalf of the child by assignment from the receiving parent.

Title XIX (Medicaid)—Child is eligible for and may be receiving assistance under title XIX.

SSI or Other Social Security Act Benefits—Child is receiving support under title XVI or other Social Security Act titles not included in this section.

None of the Above—Child is receiving support only from the State or from some other source (Federal or non-Federal) which is not indicated above.

### XII. Amount of the Monthly Foster Care Payment (Regardless of Sources)

Enter the monthly payment paid on behalf of the child regardless of source (i.e., Federal, State, county, municipality, tribal, and private payments). If title IV-E is paid on behalf of the child the amount indicated should be the total computable amount. If the payment made on behalf of the child is not the same each month, indicate the amount of the last full monthly payment made during the reporting period. If no monthly payment has been made during the period, enter all zeros.

[58 FR 67926, Dec. 22, 1993; 59 FR 13535, Mar. 22, 1994; 59 FR 42520, Aug. 18, 1994; 60 FR 40507, Aug. 9, 1995; 60 FR 46887, Sept. 8, 1995; 65 FR 4084, Jan. 25, 2000]

**EXHIBIT A**

**Pt. 1355, App. B**                                        **45 CFR Ch. XIII (10–1–07 Edition)**

APPENDIX B TO PART 1355—ADOPTION
DATA ELEMENTS

*Section I—Adoption Data Elements*

I. General Information
  A. State
  B. Report Date ____(mo.) ____(day) ____(yr.)
  C. Record Number _____
  D. Did the State Agency Have any Involve-
    ment in This Adoption? _____
  Yes: 1
  No: 2
II. Child's Demographic Information
  A. Date of Birth ____(mo) ____(day) ____(yr.)
  B. Sex ____
  Male: 1
  Female: 2
  C. Race/Ethnicity
  1. Race
  a. American Indian or Alaska Native
  b. Asian
  c. Black or African American
  d. Native Hawaiian or Other Pacific Is-
    lander
  e. White
  f. Unable to Determine
  2. Hispanic or Latino Ethnicity_____
  Yes: 1
  No: 2
  Unable to determine: 3
III. Special Needs Status
  A. Has the State child welfare agency de-
    termined that this child has special
    needs? _____
  Yes: 1
  No: 2
  B. If yes, indicate the primary basis for de-
    termining that this child has special
    needs _____
  Racial/Original Background: 1
  Age: 2
  Membership in a Sibling Group to be
    Placed for Adoption Together: 3
  Medical Conditions or Mental, Physical or
    Emotional Disabilities: 4
  Other: 5
  1. If III. B was "4," indicate with a "1" the
    type(s) of disability(ies)
  Mental Retardation _____
  Visually or Hearing Impaired _____
  Physically Disabled _____
  Emotionally Disturbed (DSM III) _____
  Other Medically Diagnosed Condition Re-
    quiring Special Care _____
IV. Birth Parents
  A. Year of Birth _____
  Mother, If known _____
  Father (Putative or Legal), if known
    _____
  B. Was the mother married at the time of
    the child's birth? _____
  Yes: 1
  No: 2
  Unable to Determine: 3
V. Court Actions
  A. Dates of Termination of Parental
    Rights

Mother ____(mo.) ____(day) ____(yr.)
Father ____(mo.) ____(day) ____(yr.)
  B. Date Adoption Legalized ____(mo.)
    ____(day) ____(yr.)
VI. Adoptive Parents
  A. Family Structure _____
  Married Couple: 1
  Unmarried Couple: 2
  Single Female: 3
  Single Male: 4
  B. Year of Birth
  Mother (if Applicable) _____
  Father (if Applicable) _____
  C. Race/Ethnicity
  1. Adoptive Mother's Race (If Applicable)
  a. American Indian or Alaska Native
  b. Asian
  c. Black or African American
  d. Native Hawaiian or Other Pacific Is-
    lander
  e. White
  f. Unable to Determine
  2. Hispanic or Latino Ethnicity of Mother
    (If Applicable)_____
  Yes: 1
  No: 2
  Unable to Determine: 3
  3. Adoptive Father's Race (If Applicable)
  a. American Indian or Alaska Native
  b. Asian
  c. Black or African American
  d. Native Hawaiian or Other Pacific Is-
    lander
  e. White
  f. Unable to Determine
  4. Hispanic or Latino Ethnicity of Father
    (If Applicable)_____
  Yes: 1
  No: 2
  Unable to Determine: 3
  D. Relationship of Adoptive Parent(s) to
    the Child (Indicate with a "1" all that
    apply)
  Stepparent
  Other Relative of Child by Birth or Mar-
    riage _____
  Foster Parent of Child _____
  Non-Relative
VII. Placement Information
  A. Child Was Placed From _____
  Within State: 1
  Another State: 2
  Another Country: 3
  B. Child Was Placed by _____
  Public Agency: 1
  Private Agency: 2
  Tribal Agency: 3
  Independent Person: 4
  Birth Parent: 5
VIII. Federal/State Financial Adoption Sup-
    port
  A. Is a monthly financial subsidy being
    paid for this child? _____
  Yes: 1
  No: 2
  B. If yes, the monthly amount _____

**EXHIBIT A**

C. If VIII. A is yes, is the subsidy paid under Title IV-E adoption assistance?

Yes: 1
No: 2

*Section II—Definitions of Instructions for Adoption Data Elements*

*Reporting population*

The State must report on all children who are adopted in the State during the reporting period and in whose adoption the State title IV-B/IV-E agency has had any involvement. All adoptions which occurred on or after October 1, 1994 and which meet the criteria set forth in this regulation must be reported. Failure to report on these adoptions will result in penalties being assessed. Reports on all other adoptions are encouraged but are voluntary. Therefore, reports on the following are mandated:

(a) All children adopted who had been in foster care under the responsibility and care of the State child welfare agency and who were subsequently adopted whether special needs or not and whether subsidies are provided or not;

(b) All special needs children who were adopted in the State, whether or not they were in the public foster care system prior to their adoption and for whom non-recurring expenses were reimbursed; and

(c) All children adopted for whom an adoption assistance payment or service is being provided based on arrangements made by or through the State agency.

These children must be identified by answering "yes" to data element I.D. Children who are reported by the State, but for whom there has not been any State involvement, and whose reporting, therefore, has not been mandated, are identified by answering "no" to element I.D.

I. General Information

A. State—U.S. Postal Service two letter abbreviation for the State submitting the report.

B. Report Date—The last month and the year for the reporting period.

C. Record Number—The sequential number which the State uses to transmit data to the Department of Health and Human Services (DHHS). The record number cannot be linked to the child except at the State or local level.

D. Did the State Agency Have Any Involvement in This Adoption?

Indicate whether the State Title IV-B/IV-E agency had any involvement in this adoption, that is, whether the adopted child belongs to one of the following categories:

• A child who had been in foster care under the responsibility and care of the State child welfare agency and who was subsequently adopted whether special needs or not and whether a subsidy was provided or not;

• A special needs child who was adopted in the State, whether or not he/she was in the public foster care system prior to his/her adoption and for whom non-recurring expenses were reimbursed; or

• A child for whom an adoption assistance payment or service is being provided based on arrangements made by or through the State agency.

II. Child's Demographic Information

A. Date of Birth—Month and year of the child's birth. If the child was abandoned or the date of birth is otherwise unknown, enter an approximate date of birth.

B. Sex—Indicate as appropriate.

C. Race/Ethnicity

1. Race—In general, a person's race is determined by how they define themselves or by how others define them. In the case of young children, parents determine the race of the child. Indicate all races (a-e) that apply with a "1." For those that do not apply, indicate a "0." Indicate "f. Unable to Determine" with a 1" if it applies and a "0" if it does not.

American Indian or Alaska Native—A person having origins in any of the original peoples of North or South America (including Central America), and who maintains tribal affiliation or community attachment.

Asian—A person having origins in any of the original peoples of the Far East, Southeast Asia, or the Indian subcontinent including, for example, Cambodia, China, India, Japan, Korea, Malaysia, Pakistan, the Philippine Islands, Thailand, and Vietnam.

Black or African American—A person having origins in any of the black racial groups of Africa.

Native Hawaiian or Other Pacific Islander—A person having origins in any of the original peoples of Hawaii, Guam, Samoa, or other Pacific Islands.

White—A person having origins in any of the original peoples of Europe, the Middle East, or North Africa.

Unable to Determine—The specific race category is "unable to determine" because the child is very young or is severely disabled and no person is available to identify the child's race. "Unable to determine" is also used if the parent, relative or guardian is unwilling to identify the child's race.

2. Hispanic or Latino Ethnicity—Answer "yes" if the child is of Mexican, Puerto Rican, Cuban, Central or South American origin, or a person of other Spanish cultural origin regardless of race. Whether or not a person is Hispanic or Latino is determined by how they define themselves or by how others define them. In the case of young children, parents determine the ethnicity of the child. "Unable to Determine" is used because

293

**EXHIBIT A**

the child is very young or is severely disabled and no other person is available to determine whether or not the child is Hispanic or Latino. "Unable to determine" is also used if the parent, relative or guardian is unwilling to identify the child's ethnicity.

### III. Special Needs Status

A. Has the State Agency Determined That the Child has Special Needs?

Use the State definition of special needs as it pertains to a child eligible for an adoption subsidy under title IV–E.

B. Primary Factor or Condition for Special Needs—Indicate only the primary factor or condition for categorization as special needs and only as it is defined by the State.

Racial/Original Background—Primary condition or factor for special needs is racial/original background as defined by the State.

Age—Primary factor or condition for special needs is age of the child as defined by the State.

Membership in a Sibling Group to be Placed for Adoption Together—Primary factor or condition for special needs is membership in a sibling group as defined by the State.

Medical Conditions of Mental, Physical, or Emotional Disabilities—Primary factor or condition for special needs is the child's medical condition as defined by the State, but clinically diagnosed by a qualified professional.

When this is the response to question B, then item 1 below must be answered.

1. Types of Disabilities—Data are only to be entered if response to III.B was "4." Indicate with a "1" the types of disabilities.

Mental Retardation—Significantly subaverage general cognitive and motor functioning existing concurrently with deficits in adaptive behavior manifested during the developmental period that adversely affect a child's/youth's socialization and learning.

Visually or Hearing Impaired—Having a visual impairment that may significantly affect educational performance or development; or a hearing impairment, whether permanent or fluctuating, that adversely affects educational performance.

Physically Disabled—A physical condition that adversely affects the child's day-to-day motor functioning, such as cerebral palsy, spina bifida, multiple sclerosis, orthopedic impairments, and other physical disabilities.

Emotionally Disturbed (DSM III)—A condition exhibiting one or more of the following characteristics over a long period of time and to a marked degree: An inability to build or maintain satisfactory interpersonal relationships; inappropriate types of behavior or feelings under normal circumstances; a general pervasive mood of unhappiness or depression; or a tendency to develop physical symptoms or fears associated with personal problems. The term includes persons who are

schizophrenic or autistic. The term does not include persons who are socially maladjusted, unless it is determined that they are also seriously emotionally disturbed. Diagnosis is based on the *Diagnostic and Statistical Manual of Mental Disorders (Third Edition)* (DSM III) or the most recent edition.

Other Medically Diagnosed Conditions Requiring Special Care—Conditions other than those noted above which require special medical care such as chronic illnesses. Included are children diagnosed as HIV positive or with AIDS.

### IV. Birth Parents

A. Year of Birth—Enter the year of birth for both parents, if known. If the child was abandoned and no information was available on either one or both parents, leave blank for the parent(s) for which no information was available.

B. Was the Mother Married at the Time of the Child's Birth?

Indicate whether the mother was married at time of the child's birth; include common law marriage if legal in the State. If the child was abandoned and no information was available on the mother, enter "Unable to Determine."

### V. Court Actions

A. Dates of Termination of Parental Rights—Enter the month, day and year that the court terminated parental rights. If the parents are known to be deceased, enter the date of death.

B. Date Adoption Legalized—Enter the date the court issued the final adoption decree.

### VI. Adoptive Parents

A. Family Structure—Select from the four alternatives—married couple, unmarried couple, single female, single male—the category which best describes the nature of the adoptive parent(s) family structure.

B. Year of Birth—Enter the year of birth for up to two adoptive parents. If the response to data element IV.A—Family Structure, was 1 or 2, enter data for two parents. If the response was 3 or 4, enter data only for the appropriate parent. If the exact year of birth is unknown, enter an estimated year of birth.

C. Race/Ethnicity—Indicate the race/ethnicity for each of the adoptive parent(s). See instructions and definitions for the race/ethnicity categories under data element II.C. Use "f. Unable to Determine" only when a parent is unwilling to identify his or her race or ethnicity.

D. Relationship to Adoptive Parent(s)—Indicate the prior relationship(s) the child had with the adoptive parent(s).

Stepparent—Spouse of the child's birth mother or birth father.

**EXHIBIT A**

**Office of Human Development Services, HHS**       **Pt. 1355, App. C**

Other Relative of Child by Birth or Marriage—A relative through the birth parents by blood or marriage.

Foster Parent of Child—Child was placed in a non-relative foster family home with a family which later adopted him or her. The initial placement could have been for the purpose of adoption or for the purpose of foster care.

Non-Relative—Adoptive parent fits into none of the categories above.

### VII. Placement Information

A. Child Was Placed From: Indicate the location of the individual or agency that had custody or responsibility for the child at the time of initiation of adoption proceedings.

Within State—Responsibility for the child resided with an individual or agency within the State filing the report.

Another State—Responsibility for the child resided with an individual or agency in another State or territory of the United States.

Another Country—Immediately prior to the adoptive placement, the child was residing in another country and was not a citizen of the United States.

B. Child Was Placed By: Indicate the individual or agency which placed the child for adoption.

Public Agency—A unit of State or local government.

Private Agency—A for-profit or non-profit agency or institution.

Tribal Agency—A unit within one of the Federally recognized Indian Tribes or Indian Tribal Organizations.

Independent Person—A doctor, a lawyer or some other individual.

Birth Parent—The parent(s) placed the child directly with the Adoptive parent(s).

### VIII. State/Federal Adoption Support

A. Is The Child Receiving a Monthly Subsidy?

Enter "yes" if this child was adopted with an adoption assistance agreement under which regular subsidies (Federal or State) are paid.

B. Monthly Amount—Indicate the monthly amount of the subsidy. The amount of the subsidy should be rounded to the nearest dollar. Indicate "0" if the subsidy includes only benefits under titles XIX or XX of the Social Security Act.

C. If VIII.A is "Yes," is Child Receiving Title IV-E Adoption Subsidy?

If VIII.A is "yes," indicate whether the subsidy is claimed by the State for reimbursement under title IV-E. Do not include title IV-E non-recurring costs in this item.

[58 FR 67929, Dec. 22, 1993; 59 FR 42520, Aug. 18, 1994; 65 FR 4084, Jan. 25, 2000]

APPENDIX C TO PART 1355—ELECTRONIC DATA TRANSMISSION FORMAT

All AFCARS data to be sent from State agencies/Indian Tribes to the Department are to be in electronic form. In order to meet this general specification, the Department will offer as much flexibility as possible. Technical assistance will be provided to negotiate a method of transmission best suited to the States' environment.

There will be four semi-annual electronic data transmissions from the States to the Administration for Children and Families (ACF). The Summary Submission File, one each for Foster Care and Adoption, and the Detail Submission File, one each for Foster Care and Adoption. The Summary File must be transmitted first, followed immediately by the Detail File. See appendix D for Foster Care and Adoption Detail and Summary record layout formats.

There are four methods for electronic data exchange currently operating for other Departmental programs of a similar nature. These methods are: (1) MITRON tape-to-tape transfer, (2) mainframe-to-mainframe data transfer, (3) personal computer (PC) to mainframe data transmission using a data transfer protocol, and (4) a personal computer to personal computer protocol. A general description of these methods is provided below:

*1. MITRON, Tape-to-Tape Data Transmission*

In order to use the MITRON system, both the sender and receiver must have MITRON equipment (tape drive and main unit) and software. The MITRON system is capable of handling a large volume of data but is limited to one reel of tape per transmission session. (If the data quantity exceeds one tape, a header/trailer record must be placed on each physical tape reel.) These are standard 2400 foot tapes, using standard labels. The tape density is limited to the 1600 bits per inch (bpi) specification.

*2. Mainframe-to-Mainframe*

The ACF has installed a mainframe-to-mainframe data exchange system using the Sterling Software data transfer package called "SUPERTRACS." This package will allow data exchange between most computer platforms (both mini and mainframe) and the Department's mainframe in a dial-up mode. No additional software is needed by the remote computer site beyond what the Department will supply. This method has proven effective for small to moderate amounts (100 to 5,000 records) of data.

*3. Electronic File Transfer Between PC and Mainframe*

This method uses the SIMPC software package on the personal computer and the

295

**EXHIBIT A**

**Pt. 1355, App. D**                                                 **45 CFR Ch. XIII (10–1–07 Edition)**

host mainframe. The software will be provided by the Department. This method is best suited for small to moderate (100 to 5,000) records transmissions. The advantages of Electronic File Transfer are the elimination of tapes and associated problems and the advantage of automatic record checking during the transmission session. If a State is currently maintaining the AFCARS data on a personal computer and is unable to download and upload to its mainframe, Electronic File Transfer is an appropriate transmission mechanism.

*4. Personal Computer to Personal Computer*

This method uses the SIMPC software package on the sending personal computer and the receiving personal computer. The software will be provided by the Department. This method is best suited for small to moderate (100 to 5,000) records transmissions. The advantages of Electronic File Transfer are the elimination of tapes and associated problems and the advantage of automatic record checking during the transmission session. If a State is currently maintaining the AFCARS data on a personal computer, the personal computer to personal computer transfer is an appropriate transmission mechanism.

In conjunction with Departmental staff, State agencies and Indian Tribes should review their resources and select the system that will best suit their data transmission needs. Over time, State agencies and Indian Tribes can change their transmission methods, provided that proper notification is provided.

Regardless of the electronic data transmission methodology selected, certain criteria must be met by the State agencies and Indian Tribes:

(1) Records must be written using ASCII standard character format.

(2) All elements must be comprised of integer (numeric) value(s). Element character length specifications refer to the maximum number of numeric values permitted for that element. See appendix D.

(3) All records must be a fixed length. The Foster Care Detailed Data Elements Record is 150 characters long and the Adoption De-

tailed Data Elements Record is 72 characters long. The Foster Care Summary Data Elements Record and the Adoption Summary Data Elements Record are each 172 characters long.

(4) All States and Indian Tribes must inform the Department, in writing, of the method of transfer they intend to use.

[58 FR 67931, Dec. 22, 1993; 59 FR 42520, Aug. 18, 1994, as amended at 60 FR 40507, Aug. 9, 1995]

APPENDIX D TO PART 1355—FOSTER
CARE AND ADOPTION RECORD LAYOUTS

*A. Foster Care*

1. Foster Care Semi-Annual Detailed Data
Elements Record

a. The record will consist of 66 data
elements.

b. Data must be supplied for each of the elements in accordance with these instructions:

(1) All data must be numeric. Enter the appropriate value for each element.

(2) Enter date values in year, month and day order (YYYYMMDD), e.g., 19991030 for October 30, 1999, or year and month order (YYYYMM), e.g., 199910 for October 1999. Leave the element value blank if dates are not applicable.

(3) For elements 8, 11–15, 26–40, 52, 54 and 59–65, which are "select all that apply" elements, enter a "1" for each element that applies, enter a zero for non-applicable elements.

(4) Transaction Date—is a computer generated date indicating when the datum (Elements 21 or 55) is entered into the State's automated information system.

(5) Report the status of all children in foster care as of the last day of the reporting period. Also, provide data for all children who were discharged from foster care at any time during the reporting period, or in the previous reporting period, if not previously reported.

c. Foster Care Semi-Annual Detailed Data Elements Record Layout follows:

| Element No. | Appendix A data element | Data element description | No. of numeric characters |
|---|---|---|---|
| 01 ............... | I.A. .................... | State ........................................................................... | 2 |
| 02 ............... | I.B. .................... | Report period ending date ........................................... | 6 |
| 03 ............... | I.C. .................... | Local Agency FIPS code (county or equivalent jurisdiction) ............ | 5 |
| 04 ............... | I.D. .................... | Record number ............................................................ | 12 |
| 05 ............... | I.E. .................... | Date of most recent periodic review ............................ | 8 |
| 06 ............... | II.A. ................... | Child's date of birth .................................................... | 8 |
| 07 ............... | II.B. ................... | Sex .............................................................................. | 1 |
| 08 ............... | II.C.1. ................ | Race. | |
| 08a ............. | ........................... | American Indian or Alaska native ............................... | 1 |
| 08b ............. | ........................... | Asian ........................................................................... | 1 |
| 08c ............. | ........................... | Black or African American .......................................... | 1 |
| 08d ............. | ........................... | Native Hawaiian or Other Pacific Islander ................... | 1 |

**EXHIBIT A**

**Office of Human Development Services, HHS**          **Pt. 1355, App. D**

| Element No. | Appendix A data element | Data element description | No. of numeric characters |
|---|---|---|---|
| 08e ............. | ............. | White ........................................................................................ | 1 |
| 08f ............. | ............. | Unable to Determine .............................................................. | 1 |
| 09 ............... | II.C.2. | Hispanic or Latino Ethnicity ................................................... | 1 |
| 10 ............... | II.D. | Has this child been clinically diagnosed as having a disability(ies) | 1 |
|  |  | **Indicate each type of disability of the child with a "1" for elements 11–15 and a zero for disabilities that do not apply.** |  |
| 11 ............... | II.D.1.a. | Mental retardation ................................................................. | 1 |
| 12 ............... | II.D.1.b. | Visually or hearing impaired ................................................. | 1 |
| 13 ............... | II.D.1.c. | Physically disabled ................................................................ | 1 |
| 14 ............... | II.D.1.d. | Emotionally disturbed (DSM III) ........................................... | 1 |
| 15 ............... | II.D.1.e | Other medically diagnosed condition requiring special care .. | 1 |
| 16 ............... | II.E.1. | Has this child ever been adopted ........................................ | 1 |
| 17 ............... | II.E.2. | If yes, how old was the child when the adoption was legalized? .... | 1 |
| 18 ............... | III.A.1. | Date of first removal from home .......................................... | 8 |
| 19 ............... | III.A.2. | Total number of removals from home to date ....................... | 2 |
| 20 ............... | III.A.3. | Date child was discharged from last foster care episode ...... | 8 |
| 21 ............... | III.A.4. | Date of latest removal from home ........................................ | 8 |
| 22 ............... | III.A.5. | Removal transaction date ...................................................... | 8 |
| 23 ............... | III.B.1. | Date of placement in current foster care setting ................. | 8 |
| 24 ............... | III.B.2. | Number of previous placement settings during this removal episode. | 2 |
| 25 ............... | IV.A. | Manner of removal from home for current placement episode ........ | 1 |
|  |  | **Actions or conditions associated with child's removal: Indicate with a "1" for elements 26–40 and a zero for conditions that do not apply.** |  |
| 26 ............... | IV.B.1. | Physical abuse (alleged/reported) ......................................... | 1 |
| 27 ............... | IV.B.2. | Sexual abuse (alleged/reported) ........................................... | 1 |
| 28 ............... | IV.B.3. | Neglect (alleged/reported) ..................................................... | 1 |
| 29 ............... | IV.B.4. | Alcohol abuse (parent) .......................................................... | 1 |
| 30 ............... | IV.B.5. | Drug abuse (parent) .............................................................. | 1 |
| 31 ............... | IV.B.6. | Alcohol abuse (child) ............................................................ | 1 |
| 32 ............... | IV.B.7. | Drug abuse (child) ................................................................ | 1 |
| 33 ............... | IV.B.8. | Child's disability ................................................................... | 1 |
| 34 ............... | IV.B.9. | Child's behavior problem ...................................................... | 1 |
| 35 ............... | IV.B.10. | Death of parent(s) ................................................................ | 1 |
| 36 ............... | IV.B.11. | Incarceration of parent(s) ..................................................... | 1 |
| 37 ............... | IV.B.12. | Caretaker's inability to cope due to illness or other reasons ......... | 1 |
| 38 ............... | IV.B.13. | Abandonment ......................................................................... | 1 |
| 39 ............... | IV.B.14. | Relinquishment ...................................................................... | 1 |
| 40 ............... | IV.B.15. | Inadequate housing .............................................................. | 1 |
| 41 ............... | V.A. | Current placement setting ..................................................... | 1 |
| 42 ............... | V.B | Out of State placement ......................................................... | 1 |
| 43 ............... | VI. | Most recent case plan goal .................................................. | 1 |
| 44 ............... | VII.A. | Caretaker family structure .................................................... | 1 |
| 45 ............... | VII.B.1. | Year of birth (1st principal caretaker) ................................. | 4 |
| 46 ............... | VII.B.2. | Year of birth (2nd principal caretaker) ................................ | 4 |
| 47 ............... | VIII.A. | Date of mother's parental rights termination ........................ | 8 |
| 48 ............... | VIII.B. | Date of legal or putative father's parental rights ................. | 8 |
| 49 ............... | IX.A. | Foster family structure ......................................................... | 1 |
| 50 ............... | IX.B.1. | Year of birth (1st foster caretaker) ...................................... | 4 |
| 51 ............... | IX.B.2. | Year of birth (2nd foster caretaker) ..................................... | 4 |
| 52 ............... | IX.C.1. | Race of 1st foster caretaker. |  |
| 52a ............. | ............. | American Indian or Alaska Native ........................................ | 1 |
| 52b ............. | ............. | Asian ....................................................................................... | 1 |
| 52c ............. | ............. | Black or Asian American ...................................................... | 1 |
| 52d ............. | ............. | Native Hawaiian or Other Pacific Islander ........................... | 1 |
| 52e ............. | ............. | White ........................................................................................ | 1 |
| 52f ............. | ............. | Unable to Determine .............................................................. | 1 |
| 53 ............... | IX.C.2. | Hispanic or Latino ethnicity of 1st foster caretaker ............. | 1 |
| 54 ............... | IX.C.3. | Race of 2nd foster caretaker. |  |
| 54a ............. | ............. | American Indian or Alaska Native ........................................ | 1 |
| 54b ............. | ............. | Asian ....................................................................................... | 1 |
| 54c ............. | ............. | Black or African American .................................................... | 1 |
| 54d ............. | ............. | Native Hawaiian or Other pacific islander ........................... | 1 |
| 54e ............. | ............. | White ........................................................................................ | 1 |
| 54f ............. | ............. | Unable to Determine .............................................................. | 1 |
| 55 ............... | IX.C.4. | Hispanic or Latino ethnicity of 2nd foster caretaker ........... | 1 |
| 56 ............... | X.A.1. | Date of discharge from foster care ...................................... | 8 |
| 57 ............... | X.A.2. | Foster care discharge transaction date ................................ | 8 |
| 58 ............... | X.B. | Reason for discharge ............................................................ | 1 |
|  |  | **Sources of Federal support/assistance for child; indicate with a "1" for elements 58–64 and a zero for sources that do not apply.** |  |

**EXHIBIT A**

| Element No. | Appendix A data element | Data element description | No. of numeric characters |
|---|---|---|---|
| 59 .................... | XI.A. ............................ | Title IV-E (Foster Care) ........................................................ | 1 |
| 60 .................... | XI.B. ............................ | Title IV-E (Adoption Assistance) .......................................... | 1 |
| 61 .................... | XI.C. ............................ | Title IV-A (Aid to Families With Dependent Children) ......... | 1 |
| 62 .................... | XI.D. ............................ | Title IV-D (Child Support) .................................................... | 1 |
| 63 .................... | XI.E. ............................ | Title XIX (Medicaid) ............................................................. | 1 |
| 64 .................... | XI.F. ............................ | SSI or other Social Security Act benefits ........................... | 1 |
| 65 .................... | XI.G. ............................ | None of the above ............................................................... | 1 |
| 66 .................... | XII ................................ | Amount of monthly foster care payment (regardless of source) ...... | 5 |
| | | Total characters .................................................................. | 197 |

2. Foster Care Semi-Annual Summary Data Elements Record

a. The record will consist of 22 data elements.

The values for these data elements are generated by processing all records in the semi-annual detailed data transmission and computing the summary values for Elements 1 and 3–22. Element 2 is the semi-annual report period ending date. In calculating the age range for the child, the last day of the reporting period is to be used.

b. Data must be supplied for each of the elements in accordance with these instructions:

(1) Enter the appropriate value for each element.

(2) For all elements where the total is zero, enter a numeric zero.

(3) Enter date values in year, month order (YYYYMM), e.g.,199912 for December 1999.

c. Foster Care Semi-Annual Summary Data Elements Record Layout follows:

| Element No. | Summary data file | No. of characters |
|---|---|---|
| 01 .................... | Number of records ......................................................................................... | 8 |
| 02 .................... | Report period ending date (YYYYMM) ........................................................... | 6 |
| 03 .................... | Children in care under 1 year ....................................................................... | 8 |
| 04 .................... | Children in care 1 year old ........................................................................... | 8 |
| 05 .................... | Children in care 2 years old .......................................................................... | 8 |
| 06 .................... | Children in care 3 years old .......................................................................... | 8 |
| 07 .................... | Children in care 4 years old .......................................................................... | 8 |
| 08 .................... | Children in care 5 years old .......................................................................... | 8 |
| 09 .................... | Children in care 6 years old .......................................................................... | 8 |
| 10 .................... | Children in care 7 years old .......................................................................... | 8 |
| 11 .................... | Children in care 8 years old .......................................................................... | 8 |
| 12 .................... | Children in care 9 years old .......................................................................... | 8 |
| 13 .................... | Children in care 10 years old ........................................................................ | 8 |
| 14 .................... | Children in care 11 years old ........................................................................ | 8 |
| 15 .................... | Children in care 12 years old ........................................................................ | 8 |
| 16 .................... | Children in care 13 years old ........................................................................ | 8 |
| 17 .................... | Children in care 14 years old ........................................................................ | 8 |
| 18 .................... | Children in care 15 years old ........................................................................ | 8 |
| 19 .................... | Children in care 16 years old ........................................................................ | 8 |
| 20 .................... | Children in care 17 years old ........................................................................ | 8 |
| 21 .................... | Children in care 18 years old ........................................................................ | 8 |
| 22 .................... | Children in care over 18 years old ................................................................ | 8 |
| | Record Length ............................................................................................... | 174 |

*B. Adoption*

1. Adoption Semi-Annual Detailed Data Elements Record

a. The record will consist of 37 data elements.

b. Data must be supplied for each of the elements in accordance with these instructions:

(1) Enter the appropriate value for each element.

(2) Enter date values in year, month and day order (YYYYMMDD), e.g., 19991030 for October 30, 1999, or year and month (YYYYMM), e.g., 199910 for October 1999. Leave the element value blank if dates are not applicable.

(3) For elements 7, 11–15, 25, 27 and 29–32 which are "select all that apply" elements, enter a "1" for each element that applies; enter a zero for non-applicable elements.

c. Adoption Semi-Annual Detailed Data Elements Record Layout follows:

**EXHIBIT A**

**Office of Human Development Services, HHS**          **Pt. 1355, App. D**

| Element No. | Appendix B data element | Data element description | No. of numeric characters |
|---|---|---|---|
| 01 | I.A. | State | 2 |
| 02 | I.B. | Report period ending date | 6 |
| 03 | I.C. | Record number | 6 |
| 04 | I.D. | State Agency involvement | 1 |
| 05 | II.A. | Date of birth | 6 |
| 06 | II.B. | Sex | 1 |
| 07 | II.C.1. | Race. | |
| 07a | | American Indian or Alaska Native | 1 |
| 07b | | Asian | 1 |
| 07c | | Black or African American | 1 |
| 07d | | Native Hawaiian or Other Pacific Islander | 1 |
| 07e | | White | 1 |
| 07f | | Unable to Determine | 1 |
| 08 | II.C.2. | Hispanic or Latino ethnicity | 1 |
| 09 | III.A | Has the State Agency determined that this child has special needs | 1 |
| 10 | III.B | Primary basis for special needs | 1 |
| | | **Indicate a primary basis of special needs with a ''1'' for elements 11–15. Enter a zero for special needs that do not apply.** | |
| 11 | III.B.1.a | Mental retardation | 1 |
| 12 | III.B.1.b. | Visually or hearing impaired | 1 |
| 13 | III.B.1.c | Physically disabled | 1 |
| 14 | III.B.1.d | Emotionally disturbed (DSM III) | 1 |
| 15 | III.B.1.d | Other medically diagnosed condition requiring special care | 1 |
| 16 | IV.A.1. | Mother's year of birth | 4 |
| 17 | IV.A.2. | Father's (Putative or legal) year of birth | 4 |
| 18 | IV.B. | Was the mother married at time of child's birth | 1 |
| 19 | V.A.1. | Date of mother's termination of parental rights | 8 |
| 20 | V.A.2. | Date of father's termination of parental rights | 8 |
| 21 | V.B. | Date adoption legalized | 8 |
| 22 | VI.A. | Adoptive parents family structure | 1 |
| 23 | VI.B.1 | Mother's year of birth (if applicable) | 4 |
| 24 | VI.B.2 | Father's year of birth (if applicable) | 4 |
| 25 | VI.C.1. | Adoptive mother's race. | |
| 25a | | American Indian or Alaska Native | 1 |
| 25b | | Asian | 1 |
| 25c | | Black or African American | 1 |
| 25d | | Native Hawaiian or Other Pacific Islander | 1 |
| 25e | | White | 1 |
| 25f | | Unable to Determine | 1 |
| 26 | VI.C.2 | Hispanic or Latino Ethnicity | 1 |
| 27 | VI.C.3 | Adoptive father's race. | |
| 27a | | American Indian or Alaska Native | 1 |
| 27b | | Asian | 1 |
| 27c | | Black or African American | 1 |
| 27d | | Native Hawaiian or Other Pacific Islander | 1 |
| 27e | | White | 1 |
| 27f | | Unable to Determine | 1 |
| 28 | VI.C.4 | Hispanic or Latino Ethnicity | 1 |
| | | **Indicate each type of relationship of adoptive parent(s) to the child with a ''1'' for elements 29–32. Enter a zero for relationships that do not apply below.** | |
| 29 | VI.D.1 | Stepparent | 1 |
| 30 | VI.D.2. | Other relative of child by birth or marriage | 1 |
| 31 | VI.D.3 | Foster parent of child | 1 |
| 32 | VI.D.4 | Other non-relative | 1 |
| 33 | VII.A. | Child was placed from | 1 |
| 34 | VII.B. | Child was placed by | 1 |
| 35 | VIII.A. | Is this child receiving a monthly subsidy | 1 |
| 36 | VIII.B. | If VIII.B is "yes." What is the monthly amount | 5 |
| 37 | VIII.C | If VII.B is "yes." Is the child receiving title IV-E adoption assistance?. | 1 |
| | | Total Characters | 111 |

2. Adoption Semi-Annual Summary Data Elements Record

a. The record will consist of 22 data elements.

The values for these data elements are generated by processing all records in the semi-annual detailed data transmission and computing the summary values for Elements 1 and 3–22. Element 2 is the semi-annual report

**EXHIBIT A**

Pt. 1355, App. E

45 CFR Ch. XIII (10–1–07 Edition)

period ending date. In calculating the age range for the child, the last day of the reporting period is to be used.

b. Data must be supplied for each of the elements in accordance with these instructions:

(1) Enter the appropriate value for each element.

(2) For all elements where the total is zero, enter a numeric zero.

(3) Enter data values in year, month order (YYYYMM), e.g., 199912 for December 1999.

c. Adoption Semi-Annual Summary Data Element Record Layout follows:

| Element No. | Summary data file | No. of characters |
|---|---|---|
| 01 | Number of records | 8 |
| 02 | Report period ending date (YYYYMM) | 6 |
| 03 | Children adopted Under 1 year old | 8 |
| 04 | Children adopted 1 year old | 8 |
| 05 | Children adopted 2 years old | 8 |
| 06 | Children adopted 3 years old | 8 |
| 07 | Children adopted 4 years old | 8 |
| 08 | Children adopted 5 years old | 8 |
| 09 | Children adopted 6 years old | 8 |
| 10 | Children adopted 7 years old | 8 |
| 11 | Children adopted 8 years old | 8 |
| 12 | Children adopted 9 years old | 8 |
| 13 | Children adopted 10 years old | 8 |
| 14 | Children adopted 11 years old | 8 |
| 15 | Children adopted 12 years old | 8 |
| 16 | Children adopted 13 years old | 8 |
| 17 | Children adopted 14 years old | 8 |
| 18 | Children adopted 15 years old | 8 |
| 19 | Children adopted 16 years old | 8 |
| 20 | Children adopted 17 years old | 8 |
| 21 | Children adopted 18 years old | 8 |
| 22 | Children adopted over 18 years old | 8 |
| | Record Length | 174 |

[58 FR 67931, Dec. 22, 1993; 59 FR 13535, Mar. 22, 1994; 59 FR 42520, Aug. 18, 1994, as amended at 60 FR 40507, Aug. 9, 1995; 65 FR 4085, Jan. 25, 2000]

APPENDIX E TO PART 1355—DATA STANDARDS

All data submissions will be evaluated to determine the completeness and internal consistency of the data. Four types of assessments will be conducted on both the foster care and adoption data submissions. The results of these assessments will determine the applicability of the penalty provisions. (See §1355.40(e) for penalty provision description.) The four types of assessments are:

• Comparisons of the detailed data to summary data;

• Internal consistency checks of the detailed data;

• An assessment of the status of missing data; and

• Timeliness, an assessment of how current the submitted data are.

A. Foster Care

1. Summary Data Elements Submission Standards

A summary file must accompany the Detailed Data Elements submission. Both transmissions must be sent through electronic means (see appendix C for details). This summary will be used to verify basic counts of records on the detailed data received.

a. The summary file must be a discrete file separate from the semi-annual reporting period detailed data file. The record layout for the summary file is included in appendix D. section A.2.c. All data must be included. If the value for a numeric field is zero, zero must be entered.

b. The Department will develop a second summary file by computing the values from the detailed data file received from the State. The two summary files (the one submitted by the State and the one created during Federal processing) will be compared, field by field. If the two files match, further validation of the detailed data elements will commence. (See Section A.2 below.) If the two summary files do not match, we will assume that there has been an error in transmission and will request a retransmission from the State within 24 hours of the time the State has been notified. In addition, a log of these occurrences will be kept as a means of cataloging problems and offering suggestions on improved procedures.

EXHIBIT A

**Office of Human Development Services, HHS**    **Pt. 1355, App. E**

2. Detailed Data File Submission Standards

a. Internal Consistency Validations.

Internal consistency validations involve evaluating the logical relationships between data elements in a detailed record. For example, a child cannot be discharged from foster care before he or she has been removed from his or her home. Thus, the Date of Latest Removal From Home data element must be a date prior to the Date of Discharge. If this is not case, an internal inconsistency will be detected and an "error" indicated in the detailed data file.

A number of data elements have "if applicable" contingency relationships with other data elements in the detailed record. For example, if the Foster Family Structure has only a single parent, then the appropriate sex of the Single Female/Male element in the "Year of Birth" and "Race/Origin" elements must be completed and the "non-applicable" fields for these elements are to be filled with zero's or, for dates, left blank.

The internal consistency validations that will be performed on the foster care detailed data are as follows:

(1) The Local Agency must be the county or a county equivalent unit which has responsibility for the case. The 5 digit Federal Information Processing Standard (FIPS) code must be used.

(2) If Date of Latest Removal From Home (Element 21) is less than nine months prior to the Report Period Ending Date (Element 2) then the Date of Most Recent Periodic Review (Element 5) may be left blank.

(3) If Date of Latest Removal From Home (Element 21) is greater than nine months from Report Date (Element 2) then the Date of Most Recent Periodic Review (Element 5) must not be more than nine months prior to the Report Date (Element 2).

(4) If a child is identified as having a disability(ies) (Element 10), at least one Type of Disability Condition (Elements 11–15) must be indicated. Enter a zero (0) for disabilities that do not apply.

(5) If the Total Number of Removals From Home to Date (Element 19) is one (1), the Date Child was Discharged From Last Foster Care Episode (Element 20) must be blank.

(6) If the Total Number of Removals From Home to Date (Element 19) is two or more, then the Date Child was Discharged From Last Foster Care Episode (Element 20) must *not* be blank.

(7) If Data Child was Discharged From Last Foster Care Episode (Element 20) exists, then this date must be a date prior to the Date of Latest Removal From Home (Element 21).

(8) The Date of Latest Removal From Home (Element 21) must be prior to the Date of Placement in Current Foster Care Setting (Element 23).

(9) At least one element between elements 26 and 40 must be answered by selecting a

"1". Enter a zero (0) for conditions that do not apply.

(10) If Current Placement Setting (Element 41) is a value that indicates that the child is not in a foster family or a pre-adoptive home, then elements 49–55 must be zero (0).

(11) At least one element between elements 59 and 65 must be answered by selecting a "1". Enter a zero for sources that do not apply.

(12) If the answer to the question, "Has this child ever been adopted?" (Element 16) is "1" (Yes), then the question, "How old was the child when the adoption was legalized?" (Element 17) must have an answer from "1" to "5."

(13) If the Date of Most Recent Periodic Review (Element 5) is not blank, then Manner of Removal From Home for Current Placement Episode (Element 25) cannot be option 3, "Not Yet Determined."

(14) If Reason for Discharge (Element 58) is option 3, "Adoption," then Parental Rights Termination dates (Elements 46 and 47) must not be blank.

(15) If the Date of Latest Removal From Home (Element 21) is present, the Date of Latest Removal From Home Transaction Date (Element 22) must be present and must be later than or equal to the Date of Latest Removal From Home (Element 21).

(16) If the Date of Discharge From Foster Care (Element 56) is present, the Date of Discharge From Foster Care Transaction Date (Element 57) must be present and must be later than or equal to the Date of Discharge From Foster Care (Element 56).

(17) If the Date of Discharge From Foster Care (Element 56) is present, it must be after the Date of Latest Removal From Home (Element 21).

(18) In Elements 8, 52, and 54, race categories ("a" through "e") and "f. Unable to Determine" cannot be coded "0," for it does not apply. If any of the race categories apply and are coded as "1" then "f. Unable to Determine" cannot also apply.

b. Out-of-Range Standards.

Out-of-range standards relate to the occurrence of values in response to data elements that exceed, either positively or negatively, the acceptable range of responses to the question. For example, if the acceptable responses to the element, Sex of the Adoptive Child, is "1" for a male and "2" for a female, but the datum provided in the element is "3," this represents an out-of-range response situation.

Out-of-range comparisons will be made for all elements. The acceptable values are described in Appendix A, Section I.

3. Missing Data Standards

The term "missing data" refers to instances where data for an element are required but are not present in the submission.

301

Pt. 1355, App. E                                45 CFR Ch. XIII (10–1–07 Edition)

Data elements with values of "Unable to Determine," "Not Yet Determined" or which are not applicable, are not considered missing.

a. In addition, the following situations will result in converting data values to a missing data status:

(1) Data elements whose values fail internal consistency validations as outlined in A.2.a.(1)–(18) above, and

(2) Data elements whose values are out-of-range.

b. The maximum amount of allowable missing data is dependent on the data elements as described below:

(1) No Missing Data.

The data for the elements listed below must be present in all records in the submission. If any record contains missing data for any of these elements, the entire submission will be considered missing and processing will not proceed.

| Element No. | Element name |
|---|---|
| 01 ............... | State. |
| 02 ............... | Report date. |
| 03 ............... | Local agency FIPS code. |
| 04 ............... | Record number. |

(2) Less Than Ten Percent Missing Data.

The data for the elements listed below cannot have ten percent or more missing data without incurring a penalty.

| Element No. | Element description |
|---|---|
| 05 ............... | Date of most recent periodic, review. |
| 06 ............... | Child's date of birth. |
| 07 ............... | Child's sex. |
| 08 ............... | Child's race. |
| 09 ............... | Child's Hispanic or Latino Ethnicity |
| 10 ............... | Does child have a disability(ies)? |
| 11–15 ......... | Type of disability (at least one must be selected). |
| 16 ............... | Has child been adopted? |
| 17 ............... | How old was child when adoption was legalized? |
| 18 ............... | Date of first removal from home. |
| 19 ............... | Total number of removals from home to date. |
| 20 ............... | Date child was discharged from last foster care. |
| 21 ............... | Date of latest removal from home. |
| 22 ............... | Removal transaction date. |
| 23 ............... | Date of placement in current foster care setting. |
| 24 ............... | Number of previous placement settings during this removal episode. |
| 25 ............... | Manner of removal from home for current placement episode. |
| 26–40 ......... | Actions or conditions associated with child's removal (at least one must be selected). |
| 41 ............... | Current placement setting. |
| 42 ............... | Out of State placement. |
| 43 ............... | Most recent case plan goal. |
| 44 ............... | Caretaker family structure. |
| 45 ............... | Year of birth of 1st principal caretaker. |
| 46 ............... | Year of birth of 2nd principal caretaker. |
| 47 ............... | Date of mother's parental rights termination. |
| 48 ............... | Legal of putative father parental rights termination date. |

| Element No. | Element description |
|---|---|
| 49 ............... | Foster family structure. |
| 50 ............... | Year of birth of 1st foster caretaker. |
| 51 ............... | Year of birth of 2nd foster caretaker. |
| 52 ............... | Race of 1st foster caretaker. |
| 53 ............... | Hispanic or Latino Ethnicity of 1st foster caretaker. |
| 54 ............... | Race of 2nd foster caretaker. |
| 55 ............... | Hispanic or Latino Ethnicity of 2nd foster caretaker. |
| 56 ............... | Date of discharge from foster care. |
| 57 ............... | Foster care discharge transaction date. |
| 58 ............... | Reason for discharge. |
| 59–65 ......... | Sources of Federal support/assistance for child (at least one must be selected). |
| 66 ............... | Amount of monthly foster care payment (regardless of source). |

c. Penalty Processing.

Missing data are a major factor in determining the application of the penalty provisions of this regulation.

(1) Selection Rules.

All data elements will be used in calculating the missing data provision of the penalty unless one of the following limiting rules applies to the detailed case record.

(a) If Date of Latest Removal From Home (Element 21) and the Date of Discharge From Foster Care (Element 56) is less than 30 days, then the following date elements are the only ones to be used in evaluating the missing data provisions for purposes of penalty calculation:

Elements
1 to 4
6 to 9
21 and 22
41 and 42
56 to 58

(b) If Date of Latest Removal From Home (Element 18) is prior to October 1, 1995, then the following data elements are the only ones to be used in evaluating the missing data provisions for purposes of penalty calculation:

Elements
1 to 4
6 to 9
21 and 22
41 and 43
56 to 58

(2) Penalty Calculations.

The percentage calculation will be performed for each data element. The total number of detailed records that are included by the selection rules in 3.c.(1), will serve as the denominator. The number of missing data occurrences for each element will serve as the numerator. The result will be multiplied by one hundred. The penalty is invoked when any one element's missing data percentage is ten percent or greater.

302

**EXHIBIT A**

**Office of Human Development Services, HHS**　　　　　**Pt. 1355, App. E**

4. Timeliness of Foster Care Data Reports

The semi-annual reporting periods will be as of the end of March and September for each year. The States are required to submit reports within 45 calendar days after the end of the semi-annual reporting period.

Computer generated transaction dates indicate the date when key foster care events are entered into the State's computer system. The intent of these transaction dates is to ensure that information about the status of children in foster care is recorded and, thus, reported in a timely manner.

a. Date of Latest Removal From Home

The Date of Latest Removal From Home Transaction Date (Element 22) must not be more than 60 days after the Date of Latest Removal From Home (Element 21) event.

b. Date of Discharge From Foster Care

The Date of Discharge From Foster Care Transaction Date (Element 57) must not be more than 60 days after the Date of Discharge From Foster Care (Element 56) event.

For purposes of penalty processing, ninety percent of the records in a detailed data submission, must indicate that:

(1) The difference between the Date of Latest Removal From Home Transaction Date (Element 22) and the Date of Latest Removal From Home (Element 21) event is 60 days or less;

and, where applicable,

(2) The difference between the Date of Discharge From Foster Care Transaction Date (Element 57), and the Date of Discharge From Foster Care (Element 56) event is 60 days or less.

*B. Adoption*

1. Summary Data Elements File Submission Standards

A summary file must accompany the detailed Data Elements File submission. Both files must be sent through electronic means (see appendix C for details). This summary will be used to verify the completeness of the Detailed Data File submission received.

a. The summary file should be a discrete file separate from the semi-annual reporting period detailed data file. The record layout for the summary file is included in appendix D, section B.2.c. All data must be included. If the value for a numeric field is zero, zero must be entered.

b. The Department will develop a second summary file by computing the values from the detailed data file received from the State. The two summary files (the one submitted by the State and the one created during Federal processing) will be compared, field by field. If the two files match, further validation of the detailed data elements will commence. (See section B.2 below.) If the two summary files do not match, we will assume that there has been an error in trans-

mission and will request a retransmission from the State within 24 hours of the time the State has been notified. In addition, a log of these occurrences will be kept as a means of cataloging problems and offering suggestions on improved procedures.

2. Detailed Data Elements File Submission Standards

a. Internal Consistency Validations

Internal consistency validations involve evaluating the logical relationships between data elements in a detailed record. For example, an adoption cannot be finalized until parental rights have been terminated. Thus, the dates of Mother/Father Termination of Parental Rights, elements must be present and the dates must be prior to the "Date Adoption Legalized." If this is not the case, an internal inconsistency will be detected and an "error" indicated in the detailed data file.

A number of data elements have "if applicable" contingency relationships with other data elements in the detailed record. For example, if the Adoptive Parent is single, then the appropriate sex of the single female/male element in the "Family Structure," "Year of Birth" and "Race/Origin" elements must be completed and the "non-applicable" fields for these elements are to be filled with zeros or left blank.

The internal consistency validations that will be performed on the adoption detailed data are as follows:

(1) The Child's Date of Birth (Element 5) must be later than both the Mother's and Father's Year of Birth (Elements 16 and 17) unless either of these is unknown.)

(2) If the State child welfare agency has determined that the child is a special needs child (Element 9), then "the primary basis for determining that this child has special needs" (Element 10) must be completed. If "the primary basis for determining that this child has special needs" (Element 10) is answered by option "4," then at least one element between Elements 11–15, "Type of Disability," must be selected. Enter a zero (0) for disabilities that do not apply.

(3) Dates of Parental Rights Termination (Elements 19 and 20) must be completed and must be prior to the Date Adoption Legalized (Element 21).

(4) If "Is a monthly financial subsidy being paid for this child" (Element 35) is answered negatively, "2", then Element 36 must be zero (0) and "Is the subsidy paid under Title IV-E adoption assistance" (Element 37) must be a "2".

(5) If the "Child Was Placed By" (Element 34) is answered with option 1, "Public Agency," then the question, "Did the State Agency Have any Involvement in This Adoption" (Element 4) must be "1".

(6) If the "Relationship of Adoptive Parent(s) to the Child," "Foster Parent of

303

Child'' (Element 31) is selected, then the question, ''Did the State Agency Have any Involvement in This Adoption'' (Element 4) must be ''1.''

(7) If ''Is a monthly financial subsidy being paid for this child?'' (Element 35) answered ''1,'' then the question, ''Did the State Agency Have any Involvement in This Adoption'' (Element 4) must be ''1.''

(8) If the ''Family Structure'' (Element 22) is option 3, Single Female, then the Mother's Year of Birth (Element 23), the ''Adoptive Mother's Race'' (Element 25) and ''Hispanic or Latino Ethnicity'' (Element 26) must be completed. Similarly, if the ''Family Structure'' (Element 22) is option 4, Single Male, then the Father's Year of Birth (Element 24), the Adoptive Father's Race'' (Element 27) and ''Hispanic or Latino Ethnicity'' (Element 28) must be completed. If the ''Family Structure'' (Element 22) is option 1 or 2, then both Mother's and Father's ''Year of Birth,'' ''Race'' and ''Hispanic or Latino Ethnicity'' must be completed.

(9) In Elements 7, 25, and 27, race categories (''a'' through ''e'') and ''f. Unable to Determine'' cannot be coded ''0,'' for it does not apply. If any of the race categories apply and are coded as ''1'' then ''f. Unable to Determine'' cannot also apply.

b. Out-of-Range Standards.

Out-of-range standards relate to the occurrence of values in response to data elements that exceed, either positively or negatively, the acceptable range of responses to the question. For example, if the acceptable response to the element, Sex of the Adoptive Child, is ''1'' for a male and ''2'' for a female, but the datum provided in the element is ''3,'' this represents an out-of-range response situation.

Out-of-range comparisons will be made for all elements. The acceptable values are described in appendix B, section I.

### 3. Missing Data Standards

The term ''missing data'' refers to instances where data for an element are required but are not present in the submission. Data elements with values of ''Unable to Determine,'' ''Other'' or which are not applicable, are *not* considered missing.

a. In addition, the following situations will result in converting data values to a missing data status:

(1) Data elements whose values fail internal consistency validations as outlined in 2.a.(1)–(9) above, and

(2) Data elements whose values are out-of-range.

b. The maximum amount of allowable missing data is dependent on the data elements as described below.

(1) No Missing Data.

The data for the elements listed below must be present in all records in the submission. If any record contains missing data for any of these elements, the entire submission will be considered missing and processing will not proceed.

| Element No. | Element name |
| --- | --- |
| 01 .............. | State. |
| 02 .............. | Report date. |
| 03 .............. | Record number. |
| 04 .............. | Did the State agency have any involvement in this adoption? |

(2) Less Than Ten Percent Missing Data

The data for the elements listed below cannot have ten percent or more missing data without incurring a penalty.

| Element No. | Element name |
| --- | --- |
| 05 .............. | Child's date of birth. |
| 06 .............. | Child's sex. |
| 07 .............. | Child's race. |
| 08 .............. | Is the child of Hispanic or Latino ethnicity? |
| 09 .............. | Does child have special needs? |
| 10 .............. | Indicate the primary basis for determining that the child has special needs. (If Element 09 is yes, you must answer this question.) |
| 11–15 .......... | Type of special need (at least one must be selected). |
| 16 .............. | Mother's year of birth. |
| 17 .............. | Father's year of birth. |
| 18 .............. | Was mother married at time of child's birth? |
| 19 .............. | Date of mother's termination of parental rights. |
| 20 .............. | Date of father's termination of parental rights. |
| 21 .............. | Date adoption legalized. |
| 22 .............. | Adoptive parent(s)' family structure. |
| 23 .............. | Mother's year of birth. |
| 24 .............. | Father's year of birth. |
| 25 .............. | Adoptive mother's race. |
| 26 .............. | Hispanic or Latino ethnicity of mother |
| 27 .............. | Adoptive father's race. |
| 28 .............. | Hispanic or Latino ethnicity of father |
| 29–32 .......... | Relationship of adoptive parent(s) to child (at least one must be selected). |
| 33 .............. | Child placed from. |
| 34 .............. | Child placed by. |
| 35 .............. | Is a monthly financial subsidy paid for this child? |
| 36 .............. | If yes, the monthly amount is? |
| 37 .............. | Is the child receiving Title IV-E adoption assistance? (If Element 35 is a ''1'' (Yes) an- swer to this question is required.) |

c. Penalty Processing.

Missing data are a major factor in determining the application of the penalty provisions of this regulation.

(1) Selection Rules.

Only the adoption records with a ''1'' (Yes) answer in Element 4, ''Did the State Agency have any Involvement in this adoption'' will be subject to the penalty assessment process.

(2) Penalty Calculations.

The percentage calculation will be performed for each data element. The total number of detailed records will serve as the denominator and the number of missing data occurrences for each element will serve as the numerator. The result will be multiplied by one hundred. The penalty is invoked when

304

**Office of Human Development Services, HHS**    **Pt. 1355, App. F**

any one element's missing data percentage is ten percent or greater.

4. TIMELINESS OF ADOPTION DATA REPORTS

The semi-annual reporting periods will be as of the end of March and September for each year. The States are required to submit reports within 45 calendar days after the end of the semi-annual reporting period.

For penalty assessment purposes, however, no specific timeliness of data standards apply. Data on adoptions should be submitted as promptly after finalization as possible.

The desired approach to reporting adoption data is that adoptions should be reported during the reporting period in which the adoption is legalized. Or, at the State's option, they can be reported in the following reporting period if the adoption is legalized within the last 60 days of the reporting period.

Negative reports must be submitted for any semi-annual period in which no adoptions have been legalized.

[58 FR 67934, Dec. 22, 1993; 59 FR 13535, Mar. 22, 1994, as amended at 60 FR 40508, Aug. 9, 1995]

APPENDIX F TO PART 1355

ALLOTMENT OF FUNDS WITH 427 INCENTIVE FUNDS TITLE IV-B CHILD WELFARE SERVICES FISCAL YEAR 1993

| Name of State | Allotment at $294,624,000 [1] | Allotment at $141,000,000 [1] | 427 incentive funds |
|---|---|---|---|
| Alabama | 5,798,251 | 2,771,128 | 3,027,123 |
| Alaska | 674,777 | 355,179 | 319,598 |
| Arizona | 4,781,390 | 2,291,632 | 2,489,758 |
| Arkansas | 3,495,975 | 1,685,501 | 1,810,474 |
| California | 30,048,818 | 14,206,363 | 15,842,455 |
| Colorado | 3,844,876 | 1,850,024 | 1,994,852 |
| Connecticut | 2,065,826 | 1,011,122 | 1,054,704 |
| Delaware | 763,822 | 397,168 | 366,654 |
| Dist of Col | 448,212 | 248,344 | 199,868 |
| Florida | 12,946,006 | 6,141,615 | 6,804,391 |
| Georgia | 8,386,050 | 3,991,391 | 4,394,659 |
| Hawaii | 1,281,048 | 641,063 | 639,985 |
| Idaho | 1,734,494 | 854,884 | 879,610 |
| Illinois | 12,157,021 | 5,769,574 | 6,387,447 |
| Indiana | 7,115,189 | 3,392,123 | 3,723,066 |
| Iowa | 3,565,712 | 1,718,385 | 1,847,327 |
| Kansas | 3,083,341 | 1,490,926 | 1,592,415 |
| Kentucky | 5,192,133 | 2,485,316 | 2,706,817 |
| Louisiana | 6,750,330 | 3,220,076 | 3,530,254 |
| Maine | 1,533,067 | 759,902 | 773,165 |
| Maryland | 4,256,288 | 2,044,023 | 2,212,265 |
| Massachusetts | 4,566,755 | 2,190,422 | 2,376,333 |
| Michigan | 10,860,253 | 5,158,089 | 5,702,164 |
| Minnesota | 5,092,532 | 2,438,349 | 2,654,183 |
| Mississippi | 4,437,556 | 2,129,499 | 2,308,057 |
| Missouri | 6,217,709 | 2,968,921 | 3,248,788 |
| Montana | 1,211,809 | 608,414 | 603,395 |
| Nebraska | 2,136,670 | 1,044,528 | 1,092,142 |
| Nevada | 1,326,362 | 662,431 | 663,931 |
| New Hampshire | 1,078,123 | 545,375 | 532,748 |
| New Jersey | 5,307,662 | 2,539,793 | 2,767,869 |
| New Mexico | 2,493,475 | 1,212,778 | 1,280,697 |
| New York | 15,530,358 | 7,360,253 | 8,170,105 |
| North Carolina | 8,326,069 | 3,963,107 | 4,362,962 |
| North Dakota | 982,955 | 500,499 | 482,456 |
| Ohio | 13,052,582 | 6,191,871 | 6,860,711 |
| Oklahoma | 4,428,365 | 2,125,165 | 2,303,200 |
| Oregon | 3,576,418 | 1,723,434 | 1,852,984 |
| Pennsylvania | 12,649,960 | 6,002,017 | 6,647,943 |
| Rhode Island | 1,070,439 | 541,752 | 528,687 |
| South Carolina | 5,101,221 | 2,442,447 | 2,658,774 |
| South Dakota | 1,107,009 | 558,996 | 548,013 |
| Tennessee | 6,328,617 | 3,021,219 | 3,307,398 |
| Texas | 23,687,998 | 11,206,947 | 12,481,051 |
| Utah | 3,478,384 | 1,667,206 | 1,801,178 |
| Vermont | 749,584 | 390,454 | 359,130 |
| Virginia | 6,321,841 | 3,018,024 | 3,303,817 |
| Washington | 5,667,518 | 2,709,481 | 2,958,037 |
| West Virginia | 2,564,554 | 1,246,294 | 1,318,260 |

**EXHIBIT A**

ALLOTMENT OF FUNDS WITH 427 INCENTIVE FUNDS TITLE IV-B CHILD WELFARE SERVICES FISCAL YEAR 1993—Continued

| Name of State | Allotment at $294,624,000 [1] | Allotment at $141,000,000 [1] | 427 incentive funds |
|---|---|---|---|
| Wisconsin | 6,033,052 | 2,881,847 | 3,151,205 |
| Wyoming | 751,264 | 391,247 | 360,017 |

[1] These totals include allotments to the United States Territories. Therefore, the summation of the States' allotments will not be equivalent.

[58 FR 67937, Dec. 22, 1993, as amended at 65 FR 4087, Jan. 25, 2000]

# PART 1356—REQUIREMENTS APPLICABLE TO TITLE IV-E

Sec.
1356.10  Scope.
1356.20  State plan document and submission requirements.
1356.21  Foster care maintenance payments program implementation requirements.
1356.22  Implementation requirements for children voluntarily placed in foster care.
1356.30  Safety requirements for foster care and adoptive home providers.
1356.40  Adoption assistance program: Administrative requirements to implement section 473 of the Act.
1356.41  Nonrecurring expenses of adoption.
1356.50  Withholding of funds for non-compliance with the approved title IV-E State plan.
1356.60  Fiscal requirements (title IV-E).
1356.65–1356.70  [Reserved]
1356.71  Federal review of the eligibility of children in foster care and the eligibility of foster care providers in title IV-E programs.

AUTHORITY: 42 U.S.C. 620 et seq., 42 U.S.C. 670 et seq.; 42 U.S.C. 1302.

§ 1356.10  Scope.

This part applies to State programs for foster care maintenance payments, adoption assistance payments, related foster care and adoption administrative and training expenditures, and the independent living services program under title IV-E of the Act.

[61 FR 58655, Nov. 18, 1996]

§ 1356.20  State plan document and submission requirements.

(a) To be in compliance with the State plan requirements and to be eligible to receive Federal financial participation (FFP) in the costs of foster care maintenance payments and adoption assistance under this part, a State must have a State plan approved by the Secretary that meets the requirements of this part, part 1355 and section 471(a) of the Act. The title IV-E State plan must be submitted to the appropriate Regional Office, ACYF, in a form determined by the State.

(b) Failure by a State to comply with the requirements and standards for the data reporting system for foster care and adoption (§ 1355.40 of this chapter) shall be considered a substantial failure by the State in complying with the State plan for title IV-E. Penalties as described in § 1355.40(e) of this chapter shall apply.

(c) If a State chooses to claim FFP for voluntary foster care placements, the State must meet the requirements of paragraph (a) of this section and section 102 of Pub. L. 96–272, the Adoption Assistance and Child Welfare Act of 1980, as it amends section 472 of the Act.

(d) The following procedures for approval of State plans and amendments apply to the title IV-E program:

(1) The State plan consists of written documents furnished by the State to cover its program under part E of title IV. After approval of the original plan by the Commissioner, ACYF, all relevant changes, required by new statutes, rules, regulations, interpretations, and court decisions, are required to be submitted currently so that ACYF may determine whether the plan continues to meet Federal requirements and policies.

(2) Submittal. State plans and revisions of the plans are submitted first to the State governor or his designee for review and then to the regional office, ACYF. The States are encouraged to obtain consultation of the regional staff when a plan is in process of preparation or revision.

(3) Review. Staff in the regional offices are responsible for review of State

**EXHIBIT A**