

# Child Welfare Policy Manual

## Children's Bureau
## 370 L'Enfant Promenade, SW
## Washington, DC 20447

For additional information or copies, please contact the

Child Welfare Information Gateway
(800) 394-3366 (703) 352-3488
FAX: (703) 385-3206
E-mail: info@childwelfare.gov
http://www.childwelfare.gov
http://www.acf.hhs.gov/j2ee/programs/cb/laws_policies/laws/
cwpm/index.jsp

*A service of the Children's Bureau*

**EXHIBIT C**

# Child Welfare Policy Manual: Table of Contents

## December 31, 2007

**1. AFCARS**

**1.1 Compliance and Penalties**

**1.2 Data Elements and Definitions**

    **1.2A** Adoption Specific Elements

        **1.2A.1** Adoptive parents

        **1.2A.2** Birth parents

        **1.2A.3** Child's demographics

        **1.2A.4** Court actions

        **1.2A.5** Financial information

        **1.2A.6** Placement

    **1.2B** Foster Care Specific Elements

        **1.2B.1** Case plan goal

        **1.2B.2** Child's demographics

        **1.2B.3** Episode and removal circumstances

        **1.2B.4** Financial elements

        **1.2B.5** Foster family home

        **1.2B.6** Outcome information

        **1.2B.7** Placements

        **1.2B.8** Principal caretaker

        **1.2B.9** Termination of parental rights

**1.3 Reporting Population**

**1.4 Technical Requirements**

**2. CAPTA**

**2.1 Assurances and Requirements**

    **2.1A** Access to Child Abuse and Neglect Information

        **2.1A.1** Confidentiality

        **2.1A.2** Expungment

        **2.1A.3** Open Courts

        **2.1A.4** Public Disclosure

    **2.1B** Appeals

    **2.1C** Expedited Termination of Parental Rights

    **2.1D** Guardian Ad Litems

    **2.1E** Reunification

    **2.1F** CAPTA, Assurances and Requirements, Infants Affected by Illegal Substance Abuse

        **2.1F.1** CAPTA, Assurances and Requirements, Infants Affected by Illegal Substance Abuse, Plan of Safe Care

    **2.1G** CAPTA, Assurances and Requirements, Triage

    **2.1H** CAPTA, Assurances and Requirements, Notification of Allegations

**EXHIBIT C**

**2.1I** CAPTA, Assurances and Requirements, Referrals to IDEA, Part C

**2.1J** CAPTA, Assurances and Requirements, Criminal Background Checks

**2.2 Citizen Review Panels**

**2.3 Definitions**

**3. INDEPENDENT LIVING**

**3.1 Certifications and Requirements**

 **3.1A** Adolescent Participation

 **3.1B** Age

 **3.1C** Coordination

 **3.1D** Fraud and Abuse

 **3.1E** Miscellaneous Requirements

 **3.1F** Objective Eligibility Criteria

 **3.1G** Room and Board

 **3.1H** Training

 **3.1I** Tribal

**3.2 Data Collection**

 **3.2A** Data Elements

 **3.2B** Outcome Measures

 **3.2C** Penalties for Noncompliance

 **3.2D** Systems Requirements

**3.3 Fiscal**

 **3.3A** Administrative Costs

 **3.3B** Allocations

 **3.3C** Match

 **3.3D** Non-supplantation

 **3.3E** Use of Funds

**3.4 Related Foster Care Requirements**

**3.5 Independent Living, Educational and Training Vouchers**

 **3.5A** Youth Eligibility

 **3.5B** Coordination and Duplication

 **3.5C** Eligible Expenses and Institutions

 **3.5D** Administrative Costs

 **3.5E** Match

 **3.5F** Use of Funds

**4. MEPA/IEAP**

**4.1 Diligent Recruitment**

**4.2 Enforcement of Section 471 (a)(18) of the SSA**

**4.3 Guidance for Compliance**

**5. MONITORING**

**5.1 Child and Family and Services Review (CFSR)**

**5.2 Title IV-E Eligibility Reviews**

**6. SACWIS**

**7. TITLE IV-B**

**7.1 Citizenship/Alienage Requirements**

**EXHIBIT C**

**7.2  Confidentiality**

**7.3  Programmatic Requirements**

**7.4  Use of Funds**

**8.  TITLE IV-E**

**8.1  Administrative Functions/Costs**

    **8.1A**  Allowable Costs - Adoption Assistance Program

    **8.1B**  Allowable Costs - Foster Care Maintenance Payments Program

    **8.1C**  Calculating Claims

    **8.1D**  Candidates

    **8.1E**  Contracting

    **8.1F**  Match Requirements

    **8.1G**  Title IV-E Agreements

    **8.1H**  Training

**8.2  Adoption Assistance Program**

    **8.2A**  Agreements

        **8.2A.1**  Interstate placements

        **8.2A.2**  Means test

    **8.2B**  Eligibility

        **8.2B.1**  Biological parents

        **8.2B.2**  Children in foster care

        **8.2B.3**  Child of a minor parent

        **8.2B.4**  Deceased adoptive parents/dissolved adoptions

        **8.2B.5**  Independent Adoptions

        **8.2B.6**  International Adoptions

        **8.2B.7**  Judicial determinations

        **8.2B.8**  Medicaid

        **8.2B.9**  Redeterminations

        **8.2B.10**  Responsibility for placement and care

        **8.2B.11**  Special needs

        **8.2B.12**  SSI

        **8.2B.13**  Voluntary relinquishments

    **8.2C**  Interstate Compact

    **8.2D**  Payments

        **8.2D.1**  Allowable costs

        **8.2D.2**  Duration

        **8.2D.3**  Non-recurring expenses

        **8.2D.4**  Rates

        **8.2D.5**  Termination

    **8.2E**  Promoting Adoption Assistance

**8.3  Foster Care Maintenance Payments Program**

    **8.3A**  Eligibility

        **8.3A.1**  Adjudicated delinquents

        **8.3A.2**  Age

        **8.3A.3**  Biological parents

**EXHIBIT C**

**8.3A.4** Child in facility outside scope of foster care

**8.3A.5** Child of a minor parent

**8.3A.6** Contrary to the welfare

**8.3A.7** Documentation of judicial determinations

**8.3A.8** Facilities requirements

    **8.3A.8a** child-care institution

    **8.3A.8b** foster family home

    **8.3A.8c** licensing

**8.3A.9** Reasonable efforts

    **8.3A.9a** to finalize a permanency plan

    **8.3A.9b** to prevent a removal

    **8.3A.9c** to qualify language in court orders

**8.3A.10** Redeterminations

**8.3A.11** Removal from the home/living with

**8.3A.12** Responsibility for placement and care

**8.3A.13** Voluntary placement agreements

**8.3A.14** Voluntary relinquishments

**8.3A.15** When payments may begin

**8.3B** Payments

    **8.3B.1** Allowable costs

    **8.3B.2** Rates

**8.3C** State Plan/Procedural Requirements

    **8.3C.1** Case plans

    **8.3C.2** Case review system

        **8.3C.2a** date a child is considered to have entered foster care

        **8.3C.2b** notice and opportunity to be heard

        **8.3C.2c** permanency hearings

        **8.3C.2d** six month periodic reviews

        **8.3C.2e** termination on parental rights

    **8.3C.3** Foster care goals

    **8.3C.4** Reasonable efforts

    **8.3C.5** Trial home visit

**8.4 General Title IV-E Requirements**

    **8.4A** AFDC Eligibility

    **8.4B** Aliens/Immigrants

    **8.4C** Child support

    **8.4D** Concurrent Receipt of Federal Benefits

    **8.4E** Confidentiality

    **8.4F** Criminal Record and Registry Checks

    **8.4G** Fair Hearings

    **8.4H** Safety Requirements

    **8.4I** Social Security Numbers

**9. TRIBES/INDIAN TRIBAL ORGANIZATIONS**

**9.1 Application of Title IV-B and Title IV-E Procedural Requirements**

**EXHIBIT C**

**9.2  Application of Title IV-E Eligibility Requirements**

**9.3  Responsibilities of the Bureau of Indian Affairs**

**9.4  Title IV-E Agreements**

**EXHIBIT C**

## Policy/Program Issuances

Once a bill becomes a law, an authorized unit within the federal government becomes responsible to develop guidance and procedures for the administration of the new program. The primary source of information is the legislation on which the program is based; the next source is in regulations.  Finally, the authorized unit may issue supplemental policy, instructional and informational documents related to implementing the program. The Children's Bureau issues guidance to the States on the administration of State grant programs, in the following formats:

Child Welfare Policy Manual - The manual conveys mandatory policies that have their basis in Federal Law and/or program regulations.  It also provides interpretations of Federal Statutes and program regulations initiated by inquiries from State Child Welfare agencies or ACF Regional Offices.

Action Transmittals (AT) - These issuances convey program guidance information to grantees of actions they are expected or required to take. They clarify and explain procedures and methods for operationalizing program policies and add details to program regulations or policy guide requirements.

Information Memorandum (IM) - These issuances are used as the primary means for program and staff offices to communicate with State agencies and grantees or potential grantees on a variety of matters, such as program activities and priorities, progress reports, research findings, funds available, related regulations, and proposed and pending Federal legislation affecting human service programs. Information memoranda may also provide States with program tools, models, and techniques which States may use for program development or reporting purposes.

Policy Guides and Manuals (PGM) - These issuances may be program regulation guides, grants administration manuals, and any other policy, program and grants related guides or manuals. They provide comprehensive guidance to clarify, explain, and expand upon the meaning of the related program and grant administration rules and regulations. They may incorporate previously issued interpretation of program regulations; they may also set forth applicable grant administration policies and procedures to recipients of discretionary project grants or cooperative agreements awarded by ACF program offices. They do not add to or change the nature of the requirements as stated in the regulations and do not provide new interpretations of regulations

Program Instructions (PI) - These issuances clarify and explain procedures and methods for operationalizing program policies, add details to program regulations or policy guide requirements, and convey program guidance information to grantees of actions they are expected or required to take. They may also reiterate policy that has already been transmitted by previous policy issuances but they are not used as vehicles for conveying new program policy. Program instructions may also be used to transmit State plan preprints, financial reports, program allotment tables, and non-regulatory materials on which comments are solicited, and other kind of materials.

Program Regulations (PR) - These issuances are used to transmit final regulations, interim final rules, and notices of proposed rulemaking. The regulations are basic requirements, rules, standards, and procedures for program implementation, based on specific legislative authority. Final regulations have the force and effect of law. They are published in the Federal Register and codified in the Code of Federal Regulations.

**EXHIBIT C**

## Child Welfare Policy Manual

The Child Welfare Policy Manual conveys mandatory policies that have their basis in Federal Law and/or program regulations. It also provides interpretations of Federal Statutes and program regulations initiated by inquiries from State Child Welfare agencies or ACF Regional Offices. This manual replaces the Children's Bureau's former policy issuance system. This Child Welfare Policy Manual updates and reformats all of the existing relevant policy issuance's (Policy Announcements and Policy Interpretation Questions) into an easy to use question and answer format. This manual is broken down into nine main policy areas (with detailed subsections): AFCARS, CAPTA, Independent Living, MEPA/IEAP, Monitoring, SACWIS, Title IV-B, Title IV-E, Tribes/Indian Tribal Organizations.   Future policy guidance will be disseminated in this format and announced as "Updates!" to the manual.  This web-based manual ensures that the most current policy information is available to the States in the quickest and most accurate way.  All questions/comments should be directed to the ACF Regional Offices.

**How to use the manual:** The table of contents (full text) is the guide to the entire manual. It provides a detailed topical breakdown of all the included policy information. The nine main policy areas provide shortcuts to the same targeted policy information. Each main area is then broken down into detailed subsections. There are sections of the manual that are empty of any policy information. These sections are being used as placeholders for future announcements. They are designated by an asterisk (*) following the section title in the Table of Contents. For example: 6. SACWIS *

All of the policy information appears in a question and answer format. For example (from 8.1 TITLE IV-E, Administrative Functions/Costs):

> Question: Is the cost of conducting criminal records checks for prospective foster and adoptive parents an allowable administrative cost under title IV-E?
> Answer: The regulations at section 1356.60 (c)(2) allow States to claim costs associated with recruitment and licensing as administrative costs under title IV-E. Since the criminal records check provision is a condition of licensure or approval in States that do not opt out of the provision, costs associated with criminal records checks for prospective foster and adoptive parents are allowable under title IV-E when claimed pursuant to an approved cost allocation plan.
> - Source/Date: Preamble to the Final Rule (65 FR 4020) (1/25/00)
> - Legal and Related References: 45 CFR 1356.30 and 1356.60

**How to cite the manual:** Each section and subsection of the manual has a unique number that identifies it. Each Question/Answer set is numbered as well. When citing the manual, either cite the section or the relevant Question/Answer set within that section or subsection. For example, guidance and requirements with respect to permanency hearings is contained at section 8.3C.2c of the manual. When seeking clarification on a specific policy regarding permanency hearings, users may refer to that section of the manual or to a specific Question/Answer set within that section; i.e., section 8.3C.2c, Question 2.

**How to recognize updates and deletions:** The information within the manual will change as the Children's Bureau announces new policy. Additions and deletions to the manual will be announced on the policy manual main page under Updates!
- In the question and answer text, updated policy will be indicated by a NEW / UPDATED announcement. For example:
  NEW/Updated [Date question added or updated] [Text of Question]
- Furthermore, any new policy changes that remove a question and answer from the manual will be indicated by a DELETED announcement. For example:
  DELETED [Date question deleted] [Text of question]

**EXHIBIT C**

**How the manual was developed:** Using a detailed table of contents as the basis for constructing a database to house all existing policy, the Children's Bureau began by reviewing every Policy Interpretation Question (PIQ) and Policy Announcement (PA), assigning the content to the appropriate sections of the database. While the manual was constructed using existing policy, some of the information is not presented in exactly the same format as it appeared in the original issuance because:

- Policy Announcements are not constructed in a Question/Answer format, so the information in these documents was reformatted for inclusion in the manual.

- Some of the early PIQs identified the State that posed the questions addressed. We now maintain the anonymity of a State that raises questions of national significance by removing all State-specific references.

- We updated some early policy to be consistent with recent statutory amendments. For example, some of the early policy guidance addressing the Title IV-E case review system requirements is still relevant but we updated certain terms to be consistent with the Adoption and Safe Families Act of 1997 (ASFA); i.e., "permanency hearing" rather than "dispositional hearing." For that reason, a policy whose source was a 1980s issuance may contain terminology that is consistent with the ASFA amendments to the Social Security Act.

- We found some redundancy across and within policy issuances. We consolidated redundant information when appropriate to increase efficiency. When the "Source/Date" field contains more than one policy issuance, that is an indication that the information in that Question/Answer came from multiple sources.

- Where appropriate, we consolidated information from issuances that modified, clarified, or elaborated on an earlier issuance. For example, PIQ-88-03 clarifies the guidance in PIQ-82-10 with respect to identifying facilities that are primarily for the detention of children who are adjudicated delinquent. We consolidated the guidance from these two issuances into a single Question/Answer set. The "Source/Date" field for that Question/Answer set contains both PIQs, indicating that the information therein came from those two issuances.

- When we found Question/Answer sets in PIQs that addressed multiple topics, we placed those Question/Answer sets in all appropriate sections of the manual and then struck the irrelevant material leaving a Question/Answer set that pertains to only the section in which it resides. For example, ACYF-CB-PIQ-82-04 explained State's options for funding foster parent insurance. Some of the responses in the PIQ addressed options under titles IV-B and IV-E simultaneously. Those Question/Answer sets were placed in the appropriate sections under titles IV-B and IV-E in the manual and edited accordingly.

- We reviewed superseded issuances and, on rare occasion, found policy guidance that could be reinstated. For example, ACYF-PIQ-83-07 dealt with unaccompanied refugee minors' eligibility for title IV-E. It was superseded as a result of Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA). In reviewing the issuance, we found that, if updated to be consistent with the PRWORA, the information therein is still relevant.

After reviewing the PAs and PIQs, we turned to other sources to identify policy guidance for inclusion in the manual. These sources include:

**EXHIBIT C**

• The preamble to the September 18, 1998 Notice of Proposed Rulemaking (63 FR, 50058 - 50098) and the preamble to the January 25, 2000 Final Rule (65 FR, 4020 - 4093);

• The Questions and Answers on the January 25, 2000 Final Rule that were published on our web site; and

• Information Memoranda (IM) and Program Instructions (PI). While the purpose of IMs and PIs is respectively, to transmit useful information to the field and provide instruction with respect to the implementation of the programs the Children's Bureau administers, occasionally policy guidance was transmitted through an IM or PI. We did not, however, remove these IMs and PIs from the searchable directory of Program Implementation Issuances available on the our web site at http://www.acf.hhs.gov/programs/cb/laws_policies/index.htm.

**Effective date of the manual:** The manual is effective 09/24/01.

**How to access the old system:** Every PA and PIQ was officially replaced 09/24/01, the date the manual became operational. The Child Welfare Information Gateway has archived the PAs and PIQs and will make them available to the public upon request. Please contact the Clearinghouse by telephone at (800) 394-3366 or email at info@childwelfare.gov.

**EXHIBIT C**

# Child Welfare Policy Manual References

**Commonly Used Acronyms**

**AFCARS** - Adoption and Foster Care Analysis and Reporting System
**AFDC** - Aid to Families with Dependent Children
**APD** - Advance Planning Document
**ASFA** - Adoption and Safe Families Act
**CAP** - Cost allocation plan
**CAPTA** - Child Abuse Prevention and Treatment Act
**CFSR** - Child and Family Services Review
**CPS** - Child Protective Services
**FFP** - Federal financial participation
**GAL** - Guardian Ad Litem
**ICWA** - Indian Child Welfare Act
**IEAP** - Interethnic Adoption Provisions (Small Business Job Protection Act)
**MEPA** - Multiethnic Placement Act
**PRWORA** - Personal Responsibility and Work Opportunity Reconciliation Act
**SACWIS** - Statewide Automated Child Welfare Information System
**SSI** - Supplemental Security Income
**TPR** - Termination of parental rights

**Major Child Welfare Legislation**
**Public Law 93-247** Child Abuse Prevention and Treatment Act
**Public Law 96-272** Adoption Assistance and Child Welfare Act
**Public Law 103-66** Omnibus Budget Reconciliation of 1993
**Public Law 103-432** Social Security Act Amendments of 1994
**Public Law 103-382** Multiethnic Placement Act
**Public Law 104-188** Small Business Job Protection Act
**Public Law 104-193** The Personal Responsibility and Work Opportunity Act of 1996
**Public Law 104-235** Child Abuse Prevention and Treatment Act Amendments of 1996
**Public Law 105-89** The Adoption and Safe Families Act of 1997
**Public Law 106-169** The Foster Care Independence Act of 1999

**THOMAS - Legislative Information on the Internet**
Acting under the directive of the leadership of the 104th Congress to make Federal legislative information freely available to the Internet public, a Library of Congress team brought the THOMAS World Wide Web system online in January 1995, at the inception of the 104th Congress.
http://thomas.loc.gov/

**National Archives and Records Administration - Code of Federal Regulations**
The Code of Federal Regulations (CFR) is a codification of the general and permanent rules published in the Federal Register by the Executive departments and agencies of the Federal Government. The CFR online is a joint project authorized by the publisher, the National Archives and Records Administration's Office of the Federal Register, and the Government Printing Office (GPO) to provide the public with enhanced access to Government information.
http://www.access.gpo.gov/nara/cfr/

**EXHIBIT C**

# Child Welfare Policy Manual

## 8.  TITLE IV-E

### 8.1     TITLE IV-E, Administrative Functions/Costs

*1*  *Q:*  Is the cost of conducting criminal records checks for prospective foster and adoptive parents an allowable administrative cost under title IV-E?

*A:*  The regulations at section 1356.60 (c)(2) allow States to claim costs associated with recruitment and licensing as administrative costs under title IV-E.  Since the criminal records check provision is a condition of licensure or approval in States that do not opt out of the provision, costs associated with criminal records checks for prospective foster and adoptive parents are allowable under title IV-E when claimed pursuant to an approved cost allocation plan.

*Source:     Preamble to the Final Rule (65 FR 4020) (1/25/00)Preamble to the Final Rule (65 FR 4020) (1/25/00)*
*Reference:  45 CFR 1356.30 and 1356.60*

*2*  *Q:*  Can a case assessment be considered an allowable administrative cost?

*A:*  Yes, a case assessment is an allowable administrative cost in the context of case planning.  Section 471(a)(16) of the Social Security Act (the Act) requires the State to develop a case plan as defined at section 475(1) of the Act.  The development of and ongoing updates to the case plan are allowable costs pursuant to 45 CFR 1356.60(c)(2)(iv).  A critical component of case planning is the worker's assessment of the child and family.  A case assessment might consider information regarding psychological, developmental, behavioral and educational factors; explore underlying or disguised issues such as family violence or substance abuse; examine the child and the family s needs, strengths, resources and existing support systems; and explore whether it is safe for the child to remain in or return to the home.  Furthermore, it could include information on the child's past history, current adjustment, direct observations, and family history.

Specialized assessments such as psychiatric, medical or educational assessments are medical or educational services, respectively, and are not, therefore, allowable under title IV-E (45 CFR 1356.60(c) and Child Welfare Policy Manual Section 8.1B).  Time spent analyzing specialized assessments to inform the case plan, however, is allowable.

**EXHIBIT C**

# *Child Welfare Policy Manual*

*Source:*

*Reference:  Social Security Act - section 471(a)(16), section 475(1) and (5); 45 CFR 1356.60(c); Child Welfare Policy Manual Section 8.1B*

**3   Q:** May a State use title IV-E administrative funds for such items as beds or smoke detectors to help prospective foster family homes meet licensing standards?

**A:** Yes.  A State may claim title IV-E administrative costs for items such as beds, cribs, and smoke detectors that are needed in order to license or approve a foster family home.  These costs are closely related to foster family home recruitment, which is an example of an allowable title IV-E administrative cost in 45 CFR 1356.60.  In many States, there are not enough foster family homes to meet the needs of the children in foster care.  Therefore, increasing the number of foster family homes through the allowable use of title IV-E administrative funds is appropriate.

 Any such costs must be allocated through an approved cost allocation plan.  Please note that under general appropriations law, the costs of construction and renovation are not allowable without specific affirmative authorization.  Title IV-E does not have that affirmative authorization.

*Source:     06/09/0406/09/04*

*Reference:  Section 474 of the Social Security Act and 45 CFR 1356.60(c)(2)(vii).*

**EXHIBIT C**

# *Child Welfare Policy Manual*

*4  Q:* Are the costs of medical exams necessary for a prospective foster parent to obtain and retain a foster family home license or approval an allowable administrative cost under title IV-E?

*A:* Yes. 45 CFR 1356.60(c)(2)(vii) specifically identifies recruitment and licensing of foster family homes as an example of allowable administrative costs necessary for the administration of the foster care program.  If medical exams are necessary for prospective foster parents to obtain or retain a foster family home license or approval, then these costs are allowable as they are directly related to the administration of the program.

Any such costs must be allocated through an approved cost allocation plan.

*Source:    06/09/0406/09/04*
*Reference:  Section 474 of the Social Security Act, 45 CFR 1356.60(c)(2)(vii).*

*5  Q:* May a State that receives a request for an out-of-State home study from another State pursuant to section 471(a)(26) of the Social Security Act (the Act) claim title IV-E administrative costs to comply with the request?

*A:* Yes.  The requirement in section 471(a)(26) of the Act for a State to conduct an out-of-State home study if requested by another State is a requirement of the State's title IV-E State plan. As such, the costs of performing the home study are 100% allocable to title IV-E and do not have to be allocated to other benefiting programs.

*Source:    04/24/0704/24/07*
*Reference:  Social Security Act   sections 471(a)(26) and 474(a)(3)(E)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

*6  Q:*  May a State claim administrative costs on behalf of an otherwise eligible child for an entire month when the child is placed in a licensed or approved foster family home or child care institution for less than an entire month?

*A:*  Yes.  A State may claim administrative costs from the beginning of the month in which the child meets all eligibility criteria, if the criteria are met for the child at any point during that month. The State is not required to prorate administrative cost claims based on the number of days the child is placed in the foster family home or child care institution.

*Source:    04/26/0704/26/07*

*Reference:  Social Security Act   section 474(a)(3)(E)*

## 8.1A    TITLE IV-E, Administrative Functions/Costs, Allowable Costs - Adoption Assistance Program

*1  Q:*  What are the allowable administrative costs in the title IV-E Adoption Assistance Program?

*A:*  The Social Security Act, at section 474(a)(3)(B), permits States with approved title IV-E plans to be reimbursed at a 50 percent matching rate for the costs of administrative activities as found necessary by the Secretary for the proper and efficient administration of the State plan.

45 CFR 1356.60 (c), entitled "Federal matching funds for other State and local administrative expenditures for foster care and adoption assistance under title IV-E" interprets section 474 (a)(3)(B) of the Act. All of the sections of that regulatory section apply to the administrative expenditures of both the Foster Care and Adoption Assistance Programs.

In paragraph (1) of 45 CFR 1356.60 (c), certain identified costs are deemed allowable administrative costs of the Adoption Assistance Program under title IV-E.  Federal financial participation for these costs may not be claimed under any other section of Federal regulations or Federal program. They are: the determination and redetermination of eligibility; fair hearings and appeals; rate setting; and other costs directly related only to the administration of the adoption assistance program.

In addition, the following administrative costs are also considered to be directly related only to the administration of the Adoption Assistance Program, and are therefore also allowable under 45 CFR1356.60 (c)(1): grievance procedures; negotiation and review of adoption agreements; and post-placement management of subsidy payments.

EXHIBIT C

# *Child Welfare Policy Manual*

The following are examples provided by 45 CFR 1356.60 (c)(2) of allowable administrative costs considered necessary for the administration of the Adoption Assistance Program for which Federal financial participation may be claimed under title IV-E: recruitment of adoptive homes; placement of the child in the adoptive home; case reviews conducted during a specific preadoptive placement for children who are legally free for adoption; case management and supervision prior to a final decree of adoption; a proportionate share of related agency overhead; referral to services; and development of the case plan.

The following administrative costs are also considered to be necessary for the proper and efficient operation of the Adoption Assistance Program and are therefore allowable under 45 CFR 1356.60 (c): home studies, and a proportionate share of the development and use of adoption exchanges.

Attention is also called to paragraph (3) of 45 CFR 1356.60 (c) and 45 CFR 1356.60 (b)(1)(ii) regarding restrictions on certain types of costs, i.e., social services and limitations on training costs for adoptive parents.

*Source:     ACYF-CB-PA-83-01 (10/1/80)ACYF-CB-PA-83-01 (10/1/80)*
*Reference:  Social Security Act - sections 473 and 474; 45 CFR 1356.60*

*2  Q:* Under the Adoption Assistance Program, is Federal financial participation (FFP) for administrative costs associated with case review, case management, and supervision prior to a final decree of adoption available only for children in preadoptive placements?

*A:* Yes.  Federal financial participation is available in the costs of the administration of the Adoption Assistance Program beginning when the State determines that: (1) an eligible child (section 473 (a)) cannot or should not be returned to the home of his parents; (2) the goal for the child is adoption (section 473 (c)(1)); and (3) the child has been determined by the State or local agency to be a 'child with special needs' (section 473 (c)).

In addition, the child must be legally free for adoption and that the goal of adoption must be documented in the case plan for the child and in the report of the periodic review.  Case reviews, case management and supervision are allowable costs only when provided on behalf of a child who is already placed in a preadoptive home.

Costs under the Adoption Assistance Program must be directly related to the administration of

**EXHIBIT C**

# *Child Welfare Policy Manual*

the Adoption Assistance Program and to children for whom adoption is a definite plan, rather than just a long range goal which may not materialize. Therefore, the child must be in placement in a specific preadoptive home, rather than in a foster care placement where the goal is eventual adoptive placement.

*Source:      ACYF-CB-PIQ-85-06 (6/5/85)ACYF-CB-PIQ-85-06 (6/5/85)*
*Reference:  Social Security Act - section 473*

*3  Q:*  Can a State claim title IV-E administrative costs for activities performed on behalf of a child in a finalized adoption?

*A:*  A State may claim Federal financial participation for activities performed on behalf of a child in a finalized adoption that are consistent with 45 CFR 1356.60(c) and the State's approved cost allocation plan. Under the title IV-E adoption assistance program, a State may claim for administrative activities that occur post-finalization, such as fair hearings and appeals, management of the adoption subsidy, review and renegotiation of the adoption assistance agreement, referral to services, and case management performed to implement an adoption assistance agreement.

Furthermore, if the State determines that the adoptive placement is in jeopardy and demonstrates that the adopted child is a candidate for foster care, the State may claim allowable title IV-E administrative costs under the foster care program for activities performed on behalf of the child as a candidate.

*Source:      8/16/028/16/02*
*Reference:  Social Security Act - section 474(a)(3)(B); 45 CFR 1356.60(c); CWPM Sections 8.1A, 8.1B and 8.1D*

**EXHIBIT C**

# *Child Welfare Policy Manual*

**8.1B    TITLE IV-E, Administrative Functions/Costs, Allowable Costs - Foster Care Maintenance Payments Program**

*1  Q:* Please clarify those pre-placement administrative activities that are considered a service and, therefore, not claimable under title IV-E from those that are allowable administrative functions.

*A:* A State may claim for any allowable title IV-E administrative cost that comports with or is closely related to one of the listed activities at 45 CFR 1356.60(c)(2). Allowable costs related to pre-placement activities may include the determination of eligibility, preparation for placement, placement and referral costs before the child is placed in foster care.

The administrative costs of referral to service providers (45 CFR 1356.60 (c)(2)(i)) are only for those referrals specifically designed to further the statutory goal of reasonable efforts to prevent removal in section 471(a)(15)(B)(i) of the Social Security Act. Referral to services is limited to the activities of the caseworker and the caseworker's supervisor and does not include investigations or physical or mental examinations or evaluations. The costs of services related to the prevention of placement are not foster care administrative costs and are therefore not reimbursable. A State's cost allocation plan must identify the costs that are allocated and claimed under the program.

Costs that are not reimbursable (under 45 CFR 1356.60 (c)(3)) include those for social services which provide counseling or other treatment to the child, his family, or foster family to remedy home conditions, personal problems or behaviors. Examples of non-reimbursable services include counseling, homemaker or housing services and assisting in reuniting families. These services are not reimbursable regardless of the credentials or training of the provider, e.g., these services provided by a caseworker are unallowable. Further, they are not reimbursable regardless of whether they are provided on a single occasion or as part of a series.

Allowable costs associated with preparation for and participation in judicial determinations (45 CFR 1356.60 (c)(2)(ii)) are limited to the preparation of reports to the court and participation in court proceedings by State or local agency personnel.

*Source:    ACYF-CB-PA-85-01 (11/18/85); ACYF-CB-PA-87-05 (10/22/87); 7/7/2006ACYF-CB-PA-85-01 (11/18/85); ACYF-CB-PA-87-05 (10/22/87); 7/7/2006*
*Reference:  45 CFR Part 1356.60*

**EXHIBIT C**

# *Child Welfare Policy Manual*

*2*  *Q:*  May we claim Federal financial participation (FFP) for the cost of conducting title IV-E eligibility determinations even for children who are not found to be title IV-E eligible?

*A:*  Yes.  The determination and redetermination of eligibility (45 CFR 1356.60 (c)(l)) are considered necessary administrative activities in the title IV-E foster care program. Therefore, a State may claim reimbursement for the costs of all determinations and redeterminations of eligibility for title IV-E foster care. These may include negative as well as positive eligibility determinations.

 Reimbursement for eligibility determination activities is limited to costs involved in the actual verification and documentation of eligibility and may not include the costs of other activities such as judicial determinations, placement of the child or periodic court or administrative reviews. The activities of staff whose responsibilities extend beyond eligibility determination for title IV-E must be allocated to the appropriate program; e.g., foster care maintenance, food stamps, or title XIX medical assistance.

*Source:*    *ACYF-CB-PA-87-05 (10/22/87)ACYF-CB-PA-87-05 (10/22/87)*
*Reference:  45 CFR Part 1356.60; DHHS Grant Appeals Board Decision No. 844*

*3*  *Q:*  May the State claim administrative costs for the child of a minor parent?

*A:*  When a child is placed with his/her minor parent, no administrative costs may be claimed on her/his behalf because s/he is not eligible for nor a recipient of title IV-E foster care maintenance payments.  The State is merely increasing the amount of the title IV-E foster care maintenance payment made on behalf of the eligible minor parent to accommodate the board and care of the child.  In situations where the eligibility of the minor parent and his/her infant is determined separately and the two are placed separately, the State may claim administrative costs for the child because s/he is eligible for and receiving title IV-E maintenance payments in her/his own right.

*Source:    Questions and Answers on the Final Rule (65 FR 4020) (1/25/00)Questions and Answers on the Final Rule (65 FR 4020) (1/25/00)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

*Reference:  Social Security Act - section 475 (4)*

**4  *Q:*** Can administrative costs for processing and management of foster child health care services be claimed against title IV-E?

**  *A:*** No.  In accordance with sections 474 (a)(3) and 475 (4) of the Social Security Act and 45 CFR 1356.60 (c), administrative  costs for the processing and management of health care services for foster children under title IV-E are not allowable.

 Section 475 (4) defines "foster care maintenance payments" as payments to cover the cost of (and the cost of providing) food, clothing, shelter, daily supervision, school supplies, and a child's personal travel to the child's home for visitation.  The provision of health care services is not included in that definition and therefore is not an allowable cost item under title IV-E. Allowable administrative costs are only those administrative expenditures necessary for the proper and efficient administration of the title IV-E State plan.

*Source:      ACYF-CB-PIQ-85-05 (4/12/85)ACYF-CB-PIQ-85-05 (4/12/85)*
*Reference:  Social Security Act - sections 474 (a)(3) and 475 (4); 45 CFR 1356.60 (c)*

**5  *Q:*** Is it permissible for a State title IV-B/IV-E agency (State agency) to identify court activities related to title IV-E eligible children and claim title IV-E reimbursement on behalf of the court? Such activities might include docketing of the cases, the time of court staff assigned to review "reasonable efforts" made by the State agency, clerical support, the time spent by referees with title IV-E cases, and expenses such as supplies, space and utilities.

**  *A:*** No. Section 474 (a)(3) of the Social Security Act (the Act) provides for Federal matching for State administrative expenditures; section 471(a)(2) of the Act specifies that the responsible State agency shall administer the State plan. Accordingly, a State agency may not claim reimbursement for administrative costs under title IV-E for activities being performed by the court.
 With respect to the activities described in the question, docketing of cases is a required court activity, not a State agency function. The time of court staff assigned to review "reasonable efforts" made by the State agency is likewise a required court activity, and not a State agency function. In this regard, the State agency is required by section 471(a)(15) of the Act to provide

**EXHIBIT C**

# *Child Welfare Policy Manual*

"reasonable efforts" prior to the placement of a child in foster care to eliminate the need for removal of the child from his home and, when removal is necessary, to provide "reasonable efforts" to make it possible for the child to return home or to make and finalize an alternate permanent living arrangement for the child. The court is required by section 472 (a)(2)(A)(ii) of the Act to determine if the State, in fact, has made "reasonable efforts" to keep the child in his home.

Thus, activity related to the "reasonable efforts" determination to be made by the court would not be considered an administrative cost that is reimbursable by the State agency on behalf of the court. Associated clerical and overhead expenses are similarly unallowable.

*Source:     ACYF-CB-PIQ-92-03 (7/17/92)ACYF-CB-PIQ-92-03 (7/17/92)*
*Reference:  Social Security Act - sections 471, 472 and 474*

**6   Q:** How should the costs of foster parent insurance be claimed, as maintenance payments or as administrative expenditures subject to reimbursement?  What types of insurance costs are allowable?  Is liability insurance sometimes considered a service?  What should be included in the definition of "liability insurance"?

**A:** Section 475 (4) of the Social Security Act, by including "liability insurance with respect to a child" in the definition of foster care maintenance payments, gives States the option of considering insurance for foster parents as a direct foster care maintenance cost or as an administrative cost of the foster care maintenance program under title IV-E.

Some States include payment for insurance coverage in the monthly foster care payment to foster parents; others provide the protection through a group insurance policy or through the State's self-insuring procedures.  Using self-insurance, the State may be able to provide broad coverage at low cost.

Foster parent insurance should include coverage of damages by a foster child to the home or property of the foster parents and of harm done by a foster child to another party.

*Source:     ACYF-CB-PIQ-82-04 (1/29/82)ACYF-CB-PIQ-82-04 (1/29/82)*
*Reference:  Social Security Act - section 475 (4)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

*7*  *Q:*  If foster parent insurance is an administrative cost when purchased by the State agency, then the State receives a 50% match rather than FMAP. Doesn't this provide a disincentive for the State to take responsibility for insurance of foster parents and encourage the State to have the foster parents obtain their own insurance?

*A:*  Although, under title IV-E, Federal match may be lower for administrative costs than for maintenance costs, there is advantage to the State in assuming the overall responsibility for the protection for foster parents caring for children under the State's custody as a recruitment incentive. If the State chooses to use its self-insuring procedures, it may be able to provide a broad scope of coverage at relatively low cost. Foster parents are valuable resources to the agency, and the provision of protection against possible risks they face in providing care is a strong inducement to participate in the program.

*Source:*      *ACYF-CB-PIQ-82-04 (1/29/82)ACYF-CB-PIQ-82-04 (1/29/82)*
*Reference:  Social Security Act - sections 424(a) and (c), 475 (4)*

*8*  *Q:*  There appears to be no agreement between insurers on the meaning of "liability insurance". Is the interpretation to include coverage of damages to the home or property of the foster parents as well as coverage for harm done by the child to another party, or accidental harm done by the foster parents to the child?

*A:*  The terminology may be misleading, because foster parents are interested in more than "liability insurance". The correct interpretation includes coverage of damages to the home or property of the foster parents, as well as liability for harm done by the child to another party. In addition, protection against suit for possible malpractice or situations such as alienation of affection are often realistic concerns of persons who care for the children of others.

Several States have responded to these concerns by providing coverage for foster parents under a "pooled" liability program which provides in effect a self-insurance for departments of State government. Other States have legislated or otherwise defined foster parents as employees or as persons acting on behalf of the State, thus providing protection to those persons for claims made against them as agents of the State. Some States have purchased insurance coverage for foster parents, although the policies available often do not cover all of the risks incurred.

**EXHIBIT C**

# *Child Welfare Policy Manual*

*Source:      ACYF-CB-PIQ-82-04 (1/29/82)ACYF-CB-PIQ-82-04 (1/29/82)*
*Reference:  Social Security Act - sections 424(a) and (c), 475 (4)*

**9  *Q:*** 45 CFR 1355.33 (b) requires the use of "external partners" on the child and family services review team.  Can these individuals be paid or compensated?

**    *A:*** In the regulation, we identified agencies/entities external to the State that participated in the development of the State's Child and Family Services plan as appropriate partners to include on the review team. The State may cover per diem and travel expenses for its external partners' participation to the extent that it so chooses.  Moreover, the State may, pursuant to an approved cost allocation plan, allocate the cost of conducting a child and family services review, which may include compensation for the State's external partners, to title IV-E.

*Source:      Questions and Answers on the Final Rule (65 FR 4020) (1/25/00)Questions and Answers on the Final Rule (65 FR 4020) (1/25/00)*
*Reference:  45 CFR 1355.33*

**10  *Q:*** Please provide some guidance with respect to the allowable costs for candidates for foster care.

**    *A:*** Pursuant to section 472(i) of the Social Security Act (the Act) a State may make claims for candidates for foster care for any allowable title IV-E administrative cost that comports with or is closely related to the activities listed at 45 CFR 1356.60(c)(2).

 Consistent with the law,  existing policy and DAB decisions (see DAB Decision Nos. 844 and 1428), pre-placement administrative functions for which States wish to claim FFP must be "closely related" to the administrative cost items specified at 45 CFR 1356.60.  Further, the administrative costs of referral to service providers (45 CFR 1356.60(c)(2)(i) are for those referrals specifically designed to further the statutory goal of section 471(a)(15)(B)(i) of the Act (reasonable efforts to prevent removal) and are limited to the activities of agency staff in the referral process only.

 Allowable costs of preparation for and participation in judicial determinations (45 CFR

**EXHIBIT C**

# *Child Welfare Policy Manual*

1356.60(c)(2)(ii) are limited to those costs related to preparation of reports to the court and participation in court proceedings by State or local title IV-E agency personnel.

 Title IV-E administrative costs claimed on behalf of foster care candidates are subject to the same limitations that are in place when such cost items are claimed for children in foster care. For example, investigating claims of child abuse/neglect, physical/mental examinations or evaluations, and completing case progress notes with regard to the delivery of services are not allowable title IV-E administrative functions. Nor do the actual services delivered to foster care candidates in compliance with the reasonable efforts requirements qualify as title IV-E administrative costs.

*Source:     ACYF-CB-PA-87-05 (10/22/87); ACYF-CB-PA-01-02 (7/3/01); 7/7/2006ACYF-CB-PA-87-05 (10/22/87); ACYF-CB-PA-01-02 (7/3/01); 7/7/2006*
*Reference:  Social Security Act - section 472(i)(2); 45 CFR 1356.60; Departmental Appeals Board Decision Nos. 844 and 1428; ACYF-CB-IM-06-02*

**EXHIBIT C**

# *Child Welfare Policy Manual*

**11  *Q:*** [1] May the State claim Federal financial participation (FFP) for the administrative costs of an otherwise title IV-E eligible child who is placed in an unlicensed or unapproved foster family home?

**  *A:*** Under certain circumstances, yes.  The State may claim administrative costs on behalf of an otherwise eligible child placed in an unlicensed or unapproved relative home for 12 months or the average length of time it takes the State to license or approve a foster family home, whichever is less.  During this time, an application for licensure or approval of the relative home as a foster family home must be pending (section 472(i)(1)(A) of the Social Security Act).  The State is prohibited from claiming administrative costs for a child placed in an unlicensed or unapproved foster family home that is not related to the child.  For the purposes of this provision, a relative is defined by section 406(a) of the Social Security Act as in effect on July 16, 1996, and implemented in 45 CFR 233.90(v).

[1] This question was originally deleted from the manual.  The answer is new.

*Source:*    *8/7/20068/7/2006*

*Reference:  Social Security Act   section 472(i)(1)(A), 45 CFR 233.90(v)*

**12  *Q:*** May we claim Federal financial participation (FFP) for the administrative costs of otherwise title IV-E eligible children who are placed in public child care institutions that accommodate more than 25 children?

**  *A:*** In general, no.  Section 472(c)(2) of the Social Security Act specifically excludes public child care institutions that accommodate more than 25 children from the definition of "child care institution" therein, making such facilities unallowable under title IV-E. Therefore, a child placed in a public child care institution that accommodates more than 25 children is not eligible for title IV-E, and thus the State may not claim administrative costs on his/her behalf. Nor may the State consider such child to be a candidate for the purpose of claiming title IV-E administrative costs because such child has been removed from the home.

However, a State may claim administrative costs on behalf of an otherwise eligible child for the calendar month prior to the month the child moves from an unlicensed or unapproved foster family home or child care institution into one which is licensed or approved (see section 472(i)(1)(B) of the Social Security Act and section 8.1 of the Child Welfare Policy Manual). The

**EXHIBIT C**

# *Child Welfare Policy Manual*

State must claim any such administrative costs consistent with an approved cost allocation plan.

*Source:    ACYF-CB-PA-01-02 (7/3/01); 7/17/2006ACYF-CB-PA-01-02 (7/3/01); 7/17/2006*

*Reference:  Social Security Act - section 472(c)(2) and 472(i)(1)(B); Section 8.1 of the Child Welfare Policy Manual*

*13   Q:*  May we claim title IV-E administrative costs for eligible children who receive Supplemental Security Income (SSI)?

*A:*  Yes. An August 17, 1993 memorandum from the Acting Commissioner of the Administration on Children, Youth, and Families to the Administration for Children and Families Regional Administrators allowed a State to include children who are eligible for title IV-E but who are receiving SSI in lieu of title IV-E foster care maintenance payments when determining its administrative cost ratio. This practice was conceptualized by considering these children candidates for foster care. While the policy itself is sound, a child who is in foster care is not a candidate because s/he has already been removed from home. If a child is fully eligible for title IV-E a State's choice to fund that child's board and care through SSI rather than title IV-E does not negate that child's eligibility for title IV-E.  The State may, therefore, claim Federal financial participation under title IV-E for title IV-E administrative functions performed on behalf of that child.

*Source:    ACYF-CB-PA-01-02 (7/3/01)ACYF-CB-PA-01-02 (7/3/01)*

*Reference:  Social Security Act - sections 471 and 474*

**EXHIBIT C**

# *Child Welfare Policy Manual*

**14  Q:**  May a State claim title IV-E administrative funds for the cost of conducting  child and family services (CFS) reviews and title IV-E eligibility reviews?

**A:**  Yes, however, a State that seeks to charge the allowable portion of the costs of conducting a CFS review to title IV-E must first amend its cost allocation plan to include CFS review activities.  The State must, pursuant to OMB Circular A-87 principles, allocate the costs of the CFS review across benefiting programs and may then charge the portion claimable under title IV-E at the 50 percent rate for Federal financial participation (FFP).

Conducting a child and family services review includes preparation for and completion of the statewide assessment, preparation for and the execution of the on-site portion of the review, and developing and implementing a program improvement plan.

All costs for a State to prepare and conduct a title IV-E eligibility review, as well as any required PIP development costs, are 100 percent allocable to title IV-E administration.  The costs associated with approved PIP activities are also eligible for 100 percent allocation to title IV-E administration.  A State should, however, separately allocate costs qualifying as title IV-E training (in accordance with all applicable regulations) for claiming at the 75 percent rate of FFP.

*Source:      August 16, 2002August 16, 2002*

*Reference:  Social Security Act   section 474(a)(3); 45 CFR 1355.20, 33, and 35; Office of Management and Budget Circular A-87, Cost Principles for State and Local Governments*

**EXHIBIT C**

# *Child Welfare Policy Manual*

**15  *Q:*** Is the implementation and operation of a statewide quality assurance system an allowable title IV-E administrative cost?

**   *A:*** Pursuant to section 471(a)(7) of the Social Security Act (the Act), the State agency is required to monitor and conduct periodic evaluations of its title IV-E program.  The operation of a statewide quality assurance system is one acceptable method for complying with section 471(a)(7) of the Act. A statewide quality assurance system will usually include the review of cases other than those that are title IV-E eligible and address issues, such as the effectiveness of the delivery of social services, that do not qualify as title IV-E administration.  Only quality assurance system costs associated with title IV-E eligible cases and functions may be claimed for title IV-E reimbursement.  A State may amend its cost allocation plan as necessary to include the implementation and operation of a quality assurance system and subsequently claim the allowable title IV-E portion as an administrative expense after allocating costs among all benefiting programs.

   *Source:*    8/16/028/16/02
   *Reference:  Social Security Act -- Section 401(a)(7)*

**16  *Q:*** Are administrative costs allowable when a child has run away from a foster care placement?

**   *A:*** Yes, administrative costs are allowable when a child has run away from a foster care placement.  The manual states, in section 8.3c.2, Question 3, that if a State retains placement and care responsibility for a child who has run away from a foster care placement, the State must continue to perform title IV-E activities on behalf of such a child, including holding six-month periodic reviews and permanency hearings.

   *Source:*    6/23/036/23/03
   *Reference:  Section 474 of the Act; 45 CFR 1356.60; Child Welfare Policy Manual Section 8.3c.2*

**EXHIBIT C**

# *Child Welfare Policy Manual*

**17  *Q:*** Can a case assessment be considered an allowable administrative cost?

**A:** Yes, a case assessment is an allowable administrative cost in the context of case planning. Section 471(a)(16) of the Social Security Act (the Act) requires the State to develop a case plan as defined at section 475(1) of the Act.  The development of and ongoing updates to the case plan are allowable costs pursuant to 45 CFR 1356.60(c)(2)(iv).  A critical component of case planning is the worker's assessment of the child and family.  A case assessment might consider information regarding psychological, developmental, behavioral and educational factors; explore underlying or disguised issues such as family violence or substance abuse; examine the child and the family s needs, strengths, resources and existing support systems; and explore whether it is safe for the child to remain in or return to the home.  Furthermore, it could include information on the child's past history, current adjustment, direct observations, and family history.

 Specialized assessments such as psychiatric, medical or educational assessments are medical or educational services, respectively, and are not, therefore, allowable under title IV-E (45 CFR 1356.60(c) and Child Welfare Policy Manual Section 8.1B).  Time spent analyzing specialized assessments to inform the case plan, however, is allowable.

*Source:     6/23/036/23/03*

*Reference:  Social Security Act - section 471(a)(16), section 475(1) and (5); 45 CFR 1356.60(c); Child Welfare Policy Manual Section 8.1B*

**EXHIBIT C**

# *Child Welfare Policy Manual*

**18  *Q:*** May a State claim title IV-E administrative funds for the legal services of a child in foster care
or his/her parents, such as the parent or child's legal representation in court hearings?

**   *A:*** No.  The regulations at 45 CFR 1356.60(c) specify that Federal financial participation is
available at the rate of 50% for administrative expenditures necessary for the proper and
efficient administration of the title IV-E State plan.  The administrative function specified at 45
CFR 1356.60(c)(2)(ii), preparation for and participation in judicial determinations, concerns the
State agency?s representation but not the provision of legal services to a child or parent. Only
the State agency?s participation in judicial determinations is an allowable cost.

   *Source:*     06/09/0406/09/04
   *Reference:  Section 474 of the Social Security Act, 45 CFR 1356.60(c)(2)(ii).*

**19  *Q:*** Does having an approved program improvement plan (PIP) enable a State to claim title IV-E
administrative or training costs that otherwise would not be allowable under section 474(a)(3)
of the Social Security Act?

**   *A:*** No. The costs of any administrative activities or training that a State undertakes as a result of a
program improvement plan can only be claimed under title IV-E if the costs are allowable
under the existing policies, regulations, and statute for claiming FFP. The existence of an
approved PIP does not make otherwise unallowable costs allowable under title IV-E.

   *Source:*     7/7/20067/7/2006
   *Reference:  45 CFR 1357.10(b)*

**20  *Q:*** States are permitted to claim administrative costs for a child placed with a relative for the
lesser of 12 months or the average length of time it takes for the State to license or approve a
foster home as long as a foster family home application is pending.  What happens if the State
does not license or approve the relative's home during this period?

**   *A:*** The State agency must discontinue administrative cost claims on behalf of the child if the

**EXHIBIT C**

# *Child Welfare Policy Manual*

home is not licensed or approved during the timeframe specified in section 472(i)(1)(A) of the Social Security Act (i.e., at the end of the 12th month or the average time it takes the State to license/approve a foster family home, if less).  Furthermore, the statute specifies that a State is permitted to claim administrative costs only if an application for licensure or approval of the home is pending.

*Source:    8/7/20068/7/2006*

*Reference:  Social Security Act   section 472(i)(1)(A)*

**21   Q:**  What administrative costs may a State claim during the one-month period when a child moves from an unallowable facility to a licensed or approved foster family home or child care institution as described at section 472(i)(1)(B) of the Social Security Act?

**A:**  A State may claim any allowable title IV-E administrative cost that comports with 45 CFR 1356.60(c).  There are no restrictions on the types of title IV-E administrative activities that States may claim during the one-month period, as long as they are consistent with the examples of allowable administrative costs stipulated in 45 CFR 1356.60(c)(2), such as case management and supervision, or activities that are closely related to those examples.  As required in 1356.60(c), the State?s cost allocation plan must identify the costs that are allocated and claimed under the program.

*Source:    8/7/20068/7/2006*

*Reference:  Social Security Act   section 472(i)(1)(B); 45 CFR 1356.60(c)*

**22   Q:**  Section 472(i)(1)(B) of the Social Security Act (the Act) permits States to claim administrative costs for a calendar month prior to the child s move from an unallowable facility to a licensed or approved foster family home or child care institution.  Is a State limited in how many times it can apply section 472(i)(1)(B) for the same child?

**A:**  No.  The State may claim up to one calendar month of administrative costs pursuant to section 472(i)(1)(B) of the Act each time a child transitions from a facility not eligible for title IV-E payments to a licensed or approved foster family home or child care institution.

**EXHIBIT C**

# *Child Welfare Policy Manual*

Source:      8/7/20068/7/2006
Reference:  Social Security Act   section 472(i)(1)(B)

**23  Q:**  May a State claim title IV-E administrative costs as permitted under section 472(i) of the Social
Security Act (the Act) for a child placed in an unlicensed or unapproved relative home before
completing the background check requirements in section 471(a)(20) of the Act?

**A:**  Yes.  The State may claim title IV-E administrative costs in accordance with 472(i) of the Act
absent the results of the relative?s background checks, although the State must complete the
background check requirements in section 471(a)(20) of the Act before the relative's home can
be licensed or approved by the State.  The State may claim the administrative costs only
during the period specified in the statute and while an application for foster family licensure or
approval of the relative home is pending.

Source:      01/29/0701/29/07
Reference:  Social Security Act   sections 471(a)(20) and 472(i)

**24  Q:**  May the State claim a title IV-E foster care maintenance payment for an allowable provider that
covers the entire month if a child is temporarily absent for a portion of the month?  For
example, the child has run away, goes on a weekend home visit, or is hospitalized for medical
treatment during some part of the month.

**A:**  Yes. The State may provide a full month's title IV-E foster care maintenance payment to the
licensed provider if the brief absence does not exceed 14 days and the child's placement
continues with the same provider.  Otherwise, the State must prorate its claims if the child is
absent from the placement for more than a reasonable brief period.

Source:      1/29/20071/29/2007
Reference:  Social Security Act   section 472

**EXHIBIT C**

# *Child Welfare Policy Manual*

**25  *Q:*** May a State claim administrative costs during the unlicensed period that a child is placed in a foster family home whose license has expired, but is in the process of renewal?

**   *A:*** Under certain circumstances, it is possible that the State may claim administrative costs in this situation.  Please see section 8.3A.8c, question 11 of the Child Welfare Policy Manual in which we allow the State to claim administrative costs for the entire month when an otherwise eligible child has resided in a home for the entire month, even if it is only licensed for a portion of the month.  Furthermore, if the State's policies allow an expired license to remain in effect until renewed, the child placed in such a home is considered placed in a licensed foster family home, and the State may claim Federal Financial Participation (FFP) during that period.  If, however, the State does not consider the expired license to remain in effect, the State may not claim FFP from the beginning of the month after the license expired until the beginning of the month in which the license is re-issued.

*Source:    04/26/0704/26/07*

*Reference:  Social Security Act   section 471(a)(10), Child Welfare Policy Manual   section 8.3A.8c, question 11*

**26  *Q:*** Section 472(i)(1)(B) of the Social Security Act (the Act) allows a State to claim Federal financial participation (FFP) for allowable administrative expenses for an otherwise eligible child for not more than one calendar month when the child moves from a facility not eligible for payments under title IV-E into a foster family home or child care institution licensed or approved by the State.  Please clarify for what time period administrative costs may be claimed during this transition.

**   *A:*** When an otherwise title IV-E eligible child moves from a facility not eligible for payments under title IV-E to a licensed or approved foster family home or child care institution, the State may claim administrative costs in accordance with section 472(i)(1)(B) of the Act: 1) for the full calendar month prior to the month in which the child moved; and 2) for the next full calendar month if the child meets all title IV-E eligibility criteria prior to the end of that month.  This is consistent with our administrative cost claiming practice allowing a State to claim title IV-E administrative costs for an entire month if the child is eligible for a portion of the month

*Source:    11/14/0711/14/07*

*Reference:  Social Security Act   section 472(i)(1)(B)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

*27*  *Q:*  When a child in foster care lives in a foster family home or child care institution outside the child s school of origin may the cost of transporting the child to and from the school of origin be an allowable title IV-E administrative cost?

*A:*  Yes.  As specified in the Child Welfare Policy Manual Section 8.1, Q&A3, to be an allowable title IV-E administrative cost under title IV-E, a cost must be one of the examples listed in 45 CFR 1356.60(c)(2) or closely related to one of those examples.  The costs described in the question are closely related to case management, which is listed as an example of an allowable administrative cost in 45 CFR 1356.60(c)(2).  Any such costs must be allocated through an approved cost allocation plan.

*Source:*      *12/31/0712/31/07*

*Reference:  45 CFR 1356.60(c)(2); Child Welfare Policy Manual section 8.1, Q&A3*

## 8.1C      TITLE IV-E, Administrative Functions/Costs, Calculating Claims

*1*  *Q:*  May a State claim Federal financial participation (FFP) in the title IV-E foster care and adoption assistance programs based on estimates of quarterly expenditures, or must FFP be claimed on the basis of actual expenditures reported quarterly?

*A:*  In accordance with regulations at 45 CFR 95.4, a "claim" is defined as "...a request for Federal financial participation in the manner and format required by our program regulations, and instructions or directives issued thereunder." The instructions for completing Form ACF IV-E-1 state that all amounts must be for actual expenditures made under the State's approved IV-E plan in accordance with applicable statutes and regulations. These claims must be supported by accounting records and source documentation at the time they are submitted. Estimates of quarterly expenditures do not represent a "claim" as defined above and, as such, may not be reported on the Form IV-E-1 for the purpose of claiming FFP. All claims must be comprised of actual expenditures and filed within two years from the end of the quarter within which the expenditures were made.

*Source:      ACYF-CB-PIQ-96-01 (10/8/96)ACYF-CB-PIQ-96-01 (10/8/96)*

*Reference:  45 CFR 95.4; ACYF-OC-PI 99-01 (9/22/99)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

*2* *Q:* What is the connection between the date the child is considered to have entered foster care and when the State may claim Federal financial participation (FFP) for foster care maintenance payments?

*A:* Establishing initial eligibility for title IV-E funding and initial claiming for FFP have no relationship to the date the child is considered to have entered foster care defined at section 475 (5)(F) of the Social Security Act.  The purpose of that provision is to set the "clock" for determining when to satisfy the requirements for holding periodic reviews, permanency hearings, and the TPR provision.  A child's initial eligibility for title IV-E funding is not related to this time frame.

 The date a child is considered to have entered foster care is, however, related to maintaining a child's eligibility for title IV-E funding.  Under 45 CFR 1356.21 (b)(2), we require the State to use the date the child is considered to have entered foster care in determining when to obtain a judicial determination that it made reasonable efforts to finalize a permanency plan.  We intentionally linked the timing for obtaining this judicial determination to the date the child is considered to have entered foster care so that such determinations could occur at the permanency hearing, the logical time for making such determinations.

*Source:    Preamble to the Final Rule (65 FR 4020) (1/25/00)Preamble to the Final Rule (65 FR 4020) (1/25/00)*
*Reference:  Social Security Act - sections 475 (5)(F); 45 CFR 1355.20 and 1356.21 (b)(2)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

3  *Q:*  A State asks whether it is required to apply an eligibility factor to child specific costs for children whom it "reasonably views as candidates for title IV-E foster care maintenance payments".

*A:*  Administrative costs identified in 45 CFR 1356.60 (c)(2) that are not directly linked to the eligibility of children must be allocated in such a manner as to assure that each participating program is charged its proportionate share of costs.  Such allocation may be on the basis of case count or on some other equitable basis.  These administrative costs include recruitment and licensing of foster homes, rate setting, training, and the proportionate share of related agency overhead.

Child specific administrative costs include such matters as referrals, reports and court proceedings. Allowable administrative costs associated with child specific activities are 100 percent reimbursable for those individuals that the State reasonably views as candidates for title IV-E foster care.

In order to claim child specific administrative costs, the State may individually determine those children who are title IV-E foster care candidates and claim 100 percent of the child specific allowable administrative costs incurred on behalf of these children.

Alternatively, if the child is not specifically identified as a candidate for title IV-E foster care, there must be an allocation. The allocation must be based on a determination both of candidacy for foster care and of potential IV-E eligibility. Using a ratio of IV-E to non-IV-E cases is one acceptable means of allocation. Other means of determining candidacy and of determining potential IV-E eligibility may also be acceptable.

The State must clearly identify in its Cost Allocation Plan those administrative activities which are child specific and the methodology which will be used for claiming these costs.

*Source:    ACYF-CB-PA-87-05 (10/22/87); ACYF-CB-PIQ-96-01 (10/8/96)ACYF-CB-PA-87-05 (10/22/87); ACYF-CB-PIQ-96-01 (10/8/96)*
*Reference:  45 CFR 1356.60; DHHS Grant Appeals Board Decision No. 844*

4  *Q:*  Licenses for foster family homes and child-care institutions often go into effect or may lapse on a day other than the first or last day of the month.  How should the State claim Federal financial participation (FFP) for a title IV-E eligible child who is placed in a foster family home

**EXHIBIT C**

# *Child Welfare Policy Manual*

or child-care institution that is licensed for a portion of a month?

*A:*  If a foster family home or child-care institution is licensed for a portion of a month, the State may claim FFP for the entire month when an otherwise eligible child has resided in that home or institution for the entire month.  The State must prorate any claims when the otherwise eligible child has resided in the home or institution for a portion of the month.

*Source:    Questions and Answers on the Final Rule (65 FR 4020) (1/25/00)Questions and Answers on the Final Rule (65 FR 4020) (1/25/00)*

*Reference:  Social Security Act - section 471 (a)(10)*

*5*  *Q:*  When May Federal financial participation (FFP) begin for candidates for foster care?

*A:*  States may claim FFP  for administrative costs for allowable administrative functions performed on behalf of foster care candidates in the month in which the child's candidacy is determined consistent with section 472(i)(2) of the Social Security Act (the Act).  States may not claim FFP for title IV-E administrative functions performed prior to the month of candidacy because a child is not a candidate for foster care until the State has determined that the child is at imminent risk of removal from the home and reasonable efforts are being made to prevent removal, or if necessary, to pursue removal from the home. A State must document that it has determined that a child is a candidate for foster care pursuant to one of three acceptable methods: a case plan that identifies foster care as the goal absent preventative services; an eligibility form used to document the child's eligibility for title IV-E; or evidence of court proceedings related to the child's removal from the home.

*Source:    ACYF-CB-PA-01-02 (7/3/01); 7/7/2006ACYF-CB-PA-01-02 (7/3/01); 7/7/2006*

*Reference:  Social Security Act - section 472(i)(2)); 45 CFR 1356.60; Departmental Appeals Board Decision No. 844; ACYF-CB-IM-06-02*

**EXHIBIT C**

# *Child Welfare Policy Manual*

6   *Q:*   Are administrative funds available at 50% Federal financial participation (FFP) for the cost of accrediting a State s child welfare agency?

   *A:*   Yes. Section 471(a)(22) of the Social Security Act requires States to provide standards to ensure that children in public or private foster care placements are provided quality services that protect the safety and health of the children. Therefore, costs associated with accrediting a State?s child welfare agency, to the extent they meet the requirement with regard to the placement of children in foster care, are allowable for the proper and efficient administration of the State plan.

   Any such costs must be allocated, through an approved cost allocation plan, to all benefiting programs.

    *Source:*    *06/09/0406/09/04*
    *Reference:  Section 471(a)(22) of the Social Security Act, 45 CFR 1356.60(c).*

7   *Q:*   Section 472(i)(2) of the Social Security Act permits States to claim administrative costs on behalf of a candidate for foster care who is  potentially eligible for benefits under a State plan under this part.   Does the phrase "potentially eligible" mean that the State must determine that a child would meet the Aid to Families with Dependent Children (AFDC) eligibility criteria at the time of removal before claiming allowable costs?

   *A:*   No.  States may forgo testing for AFDC eligibility in favor of using cost allocation to claim for allowable title IV-E administrative functions performed on behalf of children who are candidates for foster care maintenance payments.  The allocation must be based both on a determination of candidacy for foster care and potential title IV-E eligibility.  States typically use a ratio of title IV-E to non-title IV-E cases to satisfy the requirement that foster care candidates potentially be eligible for title IV-E.  Please see Child Welfare Manual Section 8.1C Question and Answer #3 for more detail on acceptable methods for calculating claims for candidates.

    *Source:*    *8/7/20068/7/2006*
    *Reference:  Social Security Act - section 472(i)(2)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

**8.1D    TITLE IV-E, Administrative Functions/Costs, Candidates**

*1  Q:*  May we claim Federal financial participation (FFP) for the administrative costs associated with foster care candidates even for children who never enter foster care?

*A:*  Yes. Federal financial participation for administrative costs listed at 45 CFR l356.60(c) may be claimed regardless of whether the child is actually placed in foster care and becomes a recipient of title IV-E foster care benefits. However, reimbursement is limited to those individuals the State reasonably views as candidates for foster care maintenance payments consistent with section 472(i)(2) of the Social Security Act.

The three acceptable methods of documentation indicating that a child is a candidate for foster care benefits are: (l) A defined case plan which clearly indicates that, absent effective preventive services, foster care is the planned arrangement for the child, (2) an eligibility determination form which has been completed to establish the child's eligibility under title IV-E, or (3) evidence of court proceedings in relation to the removal of the child from the home, in the form of a petition to the court, a court order or a transcript of the court's proceedings.

Should the State determine that the child is no longer a candidate for foster care at any point prior to the removal of the child from his home, subsequent activities will not be allowable for reimbursement of costs under title IV-E.

*Source:    ACYF-CB-PA-87-05 (10/22/87); 7/7/2006ACYF-CB-PA-87-05 (10/22/87); 7/7/2006*

*Reference:  Social Security Act - sections 471 (a)(15) and 472(i)(2); DHHS Grant Appeals Board Decision No. 844; ACYF-CB-IM-06-02*

**EXHIBIT C**

# *Child Welfare Policy Manual*

*2  Q:*  At what point may a child be considered a candidate for foster care?

*A:*  A candidate for foster care is a child who is at serious risk of removal from home as evidenced by the State agency either pursuing his/her removal from the home or making reasonable efforts to prevent such removal. The basis for determining when a child may be considered a candidate for foster care can be found in statute, Departmental policy, and Departmental Appeals Board (DAB) decisions:

STATUTE:  Section 471(a)(15)(B)(i) of the Act provides the frame of reference for determining the point at which a child becomes a candidate for foster care by requiring a State to make reasonable efforts to prevent a child's removal from home.  A child may not be considered a candidate for foster care solely because the State agency is involved with the child and his/her family. In order for the child to be considered a candidate for foster care, the State agency's involvement with the child and family must be for the specific purpose of either removing the child from the home or satisfying the reasonable efforts requirement with regard to preventing removal.

DEPARTMENTAL POLICY: stipulates the three acceptable methods for documenting a child's candidacy for title IV-E foster maintenance payments.  The existence of these forms of documentation indicates that a child legitimately may be considered a candidate for foster care:

1) A defined case plan which clearly indicates that, absent effective preventive services, foster care is the planned arrangement for the child.

The decision to remove a child from home is a significant legal and practice issue that is not entered into lightly.  Therefore, a case plan that sets foster care as the goal for the child absent effective preventive services is an indication that the child is at serious risk of removal from his/her home because the State agency believes that a plan of action is needed to prevent that removal.

2) An eligibility determination form which has been completed to establish the child's eligibility under title IV-E.

Completing the documentation to establish a child's title IV-E eligibility is an indication that the State is anticipating the child's entry into foster care and that s/he is at serious risk of removal from home.  Eligibility forms used to document a child's candidacy for foster care should include evidence that the child is at serious risk of removal from home.  Evidence of AFDC eligibility in and of itself is insufficient to establish a child's candidacy for foster care.

**EXHIBIT C**

# *Child Welfare Policy Manual*

3) Evidence of court proceedings in relation to the removal of the child from the home, in the form of a petition to the court, a court order or a transcript of the court proceedings.

Clearly, if the State agency has initiated court proceedings to effect the child's removal from home, s/he is at serious risk of removal from the home.

DAB DECISIONS: DAB Decision No. 1428 offers the following guidance for identifying the point at which a child may be considered a candidate:

"...The methods of documenting candidacy [identified in the Department's policy guidance] involve activities which occur at a point when the state has initiated efforts to actually remove a child from his or her home or at the point the state has made a decision that the child should be placed in foster care unless preventive services are effective..."

The DAB also ruled in Decision No. 1428 that a report of child abuse or neglect is insufficient for establishing a child's candidacy for foster care:

"...The fact that a child is the subject of [a child abuse/neglect report] falls far short of establishing that the child is at serious risk of placement in foster care and thus of becoming eligible for IV-E assistance..."

A candidate, in the opinion of the DAB, is a child who is at serious risk of removal from his/her home because the State is either pursuing that removal or attempting to prevent it. A child cannot be considered a candidate for foster care when the State agency has no formal involvement with the child or simply because s/he has been described as "at risk" due to circumstances such as social/interpersonal problems or a dysfunctional home environment.

*Source:      ACYF-CB-PA-01-02 (7/3/01)ACYF-CB-PA-01-02 (7/3/01)*
*Reference:  Social Security Act - section 471 (a)(15); Departmental Appeals Board Decision No. 1428*

*3   Q:* Can children on trial home visits be considered candidates for foster care?

*A:* Yes. A State often will provide supportive services to a child and family during the course of a trial home visit to facilitate the success of such visit. We believe that the services and supports provided to a child on a trial home visit can be considered reasonable efforts to prevent the child's removal from the home and return to foster care in accordance with section 471(a)(15)

**EXHIBIT C**

# *Child Welfare Policy Manual*

of the Act.  If the State determines that the child on a trial home visit meets the other criteria in section 472(i)(2) of the Social Security Act (the Act), the State,  may claim Federal reimbursement for the allowable title IV-E administrative costs associated therewith. However, a child may not be simultaneously both in foster care and a candidate for foster care. In addition, the State must document the child's candidacy for foster care pursuant to one of the approved methods. For example, the State may document in the child's case plan its intent for the child to return to foster care if the services provided during the course of the trial home visit prove unsuccessful.

*Source:     ACYF-CB-PA-01-02 (7/3/01); 7/7/2006ACYF-CB-PA-01-02 (7/3/01); 7/7/2006*

*Reference:  The Social Security Act   section 472(i)(2); 45 CFR 1356.21(e) and 1356.60; ACYF-CB-IM-06-02*

*4*  *Q:*  Can children in aftercare be considered candidates for foster care?

*A:*  Yes. During aftercare, the services or supports provided to the newly reunited family can be considered the State agency's reasonable efforts to prevent the child's removal from the home and re-entry into foster care in accordance with section 471(a)(15) of the Act. If the State determines that the child in aftercare meets the other criteria in section 472(i)(2) of the Social Security Act (the Act), the State may claim Federal reimbursement for the allowable title IV-E administrative costs associated therewith. However, in order to consider a child who is newly reunited with his/her family a candidate for foster care, the State must document the child's candidacy pursuant to one of the approved methods. The State may, for example, develop a case plan that demonstrates its intent to remove the child from home and return him/her to foster care if the aftercare services prove unsuccessful.

*Source:     ACYF-CB-PA-01-02 (7/3/01); 7/7/2006ACYF-CB-PA-01-02 (7/3/01); 7/7/2006*

*Reference:  The Social Security Act   section 472(i)(2); Departmental Appeals Board Decision No. 844; ACYF-CB-IM-06-02*

**EXHIBIT C**

# *Child Welfare Policy Manual*

*5*   *Q:*  What is the maximum length of time a child may be held in candidate status?

*A:*  Pursuant to Departmental Appeals Board Decision No. 844, the Department has instructed States to cease claiming Federal reimbursement when the State determines, at any point prior to the removal of a child from home, that such child is no longer a candidate.  By definition, a candidate is a child for whom the State is either pursuing or making reasonable efforts to prevent a removal, suggesting a child may be considered a candidate only for a finite period of time.  We do not prescribe the maximum length of time a child may be considered a candidate; however, a State must document its justification for retaining a child in candidate status for longer than six months.

*Source:*    ACYF-CB-PA-01-02 (7/3/01)ACYF-CB-PA-01-02 (7/3/01)
*Reference:*  Departmental Appeals Board Decision No. 844

*6*   *Q:*  Who must make the determination with respect to foster care candidacy?

*A:*  The State agency (or another public agency that has entered into an agreement with the State title IV-E agency pursuant to section 472(a)(2) of the Social Security Act (the Act)) must determine whether a child is a candidate. The basis for this clarification is set forth in regulation and Departmental policy:

REGULATION: A determination with respect to candidacy is a type of eligibility determination because title IV-E funds are expended as the result of a determination with respect to a child's status. The regulations at 45 CFR 205.100 require that officials of the State agency perform administrative functions that require the exercise of discretion.  Under long-standing Departmental policy that originates with the 1939 amendments to the Social Security Act, the determination of an individual's eligibility for a Federal entitlement is considered a function that requires the exercise of discretion.  Accordingly, determinations with respect to foster care candidacy must be made by employees of the State agency, or of another public agency that has entered into an agreement with the State agency pursuant to section 472(a)(2) of the Act. We are aware that some States contract with consultants to assist in identifying children in the foster care caseload who may be eligible for title IV-E.  These contractors are not employees of the State agency and may not make determinations with respect to title IV-E eligibility or foster care candidacy.  The same holds true for the contractors of public agencies that enter into title IV-E agreements pursuant to section 472(a)(2) of the Act.  Only employees of the

**EXHIBIT C**

# *Child Welfare Policy Manual*

public agency are authorized to make the determination of title IV-E eligibility and/or foster care candidacy.

 DEPARTMENTAL POLICY: The three acceptable forms of documentation that establish a child's candidacy for title IV-E support that the State agency must make the determination with respect to candidacy:

 1) A defined case plan which clearly indicates that, absent effective preventative services, foster care is the planned arrangement for the child.

 The DAB, in Decision No. 844, ruled that the development of a case plan is a title IV-E administrative function that may be performed on behalf of candidates in accordance with section 471(a)(16) of the Act. The case plan identified above is thus the State agency's case plan developed in compliance with section 471(a)(16) of the Act.

 2) An eligibility determination form which has been completed to establish the child's eligibility under title IV-E.

 As stated earlier, only employees of the State agency can make the determination with respect to candidacy because it is a type of eligibility determination.  The form referenced above is thus the State agency's documentation of the child's eligibility for title IV-E.

 3) Evidence of court proceedings in relation to the removal of the child from the home, in the form of a petition to the court, a court order or a transcript of the court proceedings.

 A candidate is a child for whom the State agency is either seeking a removal or fulfilling the statutory requirement to attempt to prevent removal from the home. Among other things, the State agency is required to obtain a judicial determination sanctioning or approving such an attempt to prevent removal with respect to reasonable efforts to qualify the child for title IV-E foster care maintenance payments. The judicial proceedings referenced above are those proceedings the State agency initiates to obtain the judicial determinations related to the removal of a child from home.

*Source:      ACYF-CB-PA-01-02 (7/3/01)ACYF-CB-PA-01-02 (7/3/01)*

*Reference:  Social Security Act - section 472(a); 45 CFR 205.100; Departmental Appeals Board Decision No. 844*

 *7  Q:* Are children placed in facilities that are outside the scope of what is considered foster care candidates for the purpose of claiming title IV-E administrative costs?

**EXHIBIT C**

# *Child Welfare Policy Manual*

*A:* No. A child who has been removed from his/her home is not a candidate for foster care. Moreover, States should note that, in accordance with long-standing Departmental policy, title IV-E administrative costs cannot be claimed on behalf of a child who is placed in a facility that is not a foster care facility, even if the State intends to place such child in foster care at a later date. Facilities that are outside the scope of foster care include, but are not limited to: detention facilities; psychiatric hospitals; forestry camps; or facilities that are primarily for the detention of children who are adjudicated delinquent.

*Source:     ACYF-CB-PIQ-85-06 (4/12/85); ACYF-CB-PA-01-02 (7/3/01)ACYF-CB-PIQ-85-06 (4/12/85); ACYF-CB-PA-01-02 (7/3/01)*

*Reference: Social Security Act - section 472 (c)(2)*

*8  Q:* What constitutes a case plan for the purposes of documenting a child's candidacy for foster care?

*A:* The development of a case plan in compliance with sections 471(a)(16) of the Social Security Act (the Act) is an allowable title IV-E function performed on behalf of candidates for foster care. The requirements for case plans developed pursuant to section 471(a)(16) of the Act are set forth in regulation at 45 CFR 1356.21(g). The provisions at 45 CFR 1356.21(g) are, therefore, to the extent that they are applicable to pre-placement, controlling with respect to case plans used to document candidacy for foster care. Specifically, the provisions at 45 CFR 1356.21(g)(1) and (4) apply. The case plan used to document a child's candidacy for foster care must be a written document that is developed jointly with the parent(s) or guardian of the child and include a description of the services offered and provided to prevent removal of the child from the home. In addition, the State must document, in said plan, that the goal for the child is foster care if the services described in the plan are not effective.

Adherences to the regulatory case plan provisions increase the likelihood that the plan will be effective, either in preventing or pursuing the removal of the child from the home. Nonetheless, State claims for administrative costs on behalf of candidates for foster care are not based on the completeness of the case plan. While we expect the case plan requirements that apply to a candidate to be met, the State may claim administrative costs in the month that it determines and documents a child is a candidate for foster care consistent with section 472(i)(2) of the Act (see Section 8.1C QA #5 of the Child Welfare Policy Manual).

**EXHIBIT C**

# *Child Welfare Policy Manual*

*Source:     8/16/02; 7/7/20068/16/02; 7/7/2006*

*Reference:  Social Security Act -- Sections 471(a)(16) and 475(1) 45 CFR 1356.21(g); Departmental Appeals Board*

*Decision No. 844 ; Child Welfare Policy Manual Section 8.1C QA #5; ACYF-CB-IM-06-02*

**9** **Q:** The State is permitted to claim administrative costs for a candidate for foster care if a potentially title IV-E eligible child is at imminent risk of removal from the home and the State is either pursing the removal of the child from the home or providing reasonable efforts to prevent the removal in accordance with section 471(a)(15) of the Social Security Act (the Act).  Section 472(i)(2) of the Act requires the State to redetermine that a candidate for foster care remains at imminent risk of removal at least every six months.  What happens if the State does not complete this redetermination timely?

**A:** The statute is very specific that the State may claim administrative costs for a candidate for foster care only if the State is providing reasonable efforts in accordance with section 471(a)(15) of the Act or pursuing the removal of the child from the home and redetermines at least every six months that the child remains at imminent risk of removal from the home.  Therefore, if the State does not make this determination at the six-month point, the State must cease claiming administrative costs on behalf of the child.

*Source:     8/7/20068/7/2006*

*Reference:  Social Security Act - Section 472(i)(2)*

**10** **Q:** Section 472(i)(2) of the Social Security Act (the Act) describes a candidate for foster care as a child at "imminent" risk of removal. Does the State have to use the term "imminent risk" in the case plan to document a child's candidacy? Or, is it permissible for the State to document that the child is at "serious risk of removal" from the home to satisfy this requirement?

**A:** We consider the term "serious risk of removal" to be synonymous with "imminent risk of removal."  As such, the State may use this term in the case plan to document a child's candidacy.  The State also may use alternate descriptions that are equivalent to "imminent" or "serious risk of removal."  In addition, the State must ensure that the child meets all other criteria in section 472(i)(2) of the Act and the Child Welfare Policy Manual at Section 8.1, to be a candidate for foster care.

**EXHIBIT C**

# *Child Welfare Policy Manual*

*Source:       1/29/20071/29/2007*

*Reference:  Social Security Act   section 472(i)(2)*

**11** *Q:*  In order for a child to be considered a foster care candidate for purposes of section 472(i)(2) of the Social Security Act (the Act), among other things, the State must have documented that the child is at imminent risk of removal from the home.  Does the out of home placement for the child have to be a foster care setting?

*A:*  Yes.  Section 472(i)(2) of the Act explicitly states that, among other requirements, to be a candidate for foster care, a child has to be potentially eligible for title IV-E foster care benefits. Therefore, this means that the State has made a decision that the out of home placement for the child will be a foster care setting.  A child is not a candidate for foster care when the planned out of home placement for the child is an arrangement outside of foster care, such as a detention facility.

*Source:       12/31/0712/31/07*

*Reference:  Social Security Act   section 472(i)(2)*

## 8.1E     TITLE IV-E, Administrative Functions/Costs, Contracting

*1* *Q:*  Under the title IV-E foster care program may the title IV-E State agency contract for some child foster care functions (administrative or otherwise) and still be eligible for Federal financial participation (FFP), as long as the State agency retains responsibility for the placement and care of the child?

*A:*  Yes.  Under title IV-E, such functions as training, recruiting or licensing of foster homes for which the State contracts with private agencies are defined as allowable costs for the proper administration of the State plan and may be claimed for purposes of Federal financial participation (FFP).  Responsibility for the placement and care of the foster child, however, must remain with the State agency.

*Source:       ACYF-CB-PIQ-82-07 (8/25/82)ACYF-CB-PIQ-82-07 (8/25/82)*

*Reference:  Social Security Act - section 474 (a)(3)(B)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

*2  Q:*  Title IV-E administrative costs may be claimed for activities completed by child placing agencies.  When an institution participates in case review, case supervision and case management, can an allocated amount of this time be charged to title IV-E administration?  If not, what is the appropriate way of allocating these costs?  When an institution participates in making a treatment plan and in daily recording of a child's progress, to what should these activities be allocated?

*A:*  The first statement in the question is not entirely accurate.  Title IV-E administrative costs may be claimed when the State contracts with child-placing agencies to perform foster care related administrative functions of the State.

45 CFR 1356.60 (c)(2) includes in the list of allowable State administrative costs those costs which are necessary for the administration of the foster care program.

Costs for these State administrative activities, when performed by a child-care institution, may be claimed by the State as the State's administrative costs if the State contracts with the institution to perform these activities.  These costs may not also be claimed as part of the child's title IV-E maintenance payment.

The institution's provision of social services in relation to the child's personal or behavioral problems, counseling to ameliorate home conditions and daily recording of progress would not be considered administrative activities of the title IV-E foster care maintenance program and the costs are not allowable for purposes of Federal financial participation (45 CFR 1356.60 (c)(3)).

*Source:*     *ACYF-CB-PIQ-85-06 (6/5/85)ACYF-CB-PIQ-85-06 (6/5/85)*
*Reference:  45 CFR 1356.60 (c)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

*3  Q:* May State agencies contract with another organization, such as a community college to conduct training on behalf of the State agency?  This training would be considered State agency training, not educational institution training?

*A:* Yes.  Section 474 (a)(3)(A) of the Social Security Act provides for Federal financial participation (FFP) in the costs of training personnel employed by or preparing for employment with the State or local agency.  Section 474 (a)(3)(B) covers other administrative expenditures, including the training of foster parents.  It is within the discretion and flexibility of the State agency to determine the most efficacious and cost effective means of meeting the short and long term training needs of the State and local agencies.

*Source:    ACYF-CB-PIQ-82-17 (10/14/82)ACYF-CB-PIQ-82-17 (10/14/82)*
*Reference:  Social Security Act - section 474 (a)*

*4  Q:* May title IV-E foster care maintenance payments flow through a for-profit entity to the foster care provider?

*A:* Yes.  The Fair Access Foster Care Act of 2005 (Public Law 109-113), which took effect on November 22, 2005, amended section 472(b) of the Social Security Act to eliminate the prohibition against making foster care maintenance payments through a for-profit entity.

*Source:    01/29/0701/29/07*
*Reference:  Social Security Act, section 472; Public Law 109-113*

## 8.1F    TITLE IV-E, Administrative Functions/Costs, Match Requirements

*1  Q:* Can third-party in-kind services and donated funds be used as the State's share for matching purposes under title IV-E?

**(Deleted 08/26/2002)**

**EXHIBIT C**

# *Child Welfare Policy Manual*

**2  Q:**  May third-party in-kind services be used as the State's share for matching purposes under title IV-E?

**A:**  No. Third party in-kind contributions may not be used by a State to meet Federal cost-sharing requirements under the title IV-E Foster Care and Adoption Assistance Program.

*Source:     ACYF-CB-PIQ-84-06 (10/22/84) / 8/16/02ACYF-CB-PIQ-84-06 (10/22/84) / 8/16/02*

*Reference:  Social Security Act - section 474; 45 CFR Part 1356.60*

**3  Q:**  May donated funds be used as the State's share for matching purposes under title IV-E?

**A:**  The Departmental Appeals Board concluded in Decision No. 1737 (July 14, 2000) that longstanding agency policy permitted States to claim Federal financial participation (FFP) for allowable costs paid with funds donated to support specific activities. The State must take into consideration the following conditions in order for a State to use donated funds to meet Federal cost-sharing requirements and claim FFP:

  1)  The donated funds must be used to pay for allowable title IV-E costs.
  2)  The donor may specify the activities to be supported with its donations but cannot be a sponsor or operator of a program to provide such activities.
  3)  The donor may specify the geographic area in which the activity is to be provided.

  States should note, however, that only funds donated from a public source that satisfy the above criteria may be used to match title IV-E training expenditures pursuant to 45 CFR 1356.60(b)(3).

*Source:     8/16/028/16/02*

*Reference:  Departmental Appeals Board Decision No.  1737 (July 14, 2000); 45 CFR Part 1356.60*

**EXHIBIT C**

# *Child Welfare Policy Manual*

**4  *Q:*** May unrestricted funds from a private source donated to the State that become part of the general pool of funds available to the State and are then appropriated by the State legislature be used to match title IV-E Federal Financial Participation (FFP) at the 75 percent rate for training?

**  *A:*** Yes.  Funds that are donated from a private source to the State's general funds or treasury and then appropriated by the State legislature to the State child welfare agency are considered public funds and, therefore, may be used as the State's share in claiming FFP for title IV-E training at the 75 percent rate.  However, private funds that merely are transferred from the private source to the State cannot be used to match the State?s training costs under title IV-E foster care or adoption assistance.

*Source:    April 6, 2006April 6, 2006*
*Reference:  45 CFR 235.66(a)*

**5  *Q:*** The Departmental Appeals Board (DAB) found in Decision No. 1737 that States may claim FFP for allowable administrative costs paid with private funds that are donated to support specific activities.  Does this finding mean that funds donated from a private source can be used to match Federal financial participation (FFP) at the 75% rate for title IV-E training?

**  *A:*** No.  DAB Decision No. 1737 did not address matching funds for training under section 474(a)(3)(A) and (B) of the Social Security Act (the Act).  Therefore, ACF regulations and policy which permit only public funds to be used as match for title IV-E training at the 75% rate are applicable. As specified in the Child Welfare Policy Manual at Section 8.1F question 3, only public funds may be used to match title IV-E training expenditures.  The regulations at 45 CFR 1356.60(b)(3) on Federal matching funds for State and local training for foster care and adoption assistance under title IV-E cross reference to 45 CFR 235.63 through 235.66(a) which, among other things, permit public funds to be used as match.  The regulation does not cross reference to 45 CFR 235.66(b) which permit funds donated from private sources to be used as match.

*Source:    8/7/20068/7/2006*
*Reference:  45 CFR 1356.60(b)(3); 45 CFR 235.66(a); DAB Decision No. 1737*

**EXHIBIT C**

# *Child Welfare Policy Manual*

**8.1G     TITLE IV-E, Administrative Functions/Costs, Title IV-E Agreements**

*1   Q:* May a court be considered a "public agency" for purposes of entering into a title IV-E
agreement, or does "public agency" refer  only to the executive branch of State government?
Is separation of powers an issue here?

*A:* There is no statutory prohibition on agreements between the public agency administering the
title IV-E foster care program and the court. However, legislative and program history do not
provide precedent for agreements whose only purpose is to transfer the decision-making
authority for placement and care from the title IV-E administering agency to the court or its
affiliated citizen review panel. Rather, discussion of such agreements in the 1963 Handbook of
Public Assistance Administration describes "another public agency" as a child placing agency
authorized by State law to operate a program of services to children and families, with
supervision by the agency administering the Aid to Families with Dependent Children program.
Current ACF policy sustains this position.

 Therefore, the requirements of section 472 (a)(2)(B) of the Social Security Act may be met
through an agreement with a public agency (including a court) which is authorized under State
law to operate as a child placing agency, and, if so authorized, is operating a child placing
agency. The agreement, properly written, should be binding on both parties and should permit
the State agency to have access to case records, reports or other informational materials as
needed to monitor title IV-E compliance. The State must maintain a supervisory role in relation
to all title IV-E eligible children and would need to monitor the provisions required under title
IV-E.

 However, if a court is not authorized under State law to operate and is not operating as a child
placing agency, the court could not be considered "another public agency" with responsibility
for placement and care of otherwise eligible children for purposes of section 472 (a)(2)(B).

*Source:     ACYF-CB-PIQ-85-02 (3/13/85)ACYF-CB-PIQ-85-02 (3/13/85)*

*Reference:  Social Security Act - section 472 (a)(2)(B); Handbook of Public Assistance Administration, Part IV,*
*Department of Health, Education and Welfare 7/24/63*

**EXHIBIT C**

# *Child Welfare Policy Manual*

**2   *Q:*** Which agency (State or Tribal) has responsibility for providing foster care payments and child welfare services to Indian children?

**_A:_** The title IV-E program is a State administered program to pay the costs of foster care for AFDC eligible children removed from their homes, for whom the State or the Tribe has responsibility for placement and care. It is an entitlement program for individual children and must be available to all eligible residents of a State, including Indian children living on or off reservations.

The title IV-B child welfare services program provides Federal funds in the form of formula grants to States and Tribes consistent with the purposes in section 421 of the Act.

Some Federally recognized Tribes providing child welfare services are eligible to receive title IV-B grants directly from the Federal government. Since these are grants to States and Tribes, and are not entitlements for individual children, the States and participating Tribes have the authority to allocate the use of these funds and to set priorities for their use.

Many States and Tribes have developed State-Tribal agreements which formalize the sharing of responsibility for providing foster care maintenance and child welfare services, using title IV-E and title IV-B funds, as well as Social Services Block Grant funds and State funds.

Where neither the State nor the Tribe has resources sufficient to cover all the needs of all Indian children, the Bureau of Indian Affairs, as payor of last resort, may pay for these services.

*Source:     ACYF-CB-PIQ-88-02 (1/27/88)ACYF-CB-PIQ-88-02 (1/27/88)*
*Reference:  Social Security Act - sections 421, 422, 428 and 472; 25 CFR 20.3*

**EXHIBIT C**

# *Child Welfare Policy Manual*

*3  Q:*  What is the rationale for prohibiting any body that conducts permanency hearings from being part of or under the supervision or direction of the State agency?  Does this requirement extend to other public agencies with which the State agency has a title IV-E agreement?

*A:*  Critical decisions that have a significant effect on the lives of children and their families are made at permanency hearings.  The purpose of requiring courts to oversee permanency hearings is to ensure that these hearings are conducted by an impartial body, which includes any body appointed or approved by the court to provide this oversight in its stead.  An administrative body that is part of the State agency or under its direction or supervision would not meet the test of impartiality.

The requirement does extend to other public agencies with which the State agency has an agreement. Title IV-E requirements extend to any other public agency with which the State agency enters an agreement for the performance of title IV-E administrative functions, including responsibility for placement and care of the child.

*Source:      Preamble to the Final Rule (64 FR 4020) (1/25/00)Preamble to the Final Rule (64 FR 4020) (1/25/00)*
*Reference:  Social Security Act - sections 475 (5)(c); 45 CFR 1355.20*

*4  Q:*  Under title IV-E a State agency must be designated to administer the foster care maintenance program.  Could another State agency, such as a "Youth Authority", provide program monitoring and supervision through an inter-agency contract (assuming some or all children under the "Youth Authority" will be eligible)?

*A:*  Section 472 of the Social Security Act requires that "such child's placement and care are the responsibility of the State agency administering the (title IV-E) State plan...or any other public agency with whom the State agency administering or supervising the administration of the (title IV-E) State plan...has made an agreement which is still in effect."

Assuming that a State Department of Social Services (DSS) is the title IV-E designated agency, a "Youth Authority" for example, would need to have a currently effective agreement with the DSS which covers these children and all requirements of the title IV-E law and regulations.  If the agreement covered all of the requirements, then the "Youth Authority" could, for purposes of administering the title IV-E State plan, function as the DSS's surrogate.  This arrangement, however, would not relieve the DSS of ultimate responsibility to supervise the

**EXHIBIT C**

# *Child Welfare Policy Manual*

"Youth Authority's" administration of the State plan for these children nor does it speak to the question of IV-E allowable costs. Moreover, the requirements of the Act under section 472, are broader than merely an agreement between two State entities covering particular items. To receive FFP for the care of "Youth Authority" supervised children, the DSS and the "Youth Authority" would have to assure that all the title IV-E State plan requirements are met for these children, not merely addressed by the interagency agreement. Assuming these arrangements are carried out properly, FFP could be available.

*Source:     ACYF-CB-PIQ-82-10 (8/11/82)ACYF-CB-PIQ-82-10 (8/11/82)*

*Reference:  Social Security Act - section 472*

5  *Q:*  Is a public entity that has entered into a title IV-E agreement pursuant to section 472(a)(2)(B) of the Social Security Act (the Act) with the State agency permitted to perform the title IV-E functions of an employee of the State title IV-E agency?

*A:*  Yes. Entering into a section 472(a)(2)(B) agreement with the State title IV-E agency permits another public agency to have responsibility for the placement and care of title IV-E eligible children. An agency that exercises responsibility for the placement and care of a title IV-E eligible child is fulfilling the fundamental purpose of the program and is, in effect, implementing the title IV-E State plan on behalf of a specified population of children under the agreement. Thus, such public agencies are permitted to perform functions that the State agency is required to perform pursuant to 45 CFR 205.100(b), such as eligibility determinations. Public agencies that enter into section 472(a)(2)(B) agreements are subject to all applicable Federal statutory, regulatory, and policy guidance as well as State rules that implement Federal requirements.

*Source:     06/09/0406/09/04*

*Reference:  Section 472(a)(2)(B) of the Social Security Act, 45 CFR 205.100.*

**EXHIBIT C**

# *Child Welfare Policy Manual*

**8.1H    TITLE IV-E, Administrative Functions/Costs, Training**

*1   Q:*  What is the Federal financial participation (FFP) in the costs of training for employees of the State title IV-E agency, foster parents, adoptive parents and employees of private child placing and child care agencies?

*A:*  Prior to the signing of Public Law (P.L.) 101-239 on December 19, 1989, section 474 of the Social Security Act (the Act) provided that States with plans approved under title IV-E shall be entitled to Federal matching funds for the proper and efficient administration of the State plan in the following proportions of total amounts expended: 75 percent for the training (including both short-term training and long-term training at educational institutions, through State grants to the institutions or by direct financial assistance to students enrolled in such institutions) of personnel employed or preparing for employment by the State agency or by the local agency administering the State title IV-E State plan; and 50 percent for the remainder of expenditures necessary for the proper and efficient administration of the State IV-E plan.

The regulations at 45 CFR 1356.60 specify what is considered a training cost and what is considered an administrative expense under title IV-E. Section 1356.60 (c) further explains that the State's cost allocation plan shall identify which costs are allocated and claimed under title IV-E. With regard to costs of educational programs (approved by the State agency) leading to a baccalaureate or graduate degree, the regulations clearly indicate that training to prepare persons who are employed or about to be employed by the State agency administering the title IV-E plan can include such long-term training. Grants to the institution or to the person attending the institution are reimbursable at a Federal matching rate of 75 percent. (See 45 CFR 1356.60 (b)(1)(i), 235.63 (c) and 235.64 (c) for further clarification.)

Under section 474 (a)(3)(B) of the Act, federal financial participation is available at 75 percent "...for the short-term training of current or prospective foster or adoptive parents and the members of the staff of State-licensed or State-approved child care institutions providing care to foster and adopted children receiving assistance under this part, in ways that increase the ability of such current or prospective parents, staff members, and institutions to provide support and assistance to foster and adopted children, whether incurred directly by the State or by contract."

Costs matchable as training expenditures under this provision may include: (1) travel, per diem, tuition, books and registration fees for trainees; (2) salaries, fringe benefits, travel and per diem for staff development personnel assigned to training functions to the extent time is

**EXHIBIT C**

# *Child Welfare Policy Manual*

spent performing such functions; (3) salaries, fringe benefits, travel and per diem for experts outside the agency engaged to develop or conduct training programs; and (4) costs of space, postage, training supplies, and purchase or development of training material. Costs not allowable for trainees under this provision include salaries and fringe benefits.

 Federal regulations at 45 CFR 1356.60 (b)(2) require that all training activities and costs funded under title IV-E must be included in the State agency's training plan for title IV-B. States will be reimbursed under title IV-E for such costs only if the activities and costs are described and included in the State's jointly developed and approved title IV-B plan.

 All training costs must be allocated to Title IV-E, State foster care and other State/Federal programs in such a manner as to ensure that the cost is charged to the program in accordance with the relative benefits that the program receives from the training.  States may determine the manner in which they allocate costs but must do so in accordance with the principles delineated at OMB Circular A-87 (also located at 2 C.F.R. ? 225).

*Source:     07/23/0707/23/07*

*Reference:  Social Security Act - sections 474 (a)(3)(A) and (B); 45 CFR 1356.60 (b) and (c), 235.63 - 235.66 (a)*

*2* *Q:*  May State agencies contract with another organization, such as a community college to conduct training on behalf of the State agency?  This training would be considered State agency training, not educational institution training?

*A:*  Yes.  Section 474 (a)(3)(A) of the Social Security Act provides for Federal financial participation (FFP) in the costs of training personnel employed by or preparing for employment with the State or local agency.  Section 474 (a)(3)(B) covers other administrative expenditures, including the training of foster parents.  It is within the discretion and flexibility of the State agency to determine the most efficacious and cost effective means of meeting the short and long term training needs of the State and local agencies.

*Source:     ACYF-CB-PIQ-82-17 (10/14/82)ACYF-CB-PIQ-82-17 (10/14/82)*

*Reference:  Social Security Act - section 474 (a)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

*3*  *Q:* May the States fund adoptive parents' attendance at adoption conferences with title IV-E training funds?

*A:* Yes. States may utilize title IV-E funds for the purposes of paying for the costs of adoptive parents' attendance at conferences which have training components or which include discussions of significant issues covering adoption and the needs of children. Title IV-E of the Act supports a continuing relationship between adoptive parent(s) and the agency to provide services, as needed, to the adoptive parent(s) in the care of the child. These provisions are interpreted to include training for this purpose.

Costs, including travel and per diem, claimed under title IV-E would be reimbursable at the 75% matching rate for adoptive parents attending such training conferences (45 CFR 1356.60 (b)(1)(ii)).

The placement of children in adoptive homes when they cannot return to their biological family is an essential child welfare service. Today's emphasis on placing children with special needs in adoption poses many problems and needs for adoptive parents. By attending and participating in conferences which have training components related to adoption and discussions of adoption issues, adoptive parents may better learn how to deal with special problems and enhance their parenting skills by sharing experiences with others in similar circumstances. Active participation of adoptive parents in such conferences may result in improved adoption planning and policy development through their advisory relationships with public agencies, and thereby assist in extending and strengthening adoption services to children and adoptive parents.

*Source:*      *ACYF-CB-PA-82-03 (10/14/82)ACYF-CB-PA-82-03 (10/14/82)*
*Reference:  Social Security Act - section 474 (a)(3)(B); 1356.60 (c)(5)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

**4**  *Q:*  May allowable costs include salary, travel and per diem for State agency program staff or State agency staff development unit staff conducting training of employees or foster parents?

  *A:*  For purposes of title IV-E, 45 CFR 235.64 (a), which we have used as the implementing regulation (as cross-referenced in 45 CFR 1356.60 (b)), allows the costs identified above to be claimed for FFP purposes.

  *Source:*  ACYF-CB-PIQ-82-17 (10/14/82)ACYF-CB-PIQ-82-17 (10/14/82)
  *Reference:*  Social Security Act - sections 471and 474 (a); 45 CFR Parts 1356 and 235

**5**  *Q:*  Is title IV-E training limited to training related to foster care maintenance or can it be related to the entire provision of foster care including meeting the child's service needs?  Since most training programs for foster parents discuss the "total" child, the hope would be the training costs would not need to be separated between title IV-E and title IV-B.

  *A:*  Within the restrictions articulated in section 474 (a)(3) of the Social Security Act, training may cover the full range of activities necessary to meet the States maintenance and service requirement of title IV-E.

  *Source:*  ACYF-CB-PIQ-82-17 (10/14/82)ACYF-CB-PIQ-82-17 (10/14/82)
  *Reference:*  Social Security Act - section 474 (a); 45 CFR Parts 1356 and 235

**6**  *Q:*  Prior to the on-site portion of a child and family services review (CFSR), the State members of the team must participate in a State team training. Can the costs related to such participation be claimed by the State at the 75 percent rate of Federal financial participation (FFP)?

  *A:*  Yes, the State may, using an approved cost allocation methodology, identify and claim that portion of the cost of its employees' participation in the CFSR State team training that is allowable under title IV-E at the enhanced rate of 75 percent Federal financial participation pursuant to 45 CFR 235.64(c)(3).  Specifically, travel, per-diem, and educational supplies may be claimed at the 75 percent rate.  The costs of training the State's external partners or

**EXHIBIT C**

# Child Welfare Policy Manual

participants who are not employees of the State agency similarly must be allocated across benefiting programs and the title IV-E portion may be claimed at the 50 percent FFP rate as administrative costs.

Pursuant to section 474(a)(3)(A) of the Social Security Act (the Act), an enhanced rate of FFP is available to train employees of the State agency to perform title IV-E functions. In accordance with section 471(a)(7) of the Act, the State agency is required to monitor and conduct periodic evaluations of its title IV-E program.  A State agency employee who is participating in a CFSR is, therefore, performing a title IV-E function pursuant to section 471(a)(7) of the Act, making the enhanced FFP available to train the employee to perform that function.

Any other training associated specifically with conducting a child and family services review or included in an approved CFSR program improvement plan likewise may be claimed under title IV-E in accordance with the guidance provided above.

*Source:      August 16, 2002August 16, 2002*

*Reference:  Social Security Act -- Sections 471(a)(7) and 474(a)(3)(A); 45 CFR 235.64*

**EXHIBIT C**

# *Child Welfare Policy Manual*

**7  *Q:*** The Departmental Appeals Board (DAB) found in Decision No. 1737 that States may claim FFP for allowable administrative costs paid with private funds that are donated to support specific activities.  Does this finding mean that funds donated from a private source can be used to match Federal financial participation (FFP) at the 75% rate for title IV-E training?

**  *A:*** No.  DAB Decision No. 1737 did not address matching funds for training under section 474(a)(3)(A) and (B) of the Social Security Act (the Act).  Therefore, ACF regulations and policy which permit only public funds to be used as match for title IV-E training at the 75% rate are applicable. As specified in the Child Welfare Policy Manual at Section 8.1F question 3, only public funds may be used to match title IV-E training expenditures.  The regulations at 45 CFR 1356.60(b)(3) on Federal matching funds for State and local training for foster care and adoption assistance under title IV-E cross reference to 45 CFR 235.63 through 235.66(a) which, among other things, permit public funds to be used as match.  The regulation does not cross reference to 45 CFR 235.66(b) which permit funds donated from private sources to be used as match.

*Source:      8/7/20068/7/2006*
*Reference:  45 CFR 1356.60(b)(3); 45 CFR 235.66(a); DAB Decision No. 1737*

**8  *Q:*** What are the title IV-E training topics that the State may claim at the 75 percent match rate under section 474(3)(A) of the Social Security Act and 45 CFR 1356.60(b)?

**  *A:*** In general, the training topics must be closely related to one of the examples cited in 45 CFR 1356.60(c)(1) and (2) as allowable administrative activities under the title IV-E program.  The regulatory examples of allowable activities include:

- Eligibility determinations and re-determinations
- Fair hearings and appeals
- Rate setting
- Referral to services
- Preparation for and participation in judicial determinations
- Placement of the child
- Development of the case plan
- Case reviews

**EXHIBIT C**

# *Child Welfare Policy Manual*

- Case management and supervision
- Recruitment and licensing of foster homes and institutions

Additional examples of allowable administrative activities specifically applicable to the title IV-E adoption assistance program include, but are not limited to:

- Grievance procedures
- Negotiation and review of adoption assistance agreements
- Post-placement management of subsidy payments
- Home studies
- A proportionate share of the development and use of adoption exchanges

There are many training topics that are closely related to these title IV-E allowable activities that the State may train its workers on and claim at the 75 percent rate. The following are some examples:

There are many training topics that are closely related to these title IV-E allowable activities that the State may train its workers on and claim at the 75 percent rate. The following are some examples:

e are many training topics that are closely related to these title IV-E allowable activities that the State may train its workers on and claim at the 75 percent rate. The following are some examples:

e many training topics that are closely related to these title IV-E allowable activities that the State may train its workers on and claim at the 75 percent rate. The following are some examples:

ny training topics that are closely related to these title IV-E allowable activities that the State may train its workers on and claim at the 75 percent rate. The following are some examples:

raining topics that are closely related to these title IV-E allowable activities that the State may train its workers on and claim at the 75 percent rate. The following are some examples:

**EXHIBIT C**

# Child Welfare Policy Manual

ing topics that are closely related to these title IV-E allowable activities that the State may train its workers on and claim at the 75 percent rate. The following are some examples:

topics that are closely related to these title IV-E allowable activities that the State may train its workers on and claim at the 75 percent rate. The following are some examples:

cs that are closely related to these title IV-E allowable activities that the State may train its workers on and claim at the 75 percent rate. The following are some examples:

hat are closely related to these title IV-E allowable activities that the State may train its workers on and claim at the 75 percent rate. The following are some examples:

are closely related to these title IV-E allowable activities that the State may train its workers on and claim at the 75 percent rate. The following are some examples:

closely related to these title IV-E allowable activities that the State may train its workers on and claim at the 75 percent rate. The following are some examples:

ely related to these title IV-E allowable activities that the State may train its workers on and claim at the 75 percent rate. The following are some examples:

related to these title IV-E allowable activities that the State may train its workers on and claim at the 75 percent rate. The following are some examples:

ted to these title IV-E allowable activities that the State may train its workers on and claim at the 75 percent rate. The following are some examples:

to these title IV-E allowable activities that the State may train its workers on and claim at the 75 percent rate. The following are some examples:

**EXHIBIT C**

# *Child Welfare Policy Manual*

hese title IV-E allowable activities that the State may train its workers on and claim at the 75 percent rate.  The following are some examples:

 title IV-E allowable activities that the State may train its workers on and claim at the 75 percent rate.  The following are some examples:

le IV-E allowable activities that the State may train its workers on and claim at the 75 percent rate.  The following are some examples:

V-E allowable activities that the State may train its workers on and claim at the 75 percent rate.  The following are some examples:

allowable activities that the State may train its workers on and claim at the 75 percent rate.  The following are some examples:

wable activities that the State may train its workers on and claim at the 75 percent rate.  The following are some examples:

e activities that the State may train its workers on and claim at the 75 percent rate.  The following are some examples:

tivities that the State may train its workers on and claim at the 75 percent rate.  The following are some examples:

ties that the State may train its workers on and claim at the 75 percent rate.  The following are some examples:

 that the State may train its workers on and claim at the 75 percent rate.  The following are some examples:

**EXHIBIT C**

# *Child Welfare Policy Manual*

t the State may train its workers on and claim at the 75 percent rate.  The following are some examples:

e State may train its workers on and claim at the 75 percent rate.  The following are some examples:

ate may train its workers on and claim at the 75 percent rate.  The following are some examples:

may train its workers on and claim at the 75 percent rate.  The following are some examples:

train its workers on and claim at the 75 percent rate.  The following are some examples:

n its workers on and claim at the 75 percent rate.  The following are some examples:

s workers on and claim at the 75 percent rate.  The following are some examples:

rkers on and claim at the 75 percent rate.  The following are some examples:

s on and claim at the 75 percent rate.  The following are some examples:

 and claim at the 75 percent rate.  The following are some examples:

 claim at the 75 percent rate.  The following are some examples:

im at the 75 percent rate.  The following are some examples:

t the 75 percent rate.  The following are some examples:

**EXHIBIT C**

## *Child Welfare Policy Manual*

e 75 percent rate.  The following are some examples:

 percent rate.  The following are some examples:

cent rate.  The following are some examples:

 rate.  The following are some examples:

e.  The following are some examples:

The following are some examples:

following are some examples:

owing are some examples:

g are some examples:

e some examples:

me examples:

xamples:

les:

**EXHIBIT C**

# *Child Welfare Policy Manual*

 <li>Social work practice, such as family centered practice and social work methods including interviewing and assessment.</li>

 <li>Cultural competency related to children and families.</li>

 <li>Title IV-E policies and procedures.</li>

 <li>Child abuse and neglect issues, such as the impact of child abuse and neglect on a child, and general overviews of the issues involved in child abuse and neglect investigations, if the training is not related to how to conduct an investigation of child abuse and neglect.</li>

 <li>Permanency planning including using kinship care as a resource for children involved with the child welfare system.</li>

 <li>General substance abuse, domestic violence, and mental health issues related to children and families in the child welfare system, if the training is not related to providing treatment or services.</li>

 <li>Effects of separation, grief and loss, child development, and visitation.</li>

 <li>Communication skills required to work with children and families.</li>

 <li>Activities designed to preserve, strengthen, and reunify the family, if the training is not related to providing treatment or services.</li>

 <li>Assessments to determine whether a situation requires a child?s removal from the home, if the training is not related directly to conducting a child abuse and neglect investigation. Training on how to conduct specialized assessments such as  psychiatric, medical or educational assessments are not permitted.</li>

 <li>Ethics training associated with a title IV-E State plan requirement, such as the confidentiality requirements in section 471(a)(8) of the Act.</li>

 <li>Contract negotiation, monitoring or voucher processing related to the IV-E program.</li>

 <li>Adoption and Foster Care Analysis and Reporting System (AFCARS), Statewide Automated Child Welfare Information System (SACWIS) or other child welfare automated system functionality that is closely related to allowable administrative activities in accordance with 45 CFR 1356.60(d) that the State has chosen to claim as title IV-E training rather than as SACWIS developmental or operational costs (see AT-ACF-OISM-001).</li>

 <li>Independent living and the issues confronting adolescents preparing for independent living consistent with section 477(b)(3)(D) of the Act and the Child Welfare Policy Manual (CWPM), Section 3.1H, Q/A #1.</li>

 <li>Foster care candidate determinations and pre-placement activities directed toward reasonable efforts in 471(a)(15), if the training is not related to providing a service. </li>

 <li>Training on referrals to services, not how to perform the service. </li>

*Source:*     *4/10/074/10/07*

**EXHIBIT C**

# *Child Welfare Policy Manual*

*Reference: : Social Security Act   Sections 471(a)(8), 471(a)(15), 474(3)(A)  and 477(b)(3)(D); 45 CFR 1356.60(b), (c) and (d); 235.64(a)(1) and (2); CWPM, Section 3.1H, Q/A #1; AT-ACF-OISM-001*

*9* *Q:* May the State claim title IV-E funds at the 75 percent match rate for any administrative activities that are directly related to carrying out the State agency s training initiatives?

*A:* Yes.  Consistent with 45 CFR 235.64(a)(1) and (2) (which applies to titles IV-B and IV-E training costs by cross reference at 45 CFR 1356.60(b)(3)) and Departmental Appeals Board Decision #1666, the administration of training activities (when performed by the State agency training unit), such as contract negotiation, monitoring, or voucher processing is reimbursable as a training activity at the 75 percent match rate.  Also, certain State agency overhead costs that are allocable to the State agency training unit in accordance with an approved cost allocation plan may be claimed as title IV-E training costs at 75 percent Federal financial participation (FFP).  Further, while a State normally may not claim 75 percent FFP for day-to-day staff supervision, if the supervisor is performing a training function as part of a formalized training program, such as an on-the-job training component of initial in-service training, the State may consider the portion of time during which such activity is performed by the supervisor as training eligible for 75 percent match (to the extent it is allocable to title IV-E).

*Source:    4/10/074/10/07*

*Reference:  45 CFR 1356.60(c)(2)(ix); 45 CFR 235.64(a)(1) and 235.65(a); Departmental Appeals Board Decision #1666*

**EXHIBIT C**

# *Child Welfare Policy Manual*

**10  Q:** May the State claim title IV-E administrative expenses at the 50 percent match on training topics not allowable at the 75 percent match rate?

**A:** It depends.  The State may claim title IV-E administrative costs for training staff on any topic areas that are necessary for the proper and efficient administration of the State?s title IV-E program.  These would include topics that address general skills or knowledge required for overall job performance.  Some examples of general training topics that the State may claim as a title IV-E administrative cost at the 50 percent match rate include, but are not limited to:

- State agency personnel policies and procedures
- Job performance enhancement skills (e.g., writing, basic computer skills, time management)
- First aid, CPR, or facility security training
- General supervisory skills or other generic skills needed to perform specific jobs
- Ethics unrelated to the title IV-E State plan
- Team building and stress management training
- Safe driving
- Worker retention and worker safety

*Source:    4/10/074/10/07*

*Reference:  Social Security Act   Section 474(a)(3)(E); 45 CFR 1356.60(c)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

**11   *Q:*** What training topics are not allowable as either a training cost or an administrative cost under the title IV-E program?

*A:* In general, the State may not claim title IV-E funds at the 75 percent rate unless the training addresses topics closely related to one of the examples of title IV-E administrative costs listed in Federal regulation at 45 CFR 1356.60(c)(1) and (2).  In addition, funds are not allowable at either the 75 or 50 percent match rate for training on topics that do not address a general administrative need that is determined necessary for the proper and efficient administration of the title IV-E program.  Examples of training topics that are not allowable under the title IV-E program include, but are not limited to:

- How to address or treat child or family problems or behaviors because it supports the delivery of social services rather than the administration of the title IV-E State plan.
- Conducting child abuse and neglect investigations because such specialized skills are required for staff activities that occur prior to a child's entering foster care or adoption, and even prior to a child?s becoming a candidate for foster care.
- Child welfare/social service topics that are not related directly to the title IV-E programs or the administration of the title IV-E State plan.

*Source:    4/10/074/10/07*

*Reference:  Social Security Act  Sections   474(a)(3)(A) and (E); 45 CFR 1356.60(c)(1), (2) and (3); 45 CFR 235.62(b); Departmental Appeals Board Decision #1530 and others.*

**EXHIBIT C**

# *Child Welfare Policy Manual*

**12  Q:**  Would you explain the cost-sharing or matching requirements for the title IV-E training program?

**A:**  The cost-sharing or matching requirements for the title IV-E training program are addressed in regulation at 45 CFR 235.66(a), and referenced by 45 CFR 1356.60(b).  The following principles apply:

- Only public funds consisting of cash outlays may be used as the State?s share in claiming title IV-E training costs.  In-kind contributions are not permitted.
- The funds used as match for title IV-E training must be appropriated directly to the State or local public agency administering the program, or transferred from another public agency or Tribe to the State or local agency and under its administrative control, or certified by the contributing public agency as representing expenditures eligible for FFP.
- Private funds regardless of their source of origin may not be used as the State's share in claiming title IV-E training costs[1].
- Donated funds may be used as the State's share in claiming only if they are donated from a public source (see CWPM, Section 8.1F, Q/A #3).
- Funds used as a match cannot be used to match another Federal program unless the other Federal program explicitly allows such funds to be used as a match for title IV-E (for example, Tribes with a section 472(a) title IV-E agreement may use Indian Child Welfare Act, Indian Self-determination and Education Act and Community Development Block grant funds as a match for title IV-E, including training eligible under title IV-E at the 75 percent match rate).
- Federal funds are not permitted as a match.

[1] 1356.60(b) does not cross reference to 45 CFR 235.66(b) which authorizes privately donated funds as a match under the former title IV-A Aid to Families with Dependent Children (AFDC), training program.

*Source:      4/10/074/10/07*

*Reference:  45 CFR 1356.60(b) and 235.66(a); CWPM, Section 8.1F, Q/A #3; 25 CFR Parts 20 and 25*

**13  Q:**  May a State claim title IV-E training funds at the 75 percent match rate for initial in-service training if there are gaps of days or weeks or longer when the newly hired staff is not receiving training either in the classroom or on the job?

**EXHIBIT C**

# *Child Welfare Policy Manual*

*A:* Yes.  There may be situations in which a State?s approved training plan includes initial in-service training that is delivered intermittently over a period of time.  In such situations, the State may claim title IV-E at the 75 percent match rate for the periods of time the employee is actually participating in the training.  Consistent with the regulations at 45 CFR 1356.60(b)(3) and 235.61(a), an employee must be in some form of structured training related to title IV-E administrative activities s/he will perform in order for the State to claim FFP for properly allocated trainee costs at the 75 percent match rate.  Employee absences due to approved leave do not disrupt the initial in-service training period.  However, if an employee is on duty but not participating in initial in-service training, FFP at the 75 percent rate is not available to reimburse the State agency for the costs of the employee?s salary, fringe benefits, travel or per diem during the non-training period.

*Source:*    *4/10/074/10/07*
*Reference:  45 CFR 1356.60(b)(3) and 235.61(a)*

*14  Q:*  May the State claim title IV-E training funds for the portion of the initial in-service training program that includes actual work experience?

*A:*  It depends.  Under some circumstances a State or local agency employee may be considered to be in training while carrying a partial caseload and the costs of that employee?s salary, fringe benefits, travel or per diem may be reimbursable at the 75 percent level.  To meet these circumstances, the employee must carry a caseload that is significantly smaller than that for the journeyman position in the State.  In addition, the work experience component must be fully detailed and justified as an integral component of the initial in-service training program in the State's training plan for title IV-B, as required by 45 CFR 1356.60(b)(2).  It is reasonable to expect that an initial in-service training program that includes work experience would include more than the standard day-to-day supervision typically provided to experienced employees.  Furthermore, the State should ensure that the trainee's performance is closely assessed and monitored, for example, that feedback is regularly provided to the worker.

*Source:*    *4/10/074/10/07*
*Reference:  45 CFR 1356.60(b)(2), 235.61(a) and 235.64(b)(1)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

*15  Q:* May the State claim title IV-E training funds at the 75 percent match rate to train current title IV-E agency staff who are either promoted or transfer to another position within the agency, such as from caseworker to supervisor, under an initial in-service training program?

*A:* Yes, the State may claim title IV-E training funds at the 75 percent match rate to train through an initial in-service training program current State agency employees who accept employment in a different position in the title IV-E agency, such as from a caseworker position to a supervisory position or from one program area to another such as from foster care to adoption. The training must meet the definition of initial in-service training, however, and therefore be intensive, task-oriented and last for at least one week as specified in the regulations at 45 CFR 235.61(a) and 235.64(b)(1).

While the definition of in-service training specifically indicates that such training is for "new employees," it is reasonable, within the context of this definition, to treat someone in a new position in the State agency as a "new" employee for training purposes. The employee's training needs are similar to those of a new employee. If the training is associated with the administration of an approved title IV-E State plan requirement and intended to give the staff the specific skills required to perform title IV-E foster care and adoption functions, it may be matched at the 75 percent FFP rate. Training focused on the development of supervisory skills and tasks related to supervision (generic skills training) may be matched at the rate of 50 percent FFP. The training activities and costs must be included in the State agency's training plan for title IV-B.

*Source:*     *4/10/074/10/07*
*Reference:  45 CFR 235.61(a) and 235.64(b)(1)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

*16*  *Q:*  The regulations at 45 CFR 235.61(a) define initial in-service training as a period of intensive, task-oriented training to prepare new employees to assume job responsibilities.  What is meant by "intensive?"  Are there any circumstances whereby an employee can be considered to be participating in initial in-service training while maintaining a full caseload?

  *A:*  Intensive training is training that is highly concentrated and intended to significantly strengthen and increase the employee's knowledge.  Given these parameters, an employee could not participate in intensive training while maintaining a full caseload.  There is not enough time in a regular work week to accommodate both maintaining a full caseload and participating in intensive training, whether classroom or on-the-job training is provided.  The majority of the employee's time during intensive training is dedicated to training activities.  An intensive training program may encompass an on-the-job component in which an employee maintains a partial caseload provided in a structured learning environment with a higher degree of supervision than a regular employee would experience.

  As specified in the regulations at 45 CFR 235.64, Federal financial participation is available at 75% for employees in initial in-service training for at least one week for salaries, fringe benefits, travel and per diem to the extent that the training is related to the examples of allowable administrative costs necessary for the administration of the foster care program at 45 CFR 1356.60(c)(2).

  Each State's title IV-B training plan must accord with the definition of in-service training at 45 CFR 235.61(a).  In addition, course descriptions, activities and costs must be described in the State's approved training plan for title IV-B.  Training that benefits the overall administration of a State's foster care or adoption assistance program, and not only children eligible under title IV-E, must be allocated to all benefiting Federal and State programs in accordance with OMB Circular A-87 and an approved cost allocation plan.

  *Source:*  *09/05/0709/05/07*
  *Reference:  45 CFR 235.64, 235.61(a) and 1356.60(c)(2); OMB Circular A-87*

## 8.2    TITLE IV-E, Adoption Assistance Program

  *1*  *Q:*  Can a State suspend or reduce a title IV-E adoption assistance subsidy if the adoptive parents fail to renew or recertify the adoption assistance agreement?

**EXHIBIT C**

# *Child Welfare Policy Manual*

*A:* No.  It is incumbent upon adoptive parents to keep the State informed of material changes that might impact the parent?s support, but a State cannot reduce or suspend adoption assistance if the adoptive parents fail to reply to the State?s request for information, renewal or recertification of the agreement.  Once an eligible child is receiving title IV-E adoption assistance pursuant to an agreement, adoption assistance continues until either the adoptive parents concur to a change or one of the statutory conditions are met for termination of the assistance (section 473(a)(4) of the Social Security Act and Child Welfare Policy Manual Section 8.2B.9 Q/A #2).  Therefore, suspensions or reductions in a title IV-E adoption assistance payment are not permitted without the concurrence of the adoptive parents under section 473(a)(3) of the Act .

*Source:*    12/31/0712/31/07

*Reference:  Social Security Act   section 473(a)(3) and (4); Child Welfare Policy Manual section 8.2B.9 Q/A #2*

**8.2A    TITLE IV-E, Adoption Assistance Program, Agreements**

No questions and answers are available at this time.

**8.2A.1    TITLE IV-E, Adoption Assistance Program, Agreements, Interstate placements**

*1  Q:* Which State is responsible for entering into an adoption assistance agreement in interstate adoptions?

*A:* If the State agency has responsibility for placement and care of a child, that State is responsible for entering into the adoption assistance agreement and paying the title IV-E adoption subsidy, even if the child is placed in an adoptive home in another State.  If the State agency does not have responsibility for placement and care, it is the adoptive parents' State of residence where the adoption assistance application should be made.  In that event, the public child welfare agency in the adoptive parents' State of residence is responsible for determining whether the child meets the definition of special needs, entering into the adoption assistance agreement and paying the subsidy, consistent with the way public benefits are paid in other programs.

*Source:*    ACYF-CB-PA-01-01 (1/23/01)ACYF-CB-PA-01-01 (1/23/01)

*Reference:  Social Security Act - section 473*

**EXHIBIT C**

# Child Welfare Policy Manual

**2  Q:** What happens if a family moves to a different State while the adoption assistance agreement is still in effect?

**A:** Section 475 (3)(B) of the Social Security Act requires that any adoption assistance agreement, effective on or after October 1, 1983, stipulate that the agreement ...shall remain in effect regardless of the State of which the adoptive parents are residents at any given time. The agreement shall contain provisions for the protection (under an interstate compact approved by the Secretary or otherwise) of the interests of the child in cases where the adoptive parents and child move to another State while the agreement is effective.

States which enter into adoption assistance agreements must take measures to assure that the terms of the agreements are met. Either directly, or through agreements with other States, services and medical care (children eligible for title IV-E adoption assistance payments are deemed eligible for title XIX (Medicaid) regardless of their residence within the nation) agreed upon between the State and parents must be provided (45 CFR 1356.40(e)).

The responsibility of the State to honor its commitments for title XIX and other services as specified in the adoption agreement, is based on the State's agreement to administer title IV-E. The authority for the State to enter into agreements and contracts with other States to honor commitments made in adoption assistance agreements is based on the State's statute or administrative procedures.

*Source:     ACYF-CB-PI-83-08 (8/10/83)ACYF-CB-PI-83-08 (8/10/83)*
*Reference:  Social Security Act - section 475(3); 45 CFR 1356.40*

**EXHIBIT C**

# *Child Welfare Policy Manual*

**3   *Q:*** When the State agency enters into an adoption assistance agreement with a family from another State, which State's rate structure applies as the limit for the adoption assistance payment?

**    *A:*** In situations where a child is placed by the State agency in one State with an adoptive family in another State, it is the placing State that would look at its own established foster care rate structure, as well as State law and policy governing its foster care and adoption assistance payments, to determine the amount of assistance available on behalf of the child.  If the placing and paying State's law or policy allows flexibility to pay amounts based upon the foster care board rate in the State in which the child is placed for adoption, this practice would be allowable under title IV-E since the statutory requirement in section 473 (a)(3) of the Act would be met.

*Source:      ACYF-CB-PA-01-01 (1/23/01)ACYF-CB-PA-01-01 (1/23/01)*
*Reference:  Social Security Act - section 473 (a)(3)*

**4   *Q:*** Please explain the responsibilities of States that have entered into interstate adoptions when the adoptive parents die or the adoption is dissolved.

**    *A:*** If a title IV-E adoption dissolves or the adoptive parents die and the child is placed with a State agency that assumes responsibility for placement and care, it is the placing State's responsibility to determine whether the child meets the definition of special needs, and pay the subsidy in a subsequent adoption.   If, however, a public child welfare agency is not involved in the subsequent adoptive placement of a child, it is the public child welfare agency in the subsequent adoptive parents' State of residence that is responsible for determining whether the child meets the definition of special needs, entering into the adoption assistance agreement, and paying the subsidy.  The State of the child's initial adoption or the State that pays the title IV-E adoption assistance in the child's initial adoption is irrelevant in a subsequent adoption.

*Source:      ACYF-CB-PA-01-01 (1/23/01)ACYF-CB-PA-01-01 (1/23/01)*
*Reference:  Social Security Act - section 473*

**EXHIBIT C**

# *Child Welfare Policy Manual*

**8.2A.2    TITLE IV-E, Adoption Assistance Program, Agreements, Means test**

*1    Q:*  May a State employ a means test when negotiating adoption assistance agreements?

*A:*  The use of a means test is prohibited in the process of selecting a suitable adoptive family, or in negotiating an adoption assistance agreement, including the amount of the adoption assistance payment. Once a child has been determined eligible under section 473 of the Act, adoptive parents cannot be rejected for adoption assistance or have payments reduced without their agreement because of their income or other resources.  In addition, the State cannot arbitrarily reject a request for an increase in the amount of subsidy (up to the amount the child would have received in foster care) in cases where the adoptive parents make life choices such as resigning one's job to stay at home with the adopted child or to return to school.  Adoptive parents can request a fair hearing if the State rejects such requests.

 The circumstances of the adopting parents must be considered together with the needs of the child when negotiating the adoption assistance agreement.  Consideration of the circumstances of the adopting parents has been interpreted by the Department to pertain to the adopting family's capacity to incorporate the child into their household in relation to their lifestyle, standard of living and future plans, as well as their overall capacity to meet the immediate and future needs (including educational) of the child. This means considering the overall ability of the family to incorporate an individual child into their household.  Families with the same incomes or in similar circumstances will not necessarily agree on identical types or amounts of assistance.  The uniqueness of each child/family situation may result in different amounts of payment.

*Source:*    ACYF-CB-PA-01-01 (1/23/01)ACYF-CB-PA-01-01 (1/23/01)
*Reference:*  45 CFR 1356.40 (c)

**EXHIBIT C**

# *Child Welfare Policy Manual*

**8.2B    TITLE IV-E, Adoption Assistance Program, Eligibility**

*1   Q:*  Please explain who is eligible for title IV-E adoption assistance.

*A:*  A State is required to enter into an adoption assistance agreement with the adoptive parents of a child with special needs (as defined in section 473(c) of the Social Security Act (the Act)) and provide adoption assistance if the child meets specific requirements. There are four ways that a child can be eligible for title IV-E adoption assistance:

1. Child is eligible for Aid to Families with Dependent Children (AFDC) and meets the definition of a child with special needs - Adoption assistance eligibility that is based on a child's AFDC eligibility (in accordance with the program rules in effect on July 16, 1996) is predicated on a child meeting the criteria for such at the time of removal.  In addition, the State must determine that the child meets the definition of a child with special needs prior to finalization of the adoption.

The method of removal has the following implications for the AFDC-eligible child's eligibility for title IV-E adoption assistance: If the child is removed from the home pursuant to a judicial determination, such determination must indicate that it was contrary to the child's welfare to remain in the home; or if the child is removed from the home pursuant to a voluntary placement agreement, that child must actually receive title IV-E foster care payments to be eligible for title IV-E adoption assistance.

Children placed pursuant to a voluntary placement agreement under which a title IV-E foster care maintenance payment is not made are not eligible to receive title IV-E adoption assistance.

2. Child is eligible for Supplemental Security Income (SSI) benefits and meets the definition of a child with special needs - A child is eligible for adoption assistance if the child meets the requirements for title XVI SSI benefits and is determined by the State to be a child with special needs prior to the finalization of the adoption.

There are no additional criteria that a child must meet to be eligible for title IV-E adoption assistance when eligibility is based on a special needs child meeting SSI requirements. Specifically, how a child is removed from his or her home or whether the State has responsibility for the child's placement and care is irrelevant in this situation.

Unlike AFDC eligibility that is determined by the State child welfare agency, only a designated Social Security Administration claims representative can determine SSI eligibility and provide the appropriate eligibility documentation to the State.

**EXHIBIT C**

# *Child Welfare Policy Manual*

3. Child is eligible as a child of a minor parent and meets the definition of a child with special needs - A child is eligible for title IV-E adoption assistance in this circumstance if: prior to the finalization of the adoption, the child's parent was in foster care and received a title IV-E foster care maintenance payment that covered both the minor parent and the child of the minor parent and is determined by the State to meet the definition of a child with special needs.

There are no additional criteria that must be met in order for a child to be eligible for title IV-E adoption assistance if the child's eligibility is based on his or her minor parent's receipt of a foster care maintenance payment while placed with the minor parent in foster care.  As with SSI, there is no requirement that a child must have been removed from home pursuant to a voluntary placement agreement or as a result of a judicial determination.

4. Child is eligible due to prior title IV-E adoption assistance eligibility and meets the definition of a child with special needs - In the situation where a child is adopted and receives title IV-E adoption assistance, but the adoption later dissolves or the adoptive parents die, a child may continue to be eligible for title IV-E adoption assistance in a subsequent adoption. The only determination that must be made by the State prior to the finalization of the subsequent adoption is whether the child is a child with special needs, consistent with the requirements in section 473(c) of the Act. Need and eligibility factors in section 473(a)(2)(A) of the Act must not be redetermined when such a child is subsequently adopted because the child is to be treated as though his or her circumstances are the same as those prior to his or her previous adoption. Since title IV-E adoption assistance eligibility need not be re-established in such subsequent adoptions, the manner of a child's removal from the adoptive home, including whether the child is voluntarily relinquished to an individual or private agency, is irrelevant.

*Source:      ACYF-CB-PA-01-01 (1/23/01); 7/17/2006ACYF-CB-PA-01-01 (1/23/01); 7/17/2006*
*Reference:  Social Security Act - sections 473(a)(2) and 473(c) ; The Deficit Reduction Act of 2005*

*2*  *Q:*  Does a child need to be continuously eligible for Aid to Families for Dependent Children (AFDC) during the period s/he is in foster care in order to be eligible for adoption assistance after the termination of parental rights?

*A:*  No.  A child for whom eligibility for title IV-E adoption assistance payments is being established need not have been continuously eligible for AFDC during his or her tenure in foster care. The statute requires that the child be eligible for AFDC only at the time of the child's removal from the home (section 473(a)(2)(A)(i)(I)(bb) of the Social Security Act).  Please see the Child

EXHIBIT C

# *Child Welfare Policy Manual*

Welfare Policy Manual at 8.2B for an explanation of all the eligibility criteria for the adoption assistance payments program.

*Source:      03/14/0703/14/07*

*Reference:  Social Security Act - section 473*

**3   Q:**  Are children whose legal guardianships disrupt eligible for title IV-E adoption assistance?

**A:**  If a child who had been receiving title IV-E foster care maintenance payments prior to a legal guardianship returns to foster care or is placed in an adoptive home after disruption of the legal guardianship, the factors below must be considered in determining the child's eligibility for title IV-E adoption assistance:

 1) Title IV-E Demonstration Waiver States - In States that have an approved title IV-E demonstration waiver from the Department to operate a subsidized legal guardianship program, the title IV-E terms and conditions allow reinstatement of the child's title IV-E eligibility status that was in place prior to the establishment of the guardianship in situations where the guardianship disrupts. Therefore, if a guardianship disrupts and the child returns to foster care or is placed for adoption, the State would apply the eligibility criteria in section 473 of the Social Security Act (the Act) for the child as if the legal guardianship had never occurred.

 2) Non-Demonstration Waiver States - In States that do not have an approved title IV-E demonstration waiver from the Department, the eligibility requirements in section 473 of the Act must be applied to the child's current situation. Therefore, in a situation where the child has returned to foster care from the home of a non-related legal guardian, the child would not be eligible for title IV-E adoption assistance since the child was not removed from the home of a specified relative. If, however, the child has been removed from the home of a related legal guardian, an otherwise eligible child could be eligible for title IV-E adoption assistance.

 In either situation, however, if a child meets the eligibility criteria for Supplemental Security Income and meets the definition of special needs prior to the finalization of the adoption, the child would be eligible for title IV-E adoption assistance. If a child meets these criteria, no further eligibility criteria must be met.

*Source:      ACYF-CB-PA-01-01 (1/23/01); 7/17/2006ACYF-CB-PA-01-01 (1/23/01); 7/17/2006*

**EXHIBIT C**

# *Child Welfare Policy Manual*

*Reference:  Social Security Act - sections 473; The Deficit Reduction Act of 2005*

**4**   *Q:*  Is the State required to provide title IV-E adoption assistance to all eligible children on whose behalf it is requested?

*A:*  Yes, if the child meets the criteria in section 473 of the Social Security Act (the Act).  Section 473(a)(1)(A) of the Act specifies that "[e]ach State having a plan approved under this part **shall** [emphasis added] enter into adoption assistance agreements (as defined in section 475(3) of the Act) with the adoptive parents of children with special needs."  Further, sections 473(a)(1)(B)(i) and (ii) of the Act require States to make payments of nonrecurring adoption expenses incurred by or on behalf of parents in connection with the adoption of a child with special needs and/or adoption assistance payments on behalf of a child who meets the requirements of section 473(a)(2) of the Act.

*Source:*     04/24/0704/24/07

*Reference:  Social Security Act   sections 473(a) and 475(3)*

## 8.2B.1     TITLE IV-E, Adoption Assistance Program, Eligibility, Biological parents

**1**   *Q:*  Can a biological parent whose parental rights have been terminated and who later adopts his or her biological child receive title IV-E adoption assistance?

*A:*  No. The purpose of the title IV-E adoption assistance program is to provide assistance to adoptive families who adopt special needs children in need of alternative permanent homes. A child cannot be considered a child with special needs unless, among other things, "the State has determined that the child cannot or should not be returned to the home of his parents" (section 473(c)(1) of the Act). While the termination of parental rights (TPR) would verify that this determination had previously been made, the placement of the child back into the biological home would nullify such a determination. While the State may continue to recognize that the legal ties have been severed, the biological ties remain.

 In this situation, the child would be returned to the home of the biological parent. Thus, a determining factor for title IV-E eligibility in section 473(c)(1) of the Act would not be present. The adoption by the biological parent in these circumstances, would be undertaken as a

**EXHIBIT C**

# *Child Welfare Policy Manual*

means of restoring the legal relationship between the parent and child, rather than for purposes of providing the child with new parents or a substitute for the original home.

*Source:     ACYF-CB-PIQ-89-04 (8/8/89)ACYF-CB-PIQ-89-04 (8/8/89)*

*Reference:  Social Security Act - sections 472 (a)(2)(A) and (C), 473 (a)(2)(A)(ii) and 473 (c)(1)*

## 8.2B.2     TITLE IV-E, Adoption Assistance Program, Eligibility, Children in foster care

*1*  *Q:*  Would adoptive parents continue to be eligible to receive title IV-E adoption assistance payments on behalf of a child who has been placed in a psychiatric facility under the care and responsibility of the State agency through a voluntary placement agreement?

*A:*  Yes. Title IV-E, section 473 (a)(4)(B) of the Social Security Act states that "no payment may be made to parents with respect to any child if the State determines that the parents are no longer legally responsible for the support of the child or if the State determines that the child is no longer receiving any support from such parents". Other than the age of the child, these two conditions are the only basis in the Act for terminating adoption assistance payments on behalf of a child unless requested by or agreed to by the adoptive parents. On the other hand, there is nothing to prevent the State agency or the court from requesting or ordering the parents to contribute toward the cost of the child's care in the psychiatric facility, in the same manner as any other parents would be asked in similar situations.

*Source:     ACYF-CB-PIQ-85-12 (11/25/85)ACYF-CB-PIQ-85-12 (11/25/85)*

*Reference:  Social Security Act - section 473 (a)(4)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

*2*  *Q:*  May title IV-E eligible children in adoptive homes receive title IV-E foster care maintenance payments prior to finalization of adoption?

*A:*  Prior to the finalization of adoption, title IV-E eligible children in adoptive homes may receive foster care maintenance payments if the home is licensed for foster care.

> *Source:*    *ACYF-CB-PIQ-82-01 (1/19/82)ACYF-CB-PIQ-82-01 (1/19/82)*
>
> *Reference:  Social Security Act - section 472*

**8.2B.3    TITLE IV-E, Adoption Assistance Program, Eligibility, Child of a minor parent**

*1*  *Q:*  Is the child of a minor parent eligible for title IV-E adoption assistance?

*A:*  Section 473 (a)(2)(A)(i)(III) of the Social Security Act provides that the child whose costs in a foster family home or child-care institution are covered by the title IV-E foster care payment made with respect to the parent is eligible for adoption assistance under title IV-E, if determined by the State to be a child with special needs under section 473 (c).

> *Source:*    *Source/Date: ACYF-CB-PA-88-01 (7/6/88); Questions and Answers on the Final Rule (65 FR 4020 (1/25/00)Source/Date: ACYF-CB-PA-88-01 (7/6/88); Questions and Answers on the Final Rule (65 FR 4020 (1/25/00)*
>
> *Reference:  Social Security Act - section 473 (a)(2)(A)(i)(III)*

*2*  *Q:*  When must the child of a minor parent meet the title IV-E adoption assistance eligibility criteria?

*A:*  Effective October 1, 2005, the child of a minor parent must meet the title IV-E adoption assistance eligibility criteria prior to finalization of the adoption.

> *Source:*    *8/7/20068/7/2006*
>
> *Reference:  Social Security Act - Section 473(a)(2)(A)(bb)(III); Public Law 109-171, The Deficit Reduction Act of 2005*

**EXHIBIT C**

# *Child Welfare Policy Manual*

**8.2B.4    TITLE IV-E, Adoption Assistance Program, Eligibility, Deceased adoptive parents/dissolved adoptions**

*1   Q:*  Please explain the requirements regarding a child's eligibility for title IV-E adoption assistance when the adoptive parents die or the adoption is dissolved.

*A:*  In the situation where a child is adopted and receives title IV-E adoption assistance, but the adoption later dissolves or the adoptive parents die, a child may continue to be eligible for title IV-E adoption assistance in a subsequent adoption. The only determination that must be made by the State prior to the finalization of the subsequent adoption is whether the child is a child with special needs, consistent with the requirements in section 473 (c) of the Act. Need and eligibility factors in sections 473 (a)(2)(A) of the Act must not be redetermined when such a child is subsequently adopted because the child is to be treated as though his or her circumstances are the same as those prior to his or her previous adoption. Since title IV-E adoption assistance eligibility need not be re-established in such subsequent adoptions, the manner of a child's removal from the adoptive home, including whether the child is voluntarily relinquished to an individual or private agency, is irrelevant.

> *Source:      ACYF-CB-PA-01-01 (1/23/01)ACYF-CB-PA-01-01 (1/23/01)*
> *Reference:  Social Security Act - section 473(a)(2)(A) and (C) and 473(c)*

*2   Q:*  Please explain the responsibilities of States that have entered into interstate adoptions when the adoptive parents die or the adoption is dissolved.

*A:*  If a title IV-E adoption dissolves or the adoptive parents die and the child is placed with a State agency that assumes responsibility for placement and care, it is the placing State's responsibility to determine whether the child meets the definition of special needs, and pay the subsidy in a subsequent adoption.   If, however, a public child welfare agency is not involved in the subsequent adoptive placement of a child, it is the public child welfare agency in the subsequent adoptive parents' State of residence that is responsible for determining whether the child meets the definition of special needs, entering into the adoption assistance agreement, and paying the subsidy.  The State of the child's initial adoption or the State that pays the title IV-E adoption assistance in the child's initial adoption is irrelevant in a subsequent adoption.

**EXHIBIT C**

# *Child Welfare Policy Manual*

Source:    ACYF-CB-PA-01-01 (1/23/01)ACYF-CB-PA-01-01 (1/23/01)

Reference:  Social Security Act - section 473

## 8.2B.5    TITLE IV-E, Adoption Assistance Program, Independent Adoptions

*1  Q:*  Is a child who is the subject of an independent adoption eligible for title IV-E adoption assistance?

*A:*  We consider an independent adoption one in which the child is not under the responsibility of a public or private adoption agency. It is highly improbable that a child who is adopted through an independent adoption will be eligible for title IV-E adoption assistance since many of these children are voluntarily relinquished at birth directly to an adoptive family. Children who are voluntarily relinquished are eligible only in certain limited circumstances and only when they are relinquished to the State child welfare agency or another public agency (including Tribes) with which the State agency has a title IV-E agreement. The only exceptions are: (1) a child who meets the eligibility criteria for Supplemental Security Income, and (2) a child in a subsequent adoption, under specific circumstances, if s/he received title IV-E adoption assistance in a previous adoption.  If the State determines that such child is a child with special needs, consistent with section 473(c) of the Act, the State may not apply any further requirements or restrictions to the child's eligibility for title IV-E adoption assistance.

Source:    ACYF-CB-PA-01-01 (1/23/01); 7/17/2006ACYF-CB-PA-01-01 (1/23/01); 7/17/2006

Reference:  Social Security Act - sections 473(a)(2) and 473(c); The Deficit Reduction Act of 2005

**EXHIBIT C**

# *Child Welfare Policy Manual*

**8.2B.6    TITLE IV-E, Adoption Assistance Program, International Adoptions**

*1  Q:*  Is a child who is the subject of an international adoption eligible for title IV-E adoption assistance?

*A:*  The Federal adoption assistance program under title IV-E was intended to provide permanency for children with special needs in public foster care by assisting States in providing ongoing financial and medical assistance to the families who adopt them. As a result, the statutory requirements for title IV-E adoption assistance eligibility are geared to needy children in public child welfare systems and are difficult, if not impossible, to apply to children who are adopted from abroad. Therefore, although the statute does not categorically exclude these children from participation in the title IV-E adoption assistance program, it is highly improbable that children who are adopted abroad by U.S. citizens, or are brought into the U.S. from another country for the purpose of adoption, will meet the criteria in section 473 of the Social Security Act (the Act) for title IV-E adoption assistance eligibility.

In addition to meeting the three-part criteria for special needs in section 473(c) of the Act, to be eligible for title IV-E adoption assistance, a child also must be eligible in one of the following manners: 1) Eligible for Aid to Families with Dependent Children (AFDC) at the time of the voluntary placement agreement or court removal petition; 2) Eligible for Supplemental Security Income; or, 3) foster care costs of the child are being covered by title IV-E foster care maintenance payments being made for his or her minor parent in foster care. Children who are adopted abroad, or are brought into the U.S. from other countries for the purpose of adoption, are not: 1) AFDC-eligible in their own homes (AFDC was a domestic program and therefore not available on behalf of children in their own homes in another country); 2) SSI-eligible (SSI cannot be established since a child who is adopted from another country cannot meet either the Social Security Administration's alien eligibility requirement or its "presence in the U.S." rule (requiring that an individual who has been outside the U.S. for 30 consecutive days must be present in the U.S. for 30 consecutive days to be eligible for SSI). The Child Citizenship Act of 2000, Public Law 106-395, impacts neither the SSI eligibility for children who are adopted from abroad nor the title IV-E adoption assistance eligibility for these children); or 3) eligible as a result of their minor parent's receipt of title IV-E foster care maintenance payments.

The above cited reasons, as well as the criteria that the child must meet in order to determine whether a child meets the definition of special needs make it highly improbable, if not virtually impossible, that a child adopted through an intercountry adoption will be eligible for title IV-E adoption assistance. Although it is highly improbable that children adopted through an intercountry adoption will meet the title IV-E adoption assistance requirements, States cannot in policy categorically exclude these children from consideration since the statute does not authorize such an exclusion. In the case of reimbursement of nonrecurring expenses of

EXHIBIT C

# *Child Welfare Policy Manual*

adoption, the State need only to determine that the child is a child with special needs, consistent with section 473(c) of the Act. Accordingly, if a child who is adopted from abroad meets the three criteria for special needs, the State must pay for the nonrecurring adoption expenses for these children, consistent with 45 CFR 1356.41, if requested by the parents prior to the finalization of the adoption.

*Source:     ACYF-CB-PA-01-01 (1/23/01); 7/17/2006ACYF-CB-PA-01-01 (1/23/01); 7/17/2006*

*Reference:  Social Security Act - section 473(a) and (c); The Deficit Reduction Act of 2005; 45 CFR 1356.41*

**EXHIBIT C**

# Child Welfare Policy Manual

**8.2B.7    TITLE IV-E, Adoption Assistance Program, Eligibility, Judicial determinations**

*1  Q:*  We believe that the lack of a "reasonable efforts" determination in accordance with section 472 (a)(1) of the Social Security Act (the Act) cannot result in ineligibility for title IV-E adoption assistance.  Is this correct?

*A:*  Yes. The judicial determination of "reasonable efforts" to prevent placement and reunify the child with his family is an eligibility requirement for the title IV-E foster care maintenance payments program (section 472 (a)(1) of the Act), but such a determination is not an eligibility requirement for adoption assistance in section 473 of the Act.

*Source:    ACYF-CB-PIQ-85-06 (6/5/85)ACYF-CB-PIQ-85-06 (6/5/85)*

*Reference:  Social Security Act - sections 472 and 473*

*2  Q:*  Do the "contrary to the welfare" requirements at 45 CFR 1356.21(c) and (d) apply to the adoption assistance program?

*A:*  Yes. To fulfill the eligibility criteria in section 473 (a)(2)(A)(i)(I) of the Social Security Act when a child's removal from the home is the result of court action, there must be a judicial determination to the effect that to remain in the home would be contrary to the child's welfare. Since a child's removal from the home must occur as a result of such a judicial determination, the determination must be made in the first court ruling that sanctions (even temporarily) the removal of a child from the home. If the determination is not made in the first court ruling pertaining to removal from the home, the child is not eligible for title IV-E adoption assistance. The contrary to the welfare finding must be explicit and made on a case-by-case basis. Items such as nunc pro tunc orders, affidavits, and bench notes are not acceptable substitutes for a court order. Only an official transcript is sufficient evidence of the judicial determination. A judicial determination regarding reasonable efforts to prevent removal or reunify the family, although required for title IV-E foster care, is not a requirement for title IV-E adoption assistance eligibility.

*Source:    ACYF-CB-PA-01-01 (1/23/01)ACYF-CB-PA-01-01 (1/23/01)*

*Reference:  Social Security Act - section 473 (a)(2)(A)(i)(I); 45 CFR 1356.21(c) and (d)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

**8.2B.8     TITLE IV-E, Adoption Assistance Program, Eligibility, Medicaid**

*1  Q:* Is Title XIX coverage required under title IV-E Adoption Assistance?

*A:* Yes.  Section 473 (b) of the Social Security Act clearly establishes that a child receiving foster care maintenance payments or adoption assistance payments is treated as a child who is a recipient of Aid to Families with Dependent Children (AFDC).

In addition, section 2171 of the Omnibus Budget Reconciliation Act of 1981 (P.L. 97-35) subsequently amended section 1902 (a)(10)(A) to specifically require eligibility for title XIX (Medicaid) services for "all individuals receiving aid or assistance under any plan of the State approved under...part A or part E of title IV".  Consequently, to the extent that the State has a title XIX program, children covered by title IV-E are statutorily eligible.

*Source:*     *ACYF-CB-PIQ-82-16 (6/21/82)ACYF-CB-PIQ-82-16 (6/21/82)*
*Reference:  Social Security Act - sections 471, 473 and 1902; Omnibus Budget Reconciliation Act of 1981 (P.L. 97-35)*

*2  Q:* Some States are requiring adoptive parents to complete annual renewals of their adoption assistance agreements.  Does title IV-E require the State or local agency to perform annual renewals or eligibility determinations for adoption assistance?

*A:* This question has moved to <a href="http://www.acf.hhs.gov/j2ee/programs/cb/laws_policies/laws/cwpm/policy_dsp.jsp?citID=173#1100">8.2B.9; question 2</a>

*Source:*
*Reference:*

**EXHIBIT C**

# *Child Welfare Policy Manual*

**8.2B.9    TITLE IV-E, Adoption Assistance Program, Eligibility, Redeterminations**

*1  Q:* What are the requirements for  redeterminations of title IV-E adoption assistance eligibility?

*A:* The title IV-E adoption assistance program does not require redeterminations of a child's eligibility.  Although the title XIX Medicaid program and the programs that, in part, may qualify a child initially for adoption assistance, such as Aid to Families with Dependent Children and Supplemental Security Income, require redeterminations, they are unnecessary for the purpose of maintaining a child's eligibility for title IV-E adoption assistance.  Once a child has been determined eligible and is receiving adoption assistance, a State may terminate the assistance only under the circumstances specified at section 473(a)(4) of the Social Security Act.

*Source:    ACYF-CB-PA-01-01 (1/23/01)ACYF-CB-PA-01-01 (1/23/01)*
*Reference:  Social Security Act - section 473*

*2  Q:* Some States are requiring adoptive parents to complete annual renewals of their adoption assistance agreements.  Does title IV-E require the State or local agency to perform annual renewals or eligibility determinations for adoption assistance?

*A:* No. There is no Federal statute or provision requiring annual renewals, recertifications or eligibility re-determinations for title IV-E adoption assistance.  Parents who receive adoption assistance payments, however, have a responsibility to keep the State or local agency informed of circumstances which would make them ineligible for title IV-E adoption assistance payments, or eligible for assistance payments in a different amount (Section 473 (a)(4)(B) of the Social Security Act).  Once a child is determined eligible to receive title IV-E adoption assistance, he or she remains eligible and the subsidy continues until: (1) the age of 18 (or 21 if the State determines that the child has a mental or physical disability which warrants the continuation of assistance); (2) the State determines that the parent is no longer legally responsible for the support of the child, or; (3) the State determines the child is no longer receiving any support from the parents.

*Source:    ACYF-CB-PIQ-98-02 (9/03/98)ACYF-CB-PIQ-98-02 (9/03/98)*
*Reference:  Social Security Act - section 473(a)(4)(B)*

**EXHIBIT C**

# Child Welfare Policy Manual

**8.2B.10    TITLE IV-E, Adoption Assistance Program, Eligibility, Responsibility for placement and care**

*1  Q:* Must the State have responsibility for placement and care of a child for that child to be eligible for title IV-E adoption assistance?

*A:* The eligibility requirements for adoption assistance in section 473 (a)(2) of the Act do not specify that the State title IV-E agency must have placement and care responsibility for a child to qualify for adoption assistance. There are some situations, however, in which the criteria dictate that a child be under the placement and care responsibility of the State agency or that of another public agency (including Tribes) with whom the State has a title IV-E agreement in order to be eligible for title IV-E adoption assistance. These are:

 1) a child who is placed pursuant to a voluntary placement agreement and who must have had a title IV-E foster care maintenance payment paid on his or her behalf under the agreement, consistent with section 472(a)(2)(B) and 473(a)(2)(A)(i)(I) of the Act; and

 2) a child who is eligible for title IV-E adoption assistance based upon his or her minor parent's eligibility for title IV-E foster care while in the custody of the State agency, consistent with section 473(a)(2)(A)(i)(III) of the Act.

*Source:    ACYF-CB-IM-01-01 (11-6-01)ACYF-CB-IM-01-01 (11-6-01)*
*Reference:  Social Security Act - section 473 (a)(2)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

**8.2B.11      TITLE IV-E, Adoption Assistance Program, Eligibility, Special needs**

*1*  *Q:*  Please explain the requirements for special needs determinations.

*A:*  An integral part of establishing adoption assistance eligibility requires the State to determine that the child is a child with special needs in accordance with all three criteria defined in section 473 (c) of the Social Security Act (the Act):

1) The State must determine that the child cannot or should not be returned to the home of his or her parents (section 473 (c)(1) of the Act); and 2) The State must determine that there exists a specific factor or condition because of which it is reasonable to conclude that the child cannot be placed with adoptive parents without providing title IV-E adoption assistance or title XIX medical assistance. Such a factor or condition may include (but is not limited to) ethnic background, age or membership in a minority or sibling group, the presence of a medical condition, or physical, mental or emotional disabilities.  For example, in some States ethnic background alone may inhibit the ability of a child to be adopted, while in other States a combination of factors, such as minority status and age, may be factors.  It is important to note that in each case the State must conclude that, because of a specified factor or factors, the particular child cannot be placed with adoptive parents without providing assistance; and 3) Finally, the State must determine that in each case a reasonable, but unsuccessful, effort to place the child with appropriate parents without providing adoption assistance has been made. Such an effort might include the use of adoption exchanges, referral to appropriate specialized adoption agencies, or other such activities.  The only exception to this requirement is when it would not be in the best interests of the child because of such factors as the existence of significant emotional ties with prospective adoptive parents while in the care of those parents as a foster child.  The exception also extends to other circumstances that are not in the child's best interest, as well as adoption by a relative, in keeping with the statutory emphasis on the placement of children with relatives.

The State must document in each child's case record the specific factor(s) that make the child difficult to place and describe the efforts to place the child for adoption without providing assistance.  In an effort to find an appropriate adoptive home for a child, and meet the requirement that a reasonable, but unsuccessful, effort be made to place the child without adoption assistance, it is not necessary for the agency to "shop" for a family while the child remains in foster care.  Once the agency has determined that placement with a certain family is in the child's best interest, the agency should make full disclosure about the child's background, as well as known or potential problems.  If the agency has determined that the child cannot or should not return home and the child meets the statutory definition of special needs with regard to specific factors or conditions, then the agency can pose the question of whether the prospective adoptive parents are willing to adopt without assistance.  If they say

**EXHIBIT C**

# *Child Welfare Policy Manual*

they cannot adopt the child without adoption assistance, the requirement in section 473
(c)(2)(B) for a reasonable, but unsuccessful, effort to place the child without providing adoption
assistance will be met.


*Source:     ACYF-CB-PA-01-01 (1/23/01)ACYF-CB-PA-01-01 (1/23/01)*

*Reference:  Social Security Act - sections 471(a)(19) and 473 (c)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

*2  Q:*  In establishing title IV-E eligibility for adoption assistance, is termination of parental rights the only mechanism for demonstrating that a child cannot or should not be returned home?

*A:*  One of the criteria for establishing that a child has special needs is a determination by the State that the child cannot or should not be returned to the home of his or her parents. Previous guidance stated that this means that the State must have reached that decision based on evidence by an order from a court of competent jurisdiction terminating parental rights, the existence of a petition for a termination of parental rights (TPR), or a signed relinquishment by the parents. It has been brought to our attention that there are situations in which adoptions are legal without a TPR.  Specifically, in some Tribes adoption is legal without a TPR or a relinquishment from the biological parent(s), and there is at least one State that allows relatives who have cared for a related child for a period of time to adopt without first obtaining a TPR.

 After consideration, we believe that our earlier policy is an unduly narrow interpretation of the statute.  Consequently, if a child can be adopted in accordance with State or Tribal law without a TPR or relinquishment, the requirement of section 473 (c)(1) of the Act will be satisfied, so long as the State or Tribe has documented the valid reason why the child cannot or should not be returned to the home of his or her parents.

*Source:*    ACYF-CB-PA-01-01 (1/23/01)ACYF-CB-PA-01-01 (1/23/01)

*Reference:  Social Security Act - section 473 (c)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

**8.2B.12     TITLE IV-E, Adoption Assistance Program, Eligibility, SSI**

*1  Q:*  Is there a prohibition under title IV-E against claiming Federal financial participation (FFP) for adoption assistance for a child who receives Supplemental Security Income (SSI)?

*A:*  There is no prohibition under title IV-E against claiming FFP for adoption assistance for a child who receives benefits from SSI. Section 473 of title IV-E created an adoption assistance program which permits Federal matching funds for the costs of adoption assistance for the purpose of encouraging the placement of eligible children in adoptive homes. Under title IV-E adoption assistance (section 473), the scope of eligibility specifically includes children with special needs who are eligible to receive SSI (473 (a)(2)(A)(i)(II)) as well as those eligible for AFDC (473 (a)(2)(A)(i)(I)) and title IV-E foster care (473 (a)(2)(A)(i)(III)).

Title XVI (SSI) is a needs based program and, as such, requires a test of income and resources of the adoptive parents in determining the amount of the SSI benefit to which a child with a disability(ies) may be entitled. If (or when) the parental resources and income exceed a maximum level determined by the SSI program, the child is no longer eligible for SSI payments.

If the adoptive parents decide to decline adoption assistance and choose to receive only SSI for the child, and if they have not executed an adoption assistance agreement before the adoption is finalized, they may not later receive title IV-E adoption assistance payments, as the child would no longer meet all of the eligibility requirements as a child with special needs (section 473 (c)(2)). It may be prudent for the decision maker (parent, guardian, custodian, caretaker relative) to arrange for an adoption assistance agreement which does not provide for payment, but which does provide for title XVI and title XIX coverage, and which may at some future date, upon review, be renegotiated to provide for payment of adoption assistance funds.

The adoptive parents of a child eligible for title IV-E adoption assistance and SSI benefits may make application for both programs and the child, if eligible, may benefit from both programs simultaneously.

In cases where the child is eligible for both SSI and title IV-E and there is concurrent receipt of payments from both programs, "the child's SSI payment will be reduced dollar for dollar without application of any exclusion", thus decreasing the SSI benefit by the amount of the title IV-E payment (SSI Program Operations Manual). To reiterate, concurrent receipt is subject to the SSI rule that the SSI payment will be reduced by the amount of the foster care payment.

*Source:     ACYF-CB-PA-94-02 (2/4/94)ACYF-CB-PA-94-02 (2/4/94)*

*Reference:  Social Security Act - section 473; 20 CFR 416.1100ff; Program Operations Manual System, Part 5,*

*Supplemental Security Income Chapter 008 - Income, Subchapter 30 - Unearned Income*

**EXHIBIT C**

# *Child Welfare Policy Manual*

*2*  *Q:*  Section 473(a)(2)(A)(bb)(II) of the Social Security Act (the Act) indicates that a child who meets all of the requirements of title XVI of the Act with respect to eligibility for Supplemental Security Income (SSI) benefits may be eligible for title IV-E adoption assistance.  When must a child be eligible for SSI for the purposes of meeting the title IV-E adoption assistance eligibility criteria?

*A:*  As of October 1, 2005, the child's eligibility for SSI benefits must be established prior to finalization of the adoption.

*Source:*     *8/7/20068/7/2006*
*Reference:  Social Security Act - Section 473(a)(2)(A)(bb)(II); Public Law 109-171, The Deficit Reduction Act of 2005*

### 8.2B.13     TITLE IV-E, Adoption Assistance Program, Eligibility, Voluntary relinquishments

*1*  *Q:*  Is a child who is voluntarily relinquished to a private, nonprofit agency eligible for title IV-E adoption assistance?

*A:*  As authorized by section 473(a)(2)(A)(i)(I) of the Act, a child is eligible for title IVE adoption assistance if s/he is removed from the home by way of a voluntary placement agreement with respect to which title IV-E foster care payments are provided, or as the result of a judicial determination that to remain in the home would be contrary to the child's welfare. However, a child who is voluntarily relinquished to either a public or private, nonprofit agency will be considered judicially removed in the following circumstances:

 (1) the child is voluntarily relinquished either to the State agency (or another public agency (including Tribes) with whom the State has a title IV-E agreement), or to a private, nonprofit agency; and

 (2) there is a petition to the court to remove the child from home within six months of the time the child lived with a specified relative; and

 (3) there is a subsequent judicial determination to the effect that remaining in the home would be contrary to the child's welfare.

 Under these circumstances, the AFDC-eligible child will be treated as though s/he was judicially removed rather than voluntarily relinquished. If the State agency subsequently determines that the child also meets the three criteria in the definition of a child with special

**EXHIBIT C**

# *Child Welfare Policy Manual*

needs in section 473(c) of the Act, the child is eligible for title IV-E adoption assistance. If, however, there is no petition to remove the child from the home or no subsequent judicial determination, the child cannot be considered judicially removed for the purpose of title IV-E adoption assistance eligibility. Furthermore, if the court merely sanctions the voluntary relinquishment without making a determination that it is contrary to the child's welfare to remain in the home, the child is not eligible for title IV-E adoption assistance.

*Source:     ACYF-CB-IM-01-08 (11-6-01)ACYF-CB-IM-01-08 (11-6-01)*

*Reference:  Social Security Act -section 473(a)(2)(A)(i)(I) and (c)*

## 8.2C    TITLE IV-E, Adoption Assistance Program, Interstate Compact

*1  Q:* What is the definition or description of the term "interstate compact" as used in the Adoption Assistance and Child Welfare Amendments of 1980 (Public Law 96-272)?

*A:* An interstate compact is an instrument to assure provisions for the protection of the interests of the child receiving agreed-upon financial assistance or other supportive services under a currently effective adoption assistance agreement when the adoptive parents and the child adopted under the agreement move to another State (Social Security Act, section 475 (3)). The Act requires that adoption assistance agreements remain in effect regardless of the State in which the adoptive parents are residents at any given time.

*Source:     ACYF-CB-PIQ-81-03 (10/20/81)ACYF-CB-PIQ-81-03 (10/20/81)*

*Reference:  Social Security Act - section 475*

## 8.2D    TITLE IV-E, Adoption Assistance Program, Payments

No questions and answers are available at this time.

## 8.2D.1    TITLE IV-E, Adoption Assistance Program, Payments, Allowable costs

*1  Q:* Are there restrictions for how title IV-E adoption assistance funds may be spent?

*A:* Once the adoption assistance agreement is signed and the child is adopted, the adoptive parents are free to make decisions about expenditures on behalf of the child without further

**EXHIBIT C**

# Child Welfare Policy Manual

agency approval or oversight.  Hence, once an adoption assistance agreement is in effect, the parents can spend the subsidy in any way they see fit to incorporate the child into their lives. Since there is no itemized list of approved expenditures for adoption assistance, the State cannot require an accounting for the expenditures.  The amount of the assistance may be adjusted periodically if the family's or child's circumstances change, but only with the concurrence of the adoptive family.

*Source:    ACYF-CB-PA-01-01 (1/23/01)ACYF-CB-PA-01-01 (1/23/01)*

*Reference:  Social Security Act - sections 473*

## 8.2D.2    TITLE IV-E, Adoption Assistance Program, Payments, Duration

*1  Q:*  May a State limit the duration of payments pursuant to an adoption assistance agreement?

*A:*  States may limit the duration of payments under an adoption assistance agreement for individual eligible children to a period which may end prior to the child's eighteenth birthday, if the decision is made on a case-by-case basis, taking into consideration the provisions of section 473 (a)(2) of the Social Security Act.  States may not have a blanket policy which limits the duration of all adoption assistance payments to a date earlier than the eighteenth birthday of eligible children, although a time limit may be set in individual cases with the concurrance of the adopting parents, depending on the needs of the child and the circumstances of the parents.

*Source:    ACYF-CB-PIQ-81-02 (12/8/81)ACYF-CB-PIQ-81-02 (12/8/81)*

*Reference:  Social Security Act - section 473*

## 8.2D.3    TITLE IV-E, Adoption Assistance Program, Payments, Non-recurring expenses

*1  Q:*  Please summarize the requirements for the nonrecurring expenses of adoption.

*A:*  The State must enter into an adoption assistance agreement prior to the finalization of the adoption and reimburse (up to $2000, or at State option a lower limit) the nonrecurring adoption expenses incurred by any parent who adopts a child with special needs.  The only eligibility criterion to be applied for reimbursement of the nonrecurring expenses of adoption is that the State determine that the child meets the definition of special needs, in accordance with

EXHIBIT C

# Child Welfare Policy Manual

section 473 (c) of the Act.  A child does not have to be eligible for Aid to Families with Dependent Children, title IV-E foster care, or Supplemental Security Income in order for the adoptive parents to receive reimbursement for their nonrecurring adoption expenses.  Nor does the child have to be under the responsibility for placement and care of the State agency in order for the adoptive parents to be reimbursed for the nonrecurring expenses of adoption.

 The term "nonrecurring adoption expenses" is defined as the reasonable and necessary adoption fees, court costs, attorney fees and other expenses which are directly related to the legal adoption of a child with special needs, which are not incurred in violation of State or Federal law, and which have not been reimbursed from other sources or funds.

 Federal financial participation is available at the matching rate of 50 percent for State expenditures up to $2000 for each adoptive placement.

*Source:      ACYF-CB-PA-01-01 (1/23/01)ACYF-CB-PA-01-01 (1/23/01)*

*Reference:  Social Security Act - section 473(a)(6); 473(a)(1)(B)(i); 45 CFR 1356.41*

**EXHIBIT C**

# *Child Welfare Policy Manual*

**2  *Q:***  Is it possible for States to set maximum amounts on specific items within the category of nonrecurring expenses for which they will reimburse adoptive parents?

**  *A:***  No. The Tax Reform Act of 1986 (Public Law 99-514) amended title IV-E of the Act to require States to make payments for the nonrecurring adoption expenses incurred by adopting parents in connection with the adoption of children with special needs. The only discretion given States is the flexibility to set a reasonable lower maximum than the $2000 for which Federal reimbursement is available at a 50% matching rate.

*Source:*     *ACYF-CB-PIQ-89-02 (5/23/89)ACYF-CB-PIQ-89-02 (5/23/89)*
*Reference: Social Security Act - section 473; The Tax Reform Act of 1986 (P.L. 99-514)*

**3  *Q:***  States are required to reimburse up to $2,000, or such lower amount as set by the State, for the non-recurring adoption expenses of parents who adopt children with special needs.  The regulations define "non-recurring adoption expenses" as reasonable and necessary adoption fees, court costs, attorney fees and other expenses which are directly related to the legal adoption of a child with special needs. "Other expenses" were defined as the costs of adoption incurred by or on behalf of the parents and for which parents carry the burden of payment, such as the adoption study, including health and psychological examinations, supervision of the placement prior to adoption, transportation and the reasonable costs of lodging and food for the child and/or the adoptive parents when necessary to complete the adoption process.

Would it be possible for a State to further limit the reimburseable areas within the allowable expense category? For instance, could reimbursement be limited to attorney fees only? Or, could a State elect not to reimburse adoption study fees and transportation costs?

**  *A:***  No. A State may not limit reimbursement for nonrecurring adoption expenses by category. Adoptive parents who apply for reimbursement of the non-recurring expenses of adoption must be reimbursed for any of the non-recurring adoption expenses described at 45 CFR 1356.41 (i) when they adopt a child with special needs as set forth in section 473 (c) of the Social Security Act..

*Source:*     *ACYF-CB-PIQ-89-02 (5/23/89)ACYF-CB-PIQ-89-02 (5/23/89)*
*Reference: Social Security Act - section 473*

**EXHIBIT C**

## *Child Welfare Policy Manual*

**4  Q:** Prospective adoptive parents sometimes have an attorney review the subsidy agreement to ensure that the parents  best interests are addressed.  This private attorney review is in addition to the work of the State agency attorneys who prepare the subsidy paperwork. Are attorney fees and other expenses related to the review of the title IV-E adoption assistance agreement directly related to the legal adoption of a child with special needs and, therefore, allowable under title IV-E?

**A:** Yes.  If the adoptive parents who are adopting a child with special needs incur an attorney fee for review of the adoption subsidy agreement, the State may reimburse the adoptive parents for that expenditure, up to the $2,000 limit, as a nonrecurring expense of adoption.  In addition, the State also may claim the costs of the agency attorney?s review of the adoption assistance agreement as an administrative cost, consistent with the policy in the Child Welfare Policy Manual (CWPM), Section 8.1A, Q/A #1.

*Source:      7/6/057/6/05*

*Reference:  Social Security Act -- Section 473(a)(6), 45 CFR 1356.41(i); CWPM, Section 8.1A, Q/A #1*

**5  Q:** Does the nonrecurring adoption expenses limit of $2,000 (or lower at State option) apply per adoption episode or is it a lifetime limit?

**A:** The nonrecurring adoption expenses limit is applied per adoption episode.

*Source:      7/6/057/6/05*

*Reference:  Social Security Act -- Section 473(a)(1)(B)(i), 45 CFR 1356.41*

**6  Q:** Can the title IV-E agency claim Federal financial participation (FFP) for the nonrecurring expenses of adoption if the adoption is never finalized?

**A:** Yes.  The State may claim FFP for the nonrecurring expenses of adoption in accordance with the requirements set forth in 45 CFR 1356.41 if:

**EXHIBIT C**

# *Child Welfare Policy Manual*

 - there is a title IV-E agreement for the nonrecurring expenses of adoption between the adoptive parent(s) and the State or local agency; and


 - the State has determined that the child is a child with special needs in accordance with section 473(c) of the Social Security Act (the Act).


 Consistent with section 473(a)(5) of the Act, payments may be made on behalf of a child in an adoptive placement prior to the finalization of adoption when all eligibility requirements in section 473 of the Act are met and there is a signed adoption assistance agreement between the State or local agency and the adoptive parent(s).  The regulation at 45 CFR 1356.41(b) provides that the agreement for the nonrecurring expenses of adoption may be a separate document or a part of the agreement for either Federal or State adoption assistance.  In allowing adoption assistance payments to be made prior to the finalization of the adoption, the Department has never differentiated between payments for ongoing adoption assistance under such agreements and payments for the nonrecurring expenses for adoption.  Further, nothing in statute or regulation prohibits reimbursement for the expenses incurred by adoptive families in circumstances where the adoption is not finalized.


*Source:       September 29, 2005September 29, 2005*

*Reference:  Social Security Act   Sections 473(a)(1)(B)(i) and 473(a)(5); 45 CFR 1356.41(b).*

**EXHIBIT C**

# *Child Welfare Policy Manual*

**8.2D.4    TITLE IV-E, Adoption Assistance Program, Payments, Rates**

*1  Q:*  Please explain how the State agency should set rates for title IV-E adoption assistance payments.

*A:*  The amount of the adoption assistance payment cannot exceed the amount the child would have received if s/he had been in a foster family home, but otherwise must be determined through agreement between the adoptive parents and the State or local title IV-E agency. Unlike other public assistance programs in the Social Security Act, the title IV-E adoption assistance program is intended to encourage an action that will be a lifelong social benefit to certain children and not to meet short-term monetary needs during a crisis.  Further, the adoptive parents' income is not relevant to the child's eligibility for the program.

Title IV-E adoption assistance is not based upon a standard schedule of itemized needs and countable income.  Instead, the amount of the adoption assistance payment is determined through the discussion and negotiation process between the adoptive parents and a representative of the State agency based upon the needs of the child and the circumstances of the family.  The payment that is agreed upon should combine with the parents' resources to cover the ordinary and special needs of the child projected over an extended period of time and should cover anticipated needs, e.g., child care.  Anticipation and discussion of these needs are part of the negotiation of the amount of the adoption assistance payment.

*Source:      ACYF-CB-PA-01-01 (1/23/01)ACYF-CB-PA-01-01 (1/23/01)*

*Reference:  Social Security Act - section 473 (a)(3)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

2  *Q:*  A State agency wants to include a list of specific circumstances in the adoption assistance agreement that would lead to an automatic reduction in the adoption subsidy amount if the State determines the circumstances occur.  These circumstances could include an improvement in the condition of the child or the financial circumstances of the parent, the child's eligibility for other forms of assistance, or the child's re-entry into foster care.  Is this practice allowable?

*A:*  No. Once a child is adopted and determined to be eligible for title IV-E adoption assistance, the adoption assistance payments may not be automatically adjusted without the agreement of the adoptive parents for any reason other than an across-the-board reduction or increase in foster care maintenance rates.  The statute requires that the adoption assistance payment "take into consideration the circumstances of the adopting parents and the needs of the child being adopted, and may be readjusted periodically, with the concurrence of the adopting parents depending upon changes in such circumstances (section 473(a)(3) of the Social Security Act)."  A State would not be considering the unique circumstances of the child and parents by automatically adjusting the subsidy.

The State agency may describe in the agreement specific circumstances such as those articulated in the question, that may warrant a future re-negotiation and adjustment of the payment.  Agreements that are not negotiated to the specific needs of the adoptive child and the circumstances of the family, however, are not permissible.

*Source:*     ACYF-CB-PIQ-98-02 (9/03/98)ACYF-CB-PIQ-98-02 (9/03/98)

*Reference:*  Social Security Act - section 473 (a)(3)

**EXHIBIT C**

# *Child Welfare Policy Manual*

3   *Q:*  Can the State median income adjusted to family size be used as a guide to establish consistency in determining amounts of payment?

*A:*  No. The use of such guidelines is not appropriate to the process. During the negotiation of an adoption assistance agreement, it is important to keep in mind that the circumstances of the adopting parents and the needs of the child must be considered together. The overall ability of a singular family to incorporate an individual child into the household is the objective. Families with the same incomes or in similar circumstances will not necessarily agree on identical types or amounts of assistance. The uniqueness of each child/family situation may result in different amounts of payment. Consistency is not the goal.

*Source:*     *ACYF-CB-PIQ-90-02 (10/2/90)ACYF-CB-PIQ-90-02 (10/2/90)*
*Reference:  Social Security Act - sections 473*

4   *Q:*  Is it permissible to adjust the amount of the adoption assistance payment after the adoption assistance agreement is signed?

*A:*  Adoption assistance payments made on behalf of a child cannot exceed the amount the child would have received if s/he had been in a foster family home.  Accordingly, a State may negotiate an adoption assistance agreement that automatically allows for adjustments to the adoption assistance payment when there is an increase in the foster care board rate. Alternatively, a State may renegotiate an adoption assistance agreement if the adoptive parents request an increase in payment due to a change in their circumstance and a higher foster care rate would have been paid on behalf of the child if the child had still been in foster care.  As an example, a child is adopted and the adoption assistance agreement is negotiated for $250 a month, the same amount the child had been receiving in foster care.  If, two years later, the State's monthly foster care board rate is increased to $400, the family can request that the adoption assistance agreement be renegotiated and receive up to $400 for the child, since this is the amount the child would have received each month if s/he had continued to be in foster care.

*Source:*     *ACYF-CB-PA-01-01 (1/23/01)ACYF-CB-PA-01-01 (1/23/01)*
*Reference:  Social Security Act - section 473 (a)(3)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

5  *Q:* Some State's foster care rate structures are based on levels of care.  How would such a structure impact the adoption assistance rates?

*A:* If a State's foster care payment schedule includes higher level-of-care rates that are paid across-the-board for certain children, the State may pay up to that amount in adoption assistance if that specific child would have received the higher level-of-care rate in foster care. In addition, if a State's foster care payment standard includes across-the-board higher foster care rates for working foster parents to pay for child care, or includes provisions for periodic across-the-board increases for such items as seasonal clothing, the adoption assistance agreement may include the higher rate.  However, special allowances that may be made on behalf of an individual child in certain situations in foster care, such as child care or clothing allowances, are not permitted as an allowable additional reimbursement in the adoption assistance program.  Special allowances for individual children that are over and above the State's foster care payment standard cannot be included in the amount negotiated in the adoption assistance agreement since the adoption assistance payment cannot exceed the foster care maintenance payment rate for the child.

*Source:*     *ACYF-CB-PA-01-01 (1/23/01)ACYF-CB-PA-01-01 (1/23/01)*
*Reference:  Social Security Act - section 473 (a)(3)*

6  *Q:* When the State agency enters into an adoption assistance agreement with a family from another State, which State's rate structure applies as the limit for the adoption assistance payment?

*A:* In situations where a child is placed by the State agency in one State with an adoptive family in another State, it is the placing State that would look at its own established foster care rate structure, as well as State law and policy governing its foster care and adoption assistance payments, to determine the amount of assistance available on behalf of the child.  If the placing and paying State's law or policy allows flexibility to pay amounts based upon the foster care board rate in the State in which the child is placed for adoption, this practice would be allowable under title IV-E since the statutory requirement in section 473 (a)(3) of the Act would be met.

*Source:*     *ACYF-CB-PA-01-01 (1/23/01)ACYF-CB-PA-01-01 (1/23/01)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

*Reference:  Social Security Act - section 473 (a)(3)*

*7* *Q:*  May a State's policy limit the maximum adoption assistance payment for any family at a level lower than the maximum foster care maintenance payment a child would have received in a foster family home?

*A:*  Federal law and regulations do not prohibit a State from having a law or policy that limits the maximum adoption assistance payments to a level lower than the maintenance payment a child would have received in a foster family home. The law only prescribes that the adoption assistance payment can be no more than the foster care maintenance payment that the child would have received in a foster family home during the same time period (see section 473(a)(3) of the Social Security Act). Within these parameters, however, the State must negotiate the amount of the adoption assistance payment with the adoptive family taking into consideration the needs of the child and the circumstances of the family. Furthermore, from a practice standpoint establishing a lower ceiling within which the State and family may negotiate an adoption assistance payment may reduce the pool of adoptive parents available to provide permanent homes for children with special needs.

*Source:    7/7/20067/7/2006*

*Reference:  Social Security Act   section 473(a)(3)*

## 8.2D.5    TITLE IV-E, Adoption Assistance Program, Payments, Termination

*1* *Q:*  Under what circumstances may the State agency terminate an adoption assistance agreement?

*A:*  Title IV-E adoption assistance is available on behalf of a child if s/he meets all of the eligibility criteria and the State agency enters into an adoption assistance agreement with the prospective adoptive parent(s) prior to the finalization of the adoption.  The agreement must be signed by all parties to the agreement (namely, the adoptive parents and a State agency representative) in order to meet the requirements for an adoption assistance agreement.

 Once an adoption assistance agreement is signed and in effect, it can be terminated under three circumstances only.  Namely, (1) the child has attained the age of 18 (or the age of 21 if the State has determined that the child has a mental or physical disability which would warrant

**EXHIBIT C**

# *Child Welfare Policy Manual*

continuation of assistance); (2) the State determines that the adoptive parents are no longer legally responsible for support of the child; or (3) the State determines that the adoptive parents are no longer providing any support to the child.

*Source:     ACYF-CB-PA-01-01 (1/23/01)ACYF-CB-PA-01-01 (1/23/01)*
*Reference:  Social Security Act - section 473(a)(4); 45 CFR 1356.40(b)*

*2  Q:*  Section 473(a)(4)(B) of the Social Security Act states that no adoption assistance payment can be made, "to parents with respect to any child if the State determines that the parents are no longer legally responsible for the support of the child or if the State determines that the child is no longer receiving any support from such parents."  When is a parent considered to be "no longer legally responsible for support" or not providing "any support" for the child?

*A:*  A parent is considered no longer legally responsible for the support of a child when parental rights have been terminated or when the child becomes an emancipated minor, marries, or enlists in the military.

 "Any support" includes various forms of financial support.  The State may determine that payments for family therapy, tuition, clothing, maintenance of special equipment in the home, or services for the child's special needs, are acceptable forms of financial support. Consequently, the State may continue the adoption assistance subsidy, if it determines that the parent is, in fact, providing some form of financial support to the child.

*Source:     ACYF-CB-PIQ-98-02 (9/03/98)ACYF-CB-PIQ-98-02 (9/03/98)*
*Reference:  Social Security Act - section 473(a)(4)(B)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

*3*  *Q:* Can a State agency automatically suspend the adoption assistance payment for the duration of an adopted child's placement in foster care?  The State agency would reinstate the payment upon the child's return home.

*A:* No. An automatic suspension is, in effect, the equivalent to a termination of the adoption assistance payment and as such is unallowable under section 473(a)(4)(B) if the parent remains legally responsible or is providing any support for the child. However, consistent with section 473(a)(4)(B) of the Act, there may be circumstances in which adoptive parent(s) may be eligible for payments in a different amount. In these instances, a State may re-negotiate the agreement and reduce the payment for the duration of an adopted child's placement in foster care with the concurrence of the adoptive parent.t.

*Source:*      *ACYF-CB-PIQ-98-02 (9/03/98)ACYF-CB-PIQ-98-02 (9/03/98)*
*Reference:  Social Security Act - section 473(a)(4)(B)*

## 8.2E     TITLE IV-E, Adoption Assistance Program, Promoting Adoption Assistance

*1*  *Q:* What is the State's responsibility for notifying prospective adoptive parents about the availability of adoption assistance?

*A:* The State title IV-B/IV-E agency is required to actively seek ways to promote the adoption assistance program. This means that it is incumbent upon the State agency to notify prospective adoptive parents about the availability of adoption assistance for the adoption of a child with special needs.  There is no prescribed way in which promotion of the program must be accomplished.  One example would be to alert potential adoptive parents during a recruitment campaign for adoptive homes (websites, newspapers, flyers, etc.).  Another example would be to alert every prospective adoptive parent who inquires to the State agency about adoption.

 The primary goal of the title IV-E adoption assistance program is to provide financial support to families who adopt difficult-to-place children from the public child welfare system.  These are children who otherwise would grow up in State foster care systems if a suitable adoptive parent could not be found.  Thus, the State or local title IV-E agency is responsible for assuring that prospective adoptive families with whom they place eligible children who are under their responsibility are apprised of the availability of title IV-E adoption assistance.

**EXHIBIT C**

# *Child Welfare Policy Manual*

However, in circumstances where the State agency does not have responsibility for placement and care, or is otherwise unaware of the adoption of a potentially special needs child, it is incumbent upon the adoptive family to request adoption assistance on behalf of the child.  It is not the responsibility of the State or local agency to seek out and inform individuals who are unknown to the agency about the possibility of title IV-E adoption assistance for special needs children who also are unknown to the agency.  This policy is consistent with the intent and purpose of the statute, and that is to promote the adoption of special needs children who are in the public foster care system.

*Source:     ACYF-CB-PA-01-01 (1/23/01)ACYF-CB-PA-01-01 (1/23/01)*

*Reference: 45 CFR 1356.40 (f)*

## 8.3     TITLE IV-E, Foster Care Maintenance Payments Program

No questions and answers are available at this time.

## 8.3A     TITLE IV-E, Foster Care Maintenance Payments Program, Eligibility

*1   Q:* A judicial determination is made that a child should be removed from his home, and the child is placed in foster care with title IV-E foster care payments being paid on his behalf.  Casework services are provided toward a goal of reuinification.  At a later date, the court rules that the child should return home; however, the court retains jurisdiction and continues the county department's responsibility to supervise the home and to provide services necessary to further strengthen the family unit.

Subsequent circumstances cause the court to determine that the child must return to foster care.  In considering initial eligibility on the title IV-E foster care reapplication, which judicial determination removing the child from his home should be used - the first or the second?

*A:* When a child is removed from his home and placed in foster care, there must be a judicial determination to the effect that continuation in the home would be contrary to the welfare of the child and that reasonable efforts have been made to prevent or eliminate the need for removal.  Such a determination is necessary at any time (or every time) that a child is removed from his home, because each situation involves different circumstances and reasons for placement.  Unless the child was visiting his home on a trial basis, a return to foster care would require a new determination of eligibility based on the circumstances at that time.  In the situation described, the judicial determination and eligibility factors current at the time of the most recent removal would be used to determine eligibility for title IV-E foster care.

**EXHIBIT C**

# *Child Welfare Policy Manual*

*Source:      ACYF-CB-PIQ-86-03 (5/9/86)ACYF-CB-PIQ-86-03 (5/9/86)*

*Reference:  Social Security Act - section 472*

*2  Q:*  The statute refers to a child being eligible for AFDC "in or for such month" in sections 472(a)(3)(A)(i) and (ii) of the Social Security Act (the Act).  Please clarify the month in which the child must have met the AFDC eligibility criteria?

*A:*  The child must have been eligible for AFDC in either the month of the voluntary placement agreement or the removal petition. This is true whether the child was living with a specified relative at the time of the removal petition or voluntary placement agreement (section 472(a)(3)(A)(i) of the Act), or whether the child was living with an interim relative caretaker within the six months prior to the removal petition or voluntary placement agreement (section 472(a)(3)(A)(ii)(II) of the Act).  In the latter situation, although the child is not in the home of the specified relative from whom the child was removed, the State must determine whether the child would have met the AFDC criteria had the child remained in the specified relative's home.

*Source:      7/7/20067/7/2006*

*Reference:  Social Security Act - section 472(a)(3)(A)(i) and (ii); 45 CFR 1356.21(l)*

*3  Q:*  In determining a child's Aid to Families with Dependent Children (AFDC) eligibility, should the State look to the household circumstances at the time of the child's removal or should the State look at the whole month of the removal petition or voluntary placement agreement to determine deprivation and/or income?   For example, can a child's deprivation be based on circumstances that occur in the month of removal, but after the child's removal from the home?

*A:*  AFDC eligibility criteria, including deprivation, must be met in the month of, but prior to, the child's removal from the home. The State may not establish the child's deprivation based on household circumstances that occur after a child's removal. This is based on section 472(a)(1)(B) of the Social Security Act (the Act) which specifies that &quot;the child, **while in the home** [emphasis added], would have met the AFDC eligibility requirement of [section 472(a)(3) of the Act].&quot;

*Source:      04/26/0704/26/07*

**EXHIBIT C**

# *Child Welfare Policy Manual*

*Reference:  Social Security Act   sections 472(a)(1)(B) and 472(a)(3)*

**8.3A.1    TITLE IV-E, Foster Care Maintenance Payments Program, Eligibility, Adjudicated delinquents**

*1  Q:*  Are adjudicated delinquents eligible for title IV-E foster care maintenance payments?

*A:*  The question of eligibility for Federal reimbursement in the case of adjudicated delinquents rests on two factors: (1) eligibility of the child, and (2) the type of facility in which the child is placed. Any child for whom title IV-E foster care maintenance payments are claimed must meet the eligibility criteria described in section 472 (a) of the Social Security Act (the Act). These general requirements are: (a) The child must be a "dependent child" as defined in section 406 (a) or 407 of the Act (as in effect on July 16, 1996) and the applicable regulation, 45 CFR 233.90 (c)(1), but for his or her removal from the home of a specified relative; (b) That the child was eligible for Aid to Families with Dependent Children (AFDC) in the month described in section 472 (a)(3)(A)(i) of the Act and consistent with the contingencies explained in section 472 (a)(3)(A)(ii) of the Act; (c) The child must be removed from the home of a relative pursuant to a voluntary placement agreement or as the result of a judicial determination to the effect that continuation in the home would be contrary to the welfare of the child and that reasonable efforts were made prior to placement to prevent the need for removal of the child from his home; and (d) The child's placement and care must be the responsibility of the State title IV-E agency or another public agency with whom the State agency has a currently effective agreement.

 If the child meets the title IV-E eligibility requirements, FFP may be claimed for foster care costs in licensed or approved facilities as described in section 472 (b) and (c) of the Act. Such facilities, however, may not include "detention facilities, forestry camps, training schools, or any other facility operated primarily for the detention of children who are determined to be delinquent."

*Source:     ACYF-CB-PIQ-82-10 (8/11/82); ACYF-CB-PIQ-88-03 (4/11/88)ACYF-CB-PIQ-82-10 (8/11/82); ACYF-CB-PIQ-88-03 (4/11/88)*

*Reference:  Social Security Act - sections 406 (a) and 407 (as in effect on July 16, 1996) and 472; 45 CFR 1355.20 and 233.90 (c)(1)*

*2  Q:*  If a temporary detention order states that the child is to be detained until sentencing because

**EXHIBIT C**

# *Child Welfare Policy Manual*

there is reason to believe he would run away, would this satisfy the requirement for a determination regarding "contrary to the welfare?"

*A:* No. This language could not be construed to mean that to continue in the home would be "contrary to the (child's) welfare." It is important to remember that the judicial determinations required for title IV-E eligibility were intended to ensure that children were not removed from their homes unnecessarily. In juvenile justice procedures, where children are removed for correctional purposes, the courts must determine that continuation in the home would be contrary to the child's welfare if title IV-E eligibility is to be established.

*Source:*    *ACYF-CB-PIQ-91-03 (4/3/91)ACYF-CB-PIQ-91-03 (4/3/91)*
*Reference:  Social Security Act - sections 472 (a)(2)(A)(ii)*


*3* *Q:* Court orders that sentence a child to a juvenile detention facility often include language which differs from that in a dependency order resulting in a foster care placement. Does language in a detention order indicating that the child is a "threat to himself or the community" meet the requirement in section 472 of the Social Security Act regarding "contrary to the welfare?"

*A:* A court order indicating that the child is a threat to himself satisfies the requirement of a determination that remaining in the home would be contrary to the child's welfare. However, if the court order indicates only that the child is a threat to the community, such language would not satisfy the requirement for a determination that continuation in the home would be contrary to the child's welfare.

*Source:*    *ACYF-CB-PIQ-91-03 (4/3/91)ACYF-CB-PIQ-91-03 (4/3/91)*
*Reference:  Social Security Act - sections 472 (a)(2)(A)(ii)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

*4*  *Q:*  A youth may be declared a ward of the court and be ordered placed in much the same manner as delinquents, yet, he is not a delinquent in that no crime has been committed.  Does the term "juvenile delinquent" refer to status offenders and, if not, are status offender wards eligible for Federal funds?

*A:*  It is the Department's position that "juvenile delinquent" refers only to those children who have been adjudicated as having committed a delinquent act(s) and does not include status offenders.  This interpretation is clearly supported by the legislative history.

*Source:*  *ACYF-CB-PIQ-82-10 (8/11/82)ACYF-CB-PIQ-82-10 (8/11/82)*
*Reference:  Social Security Act - section 470*

**8.3A.2    TITLE IV-E, Foster Care Maintenance Payments Program, Eligibility, Age**

*1*  *Q:*  For what classes of title IV-E eligible children does title IV-E allow continuation of foster care maintenance payments after age 18 and reimbursements for those payments?  May a State, for example, claim Federal financial participation (FFP) for children in foster care who have mental or physical handicaps who remain in care until age 21?

*A:*  Under section 406 (a) of the Social Security Act (the Act) (as in effect on July 16, 1996) a dependent child is defined as one under the age of 18.  This age limit applies to title IV-E foster care eligibility under section 472 of the Act.  The only exception under section 406 (a) is (at State option) for those children who are over 18 and under the age of 19 and who are full time students expected to complete their secondary schooling or equivalent training before reaching age 19.  There is no provision under title IV-E which specifically allows payments on behalf of mentally or physically handicapped children in foster care who are age 18 or older.  Therefore, no federal financial participation is available for such payment unless the requirements of 45 CFR 233.90 are met.

 On the other hand, title IV-E adoption assistance (at State option) may be continued to age 21 with respect to a child with a mental or physical handicap.

*Source:*  *ACYF-CB-PIQ-85-05 (4/12/85)ACYF-CB-PIQ-85-05 (4/12/85)*
*Reference:  Social Security Act - sections 406 (a) (as in effect on July 16, 1996) and 472*

**EXHIBIT C**

# *Child Welfare Policy Manual*

*2* *Q:* Can a youth who was previously title IV-E eligible who has "aged out" of foster care at age 18 retain his/her title IV-E eligibility if he/she re-enters foster care?  The youth is under age 19 and expected to graduate from high school before reaching the age of 19.

*A:* No.  The State must newly determine the child's title IV-E foster care eligibility once a child ages out of foster care at age 18 and the State no longer has placement and care responsibility.  Section  8.3A.10 Q&A2 of the Child Welfare Policy Manual explains that a re-determination of title IV-E eligibility is permitted only when the child is continuously in foster care status and remains under the responsibility of the State agency for placement and care, neither of which is the case as described.

However, a youth at age 18 could retain his/her title IV-E eligibility if s/he provides written authorization for the State's <em>continued</em> placement and care responsibility prior to aging out of foster care, and is a full time student and expected to complete his/her secondary schooling or equivalent training before reaching age 19 consistent with the State's former AFDC plan.

*Source:* *12/31/0712/31/07*
*Reference:  Social Security Act   section 472(a)(3); Child Welfare Policy Manual section 8.3A.10 Q&A2*

## 8.3A.3    TITLE IV-E, Foster Care Maintenance Payments Program, Eligibility, Biological parents

*1* *Q:* Since adoption assistance is not available for children adopted by biological parents, would Federal financial participation (FFP) under title IV-E foster care be available in those homes if the parents do not adopt and the agency retains guardianship and responsibility for placement and care?

*A:* No. Title IV-E foster care maintenance payments are available for AFDC-eligible children who have been removed from their own homes and placed in a foster family home or child care institution. By definition, foster care is provided by someone other than a biological parent.

While a termination of parental rights severs the legal ties between the parent and the child, it does not change the biological relationship with the child. A child living with his parents would not be considered to be living in a foster home and, thus, would not be eligible for title IV-E foster care maintenance payments.

**EXHIBIT C**

# *Child Welfare Policy Manual*

Source:      ACYF-CB-PIQ-89-04 (8/8/89)ACYF-CB-PIQ-89-04 (8/8/89)

Reference:  Social Security Act - sections 472 (a)(2)(A) and (C), 472 (b)

2  *Q:*  When a child is removed from the custodial parent and placed by the State for a temporary period of time with the non-custodial parent under the placement and care responsibility of the State title IV-E agency, and then the State agency subsequently moves the child to a licensed foster family home, must the State agency obtain another removal order in order to claim title IV-E?

*A:*  No.  The child is not eligible for title IV-E while placed with the non-custodial parent (see Child Welfare Policy Manual Section 8.3A.3 Q/A #1).  However, the child's placement with the non-custodial parent has no bearing on whether the State may claim title IV-E reimbursement for the child when s/he is later placed in a licensed foster family home, so long as the State maintains placement and care responsibility and the child otherwise meets the criteria in sections 472(a)(2)(A) and (B) and 472(a)(3) of the Act.  Presuming the State has already obtained a contrary to the welfare finding in relation to the custodial parent, it remains valid for title IV-E purposes unless the State's placement and care responsibility ends and the child is removed again pursuant to a court order or voluntary placement agreement.

Source:      12/6/200712/6/2007

Reference:  Social Security Act   sections 472(a)(2)(A) and (B); 45 CFR 1355.20

**EXHIBIT C**

# *Child Welfare Policy Manual*

**8.3A.4     TITLE IV-E, Foster Care Maintenance Payments Program, Eligibility, Child in facility outside scope of foster care**

*1  Q:*  How is a child's IV-E eligibility impacted by an interruption in a foster care episode, for example, a temporary placement in a detention facility or psychiatric hospital?

*A:*  States have two options for addressing the scenario presented in this question:

First, despite the interruption in foster care, the State may choose to treat the foster care placement as continuous if the original court order pertaining to the child's removal from the home is still in effect.  If the State chooses to do so, it must redetermine the child's eligibility for title IV-E upon his/her placement in a foster family home or child-care institution by verifying the child's need and deprivation.

Alternatively, the State may treat the placement in a facility that is outside the scope of foster care as a discharge from foster care.  If so, the State must, re-establish the child's title IV-E eligibility, which includes obtaining the requisite judicial determinations.

Regardless of the option the State chooses, no Federal financial participation is available while the child is placed in a facility that is considered outside the scope of "foster care."

*Source:     Questions and Answers on the  Final Rule (65 FR 4020) (1/25/00)Questions and Answers on the  Final Rule (65 FR 4020) (1/25/00)*

*Reference:  Social Security Act - section 472 (a); 45 CFR 1355.20*

**EXHIBIT C**

# *Child Welfare Policy Manual*

*2*  *Q:*  How should the State establish title IV-E eligibility for a child who is temporarily placed in a facility that is considered outside the scope of "foster care," such as a detention facility or psychiatric hospital, prior to his/her placement in foster care?  When may the State begin to claim for such child if s/he is placed in foster care?

*A:*  The State must comply with the title IV-E eligibility criteria as set forth in the statute at section 472 (a) of the Social Security Act (the Act) and the implementing regulations at 45 CFR 1356.21(b), (c), and (d). The State must establish the child's eligibility at removal (which includes meeting the Aid to Families with Dependent Children eligibility requirements as in effect on July 16, 1996 and judicial determinations to the effect that the child's removal from the home was contrary to his/her welfare and that reasonable efforts were made to prevent such removal) even for children who are not initially placed in a foster care setting. Title IV-E is an entitlement program and, as such, no flexibility exists with respect to satisfying the requisite eligibility criteria. If such eligibility criteria are not satisfied within the time frames prescribed in the regulation, the child is ineligible for title IV-E funds.

When the child is transferred to a facility that meets the requirements of section 472 (c) of the Act, Federal financial participation is available from the first day of placement in the month in which all title IV-E eligibility requirements are met.

*Source:    Questions and Answers on the  Final Rule (65 FR 4020) (1/25/00); ACYF-CB-PIQ 88-03 (4/11/88)Questions and Answers on the  Final Rule (65 FR 4020) (1/25/00); ACYF-CB-PIQ 88-03 (4/11/88)*
*Reference:  Social Security Act - section 472; 45 CFR 1356.21*

**EXHIBIT C**

# *Child Welfare Policy Manual*

3   *Q:*   When a child is removed from the custodial parent and placed by the State for a temporary
period of time with the non-custodial parent under the placement and care responsibility of the
State title IV-E agency, and then the State agency subsequently moves the child to a licensed
foster family home, must the State agency obtain another removal order in order to claim title
IV-E?

*A:*   No.  The child is not eligible for title IV-E while placed with the non-custodial parent (see Child
Welfare Policy Manual Section 8.3A.3 Q/A #1).  However, the child's placement with the non-
custodial parent has no bearing on whether the State may claim title IV-E reimbursement for
the child when s/he is later placed in a licensed foster family home, so long as the State
maintains placement and care responsibility and the child otherwise meets the criteria in
sections 472(a)(2)(A) and (B) and 472(a)(3) of the Act.  Presuming the State has already
obtained a contrary to the welfare finding in relation to the custodial parent, it remains valid for
title IV-E purposes unless the State's placement and care responsibility ends and the child is
removed again pursuant to a court order or voluntary placement agreement.

*Source:*     *12/6/200712/6/2007*
*Reference:  Social Security Act   sections 472(a)(2)(A) and (B); 45 CFR 1355.20*

**8.3A.5      TITLE IV-E, Foster Care Maintenance Payments Program, Eligibility, Child of a minor parent**

1   *Q:*   Please explain the requirements with respect to title IV-E eligibility and the case review system
at section 475(5) of the Social Security Act (the Act) for a child and his/her minor parent in
foster care.  Specifically:  Must the State have placement and care responsibility of both?  Is
the child considered to be in foster care even if the State does not have placement and care
responsibility?  May the child continue to receive IV-E if the minor parent runs away?  May the
State claim administrative costs for the child?  Is the child eligible for medical assistance under
title XIX and social services under title XX?

*A:*   Section 475(4)(B) of the Act requires that foster care maintenance payments for a minor parent
in foster care cover a child of such parent if the child is placed with the minor parent.  Neither
the statute nor regulations require the State to have placement and care responsibility for the
child in order for such costs to be included in the minor parent?s foster care maintenance
payment.  Good social work practice suggests that the minor parent?s case plan include the
needs of the child and that the child?s needs and interests be addressed during the six-month
periodic reviews and permanency hearings held on behalf of the minor parent.  However, the
State is not required to satisfy these requirements independently on behalf of the child

**EXHIBIT C**

# *Child Welfare Policy Manual*

because s/he is not under the State?s responsibility for placement and care and, therefore, pursuant to Federal law and regulations, is not in foster care.

 In cases where the State has placement and care responsibility for both the minor parent and the child, title IV-E eligibility would have to be determined individually for each.  Likewise, if a minor parent leaves the foster home and does not take the child, the child?s eligibility for foster care then would be based upon his or her individual circumstances.  In addition, the State would have to obtain responsibility for placement and care of the child through either a voluntary placement agreement or a court order with the required judicial determinations.  Once the child of a minor parent is in foster care, the requirements of the case review system at section 475(5) of the Act apply.

 When a child is placed with his/her minor parent without placement and care responsibility by the State, no administrative costs may be claimed on her/his behalf because s/he is not eligible for nor a recipient of title IV-E foster care maintenance payments.  The State is merely increasing the amount of the title IV-E foster care maintenance payment made on behalf of the eligible minor parent to accommodate the board and care of the child.  In situations where the eligibility of the minor parent and his/her infant are determined separately and both are placed in foster care, the State may claim administrative costs for the child because s/he is eligible for and receiving title IV-E maintenance payments in her/his own right.

 Section 472(h) of the Act makes clear that a child whose costs are covered by the title IV-E payment made with respect to the minor parent is a child with respect to whom foster care maintenance payments are made under title IV-E and is thus eligible for medical assistance and social services under titles XIX and XX.

*Source:      06/09/0406/09/04*

*Reference:  Social Security Act   sections 472 and 475 and Titles XIX and XX; 45 CFR 1356.21*

*2  Q:*  If the child of a minor parent, who is a title IV-E recipient, has resources, such as survivor benefits, how would the resources of the infant affect his/her minor parent's eligibility for title IV-E foster care maintenance payments?

*A:*  Section 475 (4)(B) of the Social Security Act requires States to include in the foster care maintenance payment for a minor parent an amount necessary to cover the costs of maintenance of the son or daughter living in the same foster home or institution with such minor parent. Eligibility of the son or daughter under title IV-E is not a condition of the

**EXHIBIT C**

# *Child Welfare Policy Manual*

increased maintenance payment on behalf of the minor parent. Rather, it is the title IV-E eligibility of the minor parent that allows the increased payment to include an amount to meet the son's or daughter's needs in that home.

*Source:    ACYF-CB-PIQ-91-02 (4/2/91)ACYF-CB-PIQ-91-02 (4/2/91)*

*Reference:  Social Security Act - sections 472 (h) and 475 (4)(B)*

**3** **Q:** Are both a teen mother and her child eligible for Federal financial participation under title IV-E if both are under the placement and care responsibility of the State and have been placed in the same foster family home?  If so, would the minor child continue to be eligible for title IV-E if the court orders that the child be reunited with the teen mother?

**A:** If a teen mother and her child are both in the same foster family home and each has been determined to be eligible for title IV-E, the State can claim FFP under title IV-E foster care for both the teen mother and her child.  This includes foster care maintenance payments and administrative costs.  In this situation, both the child and mother have been determined eligible for title IV-E foster care, and placed in a licensed foster family home.  The fact that the teen mother and her child are in the same foster home does not mean that they have been ?reunified? in the statutory sense, as the foster parent and not the teen parent, is responsible for the day-to-day care and supervision of the child.

If reunification of the child with the teen mother has occurred and the child is no longer under the responsibility of the State for placement and care, the child is no longer eligible for a title IV-E payment.  (We use the term ?reunification? here to refer to situations in which a child is returned to the parent?s control and is no longer under the care or supervision of the State.)  In such situations, the State must include amounts necessary to cover the costs incurred on behalf of the child in the teen mother?s title IV-E payment.  (See Section 475(4)(B)(ii) of the Act, 45 CFR 1356.21(j), and CWPM 8.3.A.5)  However, once the child is no longer under the responsibility of the State for placement and care, the State cannot continue to claim administrative costs on his or her behalf since s/he is not eligible for, nor a recipient of, title IV-E foster care maintenance payments.

*Source:    06/09/0406/09/04*

*Reference:  Social Security Act   sections 472 and 475;  45 CFR 1356.21.*

**EXHIBIT C**

## *Child Welfare Policy Manual*

**8.3A.6     TITLE IV-E, Foster Care Maintenance Payments Program, Eligibility, Contrary to the welfare**

*1  Q:* Do you consider an emergency order (sometimes referred to as a "pick-up order" or "ex-parte order") as the first court ruling for the purpose of meeting the contrary to the welfare requirements?

*A:* We have made no distinction about the type of order in which the contrary to the welfare determination is required.  Such a determination must be made in the very first court order pertaining to the child's removal from home.  If the emergency order is the first order pertaining to a child's removal from home, then the contrary to the welfare determination must be made in that order to establish title IV-E eligibility.

*Source:     Preamble to the Final Rule (65 FR 4020) (1/25/00)Preamble to the Final Rule (65 FR 4020) (1/25/00)*
*Reference:  45 CFR 1356.21 (c)*

*2  Q:* For purposes of meeting the section 472 (a)(2)(A)(ii) eligibility requirement, must a temporary detention order include "contrary to the welfare" language or is it possible to consider a later delinquency adjudication order or dependency adjudication order as the removal order?

*A:* The statute requires that the "removal" from the home must occur as the result of a judicial determination to the effect that continuation therein would be contrary to the child's welfare.

 Therefore, such a determination must be made in the order that results in the removal of the child from the home. Since the child has already been removed from his home and is in detention as the result of a temporary detention order, the later hearing order only sanctions that removal. A child would remain ineligible during the entire foster care placement if the "contrary to the welfare" determination is not made at the time of the temporary detention order.

*Source:     ACYF-CB-PIQ-91-03 (4/3/91)ACYF-CB-PIQ-91-03 (4/3/91)*
*Reference:  Social Security Act - section 472 (a)(2)(A)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

**3  Q:**  A child is ineligible for an entire foster care episode for failure to satisfy the contrary to the welfare requirements.  Please explain the rationale for this position.

**A:**  The contrary to the welfare determination is a critical statutory protection and a criterion for establishing title IV-E eligibility.  Once a child is removed from home, the State cannot go back and "fix" an inappropriate removal. If a child's removal from home is not based on a judicial determination that it was contrary to the child's welfare to remain in the home, the child is ineligible for title IV-E funding for the entire foster care episode subsequent to that removal because there is no opportunity to satisfy this eligibility criterion at a later date.  The same does not hold true for all other eligibility criteria.  For example, judicial determinations regarding reasonable efforts to finalize a permanency plan, placement in a licensed foster family home or child care institution, and State agency responsibility for placement and care are all title IV-E eligibility criteria that can be reestablished if lost or established at a later time if missing at the beginning of a foster care episode.  This is not the case with the contrary to the welfare determination.

*Source:    Preamble to the Final Rule (65 FR 4020) (1/25/00)Preamble to the Final Rule (65 FR 4020) (1/25/00)*
*Reference: 45 CFR 1356.21 (c)*


**4  Q:**  Court orders that sentence a child to a juvenile detention facility often include language which differs from that in a dependency order resulting in a foster care placement. Does language in a detention order indicating that the child is a "threat to himself or the community" meet the requirement in section 472(a)(2)(A)(ii) regarding "contrary to the welfare?"

**A:**  A court order indicating that the child is a threat to himself satisfies the requirement of a determination that remaining in the home would be contrary to the child's welfare. However, if the court order indicates only that the child is a threat to the community, such language would not satisfy the requirement for a determination that continuation in the home would be contrary to the child's welfare.

*Source:    ACYF-CB-PIQ-91-03 (4/3/91)ACYF-CB-PIQ-91-03 (4/3/91)*
*Reference: Social Security Act - section 472 (a)(2)(A)(ii)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

5   *Q:*  If a temporary detention order states that the child is to be detained until sentencing because there is reason to believe he would run away, would this satisfy the requirement for a determination regarding "contrary to the welfare?"

*A:*  No. This language could not be construed to mean that to continue in the home would be "contrary to the (child's) welfare." It is important to remember that the judicial determinations required for title IV-E eligibility were intended to ensure that children were not removed from their homes unnecessarily. In juvenile justice procedures, where children are removed for correctional purposes, the courts must determine that continuation in the home would be contrary to the child's welfare if title IV-E eligibility is to be established.

*Source:*     ACYF-CB-PIQ-91-03 (4/3/91)ACYF-CB-PIQ-91-03 (4/3/91)
*Reference:*  Social Security Act - section 472 (a)(2)(A)(ii)

6   *Q:*  Our State presently petitions the court for protective supervision of a child (not legal custody) with the right to place the child. The petition is based on the child's being within the jurisdiction of the court on the basis that the child is abused, neglected, or is beyond the control of the parents.  If the State is given protective supervision with the right to place, it is based on that petition. If placement becomes necessary, placement is made without the State needing to return to court for an amended order. In some situations, the child is already in placement under an immediate physical custody order of the court.

Is the granting of a State's petition for protective supervision with the right to place and the subsequent placement of the child sufficient to make an otherwise eligible child qualify for foster care payments under title IV-E?

*A:*  No. The Social Security Act, at section 472 (a)(2)(A), requires that the removal of a child from the home be the result of a voluntary placement agreement or a judicial determination to the effect that continuation therein would be contrary to the welfare of the child.

 If the court grants protective supervision responsibility to the State agency and leaves to that agency the option to remove the child from the home at a later time, the requirement in section 472 (a)(2)(A)(ii) for a judicial determination has not been met. Although there are no Federal requirements as to the exact language of court orders, the Act requires a judicial determination to the effect that continuation in the child's home would be contrary to his welfare. The granting of a petition for protective supervision with the right to place the child is not sufficient to meet

**EXHIBIT C**

# *Child Welfare Policy Manual*

this requirement.

At the time of removal, if a judicial determination is made that amends the earlier order granting protective supervision that sanctions the removal and satisfies the requirements in section 472 (a)(2)(A)(ii), the otherwise eligible child would then become eligible for title IV-E.

*Source:    ACYF-CB-PIQ-84-05 (7/5/84); ACYF-CB-PIQ-85-07 (6/25/85)ACYF-CB-PIQ-84-05 (7/5/84); ACYF-CB-PIQ-85-07 (6/25/85)*

*Reference: Social Security Act - section 472(a)(2)(A)*

*7   Q:*  After a dependency petition is filed, the court finds reasonable grounds to believe a child is dependent and would be endangered in his or her home and enters a temporary shelter order causing the child to be taken in to custody.  The child is then placed in foster care by the State agency.  Does this temporary shelter order constitute a "judicial determination" as required for a State to receive Federal financial participation (FFP) in the costs of the child's foster care maintenance under the title IV-E program?  May FFP begin from the date of the shelter order, if the order is not rescinded or otherwise revised so that it no longer supports the removal of the child from the home?

*A:*  A temporary shelter care order that meets the requirements of a "judicial determination" would permit the authorization of FFP as of the date of the shelter care order, provided all other eligibility requirements are met. As to the requirements of a "judicial determination," the essential element is that the court order (temporary or dispositional) for removal of the child from the home is based on a determination that continuation therein would be contrary to the welfare of the child.

It is correct that FFP would have to be discontinued if at a subsequent hearing the court order was rescinded or revised so that it no longer supported the removal of the child from the home. It is also correct that the date the judicial proceedings are initiated is not the date the judicial determination is made, if the initiated action is only a petition or summons, unless the judicial determination is made on the same date.

A State may claim Federal matching for costs of children placed involuntarily in foster care only after judicial determinations are made (1) that continuation in the home would be contrary to the welfare of the child and (2) that reasonable efforts had been made to prevent the removal of the child from the home. Once the court order is issued (either a temporary or dispositional order), FFP may be claimed only from the first day the child is in the foster home; provided all other title IV-E eligibility criteria are satisfied.

**EXHIBIT C**

# *Child Welfare Policy Manual*

*Source:    ACYF-CB-PIQ-82-03 (1/29/82)ACYF-CB-PIQ-82-03 (1/29/82)*

*Reference: Social Security Act - section 472*

*8  Q:*  Once a court order is issued with a judicial determination that remaining in the home is contrary to the child's welfare, does the State have to actually remove the child at that time and place the child in foster care?

*A:*  Yes.  Section 472(a)(2) of the Social Security Act predicates a child's receipt of title IV-E funds on the child's removal from home as the result of either a voluntary placement agreement or a judicial determination that to remain at home is contrary to the child's welfare.

The judicial determination that results in the child's removal must coincide with (i.e., occur at the same time as) the agency's action to physically or constructively remove the child, unless the court order specifies an alternative timeframe for removal, as allowed for in the Departmental Appeals Board (DAB) decision # 2017.

If a court makes a judicial determination that it is contrary to the child's welfare to remain at home (without specifying an alternative timeframe) and the child does, in fact, remain at home and no removal occurs, the requirement for removal is not met and the child is ineligible for title IV-E.  If the child's safety is not at risk and a State chooses to offer support services to the family in-home to prevent having to remove the child, it should do so.  States cannot issue "blanket" removal orders, however, in an attempt to guarantee title IV-E eligibility in the event that the child has to be removed from home at some point in the future.

*Source:    1/29/20071/29/2007*

*Reference: Social Security Act   section 472(a)(2)*

**EXHIBIT C**

## *Child Welfare Policy Manual*

**8.3A.7    TITLE IV-E, Foster Care Maintenance Payments Program, Eligibility, Documentation of judicial determinations**

*1*  *Q:*  Please explain the rationale for the policy of requiring judicial determinations to be explicit, made on a case-by-case basis, and so stated in the court order and provide guidance on how to satisfy this requirement.

*A:*  The basis for this policy can be found in the legislative history of the Federal foster care program.  The Senate report on the bill that became Public Law 96-272 characterized the required judicial determinations as "... important safeguard[s] against inappropriate agency action..." and made clear that such requirements were not to become "... a mere pro forma exercise in paper shuffling to obtain Federal funding..." (S. Rept. No. 336, 96th Cong., 2d Sess. 16 (1980)).  We concluded, based on our review of States' documentation of judicial determinations over the past years, that, in many instances, these important safeguards had become precisely what Congress was concerned that they not become.

 States have a great deal of flexibility in satisfying this requirement.  For example, the court order may reference the facts of a court report, related psychiatric or psycho-social report, or sustained petition as a mechanism for demonstrating that judicial determinations are made on a case-by-case basis.  If the State can demonstrate that such determinations are made on a case-by-case basis through a checklist then that is acceptable also.

*Source:    Preamble to the Final Rule (65 FR 4020) (1/25/00)Preamble to the Final Rule (65 FR 4020) (1/25/00)*

*Reference:  45 CFR 1356.21 (d); S. Rept. No. 336, 96th Congress, 2nd Session 16 (1980)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

*2* *Q:* Some States do not transcribe court hearings; rather, court clerks take "bench notes" during the course of a hearing.  Are these "bench notes" acceptable for purposes of meeting the documentation requirements of 45 CFR 1356.21(d)?

*A:* No. Bench notes do not constitute acceptable documentation of judicial determinations.  In accordance with the regulations, the only acceptable alternative documentation of judicial determinations, absent language in a court order, is a transcript of the court proceedings.  We recommend that the State agency collaborate closely with the judicial system to assure that the necessary judicial determinations are made and appropriately recorded for children who must be removed from their homes.

*Source:     Questions and Answers on the Final Rule (65 FR 4020) (1/25/00)Questions and Answers on the Final Rule (65 FR 4020) (1/25/00)*
*Reference:  45 CFR 1356.21 (d)*


*3* *Q:* Please clarify whether a judicial determination to satisfy title IV-E eligibility criteria must use the exact terminology of "contrary to the welfare," "reasonable efforts to prevent removal" or "reasonable efforts to finalize a permanency plan."

*A:* Judicial determinations do not need to contain the exact language in the statute at section 472(a)(2)(A)(ii) of the Social Security Act (the Act) or regulations at 45 CFR 1356.21(b) and (c) to satisfy the title IV-E eligibility requirements.  As specified in the preamble to the final rule published on January 25, 2000 (65 FR 4056), the judicial determinations must convey that the court has determined that the requisite findings have been made.  If the judicial determination is not made in a court order, a transcript of the proceedings that indicates that the judicial determination was made is the only other  acceptable documentation .

*Source:     12/6/200712/6/2007*
*Reference:  Social Security Act   472(a)(2)(A)(ii); 45 CFR 1356.21; 65 FR 4056*

**EXHIBIT C**

# *Child Welfare Policy Manual*

**8.3A.8     TITLE IV-E, Foster Care Maintenance Payments Program, Eligibility, Facilities requirements**

No questions and answers are available at this time.

**8.3A.8a     TITLE IV-E, Foster Care Maintenance Payments Program, Eligibility, Facilities requirements, child-care institution**

*1  Q:*  When and under what conditions can a public agency or unit of government claim reimbursement under title IV-E for multiple facilities operated as licensed public child care institutions for 25 or fewer children?

*A:*  Only public child-care institutions which are clearly and definitely separate entities serving 25 or fewer children are covered under the provisions in section 472 of the Social Security Act. Child care institutions operated by a public agency or unit of government must be separate entities that are managed or administered as individual programs complete in themselves.

In addition to a license or approval for 25 or fewer children, other criteria that are indicative of an independent, discrete facility are: (a) separate budget; (b) separate on-site management, including control over personnel, i. e. hiring and firing; (c) separate control over intake and discharge; (d) separate control over development of the child care program; and (e) separate identification of program/treatment purposes and goals.

Although cottages on the same plot of land are not considered to be separate entities, physical proximity to other facilities is not in itself a factor that would disqualify an institution that has otherwise demonstrated its autonomy.  For example, a county may operate several small institutions throughout the county within a short distance from each other.  If they are not on a common lot and do not share the same address or history of being one institution, it is possible that the costs of care in each facility may be allowable for FFP, if all other conditions, as outlined above, are met by the institution.

*Source:      ACYF-CB-PIQ-88-04 (7/19/88)ACYF-CB-PIQ-88-04 (7/19/88)*
*Reference:  Social Security Act - section 472 (c)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

*2*  *Q:*  An inquiry from a State described a situation in which a local governmental unit is operating a residential child care facility that consists of several cottages on a common plot of land. One of the cottages, licensed by the State, has a licensed capacity of 25 or fewer children. Another cottage is also licensed, but for more than 25. The question is: are the costs of care in the cottage of 25 or less eligible for Federal financial participation (FFP), since it has an individual license and is not considered, for purposes of licensing, as a part of the other cottage housing more than 25 children?

*A:*  No. Despite the fact the individual cottage is licensed for 25 or fewer children, it is considered to be part of a single larger institution. The cottages, as described, are located on a common plot of land and are operated and managed by a single administration. Decentralization of living units from one large building to several smaller cottages does not qualify the institution under the definition of "child-care institution" in section 472 (c) of the Social Security Act. Therefore, the costs of foster care maintenance for children living in a public institution of this type, with a total population of over 25, may not be claimed for FFP under title IV-E.

Congressional intent is clear in the Senate Committee Report (No. 96-336 p. 16): "the committee expects that the administration will closely monitor claims for reimbursement under this authority to assure that payments are not made with respect to care in large institutions which have made superficial changes, such as the establishment of a 'group home' wing within a larger institution. The committee intends that only institutions which are clearly and definitely separate entities serving 25 or fewer children will be covered by the provision."

In addition, the House Conference Report (No. 96-136 p.54) stated that foster care payments for children placed in large public institutions would be disallowed, "even though a wing on the institution, a dormitory, or a cottage on the grounds of the institution may have 25 or fewer residents."

*Source:*     *ACYF-CB-PIQ-88-04 (7/19/88)ACYF-CB-PIQ-88-04 (7/19/88)*
*Reference:  Social Security Act - section 472 (c); House of Representatives Conference Report No. 96-136 and Senate Committee Report No. 96-336*

*3*  *Q:*  What is the operative definition of the term "primarily" when used to describe a facility for the detention of children?

*A:*  Section 472 (c)(2) of the Social Security Act (the Act) defines "child-care institution". The word

**EXHIBIT C**

# *Child Welfare Policy Manual*

"primarily" is used to modify the use of the facility for detention purposes.  The following questions are asked when determining the "primarily" issue:  (a) Who operates the facility?  (b) For what purposes does it exist?  (c) Is it licensed or approved?  If so, for what use and by whom?  (d) From whom does it receive its major financial resources?  (e) What type of children are residents?  (f) Would it be viable without the need to house children adjudicated delinquent?  (g) Is the facility physically restrictive?

 In addition to these questions, the Department would look to the specific facts of a given situation.  However, it is important to keep in mind that separation of serious juvenile offenders from foster care children (including status offenders) is a most significant practice issue.  To expose a dependent child to the potentially negative influence of delinquent children, would usually be considered an inappropriate foster care placement decision.

*Source:    ACYF-CB-PIQ-82-10 (8/11/82); ACYF-CB-PIQ-88-03 (4/11/88)ACYF-CB-PIQ-82-10 (8/11/82); ACYF-CB-PIQ-88-03 (4/11/88)*

*Reference:  Social Security Act - sections 472; 45 CFR 1355.20*

*4*  *Q:*  Is Federal financial participation available for children placed in for-profit child-care institutions?

*A:*  Formerly, title IV-E foster care maintenance payments for placements in child-care institutions were restricted to public or private nonprofit institutions.  Effective August 22, 1996 with the enactment of the Personal Responsibility and Work Opportunity Reconciliation Act, title IV-E reimbursement became available for State foster care maintenance expenditures incurred through placements made in eligible private "for-profit" child-care institutions.

*Source:    ACYF-CB-PA-97-01 (7/25/97)ACYF-CB-PA-97-01 (7/25/97)*

*Reference:  Social Security Act - section 472 (c)(2).*

**EXHIBIT C**

# Child Welfare Policy Manual

5  *Q:*  If an otherwise eligible title IV-E child is placed in a child care institution that has locked living units for the child's benefit or safety, does this render the facility "physically restrictive," such that the child is ineligible for title IV-E?

*A:*  Not necessarily. A facility that has locked living units may meet the Federal definition of a child care institution enabling the State to claim title IV-E on behalf of a child.  The statute at section 472 (c)(2) of the Social Security Act requires the State to place the child in a child care institution that meets certain statutory and regulatory requirements.  The law stipulates that a child care institution shall not include detention facilities "or any other facility operated primarily for the detention of children who are determined to be delinquent". The definition of child care institution in Federal regulations at 45 CFR 1355.20 states that:

 [A] Detention facility in the context of the definition of child care institution in section 472 (c)(2) of the [Social Security] Act means a physically restricting facility for the care of children who require secure custody pending court adjudication, court disposition, execution of a court order or after commitment.

 It is clear that States may not claim title IV-E for a child if the facility is "physically restrictive" in that it is used primarily to detain children who require secure custody.  If a facility is not used primarily for this purpose, but the facility has some restrictions for the benefit or safety of the child, then the State may make title IV-E claims on behalf of an otherwise eligible child placed there.

 While the State may claim title IV-E for a child placed in a child care institution that is secured for his or her benefit or safety, we want to note one caveat. The Departmental Appeals Board (California Department of Social Services Decision No. 960) noted in its decision that "a mixture of detention and treatment is common in juvenile law."  Adding a treatment component to a facility that is used primarily to secure delinquent children does not render the child care institution consistent with the strictures of title IV-E.

*Source:*    *6/23/036/23/03*

*Reference:  Social Security Act - Section 472 (c)(2); 45 CFR 1355.20; Departmental Appeals Board California Department of Social Services Decision No. 960.*

**8.3A.8b    TITLE IV-E, Foster Care Maintenance Payments Program, Eligibility, Facilities requirements, foster family home**

**EXHIBIT C**

# *Child Welfare Policy Manual*

*1*  *Q:*  Does the language in the first part of the definition: "Foster family home means the home of an individual or family..." modify the latter statement: "The term may include group homes...or other facilities?"  For example, is corporate ownership of a group home precluded?

*A:*  The sentence of the regulation at 45 CFR l355.20 which refers to group homes or boarding homes does not change the required nature of the facility, which must be the home of an individual or family. A group home owned and operated by a corporation would not be within the definition of a foster family home. A foster family group home or foster family boarding home, if it is licensed or approved as such by the State and it is the home of an individual or family, would be considered within the definition of "foster family home," whether payments are made to the individual, family, or to a public agency or non-profit child placement or child care agency (section 472(b)(1) of the Social Security Act).

*Source:*    *ACYF-CB-PIQ-87-04 (8/13/87)ACYF-CB-PIQ-87-04 (8/13/87)*
*Reference:  Social Security Act - section 472; 45 CFR 1355.20 (a)*

*2*  *Q:*  The regulation at 45 CFR 1355.20 (a) which includes a definition of the term "foster family home" as " . . . the home of an individual or family licensed or approved by the State licensing or approval authority(ies), . . . The term may include group homes, agency operated boarding homes or other facilities licensed or approved for the purpose of providing foster care by the State agency responsible for approval or licensing of such facilities."  Is it the intent of 45 CFR 1355.20 to open up the definition of foster family home to what is essentially institutional care (e.g., residential treatment)?

*A:*  No. Title IV-E provides at section 472 (b) that foster care maintenance payments may be made on behalf of a title IV-E eligible child who is either: (1) in the foster family home of an individual; or (2) in a child-care institution.

 It is not the intent of the regulation to equate residential treatment in a child care institution with foster family care.

*Source:*    *ACYF-CB-PIQ-87-04 (8/13/87)ACYF-CB-PIQ-87-04 (8/13/87)*
*Reference:  Social Security Act - section 472 ; 45 CFR 1355.20*

**EXHIBIT C**

## *Child Welfare Policy Manual*

**8.3A.8c     TITLE IV-E, Foster Care Maintenance Payments Program, Eligibility, Facilities requirements, licensing**

*1  Q:* Can the State waive some foster home standards or criteria for licensure or approval of relative foster homes?

*A:* Yes, in certain situations.  In order to meet the requirements of section 471 (a)(10) of the Social Security Act, the State licensing authority must be responsible for establishing standards for foster family homes and child care institutions which are reasonably in accord with recommended standards of national organizations.

However, special situations may arise where there are grounds for waiving a requirement for an individual relative/foster parent on behalf of a foster child.  For example, a relative's dwelling may contain 10% less square feet than necessary to meet normal licensing standards.  In these exceptional circumstances, the reason for the waiver must be documented in the licensing/approval record for the foster home and the certification of licensure/approval must indicate its applicability only to the specific relative child.

All foster care licensing standards should provide equal protection in terms of safety, sanitation, civil rights, and admission policies (where applicable) for all children in care, regardless of their special situations.  Children living in the homes of relatives are entitled to no less protection than children living in non-relative foster homes.

*Source:*     *ACYF-CB-PIQ-85-11 (11/21/85)ACYF-CB-PIQ-85-11 (11/21/85)*
*Reference:  Social Security Act - sections 471 (a)(10), and 472 (c)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

*2  Q:*  Must a foster home be licensed by the State or by a State-certified child placement agency for title IV-E payments to be properly made?

*A:*  No. Although Federal financial participation (FFP) is available for the costs of foster care maintenance only in licensed or approved foster homes or child care institutions, the statute does not limit licensing authority to the State or a State-certified child placement agency. Foster care facilities may be licensed by the State agency responsible for licensing, by other agencies under contract with the title IV-B/IV-E agency, or by Indian Tribal licensing authorities.

The statute at section 472 does not mention Indian Tribes; however, the regulation at 45 CFR l355.20, in defining "foster family home," makes clear that with respect to foster family homes on or near reservations, such homes may be licensed or approved by the Tribal licensing or approval authority(ies). The Indian Child Welfare Act of 1978 at 25 U.S.C. 1931 (b) expressly provides that, for purposes of qualifying for Federal funds under any Federally assisted program, " . . . licensing or approval of foster or adoptive homes or institutions by an Indian tribe shall be deemed equivalent to licensing or approval by a State." In Native Village of Stevens v. Smith, 770 F.2d l486 (9th Cir., 1985), the Court held that: "Congress clearly intended by this section 193l(b) that tribal approval be recognized as equivalent to State licensing or approval." Stevens at 1488.

*Source:*     *ACYF-CB-PIQ-87-01 (3/25/87)ACYF-CB-PIQ-87-01 (3/25/87)*

*Reference:  Social Security Act - section 472; 45 CFR 1355.20; 25 U.S.C. of the Indian Child Welfare Act*

**EXHIBIT C**

# *Child Welfare Policy Manual*

*3*  *Q:*  Must a Tribal foster home meet State licensing standards or be a "relative home" in order to be eligible for payments under title IV-E?

*A:*  Foster homes on or near an Indian reservation or "relative homes" must meet either State licensing standards or Indian Tribal licensing standards.

*Source:*     *ACYF-CB-PIQ-87-01 (3/25/87); Preamble to the Final Rule (65 FR 4020) ( 1/15/00)ACYF-CB-PIQ-87-01 (3/25/87); Preamble to the Final Rule (65 FR 4020) ( 1/15/00)*

*Reference:  Social Security Act - section 471 (a)(10); 45 CFR 1355.20; 25 U.S.C. of the Indian Child Welfare Act*

*4*  *Q:*  Both sections 401 (c)(1)(A) and 411 (c)(1)(A) of the Personal Responsibility Work Opportunity Reconciliation Act (PRWORA) define Federal, State, and local public benefits to include professional or commercial licenses. Is a foster care or adoptive home license/approval considered a Federal, State, or local public benefit?

*A:*  No. Foster care and adoptive home licenses/approvals are not considered a Federal, State or local public benefit under sections 401(c)(1)(A) and 411(c)(1)(A) of PRWORA because they are not professional or commercial licenses.

*Source:*     *ACYF-CB-PIQ-99-01 (1/14/99)ACYF-CB-PIQ-99-01 (1/14/99)*

*Reference:  Social Security Act - Titles IV-B and IV-E; the Personal Responsibility Work Opportunity Reconciliation Act (PRWORA) (PL 104-193)*

*5*  *Q:*  May a State maintain separate systems that "license" one category of foster family homes, e.g., non-relatives, and "approves" another category, e.g., relatives, as long as both systems adhere to the same standards?

*A:*  Regardless of the term used to denote full licensure or approval, the statute and the regulation require that the State use the same standards to license or approve all foster homes, and the standards used must comprise full licensure or approval of the homes, including all applicable safety requirements. Some States have applied the terms "licensed" and/or "approved" to

**EXHIBIT C**

# *Child Welfare Policy Manual*

foster family homes that have complied with the States' requirements to provide foster care for children under the States' care and placement responsibility. At times, State requirements for "licensure" and "approval" have been different, particularly in their applicability to related and non-related foster family homes. While States may continue to use two different terms to denote licensure or approval of homes, the benefits of doing so are unclear, as the same standards must be used for all homes.

*Source:     Questions and Answers on the Final Rule (65 FR 4020) (1/25/00)Questions and Answers on the Final Rule (65 FR 4020) (1/25/00)*

*Reference:  Social Security Act - section 471 (a)(10); 45 CFR 1355.20*

**6  Q:**  The regulations permit States to claim title IV-E reimbursement made for children placed in foster family homes for a period of time, up to 60 days, between the date the foster family homes meets all the licensing or approval criteria and the date the agency issues the license or approval. When does the 60-day period begin?

**A:**  We recognize that certain administrative procedures may delay the actual issuance of a license beyond the date that all of the required documentation is received by the agency. The 60-day period begins when the agency has, in hand, all of the documentation required to issue a license, based on full compliance with the agency's licensing standards.

*Source:     Questions and Answers on the Final Rule (65 FR 4020) (1/25/00)Questions and Answers on the Final Rule (65 FR 4020) (1/25/00)*

*Reference:  45 CFR 1355.20*

**7  Q:**  We understand the prohibition on claiming FFP for title IV-E foster care maintenance payments on behalf of children placed in foster family homes that are not fully licensed or approved. In situations where a foster home that has a full license or approval is placed on "probation" due to some factor that must be corrected, but maintains the license or approval during the probationary period, can the State claim FFP under title IV-E during the probationary period?

**A:**  The purpose of requiring full licensure or approval of all foster family homes is to assure that the State's licensure or approval standards, including those that protect the health and safety of children, are applied to all foster homes that care for children. If a foster family home is

**EXHIBIT C**

# *Child Welfare Policy Manual*

placed on probation due to lack of compliance with a licensing or approval standard, the State may not claim FFP for foster care maintenance payments during the time that the foster home does not comply with the standards. However, if the home meets all of the licensure or approval standards but is on probation only in the sense that it is a newly licensed home requiring more frequent supervision by the agency, the period of probation would not preclude title IV-E foster care payments being made on behalf of an eligible child in the home.

*Source:     Questions and Answers on the Final Rule (65 FR 4020) (1/25/00)Questions and Answers on the Final Rule (65 FR 4020) (1/25/00)*

*Reference:  Social Security Act - section 471 (a)(10); 45 CFR 1355.20*

8   *Q:*  What is an example of a two-tiered system of licensing, and how does that apply to training foster families?

*A:*  A two-tiered system of licensing is one in which different licensing standards are applied to different groups of foster family homes. For example, different standards for related foster family homes and non-related foster family homes, as well as for "provisional" foster family homes that have not yet met all required standards for full licensure, are two-tiered systems. If a State maintains certain training requirements as a standard to be met for full licensure, the standard must be applied to all foster family homes licensed or approved by the State.

*Source:     Questions and Answers on the Final Rule (65 FR 4020) (1/25/00)Questions and Answers on the Final Rule (65 FR 4020) (1/25/00)*

*Reference:  Social Security Act - section 471 (a)(10); 45 CFR 1355.20*

9   *Q:*  By what authority are Tribes restricted to licensing homes that are on or near Indian reservations?

*A:*  Section 1931 of the Indian Child Welfare Act (ICWA) authorizes Indian tribes and tribal organizations to establish and operate child and family services programs "on or near reservations," including a system for licensing or otherwise regulating Indian foster and adoptive homes.  We use this language at section 1355.20 of the regulations to remain consistent with the ICWA.

**EXHIBIT C**

# *Child Welfare Policy Manual*

*Source:      Preamble to the Final Rule (65 FR 4020) (1/25/00)Preamble to the Final Rule (65 FR 4020) (1/25/00)*

*Reference:  Social Security Act - 45 CFR 1355.20; 25 U.S.C. of the Indian Child Welfare Act*

*10  Q:*  Must foster family homes approved through the tribal process meet the same standard as homes licensed by the State?

*A:*  The definition of "foster family home" at section 1355.20 of the regulations gives tribal licensing or approval authorities the jurisdiction to license or approve homes that are on or near Indian reservations.  This is consistent with the Indian Child Welfare Act at section 1931(b) which states that for purposes of qualifying for funds under a Federally assisted program, licensing or approval of foster or adoptive homes or institutions by an Indian tribe is equivalent to licensing or approval by a State.  The authority to license or approve includes the authority to set standards.

*Source:      Preamble to the Final Rule (65 FR 4020) (1/25/00)Preamble to the Final Rule (65 FR 4020) (1/25/00)*

*Reference:  Social Security Act - 45 CFR 1355.20; 25 U.S.C. of the Indian Child Welfare Act*

*11  Q:*  Licenses for foster family homes and child-care institutions often go into effect or may lapse on a day other than the first or last day of the month.  How should the State claim Federal financial participation (FFP) for a title IV-E eligible child who is placed in a foster family home or child-care institution that is licensed for a portion of a month?

*A:*  If a foster family home or child-care institution is licensed for a portion of a month, the State may claim FFP for the entire month when an otherwise eligible child has resided in that home for the entire month.  The State must prorate any claims when the otherwise eligible child has resided in the home or institution for a portion of the month.

*Source:      Questions and Answers on the Final Rule (65 FR 4020) (1/25/00)Questions and Answers on the Final Rule (65 FR 4020) (1/25/00)*

*Reference:  Social Security Act - section 471 (a)(10)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

**12  *Q:***  Can a State claim title IV-E reimbursement for an eligible child placed in a child-care institution that has a provisional license?  Can the State claim title IV-E if the child care institution has a probationary license due to a violation of State procedures?

**  *A:***  If a child-care institution is granted a provisional license or placed on probationary status due to its failure to fully satisfy all of the State's licensing standards, then children placed in such facility are not eligible for title IV-E foster care maintenance payments.  The child-care institution becomes eligible for Federal financial participation when it comes into full compliance with the State's licensing standards.

*Source:    Questions and Answers on the Final Rule (65 FR 4020) (1/25/00)Questions and Answers on the Final Rule (65 FR 4020) (1/25/00)*
*Reference:  Social Security Act - section 471 (a)(10)*

**13  *Q:***  Does the law require that licensed child-placing agencies in a State use the same foster home licensing standards as the State?

**  *A:***  Yes.  Section 471(a)(10) of the Act requires that the State licensing authority establish licensing standards and apply those standards to any foster family home or child care institution receiving funds under titles IV-B or IV-E of the Act.  Furthermore, 45 CFR 1355.20 requires a State to apply the foster care licensing standards to all foster family homes for which it claims Federal financial participation.  The only exception to these requirements is for foster family homes on or near Indian reservations, which may be licensed or approved in accordance with standards established by the tribal licensing or approval authority.  The fact that a child-placing agency is conducting licensing activities on behalf of a State does not diminish the requirement for the State to apply the licensing standards equally to all foster family homes.  Failure of the State to comply with this requirement will be considered a State plan compliance issue.

 The law does not preclude the State or child-placing agency from establishing additional criteria above and beyond basic State licensing requirements for different levels of care to meet children's needs.  For example, the State may license or approve all foster family homes according to the same minimum standards but require additional criteria for foster families that will provide therapeutic care or care for fragile children with  special medical needs. As long as the State or child-placing agency adheres to the State's basic licensing standards, the State

**EXHIBIT C**

# *Child Welfare Policy Manual*

meets the requirements of section 471(a)(10) of the Act.

*Source:    8/16/028/16/02*

*Reference:  Social Security Act   section 471(a)(10); 45 CFR 1355.20*

**14  Q:** May a State claim title IV-E reimbursement on behalf of an otherwise eligible child when a State s licensure requirements are met as the result of a "variance"?

**A:** Under specific circumstances, a State may claim title IV-E reimbursement on behalf of an otherwise eligible child when a State?s licensure requirements are met through a ?variance?. For title IV-E purposes, a ?variance? is a mechanism that allows the State to meet a standard for licensure in a way other than is specified in the rule that governs licensure in that State.  A ?variance? is acceptable on a case-by-case basis only if the State has the authority to permit "variances", the purpose of the State?s licensing standard is achieved, and the safety of the child is maintained.  A ?variance? constitutes an alternative equivalent method to meet the standard.  For example, a "variance" may be granted when a foster family?s well does not have potable water, and the family purchases bottled water for drinking.  The State?s "variance" from the original rule still meets the State?s licensing requirement that the home is able to provide safe drinking water.

*Source:    September 29, 2005September 29, 2005*

*Reference:  45 CFR 1355.20(a)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

*15* *Q:* May a State claim title IV-E foster care maintenance payments on behalf of an otherwise eligible child who is in a pre-adoptive placement with an adoptive family if the family does not meet the State's foster care license/approval requirements but does meet the State's adoptive home license/approval requirements?

*A:* No.  The State may not claim title IV-E foster care maintenance payments for the child because the child is not in a licensed/approved foster family home as required in section 472(b)(1) of the Social Security Act (the Act).  Although the child is in a home that meets the State's adoptive home approval requirements, the requirement in section 472(b)(1) of the Act that the child be placed in a licensed/approved foster family home is not met.

However, if the child meets the adoption assistance eligibility requirements in section 473(a)(2) of the Act, the State may claim for title IV-E adoption assistance payments paid on the child's behalf once an adoption assistance agreement has been signed by all parties prior to finalization.

*Source:*    April 6, 2006April 6, 2006
*Reference:*  Social Security Act - sections 472(b) and 473(a)

*16* *Q:* In response to a question about foster care provider licenses that go into effect or lapse on a day other than the first or last day of the month, section 8.3A.8c of the Child Welfare Policy Manual (CWPM), Q/A #11, states that "[i]f a foster family home or child-care institution is licensed for a portion of a month, the State may claim Federal financial participation (FFP) for the entire month when an otherwise eligible child has resided in that home for the entire month."  Does this same policy apply in situations where a foster care provider's license is revoked at some point during the month?

*A:* No.  Although it has been long-standing policy that FFP can be claimed from the first day of placement in the month in which all eligibility criteria have been met, such policy does not extend to situations in which a foster care provider's license or approval has been revoked.  Revocation of a license/approval implies that the State has rescinded, withdrawn or otherwise invalidated the provider?s license or approval.  Therefore, instead of the Q/A referred to in the question, section 8.3A.8c of the CWPM, Q/A #7, more appropriately applies to this circumstance.  This Q/A responds to a question about whether FFP can be claimed in situations where a fully licensed foster home has been placed on probation.  The response, in part, states that, "[i]f a foster family home is placed on probation due to lack of compliance with

**EXHIBIT C**

# *Child Welfare Policy Manual*

a licensing or approval standard, the State may not claim FFP for foster care maintenance payments during the time that the foster home does not comply with the standards." Accordingly, a State cannot claim FFP for foster care maintenance payments beyond the date of revocation of a foster care provider's license or approval. A State may, however, claim a full month of administrative costs in accordance with the State's cost allocation plan.

*Source:     8/7/20068/7/2006*

*Reference:  45 CFR 1355.20 (definition of <i>foster family home</i>); Child Welfare Policy Manual, Section 8.3A.8c, Q/A #7 and Q/A #11*

**17  Q:** May a State claim administrative costs during the unlicensed period that a child is placed in a foster family home whose license has expired, but is in the process of renewal?

**A:** Under certain circumstances, it is possible that the State may claim administrative costs in this situation. Please see section 8.3A.8c, question 11 of the Child Welfare Policy Manual in which we allow the State to claim administrative costs for the entire month when an otherwise eligible child has resided in a home for the entire month, even if it is only licensed for a portion of the month. Furthermore, if the State's policies allow an expired license to remain in effect until renewed, the child placed in such a home is considered placed in a licensed foster family home, and the State may claim Federal Financial Participation (FFP) during that period. If, however, the State does not consider the expired license to remain in effect, the State may not claim FFP from the beginning of the month after the license expired until the beginning of the month in which the license is re-issued.

*Source:     04/26/0704/26/07*

*Reference:  Social Security Act   section 471(a)(10), Child Welfare Policy Manual   section 8.3A.8c, question 11*

**EXHIBIT C**

# *Child Welfare Policy Manual*

18  *Q:*  When a child is placed in foster care outside the State that has placement and care responsibility, must the foster family home be licensed by the State in which it is situated for title IV-E eligibility purposes?  Will it be considered an error case on a title IV-E eligibility review if a foster family home is not licensed by the State in which it is situated?

*A:*  Yes to both questions. In order for a child to be eligible for title IV-E foster care maintenance payments, the statute requires that the foster family home or child care institution be licensed by the State licensing authority in the State in which the home is situated.  Section 472(c)(1) of the Social Security Act (the Act) defines foster family home as "a foster family home for children which is licensed by the State in which it is situated or has been approved, by the agency of such State having responsibility for licensing homes of this type, as meeting the standards established for such licensing." The definition for a child care institution in 472(c)(2) of the Act similarly requires licensing or approval by the State in which it is situated.  See the CWPM Section 8.3A.8c, Q/A #2 for the situations in which a Federally-recognized Indian tribal licensing authority may license a foster family homes for title IV-E purposes.

 If during a title IV-E eligibility review, we find that a foster care maintenance payment has been made during the period under review for a child placed in a home (or child care institution) not licensed or approved by the State in which it is situated, the case will be found in error.  If we find such payments were made outside the period under review, the ineligible payments will be disallowed.

*Source:*      11/14/0711/14/07

*Reference:*  Social Security Act   section 472(c)

**EXHIBIT C**

# *Child Welfare Policy Manual*

19  *Q:*  If a State's license or approval of a private child-placing agency expires but that agency continues to license/approve foster family homes on behalf of the State, will the Administration for Children and Families (ACF) consider such homes fully licensed or approved according to State standards for title IV-E eligibility purposes?

*A:*  Section 472(c) of the Social Security Act (the Act) requires a foster family home to be licensed or approved in accordance with section 471(a)(10) of the Act by the agency of the State that has responsibility for licensing such homes.  Therefore, as long as the State considers the foster family home licensed, ACF will consider the title IV-E eligibility requirement met.

*Source:*    *12/31/0712/31/07*

*Reference:  Social Security Act   sections 471(a)(10) and 472(c)*

## 8.3A.9    TITLE IV-E, Foster Care Maintenance Payments Program, Reasonable efforts

1  *Q:*  What is the statutory basis for treating a judicial determination that the State made reasonable efforts to prevent the child's removal from his/her home, to reunify the child and family, and to make and finalize an alternate permanent placement when the child and family cannot be reunited as title IV-E eligibility criteria?

*A:*  Section 472 (a)(2)(A)(ii) of the Social Security Act (the Act) contains two eligibility criteria. The first pertains to the child's removal from home. Such removal must be based on a judicial determination that it was contrary to the child's welfare to remain at home. The second eligibility criterion requires a judicial determination that the State made reasonable efforts of the type described in section 471(a)(15) of the Act. Section 471(a)(15) of the Act requires the State agency to make reasonable efforts to prevent the child's removal from his/her home, to reunify the child and family, and to make and finalize an alternate permanent placement when the child and family cannot be reunited. The requirements for judicial determinations regarding reasonable efforts are title IV-E eligibility criteria. If the eligibility criteria are not satisfied, the child is not eligible for title IV-E funding.

*Source:*    *Preamble to the Final Rule (65 FR 4020) (1/25/00); 7/17/2006Preamble to the Final Rule (65 FR 4020) (1/25/00); 7/17/2006*

*Reference:  Social Security Act - sections 471 (a)(15) and 472 (a)(2)(A)(ii); 45 CFR 1356.21 (b) and (d)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

*2*  *Q:*  May a State receive an extension to the time frames prescribed in the regulation for obtaining judicial determinations regarding reasonable efforts to address the problem of continuances?

*A:*  We are sympathetic to the issue of continuances.  However, we believe that the need for timely judicial determinations is more appropriately addressed by building capacity through training judges and attorneys rather than extending the time frames for satisfying title IV-E eligibility criteria.  Therefore, no extensions may be granted.

*Source:*    *Preamble to the Final Rule (65 FR 4020) (1/25/00)Preamble to the Final Rule (65 FR 4020) (1/25/00)*
*Reference:  45 CFR 1356.21 (b)*

*3*  *Q:*  May a checklist be used to document the reasonable efforts requirements?

*A:*  The regulations, at section 1356.21 (d), requires judicial determinations to be explicit, and made on a case-by-case basis. This requirement is made to assure that the individual circumstances of each child before the court are properly considered in making judicial determinations. If the State can demonstrate that such determinations are made on a case-by-case basis and documented through a checklist, that will be considered acceptable in a title IV-E foster care eligibility review.

*Source:*    *Questions and Answers on the Final Rule (65 FR 4020) (1/25/00)Questions and Answers on the Final Rule (65 FR 4020) (1/25/00)*
*Reference:  45 CFR 1356.21 (d)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

**8.3A.9a    TITLE IV-E, Foster Care Maintenance Payments Program, Eligibility, Reasonable Efforts to Finalize a Permanency Plan**

*1   Q:*  We understand that the timing for obtaining the initial judicial determination related to making reasonable efforts to finalize/achieve a permanency plan is based on the date the child is considered to have entered foster care.  Are subsequent judicial determinations to be obtained based on the date the child is considered to have entered foster care or within 12 months of the date the judicial determination actually was obtained?

*A:*  The statute requires that the judicial determination of reasonable efforts to finalize/achieve a permanency plan be obtained no later than 12 months from the date the child is considered to have entered foster care and at least once every 12 months thereafter while the child is in foster care.  Accordingly, States must use the date of the last judicial determination for a child to determine the date the next one is due.  In no circumstance may the interval between these judicial determinations exceed 12 months.  If a judicial determination regarding reasonable efforts to finalize a permanency plan is not made within the time frame prescribed above, the child becomes ineligible under title IV-E at the end of the month in which the judicial determination was required to have been made and remains ineligible until such a determination is made.

Although the permanency hearing may serve as the mechanism for obtaining the judicial determination of reasonable efforts to finalize/achieve a permanency plan, there is no requirement that the judicial determination be made at a permanency hearing.  The court may make such a judicial determination, based upon evidence presented to it by the State, without a formal hearing.

*Source:      06/09/0406/09/04*

*Reference:  Section 471(a)(15)(B) of the Social Security Act, 45 CFR 1355.20 and 1356.21(b)(2).*

**EXHIBIT C**

# *Child Welfare Policy Manual*

*2* *Q:* Regarding the reasonable efforts to finalize judicial determination: Is the State required to look at the permanency plan in effect at the time the judicial determination is due to see if the court order addresses that specific plan in its reasonable efforts judicial determination?

*A:* No. The State is not required to reconcile the permanency plan in effect at the time the judicial determination is due with the reasonable efforts determination itself.  In order to sustain a child's ongoing title IV-E foster care eligibility, the court must make a judicial determination of reasonable efforts to finalize a permanency plan within 12 months from the date the child is considered to have entered foster care and at least once every 12 months thereafter while the child remains in foster care.  We have indicated that we will not instruct courts on the criteria they are to use to make the judicial determination.  At the same time, however, we recognize the significance of the provision as it relates to moving a child toward permanency.  The courts, therefore, may rule on the plan that is in effect at the time of the finding, a plan that has been in effect for a brief period of time, or the activities related to achieving permanency that took place over the prior 12 months, even if the plan had been abandoned during that 12-month period.  In any event, the judicial determination should reflect the court?s judgment as to whether the agency activities that were performed during the previous 12 months were meaningful in bringing about permanency for the child.

*Source:*   *7/6/057/6/05*

*Reference:  Social Security Act -- Section 471 (a)(15), 45 CFR 1356.21(b)(2), 1356.71(d)(1)(i)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

*3  Q:* Is the State required to obtain a judicial determination regarding reasonable efforts to finalize a permanency plan in accordance with 45 CFR 1356.21(b)(2) for a child placed in foster care as a result of a voluntary placement agreement?

*A:* No.  A judicial determination regarding reasonable efforts to finalize a permanency plan is required only for children removed from their homes via court action (section 472(a)(2)(A)(ii) of the Social Security Act (the Act)).  Although a judicial determination regarding reasonable efforts to finalize a permanency plan is not required, the State must comply with the State plan requirements to provide reasonable efforts for all children as described in section 471(a)(15) of the Act, including those children who are voluntarily placed.

*Source:*     April 6, 2006April 6, 2006

*Reference:  Social Security Act - sections 472(a)(2)(A)(ii) and 471(a)(15); 45 CFR 1356.21(b) and (2) and 1356.22*

*4  Q:* What are the criteria for determining whether a child is ineligible for a title IV-E foster care maintenance payment with respect to the requirement that a judicial determination regarding reasonable efforts to finalize a permanency plan be made within 12 months of the date the child is considered to have entered foster care and every 12 months thereafter?  For example, is a child ineligible from the date the determination is due until such time as the date the determination is made?

*A:* Consistent with the regulation at 45 CFR 1356.21(b)(2)(ii), if a judicial determination regarding reasonable efforts to finalize a permanency plan is not made in accordance with the prescribed schedule, the child becomes ineligible for title IV-E at the end of 12th month following the date the child is considered to have entered foster care or the end of the 12th month from the most recently obtained judicial determination regarding reasonable efforts to finalize a permanency plan.  If the reasonable efforts to finalize a permanency plan determination subsequently is made later for the otherwise eligible child, the State can claim Federal financial participation (FFP) under title IV-E foster care from the beginning of the month in which the judicial determination was made.  See section 8.3A.15 of the Child Welfare Policy Manual, Q/A#1.

 We offer the following example to clarify the policy:

 If the judicial determination regarding reasonable efforts to finalize a permanency plan is due September 10, 2004, but not held until October 18, 2004, the State may claim FFP on behalf of an otherwise eligible child without interruption.  Consistent with the regulation cited above, the

**EXHIBIT C**

# *Child Welfare Policy Manual*

child is eligible until the end of the 12th month in which the determination is due. Therefore, in this example, the child is eligible through September 2004, which is the month in which the determination was due.  Further, in accordance with long-standing Departmental policy, once all eligibility criteria are met for a child, a State may claim Federal financial participation for a child from the first day of placement in the month in which all title IV-E eligibility criteria are met.  Therefore, the child would continue to be eligible for title IV-E benefits from October 1, 2004, since the determination was made in October 2004.

 It should be noted that for a child who entered foster care prior to March 27, 2000 (the effective date of the Final Rule which established the reasonable efforts to finalize a permanency plan requirement at 45 CFR 1356.21(b)(2)), the concept of "the date the child is considered to have entered foster care" is nonexistent.  For those children, the initial reasonable efforts to finalize a permanency plan judicial determination was due no later than March 27, 2001.

*Source:      8/7/20068/7/2006*

*Reference:  Social Security Act   section 471(a)(15)(B)(ii); 45 CFR 1356.21(b)(2)(ii); 65 FR 4052; Child Welfare Policy Manual Section 8.3A.15 Q/A#1*

**EXHIBIT C**

# *Child Welfare Policy Manual*

5   *Q:*   When a child in foster care is placed in another State and the sending State transfers the child's placement and care responsibility to the receiving State s title IV-B/IV-E agency, does the "clock" re-start for determining when the case review requirements or reasonable efforts to finalize a permanency plan are due?

*A:*   No.  The "clock" for the case review requirements and reasonable efforts to finalize a permanency plan judicial determination begins on the date the child is considered to have entered foster care (section 475(5)(F) of the Social Security Act, 45 CFR 1355.20 and 1356.21(b)(2)).  The date the child is considered to have entered foster care is the earlier of the date of the first judicial finding that the child has been subjected to child abuse or neglect, or the date that is 60 days after the child's removal from the home.  The child's transfer from one State to another does not alter either date.  Moreover, we believe that not extending the timeframes for carrying out the protections in such circumstances is consistent with a child's sense of time and the statute?s emphasis on timely permanency for children.

*Source:*      09/05/0709/05/07

*Reference:  Social Security Act - section 475(5)(F); 45 CFR 1355.20 and 1356.21(b)(2)*

**8.3A.9b      TITLE IV-E, Foster Care Maintenance Payments Program, Reasonable efforts, to prevent a removal**

1   *Q:*   Does the initial "reasonable efforts to prevent removal" determination affect the child's initial eligibility for title IV-E foster care payments, or does this determination constitute FFP criteria for claiming foster care maintenance payments?

*A:*   Pursuant to the regulations at section 1356.21(b) (1) (ii), judicial determinations regarding reasonable efforts to prevent removal must be made in accordance with the criteria and time frames specified therein, or the child is not eligible under the title IV-E foster care maintenance payments program for the duration of that stay in foster care.

*Source:      Questions and Answers on the Final Rule (65 FR 4020) (1/25/00)Questions and Answers on the Final Rule (65 FR 4020) (1/25/00)*

*Reference:  Social Security Act - section 472 (a)(2)(A)(ii); 45 CFR 1356.21 (b)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

2  *Q:*  When must the "reasonable efforts to prevent removal" criteria be met; in the initial court order that removes the child or 60 days from the date the child is removed?

*A:*  Pursuant to 45 CFR 1356.21 (b)(1)(i), the State agency must obtain a judicial determination that it either made or was not required to make reasonable efforts to prevent a child's removal from the home no later than 60 days from the date the child was removed from the home. However, the State agency may obtain such a determination earlier than 60 days from the date of removal.

*Source:    Questions and Answers on the Final Rule (65 FR 4020) (1/25/00)Questions and Answers on the Final Rule (65 FR 4020) (1/25/00)*
*Reference:  Social Security Act - section 471 (a)(15); 45 CFR 1356.21 (b)*

3  *Q:*  Title IV-E eligibility for an entire foster care episode is prohibited if the reasonable efforts to prevent removal requirements are not satisfied.  Please explain the rationale for this policy.

*A:*  The requirement for the State to make reasonable efforts to make removals is a fundamental protection under the Social Security Act and one of several criteria used in establishing title IV-E eligibility.  From both a practice and an eligibility perspective, it is impossible for the State to provide efforts to prevent the removal of a child from home after the fact.

 From a practice perspective, the removal of a child from the home, even temporarily, makes a profound impact on a family that cannot be undone.  If the child is returned after services have been delivered, or even immediately, the State has reunified the family, not prevented a removal.

 The statute requires that title IV-E eligibility be established at the time of a removal.  If the State does not make reasonable efforts to prevent a removal or fails to obtain a judicial determination with respect to such efforts, the child can never become eligible for title IV-E funding for that entire foster care episode because there is no opportunity to establish eligibility at a later date.

*Source:    Preamble to the Final Rule (65 FR 4020) (1/25/00)Preamble to the Final Rule (65 FR 4020) (1/25/00)*
*Reference:  45 CFR 1356.21 (b)(1)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

*4* *Q:* For title IV-E eligibility purposes, will the Administration for Children and Families accept a judicial determination that efforts to prevent removal or reunify the family were not necessary for a reason other than those described in 45 CFR 1356.21(b)(3)?

*A:* Yes.  We addressed this issue in the 1998 preamble to the Proposed Rule on <em>Title IV-E Foster Care Eligibility Reviews and Child and Family Services State Plan Reviews</em> (63 FR 50057, 50073).  It states that "[w]hile we recognize that concern for the child's safety may preclude efforts to prevent removal, the court must make a reasonable efforts determination. Even when children are removed in emergency situations, the court must consider whether appropriate services were or should have been provided.  When the court determines that it was reasonable for the agency to make no effort to provide services to prevent removal [or to return the child home] in light of exigent circumstances discovered through assessment of the family, such as the safety or protection of the child, there must be a judicial determination to that effect."  Thus, if there is a judicial determination to the effect that efforts to prevent removal or reunify the family have not been made due to the immediate danger to the child, or that the lack of efforts is appropriate due to the particular circumstances of the case, the reasonable efforts requirements in 45 CFR 1356.21(b)(1) and (2) will be satisfied.

*Source:    12/31/0712/31/07*

*Reference:  45 CFR §1356.21(b); Title IV-E Foster Care Eligibility Reviews and Child and Family Services State Plan Reviews (63 FR 50057, 50073; 65 FR 4020, 4053)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

**8.3A.9c    TITLE IV-E, Foster Care Maintenance Payments Program, Reasonable Efforts, Qualifying Language in Court Orders**

*1  Q:*  Some States have begun to use qualifying language in court orders, which restricts the purpose of the reasonable efforts findings to title IV-E funding purposes only.  For example, in one State, the court annotates its orders with the phrase "for Federal funding purposes only" in order to address parental concerns that the order is entered without prejudice.  Another State proposes adding language to the court order that "the title IV-E judicial determination shall not be given any effect in subsequent court proceedings."  Is the use of qualifiers to the judicial determination of reasonable efforts allowable under title IV-E?

*A:*  No. It is not permissible for a State to use such restrictive language in making the required judicial findings.  When a judicial determination is qualified by language stating or implying that it has been made for the purpose of Federal funding only or that it has no precedential effect, then a bona fide judicial determination has not been made.  An official notation that a finding is for a limited purpose only suggests that it must be "re-made" in order for it to become valid.

 This policy is consistent with legislative history and was addressed in the preamble to the 2000 regulations, which quote S. Rep. No. 336, 96th Cong., 2d Sess. 16 (1980) and make the point that the required judicial determinations should not become "...a mere pro forma exercise in paper shuffling to obtain Federal funding..." (pg. 4056, 65 Fed. Reg.).

 Court orders containing judicial determinations qualified by restrictive language such as that described above will not satisfy title IV-E eligibility requirements for Federal financial participation (FFP).

*Source:*    *7/6/057/6/05*

*Reference:  Social Security Act -- Sections 471(a)(15)(B) and 472(a)(2)(A)(ii)*

**EXHIBIT C**

# Child Welfare Policy Manual

**8.3A.10    TITLE IV-E, Foster Care Maintenance Payments Program, Eligibility, Redeterminations**

*1  Q:*  We believe failure to hold a timely redetermination of title IV-E eligibility is a program issue, not an eligibility issue.  Is this correct?

*A:*  You are correct in your assessment that failure to hold a timely redetermination of title IV-E eligibility is a State plan issue (a program issue, as stated in your question) rather than an issue related to the eligibility of the child for title IV-E foster care maintenance payments.

 Under the Aid to Families with Dependent Children (AFDC) Program, an eligibility redetermination is a State plan requirement (45 CFR 206.10 (a)(9)(iii)) and not a factor affecting the child's eligibility.  While there is no statutory requirement under title IV-E concerning the frequency of eligibility redeterminations, such a procedure should be carried out periodically in order to assure that Federal financial participation is claimed properly. (Section 471 (a)(1) allows for Federal financial participation for foster care maintenance payments only in accordance with the requirements in section 472.  Therefore, the State must assure that the child meets those eligibility requirements.)

 ACYF has advised State agencies that an appropriate period for redetermination would be every 12 months, at which time factors subject to change, such as continued deprivation of parental support and care and the child's financial need would be reviewed and documented. However, if the State agency misses the twelve month eligibility redetermination schedule in certain cases, those cases would not be considered ineligible for Federal financial participation for that reason alone.  When the eligibility review is held, however, if the child is found to have been ineligible for any prior month, no claim for Federal financial participation may be made for that month.

*Source:*    ACYF-CB-PIQ-85-06 (6/5/85)ACYF-CB-PIQ-85-06 (6/5/85)
*Reference:  Social Security Act - sections 471 and 472; 45 CFR 206.10 (a)(9)(iii)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

**2  *Q:*** Is it permissible to allow redeterminations to be used after a break in foster care placement in those cases where there is no new court ordered removal from the home and no break in State responsibility for placement and care?  Examples of situations in which redeterminations are currently being used are as follows: (a) A child in foster care goes to the State training school and then back to foster care; (b) A child in foster care goes to live with a relative (not parent) under State supervision, and then back to foster care; (c) A child in foster care goes home under State supervision without a change in court order and then returns to foster care.

*A:*  The criteria to be used in determining whether an initial determination or redetermination of a child's eligibility for foster care maintenance payments under title IV-E would be required hinge on whether the child is continuously in foster care status and remains under the responsibility of the State agency for placement and care.  In making this determination, the State would ask: (1) Is the child in foster care? (2) Is the original court order or voluntary placement agreement still in effect in relation to removal of the child from his home? (3) Is the child still under the responsibility of the State agency for placement and care?  If all of these conditions are in effect, even though there has been a temporary interruption of the foster care placement, a redetermination of eligibility would be appropriate.

 If the child is discharged from foster care and returned to his own home (the home from which he was removed), he could not be considered to be in foster care status, even if the State agency maintains a supervisory role with the child and family.  If the child leaves foster care to live with a relative, the State agency would need to determine whether the child remained in foster care status or whether the home of the relative was now considered to be the child's own home.  Any continuing foster care status, where the child is still under responsibility of the State agency, would indicate the need for periodic redeterminations of eligibility at regular 12 month intervals.  Short trial visits to a child's home would not be considered interruptions in foster care status.  In the event the child returns home (for what is expected to be a permanent period), but is later returned to foster care, a new determination of eligibility based on circumstances at the time of that placement would be required.  If the child leaves the foster home and is placed in a State training school for a temporary period, and the court order of removal is still in effect, he may retain his foster care status during the training school placement.  A redetermination of eligibility would be required after the child returns to the foster care facility.  Of course, Federal financial participation is allowed only during the time the child is in a licensed or approved foster care facility.

*Source:    ACYF-CB-PIQ-85-06 (6/5/85)ACYF-CB-PIQ-85-06 (6/5/85)*

*Reference:  Social Security Act - section 472*

**EXHIBIT C**

# *Child Welfare Policy Manual*

*3*  *Q:*  During the time the child is receiving title IV-E foster care payments, the parental rights of his parents are terminated.  The child is subsequently moved into a residential care facility which is not eligible to receive foster care payments and the title IV-E case is discontinued.  Later, he is again placed into a foster home and reapplication for title IV-E foster care is made.

In considering eligibility for this reapplication, the deprivation at the time of court action, found initially and verified under the old foster care case, can be utilized.  However, to meet the requirement of "continues to be eligible", must deprivation with regard to the biological parents again be established or may the termination of parental rights be used to constitute deprivation?

*A:*  If the child has not returned to his own home and has been continuously in a foster care status since removal from the home (whether or not the facility is eligible to receive payments under title IV-E), a redetermination of eligibility would be appropriate at the time he returned to a facility eligible for Federal financial participation (FFP).

 A redetermination of the deprivation factor at that tiime would consist of a confirmation that the conditions at the time of removal from the home continued to exist or that termination of parental rights (TPR) had occurred.  In the latter case, the TPR would, from that point and throughout this episode of foster care, become the reason for continuing eligibility in terms of the deprivation factor.

 If, however, the child is not continuously in foster care status and returns to the home of a relative that is considered to be his own home, then a subsequent re-entry into the foster care system requires a new (initial) determination of all eligibility factors.

 In such a situation, where the child was living in the home of another relative after termination of parental rights and was later removed from the home of that relative, deprivation would then be based upon the absence of the parent(s) from the home of the relative, rather than TPR. (See section 406(a) as in effect on July 16, 1996).

*Source:*     *ACYF-CB-PIQ-86-03 (5/9/86)ACYF-CB-PIQ-86-03 (5/9/86)*

*Reference:  Social Security Act - sections 406 (a) and 407 (as in effect on July 16, 1996)*

## 8.3A.11     TITLE IV-E, Foster Care Maintenance Payments Program, Eligibility, Removal from the home/living with

*1*  *Q:*  We are confused by the term "constructive removal"?  Please explain the term and its

EXHIBIT C

# *Child Welfare Policy Manual*

implications for the title IV-E program.

*A:*  To be eligible for title IV-E funding, a child must, among other things, be removed from the home of a relative as the result of a voluntary placement agreement or a judicial determination that continuation in the home would be contrary to the child's welfare.  The statute allows a six-month period of time during which the child can live with an interim caretaker, relative or non-relative, and still be eligible for title IV-E.  Under prior policy, we interpreted the term "removal" to mean a physical removal.  As a result, if the interim caretaker was a relative, and the State intended to remove custody from the parent but let the child remain with that interim caretaker relative, the child could not be eligible for title IV-E funding because the child was not physically removed from the home of a relative.  This policy created a disincentive for relative placements.  To remove this inequity between relative and non-relative caregivers, we now permit the removal of the child from the home, in this circumstance, to be a "constructive" (i.e., nonphysical, paper, or legal) removal.

We offer a summary of examples to clarify when a child would be eligible for title IV-E foster care pursuant to a constructive removal.  These examples presume that the child is eligible for Aid to Families with Dependent Children (AFDC) in the home of the parent or other specified relative:

The child lived with either a related or non-related interim caretaker for less than six months prior to the State's petition to the court for removal of the child.  The State licenses the home as a foster family home and the child continues to reside in that home in foster care.  The child is eligible for title IV-E foster care since s/he lived with the parent within six months of the State's petition to the court, and was constructively removed from the parent (i.e., there was a paper removal of custody).

The child lived with either a related or non-related interim caretaker for more than six months prior to the State's petition to the court.  The State licenses the home as a foster family home and the child remains in that home in foster care.  The child is ineligible for title IV-E foster care since s/he had not lived with the parent within six months of the State's petition to the court, and was not removed from the home of a relative.  (Although constructively removed, the child is ineligible for title IV-E because it had been more than six months since the child lived with the parent.)

The child lives with a related interim caretaker for seven months before the caretaker contacts the State to remove the child from his/her home. The agency petitions the court and the court

**EXHIBIT C**

# *Child Welfare Policy Manual*

removes the custody from the parents and physically removes the child from the home of the interim related caretaker. The child would not be eligible for title IV-E foster care since s/he had not lived with the parent or other specified relative from whom there was a constructive removal within six months of the initiation of court proceedings. (Although the child was physically removed from the home of the related interim caretaker, that removal cannot be used to determine title IV-E eligibility since the removal was not the result of a voluntary placement agreement or judicial determination, as required in section 472 (a)(2)(A) of the Act. Moreover, the child is ineligible for title IV-E because it had been more than six months since the child lived with the parent from whom s/he was removed.)

The child lived with a non-related interim caretaker for seven months before the caretaker asks the State to remove the child from his/her home and place in foster care. The child is ineligible for title IV-E foster care because s/he had not lived with a parent or specified relative within six months of the petition.

The child is in a three-generation household in which the mother leaves the home. The grandmother contacts the State agency four months later and the agency petitions the court within six months of the date the child lived with the mother in the home. The State licenses the grandmother's home as a foster family home and the child continues to reside in the home in foster care. The child is eligible for title IV-E foster care since s/he lived with the parent within six months of the State's petition to the court, and was constructively removed from the parent's custody.

*Source:      Preamble to the Final Rule (65 FR 4020) (1/25/00)Preamble to the Final Rule (65 FR 4020) (1/25/00)*
*Reference:  Social Security Act - section 472 (a)(2)(A); 45 CFR 1356.21 (k) and (l)*

*2*  *Q:*  Can a child be considered "constructively" removed from a legal guardian who is not a specified relative?

*A:*  No. The statute at section 472 (a)(3)(A) of the Social Security Act requires, among other things, that a child be living with and removed from the home of a specified relative at the time of the voluntary placement agreement or initiation of court proceedings. The provisions for "constructive" removal do not alter the requirement that the removal be from the home of a parent or specified relative.

**EXHIBIT C**

# *Child Welfare Policy Manual*

Source:     Preamble to the Final Rule (65 FR 4020) (1/25/00)Preamble to the Final Rule (65 FR 4020) (1/25/00)

Reference:  Social Security Act - sections 406 (a) and 407 (as in effect on July 16, 1996) and 472(a)(3)(A); 45 CFR 1356.21 (k)

**3  Q:**  May a child born to a woman while she is a prison inmate or patient in a state hospital be considered eligible for foster care payments if all other title IV-E foster care requirements are met? It has been our interpretation that since the child could not return home with the mother and live with her because of her prisoner or patient status, the child would not be eligible to receive AFDC. Hence, such a child could not meet title IV-E foster care eligibility requirements.

**A:**  An otherwise eligible child born to a woman who is a prison inmate or a patient in a hospital, and deprived of the support of an absent father, would be eligible for the title IV-E foster care program if removed from the "home of a relative" and placed in foster care in accordance with section 472 of the Social Security Act (the Act). This is true when the child is placed in foster care awaiting the mother's release or when parental rights are terminated directly after birth. The inability of the child to return to the mother during her prisoner or patient status (or for any other reason) has no bearing on the child's eligibility for title IV-E foster care.

Eligibility for the title IV-E foster care maintenance payments program as defined in section 472(a) of the Act states that a State shall make foster care maintenance payment on behalf of each child who has been removed from the home of a relative specified in section 406(a) (as in effect on July 16, 1996)" if, among other things, the child was AFDC eligible in the home of the specified relative from whom the child was legally removed.

The child born to a mother who was a hospital patient or a prison inmate would be considered to be living with the mother at the time of birth, and if placed in foster care would be removed from the home of the relative (the mother) in accordance with section 472 (a). The definition of "home" at 45 CFR 233.90 (c)(1)(v)(B) is applicable to the hospital or prison setting.

Source:     ACYF-CB-PIQ-86-03 (5/9/86); 7/17/2006ACYF-CB-PIQ-86-03 (5/9/86); 7/17/2006

Reference:  Social Security Act - sections 406 (a) and 407 (as in effect on July 16, 1996) and 472(a); 45 CFR 233.90 (c)(1)(v)(B) and 45 CFR 1356.21 (k)

**4  Q:**  For the purpose of determining a child's eligibility for Aid to Families with Dependent Children (AFDC) at the time of the child's removal from his or her home, the child must have been living

**EXHIBIT C**

# *Child Welfare Policy Manual*

with and removed from the home of a specified relative.  Who is considered a "specified relative" for this purpose?

*A:*  A specified relative is defined as any relation by blood, marriage or adoption who is within the fifth degree of kinship to the dependent child.  This includes great-great-great grandparents and first cousins once removed (children of first cousins).  Accordingly, for the purpose of determining title IV-E eligibility, any otherwise eligible child who is removed from the home of a relative who is within the fifth degree of kinship to the child will be eligible for assistance under title IV-E.

*Source:*    ACYF-CB-IM-92-04 (2/24/92)ACYF-CB-IM-92-04 (2/24/92)
*Reference:* 45 CFR 233.90 (c)(1)(v)

*5*  *Q:*  Once a court order is issued with a judicial determination that remaining in the home is contrary to the child's welfare, does the State have to actually remove the child at that time and place the child in foster care?

*A:*  Yes. Section 472(a)(2) of the Social Security Act predicates a child's receipt of title IV-E funds on the child's removal from home as the result of either a voluntary placement agreement or a judicial determination that to remain at home is contrary to the child's welfare.

The judicial determination that results in the child's removal must coincide with (i.e., occur at the same time as) the agency's action to physically or constructively remove the child, unless the court order specifies an alternative timeframe for removal, as allowed for in the Departmental Appeals Board (DAB) decision # 2017.

If a court makes a judicial determination that it is contrary to the child's welfare to remain at home (without specifying an alternative timeframe) and the child does, in fact, remain at home and no removal occurs, the requirement for removal is not met and the child is ineligible for title IV-E. If the child's safety is not at risk and a State chooses to offer support services to the family in-home to prevent having to remove the child, it should do so. States cannot issue "blanket" removal orders, however, in an attempt to guarantee title IV-E eligibility in the event that the child has to be removed from home at some point in the future.

*Source:*    1/29/20071/29/2007
*Reference: Social Security Act   section 472(a)(2)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

**8.3A.12      TITLE IV-E, Foster Care Maintenance Payments Program, Eligibility, Responsibility for placement and care**

*1*  *Q:*  What does "responsibility for placement and care" mean? Are there certain activities which cannot be delegated? If so, which activities? Can the "case plan" be delegated while the child is under the care of the nonprofit agency? Does "responsibility for placement and care" mean that the State agency must have custody of the child or can the court give custody to a private nonprofit agency? We think "responsibility for placement and care" follows custody.

*A:*  The title IV-E agency, or another public agency with whom the State agency has made an agreement which is still in effect, is to be assigned the overall responsibility for placement and care of the child, although many of the activities associated with the placement and care may be performed by others. Clearly, if the court assigns the responsibility for a child to an agency or institution other than the State or local agency administering the title IV-E foster care program or to another public agency with which the title IV-E agency has no agreement, no Federal financial participation (FFP) will be allowable.

Under title IV-E, to be eligible for FFP, section 472 (a)(2)(B) of the Social Security Act (the Act) requires that the responsibility for placement and care of the child is with the State agency administering the plan approved under section 471 of the Act, or any other public agency with whom the State agency administering or supervising the administration of the State plan approved under section 471 has made an agreement which is in effect.

A major responsibility in placement and care is the development of an individual case plan for the child, including periodic review of the appropriateness and suitability of the plan and the foster care placement, to ensure that proper care and services are provided to facilitate return to the child's own home or to make an alternative permanent placement. The case plan activities, such as assessing family strengths and needs, identifying and using community resources, and the periodic review and determination of the continued appropriateness of placement, and the efforts to finalize a permanency plan may be carried out by agencies from which services are purchased. However, the ultimate responsibility for ensuring that there is an appropriate plan of care, case review, and activities to improve the home of the child or identify and work toward a permanency plan for the child remains with the State agency identified in the State plan as having responsibility for the placement and care of the child. Thus, the State agency must actively supervise the various activities performed by the contractor or other agency. This supervision includes case plan assessment and case review functions and adherence to the requirements of the Act, Federal rules, regulations and policy interpretations in operation of the foster care maintenance program. The State is ultimately responsible for proper operation of the foster care program.

Although responsibility for placement and care generally is associated with child custody, custody of the child is not a requirement of Federal law or policy under title IV-E and the State

**EXHIBIT C**

# Child Welfare Policy Manual

agency need not be given custody, but must be given responsibility for placement and care of the child. Custody may be retained by the court or be given to a private nonprofit agency. However, the State agency administering the title IV-E plan or another public agency with which the title IV-E agency has a currently effective agreement can be given "responsibility for placement and care" in order to claim FFP for foster care costs under this program.

*Source:      ACYF-CB-PIQ-82-07 (8/25/82)ACYF-CB-PIQ-82-07 (8/25/82)*

*Reference:  Social Security Act - sections 471 and 472*

**EXHIBIT C**

# *Child Welfare Policy Manual*

*2*  *Q:*  Can foster care payments under title IV-E be made on behalf of a child initially placed under the care of another public agency (and no inter-agency agreement exists), when and if the responsibility for the placement and care of the child is later transferred to the State title IV-E agency?

*A:*  Yes. Section 472 (a)(2)(B) of the Social Security Act (the Act) does not require that the child's placement and care be the initial responsibility of the State title IV-E agency, nor does it conversely prohibit a subsequent transfer from another public (or private) agency to the State agency from triggering eligibility for foster care payments for an otherwise eligible child. When all eligibility criteria in section 472(a) are met, a State may claim FFP from the first day of placement in the month in which all eligibility criteria have been met. FFP may not be retroactive to the time of removal.

Once the responsibility for placement and care has been given to the State agency, all of the State plan requirements in sections 471(a)(15) and (16) of the Act are applicable, including the title IV-E case plan and case review requirements.

*Source:*      *ACYF-CB-PIQ-87-03 (6/1/87)ACYF-CB-PIQ-87-03 (6/1/87)*
*Reference:  Social Security Act - sections 471 and 472*

*3*  *Q:*  The regulations at 45 CFR 1356.21(g)(3) specify that Federal financial participation (FFP) for title IV-E foster care maintenance payments may not be claimed when a court orders a placement with a specific foster care provider.  In situations where the court specifies the placement in a court order after hearing testimony from various sources, including the State IV-E agency, is FFP available?  Is availability of FFP affected when the court disagrees with the agency's placement recommendation and specifies another placement in the order?

*A:*  Title IV-E requires, as a condition of eligibility, that a child's placement and care responsibility be vested either with the State agency, or another public agency with which the State has an agreement. The purpose of the regulatory provision in question is to assure that the authority of the State title IV-E agency with placement and care responsibility for the child is not usurped.  A "court-ordered" placement, as prohibited in the rule, involves the court taking placement and care responsibility away from the agency and assuming placement and care responsibility by choosing the child's placement without bona fide consideration of the agency's recommendation regarding placement.  This does not mean that the court must always concur with the agency's recommendation in order for the child to be eligible for title IV-

**EXHIBIT C**

# *Child Welfare Policy Manual*

E foster care payments.   As long as the court hears the relevant testimony and works with all parties, including the agency with placement and care responsibility, to make appropriate placement decisions, we will not disallow the payments.  The prohibition in the rule also does not apply to situations where the court merely names the child's placement in the court order as an endorsement or approval of the agency's placement choice.

*Source:     Questions and Answers on the Final Rule (65 FR 4020) (1/25/00)Questions and Answers on the Final Rule (65 FR 4020) (1/25/00)*
*Reference:  45 CFR 1356.21 (g)(3)*

*4   Q:*  Does responsibility for placement and care of the child as used in section 472(a)(2)(B) of title IV-E of the Social Security Act (the Act) equate with custody?

*A:*  Not necessarily. The title IV-E foster care program requires, as a condition of eligibility, that a child's placement and care responsibility be vested either with the State agency or another public agency with which the State has a bona fide agreement pursuant to section 472(a)(2)(B)(ii) of the Act. The term placement and care means that the State agency is legally accountable for the day-to-day care and protection of the child who has come into foster care through either a court order or a voluntary placement agreement. Sometimes this responsibility translates to "custody" or "care and control" of the child via a court order, but custody is not a title IV-E requirement. Placement and care responsibility allows the State agency to make placement decisions about the child, such as where the child is placed and the type of placement most appropriate for the child. It also ensures that the State provides the child with the mandated statutory and regulatory protections, including case plans, administrative reviews, permanency hearings, and updated health and education records.

*Source:     ACYF-CB-PIQ-82-07 (8/25/82); 6/23/03ACYF-CB-PIQ-82-07 (8/25/82); 6/23/03*
*Reference:  Social Security Act - sections 471 and 472*

**EXHIBIT C**

# *Child Welfare Policy Manual*

**8.3A.13    TITLE IV-E, Foster Care Maintenance Payments Program, Eligibility, Voluntary placement agreements**

*1  Q:*  If a State fails to obtain the necessary judicial determination within the first 180 days of a voluntary placement, can the case be reopened when a judicial hearing is convened or does the child lose all further benefits of the title IV-E program during that period of placement?

*A:*  The case may not be reopened.  The judicial determination must be made within the first 180 days of placement.  Section 472 (e) of the Social Security Act states that no Federal payment may be made for a child removed from his or her home pursuant to a voluntary placement agreement and who remains in voluntary placement in excess of 180 days, unless there has been a judicial determination within the first 180 days of such placement to the effect that the placement is in the best interests of the child.

According to the legislative history, this provision was included in Public Law 96-272 in order to allow for short term emergency placements but provide the child with the protection of a court review if the placement became prolonged.

*Source:*    ACYF-CB-PIQ-85-09 (10/10/85)ACYF-CB-PIQ-85-09 (10/10/85)
*Reference:  Social Security Act - sections 472 (d) and (e)*

*2  Q:*  In the event that a court hearing date has been set within the first 180 days of a voluntary placement, but no determination made, may a pre-approved continuance hearing date deem the child eligible up to the continuance date?

*A:*  No.  Although the applicable title IV-E requirement at section 472 (e) is stated in terms of a judicial determination, it does not specifically require a court hearing.  If the determination is not made within 180 days of placement, whether or not a hearing is held, Federal financial participation may not continue.

*Source:*    ACYF-CB-PIQ-85-09 (10/10/85)ACYF-CB-PIQ-85-09 (10/10/85)
*Reference:  Social Security Act - sections 472 (d) and (e)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

*3* *Q:* A State places a child into foster care pursuant to a voluntary placement agreement but does not have the voluntary placement provision in its State Plan and, thus, does not claim Federal financial participation (FFP) for the child. Can this placement later be considered a judicial removal and FFP be claimed from that time forward if there is a petition to the court within six months of the time the child had last been living with the parent(s) and subsequent judicial determinations are made regarding "contrary to the welfare" and "reasonable efforts"?

*A:* No. The statute allows FFP for otherwise eligible children who are removed from their homes either pursuant to a voluntary placement agreement or as the result of judicial determinations regarding "contrary to the welfare" and "reasonable efforts." It is a State option whether to claim FFP for voluntary placements. For a State to be eligible for Federal reimbursement for voluntary placements, it must meet the requirements of section 472 of the Social Security Act and must have such provision in its title IV-E State Plan. In States that accept voluntary placements, but do not meet the requirements for claiming FFP, such placements are ineligible for FFP during the entire stay in foster care. The fact that a petition is filed within six months of the removal and the required subsequent judicial determinations are obtained does not change the nature of the removal from voluntary to judicial.

If, however, a State revises its title IV-E State Plan and becomes eligible to claim FFP for voluntary placements, it may also begin to claim FFP for any eligible child who had previously been removed pursuant to a voluntary placement agreement if there had been a judicial determination regarding "best interests" within 180 days of the child's placement.

*Source:*     *ACYF-CB-PIQ-89-03 (7/24/89)ACYF-CB-PIQ-89-03 (7/24/89)*

*Reference:  Social Security Act - sections 472*

**EXHIBIT C**

# *Child Welfare Policy Manual*

*4*  *Q:*  If a State, which is claiming Federal financial participation (FFP) for voluntarily placed children, misses the requirement for a judicial determination within 180 days of placement that such placement is in the best interests of the child, but petitions the court within the six-month timeframe set forth in section 472(a)(3)(A)(ii)(II) of the Social Security Act, can the State consider this a judicial removal, once determinations are made concerning "contrary to the welfare" and "reasonable efforts"?

*A:*  No. The State has been claiming FFP under the Federal voluntary placement program for 180 days. In this case, the State has failed to meet the requirement for continuing FFP that there must be a judicial determination within 180 days to the effect that the placement is in the best interests of the child. The fact that the State petitioned the court within six months of the time the child last resided with a relative and later obtained the judicial determinations required for judicial removals would not change the nature of that removal from voluntary to judicial.

*Source:*     *ACYF-CB-PIQ-89-03 (7/24/89)ACYF-CB-PIQ-89-03 (7/24/89)*
*Reference:*  *Social Security Act - sections 472(a)(3)(A)(ii)(II); 45 CFR 1356.22*

*5*  *Q:*  May a State develop a voluntary placement agreement that would allow a parent to retain custody of his or her child and allow the State to claim Federal financial participation under the title IV-E foster care maintenance payments program on behalf of an otherwise eligible child?

*A:*  Yes. As long as the State retains placement and care responsibility for the child, the fact that the voluntary placement agreement allows the parent to retain custody of the child does not impair the child's eligibility for title IV-E foster care maintenance payments. Placement and care responsibility means that the State agency is legally accountable for the day-to-day care and protection of the child in foster care. Responsibility for placement and care allows the State agency to make placement decisions about the child, such as where the child is placed and the type of placement most appropriate for the child.

The State's placement and care responsibilities under section 472(a)(2)(B) of the Social Security Act must be unencumbered in order to claim Federal financial participation for title IV-E foster care costs. To the extent that a States definition of custody contradicts or in any manner limits the agency's placement and care discretion, such children would not be eligible for title IV-E foster care maintenance payments.

**EXHIBIT C**

# *Child Welfare Policy Manual*

Source:      06/09/0406/09/04

Reference:  Social Security Act- sections 472(a)(2)(B) and  (f), CWPM section 8.3A.12.

**6  Q:** When a child is initially placed into foster care through a voluntary placement agreement, and the State subsequently issues a court order regarding the child's removal and/or the State's placement and care responsibility, what criteria must be met for the child to be eligible for title IV-E foster care maintenance payments?

**A:** The child must meet the criteria for voluntary placement agreements in section 472(a)(2)(A)(i) of the Social Security Act and 45 CFR 1356.22(a) to be eligible for title IV-E foster care maintenance payments.  This is because the subsequent court order does not change the child's removal, which was authorized by the voluntary placement agreement.  As such, the agency is not required to secure a judicial finding of reasonable efforts to prevent removal or to finalize the permanency plan.

Source:      04/26/0704/26/07

Reference:  Social Security Act   section 472(a)(2)(A); 45 CFR 1356.22(a)

**7  Q:** Section 472(e) of the Social Security Act (the Act) requires a State to obtain a judicial determination during the first 180 days of the voluntary placement to the effect that the placement is in the child's best interest to continue title IV-E payments beyond that time. When does this 180-day clock begin?

**A:** The 180-day clock begins the day a child is physically placed in foster care as defined in 45 CFR 1355.20 pursuant to a voluntary placement agreement with the exception of constructive removals.  In constructive removals, the 180-day clock begins on the date the voluntary placement agreement is signed since there is no physical removal of the child from his/her home (45 CFR 1356.21(k)(3)).

Source:      12/6/200712/6/2007

Reference:  The Social Security Act   Section 472(e); 45 CFR 1355.20, 1356.21(k)(3) and 1356.22(b)

**EXHIBIT C**

# *Child Welfare Policy Manual*

**8.3A.14      TITLE IV-E, Foster Care Maintenance Payments Program, Eligibility, Voluntary relinquishments**

*1  Q:*  May voluntary relinquishments from biological parents be treated as voluntary placement agreements for the purpose of establishing title IV-E eligibility?  What if the relinquishment is approved by a court?

*A:*  A child who is voluntarily relinquished to the State agency does not meet the requirements of section 472 of the Social Security Act for the receipt of foster care maintenance payments.

Voluntary relinquishment means the voluntary relinquishing by parents of their parental rights to the department of social services, without court involvement. A voluntary relinquishment does not meet the definition of a voluntary placement under section 472 nor is it a placement resulting from a judicial determination as provided by section 472. Thus, Federal financial participation (FFP) would not be available for voluntarily relinquished children.

In order for a child to qualify for foster care maintenance payments, section 472 (a)(2) provides that removal from the home must occur by either of two ways: (1) pursuant to a voluntary placement agreement entered into by the child's parent or legal guardian or (2) be the result of a judicial determination to the effect that continuation therein would be contrary to the welfare of such child and that reasonable efforts have been made (A) prior to the placement of a child in foster care to prevent or eliminate the need for removal of the child from his home, (B) to make it possible for the child to return home, and (C) to finalize an alternate permanency plan if the child cannot be returned home.

The term "voluntary placement" as provided at section 472 (f)(1) means: an out-of-home placement of a minor by or with participation of a State agency, after the parents or guardians of the minor have requested the assistance of the agency and signed a voluntary placement agreement. The term "voluntary placement agreement" as provided by section 472 (f)(2) means: a written agreement, binding on the parties to the agreement between the State agency, any other agency acting on its behalf, and the parents or guardians of a minor child which specifies, at a minimum, the legal status of the child and the rights and obligations of the parents or guardians, the child, and the agency while the child is in placement.

It is clear from section 472, specifically sections 472 (a)(2)(A) and (f) that voluntary placement recognizes an agreement between parents (or legal guardians) and the State. The agreement, as provided by section 472 (f) must specify the "legal status of the child and the rights and obligations of the parents or guardians, the child, and the agency while the child is in placement." Parents cannot be a party to such an agreement while abandoning their basic legal status as parents. Further, if at any time after the signing of the agreement, the parents or

**EXHIBIT C**

# *Child Welfare Policy Manual*

legal guardians no longer have the legal status as such, then the agreement is no longer effective, and the placement is no longer the voluntary placement stipulated in the agreement.

The language of section 472 (g) suggests that a voluntary placement is a temporary state of affairs with parents or guardians having the capacity and right to revoke such agreement unless a court determines that return to the home would be contrary to the best interest of the child. Even in this latter situation, such a determination prevents a return of the child to its parental home but does not deprive the parents of their parental rights.

Finally, with regard to non-voluntary placement under section 472, it is clear that Federal foster care payments can be made only if the removal from the home of the parents was the result of a judicial determination (including the "reasonable efforts" determination) as required by section 472 (a)(2)(A)(ii). Thus, even though a voluntary relinquishment is later accepted or approved in court, such an approval does not change the nature of the action from a voluntary relinquishment to a removal which results from a judicial determination as provided by section 472 (a)(2)(A)(ii).

*Source:      ACYF-CB-PIQ-85-03 (3/19/85)ACYF-CB-PIQ-85-03 (3/19/85)*
*Reference:  Social Security Act - section 472 (a)(2)(A), (f) and (g)*

*2  Q:*  How may a child who is voluntarily relinquished by his/her parents to the State title IV-E agency become eligible for title IV-E foster care maintenance payments?

*A:*  If the child had last been living with the parent(s) within six months of the date court proceedings were initiated leading to a judicial determination that remaining in the home would be contrary to the welfare of such child, the removal from the home will be considered a "judicial removal." In addition, the "reasonable efforts" determination must be made in relation to removal of the child from the home. Such judicial determinations will prevail as the critical factor related to removal and any prior voluntary relinquishment action will not be relevant for purposes of title IV-E eligibility (sections 472(a)(2)(A)(ii) and 472(a)(3)(A)of the Social Security Act).

However, if the court merely sanctions the relinquishment without making the findings specified in section 472(a)(2)(A)(ii), the child cannot be considered to be "judicially removed" in accordance with that section, and foster care maintenance payments may not be claimed under title IV-E.

**EXHIBIT C**

# *Child Welfare Policy Manual*

Source:    ACYF-CB-PIQ-89-01 (2/9/89)ACYF-CB-PIQ-89-01 (2/9/89)

Reference:  Social Security Act - section 472 (a)(2) and (3)

## 8.3A.15    TITLE IV-E, Foster Care Maintenance Payments Program, Eligibility, When payments may begin

*1*  *Q:*  At what point may the State begin to claim Federal financial participation (FFP) for title IV-E foster care maintenance payments?

*A:*  States may claim FFP from the first day of placement in the month in which all title IV-E eligibility criteria are met.

Source:    ACYF-CB-PIQ-91-05 (8/15/91)ACYF-CB-PIQ-91-05 (8/15/91)

Reference:  Social Security Act - section 472

## 8.3B    TITLE IV-E, Foster Care Maintenance Payments Program, Payments

*1*  *Q:*  Under title IV-E, how is the term "foster care maintenance payments" defined?

*A:*  Under title IV-E, the term "foster care maintenance payments" is defined (in section 475(4) of the Social Security Act) as: "...payments to cover the cost of (and the cost of providing) food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance with respect to a child and reasonable travel to the child's home for visitation. In the case of institutional care, such term shall include the reasonable costs of administration and operation of such institution as are necessarily required to provide the items described in the preceding sentence."

The cost items listed in the first sentence apply equally to family foster care and institutional foster care. The costs of providing the items may include costs such as local transportation necessary for either a foster parent or institution to provide the items. However, allowable costs do not include reimbursement in the nature of salary for the exercise by the foster family of ordinary parental duties.

The second sentence applies only to institutional foster care. The reasonable costs of administration and operation necessary to provide the items only for children served under title

**EXHIBIT C**

# *Child Welfare Policy Manual*

IV-E foster care are allowable elements in payments to child care institutions. Since these costs are limited types of activities and apply only to title IV-E children, the costs of foster care in institutions will have to be allocated along two lines: (1) the allocation of costs, for purposes of Federal financial participation (FFP), based on allowable cost items and activities; and (2) the allocation of costs based on the proportion of children in the institution receiving foster care under title IV-E for those allowable elements compared to children whose care is paid under other programs.

The establishment of a cost allocation system for institutions, as well as for the State itself, is a State responsibility and is a necessary precursor to the State's ability to claim FFP for allowable institutional foster care costs.

*Source:     ACYF-CB-PA-82-01 (4/30/82)ACYF-CB-PA-82-01 (4/30/82)*

*Reference:  Social Security Act - sections 472, 474 and 475 (4)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

*2* *Q:* Does title IV-E preclude a State agency from passing on to the child title IV-E funds for his use for his maintenance in an independent living program?

*A:* Title IV-E precludes payments made directly to the child or turned over to him by another agency for the purpose of meeting independent living costs. The eligibility of a child for title IV-E is based in part on the fact that he is placed in a family foster home or child care institution as a result of a court determination or voluntary agreement (section 472 (a)(2)(A) and (C) of the Social Security Act (the Act)). Federal financial participation is limited to foster care maintenance payments made on behalf of a child described in section 472 (a) of the Act who is in a foster family home or in a child care institution (section 472 (b)). Both "foster family home" and "child care institution" are defined in section 472 (c). Title IV-E does not include "independent living" in these definitions, and it is not considered foster care within the meaning of the Act. Title IV-B may be an alternative source of funding for these independent living programs. Since independent living is not considered foster care, the limitations found in section 424(c) of title IV-B to foster care payments would not apply.

*Source:*     *ACYF-CB-PIQ-83-05 (10/19/83)ACYF-CB-PIQ-83-05 (10/19/83)*
*Reference:*  *Social Security Act - sections 424 and 472; 45 CFR 1355.20*

*3* *Q:* Please clarify how funds may be disbursed for allowable child care.

*A:* States may include the cost of allowable child care in the basic foster care maintenance payment or may make a separate maintenance payment directly to the licensed provider.  For example, if,  in a particular foster family, both parents work, the State may include the cost of child care in the maintenance payment made to that family or may pay the licensed provider directly.  Regardless of the payment method chosen, the State must be able to provide documentation to verify allowable expenditures.

*Source:*     *Preamble to the Notice of Proposed Rulemaking (63 FR 50058) (9/18/98)Preamble to the Notice of Proposed Rulemaking (63 FR 50058) (9/18/98)*
*Reference:*  *45 CFR 1355.20*

**EXHIBIT C**

# *Child Welfare Policy Manual*

**4  *Q:*** Federal policy allows a State to include child care for working foster parents in the title IV-E foster care maintenance payment.  Are there any Federal requirements that prohibit a State from providing child care for working foster parents in some but not all "political subdivisions" or jurisdictions in the State?

**  *A:*** No.  Nothing in statute or regulation prohibits a State from providing child care for working parents in some but not all jurisdictions.  Daily supervision is one of the components of a foster care maintenance payment, and licensed child care is an allowable element of daily supervision in certain circumstances (see the definition of foster care maintenance payments in 45 CFR ?1355.20).  A State has the discretion to choose the way in which it will provide daily supervision, including whether or not to provide child care in the title IV-E foster care maintenance payment for some or all working foster parents.

*Source:     March 1, 2005March 1, 2005*

*Reference:  Section 475(4)(A) of the Social Security Act; 45 CFR §1355.20*

**5  *Q:*** May title IV-E foster care maintenance payments flow through a for-profit entity to the foster care provider?

**  *A:*** Yes.  The Fair Access Foster Care Act of 2005 (Public Law 109-113), which took effect on November 22, 2005, amended section 472(b) of the Social Security Act to eliminate the prohibition against making foster care maintenance payments through a for-profit entity.

*Source:     01/29/0701/29/07*

*Reference:  Social Security Act, section 472; Public Law 109-113*

**6  *Q:*** May title IV-E eligible children in adoptive homes receive title IV-E foster care maintenance payments prior to finalization of adoption?

**  *A:*** Prior to the finalization of adoption, title IV-E eligible children in adoptive homes may receive foster care maintenance payments if the home is licensed for foster care. This practice is

**EXHIBIT C**

# *Child Welfare Policy Manual*

necessary to prevent a gap in medical care and/or support for foster children who have been placed for adoption but are ineligible for IV-E subsidy until the adoption assistance agreement is signed.

*Source:    ACYF-CB-PIQ-82-01 (1/19/82)ACYF-CB-PIQ-82-01 (1/19/82)*

*Reference:  Social Security Act - section 471 and 475*

**8.3B.1    TITLE IV-E, Foster Care Maintenance Payments Program, Payments, Allowable costs**

*1*  *Q:*  What are the elements of costs for foster care maintenance payments under section 475 (4) of the Social Security Act (the Act)?

*A:*  There are three groups of costs:

(1) Items of Cost: Clearly, all items of cost specifically enumerated in the Act are allowable. In addition, questions may arise about the interpretation of items, listed in the Act, particularly, "daily supervision."

(a) "Daily supervision" in family foster care - "Daily supervision" in family foster care may include such an item as child care. A foster family parent who is working while a foster child is not in school will have to arrange for some form of alternate care, such as day care, for the daily supervision of the child. However, as was stated in the legislative history of P.L. 96-272, "payments for the costs of providing care to foster children are not intended to include reimbursement in the nature of a salary for the exercise by the foster family parent of ordinary parental duties." (p. 50, House of Representatives, Report No. 96-900, April 23, 1980.)

(b) "Daily supervision" in institutional foster care - "Daily supervision" in institutions is a limited function. It includes routine day-to-day direction and supervision. It does not include social services.

(c) Social services under family foster care or institutional foster care - As with all items of care and for costs of administration and operation, the critical factor is the activity being performed and not the title or position of the performer. "Social services" are not allowable cost items as title IV-E maintenance payments under any circumstances, regardless of what type of person

**EXHIBIT C**

# *Child Welfare Policy Manual*

provides them.

 Examples of unallowable "social services" are: counseling and therapy to help with a child's adjustment at the institution; counseling and therapy to help a child resolve the problem(s) for which he or she was placed; counseling and therapy with the child and his or her biological family to resolve the difficulties that led to the need for placement; counseling and therapy to plan for the return of the child to the community; and psychological or educational testing, evaluation, and assessment. These costs may be claimed under other programs, e.g., title IV-B or title XX (Social Services Block Grant Program) of the Act or a State-funded program.

 (d) Other items in family or institutional foster care - Questions have been raised regarding some other specific items. "Recreation" is not enumerated in the Act and cannot be regarded as an element of these costs except where it clearly substitutes for otherwise necessary daily supervision, e.g., day care, as discussed in (a) above. In such a case, only the minimal costs for the eligible child and caretaker may be included.

 (2) Costs of providing: In both family and institutional foster care, the costs of providing the items listed in section 475 (4) may be included in payments. This is a limited added cost. However, recreation generally is not a "cost of providing". When it is a form of daily supervision, as stated in paragraph (1)(d) above, it is allowable.

 In an institution, the cost of providing the items might include the costs of activities performed by cottage parents or other persons filling such a role in their daily supervision of eligible children. The key is the activity being performed rather than the occupation or profession of the individual.  And, to reiterate, only the proportion of costs related to providing allowable items to title IV-E children is eligible for payment.

 Inquiry has also been made regarding two other functions and performers. The costs of providing daily supervision of eligible children in an institution by a social worker is allowable; however, the costs of a social worker providing counseling and guidance related to a child's development, as contrasted with routine supervision, would not be an allowable cost. Further, only the proportion of costs attributable to title IV-E children would be allowable.

 Another question relates to the costs of (1) dispensing over the counter medicines, (2) supervising the administration of prescribed medicines, (3) administering first aid and (4)

**EXHIBIT C**

# Child Welfare Policy Manual

diagnosing illnesses. The activities performed under numbers (1) and (2) and routine activities under (3) would be allowable. The activity described under (4) is more specialized and is not a cost of providing daily supervision. It is unlike an activity which a family foster parent would be expected to be able to perform in the course of providing "daily supervision." Again, only the proportion of costs of providing allowable items to title IV-E children are eligible for Federal financial participation (FFP).

 (3) Reasonable costs of administration and operation in an eligible institution: Section 475 (4) also permits payment on behalf of eligible children in institutions to include "the reasonable costs of administration and operation of such institution as are necessarily required to provide the items [described in the same paragraph]." Factors related to the allowability of costs therefore include:

 (a) The institution must meet the definition of a "child-care institution" in section 472 (c)(2) of the Act. Costs borne by child placing agencies are not eligible for FFP.

 (b) The costs of administration and operation must be "necessarily required to provide the items described in [paragraph 475 (4)]." Thus, the proportional cost of a bookkeeper, food workers, and supervisor of cottage parents for the institution would be allowable. The costs of providing counseling or diagnosis of illness by a social worker or nurse or costs of the staff of a parent agency not employed by the institution would not be allowable.

 (c) The costs must be "reasonable", that is, no more than the customary costs for performing similar functions in similar institutions, e.g., in size, and type of children, such as handicapped children.

 (d) The costs must be allocated for title IV-E children on whose behalf payments are made.

 (e) The costs must be allowable under 45 CFR Part 92.

 Given these factors, the issue of cost allocation is important. Various cost allocation methods, e.g., random moment studies or actual counts, may be used by institutions in developing their cost allocation plans. The State agency must approve the plan as a part of its approval of rates.

**EXHIBIT C**

# *Child Welfare Policy Manual*

Source:    ACYF-CB-PA-82-01 (4/30/82)ACYF-CB-PA-82-01 (4/30/82)
Reference:  Social Security Act - sections 472, 474 and 475 (4)

*2*  *Q:*  In child care institutions, are costs that are normally associated with family activities such as going to a baseball game, picnics, etc., allowable for Federal financial participation (FFP) in the title IV-E Foster Care Maintenance Payment Program?  What about staff time for supervision, transportation, tickets, etc.?

*A:*  Reimbursement of recreation costs per se is not permitted under title IV-E (see the definition of "foster care maintenance payments" under section 475(4) of the Social Security Act). Since section 475(4) includes "a child's personal incidentals," however, the reasonable and occasional cost of such items as tickets or other admission fees for sporting, entertainment or cultural events or dues for clubs are reimbursable under title IV-E Foster Care as a part of the maintenance payment.

The costs of staff necessary to provide supervision to insure the well being and safety of children on or off campus are allowable even if the event has recreational components. The costs of staff merely accompanying the children but not necessary for their supervision are not allowable.

Transportation as a separate item of expense is not allowable except for reasonable travel to the child's home for visitation.

Source:    ACYF-CB-PIQ-87-02 (5/18/87)ACYF-CB-PIQ-87-02 (5/18/87)
Reference:  Social Security Act - sections 472, 474 and 475 (4)

**EXHIBIT C**

# *Child Welfare Policy Manual*

*3*  *Q:*  Are all costs for day care/baby-sitting services provided to title IV-E eligible children reimbursable as a title IV-E foster care maintenance cost?

If not, for which of the following purpose(s) may daycare/babysitting services be claimed for reimbursement: (1) illness of the foster parent; (2) respite care; (3) foster parent attendance at: administrative case review/judicial reviews, case conferences/team meetings, school conferences/ET (Pupil Evaluation Team), or foster parent training; (4) foster parent visits with a child who is temporarily out of the home, e.g. child hospitalized or at camp; (5) enhancement of a foster child's social skills/peer relationships/socialization; or, (6) special needs of foster child best met in a day care setting.

*A:*  The legislative history of Public Law 96-272 (p. 5, House of Representatives, Report No. 96-900, April 23, 1980) states that "payments for the costs of providing care to foster children are not intended to include reimbursement in the nature of a salary for the exercise by the foster family parent of ordinary parental duties." Since foster care maintenance payments are not salaries, foster parents must often work outside the home. Therefore, child care that provides daily supervision during a foster parent's working hours when the child is not in school is an allowable expenditure under title IV-E. Child care costs which facilitate the foster parent's attendance at activities which are beyond the scope of "ordinary parental duties" are allowable expenditures as well.

Child care provided to a foster child to facilitate a foster parent's participation in activities that are within the realm of "ordinary parental duties" or child care activities which are deemed a social service are not reimbursable under title IV-E. The items enumerated in the question were assessed based on these criteria.

(1) Illness of a foster parent: ensuring supervision for one's children during one's illness is an ordinary parental duty. Therefore, child care provided to a child in foster care due to the illness of the foster parent is not an allowable expenditure under title IV-E foster care maintenance.

(2) Respite care: respite care is defined in federal regulation as an allowable title IV-B child welfare service and is not an allowable expenditure under title IV-E foster care maintenance. States may use title XX to fund respite care services.

(3) Foster parent attendance at:

a. administrative case/judicial reviews: this activity is not an ordinary parental duty. Therefore, child care is an allowable expenditure under title IV-E foster care maintenance when the foster parent(s) is required to attend administrative case/judicial reviews without the foster child;

**EXHIBIT C**

# *Child Welfare Policy Manual*

 b. case conferences/team meetings: when the foster parent is mandated by the court or the agency to attend case conferences or team meetings without the foster child, child care is an allowable expenditure under title IV-E foster care maintenance because this activity is beyond the scope of ordinary parental duties;

 c. school conferences/ET (Pupil Evaluation Team): this activity is an ordinary parental duty and the cost of child care to provide for the foster parent's attendance at such is not an allowable expenditure under title IV-E foster care maintenance; or,

 d. foster parent training: foster parent training required by the State agency is an activity beyond the scope of ordinary parental duties. Therefore, the cost of child care to provide for the foster parent's attendance at mandatory foster parent training is an allowable expenditure under title IV-E foster care maintenance.

 (4) Foster parent visits with a child who is temporarily out of the home, e.g. child hospitalized or at camp: this is an ordinary parental duty. Child care provided to facilitate such is not an allowable expenditure under title IV-E foster care maintenance.

 (5) Enhancement of a foster child's social skills/ peer relationships/socialization: child care that serves to enhance a child's social skills is typically a social service and/or recreational activity and, as such, is not reimbursable under title IV-E foster care maintenance. However, when recreational activities clearly substitute for otherwise necessary daily supervision, e.g., child care during the foster parent's working hours, they are allowable expenditures under title IV-E foster care maintenance.

 (6) Special needs of a foster child best met in a day care setting: therapeutic child care is a social service and is not an allowable expenditure under title IV-E foster care maintenance.

 Child care services for children in foster care must be rendered by a provider that is licensed, certified, or has some other formal status under State or local regulations in order for the State to claim reimbursement under title IV-E. This interpretation is consistent with the statute at section 472(c) which requires States to make placements in licensed or approved foster family homes and/or child care institutions. Since foster parents must be licensed or approved, child care providers that provide a foster child daily supervision in the foster parent's stead must also be licensed or approved in order for the State to claim reimbursement under title IV-E foster care maintenance. Informal, episodic child care need not have such status and is presumably included in the basic title IV-E foster care maintenance payment.

*Source:     ACYF-CB-PIQ-97-01 (3/4/97)ACYF-CB-PIQ-97-01 (3/4/97)*

*Reference:  Social Security Act - sections 472, 474 and 475; 45 CFR 1356.60*

**EXHIBIT C**

## *Child Welfare Policy Manual*

*4*  *Q:*  For which of the following purpose(s) may transportation services be claimed for reimbursement as a foster care maintenance payment: (1) the foster parent's involvement in/attendance at administrative case/judicial reviews, case conferences/team meetings, school conferences, and foster parent training; (2) the travel of a child in foster care to/from the following activities: (a) allowable day care, (b) school attendance and extracurricular activities, (c) pre-placement visits, (d) foster family trips, (e) sports and cultural events, (f) administrative case/judicial reviews, (g) visitation at other locations, e.g., in the child welfare office, or, (h) visitation with siblings, other relatives, or other caretakers?

*A:*  Local travel associated with providing the items listed in the first sentence of section 475 (4)(A) of the Social Security Act (the Act): food; clothing; shelter; daily supervision; school supplies; and a child's personal incidentals is an allowable expenditure for title IV-E foster care reimbursement.

 The cost of local transportation associated with the items listed at section 475(4)(A) is presumably included in the basic title IV-E foster care maintenance payment. Transportation as a separate item of expense is not allowable except for reasonable travel to the child's home for visitation. The items enumerated in the question were assessed based on these criteria.

 (1) The foster parent's involvement in/attendance at administrative case/judicial reviews, case conferences/team meetings, school conferences, and foster parent training: these items do not coincide with the definition at section 475 (4)(A). Therefore, transportation associated with them is not an allowable title IV-E foster care maintenance expenditure. However, section 474 (a) of the Act states that each State shall be entitled to a payment "... for the proper and efficient administration of the State plan...." Transportation to provide for a foster parent's attendance at administrative case/judicial reviews and mandatory case conferences/team meetings is an allowable title IV-E administrative expenditure because these activities provide for the proper and efficient administration of the title IV-E State plan. Additionally, section 474(3)(B) of the Act states that each State shall be entitled to Federal financial participation for "... expenditures (including travel and per diem expenses) as are for the short-term training of current or prospective foster or adoptive parents..." Transportation to provide for foster parent's attendance at mandatory foster parent training is an allowable title IV-E training expenditure.

 (2) The travel of a child in foster care to/from the following activities:

 a. allowable day care: transportation as a separate item of expense is not allowable except for reasonable travel to the child's home for visitation. However, the costs of transporting a child in foster care to and from child care that substitutes for daily supervision are allowable and

**EXHIBIT C**

# *Child Welfare Policy Manual*

presumed to be included in the basic foster care maintenance payment;

 b. school attendance and extracurricular activities: the primary function of school is to provide education.  Since education is not in the definition found at section 475(4)(A), transportation to and from school is not an allowable title IV-E foster care maintenance expenditure.  However, transportation associated with the child's attendance at his/her school of origin is an allowable administrative cost under title IV-E because such transportation is related to case management and therefore necessary for the proper and efficient administration of the title IV-E State plan (see Child Welfare Policy Manual section 8.1B  and 45 CFR 1356.60(c)(2)).  The cost of transportation to and from extracurricular activities that substitute for daily supervision is allowable and presumed to be included in the basic title IV-E foster care maintenance payment;

 c. pre-placement visits: this activity does not fall under the definition at section 475(4)(A). Therefore, transportation to and from pre-placement visits is not an allowable foster care maintenance expenditure. However, regulations at 45 CFR 1356.60(c)(2) list "placement of the child" as an example of an allowable administrative cost;

 d. foster family trips: transportation for foster family trips is not an allowable expenditure under title IV-E because these trips do not coincide with the items described at section 475(4)(A) of the Act. Transportation as a separate item of expense is not allowable except for reasonable travel to the child's home for visitation;

 e. sports and cultural events: the reimbursement of recreation costs per se is not permitted under title IV-E. Since section 475(4) includes "a child's personal incidentals" the reasonable and occasional cost of such items as tickets or other admission fees for sporting, entertainment or cultural events are reimbursable under title IV-E Foster Care as a part of the maintenance payment. Transportation to and from these events is presumed to be included in the basic foster care maintenance payment;

 f. administrative case/judicial reviews: transportation costs associated with the child's attendance at administrative case/judicial reviews are not allowable expenditures under title IV-E foster care maintenance because these activities do not coincide with the items described at section 475(4)(A). However, transportation costs associated with the child's attendance at administrative case/judicial reviews are allowable administrative costs under title IV-E because they provide for the proper and efficient administration of the title IV-E State plan;

 g. visitation at other locations, e.g., in the child welfare office: the statute provides for "reasonable travel to a child's home for visitation," however, in many circumstances, it is not possible or appropriate for visitation to occur at the child's home. Therefore, reasonable transportation costs for visits at locations other than the child's home, e.g., at the child welfare

**EXHIBIT C**

# *Child Welfare Policy Manual*

office or other location deemed appropriate by the agency, are allowable as separate expenditures under title IV-E foster care maintenance. Transportation costs for visitation are only reimbursable for the child and not for the costs of a biological parent or other relative visiting with the child. States may use title XX or title IV-B funds for that purpose; or

 h. visitation with siblings, other relatives, or other caretakers: since section 475(4)(A) does not specify with whom visits must occur, reasonable travel for visits with siblings, relatives, or other caretakers is an allowable separate title IV-E foster care maintenance expenditure. Again, transportation costs for visitation are only reimbursable for the child and not for the costs of a relative visiting with the child. States may use title XX or title IV-B funds for that purpose.

*Source:     12/31/0712/31/07*

*Reference:  Social Security Act - sections 472, 474 and 475; 45 CFR 1356.60*

*5*  *Q:*  What is an acceptable profit margin for a for-profit child-care institution that services title IV-E eligible children?

*A:*  When contracting for goods or services with a profit-making enterprise, there is a presumption that a certain amount of profit is included in the price offered. While there are no Federal guidelines limiting the amount or percentage of profit that may be included in such a contracted price, States are required to obtain the most beneficial pricing by adhering to the "Procurement Standards" mandated by 45 CFR 92.36 and the requirements of OMB Circular A-87, that "...(t)o be allowable under Federal awards, costs must ... (b)e necessary and reasonable for proper and efficient performance and administration of Federal awards."

 In defining "reasonable costs", A-87 provides the following guidance:

 "... A cost is reasonable if, in its nature and amount, it does not exceed that which would be incurred by a prudent person under the circumstances prevailing at the time the decision was made to incur the cost ...In determining reasonableness of a given cost, consideration shall be given to: Whether the cost is of a type generally recognized as ordinary and necessary for the operation of the governmental unit or the performance of the Federal award; The restraints or requirements imposed by such factors as - sound business practices, arms length bargaining, Federal, State and other laws and regulations, and, terms and conditions of the Federal award; Market prices for comparable goods or services; Whether the individuals concerned acted with

**EXHIBIT C**

# *Child Welfare Policy Manual*

prudence in the circumstances considering their responsibilities to the governmental unit, its employees, the public at large, and the Federal Government; Significant deviations from the established practices of the governmental unit which may unjustifiably increase the Federal award's cost."


 Accordingly, when States are awarding contracts to for-profit child-care institutions under title IV-E, it is whether the price itself is reasonable under the A-87 standards that will be used to determine the allowability of that cost, not the amount of profit which a contractor may be making under that contract.


*Source:     ACYF-CB-PA-97-01 (7/25/97)ACYF-CB-PA-97-01 (7/25/97)*

*Reference:  Social Security Act - sections 472 and 473; PL 104-193; OMB Circular Number A-87*

**EXHIBIT C**

# *Child Welfare Policy Manual*

**6  Q:** Routine medical-related expenses are covered under our State's uniform foster care rate. However, when unexpected, expensive medical costs are incurred which are not covered by title XIX, can other Federal funds be utilized?  May prescription drugs which are not covered by Medicaid or any other program be allowed as a personal incidental cost within the definition in section 475 (4) of the Social Security Act (the Act)?  If so, would there be any special conditions which would have to be met (e.g. cost limits, documentation)?  If not, is there any provision within title IV-E which would permit reimbursement of the costs of prescription drugs for children in foster care for which no other funding source is available?

**A:** Federal medical payments on behalf of title IV-E eligible children in foster care are provided under the State's title XIX, Medicaid program, in accordance with title XIX, Medicaid Program, and with section 472 (h) of the Act.  The definition of "foster care maintenance payments" in section 475 (4) does not include medical expenses as an allowable cost in title IV-E.

 A State may not include in the title IV-E foster care maintenance payment a specific allowance for medical care - nor may a State be reimbursed under title IV-E for direct expenditures of the types described in the questions. The "personal incidentals" item in the foster care maintenance payment under title IV-E, as provided by section 475 (4), may be used to meet incidental needs - and foster parents are not generally required to provide an accounting of specific expenditures, as long as the basic needs of the child are met and the maintenance payment is used for those needs.

*Source:     ACYF-CB-PIQ-84-01 (2/10/84)ACYF-CB-PIQ-84-01 (2/10/84)*

*Reference:  Social Security Act - sections 472 (h) and 475 (4); Title XIX*

**EXHIBIT C**

# *Child Welfare Policy Manual*

**7**   *Q:*  How should the costs of foster parent insurance be claimed, as maintenance payments or as administrative expenditures subject to reimbursement?  What types of insurance costs are allowable?  Is liability insurance sometimes considered a service?  What should be included in the definition of "liability insurance"?

*A:*  Section 475 (4) of the Social Security Act, by including "liability insurance with respect to a child" in the definition of foster care maintenance payments, gives States the option of considering insurance for foster parents as a direct foster care maintenance cost or as an administrative cost of the foster care maintenance program under title IV-E.

 Some States include payment for insurance coverage in the monthly foster care payment to foster parents; others provide the protection through a group insurance policy or through the State's self-insuring procedures.  Using self-insurance, the State may be able to provide broad coverage at low cost.

 Foster parent insurance should include coverage of damages by a foster child to the home or property of the foster parents and of harm done by a foster child to another party.

*Source:*    *ACYF-CB-PIQ-82-04 (1/29/82)ACYF-CB-PIQ-82-04 (1/29/82)*
*Reference:  Social Security Act - section 475 (4)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

8  *Q:*  An individual is both a foster care provider and a child care provider for the same child.  Is it permissible under title IV-E for the State to provide a title IV-E foster care maintenance payment and a Federal child care payment (title IV-A or child care development fund) to the same provider?

*A:*  There is nothing in title IV-E that prohibits a State from providing a title IV-E foster care maintenance payment and a title IV-A or child care development fund payment to the same provider for the same child.  Under these circumstances, however, the State may not include any payment for child care in its title IV-E foster care maintenance payment for the child.

*Source:*     *06/09/0406/09/04*

*Reference:  Social Security Act, sections 472, 474 and 475(4)*

9  *Q:*  The definition of "foster care maintenance payments" at 475(4)(A) of the Social Security Act includes payments to cover the cost of (and the cost of providing) a child's "personal incidentals."  For title IV-E purposes, what does the term "personal incidentals" include?

*A:*  The Social Security Act requires that the title IV-E foster care maintenance payment is to cover the cost of (and the cost of providing), among other things, the personal incidentals of the child in foster care. These items are typically purchased for the child on an occasional, as-needed basis and may include a variety of items. Specifically, we consider the following categories of expenditures examples of "personal incidentals":  items related to personal hygiene; cosmetics; over-the-counter medications and special dietary foods; infant and toddler supplies, including high chairs and diapers; fees related to activities, such as Boy/Girl Scouts; special lessons, including horseback riding; graduation fees; funeral expenses; and miscellaneous items such as stamps, envelopes, writing paper, film and the cost of film development for a personal camera.

 Further, as stated in section 8.3B.1 of the Child Welfare Policy Manual (CWPM), the "reasonable and occasional" costs of such items as tickets or other admission fees for sporting, entertainment or cultural events or dues for clubs are reimbursable under the foster care maintenance payment as personal incidentals.

 The State may provide for these costs in the basic foster care maintenance payment or a separate payment to the foster parent.

**EXHIBIT C**

# *Child Welfare Policy Manual*

*Source:*     *7/6/057/6/05*

*Reference:*  *Social Security Act -- Section 475(4)(A), CWPM Section 8.3B.1*

**10  *Q:*** In some States, foster parents provide "respite" for a short period of time for a child in foster care who is placed with another foster parent.  May the State claim title IV-E foster care maintenance payments for the child who goes temporarily to stay with another foster parent for respite purposes?

**   *A:*** Yes.  A State may claim allowable title IV-E foster care maintenance payments on behalf of a child who is title IV-E eligible and is placed with a licensed foster care provider only temporarily, as a respite placement.  The foster parent is not being paid to provide respite care, rather the allowable costs of an eligible child are continuing to be paid.  Title IV-E foster care maintenance payments may be claimed because the child is eligible and with a licensed provider.  However, foster care maintenance payments may not be made to both providers for the same period in this situation.

*Source:*     *September 29, 2005September 29, 2005*

*Reference:*  *Social Security Act   Section 475 (4)*

## 8.3B.2     TITLE IV-E, Foster Care Maintenance Payments Program, Payments, Rates

**1  *Q:*** What are the restrictions for rate setting with respect to for-profit child-care institutions?

**   *A:*** States used non-Federal dollars when contracting with for-profit child-care institutions prior to the amendments to section 472 (c) of Social Security Act (the Act) which provide Federal financial participation (FFP) for children placed in for-profit child-care institutions. The availability of FFP should have little or no impact on States' rate setting practices for for-profit child-care institutions if a single set of standards has been utilized for facilities regardless of title IV-E eligibility. The approved rates should, however, clearly identify and separate payments for foster care maintenance, as defined at section 475 (4)(A) of the Act, from those for tuition, treatment, social services, and other expenditures not reimbursable under title IV-E foster care maintenance.

**EXHIBIT C**

# *Child Welfare Policy Manual*

*Source:      ACYF-CB-PA-97-01 (7/25/97)ACYF-CB-PA-97-01 (7/25/97)*

*Reference:  Social Security Act - sections 472 and 475; the Personal Responsibility Work Opportunity Reconciliation Act (PRWORA) (PL 104-193)*

*2* *Q:*  In our State, we pay four different rates for foster care maintenance.  A basic rate to all foster parents covers food, clothing, shelter, and personal incidentals.  In addition, there are three levels of supplements which are paid to foster parents who care for children with varying degrees of physical or emotional handicaps.  The higher rates in these cases relate to the increased supervision required for children with special needs and are considered a part of the foster care maintenance payment.  Are these supplemental payments to foster parents allowable for reimbursement under title IV-E foster care as a maintenance cost?

*A:*  Yes. These costs are allowable for Federal financial participation under the title IV-E foster care program.  Certain categories of children, including those with physical or emotional disabilities, may require more day-to-day supervision and attention than those without such conditions.  Although Congress did not intend that salaries be paid under title IV-E to foster parents for ordinary parental duties, "daily supervision" is one of the items included in the definition of "foster care maintenance payments" in section 475(4) of the Social Security Act. A supplement to the basic maintenance payment for a particular child is justified when the child has greater than usual needs for the items included in the definition, as determined by the State agency.

*Source:      ACYF-CB-PIQ-86-04 (8/20/86)ACYF-CB-PIQ-86-04 (8/20/86)*

*Reference:  Social Security Act - section 475 (4)*

**EXHIBIT C**

## *Child Welfare Policy Manual*

**8.3C    TITLE IV-E, Foster Care Maintenance Payments Program, State Plan/Procedural Requirements**

*1*  *Q:*  For what population of children must the section 422 protections be provided?

*A:*  Section 422 of the Social Security Act requires that all of the protections set forth therein be provided to all children in foster care.  "Foster care" is defined at 45 CFR 1355.20 as:

"24 hour substitute care for all children placed away from their parents or guardians and for whom the State agency has placement and care responsibility.  This includes but is not limited to foster family homes, foster homes of relatives, group homes, emergency shelters, residential facilities, child-care institutions, and pre-adoptive homes regardless of whether the foster care facility is licensed and whether payments are made by the State or local agency for the care of the child or whether there is Federal matching of any payments that are made."

Situations exist in which a child who, while s/he may have been removed from her/his home and placed in 24 hour substitute care, is not considered to be in "foster care" because of the nature of the facility in which s/he is placed. In accordance with the statute, we have not considered detention facilities, forestry camps, training schools, facilities that are primarily for the detention of children who are adjudicated delinquent, and facilities like medical or psychiatric hospitals as foster care placements.  Therefore, children placed in facilities of the type described here are not, by definition, in foster care and the State is not required to provide the protections to them while they are placed in such facilities.

*Source:    Questions and Answers on the Final Rule (65 FR 4020) (1/25/00)Questions and Answers on the Final Rule (65 FR 4020) (1/25/00)*

*Reference:  Social Security Act - section 471 (22); 45 CFR 1355.20*

**EXHIBIT C**

# *Child Welfare Policy Manual*

*2*  *Q:*  Please explain the requirements with respect to case plans and the case review system at section 475 of the Social Security Act (the Act) for a child and his/her minor parent in foster care.

*A:*  The State is not required to satisfy the requirements of the case plan and case review system set forth at section 475 of the Act on behalf of a child of a minor parent because s/he has not been removed from her/his biological parent and; therefore, pursuant to Federal law and regulations, is not in foster care. However, good social work practice suggests that the minor parent's case plan include the needs of the child and that the child's needs and interests be addressed during the six-month periodic reviews and permanency hearings held on behalf of the minor parent.

In cases where the State has placement and care responsibility for both the minor parent and child, and has placed them in different foster homes, the child is considered to be in foster care and the requirements of the case plan and case review system at section 475 of the Act apply.

*Source:    Questions and Answers on the Final Rule (65 FR 4020) (1/25/00)Questions and Answers on the Final Rule (65 FR 4020) (1/25/00)*
*Reference:  Social Security Act - section 475; 45 CFR 1355.20*

*3*  *Q:*  Section 471(a)(26) of the Social Security Act (the Act) requires the State to conduct and complete an interstate home study and return a report on the results of the study within 60 days (or 75 days under certain circumstances). Must the State include the results of the criminal background checks and child abuse registry checks on the prospective foster or adoptive family required by section 471(a)(20) of the Act in the 60-day report?

*A:*  No. Section 471(a)(26) of the Act requires that if a State receives a request to conduct a "study of a home environment" to assess the safety and suitability of placing a child in the home, the State must within 60 days conduct, complete, and provide a report of the study to the requesting State. This requirement for an interstate "home study" does not encompass the Federal provisions for criminal background checks and child abuse registry checks in section 471(a)(20) of the Act. Rather, these checks are required before the State can license or approve a prospective foster or adoptive family. Ideally, however, the receiving State would include the results of the criminal background check and child abuse registry check in the report to the sending State so that the State could more readily determine the suitability of the

**EXHIBIT C**

# *Child Welfare Policy Manual*

home for the child.

*Source:    01/29/0701/29/07*

*Reference:  Social Security Act   sections 471(a)(26) and 471(a)(20)*

*4  Q:*  How will ACF determine compliance with the interstate home study requirements in section 471(a)(26) of the Social Security Act (the Act)?

*A:*  Section 471(a)(26) of the Act is a title IV-E State plan requirement; therefore, ACF has the authority to apply the partial review process described in 45 CFR 1355.32(d), if warranted, to determine the State's compliance.

*Source:    01/29/0701/29/07*

*Reference:  Social Security Act   section 471(a)(26)*

*5  Q:*  Section 471(a)(26)(A)(i) of the Social Security Act (the Act) requires States to complete out-of-State home studies within 60 days, or 75 days in limited circumstances.  Are the time limits of section 471(a)(26)(A)(i) of the Act based on business or calendar days?

*A:*  The 60 and 75-day time limits that apply to the requirements of section 471(a)(26)(A)(i) of the Act are based on calendar days.  Time limits referred to in the statute refer to calendar days unless otherwise specified.

*Source:    04/24/0704/24/07*

*Reference:  Social Security Act   section 471(a)(26)(A)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

**6  Q:** Section 471(a)(26)(A)(i) of the Social Security Act (the Act) requires that States complete out-of-State home studies within 60 days, or 75 days in limited circumstances.  At what point does the 60 or 75-day timeframe begin?

**A:** Section 471(a)(26)(A)(i) of the Act establishes that the 60 and 75-day period  begins when the State that is to conduct the home study receives the home study request.  It is up to each State to determine the entity in the State to receive these requests.

*Source:       04/24/0704/24/07*

*Reference:  Social Security Act   section 471(a)(26)(A)*

**7  Q:** Section 471(a)(26)(A)(i) of the Social Security Act (the Act) requires that within 60 days of having received an interstate home study request from another State, the responding State conduct and complete the study and return a report to the requesting State.   If the home study request is incomplete when it is received and additional information is required, when does the statutory 60-day timeframe begin?

**A:** A State may establish its own rules for what constitutes a completed out-of-State home study request pursuant to section 471(a)(26)(A)(i) of the Act.  Therefore, the 60-day timeframe begins when a complete request, as defined by the State that is performing the home study, is received from the requesting State.

*Source:       04/24/0704/24/07*

*Reference:  Social Security Act   section 471(a)(26)(A)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

*8* *Q:* Under section 471(a)(26)(A) of the Social Security Act (the Act), the law requires a State receiving an out-of-State home study request to "directly or by contract" complete the home study.  Does the statute permit either the responding or requesting State to contract with a private agency for an interstate home study?

*A:* Yes. When a State receives an out-of-State home study request, the State is required to conduct and complete the study "directly or by contract."  However, the requesting State may choose to contract directly with a private agency to conduct an out-of-State home study, rather than requesting the State to complete the study.

*Source:     04/24/0704/24/07*

*Reference:  Social Security Act   section 471(a)(26)(A)*

## 8.3C.1     TITLE IV-E, Foster Care Maintenance Payments Program, State Plan/Procedural Requirements, Case plans

*1* *Q:* 45 CFR 1356.21 (g)(1) requires case plans to be developed jointly with the parent(s).  What if the State is unable to locate the parent or s/he is unwilling or unable to participate in developing the plan?

*A:* We believe the regulatory requirement to include parents in the joint development of case plans serves the goal of the Adoption and Safe Families Act (Pub. Law 105-89) to begin the permanency planning process and service delivery as soon as possible following a child's removal from home.  If the parent is not able or willing to participate in the development of the case plan, it should be so noted in the plan.

*Source:     Preamble to the Notice of Proposed Rulemaking (63 FR 50058) (9/18/98)Preamble to the Notice of Proposed Rulemaking (63 FR 50058) (9/18/98)*

*Reference:  45 CFR 1356.21 (g)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

2   *Q:*  How long after the original placement occurs must the case plan be written?  Must a new case plan be prepared each time a child moves to a new provider or is it sufficient to update the case plan for each change in placement?  How often must the case plan be updated if the child remains in the same placement for several years?

*A:*  The regulations at 45 CFR 1356.21 (g) require that the case plan "Be developed within a reasonable period, to be established by the State, but in no event later than 60 days from the child's removal from the home..." Therefore, when a new placement is made, either a new or updated case plan must be developed.

If a child remains in the same placement for several years, the case plan should be updated periodically.  Ordinarily, this should occur after each six-month periodic review.  The education and health section of the case plan should also be updated as appropriate to reflect the changing services to and needs of the child.

*Source:*     *ACYF-CB-PIQ-90-03 (12/6/90)ACYF-CB-PIQ-90-03 (12/6/90)*
*Reference:  Social Security Act - section 471 (a)(16), 475 (1) and (5); 45 CFR 1356.21 (g)*

3   *Q:*  Must the court approve case plans?

*A:*  No. There is no statutory basis for requiring judicial approval of the State agency's case plan document.  The court's role is to: exercise oversight of the permanency plan; review the State agency's reasonable efforts to prevent removal from the home, reunify the child with the family and finalize permanent placements; and to conduct permanency hearings.  The State agency is responsible for developing and implementing the case plan.  We see no additional benefit in requiring court approval of the case plan.

Moreover, it is not permissible for courts to extend their responsibilities to include choosing a child's placement with a specific foster care provider.  To be eligible for title IV-E foster care maintenance payments the child's placement and care responsibility must either lie with the State agency, or another public agency with whom the State has an agreement according to section 472 (a)(2) of the Social Security Act.  Once a court has chosen a placement with a specific provider, it has assumed the State agency's placement responsibility.  Consequently, the State cannot claim Federal financial participation (FFP) for that placement.

**EXHIBIT C**

# *Child Welfare Policy Manual*

Source:     Preamble to the Final Rule (65 FR 4020) (1/25/00)Preamble to the Final Rule (65 FR 4020) (1/25/00)
Reference: 45 CFR 1356.21 (g)

**4   Q:** What are the title IV-E and title IV-B case plan requirements regarding health and educational records?  Can the education and health records remain a part of the case record rather than be incorporated into the case plan?  Can education and health records be attached to the case plan as an appendix?

**A:** Section 475 (1) of the Social Security Act (the Act) included in its definition of "case plan" the requirement that a foster child's case plan must include certain information regarding his educational and health status.  In addition, section 475 (5)(D) of the Act ensures that the child's health and education records are reviewed and updated at the time of each placement of the child in foster care and that such records are supplied to the foster parent or foster care provider with whom the child is placed.

The case plan must be a discrete document which includes the education and health records of the child.  In most cases, the information to be included in the case plan, and supplied to the foster parent(s) or caretaker of the foster child, would be less comprehensive than the case record.  The case record, on the other hand, should include all of the health and education records of the child and include detailed medical reports, psychological evaluations, etc.

It would be possible to comply with the law by attaching copies of the most relevant health and education information to the case plan as an appendix or by summarizing this information as an integral part of the case plan.

Source:     ACYF-CB-PIQ-90-03 (12/6/90)ACYF-CB-PIQ-90-03 (12/6/90)
Reference: Social Security Act - sections 475 (1)

**EXHIBIT C**

# *Child Welfare Policy Manual*

**5** **Q:** Section 475(1)(C) of the Social Security Act states that the case plan must include "the most recent information available" regarding the health and education records of the child.  How can a State meet the requirements in order to continue eligibility for Federal financial participation (FFP) if the records are not available?

**A:** States are required under this provision to include the child's most recent available health and educational records in the child's case plan. If the information is unavailable as a result of Federal or State confidentiality restrictions or for any other reason, the State should explain this in the case plan and describe the steps being taken to obtain such records. Including recent health and education records in a case plan is a State plan requirement, rather than a title IV-E eligibility criterion upon which FFP is conditioned.  Therefore, we may determine whether the State is in substantial compliance with this requirement through a Child and Family Services Review or a partial review (45 CFR 1355.32 and 1355.34).

*Source:     01/29/0701/29/07*

*Reference:  The Safe and Timely Interstate Placement of Foster Children Act of 2006 (P.L. 109-239); 475(5)(C) of the Social Security Act*

**6** **Q:** Regulations at 45 CFR 1356.21(g) require that a State develop a case plan within 60 days of removal.  How is the due date for development of a case plan determined for a child initially placed in a facility outside the scope of foster care (e.g., a detention facility or psychiatric hospital) prior to entering foster care?

**A:** The case plan requirements in 45 CFR 1356.21(g) apply to children in foster care. Accordingly, when a child is initially placed in a facility that is outside the scope of foster care, the State has 60 days from the date the child is placed in foster care to develop a case plan.

*Source:     12/31/0712/31/07*

*Reference:  Social Security Act   sections 471(a)(16); 45 CFR 1356.21(g); Preamble to the Final Rule (65 FR 4031)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

**8.3C.2     TITLE IV-E, Foster Care Maintenance Payments Program, State Plan/Procedural Requirements, Case review system**

*1  Q:*  Should the time a child spends in shelter care be factored into calculating the timing for holding periodic reviews, permanency hearings, and for complying with the termination of parental rights (TPR) provision?

*A:*  Under long-standing Departmental policy, shelter care is considered a form of foster care (see the definition of "foster care" at 45 CFR 1355.20).  Shelter care is one of many possible settings in which children in foster care are placed.  Therefore, time spent in shelter care counts in determining when to hold periodic reviews, permanency hearings, and for complying with the TPR provision.

*Source:      Preamble to the Final Rule (65 FR 4020) (1/25/00)Preamble to the Final Rule (65 FR 4020) (1/25/00)*

*Reference:  Social Security Act - section 475 (5)(F); 45 CFR 1355.20 and 1356.21 (f)*

*2  Q:*  How is the timing for holding six-month periodic reviews and permanency hearings impacted by an interruption in a foster care episode, for example, a temporary placement in a detention facility or psychiatric hospital?

*A:*  States have two options for addressing the scenario presented in this question:

First, despite the interruption in foster care, the State may choose to treat the foster care placement as continuous if the original court order pertaining to the child's removal from the home is still in effect.  If the State chooses to do so, the "clock" for holding six-month periodic reviews and permanency hearings would stop while the child is placed in a facility that is outside the scope of "foster care" because the State is not required to hold such reviews and hearings for children who are not in "foster care."  The timing for holding six-month periodic reviews and permanency hearings would resume in accordance with the original schedule when the child returns to a foster care setting.

Alternatively, the State may treat the placement in a facility that is outside the scope of foster care as a discharge from foster care.  Obviously, if the child is discharged from foster care, the State is not required to hold six-month periodic reviews or permanency hearings for such child. The timing for holding such reviews and hearings begins anew when/if the child returns to foster care.

**EXHIBIT C**

# *Child Welfare Policy Manual*

Regardless of the option the State chooses, no Federal financial participation is available while the child is placed in a facility that is considered outside the scope of "foster care."

*Source:     Questions and Answers on the Final Rule (65 FR 4020 (1/25/00)Questions and Answers on the Final Rule (65 FR 4020 (1/25/00)*

*Reference:  Social Security Act - section 475 (5); 45 CFR 1355.20*

*3   Q:* Must the State hold six-month periodic reviews and permanency hearings for children who have run away?

*A:* If the State retains responsibility for the placement and care of the child during the runaway episode, it must continue to hold six-month periodic reviews and permanency hearings on the original schedule, even if the child has not been located.

*Source:     Questions and Answers on the Final Rule (65 FR 4020 (1/25/00)Questions and Answers on the Final Rule (65 FR 4020 (1/25/00)*

*Reference:  Social Security Act - sections 472 (a) and 475 (5)*

*4   Q:* Must the State hold six-month periodic reviews and permanency hearings for children in foster care who are placed in unlicensed foster family homes?

*A:* Yes.  The protections set forth at section 422(a)(10) of the Social Security Act apply to all children in foster care, regardless of a foster care provider's licensure.

*Source:     Questions and Answers on the Final Rule (65 FR 4020 (1/25/00)Questions and Answers on the Final Rule (65 FR 4020 (1/25/00)*

*Reference:  Social Security Act - section 422; 45 CFR 1355.20*

**EXHIBIT C**

# *Child Welfare Policy Manual*

5  *Q:*  We understand that the timing for conducting the initial permanency hearing and six-month periodic review is based on the date the child is considered to have entered foster care. Are subsequent reviews/hearings to be held based on the date the child is considered to have entered foster care or within 12 months of the date the prior hearing or review was actually held?

*A:*  Either methodology referenced in the question is consistent with and would satisfy the regulatory requirements. We will, therefore, leave the methodology employed to the State's discretion. We strongly encourage States, however, to adopt and set forth in State policy one methodology for holding the subsequent hearings/reviews to ensure consistent application across the title IV-E caseload.

*Source:     Questions and Answers on the Final Rule (65 FR 4020 (1/25/00)Questions and Answers on the Final Rule (65 FR 4020 (1/25/00)*
*Reference:  Social Security Act - section 475 (5); 45 CFR 1355.20*

6  *Q:*  When a child in foster care is placed in another State and the sending State transfers the child's placement and care responsibility to the receiving State's title IV-B/IV-E agency, does the "clock" re-start for determining when the case review requirements or reasonable efforts to finalize a permanency plan are due?

*A:*  No. The "clock" for the case review requirements and reasonable efforts to finalize a permanency plan judicial determination begins on the date the child is considered to have entered foster care (section 475(5)(F) of the Social Security Act, 45 CFR 1355.20 and 1356.21(b)(2)). The date the child is considered to have entered foster care is the earlier of the date of the first judicial finding that the child has been subjected to child abuse or neglect, or the date that is 60 days after the child's removal from the home. The child's transfer from one State to another does not alter either date. Moreover, we believe that not extending the timeframes for carrying out the protections in such circumstances is consistent with a child's sense of time and the statute?s emphasis on timely permanency for children.

*Source:     09/05/0709/05/07*
*Reference:  Social Security Act - section 475(5)(F); 45 CFR 1355.20 and 1356.21(b)(2)*

**EXHIBIT C**

## *Child Welfare Policy Manual*

**8.3C.2a    TITLE IV-E, Foster Care Maintenance Payments Program, State Plan/Procedural Requirements, Case review system, date a child is considered to have entered foster care**

*1  Q:*  For the date the child is considered to have entered foster care, may the State use a date that is earlier than that prescribed in regulation?

*A:*  The time frames for considering when a child has entered foster care, i.e., the earlier of a judicial finding of abuse or neglect or 60 days from the date the child is removed from the home, are statutory.  However, nothing precludes a State from using a point in time that is earlier than that required by statute or regulation, such as the date the child is physically removed from the home.  Clearly, if a State uses the date a child is physically removed from the home, the requirements for holding periodic reviews, permanency hearings, and complying with the termination of parental rights provision within the time frames prescribed would be satisfied.

*Source:*    *Preamble to the Final Rule (65 FR 4020) (1/25/00)Preamble to the Final Rule (65 FR 4020) (1/25/00)*
*Reference:  Social Security Act - section 475 (5)(F); 45 CFR 1355.20, 1356.21 (b)(2) and 1356.22*

*2  Q:*  How does the date of entry into foster care apply to children who enter foster care pursuant to a voluntary placement agreement?

*A:*  The statute makes no distinction with respect to the manner in which children enter foster care when setting the parameters for determining when a child is considered to have entered foster care.  Therefore, children placed in foster care via a voluntary placement agreement will be considered to have entered foster care no later than 60 days after the child is removed from the home.

 We want to take this opportunity, however, to note that the purpose of the 60-day limit at section 475 (5)(F) of the Social Security Act is to ensure that periodic reviews, permanency hearings, and application of the termination of parental rights (TPR) provision are not delayed as a result of contested involuntary removals.  The danger of such a delay often does not exist when children are removed from their homes pursuant to a voluntary placement agreement.  When children are removed from home via a voluntary placement agreement, we encourage States to use the date the child is placed in foster care (rather than 60 days later) as the date for calculating when to hold periodic reviews, permanency hearings, and for complying with the TPR provision.

**EXHIBIT C**

# *Child Welfare Policy Manual*

*Source:*     *Preamble to the Final Rule (65 FR 4020) (1/25/00)Preamble to the Final Rule (65 FR 4020) (1/25/00)*

*Reference: Social Security Act - section 475 (5)(F); 45 CFR 1355.20, 1356.21 (b)(2) and 1356.22*

*3*  *Q:*  How should the State determine the date a child is considered to have entered foster care for a child who is voluntarily relinquished?

*A:*  The date a child is considered to have entered foster care according to the statute is the earlier of a judicial finding of abuse or neglect or 60 days from the date the child was removed from the home.  Typically, there is no finding of abuse or neglect in a voluntary relinquishment, so the date of entry into foster care would be no later than 60 days from the date the child was removed from the home.

*Source:*     *Preamble to the Final Rule (65 FR 4020) (1/25/00)Preamble to the Final Rule (65 FR 4020) (1/25/00)*

*Reference: Social Security Act - section 475 (5)(F); 45 CFR 1355.20, 1356.21 (b)(2) and 1356.22*

*4*  *Q:*  What is the connection between the date the child is considered to have entered foster care and when the State may claim Federal financial participation (FFP) for foster care maintenance payments?

*A:*  Establishing initial eligibility for title IV-E funding and initial claiming for FFP have no relationship to the date the child is considered to have entered foster care defined at section 475 (5)(F) of the Social Security Act.  The purpose of that provision is to set the "clock" for determining when to satisfy the requirements for holding periodic reviews, permanency hearings, and the termination of parental rights (TPR) provision.  A child's initial eligibility for title IV-E funding is not related to this time frame.

 The date a child is considered to have entered foster care is, however, related to maintaining a child's eligibility for title IV-E funding.  Under section 1356.21 (b)(2), we require the State to use the date the child is considered to have entered foster care in determining when to obtain a judicial determination that it made reasonable efforts to finalize a permanency plan.  We intentionally linked the timing for obtaining this judicial determination to the date the child is considered to have entered foster care so that such determinations could occur at the

**EXHIBIT C**

# *Child Welfare Policy Manual*

permanency hearing, the logical time for making such determinations.

*Source:     Preamble to the Final Rule (65 FR 4020) (1/25/00)Preamble to the Final Rule (65 FR 4020) (1/25/00)*

*Reference:  Social Security Act - section 475 (5)(F); 45 CFR 1355.20, 1356.21 (b)(2) and 1356.22*

*5   Q:*  States often temporarily place children in facilities that are outside the scope of what is considered "foster care," such as a detention facility or psychiatric hospital, with the intent of moving the child to a foster care placement at a later date.  What is the "date the child is considered to have entered foster care" (the date used to satisfy the case review requirements at section 475 (5) of the Social Security Act (the Act)) for such children?

*A:*  If a child is initially placed in a facility that is not a foster family home or child-care institution, i.e., the child is not in "foster care," and remains in such facility for more than 60 days, the date such child is considered to have entered foster care is the day that child is placed in a foster family home or child-care institution.  If however, the child's entry into foster care from such a setting occurs within 60 days of his or her removal from the home, States should determine the "clock" for satisfying the requirements of the case review system in accordance with section 475 (5)(F) of the Act, i.e., the earlier of a judicial finding of abuse or neglect or 60 days from the date of removal.

*Source:     Questions and Answers on the  Final Rule (65 FR 4020) (1/25/00)Questions and Answers on the  Final Rule (65 FR 4020) (1/25/00)*

*Reference:  Social Security Act - section 475 (5); 45 CFR 1355.20*

**EXHIBIT C**

# *Child Welfare Policy Manual*

**8.3C.2b     TITLE IV-E, Foster Care Maintenance Payments Program, State Plan/Procedural Requirements, Case review system, notice and right to be heard**

*1  Q:*  Is it possible to waive noticing a parent whose child's case plan goal is a permanent foster care placement?

*A:*  There is no waiver provision in the law with respect to opportunity for parental involvement in an administrative review undertaken as required by the case review system.

A periodic case review may be undertaken either by a court or by an "administrative review". (Section 475 (5)(B) of the Social Security Act (the Act)).  Section 475 (6) of the Act defines an "administrative review" as a "review open to the participation of the parents of the child..."

These provisions indicate that when a State agency satisfies the periodic review requirement by "administrative review", it must provide parents the opportunity to participate in the proceedings.  Of course the parents may choose not to participate.  But it is incumbent upon the State agency to give them that opportunity.

*Source:*     ACYF-CB-PIQ-81-01 (10/20/81)ACYF-CB-PIQ-81-01 (10/20/81)
*Reference:*  Social Security Act - sections 471 (a)(16) and 475 (5) and (6)

*2  Q:*  Do the notice requirements in section 475(G) of the Social Security Act apply to all court hearings? Do they apply to shelter care, emergency removal, adjudication and disposition hearings?  Do they apply to procedural hearings, such as pretrial hearings or hearings on motions for discovery?

*A:*  The revised statutory language confers a "right" to be heard instead of an "opportunity," as well as changes such right to be heard to a "proceeding" instead of "review or hearing" as in the previous language.  Thus, we are interpreting this change to mean that in having a "right" to any "proceeding" to be held with respect to the child, the foster parents, pre-adoptive parents or relatives providing care for a child must, at a minimum, be provided with notice of their right to be heard in all permanency hearings, as well as six-month reviews, if held by the court.

*Source:*     01/29/0701/29/07
*Reference:*  Social Security Act   section 475(5)(G), 45 CFR 1356.21(o)

**EXHIBIT C**

# *Child Welfare Policy Manual*

**8.3C.2c     TITLE IV-E, Foster Care Maintenance Payments Program, State Plan/Procedural Requirements, Case review system, permanency hearings**

*1  Q:* Must the State cease efforts at reunification at the permanency hearing if the child is unable to return home to the parent at that time?

*A:* No. The State is not obliged to set an alternate permanency plan at the permanency hearing if the child and family are not able to reunify at that time.  However, the intent of the Adoption and Safe Families Act in shortening the time line for holding a permanency hearing was to place greater accountability and responsibility on parents for making their home ready and safe for the child's return.  Families often present very complicated issues that must be resolved prior to reunification.  For example, parents dealing with substance abuse issues may require more than 12 months to resolve those issues.  However, a parent must be  complying with the established case plan, making significant measurable progress toward achieving the goals established in the case plan, and diligently working toward reunification in order to maintain it as the permanency plan at the permanency hearing.  Moreover, the State and court must expect reunification to occur within a time frame that is consistent with the child's developmental needs.  If this is not the situation, the State is obliged to establish and act on an alternate permanency plan for the child at the permanency hearing.  Too often, reunification is retained as the permanency goal when a parent is negligent in complying with the requirements of the case plan until the months or weeks immediately prior to the permanency hearing.  A parent's resumption of contact or overtures toward participating in the case plan in the months or weeks immediately preceding the permanency hearing are insufficient grounds for retaining reunification as the permanency plan.  In such situations, the parent should demonstrate a genuine, sustainable investment in completing the requirements of the case plan in order to retain reunification as the permanency goal. The shortened time frames and increased accountability for parents makes it incumbent on the State to begin providing services to families as soon as it receives responsibility for the child's placement and care. Ideally, the State will begin delivering services to resolve those parental issues which lead to the removal as soon as the child is removed from home.

*Source:     Preamble to the Notice of Proposed Rulemaking (63 FR 50058) (9/18/98)Preamble to the Notice of Proposed Rulemaking (63 FR 50058) (9/18/98)*
*Reference:  Social Security Act - section 475 (5)(C); 45 CFR 1355.20*

**EXHIBIT C**

## *Child Welfare Policy Manual*

2  *Q:*  What is the rationale for prohibiting any body that conducts permanency hearings from being part of or under the supervision or direction of the State agency?  Does this requirement extend to other public agencies with which the State agency has a title IV-E agreement?

*A:*  Critical decisions that have a significant effect on the lives of children and their families are made at permanency hearings.  The purpose of requiring courts to oversee permanency hearings is to ensure that these hearings are conducted by an impartial body, which includes any body appointed or approved by the court to provide this oversight in its stead.  An administrative body that is part of the State agency or under its direction or supervision would not meet the test of impartiality.

The requirement does extend to other public agencies with which the State agency has an agreement. Title IV-E requirements extend to any other public agency with which the State agency enters an agreement for the performance of title IV-E administrative functions, including responsibility for placement and care of the child.

*Source:    Preamble to the Final Rule (65 FR 4020) (1/25/00)Preamble to the Final Rule (65 FR 4020) (1/25/00)*
*Reference:  Social Security Act - section 475 (5)(C); 45 CFR 1355.20*

3  *Q:*  May a State include placement in a permanent foster family home and emancipation in the list of permanency goals at section 475 (5)(C) of the Social Security Act (the Act) that are exempt from the compelling reason requirement in that section?

*A:*  No. Section 475 (5)(C) of the Act specifies that the only permanency options the State may set without a compelling reason to do so include reunification, adoption, legal guardianship, or placement with a fit and willing relative.

*Source:    Preamble to the Final Rule (65 FR 4020) (1/25/00)Preamble to the Final Rule (65 FR 4020) (1/25/00)*
*Reference:  Social Security Act - section 475 (5)(C); 45 CFR 1355.20*

**EXHIBIT C**

# *Child Welfare Policy Manual*

*4*  *Q:*  In what way can a State meet the requirement for the court holding a permanency hearing to conduct age-appropriate consultation with the child in section 475(5)(C)(ii) of the Social Security Act (the Act)?

*A:*  Any action that permits the court to obtain the views of the child in the context of the permanency hearing could meet the requirement.  Section 475(5)(C)(ii) of the Act tasks the State with applying procedural safeguards to ensure that the consultation occurs.  However, the statute does not prescribe a particular manner in which the consultation with the child must be achieved which provides the State with some discretion in determining how it will comply with the requirement.

We do not interpret the term "consult" to require a court representative to pose a literal question to a child or require the physical presence of the child at a permanency hearing. However, the child's views on the child's permanency or transition plan must be obtained by the court for consideration during the hearing.  For example, a report to the court in preparation for a permanency hearing that clearly identifies the child?s views regarding the proposed permanency or transition plan for the child could meet the requirement.  Also, an attorney, caseworker, or guardian ad litem who verbally reports the child?s views to the court could also meet the requirement.  Information that is provided to the court regarding the child?s best interests alone are not sufficient to meet this requirement.  Ultimately, if the court is not satisfied that it has obtained the views of the child through these or any other mechanism, it could request that the child be in the courtroom, or make other arrangements to obtain the child's views on his/her permanency or transition plan.

*Source:*     *06/22/0706/22/07*

*Reference:*  *Social Security Act   475(5)(C)(iii)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

**8.3C.2d     TITLE IV-E, Foster Care Maintenance Payments Program, State Plan/Procedural Requirements, Case review system, six month periodic reviews**

*1  Q:* Is it possible to abbreviate and/or alter case review procedures for a child whose case plan goal is long-term foster care?

*A:* Each child for whom foster care maintenance payments are claimed under title IV-E must have a case review in accordance with the provisions outlined in section 475 (5) of the Social Security Act.  These statutory requirements must be adhered to under all circumstances.  Thus, a case plan and periodic reviews must be developed and implemented even if the goal for the child is long-term foster care.

 However, the form and content of the review may be varied to accommodate the circumstances described.  If the placement goal is long-term foster care, review would focus on areas other than alleviating problems in the child's original home.  There are many interests of the child for which the agency continues to be responsible.  There are, for example, matters concerning the continued appropriateness of the plan and the placement, plans for assuring that the child continues to receive proper care in the placement, and the appropriateness of services provided to the child under the plan; and, by implication, the agency has a continuing responsibility to assure and facilitate the child's adjustment.  Moreover, information from full case review is needed to report to the court at the 12-month permanency hearing.

*Source:     ACYF-CB-PIQ-81-01 (10/20/81)ACYF-CB-PIQ-81-01 (10/20/81)*
*Reference:  Social Security Act - sections 471(a)(16) and 475(1) and (5)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

*2* **Q:** Is it correct to say that an administrative review as a written report from the State agency to the court does not meet the court review requirement unless the court reviews the report and makes a determination as described in section 475 of the Social Security Act (the Act)?

*A:* This interpretation is correct. Section 475 (5)(B) of the Act lists the determinations which must be made with regard to a foster child's status during the periodic six month review. If these do not occur in the court review, it is the State agency's responsibility to carry out an administrative review which meets these requirements. For States which make use of courts for periodic review of children in foster care, it would be advisable to develop cooperative arrangements, if possible, to accomplish the purposes of the review.

*Source:     ACYF-CB-PIQ-82-01 (1/19/82)ACYF-CB-PIQ-82-01 (1/19/82)*
*Reference:  Social Security Act - sections 471(a)(16) and 475 (5)*

*3* **Q:** We believe failure to hold a six month case review is a program issue and not an eligibility issue.  Is this correct?

*A:* Yes.  Failure to hold a periodic review as required in section 471 (a)(16) of the Social Security Act is not an eligibility issue.   Section 471 (a)(16) is a title IV-E State plan requirement for a case review system with respect to each child receiving title IV-E foster care maintenance payments.  It is not an eligibility requirement for the individual  child in care.  Failure to conduct timely periodic reviews of the status of each child receiving assistance under title IV-E could result in the State's being out of compliance with its title IV-E State plan; however, such failure would not affect the individual child's eligibility under the program.

*Source:     ACYF-CB-PIQ-85-06 (6/5/85)ACYF-CB-PIQ-85-06 (6/5/85)*
*Reference:  Social Security Act - sections 471 (a)(16) and 472*

**EXHIBIT C**

# *Child Welfare Policy Manual*

**4  *Q:*** Can periodic reviews occur less frequently than every six months?

**  *A:*** No.  Section 475 (5)(B) of the Social Security Act provides that, "the status of each child is reviewed periodically but no less frequently than once every six months by either a court or by administrative review.."  Without exception, the clear statutory language requires a review at least once every six months.

*Source:*    *ACYF-CB-PIQ-81-01 (10/20/81)ACYF-CB-PIQ-81-01 (10/20/81)*
*Reference:  Social Security Act - sections 471(a)(16) and 475 (5)(B)*

## 8.3C.2e    TITLE IV-E, Foster Care Maintenance Payments Program, State Plan/Procedural Requirements, Case review system, termination of parental rights

**1  *Q:*** How should a State calculate the 15 out of 22 months when a child has multiple entries to and exits from foster care?

**  *A:*** For the purpose of implementing the termination of parental rights (TPR) provision for children with multiple foster care placement episodes within the 22 month period, the State must use a cumulative method of calculating 15 months in foster care.  For example, a child enters foster care on January 15, 2001 and is discharged from foster care three months later on April 15, 2001.  He remains home for six months and then enters foster care again on October 15, 2001.  The State must apply the TPR requirement at section 475(5)(E) of the Social Security Act with respect to this child based on the date he entered foster care for the first foster care episode, or January 15, 2001.  If this child remains in foster care for another 12 months, the State will be obliged to comply with section 475(5)(E) on October 15, 2002, because this child will have been in foster care for a cumulative total of 15 out of the previous 22 months.  However, the time line for conducting case reviews, permanency hearings, and providing time-limited reunification services for the subsequent foster care episode must be based on the date the child entered foster care for that episode, October 15, 2001.

 If the child in the above scenario does not return to foster care until January 15, 2003, the State must begin calculating a new 15 out of 22 month period for applying section 475(5)(E) and the other case review requirements as of January 15, 2003, because this most recent date of entry into foster care is more than 22 months after the date the child entered foster care during the prior episode.

**EXHIBIT C**

# *Child Welfare Policy Manual*

*Source:     Preamble to the Notice of Proposed Rulemaking (63 FR 50058) (9/18/98)Preamble to the Notice of Proposed Rulemaking (63 FR 50058) (9/18/98)*

*Reference: Social Security Act - section 475 (5)(E); 45 CFR 1356.21 (i)*

*2* *Q:* When a child has been in foster care for 15 out of 22 months but the State does not file a petition to terminate parental rights (TPR) because an exception applies, must the State begin counting another 15 out of 22 months at that time?

*A:* States need only apply section 475(5)(E) of the Social Security Act (the Act) to a child once. If, when a child reaches 15 months in foster care, the State does not file a petition for TPR because one of the exceptions applies, or the State does file such a petition but the court does not sustain that petition, the State does not need to begin calculating another 15 out of 22 months in foster care for that child. We think the requirements at sections 471(a)(15)(C) and (E) and 475(1)(E) of the Act regarding reasonable efforts to make and finalize alternate permanency placements and the requirements at section 475(5)(C) of the Act regarding permanency hearings provide children sufficient protections with respect to achieving permanency, thereby removing the need to require multiple applications of section 475(5)(E) of the Act. However, this does not preclude the State from filing, or the court from ordering, a petition for TPR upon later review if the permanency plan has not been achieved.

*Source:     Preamble to the Notice of Proposed Rulemaking (63 FR 50058) (9/18/98)Preamble to the Notice of Proposed Rulemaking (63 FR 50058) (9/18/98)*

*Reference: Social Security Act - section 475 (5)(E); 45 CFR 1356.21 (i)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

*3*  *Q:*  Must the State obtain a judicial determination regarding a compelling reason not to file a petition to terminate parental rights (TPR)?

*A:*  No. We have not interpreted the statutory language which requires that the documentation of the compelling reason be "... available for court review..." as a requirement that the court make a determination with respect to the compelling reason.  To interpret this language as requiring a court determination with respect to the compelling reason not to file a TPR would place an unnecessary additional burden on the State agency and the courts.  We do anticipate, however, that the court will have the opportunity to review the compelling reason not to file for TPR as part of its ongoing oversight.

*Source:*    *Preamble to the Notice of Proposed Rulemaking (63 FR 50058) (9/18/98)Preamble to the Notice of Proposed Rulemaking (63 FR 50058) (9/18/98)*
*Reference:  Social Security Act - section 475 (5)(E); 45 CFR 1356.21 (i)*

*4*  *Q:*  Is it possible to exempt certain categories of children from the requirement to file or join termination of parental rights (TPR) petitions for children who have been in foster care for 15 out of the most recent 22 months?

*A:*  No. There is no statutory authority to provide an exemption for particular populations from the requirement to file a TPR for children who have been in foster care for 15 out of the most recent 22 months.  The TPR requirement is designed to encourage State agencies to make timely decisions about permanency for children in foster care.  Exempting groups of children from the requirements would be contrary to this goal.

*Source:*    *Preamble to the Final Rule (65 FR 4020) (1/25/00)Preamble to the Final Rule (65 FR 4020) (1/25/00)*
*Reference:  Social Security Act - section 475 (5)(E); 45 CFR 1356.21 (i)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

5  *Q:*  Please explain how the termination of parental rights (TPR) requirement applies to Indian tribes and it's relationship to Indian Child Welfare Act requirements.

*A:*  The Indian Child Welfare Act of 1978 (ICWA), Public Law 95-608, was passed in response to concerns about the large number of Indian children who were being removed from their families and tribes and the failure of States to recognize the culture and tribal relations of Indian people. ICWA, in part, creates procedural protections and imposes substantive standards on the removal, placement, termination of parental rights and consent to adoption of children who are members of or are eligible for membership in an Indian tribe. The addition of the requirement in section 475 (5)(E) of the Social Security Act (the Act) to file a petition for TPR for certain children in no way diminishes the requirements of ICWA for the State to protect the best interests of Indian children. Furthermore, States are required to comply with the ICWA requirements and develop plans that specify how they will comply with ICWA in section 422 (b)(9) of the Act.

The requirement in section 475 (5)(E) of the Act applies to Indian tribal children as it applies to any other child under the placement and care responsibility of a State or tribal agency receiving title IV-B or IV-E funds. While we recognize that termination of parental rights and adoption may not be a part of an Indian tribe's traditional belief system or legal code, there is no statutory authority to provide a general exemption for Indian tribal children from the requirement to file a petition for TPR. If an Indian tribe that receives title IV-B or IV-E funds has placement and care responsibility for an Indian child, the Indian tribe must file a petition for TPR or, if appropriate, document the reason for an exception to the requirement in the case plan, on a case-by-case basis.

*Source:*    *Preamble to the Final Rule (65 FR 4020) (1/25/00)Preamble to the Final Rule (65 FR 4020) (1/25/00)*
*Reference:  Social Security Act - sections 422 (b)(9) and 475 (5)(E); 45 CFR 1356.21 (i); The Indian Child Welfare Act of 1978 (PL 95-608)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

*6*  *Q:*  May the State or Tribe define compelling reasons for not filing a petition to terminate parental rights (TPR) in State law or Tribal code?

*A:*  No. States and Tribes may not develop a standard list of compelling reasons for not filing for TPR that exempts groups of children.  Such a practice is contrary to the requirement that determinations regarding compelling reasons be made on a case-by-case basis.  States and Tribes may, however,  provide case workers examples of such for training purposes.

*Source:*    *Preamble to the Final Rule (65 FR 4020) (1/25/00)Preamble to the Final Rule (65 FR 4020) (1/25/00)*
*Reference:  Social Security Act - section 475 (5)(E); 45 CFR 1356.21 (i)*

*7*  *Q:*  Is the fact that a child had been in foster care for 15 out of the most recent 22 months legal grounds for a State to file a termination of parental rights (TPR) petition?

*A:*  States are neither required nor prohibited by Federal statute from making a child's length of stay in foster care legal grounds to file or grant a petition for TPR.

*Source:*    *Preamble to the Final Rule (65 FR 4020) (1/25/00)Preamble to the Final Rule (65 FR 4020) (1/25/00)*
*Reference:  Social Security Act - section 475 (5)(E); 45 CFR 1356.21 (i)*

## 8.3C.3    TITLE IV-E, Foster Care Maintenance Payments Program, State Plan/Procedural Requirements, Foster care goals

*1*  *Q:*  Must the foster care goals required at section 471 (a)(14) of the Social Security Act be enacted into State statute or may these goals be set forth in administrative code?

*A:*  Section 471 (a)(14) of the Social Security Act requires that specific goals be established by State law as to the maximum number of children receiving assistance under the State's title IV-E plan who will remain in foster care in excess of 24 months, and that the State plan include a description of the steps which will be taken by the State to achieve such goals. There is no specific requirement that such goals be incorporated into a statutory enactment. Our Office of the General Counsel has found that "State law" includes the administrative regulations of a

**EXHIBIT C**

# *Child Welfare Policy Manual*

State, properly promulgated according to the procedural requirements of that State.  The goals which are to be established by State law may be either incorporated into a State statute or established through administrative regulation.  In either case, they must be specific as to absolute numbers or a percentage of all foster children receiving assistance under the plan.

*Source:      ACYF-PIQ-82-01 (1/19/82)ACYF-PIQ-82-01 (1/19/82)*

*Reference:  Social Security Act - section 471 (a)(14)*


## 8.3C.4     TITLE IV-E, Foster Care Maintenance Payments Program, State Plan/Procedural Requirements, Reasonable efforts

*1*   *Q:*  What is the definition of "reasonable efforts?"


*A:*  We have not, nor do we intend to define "reasonable efforts."  To do so would be a direct contradiction of the intent of the law.  The statute requires that reasonable efforts determinations be made on a case-by-case basis.  We think any definition would either limit the courts' ability to make determinations on a case-by-case basis or be so broad as to be ineffective.  In the absence of a definition, courts may entertain actions such as the following in determining whether reasonable efforts were made:

 (1) Would the child's health or safety have been compromised had the agency attempted to maintain him or her at home?

 (2) Was the service plan customized to the individual needs of the family or was it a standard package of services?

 (3) Did the agency provide services to ameliorate factors present in the child or parent, i.e., physical, emotional, or psychological, that would inhibit a parent's ability to maintain the child safely at home?

 (4) Do limitations exist with respect to service availability, including transportation issues?  If so, what efforts did the agency undertake to overcome these obstacles?

 (5) Are the State agency's activities associated with making and finalizing an alternate permanent placement consistent with the permanency goal?  For example, if the permanency goal is adoption, has the agency filed for termination of parental rights, listed the child on State and national adoption exchanges, or implemented child-specific recruitment activities?

**EXHIBIT C**

# *Child Welfare Policy Manual*

*Source:     Preamble to the Notice of Proposed Rulemaking (63 FR 50058) (9/18/98)Preamble to the Notice of Proposed Rulemaking (63 FR 50058) (9/18/98)*

*Reference:  Social Security Act - section 471 (a)(15)*

*2*   *Q:*  The statute states that a court of competent jurisdiction may find that reasonable efforts are not required.  Please clarify what is meant by the term "court of competent jurisdiction".

*A:*  The court that has responsibility for hearing child welfare dependency cases must make the determination that reasonable efforts to prevent a child's removal from home or to reunify a child and family are not required.  Depending on the circumstances, this determination may be based on the findings of another court or the findings of the court that is determining whether reasonable efforts are required.

 The court that hears child welfare dependency cases may find that the child has been subjected to aggravated circumstances, if it has the authority to do so, and that reasonable efforts are not required because the statutory language at section 471(a)(15)(D)(i) of the Social Security Act (the Act) regarding aggravated circumstances does not require a criminal conviction.

 When a parent has been found to have committed one of the felonies enumerated at section 471(a)(15)(D)(ii) of the Act, the court's determination that reasonable efforts are not required must be based on the findings of a criminal court.  The statutory language at section 471(a)(15)(D)(ii) requires a criminal conviction of one of the felonies identified therein.  In circumstances in which the criminal proceedings have not been completed or are under appeal, the court that hears child welfare dependency cases must determine whether reasonable efforts are required based on the developmental needs of the child and the length of time associated with completion of the criminal proceedings or the appeals process.

 When the determination that reasonable efforts are not required is based on a previous involuntary termination of parental rights, that determination is clearly based on the findings of another court decision.

*Source:     Preamble to the Notice of Proposed Rulemaking (63 FR 50058) (9/18/98)Preamble to the Notice of Proposed Rulemaking (63 FR 50058) (9/18/98)*

*Reference:  Social Security Act - section 471 (a)(15)(D); 45 CFR 1356.21 (b)(3)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

*3*  *Q:*  Are States required to engage in concurrent planning or is it at State option?

  *A:*  States have the option of making reasonable efforts to make and finalize an alternate
      permanent placement concurrently with reasonable efforts to reunify a child with his/her family.
      Concurrent planning can be an effective tool for expediting permanency, and the statute offers
      it as such.  However, since it may not be an appropriate approach for every child or family,
      States are not required to use concurrent planning and the decision to do so must be made on
      a case-by-case basis.  We urge States to obtain technical assistance and provide appropriate
      training and supervision to agency workers prior to deploying a concurrent planning strategy.

  *Source:*     *Preamble to the Notice of Proposed Rulemaking (63 FR 50058) (9/18/98)Preamble to the Notice of Proposed*
  *Rulemaking (63 FR 50058) (9/18/98)*
  *Reference:  Social Security Act - section 471 (a)(15)(F); 45 CFR 1356.21 (b)(4)*

*4*  *Q:*  The regulations, at 45 CFR 1356.21 (b)(3), list the circumstances under which the court may
      determine that reasonable efforts are not required to prevent removal or to reunify the child
      and family. Are there other circumstances under which the court may determine that
      reasonable efforts are not required?

  *A:*  The statute specifically enumerates those circumstances in which reasonable efforts are not
      required. Unless one of the circumstances at section 471 (a)(15)(D) of the Social Security Act
      (the Act) exists, the statute requires the State to make reasonable efforts. In each individual
      case, the court and the State must determine the level of effort that is reasonable, based on
      safety considerations and the circumstance of the family. Section 478 of the Act clarifies that
      the State court continues to have discretion when making judgments about the health and
      safety of the child.

  *Source:*     *Questions and Answers to the Final Rule (65 FR 4020) (1/25/00)Questions and Answers to the Final Rule (65*
  *FR 4020) (1/25/00)*
  *Reference:  Social Security Act - section 471 (a)(15)(D) and 478; 45 CFR 1356.21 (b)(3)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

5   *Q:*  Can Indian tribes identify, in tribal code, those aggravated circumstances in which reasonable efforts are not required in accordance with section 471 (a)(15)(D)(i) of the Social Security Act?

   *A:*  When entering into a title IV-E agreement with a State, the tribe must adhere to the list of aggravated circumstances defined in State law.  The statute at section 471 (a)(15)(D)(i) specifically requires that the aggravated circumstances in which reasonable efforts are not required be defined in State law.  Moreover, other public agencies and tribes that enter into agreements with the State agency are not operating or developing their own title IV-E program separate and apart from that operated under the State plan.  Rather, the agency or tribe is agreeing to operate the title IV-E program established under the State plan for a specific population of children in foster care.  Therefore, the other public agency or tribe is bound by any State statute related to the operation of the title IV-E program.  We expect the State child welfare agency to engage the tribes, and any other agency with which it has title IV-E agreements, in developing its list of aggravated circumstances.

   *Source:*      *Preamble to the Final Rule (65 FR 4020) (1/25/00)Preamble to the Final Rule (65 FR 4020) (1/25/00)*

   *Reference:  Social Security Act - section 471 (a)(15)(D) and 478; 45 CFR 1356.21 (b)(3)*

6   *Q:*  What are the requirements with respect to the timing for obtaining judicial determinations that reasonable efforts are not required to reunify a family?

   *A:*  There are none.  We do not think it is appropriate to prescribe a time frame for obtaining such a determination.

   *Source:*      *Preamble to the Final Rule (65 FR 4020) (1/25/00)Preamble to the Final Rule (65 FR 4020) (1/25/00)*

   *Reference:  45 CFR 1356.21 (b)(3)*

**8.3C.5     TITLE IV-E, Foster Care Maintenance Payments Program, State Plan/Procedural Requirements, Trial home visit**

1   *Q:*  What is the regulatory definition of a trial home visit?

**EXHIBIT C**

# *Child Welfare Policy Manual*

*A:* There is no regulatory definition of the term "trial home visit," as it is within the State's discretion to define. We do not think that it would be appropriate for us to develop a regulatory definition. We also do not believe that we could develop a definition that would be inclusive of the variety of State policies on trial home visits or that a definition would be helpful. In practice, a trial home visit is intended to be a short term option in preparation for returning the child home permanently.

*Source:     Preamble to the Final Rule (65 FR 4020) (1/25/00)Preamble to the Final Rule (65 FR 4020) (1/25/00)*
*Reference:  45 CFR 1356.21 (e)*

*2* *Q:* Often, courts do not specify time periods for trial home visits for children in foster care. If a court does not specify a time period, should we assume it cannot be longer than six months without having to re-establish eligibility for title IV-E foster care payments?

*A:* Pursuant to 45 CFR 1356.21 (e), six months is the outside limit for a trial home visit without having to re-establish title IV-E eligibility if the child re-enters foster care, unless there is a court order extending the trial home placement beyond six months. If there is a court order extending the trial home visit beyond six months, and the trial home visit does not exceed the time frame in the court order, the child retains title IV-E eligibility upon returning to foster care following the trial home visit.

*Source:     Question and Answers on the  Final Rule (65 FR 4020) (1/25/00)Question and Answers on the  Final Rule (65 FR 4020) (1/25/00)*
*Reference:  45 CFR 1356.21 (e)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

*3*  *Q:*  Would a continuance of a hearing scheduled to address the trial home visit satisfy the requirement that for title IV-E funding to continue, a court must order a longer visit?

*A:*  No. The regulations establish a six-month outer limit for a trial home visit, except when a court orders a longer visit.  A court continuance of a hearing regarding the trial home visit does not satisfy this requirement.

*Source:*     *Preamble to the Final Rule (65 FR 4020) (1/25/00)Preamble to the Final Rule (65 FR 4020) (1/25/00)*
*Reference: 45 CFR 1356.21 (e)*

*4*  *Q:*  Must the State hold six-month periodic reviews and permanency hearings for children on trial home visits?

*A:*  Historically, this has been an area in which States have had some flexibility.  If the State considered a child who is on a trial home visit to be "in foster care," then it was required to continue holding six-month periodic reviews and permanency hearings during that visit.  If not, then the State was not required to hold such reviews or hearings.  If the trial home visit ends within the six months allotted in the regulations at 45 CFR 1356.21 (e), then the foster care placement is considered continuous and the State should hold six-month periodic reviews and permanency hearings in accordance with the original schedule.

*Source:*     *Questions and Answers on the Final Rule (65 FR 4020) (1/25/00)Questions and Answers on the Final Rule (65 FR 4020) (1/25/00)*
*Reference: Social Security Act - section 475 (5); 45 CFR 1356.21 (e)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

**8.4     TITLE IV-E, General Title IV-E Requirements**

*1   Q:*   What is the definition of "unemployed parent" for purposes of completing the AFDC portion of a title IV-E eligibility determination?

*A:*   The Administration for Children and Families (ACF) and the Centers for Medicaid and Medicare Services (CMS) amended the definition of ?unemployed parent? at 45 CFR 233.101(a)(1) in 1998 in response to the replacement of the former AFDC program with the Temporary Assistance for Needy Families (TANF) program. Each State was required to establish a ?reasonable standard? for measuring unemployment in order to determine whether an individual qualified for benefits under TANF or Medicaid and whether a child met the AFDC portion of title IV-E eligibility.  The amended regulation specifically permits States to consider hours of work, dollar amounts earned, and family size in establishing the reasonable standard of unemployment.

At a minimum, States are required to include as an ?unemployed parent? an individual who is employed less than 100 hours per month, or exceeds that standard for a particular month if the work is intermittent and the excess work is temporary.  Such work may be considered temporary if the unemployed parent worked fewer than 100 hours in the preceding two months and is expected to work fewer than 100 hours in the following month (see 45 CFR 233.101(a)(1)).  States are constrained by this definition in order to preserve Medicaid and title IV-E eligibility for any individuals who would have been eligible under the AFDC rules previously in effect (see 63 FR 42270 - 42272, August 7, 1998). States are not required to establish a broader definition of ?unemployed parent? but may do so.

*Source:     6/23/036/23/03*

*Reference:  Public Law 104-193; 45 CFR 233.101(a)(1); 63 FR 42270-42275, August 7, 1998.*

**EXHIBIT C**

# *Child Welfare Policy Manual*

**8.4A    TITLE IV-E, General Title IV-E Requirements, AFDC Eligibility**

*1  Q:*  Section 108 (d) of the Personal Responsibility Work Opportunity Reconciliation Act (PRWORA) (as amended by the Balanced Budget Act of 1997, P.L. 105-33) links eligibility for Federal foster care and adoption assistance to the Aid to Families with Dependent Children (AFDC) program as it was in effect on July 16, 1996. Section 401(a) of PRWORA limits Federal public benefits to "qualified aliens." The term "qualified alien" was not defined or in use on July 16, 1996.  How are States to apply these two provisions?

*A:*  Alien children must be eligible for AFDC under a State's July 16, 1996 plan and must also meet the PRWORA definition of "qualified alien" to be eligible for Federal foster care maintenance or adoption assistance (except that children receiving adoption assistance pursuant to agreements signed before August 22, 1996 may continue to receive such assistance).

*Source:    ACYF-CB-PIQ-99-01 (1/14/99)ACYF-CB-PIQ-99-01 (1/14/99)*
*Reference:  Social Security Act - sections 472(a)(4) and 473(a)(2)(B); the Personal Responsibility Work Opportunity Reconciliation Act (PL 104-193); Balanced Budget Act of 1997 (PL 105-33)*

*2  Q:*  Under the following circumstances, is the child eligible for title IV-E foster care?  Aid to Families with Dependent Children (AFDC) eligibility for a child is based on incapacity of the parent.  In the month following removal, the parent is no longer consider incapacitated. By the time of the twelve month eligibility redetermination, the family is no longer eligible for AFDC. What is the title IV-E status of the child?

*A:*  The child is not eligible for title IV-E foster care unless the AFDC deprivation requirement is met.  Incapacity of a parent is one of the reasons a child may be determined to be deprived of parental support or care under AFDC (reference section 406 (a) and 407 of the Act (as such sections were in effect on July 16, 1996) and 45 CFR 233.90 (c)(1)(i)).  Eligibility ends when the parent is no longer incapacitated, unless a different reason for deprivation has emerged, such as death or absence from the home.

*Source:    ACYF-CB-PIQ-85-07 (6/25/85)ACYF-CB-PIQ-85-07 (6/25/85)*
*Reference:  Social Security Act - sections 406 (a) and 407 (as in effect on July 16, 1996); 45 CFR 233.90*

**EXHIBIT C**

# *Child Welfare Policy Manual*

**3  Q:** When continued deprivation cannot be substantiated after initial eligibility has been established because the whereabouts of the parent from whom the child was removed cannot be determined, is the child no longer eligible under title IV-E?

**A:** The inability to determine the whereabouts of the parent from whose home the child was removed does not preclude continuing eligibility for title IV-E foster care maintenance payments.

At the time of the twelve month redetermination of eligibility, both need and deprivation must be documented.  Deprivation of parental support or care may be based on the death, continued absence from the home, physical or mental incapacity of a parent, or at State option, unemployment of the principal wage earner.  If the whereabouts of the parent from whose home the child was removed cannot be determined by the State agency at the time of redetermination and documentation in the case record verifies the efforts made to locate the parent(s), then deprivation may be established based on continued absence from the home.

However, the continued absence of the parents from the home must be accompanied by factors such as set forth in 45 CFR 233.90 (c)(1)(iii): "...When the nature of the absence is such as either to interrupt or to terminate the parent's functioning as provider of maintenance, physical care, or guidance for the child, and the known or indefinite duration of the absence precludes counting on the parent's performance of the function of planning for the present support or care of the child."

While the specific circumstances of either of the parents may not be known to the agency, documentation of their continued absence is required in order to redetermine the child's eligibility for title IV-E foster care.  The method for substantiation of the parents' absence is left to State policy and procedure.

If the child had been removed from the home of a relative rather than from the parent(s)' home, the relative's home is reviewed at the time of redetermination to establish continuing deprivation of parental support and care.  If either or both parents are not in that household at redetermination, then the child is so deprived, based on continued absence of the parent(s) from that home.

On the other hand, the continued absence of parents from the home cannot be used as basis for determining that a child is initially deprived of parental support or care, in cases where there is an inability to document that the child had been living in the home of any parent or relative, e.g., in the case of an abandoned child.

**EXHIBIT C**

# *Child Welfare Policy Manual*

*Source:*      *ACYF-CB-PIQ-85-07 (6/25/85)ACYF-CB-PIQ-85-07 (6/25/85)*

*Reference:*  *Social Security Act - sections 406 (a) and 472 (a); 45 CFR 233.90*

**EXHIBIT C**

# *Child Welfare Policy Manual*

**4  *Q:*** During the time the child is receiving title IV-E foster care payments, the parental rights of his parents are terminated.  The child is subsequently moved into a residential care facility which is not eligible to receive foster care payments and the title IV-E case is discontinued.  Later, he is again placed into a foster home and reapplication for title IV-E foster care is made.

In considering eligibility for this reapplication, the deprivation at the time of court action, found initially and verified under the old foster care case, can be utilized.  However, to meet the requirement of "continues to be eligible," must deprivation with regard to the natural parents again be established or may the termination of parental rights be used to constitute deprivation?

**    *A:*** If the child has not returned to his own home and has been continuously in a foster care status since removal from the home (whether or not the facility is eligible to receive payments under title IV-E), a redetermination of eligibility would be appropriate at the time he returned to a facility eligible for Federal financial participation (FFP).

 A redetermination of the deprivation factor at that time would consist of a confirmation that the conditions at the time of removal from the home continued to exist or that termination of parental rights (TPR) had occurred.  In the latter case, the TPR would, from that point and throughout this course of foster care, become the reason for continuing eligibility in terms of the deprivation factor.

 If, however, the child is not continuously in foster care status and returns to the home of a relative that is considered to be his own home, then a subsequent re-entry into the foster care system requires a new (initial) determination of all eligibility factors.

 In such a situation, where the child was living in the home of another relative after termination of parental rights and was later removed from the home of that relative, deprivation would then be based upon the absence of the parent(s) from the home of the relative, rather than TPR. (See section 406(a) (as in effect on July 16, 1996)).

*Source:*     *ACYF-CB-PIQ-86-03 (5/9/86)ACYF-CB-PIQ-86-03 (5/9/86)*
*Reference:  Social Security Act - sections 406 (a) and 407 (as in effect on July 16, 1996); 45 CFR 233.90*

**5  *Q:*** Aid to Families with Dependent Children (AFDC) initial eligibility requires the counting of a step-parent's income.  Is this requirement applicable to title IV-E?

**EXHIBIT C**

# *Child Welfare Policy Manual*

*A:* If the State deems step-parent income available to the child pursuant to its July 16, 1996 AFDC State plan, step-parent income must be counted in determining title IV-E eligibility (45 CFR 233.30 (a)(3)(xiv)).

*Source:     ACYF-CB-PIQ-85-07 (6/25/85)ACYF-CB-PIQ-85-07 (6/25/85)*
*Reference:  45 CFR 233.30*

*6  Q:* Under the Aid to Families with Dependent Children (AFDC) regulations, certain work expense deductions and disregards are allowable in determining eligibility.  In determining the amount of a child's earnings, is the AFDC budgeting procedure to be followed or are States allowed to establish a separate set of budgeting procedures for title IV-E?

*A:* The AFDC regulations and procedures (45 CFR 233.20) are applicable in the title IV-E foster care maintenance payments program.  In determining the eligibility of a child who is receiving foster care benefits under title IV-E, the amount of the child's gross income should be applied to 185% of the need standard, and eligibility would continue in terms of need as long as his gross income did not exceed that point.  However, in applying the 185% test when determining initial eligibility, the State has the option to disregard the earned income of a dependent child who is a full time student. Once the child is receiving payments under the title IV-E program, the earned income of the child who is a full time student is disregarded indefinitely (402 (a)(8)(A)(i) and 402 (a)(8)(A)(vii)).

 If a portion of the child's income is applied to the foster care maintenance cost, the State's claim for Federal financial participation should include only its share of the amount paid for foster care that has not been offset by the child's countable income.

*Source:     ACYF-CB-PIQ-85-07 (6/25/85)ACYF-CB-PIQ-85-07 (6/25/85)*
*Reference:  Social Security Act - 45 CFR 233.20*

**EXHIBIT C**

# *Child Welfare Policy Manual*

**7   *Q:*** A State asks whether the payment standard or the Aid to Families with Dependent Children (AFDC) need standard to determine AFDC eligibility shall be used to determine eligibility for the title IV-E program.

*A:* The AFDC need standard should be used for determining eligibility for the title IV-E program. Section 472 (a) of the Social Security Act defines as eligible "a child who would meet the requirements of section 406 (a)... ;" as in effect on July 16, 1996 section 406 (a), in turn, refers to a "needy child," without reference to a payment standard. Reference to the need standard thus flows directly from the words of the statute. The IV-E program has never interpreted the reference to receipt of aid, in section 472 (a)(4), as excluding from foster care eligibility a needy child who did not or might not have actually received AFDC because of the payment standard.

 Section 472 of the Social Security Act refers to the need standard at the outset, and does not subsequently distinguish between the need and payment standards; moreover, there is no such distinction recognized in the IV-E regulations. Consistent with that framework, the reference to receipt of aid in section 472 (a)(4) has been consistently understood to mean eligibility in accordance with the need standard.

 Furthermore, when section 472 (a)(4) states: "received aid...in or for the month in which court proceedings leading to the removal...from the home were initiated," it is not using those words as an eligibility requirement but rather, referring to the point in time when the child meets the appropriate eligibility standards. Thus, sections 472 (a)(4)(A) and (B) are understood to refer to the times when the child met the 406 (a) standards.

*Source:      ACYF-CB-PIQ-96-01 (10/8/96)ACYF-CB-PIQ-96-01 (10/8/96)*
*Reference:  Social Security Act - sections 402, 406, 407 (as in effect on July 16, 1996) and 472 (a)(4); 45 CFR 1356.60 and 233.20 (a)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

*8  Q:*  May the income of a foster care child be pro-rated among the siblings who are placed in the same living arrangement with that child?  May resources considered similarly in the same situation?  In other words, may the children be considered an assistance group or must each child be a separate assistance unit?

*A:*  Each child in foster care, whether placed alone or in the same foster care facility as his or her siblings, is considered a separate unit for purposes of determing eligibility for title IV-E foster care.  Only income that is actually received by a child in foster care is counted as available to meet the child's needs and the income and resources of the foster child would not be considered as available to siblings placed or living in the same foster home.

*Source:*      *ACYF-CB-PIQ-86-03 (5/9/86)ACYF-CB-PIQ-86-03 (5/9/86)*
*Reference:  Social Security Act - sections 406 (a) and 407 (as in effect on July 16, 1996); 45 CFR 233.90*

*9  Q:*  If, under a waiver pursuant to section 1115 (a) of the Social Security Act (an 1115 (a) waiver), the State denied benefits to a child who would otherwise meet the requirements of the Aid to Families with Dependent Children (AFDC) program, would that child then be ineligible for title IV-E foster care maintenance or adoption assistance payments, should that child come into State care?

*A:*  No.  A State's 1115 (a) waiver of AFDC requirements does not affect eligibility for title IV-E foster care maintenance or adoption assistance payments.  Regardless of whether the rules and provisions of a State's section 1115 (a) waiver broaden or restrict AFDC eligibility, those waiver rules shall not be applied in making title IV-E eligibility determinations.

*Source:*      *ACYF-CB-PIQ-96-02 (12/12/96)ACYF-CB-PIQ-96-02 (12/12/96)*
*Reference:  Social Security Act - section 1115*

**EXHIBIT C**

## *Child Welfare Policy Manual*

**10  Q:** For the purpose of determining a child's AFDC eligibility at the time of the child's removal from his or her home, the child must have been living with and removed from the home of a specified relative.  Who is considered a "specified relative" for this purpose?

**A:** A specified relative is defined as any relation by blood, marriage or adoption who is within the fifth degree of kinship to the dependent child.  This includes great-great-great grandparents and first cousins once removed (children of first cousins).  Accordingly, for the purpose of determining title IV-E eligibility, any otherwise eligible child who is removed from the home of a relative who is within the fifth degree of kinship to the child will be eligible for assistance under title IV-E.

*Source:     ACYF-CB-IM-92-04 (2/24/92)ACYF-CB-IM-92-04 (2/24/92)*

*Reference:  Social Security Act - section 406 (a) (as in effect on July 16, 1996); 45 CFR 233.90(c)(1)(v)*

**11  Q:** How does the State agency determine need and deprivation to establish a child's eligibility for title IV-E adoption assistance?

**A:** If a child's eligibility for title IV-E adoption assistance is based upon his or her eligibility for Aid to Families with Dependent Children (AFDC) as a dependent child, the State must determine that the child would have been AFDC-eligible in the home from which s/he was removed. To meet the AFDC criteria, the child must be both a needy child and a child who is deprived of parental support or whose principal wage earner parent is unemployed. Need exists in the child's home if the resources available to the family are below $10,000 and meets the income test (see section 8.4B Q/A #18 of the Child Welfare Policy Manual). Deprivation exists in the home in situations where there is death of a parent, an absent parent, or a parent with a mental or physical incapacity to the extent that the parent cannot support or care for the child. At the point of the removal of a child from his or her home, a termination of parental rights (TPR) alone is not proof that deprivation exists. The factors noted here must be established based on the circumstances in that home.  If the child meets these AFDC criteria at removal, no further AFDC eligibility determination is needed for adoption assistance.

*Source:     ACYF-CB-PA-01-01 (1/23/01); 7/17/2006ACYF-CB-PA-01-01 (1/23/01); 7/17/2006*

*Reference:  Social Security Act - section 473 (a)(2); section 8.4B Q/A #18 of the Child Welfare Policy Manual).*

**EXHIBIT C**

# *Child Welfare Policy Manual*

**12  Q:** Pursuant to the provisions of the Foster Care Independence Act of 1999, Section 472(a) of the Social Security Act was amended to permit an increase in the value of resources allowable for title IV-E eligibility to $10,000. What is the effective date of this amendment?

**A:** The effective date of the amendment to section 472(a) of the Social Security Act (the Act) made by the Foster Care Independence Act of 1999 is December 14, 1999. (Note: The Deficit Reduction Act of 2005 located the resource value provision for the foster care program at section 472(a)(3)(B) and for the adoption assistance program at section 473(a)(2)(A)(i)(I)(bb) of the Act).

*Source:    Questions and Answers on the Chafee Foster Care Independence Program; 7/17/2006Questions and Answers on the Chafee Foster Care Independence Program; 7/17/2006*
*Reference:  Social Security Act - sections 472(a)(3)(B) and 473(a)(2)(A)(i)(I)(bb); The Foster Care Independence Act of 1999; the Deficit Reduction Act of 2005*

**13  Q:** Should a State include Temporary Assistance for Needy Families (TANF) payments as unearned income when determining whether a child meets the Aid to Families with Dependent Children (AFDC) requirements in effect on July 16, 1996 for title IV-E eligibility purposes?

**A:** No.  As the title IV-A program, TANF should not be counted as income in determining title IV-E eligibility.

*Source:    06/09/0406/09/04*
*Reference:  Section 472 of the Social Security Act.*

**14  Q:** What is the definition of unemployed parent for purposes of completing the AFDC portion of a title IV-E eligibility determination?

**A:** The Administration for Children and Families (ACF) and the Centers for Medicaid and Medicare Services (CMS) amended the definition of unemployed parent at 45 CFR 233.101(a)(1) in 1998 in response to the replacement of the former AFDC program with the

**EXHIBIT C**

# *Child Welfare Policy Manual*

Temporary Assistance for Needy Families (TANF) program. Each State was required to establish a reasonable standard for measuring unemployment in order to determine whether an individual qualified for benefits under TANF or Medicaid and whether a child met the AFDC portion of title IV-E eligibility.  The amended regulation specifically permits States to consider hours of work, dollar amounts earned, and family size in establishing the reasonable standard of unemployment.

*Source:     6/23/036/23/03*

*Reference:  Public Law 104-193; 45 CFR 233.101(a)(1); 63 FR 42270-42275, August 7, 1998.*

*15  Q:* How is the $10,000 resource limit to be applied in determining eligibility for title IV-E?

*A:* The Foster Care Independence Act of 1999 amended section 472(a) of the Social Security Act to authorize an increase in the value of resources allowable for title IV-E eligibility to $10,000. The $10,000 resource limit applies to the resources of the child and family for the purposes of determining initial AFDC/title IV-E eligibility and to the child only for ongoing title IV-E foster care eligibility. A State may not opt to set the combined value of resources at less than $10,000. (Note: The Deficit Reduction Act of 2005 located the resource value provision for the foster care program at section 472(a)(3)(B) and for the adoption assistance program at section 473(a)(2)(A)(i)(I)(bb) of the Social Security Act).

*Source:     7/6/05; 7/17/20067/6/05; 7/17/2006*

*Reference:  Social Security Act -- Sections 472(a)(3) and 473(a)(2)(A)(i)(I)(bb); The Foster Care Independence Act of 1999; The Deficit Reduction Act of 2005*

**EXHIBIT C**

# *Child Welfare Policy Manual*

**16  Q:** May States adjust the 1996 standard of need to reflect cost of living adjustments?

**A:** No. The Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA) did not include any allowance for cost of living or adjustments for inflation in setting the July 16, 1996 look-back date.  States may not adjust the 1996 standard of need to reflect cost of living adjustments, since the statutory look-back date is set at a specific point in time.

*Source:      7/6/057/6/05*

*Reference:  Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (P.L.104-193)*

**17  Q:** May a State determine a child's title IV-E eligibility based on the Temporary Assistance for Needy Families (TANF) Program instead of the Aid to Families with Dependent Children (AFDC) Program?

**A:** No. The Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA) retained the connection between the title IV-E program and the AFDC program and established an AFDC "look-back date" of
 July 16, 1996.   As such, TANF eligibility may not be substituted for an AFDC eligibility determination.  States must use the title IV-A State plan that was in effect on July 16, 1996, to determine a child?s AFDC eligibility.

*Source:      September 29, 2005September 29, 2005*

*Reference:  Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (P.L.104-193)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

**18  Q:**  One of the title IV-E eligibility requirements under section 472(a) of the Social Security Act (Act) is that a child must have been eligible for the former Aid to Families with Dependent Children (AFDC) program.  As such, the State must determine that the child is a dependent child based on the State title IV-A plan in effect as of July 16, 1996.  What process must States use to determine whether a child is a "needy child" under the former AFDC program, as described in former section 406(a) of the Act?

**A:**  The AFDC program required that a child meet eligibility requirements related to both financial need (i.e., a "needy child") and deprivation of parental support.  In response to the specific question, this answer addresses only the requirements for establishing that a child meets the requirements related to financial need under AFDC.

For initial eligibility determinations, the State must apply the former AFDC program's two-step income test to establish whether a child would have been considered a "needy child" under the State's title IV-A plan in effect on July 16, 1996.  In addition to the income test, the State must apply a test of resources.  Both the two-step income and resources tests must be applied, in accordance with 45 CFR 233.20. [1]

Prior to the passage of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, each State set its own AFDC need standard to use in determining eligibility for the program.  The term "AFDC need standard" refers to the amount of money a State determined that a particular size family needed to subsist.  For title IV-E purposes, the State's need standard as of July 16, 1996, (disregarding any Section 1115(a) waivers that may have been in effect on that date) is the amount that provides the basis for both steps in the initial income test portion of the AFDC eligibility determination process.

The two-step income test to determine financial need under AFDC to be conducted in accord with Federal requirements and the State plan as in effect on July 16, 1996, is as follows (see 45 CFR 233.20(a)(3)(xiii) and 45 CFR 233.20(a)(3)(ii)(F)):

*Step One of the Income Test-Gross Income Limitation*:  The State determines if

**EXHIBIT C**

## *Child Welfare Policy Manual*

the family's gross income is less than 185 percent of the State's AFDC need standard, after applying appropriate disregards. [2]  If the family's gross income is more than 185 percent of the State's AFDC need standard, the child would have been ineligible for the program and, thus, is not eligible for title IV-E.  If the family's gross income does not exceed 185 percent of the State's AFDC need standard, the State proceeds to the second step to continue the process of determining if a child is a needy child and would have been eligible for AFDC.

 *Step Two of the Income Test-Determination of Need*:  For this second step, the State compares the family's income, after applying further appropriate disregards, to 100 percent of the State's AFDC need standard, the same need standard used in step one.  If the family's income is in excess of 100 percent of the State's need standard, the child would not have been eligible for AFDC and, thus, is not eligible for title IV-E.  If the family's income does not exceed 100 percent of the need standard, the child would have met the AFDC income test for eligibility.

 In addition to applying the two-step income test to determine if a child would have been considered a "needy child" under AFDC, the State must determine whether the child's family has resources under $10,000 in value, after appropriate disregards.[3]   Both the income and resources tests must be applied to the child and family in the removal home to determine initial eligibility for AFDC.

 *Redeterminations of title IV-E eligibility*: Under AFDC, the two-step income test also applied to eligibility redeterminations.  Since the 1980s, however, ACF has had policies in place that allow a State to use a slightly different process to redetermine a child's AFDC eligibility for the purpose of title IV-E.  As stated in the Child Welfare Policy Manual at 8.4A #6, a State may choose to apply only the gross income limitation, which compares the child's income against 185 percent of the need standard.  A State also may substitute a child's foster care need standard (formerly known as the "foster care payment rate") for the AFDC need standard when redetermining a child's eligibility.  This policy remains in effect.  Regardless of the income test the State applies, the $10,000 resources test also must be applied to redetermine a child's eligibility.

**EXHIBIT C**

# *Child Welfare Policy Manual*

Under the AFDC foster care program, before the creation of title IV-E, a State used a child's foster care rate (referred to as the foster care need standard) as the need standard for redetermining the child's eligibility, rather than using the AFDC need standard.  When AFDC was replaced by the Temporary Assistance for Needy Families (TANF) program in 1996, ACF issued policy (PIQ 96-01, Question #2) directing States to use the AFDC need standard for eligibility determinations, but did not explicitly prohibit the use of a child's foster care need standard for making redeterminations.  Accordingly, States may use either the child's foster care need standard or the AFDC need standard for making redeterminations unless the Department issues a regulation that directs them otherwise.

[1] The two-step process has been in place since 1981.  See the 1994 Green Book, 14th Edition, July 15, 1994, Section 10 for more details on the two-step process.

[2] The gross income limitation -the first step of the process- was increased from 150 percent to 185 percent of the need standard by the Deficit Reduction Act of 1984 (Public Law 98-369) and implemented through regulation at 45 CFR 233.20(a)(3)(xiii).

[3] Public Law 106-169 increased the resource limit to $10,000.  See the Child Welfare Policy Manual at 8.4A #15 for more information.

*Source:      March 16, 2006March 16, 2006*
*Reference:  Social Security Act   Section 472(a), Sections 406(a) and 407 (as in effect on July 16, 1996); 45 CFR 233.20(a)(3)(xiii); 45 CFR 233.20(a)(3)(ii)(F); 45 CFR 233.20(a)(2); 45 CFR 233.20(a)(2)(v)*

*19  Q:*  How does a State determine title IV-E eligibility for an abandoned child whose parents are unknown?

*A:*  It is unlikely that a State would be able to determine title IV-E eligibility for an abandoned child whose parents are unknown.  This situation differs from one in which a parent leaves a child with a friend or relative and is unreachable, but the identity of the parent is known.  In either scenario, all of the title IV-E eligibility requirements must be met for a child on whose behalf title IV-E foster care or adoption assistance is claimed.  This includes the requirement that the

**EXHIBIT C**

# *Child Welfare Policy Manual*

child meet the Aid to Families with Dependent Children (AFDC) eligibility requirements as outlined at section 472(a)(3) and 473(a)(2) of the Social Security Act.  As such, the State must be able to establish and verify financial need and deprivation of parental support based on the home from which the child was removed.  Determining a child's financial need requires a State to examine the parents' income and resources.  In the case in which the identity of the parents is unknown, including when a child has been abandoned, the State will not have any financial information on which to make an AFDC eligibility determination.  A State must document that a child meets all AFDC eligibility requirements; a State cannot presume that a child would meet the eligibility requirements simply because the child has been abandoned.

*Source:     April 6, 2006April 6, 2006*

*Reference:  Social Security Act - sections 472(a)(3) and 473(a)(2)*

**20  Q:**  If a child is removed from a specified relative who is the child's legal guardian, must the State determine whether the child meets the Aid to Families with Dependent Children (AFDC) criteria of deprivation based on the legal guardian or the parent?

**A:**  A determination of deprivation is always made in relation to the child's parent for AFDC eligibility purposes.  Under no circumstances does the State look to the legal guardian to determine deprivation.  Consistent with the provision in 45 CFR 233.90(c)(1)(i), "[t]he determination whether a child has been deprived of parental support or care is made in relation to the child's natural parent or, as appropriate, the adoptive parent or stepparent described in paragraph (a) of this section."  Even when parental rights have been terminated and the child is removed from a relative legal guardian, the State must look to the situation of the parents to determine deprivation.  When determining deprivation with respect to a child who is living with a relative legal guardian, a positive determination regarding deprivation can be made based upon the fact that the child is deprived of parental support due to continued absence.  Although deprivation must be based on the child?s parent, this does not alter the requirement to determine whether the child would have met the AFDC criteria of financial need while living in the home of the <em>specified relative</em> from whom the child was removed (section 472(a)(3) of the Social Security Act and 45 CFR 1356.21(l)).

*Source:     04/24/0704/24/07*

*Reference:  Social Security Act - section 472(a)(3); 45 CFR 233.90(c)(1)(i) and 1356.21(l)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

**21** *Q:* In determining a child's Aid to Families with Dependent Children (AFDC) eligibility, should the State look to the household circumstances at the time of the child's removal or should the State look at the whole month of the removal petition or voluntary placement agreement to determine deprivation and/or income?   For example, can a child's deprivation be based on circumstances that occur in the month of removal, but after the child s removal from the home?

 

   *A:* AFDC eligibility criteria, including deprivation, must be met in the month of, but prior to, the child's removal from the home. The State may not establish the child's deprivation based on household circumstances that occur after a child's removal. This is based on section 472(a)(1)(B) of the Social Security Act (the Act) which specifies that &quot;the child, **while in the home** [emphasis added], would have met the AFDC eligibility requirement of [section 472(a)(3) of the Act].&quot;

 

     *Source:*    04/26/0704/26/07

     *Reference: Social Security Act   sections 472(a)(1)(B) and 472(a)(3)*

 

 

**22** *Q:* Must a State use one definition of &quot;unemployed parent&quot; for Medicaid, Temporary Assistance for Needy Families (TANF) and title IV-E purposes?

 

   *A:* No.  For title IV-E eligibility purposes, there is no requirement that the State use the same definition of &quot;unemployed parent&quot;as Medicaid and TANF.  The State must use the definition that was in its Aid to Families with Dependent Children (AFDC) State plan on July 16, 1996, unless the State has used the authority under 45 CFR 233.101(a)(1) to apply a less restrictive definition to the title IV-E program.

 

     *Source:*    04/26/0704/26/07

     *Reference: 45 CFR 233.101(a)(1)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

23  *Q:*  How should the State determine financial need for initial Aid to Families with Dependent Children (AFDC) program eligibility purposes when the child is removed from a specified relative other than a parent?  Must the State consider the relative's income and resources?

*A:*  If a child is removed from the non-parental specified relative through a contrary to the welfare judicial determination, or a valid voluntary placement agreement, the State determines financial need based on the financial situation of the child only.  However, if the State's July 16, 1996 AFDC State plan required the State to consider non-parental relative income or resources, then the State must consider the relative's income and resources.

*Source:*     12/31/0712/31/07
*Reference:*  45 CFR 233.20

## 8.4B     TITLE IV-E, General Title IV-E Requirements, Aliens/Immigrants

1  *Q:*  Section 403 (a) of the Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA) (PL 104-193) sets a five year residency requirement for qualified aliens who enter the United States on or after August 22, 1996 and who make application for Federal means-tested programs. Section 403(c)(2)(F) of PRWORA lists those programs that are exempted from section 403(a) to include titles IV-B and IV-E, under certain circumstances; however, title XIX is not on the list of programs exempted from section 403(a) of PRWORA. Title IV-E eligible children are categorically eligible for Medicaid. Must qualified alien children who are eligible for title IV-E meet the five year residency requirement to be eligible for title XIX?

*A:*  No. All qualified alien children who are eligible for title IV-E retain their categorical eligibility for Medicaid under title XIX, regardless of how long they have been in the United States. Section 402(a)(3) of the Social Security Act (as amended by PRWORA) requires States to certify, in their Temporary Assistance for Needy Families Plans, that "... the State will operate a foster care and adoption assistance program under the State plan approved under part E, and that the State will take such actions as are necessary to ensure that children receiving assistance under such part are  eligible for medical assistance under the State plan under title XIX."

The statute makes no distinction between children who are citizens and children who are qualified aliens. Thus, the law requires all title IV-E eligible children to receive medical coverage under title XIX.

**EXHIBIT C**

# *Child Welfare Policy Manual*

*Source:*     *ACYF-CB-PIQ-99-01 (1/14/99)ACYF-CB-PIQ-99-01 (1/14/99)*

*Reference:  Social Security Act - Titles IV-E and  XIX; The Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PL 104-193)*

*2*  *Q:*  Are unaccompanied minor refugee children eligible for title IV-E payments for foster care?

*A:*  In order to be eligible for foster care payments under title IV-E any child must meet the requirements of section 406(a) or of section 407 of the Social Security Act (the Act) (as such sections were in effect on July 16, 1996) except for his removal from the home of a relative (specified in section 406(a)), in addition to meeting the other requirements found in section 472(a) of the Act. If a State is able to document that the child meets the requirements found in the Act, the unaccompanied minor refugee child is eligible for title IV-E payment, provided he/she is a qualified alien.

One of the major problems, however, is that because the child is unaccompanied, documentation is not ordinarily available to substantiate the child's age, financial need, and deprivation of parental support or care by reason of death of a parent, continued absence of the parent from the home, or physical or mental incapacity of a parent (45 CFR 233.90(c)).

In addition, the child must meet the requirements of section 472 (a)( of the Act. These requirements include, for example, the existence of a voluntary placement agreement entered into by the child's parent or legal guardian or a judicial determination that continuation of the child in his home would be contrary to his welfare. Another requirement is that the child either received aid under section 402 of the Act (as in effect on July 16, 1996) in the month in which the agreement or judicial determination was made, or would have received aid in or for that month if an application had been made and the child had been living with a specified relative within six months prior to the month in which the agreement was made or the judicial proceeding was initiated.

Therefore, although the unaccompanied minor refugee child may clearly be in need of foster care upon his arrival in this country, he must also meet the eligibility requirements of title IV-E (section 472(a)) if Federal financial participation is claimed by the State. If it can be documented that he meets the requirements, then he would be eligible for title IV-E payments.

The circumstances of a refugee child who comes into the country with his family are different from the unaccompanied child in that the first child is "living with" his family. Assuming the degree of kinship is that cited in section 406(a) of the Act, this accompanied child could later become eligible for title IV-E foster care payments, if all criteria in section 472(a) are met and

**EXHIBIT C**

# *Child Welfare Policy Manual*

the documentation of age, need and deprivation can be reviewed in relation to the home (in the U.S.) from which he is removed.

*Source:     ACYF-CB-PIQ-83-07 (10/24/83); ACYF-CB-PIQ-99-01 (1/14/99)ACYF-CB-PIQ-83-07 (10/24/83); ACYF-CB-PIQ-99-01 (1/14/99)*

*Reference:  Social Security Act - sections 406 (a), 407 (as in effect on July 16, 1996) and 472; 45 CFR 233.90*

**EXHIBIT C**

# *Child Welfare Policy Manual*

**3  Q:** It is our understanding that qualified aliens, regardless of whether they entered the United States before or after the date of enactment of the Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA), August 22, 1996, are eligible for Federal foster care maintenance and adoption assistance payments. Is this a correct interpretation?

**A:** Not entirely. If the child is a qualified alien who is placed with a qualified alien or United States citizen, the date the child entered the United States is irrelevant. However, if the child is a qualified alien who entered the United States on or after August 22, 1996 and is placed with an unqualified alien, the child would be subject to the five-year residency requirement for Federal means-tested public benefits at section 403(a) of PRWORA unless the child is in one of the excepted groups identified at section 403(b). As a general matter, we do not expect these situations to arise very often. In the event such situations do arise, State or local funds may be used to support these children.

*Source:    ACYF-CB-PIQ-99-01 (1/14/99)ACYF-CB-PIQ-99-01 (1/14/99)*

*Reference:  Social Security Act- sections 472(a)(4) and 473(a)(2)(B); The Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PL 104-193)*

**4  Q:** Does the welfare reform legislation concerning benefits for immigrants/aliens have any impact on title IV-E eligibility for legal aliens, persons permanently residing under color of law (PRUCOL), etc.?

**A:** Yes. Alien children must be qualified aliens in order to be eligible for Federal foster care maintenance and adoption assistance payments and independent living services.  Not all legal aliens or aliens with PRUCOL status necessarily meet the criteria for qualified alien status.

*Source:    ACYF-CB-PIQ-99-01 (1/14/99)ACYF-CB-PIQ-99-01 (1/14/99)*

*Reference:  Social Security Act- section 472(a)(4)and 473(a)(2)(B); The Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PL 104-193)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

5   *Q:*   Does title IV of the Personal Responsibility and Work Opportunity Reconciliation Act
(PRWORA) supersede the provision in section 472(a) of the Social Security Act (the Act)
which affords title IV-E eligibility to certain alien children who would be otherwise eligible for
title IV-E but for their disqualification for the Aid to Families with Dependent Children (AFDC)
program due to their alien status?

*A:*   Yes. States must follow the rule in PRWORA section 401(a) that: "(n)otwithstanding any other
provision of law ... an alien who is not a qualified alien ... is not eligible for any Federal public
benefit..."

*Source:*    *ACYF-CB-PIQ-99-01 (1/14/99)ACYF-CB-PIQ-99-01 (1/14/99)*
*Reference:  Social Security Act - section 472 (a); tThe Personal Responsibility and Work Opportunity Reconciliation Act*
*of 1996 (PL 104-193)*

6   *Q:*   Section 108 (d) of the Personal Responsibility and Work Opportunity Reconciliation Act
(PRWORA) (as amended by the Balanced Budget Act of 1997, P.L. 105-33) links eligibility for
Federal foster care and adoption assistance to the Aid to Families with Dependent Children
(AFDC) program as it was in effect on July 16, 1996. Section 401(a) of PRWORA limits
Federal public benefits to "qualified aliens." The term "qualified alien" was not defined or in use
on July 16, 1996.  How are States to apply these two provisions?

*A:*   Alien children must be eligible for AFDC under a State's July 16, 1996 plan and must also
meet the PRWORA definition of "qualified alien" to be eligible for Federal foster care
maintenance or adoption assistance (except that children receiving adoption assistance
pursuant to agreements signed before August 22, 1996 may continue to receive such
assistance).

*Source:*    *ACYF-CB-PIQ-99-01 (1/14/99)ACYF-CB-PIQ-99-01 (1/14/99)*
*Reference:  Social Security Act - Title IV-E; The Personal Responsibility and Work Opportunity Reconciliation Act of*
*1996 (PL 104-193)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

*7*  *Q:*  Can an unqualified alien become the foster or adoptive parent of a title IV-E eligible child?

*A:*  Yes. However, the unqualified alien foster or adoptive parent of a child who entered the United States on or after 8/22/96 would be eligible to receive title IV-E payments on behalf of the child only if the child is a United States citizen, is in one of the excepted groups at section 403(b) the Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA), or has lived in the United States as a qualified alien for five years.

This interpretation is consistent with section 401(a) of PRWORA, which requires aliens to be qualified in order to receive Federal public benefits. Foster and adoptive parents are not recipients of Federal foster care and adoption assistance payments; rather, foster care and adoption assistance payments are made on the child's behalf to meet his or her needs.

*Source:*     *ACYF-CB-PIQ-99-01 (1/14/99)ACYF-CB-PIQ-99-01 (1/14/99)*
*Reference:  The Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PL 104-193)*

*8*  *Q:*  Both sections 401(c)(1)(A) and 411(c)(1)(A) of the Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA) (PL 104-193) define Federal, State, and local public benefits to include professional or commercial licenses. Is a foster care or adoptive home license/approval considered a Federal, State, or local public benefit?

*A:*  No. Foster care and adoptive home licenses/approvals are not considered a Federal, State or local public benefit under sections 401(c)(1)(A) and 411(c)(1)(A) of PRWORA because they are not professional or commercial licenses.

*Source:*     *ACYF-CB-PIQ-99-01 (1/14/99)ACYF-CB-PIQ-99-01 (1/14/99)*
*Reference:  The Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PL 104-193)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

*9*  *Q:*  Are States required to verify the citizenship or immigration status of individuals receiving services or payments under title IV-E?

*A:*  States are required to verify the citizenship or immigration status of all children receiving Federal foster care maintenance payments, adoption assistance payments, or independent living services.

States are not required to verify the citizenship or alien status of foster or adoptive parents, with one exception. States must verify the citizenship or immigrant status of potential foster or adoptive parents when placing a qualified alien child who entered the United States on or after 8/22/96 and has been in the United States as a qualified alien for less than five years. In order to be exempt from the five year residency requirement imposed at section 403 of the Personal Responsibility and Work Opportunity Reconciliation Act, a qualified alien child must be placed with a citizen or a qualified alien; hence, citizenship/alien status of prospective foster or adoptive parents must be verified in such circumstances.

*Source:    ACYF-CB-PIQ-99-01 (1/14/99)ACYF-CB-PIQ-99-01 (1/14/99)*

*Reference:  Social Security Act - Title IV-E; The Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PL 104-193)*

*10*  *Q:*  Can you explain section 472(a)(4) of the Social Security Act (the Act) and how it applies to Aid to Families with Dependent Children (AFDC) eligibility under title IV-E?

*A:*  Section 472(a)(4) of the Act is no longer applicable to the title IV-E program.  This provision essentially "deemed" certain alien children who were "temporary" legal residents as eligible for AFDC, thereby granting them access to the title IV-E program if other eligibility requirements were met.  This provision was made obsolete by title IV of the Personal Responsibility and Work Opportunity Reconciliation Act (PRWORA) of 1996 (Public Law 104-193).  Under PRWORA, a child must be a qualified alien or a citizen in order to receive title IV-E foster care maintenance or adoption assistance payments.  (See Child Welfare Policy Manual section 8.4B Q&A5 and 6).

*Source:    12/31/0712/31/07*

*Reference:  Social Security Act   section 472(a)(4), Personal Responsibility and Work Opportunity Reconciliation Act of*

**EXHIBIT C**

# *Child Welfare Policy Manual*

*1996 (Public Law 104-193)   section 401(a), Child Welfare Policy Manual section 8.4B Q&A5 and 6*

**8.4C    TITLE IV-E, General Title IV-E Requirements, Child support**

*1  Q:* As part of the Aid to Families with Dependent Children (AFDC) requirements for initial eligibility, the parents must sign a child support assignment form.  Does this provision apply to title IV-E?

*A:* When Public Law 96-272 established title IV-E in 1980, it made no provision for the assignment of support rights as a condition of eligibility.  Early developmental policy stated that under title IV-E the assigment of support rights was optional; however, section 471 (a) (as amended by Public Law 98-378, (effective October 1, 1984)) requires States to take steps to secure an assignment of support rights on behalf of each child receiving title IV-E foster care maintenance payments.  However, a child is not ineligible under title IV-E because the parent fails to comply with certain AFDC requirements in regard to child support assignment.

According to the regulations, "a child may not be denied AFDC either initially or subsequently because a parent or other caretaker relative fails to cooperate with the child support agency..." (45 CFR 233.90 (b)(4)(1)).

*Source:    ACYF-CB-PIQ-85-07 (6/25/85)ACYF-CB-PIQ-85-07 (6/25/85)*
*Reference:  45 CFR 233.90*

**EXHIBIT C**

# *Child Welfare Policy Manual*

*2* *Q:* A child for whom title IV-E adoption assistance payments are made re-enters foster care and becomes eligible for title IV-E foster care maintenance payments.  Must the title IV-E agency refer the child to the title IV-D agency to establish and collect child support?

*A:* States are required to refer children receiving title IV-E foster care to title IV-D for child support enforcement, but are afforded some degree of flexibility by title IV-E in determining which cases are appropriate for referral.  The State's title IV-E plan must provide that, "where appropriate all steps will be taken, including cooperative efforts with the State agencies administering the plans approved under parts A and D, to secure an assignment to the State of any rights to support on behalf of each child receiving foster care maintenance payments under this part" (Section 471(a)(17) of the Social Security Act).

 To determine if a case is "appropriate" to refer to the title IV-D agency, the State should evaluate it on an individual basis, considering the best interests of the child and the circumstances of the family.  For example, is the parent working towards reunification with the child, consistent with the case plan?  Would the referral impede the parent's ability to reunify with the child?  Has the parent agreed to pay for the costs of out-of-home care or to temporarily accept a reduction in the adoption assistance payment?  Questions of this nature should guide the agency's decision making regarding whether or not the referral should be made to the title IV-D agency.

*Source:*     *ACYF-CB-PIQ-98-02 (9/03/98)ACYF-CB-PIQ-98-02 (9/03/98)*
*Reference:  Social Security Act - section 471(a)(17)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

*3  Q:*  If the State title IV-E agency refers to the title IV-D agency a child in foster care on whose behalf a title IV-E adoption assistance subsidy is being paid, can the court or the administrative body limit the child support award to the amount of the adoption assistance subsidy?

*A:*  Each State is required by Federal statute and regulation to establish guidelines for child support awards within the State that "take into consideration all earnings and income of the absent parent" (45 CFR 302.56(c)).  The court or administrative body setting the award must presume that the amount resulting from the application of these guidelines is the correct amount of child support to be paid (section 467(b)(2) of the Social Security Act; 45 CFR 302.56(f)).  It is unlikely that the presumptive child support obligation determined according to the State child support guidelines would be equal to the adoption subsidy amount.

 Federal law, however, allows the court to deviate from the presumptive amount determined pursuant to the State child support guidelines.  In order to deviate from the presumptive amount required by the guidelines, the court must make written findings on the record, documenting why the guidelines amount is unjust or inappropriate in a given case.  These findings must be based on criteria that are established by the State that support a deviation from the guidelines (section 467(b)(2); 45 CFR 302.56 (g)).  ACF recommends that the title IV-E agency collaborate with the title IV-D agency to review and recommend criteria for deviations that would support the best interests of the child.

*Source:*     *ACYF-CB-PIQ-98-02 (9/03/98)ACYF-CB-PIQ-98-02 (9/03/98)*

*Reference:  Social Security Act - section 467(b)(2); 45 CFR 302.56*

**EXHIBIT C**

# *Child Welfare Policy Manual*

*4*  *Q:*  Must adoption assistance payments be included in the definition of  "all earnings and income" as described in the child support regulations at 45 CFR 302.56(c) for the purpose of determining the child support award?

*A:*  Adoption assistance payments may or may not be included in a State's definition of "all earnings and income" for the purpose of determining a child support award.  Federal regulations implementing the Federal child support laws require that State guidelines take into consideration "all earnings and income of the absent parent" but afford States the discretion to define the term.

*Source:*    *ACYF-CB-PIQ-98-02 (9/03/98)ACYF-CB-PIQ-98-02 (9/03/98)*
*Reference:*  *45 CFR 302.56 (c)*


**8.4D    TITLE IV-E, General Title IV-E Requirements, Concurrent Receipt of Federal Benefits**

*1*  *Q:*  What is the Department's policy, under title IV-E, on concurrent receipt of benefits under title IV-E and Supplemental Security Income (SSI)?

*A:*  There is no prohibition in title IV-E against claiming Federal financial participation (FFP) for foster care maintenance payments or adoption assistance payments made on behalf of a child who is receiving SSI benefits.

 Foster Care: Although eligibility for title IV-E foster care is tied to eligibility for Aid to Families with Dependent Children (AFDC) as was in effect on July 16, 1996 and AFDC precluded concurrent eligibility for payments from AFDC and title XVI (section 402 (a)(24) of the Social Security Act), this preclusion rule is not transferable to title IV-E for the purposes of foster care maintenance payment eligibility determinations. A child, if eligible, may receive benefits from both programs simultaneously.
 In cases where the child is eligible for both SSI and title IV-E and there is concurrent receipt of payments from both programs, "the child's SSI payment will be reduced dollar for dollar without application of any exclusion", thus decreasing the SSI benefit by the amount of the title IV-E payment (SSI Program Operations Manual). To reiterate, concurrent receipt is subject to the SSI rule that the SSI payment will be reduced by the amount of the foster care payment.
 Adoption Assistance: In the Adoption Assistance program, the applicant may choose to apply for either or both SSI and adoption assistance. Concurrent receipt of benefits from the adoption assistance program and SSI is not prohibited under title IV-E (section 473).

**EXHIBIT C**

## *Child Welfare Policy Manual*

Section 473 of title IV-E created an adoption assistance program which permits Federal matching funds for the costs of adoption assistance for the purpose of encouraging the placement of eligible children in adoptive homes. Under title IV-E adoption assistance (section 473), the scope of eligibility includes children with special needs who are eligible to receive SSI as well as those eligible for AFDC and title IV-E foster care. The statute's intention to extend the program of adoption assistance is clearly stated in section 473 (a)(2)(A)(i)(II): "Each State...shall...make adoption assistance payments...to parents...who... adopt a child who...(II) meets all of the requirements of title XVI with respect to eligibility for supplemental security income benefits...."

The adoptive parents of the child eligible to receive title IV-E adoption assistance payments and SSI benefits may make application for both programs and the child, if eligible, may receive benefits from both programs. In considering the most appropriate choice of programs and deciding whether to make application for one or both, the adoptive parents should be aware of the differences between SSI and the Adoption Assistance Program.

Title XVI (SSI) is a needs based program and, as such, requires a test of income and resources of the adoptive parents in determining the amount of the SSI benefit to which a disabled child may be entitled. If (or when) the parental resources and income exceed a maximum level determined by SSI, the child is no longer eligible for SSI payments.

In cases where the income and resources of the adoptive parents do not affect the child's eligibility for SSI and there is concurrent receipt of payments from both programs, SSI will then count dollar-for-dollar the amount of title IV-E adoption assistance paid to the parents, thus decreasing the SSI benefit by the amount of the adoption assistance payment.

In the Adoption Assistance Program, the amount of the adoption assistance payment is determined after taking into consideration the circumstances of the adopting parents and the needs of the child being adopted. While the child's SSI benefit would be a consideration in the negotiation of the amount of the adoption assistance payment as part of the determination of the needs of the child being adopted, this income would not generate an automatic reduction in any standardized payment amount, as in the SSI program.

The amount agreed upon by the adoptive parents and the administering agency is limited, however, to the amount of the foster care maintenance payment which would have been paid if the child had been in a foster family home (section 473 (a)(3)).

Because there are many complexities and financial implications for the States as well as the adoptive families, it is important for all parties to discuss all aspects of a combination of SSI and adoption assistance at the time the adoption assistance agreement is negotiated. Such

**EXHIBIT C**

# *Child Welfare Policy Manual*

discussions could include, in addition to the adoptive parents, representatives from title IV-E and title XVI programs.

With full knowledge of the SSI and Adoption Assistance programs, the adoptive parents can then make an informed decision about application for or receipt of benefits from either or both programs for which they or the child are eligible. They should be advised, however, that if they decline title IV-E adoption assistance and choose to receive only SSI for the child, and if they do not execute an adoption assistance agreement before the adoption is finalized and do not receive adoption assistance payments pursuant to such an agreement, they may not later receive title IV-E adoption assistance payments, as the child would no longer meet all of the eligibility requirements as a child with special needs (section 473 (c)(2)).

*Source:       ACYF-CB-PA-94-02 (2/4/94)ACYF-CB-PA-94-02 (2/4/94)*

*Reference:  Social Security Act - sections 402 (a)(24), 406 (a) and 407 (as in effect on July 16, 1996) and 472 (a) and 473 (a); Program Operations Manual System, Part 5, Supplemental Security Income Chapter 008 - Income, Subchapter 30 - Unearned Income*

*2  Q:*  How should the decision to apply for SSI or title IV-E benefits be made?

*A:*  The difference between title XVI (SSI) and title IV-E should be considered carefully by the decision maker when choosing whether to apply for either or both title IV-E or SSI benefits on behalf of the child. Information regarding the benefits available under each program should be made available by the State title IV-E agency so that an informed choice can be made in the child's best interest. To achieve this goal, title IV-E agencies should exchange information regarding eligibility requirements and benefits with local Social Security district offices and establish formal procedures to refer clients and their representatives to the local Social Security district office for consultation and/or application when appropriate.

*Source:       ACYF-CB-PA-94-02 (2/4/94)ACYF-CB-PA-94-02 (2/4/94)*

*Reference:  Social Security Act - titles IV-E and XVI*

**EXHIBIT C**

# *Child Welfare Policy Manual*

**3  Q:** May we claim title IV-E administrative costs for eligible children who receive Supplemental Security Income (SSI)?

**A:** Yes. An August 17, 1993 memorandum from the Acting Commissioner of the Administration on Children, Youth, and Families to the Administration for Children and Families Regional Administrators allowed a State to include children who are eligible for title IV-E but who are receiving SSI in lieu of title IV-E foster care maintenance payments when determining its administrative cost ratio. This practice was conceptualized by considering these children candidates for foster care. While the policy itself is sound, a child who is in foster care is not a candidate because s/he has already been removed from home. If a child is fully eligible for title IV-E a State's choice to fund that child's board and care through SSI rather than title IV-E does not negate that child's eligibility for title IV-E.  The State may, therefore, claim Federal financial participation under title IV-E for title IV-E administrative functions performed on behalf of that child.

*Source:    ACYF-CB-PA-01-02 (7/3/01)ACYF-CB-PA-01-02 (7/3/01)*

*Reference:  Social Security Act - sections 471 and 474*

**4  Q:** Are Supplemental Security Income (SSI) benefits under Title XVI made to a child in foster care, including those funds conserved for the child in dedicated accounts, counted as a resource when determining eligibility for title IV-E?

**A:** No.  The child must have been eligible for Aid to Families with Dependent Children (AFDC) as it was in effect on July 16, 1996 (section 472(a) of the Social Security Act) to receive title IV-E foster care maintenance payments. The AFDC regulations at 45 CFR 233.20(a)(1)(ii) and 45 CFR 233.20(3)(x) exclude the needs, income and resources of individuals receiving benefits under title XVI in determining the need and amount of payment of an AFDC assistance unit. Thus, these exclusions apply to SSI-eligible children who are under the care and responsibility of the State agency and otherwise eligible for title IV-E.

*Source:    11/14/0711/14/07*

*Reference:  Social Security Act - titles IV-E and XVI; 45 CFR 233.20(a)(3)(x)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

**8.4E     TITLE IV-E, General Title IV-E Requirements, Confidentiality**

*1  Q:*  Under title IV-E, what information can be released? In particular, what information is child welfare information when a child is placed as a result of a juvenile offense?

*A:*  The issue of confidentiality is not focussed around the specific nature of the information, but rather the source of the information. No information that is gained from the child welfare agency may be released, except for the purposes identified in 45 CFR 205.50 (a)(1)(i). If the court gains information regarding a juvenile from the child welfare agency, this information must remain confidential. Should the court gain information about a juvenile in a proceeding that does not involve the child welfare agency, the confidentiality provisions of Section 471(a)(8) of the Social Security Act do not apply. Other parties would abide by their own confidentiality restrictions.

Thus, in a court proceeding, if a psychologist is requested to testify on behalf of the child welfare agency, the information is safeguarded under the provisions of Section 471(a)(8). If the psychologist's relationship to the child does not involve the child welfare agency, then Section 471(a)(8) does not apply.

*Source:     ACYF-CB-PIQ-95-02 (6/7/95)ACYF-CB-PIQ-95-02 (6/7/95)*
*Reference:  Social Security Act - section 471 (a)(8);  45 CFR 205.50*

*2  Q:*  Who can release information? In particular, can parties other than the State title IV-E agency (such as the court) release information?

*A:*  The release of information which was obtained from the child welfare agency by any party (including the court), except in the same circumstances as identified in 45 CFR 205.50(a)(1)(i), would result in State violation of the State Plan requirements for Foster Care and Adoption.

*Source:     ACYF-CB-PIQ-95-02 (6/7/95)ACYF-CB-PIQ-95-02 (6/7/95)*
*Reference:  Social Security Act - section 471 (a)(8);  45 CFR 205.50*

**EXHIBIT C**

# *Child Welfare Policy Manual*

3  *Q:*  Is any information contained in the child welfare record protected from redisclosure by a court in accordance with title IV-E confidentiality requirements?

*A:*  No. The prohibition covers information that is gained from the child welfare agency. The provisions of confidentiality of information cannot be extended to information that the court has gained from sources other than the child welfare agency.

For example, if the police, school officials, or some other party refers a child to the child welfare agency, the child welfare agency must treat information about the referral as confidential. If the child welfare agency informed the court about this referral, court redisclosure of this information would result in the State's violation of the State plan requirements under title IV-E. If the police, the school official, or some other party went to the court directly, then the confidentiality provisions would not apply. If the court became aware of the police, the school, or other party involvement through a source other than the child welfare agency, the confidentiality provisions in Section 471(a)(8) of the Social Security Act and 45 CFR 205.50 would not apply.

*Source:*      *ACYF-CB-PIQ-95-02 (6/7/95)ACYF-CB-PIQ-95-02 (6/7/95)*
*Reference:  Social Security Act - section 471 (a)(8);  45 CFR 205.50*

4  *Q:*  Under what authority may the Department review closed or sealed foster care records, particularly for those children who have been adopted?

*A:*  Section 471(a)(8) of the Social Security Act requires a State Plan to provide safeguards restricting use and disclosure of information concerning individuals assisted by the foster care and adoption assistance programs. It also indicates that a State Plan must provide: Safeguards which restrict the use of information concerning individuals assisted under the State Plan to purposes directly connected with... (C) the administration of any other federal or federally assisted program which provides assistance, in cash or in kind, or services, directly to individuals on the basis of need, and (D) any audit or similar activity conducted in connection with the administration of any such plan or program by any governmental agency which is authorized by law to conduct such audit or activity; and the safeguards so provided shall prohibit disclosure, to any committee or legislative body (other than an agency referred to in (D), with respect to any activity referred to in such clause), of any information which identifies by name or address any such applicant or recipients except that nothing contained herein shall

**EXHIBIT C**

# *Child Welfare Policy Manual*

preclude a State from providing standards which restrict disclosures to purposes more limited than those specified herein, or which in the case of adoptions, prevent disclosure entirely.

 While the language of section 471(a) (8) (D) provides that States may restrict disclosure entirely of adoption assistance records, that subsection, read in its entirety and in harmony with other sections of the Act, indicates that Congress did not intend to restrict access to federal auditors of information essential for audits under the title IV-E foster care and adoption assistance programs.

 In particular, section 471(a) (8) (D) itself provides for disclosure of information concerning individuals assisted by the foster care and adoption assistance programs for purposes directly connected with audits conducted by the Federal Government and otherwise authorized by law.

 The authority for Federal audits of the foster care and adoption assistance programs is expressly provided for under section 471 (a)(6). That section requires that a State Plan, in order to qualify for FFP for foster care and adoption assistance, provide that the appropriate State agency will make such reports, in such form and containing such information as the Secretary may from time to time find necessary to assure the correctness and verification of such reports.

 The legislative history of section 471(a)(8) also reveals that while Congress was concerned about providing safeguards which limited access to information on individuals assisted by the title IV-E programs, it did not intend to hinder the essential function of Federal audits. Thus, while Congress extended to States the option of imposing restrictions broader than those imposed in the past on the disclosure of information for the protection of the confidentiality of recipients of adoption assistance, it did not impede essential auditing functions by those authorized to conduct such audits.

 Accordingly, in the case of reviews of the eligibility of foster care and adoption assistance claims, the State Agency must make available foster care and adoption records (including sealed foster care and adoption records) in order to document the eligibility of the beneficiaries (children) and related costs of administration. If the requested records cannot or are not made available, all payments made on behalf of the children whose records have not been made available for review and associated costs will be disallowed.

*Source:     ACYF-PA-85-02 (12/19/85)ACYF-PA-85-02 (12/19/85)*

*Reference:  Social Security Act - section 471 (a)(6) and (8); H.R. Rep. Conf. No. 96-900, 96th Congress 2nd Session 44 (1980)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

*5* *Q:* What are the title IV-E confidentiality requirements?

*A:* Title IV-E of the Social Security Act requires that States provide safeguards to restrict the use and/or disclosure of information regarding children receiving title IV-E foster care and adoption assistance. In addition, in accordance with 45 CFR 1355.30 (p)(3), records maintained under title IV-E of the Act are subject to the confidentiality provisions in 45 CFR 205.50. Among other things, 45 CFR 205.50 restricts the release or use of information concerning individuals receiving financial assistance under the programs governed by this provision to certain persons or agencies that require the information for specified purposes. The authorized recipients of this information are in turn subject to the same confidentiality standards as the agencies administering those programs.

 To the extent that the records of the title IV-E agency contain information regarding child abuse and neglect reports and records, such information is subject to the confidentiality requirements at section 106 of the Child Abuse Prevention and Treatment Act (CAPTA).

*Source:    ACYF-NCCAN-PIQ-97-03 (9/26/97); ACYF-CB-PIQ-98-01 (6/29/98)ACYF-NCCAN-PIQ-97-03 (9/26/97); ACYF-CB-PIQ-98-01 (6/29/98)*

*Reference:  Social Security Act - section 471 (a)(8); 45 CFR 205.50; 45 CFR 1355.30; Child Abuse Prevention and Treatment Act (CAPTA), as amended (42 U.S.C. 5101 et seq.) - sections 106 (b)(2)(A)(v) and (vi)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

6  *Q:* Will States compromise compliance with title IV-E of the Social Security Act if they comply with the confidentiality requirements in sections 106 (b)(2)(v) and (vi) of CAPTA?

*A:* Title IV-E requires that States provide safeguards restricting the use and/or disclosure of information regarding children served by title IV-E foster care.  Records maintained under title IV-E are to be safeguarded against unauthorized disclosure.  The regulation at 45 CFR 205.50 states that the release or use of information concerning individuals applying for or receiving financial assistance is restricted to certain persons or agencies that require it for specified purposes.  Such recipients of information are in turn subject to standards of confidentiality comparable to those of the agency administering the financial assistance programs.

 There may be instances where CPS information is subject both to disclosure requirements under CAPTA and to the confidentiality requirements under title IV-E and 45 CFR 205.50.  To the extent that the CAPTA provisions require disclosure (such as in section 106 (b)(2)(A)(vi), the CAPTA disclosure provision would prevail in the event of a conflict since the CAPTA confidentiality provisions were most recently enacted.  Where the CAPTA provision is permissive (such as in sections 106 (b)(2)(A)(v)(I)-(VI)), it allows States to disclose such information without violating CAPTA, but it does not make such disclosure permissible in other programs if it is not otherwise allowed under the other program's governing statute or regulations.

*Source:    ACYF-NCCAN-PIQ-97-03 (9/26/97)ACYF-NCCAN-PIQ-97-03 (9/26/97)*

*Reference:  Child Abuse Prevention and Treatment Act (CAPTA), as amended (42 U.S.C. 5101 et seq.) - sections 106; 45 CFR 205.50*

**EXHIBIT C**

# *Child Welfare Policy Manual*

**7** *Q:* Some States have enacted laws that allow open courts for juvenile protection proceedings, including child in need of protection or services hearings, termination of parental rights hearings, long-term foster care hearings and in courts where dependency petitions are heard. Questions have arisen about whether courts that are open to the public and allow a verbal exchange of confidential information meet the confidentiality requirements under title IV-E. Do the confidentiality provisions in title IV-E restrict the information that can be discussed in open court?

*A:* Yes. The purpose of the confidentiality provision is to protect the privacy rights of individuals receiving services or assistance under title IV-E and to assure that confidential information is not disclosed to unauthorized recipients. While, under title IV-E, confidential information may be shared with the courts, there is no provision which allows for public disclosure of such information. The confidentiality requirements of title IV-E do not prohibit open courts per se. However, to the extent that the proceedings involve discussion of confidential information concerning a child who is receiving title IV-E foster care or adoption assistance, the confidentiality requirements apply. Accordingly, such information cannot be discussed in a public forum, including an open court. To the extent that confidential information is relevant to the proceedings, it must be discussed in the court's chambers or some other restricted setting, and the pertinent sections of the transcript must be kept confidential as well.

Violation of the Federal confidentiality provisions is a State plan compliance issue under title IV-E.

*Source:      ACYF-CB-PIQ-98-01 (6/29/98)ACYF-CB-PIQ-98-01 (6/29/98)*
*Reference:  Social Security Act - section 471 (a)(8); Child Abuse Prevention and Treatment Act (CAPTA), as amended (42 U.S.C. 5101 et seq.) - section 106; 45 CFR 205.50; 45 CFR 1355.21 (a)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

*8*  *Q:*  Is it permissible under title IV-B or IV-E of the Social Security Act (the Act) for the State to disclose to the public information contained in a State IV-B/IV-E agency's records regarding a deceased foster child?

*A:*  Yes.  Section 471(a)(8) of the Act and section 45 CFR 205.50 require the State IV-B or IV-E agency to provide safeguards which restrict the disclosure of information concerning individuals assisted under the title IV-B or IV-E State plan.  Upon the child's death, he/she is no longer a recipient of these programs.  However, information concerning other family members is still protected if they are recipients and care must be exercised to not release information on such other family members.

*Source:      09/05/0709/05/07*

*Reference:  Social Security Act   section 471, 45 CFR 205.50*

## 8.4F     TITLE IV-E, General Title IV-E Requirements, Criminal Record and Registry Checks

*1*  *Q:*  Do States have to request information from a "State" maintained child abuse and neglect registry of a U.S. Territory in which a prospective foster or adoptive parent has resided within the last five years in accordance with section 471(a)(20)(C)(i) of the Social Security Act (the Act)?

*A:*  Yes. For the purposes of title IV-E, a "State" is defined in 45 CFR 1355.20 as the 50 States, the District of Columbia, Commonwealth of Puerto Rico, the U.S. Virgin Islands, Guam and American Samoa.  As such, States have to request child abuse and neglect information pursuant to section 471(a)(20)(C)(i) of the Act of any of these territories that maintains a child abuse and neglect registry.  However, only those Territories that have an approved State plan under title IV-E are obligated to comply with an incoming request pursuant to section 471(a)(20)(C)(ii) of the Act.

*Source:      12/6/200712/6/2007*

*Reference:  Social Security Act - section 471(a)(20)(C); 45 CFR 1355.20*

**EXHIBIT C**

# *Child Welfare Policy Manual*

*1*  *Q:*  Does the criminal background check provision require checks at the State level, Federal level, or both?

**(Deleted 01/31/2007)**

*2*  *Q:*  Does the criminal records checks provision apply to foster parents and adoptive parents whose licensure or approval predates the passage of the Adoption and Safe Families Act?

**(Deleted 09/20/2007)**

*3*  *Q:*  Do the requirements for a criminal records check include checks for any member of the household over the age of 18?

*A:*  No. Such a requirement would go beyond the statute.

*Source:*     *Preamble to the Final Rule (65 FR 4020) (1/25/00)Preamble to the Final Rule (65 FR 4020) (1/25/00)*
*Reference:  Social Security Act - section 471 (a)(20); 45 CFR 1356.30*

*4*  *Q:*  Does a "drug-related offense" include an alcohol-related felony conviction?

*A:*  The criminal records check provision at section 471 (a)(20)(A) of the Social Security Act would apply in such situations.  Alcohol is considered a drug and a felony conviction for an alcohol-related offense is a serious crime.  Therefore, unless the State opts out of the provision, an alcohol-related felony conviction within the last five years would prohibit the State from placing children with the individual for the purpose of foster care or adoption under title IV-E.

*Source:*     *Preamble to the Final Rule (65 FR 4020) (1/25/00)Preamble to the Final Rule (65 FR 4020) (1/25/00)*
*Reference:  Social Security Act - section 471 (a)(20); 45 CFR 1356.30*

**EXHIBIT C**

# *Child Welfare Policy Manual*

5   *Q:*   May an Indian tribe elect not to conduct or require criminal records checks on foster or
adoptive parents if it obtains an approved resolution from the governing body of the Indian
tribe?

*A:*   No. Tribes may only receive title IV-E funds pursuant to a title IV-E agreement with a State. A
Tribe that enters into such an agreement must comport with section 471 (a)(20) of the Social
Security Act (the Act) and section 1356.30 in accordance with the State plan in order to receive
title IV-E funding on behalf of children placed in the homes it licenses.  Agreements between
the State child welfare agency and other public agencies or Tribes permit those entities to
have placement and care responsibility for a particular group of the foster care population
under the approved State plan. Such agreements do not permit other public agencies or tribes
to develop a distinct title IV-E program separate from that operated under the approved State
plan.

*Source:*     *Preamble to the Final Rule (65 FR 4020) (1/25/00)Preamble to the Final Rule (65 FR 4020) (1/25/00)*
*Reference:  Social Security Act - section 471(a)(20); 45 CFR 1356.30*

6   *Q:*   Must a State complete the fingerprint-based check of national crime information databases
required by section 471(a)(20)(A) of the Social Security Act before placing a child in the home
of a prospective foster or adoptive parent?

*A:*   No. The State is not required by Federal law to complete the fingerprint-based checks before
placing a child in the home of a prospective foster or adoptive parent.  Rather, section
471(a)(20)(A) of the Act makes a fingerprint-based check of the national crime information
databases an integral part of a State's criminal records check procedures that the State must
complete before licensing or approving a prospective foster or adoptive parent.

 Although the State may place a child in the home prior to completing the required criminal
records check, doing so prior to completing thorough safety checks has serious practice
implications.  Further, States must still meet other Federal requirements to claim title IV-E
foster care maintenance or adoption assistance.  Therefore, title IV-E foster care maintenance
payments may be paid on behalf of an otherwise eligible child only once the criminal records
check has been completed, the records reveal that the parents did not commit any prohibited

**EXHIBIT C**

## *Child Welfare Policy Manual*

felonies in section 471(a)(20)(A)(i) and (ii) of the Act, and the foster family home is licensed. Similarly, title IV-E adoption assistance payments may be paid on behalf of an otherwise eligible child only once the criminal records check has been completed, the records reveal that the parents did not commit any of the prohibited felonies, and all other adoption assistance criteria are met.

*Source:      01/29/0701/29/07*

*Reference: Social Security Act   471(a)(20)(A)*

7  *Q:*  Must the State conduct the child abuse and neglect registry checks required by section 471(a)(20)(C) of the Social Security Act before placing a child in the home of a prospective foster or adoptive parent?

*A:*  No.  The State is not required to conduct a check of the State's child abuse and neglect registry before placing a child in the home of a prospective foster or adoptive parent.  Rather, a State must check, or request a check of a State-maintained child abuse and neglect registry in each State the prospective foster and adoptive parents and any other adult(s) living in the home have resided in the preceding five years before the State can license or approve a prospective foster or adoptive parent.

Although the State may place a child in the home prior to completing the required registry checks, doing so prior to completing thorough safety checks has serious practice implications. Further, States must still meet other Federal requirements to claim title IV-E foster care maintenance or adoption assistance.  Therefore, title IV-E foster care maintenance payments may be paid on behalf of an otherwise eligible child only once the criminal records check has been completed, the records reveal that the parents did not commit any prohibited felonies in section 471(a)(20)(A)(i) and (ii) of the Act, and the foster family home is licensed.  Similarly, title IV-E adoption assistance payments may be paid on behalf of an otherwise eligible child only once the criminal records check has been completed, the records reveal that the parents did not commit any of the prohibited felonies, and all other adoption assistance criteria are met.

*Source:      01/29/0701/29/07*

*Reference: Social Security Act   section 471(a)(20)(C)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

*8*  **Q:**  Does section 471(a)(20) of the Social Security Act (the Act) require the State to conduct a child abuse and neglect registry check on an adult who moves into a licensed/approved foster or adoptive home?

   **A:**  No.  The new child abuse and neglect registry check requirements in section 471(a)(20) of the Act apply to "prospective" adoptive or foster parents, as well as all adults living in the prospective family's home.  Thus, once a foster or adoptive home has been approved or licensed by the State, section 471(a)(20) of the Act does not require the State to complete additional child abuse and neglect checks on other adult(s) living in the home.

   *Source:*     *01/29/0701/29/07*

   *Reference:*  *Social Security Act   section 471(a)(20)*

*9*  **Q:**  Please explain the criminal background check requirements of section 471(a)(20)(A) of the Act and to whom they apply.

   **A:**  Section 471(a)(20)(A) of the Act places requirements on the State as a condition of the title IV-E State plan and places additional requirements for claiming title IV-E foster care maintenance and adoption assistance payments on behalf of a title IV-E eligible child.

   As a condition of the title IV-E State plan, the State title IV-E agency must have procedures for criminal background checks, including fingerprint-based criminal record checks of the national crime information databases for prospective foster and adoptive parents.  The State title IV-E agency and its agents, must conduct the checks and otherwise apply the procedures for prospective parents whom it will license or approve to care for a participant in the State?s title IV-B/IV-E program (section 471(a)(20)(A) of the Act).  Agents of the title IV-E agency include a State licensing authority and any other agency that is under contract with the title IV-E agency to issue licenses or approvals.

   Further, in order for a State to claim title IV-E foster care maintenance or adoption assistance payments for an otherwise title IV-E eligible child, the criminal records check must reveal that the prospective foster or adoptive parent has not been convicted of the prohibited felonies, and in the case of a foster family home, the home must be licensed or approved (section 471(a)(20)(A)(i) and (ii) of the Act).  This applies regardless of the entity that licenses or approves the prospective parent (e.g., a private adoption agency, an Indian tribe either with or without an agreement under section 472(a)(2)(B)(ii) of the Act, or a private child placing agency not under contract with the State agency).

**EXHIBIT C**

# *Child Welfare Policy Manual*

*Source:*     *April 13, 2007April 13, 2007*
*Reference:*  *Social Security Act - section 471(a)(20)(A)*

**10**   *Q:*   To whom do the child abuse and neglect registry checks for prospective foster and adoptive parents at section 471(a)(20)(C) of the Social Security Act (the Act) apply?

    *A:*   The State must check any child abuse and neglect registry maintained by a State in which the adults living in the home of a prospective foster or adoptive parent have resided in the preceding five years, for any prospective parent who: 1) will be licensed or approved by the title IV-E agency, another public agency operating the title IV-E program pursuant to an agreement with the title IV-E agency (section 472(a)(2)(B)(ii) of the Act), or any other agency that is under contract with the title IV-E agency to issue licenses or approvals; and, 2) will provide care for a child who is a participant in the State?s title IV-B/IV-E programs (section 471(a)(20)(C)(i) of the Act).

*Source:*     *April 13, 2007April 13, 2007*
*Reference:*  *Social Security Act - section 471(a)(20)(C)*

**11**   *Q:*   May a State develop alternative procedures for background checks that do not include a fingerprint-based check of the national crime information databases (NCID) or a check of all State-maintained child abuse and neglect registries in which a prospective foster or adoptive parent and other adults living in the house have resided in the past five years?

    *A:*   A State's general procedures for criminal background checks of prospective foster and adoptive parents prior to licensing or approval as specified in section 471(a)(20) of the Social Security Act, must include conducting fingerprint-based checks of the NCID. The State must also check its own State-maintained child abuse and neglect registry, if it has one, and other State-maintained registries in which adult members of the prospective foster or adoptive parent's home have resided in the last five years. See the Child Welfare Policy Manual (CWPM) Section 8.4F Q/A #29 for case-by-case situations in which States may use an alternative method to obtain fingerprint-based checks of the NCID.

**EXHIBIT C**

# *Child Welfare Policy Manual*

*Source:*    *07/02./0707/02/07*

*Reference:  Social Security Act - section 471(a)(20); CWPM Section 8.4F #29*

**12  Q:**  If a foster parent decides to become an adoptive parent, would the background check provisions of section 471(a)(20) of the Social Security Act (the Act) apply if the foster parent had already undergone the checks to be licensed as a foster parent?

**A:**  It depends.  Some prospective parents are "dually licensed" to be a foster parent and/or an adoptive parent and therefore do not need a separate license or approval once initially licensed or approved.  In this circumstance, the parent providing foster care does not become a "prospective" adoptive parent and the State would not be required by Federal law to conduct the background checks in section 471(a)(20) of the Act again.  However, if a State has separate licenses or approvals for foster and adoptive parents, then the State must comply with section 471(a)(20) of the Act prior to licensing or approving the foster parent as an adoptive parent.

*Source:*    *April 13, 2007April 13, 2007*

*Reference:  Social Security Act - section 471(a)(20)*

**13  Q:**  May a State establish an appropriate timeframe for when a fingerprint-based check of the national crime information databases or a child abuse and neglect registry check must be completed or can remain valid to meet the purposes in section 471(a)(20) of the Social Security Act (the Act)?

**A:**  Yes.  The statute requires only that the background checks for prospective foster and adoptive parents be conducted prior to licensure or approval (section 471(a)(20) of the Act).  Since the statute does not prescribe a specific timeframe for when such checks must be completed or remain valid, the State has the discretion to establish timeframes as it sees fit, so long as the background checks are completed prior to licensure or approval.

*Source:*    *April 13, 2007April 13, 2007*

*Reference:  Social Security Act - section 471(a)(20)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

**14  *Q:*** May a State determine that it will not license or approve a foster or adoptive parent who has a criminal record other than one specified in section 471(a)(20)(A)(i) or (ii) of the Social Security Act (the Act)?

**  *A:*** Yes.  The State has the discretion to establish more restrictive criteria for foster or adoptive home licensure or approval than described in section 471(a)(20)(A)(i) or (ii) of the Act.

*Source:*     *April 13, 2007April 13, 2007*
*Reference:  Social Security Act - section 471(a)(20)(A)*

**15  *Q:*** Section 471(a)(20)(C)(i) of the Social Security Act (the Act) requires a State to request a check of information in another State s child abuse and neglect registry in which a prospective foster parent, adoptive parent, or other adult in the home has resided in the preceding five years. With regard to this provision, is the requesting State able to comply with the law if the other State that maintains such a registry denies the request because the provision is not yet effective in the other State?

**  *A:*** Yes.  Section 471(a)(20)(C)(i) of the Act requires the State to request and check a State-maintained child abuse and neglect registry of another State in which prospective foster and adoptive parents and other adults living in the home have resided within the last five years. The requirement is met for the requesting State when the State receives the information from the other State?s registry or is denied the request because the statutory provision is not yet in effect in the other State (or does not maintain a registry).  If the State?s request to check child abuse and neglect information is denied because the other State has an ACF-approved delayed effective date, or the State does not maintain a registry, the State may determine whether to license or approve the prospective foster or adoptive parent in the absence of the information.

 A State that maintains a child abuse and neglect registry must comply with another State?s request to check information on a prospective adoptive or foster parent and other adult household members (section 471(a)(20)(C)(ii) of the Act) as of the State?s specified effective date consistent with section 471(a)(20)(C)(i) and (ii) of the Act.  The effective date will vary among the States and may extend into 2008 if a State has an ACF-approved delayed effective date (section 152(c) of Public Law 109-248).

**EXHIBIT C**

# *Child Welfare Policy Manual*

*Source:    April 13, 2007April 13, 2007*

*Reference:  Social Security Act - section 471(a)(20)(C); Public Law 109-248   section 152(c)*

**16  *Q:*** Must a State make a registry check request pursuant to section 471(a)(20)(C)(i) of the Social Security Act (the Act) of a State which is not yet required to comply with such a request due to having an ACF-approved delayed effective date for section 471(a)(20)(C)(ii) of the Act?

**  *A:*** Yes.  Section 471(a)(20)(C)(i) of the Act requires a State to request a check of information in another State?s child abuse and neglect registry in which a prospective foster parent, adoptive parent, or adult in the home has resided in the preceding five years.  A State seeking to approve or license prospective foster or adoptive parents must request the information on all adults in the prospective foster/adoptive home, even if the other State that maintains a child abuse and neglect registry has an ACF-approved delayed effective date.

*Source:    April 13, 2007April 13, 2007*

*Reference:  Social Security Act - section 471(a)(20)(C)(i)*

**17  *Q:*** Section 471(a)(20)(C)(i) of the Social Security Act (the Act) states that "the State shall check any child abuse and neglect registry maintained by the State..."  How does this apply if a State does not maintain a child abuse and neglect registry?

**  *A:*** If a State itself does not maintain a child abuse and neglect registry, the State is not required by section 471(a)(20)(C)(i) of the Act to provide information to a requesting State or check further for child abuse and neglect information within the State on the prospective adoptive parent, foster parent or other adults living in the home.

*Source:    April 13, 2007April 13, 2007*

*Reference:  Social Security Act - section 471(a)(20)(C)(i)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

**18  Q:** How should a State proceed when another State that maintains a child abuse and neglect registry does not respond to an out-of-State request to check a child abuse and neglect registry pursuant to section 471(a)(20)(C)(i) of the Social Security Act (the Act)?

**A:** The State may not approve or license a prospective foster or adoptive home pursuant to section 471(a)(20)(C)(i) of the Act without the results of a State-maintained child abuse and neglect registry check of another State where the prospective parents or other adults in the home have lived in the past five years, unless the results are not provided because the other State has an ACF-approved delayed effective date.  A State that believes that another State that maintains a registry is not responding appropriately to an information request for a reason other than an ACF-approved delayed effective date should contact their ACF regional office. ACF may conduct a partial review pursuant to 45 CFR 1355.32(d) to determine the State?s compliance with the title IV-E State plan.

*Source:     April 13, 2007April 13, 2007*
*Reference:  Social Security Act - section 471(a)(20)(C)(i) and (ii); 45 CFR 1355.32(d)*

**19  Q:** How should a State that maintains a child abuse and neglect registry and has an ACF-approved delayed effective date respond to incoming requests for child abuse and neglect registry information on prospective adoptive and foster parents pursuant to section 471(a)(20)(C) of the Social Security Act?  Is that State out of compliance with the law if it does not provide the information?

**A:** The statute does not prescribe how a State with an ACF-approved delayed effective date should respond when denying a request for child abuse and neglect registry information from another State.  The State is not out of compliance with the statute if it is unable to provide the information in its registry to another State on the adults living in the home of a prospective foster and adoptive parent before the ACF-approved effective date on which it is required to comply.

*Source:     April 13, 2007April 13, 2007*
*Reference:  Social Security Act - section 471(a)(20)(C)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

**20  *Q:*** If a State has verified that another State does not maintain a child abuse and neglect registry, is the State still required by section 471(a)(20)(C)(i) of the Social Security Act (the Act) in every case to make a request to that other State?

   *A:* No.  The requirement in section 471(a)(20)(C)(i) of the Act to request a check for child abuse and neglect registry information in another State in which the prospective parent or other adult has resided in the preceding five years is inapplicable if that other State does not maintain a child abuse and neglect registry.

     *Source:*     April 13, 2007April 13, 2007
     *Reference:  Social Security Act - section 471(a)(20)(C)(i)*

**21  *Q:*** Some States have procedures that predicate releasing information from their State-maintained child abuse and neglect registry on the requesting State meeting certain conditions.  For example, some States require the requesting State to obtain a notarized release or consent from the prospective foster or adoptive parent and others charge a fee for the information.  Is this permissible?

   *A:* Yes. The statute does not prohibit a State from establishing procedures or charging fees for another State to access information from its State-maintained child abuse and neglect registry.  As long as the State that maintains the registry enables another State to request and check information in that registry, the State is meeting the requirement in section 471(a)(20)(C)(ii) of the Social Security Act.  Any fees paid by the requesting State to another State to gain access to information in a State-maintained child abuse and neglect registry pursuant to section 471(a)(20)(C)(i) of the Act may be reimbursed as direct title IV-E administrative costs.

     *Source:*     April 13, 2007April 13, 2007
     *Reference:  Social Security Act - section 471(a)(20)(C)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

**22  *Q:*** If the child will not receive title IV-E foster care maintenance or adoption assistance payments, must a prospective foster parent or adoptive parent who will be licensed or approved by an Indian tribe meet the requirements of 471(a)(20) of the Social Security Act (the Act)?

**  *A:*** No.  The requirement at section 471(a)(20) of the Act is applicable to the State?s title IV-E plan, with some additional conditions for claiming title IV-E payments and therefore does not extend to Indian tribal licenses or approvals if the child will not receive title IV-E foster care maintenance or adoption assistance payments.

*Source:     April 13, 2007April 13, 2007*

*Reference:  Social Security Act - sections 471(a)(20)*

**23  *Q:*** Section 471(a)(20)(A)(i) and (ii) of the Social Security Act (the Act) prohibit a State from claiming title IV-E foster care maintenance payments or adoption assistance payments when prospective foster or adoptive parents have been convicted of certain crimes.  Are there any exemptions or exceptions permitted from this requirement, such as the State or Indian tribe under a title IV-E agreement with the State considers the prospective parent rehabilitated or the placement is in the best interests of the child?

**  *A:*** No, there are no exceptions to the requirements at section 471(a)(20)(A)(i) and (ii) of the Act, once the provision is effective in the State.  The State, or an Indian tribe under a title IV-E agreement (pursuant to section 472(a)(2)(B)(ii) of the Act) has the discretion to place the child in a home where prospective parents have been convicted of such crimes.  However, the State or Tribe may not claim title IV-E foster care maintenance or adoption assistance payments in such cases.

*Source:     April 13, 2007April 13, 2007*

*Reference:  Social Security Act - sections 471(a)(20)(A) and 472(a)(2)(B)(ii)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

24  *Q:*  Is an Indian tribe that has a title IV-E agreement under section 472(a)(2)(B)(ii) of the Social Security Act (the Act) permitted an exemption or exception to the background check provisions of section 471(a)(20) of the Act?

   *A:*  No.  An Indian tribe with a section 472(a)(2)(B)(ii) agreement must meet the requirements of section 471(a)(20) of the Act for any prospective foster or adoptive parent who will provide care for a child who will receive title IV-E foster care maintenance payments or title IV-E adoption assistance payments.

   *Source:*     April 13, 2007April 13, 2007
   *Reference:*  Social Security Act   sections 471(a)(20)(A) and 472(a)(2)(B)(ii)

25  *Q:*  Do States have to request information from a child abuse and neglect registry of an Indian tribe in which a prospective foster or adoptive parent has resided within the last five years in accordance with section 471(a)(20)(C)(i) of the Social Security Act (the Act)?   Do Indian tribes have to comply with such a request from a State according to section 471(a)(20)(C)(ii) of the Act?

   *A:*  No to both questions. The references to a "State"-maintained child abuse and neglect registry in section 471(a)(20)(C)(i) and (ii) of the Act do not include an Indian tribe, as an Indian tribe is not considered a "State" for title IV-E pursuant to 45 CFR 1355.20.

   *Source:*     April 13, 2007April 13, 2007
   *Reference:*  Social Security Act - section 471(a)(20)(C)

**EXHIBIT C**

# *Child Welfare Policy Manual*

**26  *Q:*** Is a State able to comply with section 471(a)(20)(A) of the Social Security Act (the Act) if the State is unable to take legible fingerprint impressions of the prospective parent to whom the requirements apply?

**(Deleted 07/02/2007)**

**27  *Q:*** For the purposes of section 471(a)(20)(C) of the Social Security Act (the Act), what constitutes a &quot;child abuse and neglect registry maintained by the State&quot;?  If a State does not have such a registry, is it required to develop one?

**  *A:*** The State has the discretion to determine whether it has a &quot;child abuse and neglect registry maintained by the State.&quot; The law does not require a State that does not maintain a child abuse and neglect registry to develop one, neither does it require a State that currently has a registry to maintain it in perpetuity.  States that do not maintain a child abuse and neglect registry are not required by section 471(a)(20)(C)(ii) of the Act to provide child abuse and neglect information to a requesting State on adult members of a prospective foster or adoptive parent?s home.

*Source:*    *04/27/0704/27/07*

*Reference:  Social Security Act   section 471(a)(20)(C)*

**28  *Q:*** What information must a State release from its child abuse and neglect registry to comply with an incoming request from another State for information on an adult member of a prospective foster or adoptive parent's home as required by section 471(a)(20)(C)(ii) of the Social Security Act?  For example, may the State release information only on substantiated reports of abuse and neglect?

**  *A:*** The State has the discretion to determine what information to release to a requesting State on the prospective foster or adoptive parent or any adult living in the home of such prospective parent, unless or until we issue regulations on this provision.  We encourage States to be as forthcoming as possible to permit States to make appropriate decisions about approval or licensure of prospective foster or adoptive parents.

**EXHIBIT C**

# *Child Welfare Policy Manual*

*Source:*     *04/27/0704/27/07*

*Reference:  Social Security Act   section 471(a)(20)(C)(ii)*

**29**  *Q:*  Some prospective foster or adoptive parents have unreadable or missing fingerprints due to their age, disability, or occupation.  How can a State comply with section 471(a)(20)(A) of the Social Security Act (the Act) in such cases?

*A:*  Section 471(a)(20)(A) of the Act requires States to have procedures for conducting fingerprint-based checks of the national crime information databases (NCID) for certain prospective foster and adoptive parents (see CWPM 8.4F Q/A #9).  Those procedures must provide for the State to obtain fingerprints of all such prospective parents and submit them to the NCID.

We are aware that in some limited, case-specific circumstances, a State may not be able to: 1) obtain an individual?s fingerprints as a result of the individual?s disability; or, 2) obtain legible fingerprints due to low quality fingerprints, as a result of age, occupation or otherwise, thereby making it impossible for the NCID to provide results.  Establishing such procedures under the below circumstances satisfies section 471(a)(20)(A) of the Act:

<u>Inability to obtain fingerprints due to a physical disability.</u> The State must comply with section 471(a)(20)(A) of the Act by developing and utilizing a procedure to conduct a name-based check of the NCID or it may develop and utilize another appropriately comprehensive criminal background check process.  We expect the State to reserve and clearly state in writing that this alternative procedure is for limited and case-specific situations, such as when a fingerprint specialist has documented that the prospective parent?s disabling condition prevents fingerprinting, or the individual does not have fingers.

<u>Inability to obtain results due to low quality fingerprints.</u>  The State must comply with section 471(a)(20)(A) of the Act by obtaining and submitting the individual?s fingerprints to the NCID.  If the individual?s fingerprint impressions are rejected by the NCID, the State may instead implement an alternate procedure to conduct a name-based check of the NCID or to use another appropriately comprehensive criminal background check process.  We expect the State to reserve and clearly state in writing that this alternate procedure is used only in the limited and case-specific situation described above.

It is not acceptable for the State to utilize an alternative background check process when fingerprints impressions are of low quality due to the State?s lack of technological capacity or

**EXHIBIT C**

## *Child Welfare Policy Manual*

use of improper techniques.  The Criminal Justice Information Services (CJIS) Division of the Department of Justice and the State?s CJIS Systems Officer can assist the State in determining appropriate techniques and technologies to use to take legible fingerprints, including procedures for individuals with abnormalities of the fingers or hands.

*Source:       07/02/0707/02/07*

*Reference:  Social Security Act   section 471(a)(20)(A)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

**30  Q:**  Does the State title IV-E agency, or licensing authority, itself have to request information from a State-maintained child abuse and neglect registry pursuant to section 471(a)(20)(C)(ii) of the Social Security Act (the Act)?  Similarly, does the State title IV-E agency, or licensing authority, itself have to receive the registry information?

**A:**  Yes to both questions.  The statute provides "that <em>the State shall?check</em> any child abuse and neglect registry...<em>and request</em> any other State in which" the prospective parent or other adults in the home have resided the past five years (see section 471(a)(20)(C) of the Act).  Further, the State that maintains such a registry must comply with an incoming request received from another State title IV-E agency or licensing authority (section 471(a)(20)(C)(ii) of the Act).  For purposes of this State plan requirement, the request must be made <em>by the State</em> title IV-E agency or other licensing authority requiring the check <em>directly to the other State</em> where the adult had lived, and the State that maintains the child abuse and neglect registry must respond <em>to the State</em> title IV-E agency or other licensing authority rather than to the prospective parent or other adult living in the household.  It is permissible, however, for the State that maintains the registry to have a procedure which requires the State title IV-E agency or other licensing authority submitting the request to obtain an affidavit or other form of consent from the adult to release such information.

*Source:*     *12/6/200712/6/2007*

*Reference:  Social Security Act - section 471(a)(20)(C)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

**31**  *Q:*  Upon the dissolution of an adoption or death of the adoptive parents of a child receiving title IV-E adoption assistance, must the child's new prospective adoptive parents meet the background check requirements of section 471(a)(20) of the Social Security Act (the Act) before they can receive IV-E adoption assistance if that subsequent adoption will be achieved through a private or independent entity?

  *A:*  Yes.  In order for the State to claim title IV-E adoption assistance payments in an independent or private adoption for an otherwise eligible child, the background checks specified in section 471(a)(20)(A) of the Act must be conducted.  Furthermore, the checks must reveal that the prospective adoptive parent has not been convicted of one of the prohibited felonies consistent with section 471(a)(20)(A)(i) and (ii) of the Act.

  *Source:*     *12/6/200712/6/2007*

  *Reference:  Social Security Act - section 471(a)(20)(A); Child Welfare Policy Manual Section 8.4F Q/A #9 and 10*

## 8.4G     TITLE IV-E, General Title IV-E Requirements, Fair Hearings

  *1*  *Q:*  Do the regulations at 45 CFR 205.10 require fair hearings for appeals related to services as well as financial claims?

  *A:*  Yes.  The regulations at 1355.30 (p)(2) provide that the procedures for hearings found in 45 CFR 205.10 shall apply to all programs funded under titles IV-B and IV-E of the Social Security Act.  Fair hearings in relation to services as well as financial claims are therefore covered under this regulation.  The process for fair hearings under section 205.10 is essentially the same for services hearings as for financial hearings.  However, because the substantive portion of the regulations provides no examples of service issues, the State has the option of modifying the context of the hearing to accommodate services program complaints.  The hearing process under either situation requires that recipients be advised of their right to a hearing, that they may be represented by an authorized representative, and that there be a timely notice of the date and place of the hearing.

   The following paragraphs, excerpted from the now obsolete section 1392.11, may be used as guidance for the hearings related to services issues.  "The State must have a provision for a fair hearing, under which applicants and recipients may appeal denial of or exclusion from a service program, failure to take account of recipient choice of service or a determination that the individuals must participate in the service program.  The results of appeals must be

**EXHIBIT C**

## *Child Welfare Policy Manual*

formally recorded and all applicants and recipients must be advised of their right to appeal and the procedures for such appeal.  There must be a system through which recipients may present grievances about the operation of the service program."

 Examples of service issues in title IV-E that might result in a grievance or request for a hearing include: Agency failure to offer or provide appropriate pre-placement preventive services or reunification services; Agency may not have placed child in the most family-like setting in close proximity to his parents; Parents were not informed of their rights to participate in periodic administrative reviews; Agency failed to provide services agreed to in case plan; A request for a specific service is denied or not acted upon; and Agency failure to carry out terms of adoption assistance agreements.


*Source:*     *ACYF-CB-PIQ-83-04 (10/26/83)ACYF-CB-PIQ-83-04 (10/26/83)*

*Reference:  45 CFR 1355.30 (k), 205.10 and 1392.11*

**EXHIBIT C**

# *Child Welfare Policy Manual*

*2* *Q:* Please explain the circumstances in which an adoptive parents have the right to a fair hearing.

*A:* Federal regulations at 45 CFR 1356.40(b)(1) require that the adoption assistance agreement be signed and in effect at the time of, or prior to, the final decree of adoption. However, if the adoptive parents feel they wrongly have been denied benefits on behalf of an adoptive child, they have the right to a fair hearing. Some allegations that constitute grounds for a fair hearing include: relevant facts regarding the child were known by the State agency or child-placing agency and not presented to the adoptive parents prior to the finalization of the adoption; denial of assistance based upon a means test of the adoptive family; adoptive family disagrees with the determination by the State that a child is ineligible for adoption assistance; failure by the State agency to advise potential adoptive parents about the availability of adoption assistance for children in the State foster care system; decrease in the amount of adoption assistance without the concurrence of the adoptive parents; and denial of a request for a change in payment level due to a change in the adoptive parents circumstances. In situations where the final fair hearing decision is favorable to the adoptive parents, the State agency can reverse the earlier decision to deny benefits under title IV-E. If the child meets all the eligibility criteria, Federal Financial Participation (FFP) is available, beginning with the earliest date of the child's eligibility (e.g., the date of the child's placement in the adoptive home or finalization of the adoption) in accordance with Federal and State statutes, regulations and policies.

The right to a fair hearing is a procedural protection that provides due process for individuals who claim that they have been wrongly denied benefits. This procedural protection, however, cannot confer title IV-E benefits without legal support or basis. Accordingly, FFP is available only in those situations in which a fair hearing determines that the child was wrongly denied benefits and the child meets all Federal eligibility requirements. For example, if a fair hearing officer determines that a child would have been eligible for Supplemental Security Income (SSI) prior to the finalization of the adoption, FFP is available only if there had been eligibility documentation for the child from the Social Security Administration, or its designee at that time. Accordingly, if a fair hearing officer decides that a child should have received adoption assistance, but, in fact, the child does not meet all the Federal eligibility criteria, the State cannot claim FFP under title IV-E for the child.m FFP under title IV-E for the child.

*Source:    ACYF-CB-PA-01-01 (1/23/01)ACYF-CB-PA-01-01 (1/23/01)*

*Reference:  Social Security Act -sections 471(a)(12) and 473*

*3* *Q:* Do foster parents or relative caregivers have a right to a fair hearing under section 471(a)(12)

**EXHIBIT C**

# *Child Welfare Policy Manual*

of the Social Security Act (the Act) with regard to adverse placement decisions?  In particular, do the provisions for relative preference at section 471(a)(19) of the Act and an opportunity to be heard for foster parents and relative caretakers at section 475(5)(G) of the Act create fair hearing rights?

*A:*  No.  The provisions at sections 471(a)(19) and 475(5)(G) of the Act have no relation to or bearing on the fair hearing requirements.  The State determines where and with whom the child will be placed by virtue of its placement and care responsibility.

 The fair hearing provision at section 471(a)(12) of the Act provides for granting an opportunity for a fair hearing to any individual whose claim for benefits available pursuant to this part is denied or not acted upon with reasonable promptness.  The benefit under the title IV-E foster care maintenance payments program is provided to eligible children.

*Source:*  *06/09/0406/09/04*

*Reference:  Section 471(a)(12) of the Social Security Act, 45 CFR 205.10 and 1355.30(p)(2).*

*4*  *Q:*  Does section 471(a)(12) of the Act give prospective adoptive parents a right to the 45 CFR 205.10 fair hearings provisions with regard to pre-adoptive foster care placement issues?

*A:*  No. Section 471(a)(12) of the Act does not grant prospective adoptive parents the right to a fair hearing under 45 CFR 205.10, for the purposes of challenging the State?s exercise of its placement and care responsibilities pursuant to section 472(a)(2)(B) of the Act. The title IV-E fair hearings provision is directed to individuals who believe that they have been denied a benefit to which they are entitled, such as the denial of adoption assistance (see 45 CFR 205.10(a)(5) and Child Welfare Policy Manual Section 8.4). The situation raised in the question does not involve the denial of a benefit or assistance, but rather entails a placement decision.

 Nothing in Federal law or regulations requires the State to provide an individual with an opportunity for a fair hearing with regard to agency placement decisions.

*Source:*  *06/09/0406/09/04*

*Reference:  Section 471(a)(12) of the Social Security Act, 45 CFR 205.10.*

**EXHIBIT C**

# *Child Welfare Policy Manual*

*5*  *Q:*  Is a State's title IV-E agency required to conduct the fair hearings mandated at section 471(a)(12) of the Social Security Act (the Act), or may it delegate the process to another State agency?

*A:*  Although section 471(a)(12) of the Act requires that the State provide for an opportunity for a fair hearing "before the State agency," the regulation at 45 CFR 1355.30 cross references 45 CFR 205.10.  The latter citation at 45 CFR 205.10(a)(9) authorizes the hearings to "be conducted by an impartial official(s) or a designee of the agency."  Thus, an agency other than the single State agency may be designated to conduct hearings and make recommendations to the single State agency.  The provision at 45 CFR 205.100(b)(1), however, prohibits officials of the State agency from delegating their authority for exercising administrative discretion in the "administration or supervision of the plan."  Thus, although the single State agency may delegate the fair hearing function pursuant to the single State agency requirement, the State agency must make the final decision.

*Source:*    *7/6/057/6/05*

*Reference:  Social Security Act -- Section 471(a)(12), 45 CFR Parts 1355.30, 205.10(a)(9) and 205.100(b)(1)*

## 8.4H    TITLE IV-E, General Title IV-E Requirements, Safety Requirements

*1*  *Q:*  Is the requirement for criminal records checks extended to the staff of child-care institutions and unlicensed relative homes?

*A:*  The criminal records check provision does not extend to child-care facilities; the statute specifically limits this requirement to prospective foster and adoptive parents.  However, in order to be an eligible provider for title IV-E funding purposes, in all cases where no criminal records check is conducted, the licensing file must include documentation that safety considerations with respect to the caretakers have been addressed.  This safety documentation requirement applies to child-care institutions in every situation and to prospective foster and adoptive parents in States that opt out of the criminal records check provision.  Since this provision is a title IV-E funding requirement, it does not extend to relative homes that are not licensed or approved in accordance with State licensing standards because children placed in such homes are not eligible for title IV-E funding.

*Source:*    *Preamble to the Final Rule (65 FR 4020) (1/25/00)Preamble to the Final Rule (65 FR 4020) (1/25/00)*

**EXHIBIT C**

# *Child Welfare Policy Manual*

*Reference: Social Security Act - section 471 (a)(20); 45 CFR 1356.30*

## 8.4I    TITLE IV-E, General Title IV-E Requirements, Social Security Numbers

*1  Q:*  What is the policy regarding a Social Security Number for persons eligible under title IV-E?

*A:*  Section 472 of the Social Security Act does not require that an otherwise eligible child apply for or furnish to the State agency a Social Security Number in order to be eligible for the title IV-E foster care maintenance and adoption assistance programs.

*Source:    ACYF-CB-PA-86-01 (2/25/86)ACYF-CB-PA-86-01 (2/25/86)*

*Reference: Social Security Act - section 472*

*2  Q:*  How should States reconcile the inconsistent requirements for furnishing social security numbers (SSN) under Medicaid and title IV-E?

*A:*  Changes brought about by the Deficit Reduction Act of 1984 (DEFRA) (Public Law 98-369) resulted in an OHDS Policy Announcement which stated that otherwise eligible children are not required to apply for or furnish a Social Security Number (SSN) in order to be eligible for the title IV-E Foster Care Maintenance Payments Program or the Adoption Assistance Program.

However, title XIX program regulations at 42 CFR 435.910 were amended to require, effective April 1, 1985, that each individual (including children) requesting Medicaid services furnish his/her SSN as a condition of eligibility for Medicaid. (It should be noted that if an individual needs emergency medical care, medical assistance cannot be denied if the individual has not previously applied for a SSN.)

Children who are eligible for title XIX Medicaid on the basis of their eligibility under title IV-E must furnish a SSN as a condition of eligibility for Medicaid, even though a SSN is not required under title IV-E.

*Source:    ACYF-CB-PA-87-01 (1/5/87)ACYF-CB-PA-87-01 (1/5/87)*

*Reference: Social Security Act - sections 472 (h), 473 (b), 1102 and 1137; Public Law 98-369; 42 CFR 435.910*

**EXHIBIT C**

# *Child Welfare Policy Manual*

**EXHIBIT C**