# EXHIBIT C

3/4/2008 Dupuy, Sheilah (ROUGH)

1  [somewhere|answer].
2  THE WITNESS: It I might have reviewed a draft.
3  BY SPEAKER1:
4  Q. Would [one|won] person in particular [been|be]
5  responsible for prepare -- would there [been|be] [one|won]
6  person who would [been|be] sort of in charge of the report?
7  A. Yes, this would be a staff assignment, so.
8  Q. So when would it [been|be] someone how supervised?
9  A. It would [been|be] somebody who one of my managers
10 would supervise.
11 Q. Now you said that the reports would report on any
12 unusual increase that impacted group homes -- I'm sorry
13 that impacted family foster homes, what do you mean by
14 unusual increase?
15 A. The report would focus on any changes which may
16 have occurred as the result of new department mental
17 requirements or other requirements which may have increased
18 or for that matter decreased group home provider costs. An
19 example being when we switched to a biennial rate setting
20 system that actually saved providers a slight amount of
21 [moan|money].
22 Q. Is that -- what time do we have?
23 THE VIDEOGRAPHER: [11|eleven] 52.
24 SPEAKER1: I think I'm done with this portion of
25 the depo I think it might be a good [place|plays] to

3/4/2008 Dupuy, Sheilah (ROUGH)

1  [brake|break] for lunch.
2  SPEAKER2: Okay.
3  SPEAKER1: Thanks.
4  THE VIDEOGRAPHER: Off the record. [11|Eleven]
5  52.
6  (Brief recess.)
7  THE VIDEOGRAPHER: We're back on the record at 1
8  [17|seventeen].
9  Q. Okay now I believe earlier you testified that the
10 [months|most|mother's] [recent|resent] increase for rates
11 paid to foster care providers is to be implemented in 2008;
12 is that correct?
13 A. I don't [thing|think] I said -- I don't
14 [thing|think] -- I don't [thing|think] we talked about the
15 implementation date.
16 Q. Okay. Is your understand --
17 A. I think that's my understanding yes.
18 Q. Now, do you know when the rate increase was before
19 that?
20 A. I believe it was 2001.
21 Q. Okay. And were you chief of F R CB when that last
22 increase was implemented?
23 A. I was the chief of foster care at that Tim.
24 Q. Why haven't there [been|be] any increases from
25 2001 until 2008.

3/4/2008 Dupuy, Sheilah (ROUGH)

1  SPEAKER2: Objection, foundation, calls for
2  speculation.
3  THE WITNESS: I guess I'm not sure what
4  [you're|your] asking in terms of why haven't there
5  [been|be].
6  Q. Okay.
7  BY SPEAKER1:
8  Q. Okay. I'm going to introduce in another exhibit
9  it is the printout of the statute entitled California
10 California welfare institution code section [one|won]
11 [one|won] 46 0: Now, I'm not going to ask you if
12 [you're|your] familiar with this document are you familiar
13 with this statute?
14 A. Yes.
15 SPEAKER2: I'm going to interpose an objection
16 here to the extent [you're|your] going to ask [helper|her]
17 about questions about the statute the statute speaks for
18 itself she's not here to interpret a statute for you she's
19 [hear|here] as a percipient witness with that you can ask
20 [helper|her] questions but I will further object
21 [few|if you] ask [helper|her] for something that asks for
22 an interpretation or legal conclusion about this document.
23 SPEAKER1: Okay. Now, under section B of the
24 statute it says care and supervision includes food clothing
25 shelter daily supervision school supplies the child's

3/4/2008 Dupuy, Sheilah (ROUGH)

1  personal incidentals, liability insurance with respect to
2  the child and reasonable travel to the child's home for
3  visitation. Now are the payments that [you're|your]
4  department makes to foster care providers intended to cover
5  these costs.
6  SPEAKER2: Well I'm gonna make the same objection
7  I will instruct the witness not to [somewhere|answer]
8  [hear|here] but [you're|your] asking [helper|her] for an
9  interpretation of a statute and that's not the reason
10 [she is|she's] [hear|here] [she is|she's] not [hear|here]
11 as the person [months|most|mother's] knowledgeable or to
12 speak to the specific statutory interpretation
13 BY SPEAKER1:
14 Q. Well to the extent that your job duties described
15 implementing the state and federal laws and regulations, I
16 think she can testify as to [helper|her] understanding of
17 you know what the payments are what they intended to cover
18 and.
19 SPEAKER2: If she can testify as to [helper|her]
20 understanding not as a position as speaking for the
21 department in terms of policy vis-a-vis the stat you'd.
22 SPEAKER1: Based upon [you're|your] understanding
23 are the payments made to foster care providers intended to
24 cover care and supervision as defined in section B of the
25 statute?

1    A.  Based on my understanding, the payments are
2  designed -- these -- these are allowable cost categories
3  for payments so that's different from when you say designed
4  to cover.
5    Q.  What do you mean by allowable cost categories?
6    A.  This is what S F D. C. F [moan|money]
7  [may be|maybe] spent on:  A F B C F.
8    Q.  Dogs [you're|your] department or do you or anyone
9  -- do you or anyone under -- does you or anyone under
10 [you're|your] supervision do any studies to determine
11 whether any of these -- whether the payments made to foster
12 care providers are sufficient to cover any of these
13 particular categories.
14    SPEAKER2:  Foundation, am, compound bullet you may
15 [somewhere|answer] if you have a understanding.
16    THE WITNESS:  Have we -- can you just ask me that
17 again have we done any.
18 BY SPEAKER1:
19    Q.  Sure do -- did -- do you or anyone you surprise do
20 anyone studies to determine whether the payments that you
21 make to foster care providers cover for example, the cost
22 of food?
23    A.  Neither myself nor my staff have [every|ever] done
24 such a study.
25    Q.  And how about with respect to clothing?

1    A.  Neither my nor my staff have done studies on any
2  of these items.
3    Q.  On no particular item did you or [you're|your]
4  staff do any studies to --
5    A.  (Affirmative nod.).
6    Q.  Okay.  Are you familiar with the term foster care
7  maintenance payments?
8    A.  Yes.
9    Q.  What is your understanding of what foster care
10 maintenance payments are.
11    SPEAKER2:  Again I'll enter pose the same
12 objection as before that Ms. Dupuy can give you
13 [helper|her] understanding but [she is|she's] not here to
14 speak for the department in an official capacity on that
15 issue [she is|she's] [helper|her] as a percipient witness.
16    SPEAKER1:  Understood just asking for [helper|her]
17 understanding wilt witness it's my understanding that
18 foster care maintenance payments are designed to provide a
19 provider with resources to provide care and supervision to
20 a child in foster care.
21    SPEAKER1:  .
22    Q.  I'm going to introduce another exhibit.
23    (Whereupon, [Plaintiff's|Defendant's] Exhibit
24 No. @NUM, @DESCRIPTION, was marked for
25 identification.)

1  .
2  BY SPEAKER1:
3    Q.  There is entitled -- women [42|Forty-two] U.S. C S
4  section [6|six] [75|seventy-five].  Definitions.  And I
5  will direct you to page two under [4|four] A, it provides
6  -- well have you -- are you familiar with this statute?
7    A.  Yes, I've [seen|scene] the statute.
8    Q.  And under [4|four] A it provides a definition of
9  foster care maintenance payments.  And if you
10 [company|could] look at that definition and if you compare
11 it to the care and supervision of section B of -- gentleman
12 I'm gonna object [hear|here] and instruct the witness not
13 to [somewhere|answer].  You are asking [helper|her] to make
14 a conclusion comparing two statutes that's [inn|inch]
15 [tear|tier] Lee improper that's not the [role|roll] here
16 today and this even goes beyond [you're|your] previous
17 questions about [helper|her] understanding of this statute
18 speaks for itself.
19    SPEAKER1:  Well I mean [helper|her] duty in
20 [helper|her] job is to implement state and federal policies
21 and if these are the policies that [she is|she's] under
22 duty to implement then I think I'm entitled to [helper|her]
23 understanding of how it's --
24    SPEAKER2:  I absolutely disagree about that
25 [you're|your] asking [helper|her] to make a conclusion

1  based on a statute that speaks for itself and has it's own
2  significance and that is not appropriate [hear|here] and I
3  will instruct [helper|her] not to [somewhere|answer] this.
4    SPEAKER1:  Well if -- I mean is it part of your
5  job to implement federal and state law.
6    SPEAKER2:  [she is|she's] already answered that
7  question yes it is but it is not [helper|her] duty to
8  interpret state or federal statutes such as this
9  [we can|weak|week] go around on this if you want to seek a
10 motion to compel then that's fine but I'm gonna instruct
11 [helper|her] not to [somewhere|answer] this question it's
12 improper.
13    Q.  Do you know what the California necessities index
14 is?
15    A.  It's a cost of -- it's a cost of living index
16 indicator.  I'm not an expert on it.
17    SPEAKER2:  He just asked you if you knew what it
18 was, not to explain it.
19    SPEAKER1:  All right I'm going to introduce a new
20 exhibit in is section [11|eleven] 46 1 of the welfare --
21 California welfare institutions code.  And I will direct
22 you to page two under D [one|won] A.  It says the
23 [skull|schedule] of basic rates in subdivision A shall be
24 adjusted by the percentage changes in the California
25 necessities index.

3/4/2008 Dupuy, Sheilah (ROUGH)

1  A. I'm sorry. I lost you. Can --
2  Q. Page two under D [one|won] capital letter A. Fix
3  fix if?
4  A. Just beginning with the --
5  Q. Yeah.
6  A. Okay.
7  Q. It says beginning with the 1991 to '92 fiscal
8  year the --
9       THE REPORTER: Slower, please.
10      SPEAKER1: Schedule of basic rates in subdivision
11 A shall be adjusted by the percentage changes in the
12 California necessity index computed pursuant to the
13 methodology in section [11|eleven] [4|four] [5|five]
14 [3|three] subject to the a available built of funds. Now,
15 during the time when you were chief of the F R CB, were
16 rates paid to foster care providers increased based on
17 change [necessary|nest] the California necessities index.
18      SPEAKER2: Well vague as to foster care providers
19 and foundation. If you have an understanding of the
20 question you can may he [oh|owe] you may [somewhere|answer]
21 it.
22      THE WITNESS: It's my understanding that yes they
23 were increased.
24 BY SPEAKER1:
25  Q. Increased between 2000 --?

3/4/2008 Dupuy, Sheilah (ROUGH)

1  A. You said during my tenure.
2  Q. Okay from the period -- from 2001 up until the
3 [months|most|mother's] [recent|resent] increase excluding
4 the [months|most|mother's] resents increase in 2008.
5      SPEAKER2: Not in the form of the question wilt
6 witness I'm not sure what.
7 BY SPEAKER1:
8  Q. Were any adjustments in the rates paid to foster
9 Kay providers made based on percentage change
10 [necessary|nest] the California necessities index from 2001
11 until 2007.
12      SPEAKER2: Well again objection, lack of
13 foundation, asking for speculation and it's an am question,
14 it's also compound. You may [somewhere|answer] it.
15      THE WITNESS: To my knowledge the rates were
16 increased in 2001.
17  Q. .
18 BY SPEAKER1:
19  Q. Okay and that's the -- but after 2001 -- between
20 -- after that increase and before the 2008 increase were
21 any other increases made based on changes in the California
22 necessities index.
23      SPEAKER2: Well it [miss|myself] cries he is
24 [helper|her] testimony. She said rates were changed I
25 don't [thing|think] she said anything about rates being

3/4/2008 Dupuy, Sheilah (ROUGH)

1 changed based on the California necessities index.
2      SPEAKER1: Right that's what I'm asking.
3      THE WITNESS: Rates were increased in 2001 to be
4 honest with you I don't remember if that was an C N I
5 increase or another increase.
6 BY SPEAKER1:
7  Q. Does [you're|your] department do any evaluation of
8 whether the cost of living are increasing on a year by year
9 basis.
10      SPEAKER2: Asked and answered also vague as to
11 cost of living [she is|she's] already answered with respect
12 to the various categories in the previous questions you
13 asked [helper|her] specific to the California statute.
14 BY SPEAKER1:
15  Q. Well okay I guess my question is it says from the
16 statute the [skull|schedule] of basic rates shall [been|be]
17 adjusted by the percentage changes in the California
18 necessities index. Now, does [you're|your] department do
19 that on a annual basis?
20  A. Do we do what?
21  Q. Do you evaluate whether rates should [been|be]
22 changed based on change [necessary|nest] the C N I.
23      SPEAKER2: [She is|She's] testified already to
24 that fact in the negative, she said rates have [been|be]
25 increased but without being specific to the California

3/4/2008 Dupuy, Sheilah (ROUGH)

1 necessities index.
2      THE WITNESS: Repeat [you're|your] question
3 [one|won] more time just to make sure I understand.
4      SPEAKER1: .
5  Q. On a -- I just just to to clarify, the California
6 necessities index and [you're|your] understanding was that
7 it is the cost of living index it's for cost of living is
8 that is that correct.
9      SPEAKER2: Form of the question and I think
10 [she is|she's] already testimony --.
11      THE WITNESS: Yes I said it what's some measure of
12 cost of living something.
13 BY SPEAKER1:
14  Q. Okay and then witness wet I don't -- I'm not an
15 expert in what the C N I is.
16 BY SPEAKER1:
17  Q. But the California necessity index is specifically
18 [cited|sighted] in in this statute?
19  A. Correct.
20  Q. And it is -- is it [you're|your] -- is it one of
21 [you're|your] duties to implement the -- this statute?
22  A. Yes, it's my responsibility to implement what's
23 statutory Lee mandated.
24  Q. It says the adjustments shall [been|be] adjusted
25 by the California necessities index. I want to confirm,

3/4/2008 Dupuy, Sheilah (ROUGH)

1  does [you're|your] department adjust percentage changes in
2  the California necessities index on a annual basis?
3      SPEAKER2:  Okay I'm gonna object to the question
4  on the same basis as before [you're|your] asking
5  [helper|her] to interpret a statute [you're|your] asking
6  for [helper|her] to make a legal conclusion and I will
7  instruct [helper|her] not to [somewhere|answer] this
8  question because it's not appropriate given [helper|her]
9  [role|roll] [hear|here] as a percipient witness.
10     SPEAKER1:  She has to have some sort of -- if ear
11 duty is to implement the statute she has to have some
12 understanding of how to do that.
13     SPEAKER2:  Well I -- I -- I disagree with your
14 characterization and the statute speaks for itself and the
15 question you just posed to me was not the same [one|won]
16 you posed to [helper|her] if you want to have the question
17 [read|red|remembered] back make [we can|weak|week].
18     Q.  You you can't read the question back reporter
19 reporter no.
20 BY SPEAKER1:
21     Q.  Do you ever refer to the California necessities
22 index to carry out [you're|your] duties during the period
23 of time of 2001 to 2007 did you refer to the California
24 necessities index in carrying out [you're|your] duties of
25 implementing state and federal laws?

65

3/4/2008 Dupuy, Sheilah (ROUGH)

1     A.  What do you mean did I refer to it.
2     Q.  Did it -- did the California necessities index
3  play a [role|roll] in any decision you made in terms with
4  respect to setting rates for foster care providers.
5      SPEAKER2:  Well that mischaracterizes [helper|her]
6  testimony she's testified that it's the ledge slate
7  [you're|your] that's sets the rates not [helper|her]
8  department.
9      SPEAKER1:  So.
10     SPEAKER2:  So the question is meaningless there's
11 no foundation for [you're|your] premise that she or
12 [helper|her] department sets the rates.
13     SPEAKER1:  .
14     Q.  In and do -- do.
15     THE VIDEOGRAPHER:  Excuse me.  [I have|identify]
16 to change tapes.
17     This is the end of videotape number two at 1
18 [thirty-six|36].
19     THE VIDEOGRAPHER:  We're back on the record, 1
20 [37|thirty-seven].  This is beginning of videotape number
21 [3|three].
22 [7|Seven].
23     (Whereupon, [Plaintiff's|Defendant's] Exhibit
24 No. @NUM, @DESCRIPTION, was marked for
25 identification.)

66

3/4/2008 Dupuy, Sheilah (ROUGH)

1     SPEAKER2:  That's probably the [one|won] that the
2  reporter is gonna want if you just have another [copy|cope]
3  I'll give that back to you.
4      SPEAKER1:  [We can|Weak|Week] make a [copy|cope]
5  if you want.
6      SPEAKER2:  That's okay I'll give this [one|won]
7  back to you.
8  BY SPEAKER1:
9      Q.  All right do you recognize this document?
10     A.  Yes.
11     Q.  And what is it?
12     A.  It's a declaration of myself.
13     Q.  Did you prepare this document?
14     A.  Yes.
15     SPEAKER2:  Well and I'll adhere, as [helper|her]
16 counsel, I assisted in the preparation of this document, so
17 to the extent [you're|your] about going to ask any
18 questions about the preparation of that, there's privilege
19 involved there, but you may go ahead and ask around that.
20 BY SPEAKER1:
21     Q.  Okay.  It's my understanding that this document
22 was prepared for the purpose of the litigation with the
23 alliance group and which is not this case, the California a
24 lines of child family services versus Wagner and Ault.
25     SPEAKER2:  Again the document speaks for itself as

67

3/4/2008 Dupuy, Sheilah (ROUGH)

1  to the case it was filed in.
2      SPEAKER1:  .
3      Q.  Now, if you turn to paragraph [7|seven] you
4  describe -- well what do you describe in paragraph
5  [7|seven].
6      SPEAKER2:  Again, paragraph [7|seven] is -- is
7  stated [hear|here] it speaks for itself if you have any
8  specific questions other than asking for a vague narrative
9  of what you described in paragraph [67|sixty-seven].
10     SPEAKER1:  Well I want to know if she can give me
11 an introduction of what [she is|she's] attempting to
12 describe in paragraph [7|seven] then we'll get to more
13 specific questions after that.
14     SPEAKER2:  Well, I think it would be helpful if
15 you wasn't to a specific question now because again the
16 paragraphs talks about what it talks about.
17 BY SPEAKER1:
18     Q.  All right you talk about annual -- lines
19 [11|eleven] and [12|twelve], annual C N I based rate
20 increases for group homes will becomes a discretionary item
21 in state budget process?
22     A.  What did you mean biannual C N I rate increases?
23     A.  [Way|Weigh] meant is if there was a rate increase
24 it would [been|be] a discretionary item in the state budget
25 process subject to the ledge slate [you're|your] making

68