# EXHIBIT A

EDMUND G. BROWN JR.
Attorney General of the State of California
SUSAN M. CARSON
Supervising Deputy Attorney General
GEORGE PRINCE, State Bar No. 133877
Deputy Attorney General
 455 Golden Gate Avenue, Suite 11000
 San Francisco, CA 94102-7004
 Telephone: (415) 703-5749
 Fax: (415) 703-5480
 Email: George.Prince@doj.ca.gov

Attorneys for Department of Social Services

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| CALIFORNIA ALLIANCE OF CHILD AND FAMILY SERVICES,<br><br>                              Plaintiff,<br><br>     v.<br><br>JOHN WAGNER, Director of the California Department of Social Services, in his official capacity; MARY AULT, Deputy Director of the Children and Family Services Division of the California Department of Social Services, in her official capacity,<br><br>                              Defendants. | C 06-4095 MHP<br><br>DECLARATION OF SHEILAH DUPUY RE: CALIFORNIA WELFARE AND INSTITUTIONS CODE SECTION 11462(g)(2) |

I, Sheilah Dupuy, declare as follows:

1. I am employed by the California Department of Social Services (CDSS). My current post is Chief, Children's Services Operations Bureau, Children's Services Operations and Evaluation Branch. I have held this position since October of 2007.

2. From 2001 until I took my current position, I was Chief of the Foster Care Rates Bureau, which is within the Children and Family Services Division of the CDSS. My duties in that post included supervising implementation of federal and state laws relating to the setting of Aid to Families with Dependent Children-Foster Care (AFDC-FC) rates paid to eligible group

homes and foster family agency programs, formulating state regulations, and setting administrative policies for the payment of AFDC-FC rates on behalf of those individuals meeting the eligibility requirements set forth in Title IV-E of the Social Security Act (42 U.S.C. section 670 et seq.). The Foster Care Rates Bureau is responsible for overseeing statewide policies related to applicable Adoption Assistance and Child Welfare Act of 1980 (P.L. 96-272) and Title IV-E eligibility provisions, revisions, and maintenance of California's State Plan under Title IV-E, and providing technical assistance and oversight of eligibility and funding aspects of the foster care program administration in all 58 California counties. From May of 1996 until I became the Foster Care Rates Bureau Chief in 2001, I had been a manager in the rates policy unit of the foster care branch. In that position I supervised a group of individuals who were responsible for performing analytical assignments associated with rate setting policy issues under the foster care program.

3. In my capacity as the Foster Care Rates Bureau Chief I supervised a group of individuals responsible for setting rates for group homes and foster family agencies in California under the foster care program. Over the last two or three years of my tenure in that position my duties expanded to include supervision of analytical staff in the areas of foster care eligibility and foster care rate setting policies.

4. I first became employed by the CDSS in 1990 as an analyst in the Foster Care branch. Our responsibilities in my unit included performing analytical assignments necessary to implement the group home rate-setting system. Additionally, I provided bill analyses, issue papers, and technical assistance to county staff and group home and foster family agency providers. Specifically, my duties included implementation of the rates provisions of Senate Bill 370 (SB 370), which, among other things, established the current foster care group home rates system that was and remains codified in Welfare and Institutions Code section 11462.

5. From 1993 through May of 1996 I held other policy positions within the foster care program at CDSS. Although these posts were not within the rates bureau, I remained generally aware of matters within the rates-setting area in addition to my job-specific responsibilities due to the overlap in issues affecting my work and rates-specific matters.

Decl. of Sheilah Dupuy re: Calif. Welf. & Inst. Code sec. 11462(g)(2)   California Alliance, etc., v. Allenby, et al.
C 06-4095 MHP

2

6. As stated above, my duties when I joined CDSS in 1990 included work in the implementation of the rates provisions of SB 370, and I was among a group of CDSS employees with the Foster Care Branch that worked on the drafting of regulations pursuant to SB 370 that were implemented on July 1, 1990.

7. SB 370 established both a standard rate for each of the 14 Rate Classification Levels (RCLs) and a rate floor, a system that was and remains codified in Welfare and Institutions Code section 11462. The standard rates were to be phased in over a three-year period beginning July 1, 1990, with a rate floor for each of the three years. The implementing legislation required CDSS to raise the standard rate for each RCL based on information from the California Necessities Index (CNI) for fiscal years 1991-1992 and 1992-1993. Thereafter, annual CNI-based rate increases for group homes would become a discretionary item in the State budget process.

8. The Court issued an order on December 10, 2007, seeking evidence of annual reviews conducted pursuant to California Welfare and Institutions Code section 11462(g)(2). As stated in the Court's order, at page 1, lines 25-28, "This statute, by its terms, requires an annual assessment where the DSS is to compute a standardized schedule of rates based on the CNI increase and then analyze whether the resultant schedule ought to be adopted based on the availability of funds." The order then adds, at page 1, line 28: "This annual review is required independent of the amount of funds available." The order next states, at page 2, lines 2-3, that since 2001-02, "at least five annual reviews must have been performed by the DSS since the 2001-02 fiscal year. Finally, at page 2, lines 4-10, the order requests the CDSS provide evidence about these reviews, including specific information as to 1) whether the annual reviews took place, 2) what decisions were made during the annual reviews, and 3) how CDSS determined that the funds required to sanction an increase in the standardized schedule were not available.

9. During the fiscal years at issue in the order, 2001-2002 through 2006-2007, I was the Chief of the Foster Care Rates Bureau, as described in paragraph 2, above. It is my belief that at no time during that time period did CDSS interpret Welfare and Institutions Code section

Decl. of Sheilah Dupuy re: Calif. Welf. & Inst. Code sec. 11462(g)(2)   California Alliance, etc., v. Allenby, et al.
C 06-4095 MHP

3

11462(g)(2) in the manner outlined by the Court's order. As I stated in paragraph 7, above, since fiscal year 1992-1993, annual CNI-based rate increases for group homes have been a discretionary item in the State budget process: no annual review was required independent of the amount of funds available (as described in the Court's order) during my tenure as chief of the Foster Care Rates Bureau, nor was any such annual review conducted during fiscal years 2001-2002 through 2006-2007. Furthermore, I believe that at no time since the passage of the statute and the other legislation creating the RCL system has Welfare and Institutions Code section 11462 been interpreted by CDSS to require an annual review independent of the amount of funds made available by the State's Legislature.

10. Welfare and Institutions Code section 11462(g)(2), as interpreted by CDSS when I was the Chief of the Rates Bureau, does not require an annual assessment where CDSS first computes a standardized schedule of rates based on increases in the CNI and then analyzes whether the rates schedules are to be adopted based on the availability of funds. Rather, CDSS interprets the statute with "subject to the availability of funds" as the operative language: if the California Legislature through its budget-setting function increases the funding allocated to foster care group homes, then and only then can CDSS increase the amount of payments for the various RCLs set out in the statute. I believe that at no time before or after the time I was Chief of the Rates Bureau has the statute been interpreted in any different way by CDSS.

11. As legislative funding is the controlling factor in whether RCLs are increased, CDSS has always provided the full funding increases authorized by the Legislature, regardless of whether the funding increase tracks the CNI.

12. As CDSS does not conduct annual reviews as described in the Court's December 10. 2007 order, CDSS cannot provide any evidence of such reviews, such as what decisions were made during them and how CDSS determined that the funds required to sanction an increase in the standardized schedule were not available. However, CDSS does create and submit to the Legislature annual reports -- entitled "New Foster Care Group Home Requirement/Increases in Industry's Costs" -- for use by the Legislature in its decision-making processes as to increases in RCL system funding. (See Exhibits A, B, C, D, and E to this declaration, which are true and

Decl. of Sheilah Dupuy re: Calif. Welf. & Inst. Code sec. 11462(g)(2)   California Alliance, etc., v. Allenby, et al.
C 06-4095 MHP

4