# EXHIBIT C

**Page 58**

1  A. It would be somebody who one of my managers would
2  supervise.
3  Q. Now, you said that the -- the reports would report
4  on any unusual increase that impacted group homes -- I'm
5  sorry -- that impacted family foster homes. What do you
6  mean by "unusual increase"?
7  A. The report would focus on any changes which may
8  have occurred as the result of either new departmental
9  requirements or other requirements which may have increased
10  or, for that matter, decreased group home provider costs.
11  An example being when we switched to a biennial rate
12  setting system. That actually saved providers a slight
13  amount of money.
14  Q. Is that -- what time do we have?
15  THE VIDEOGRAPHER: 11:52.
16  MR. TABESH: I think I'm done with this portion of
17  the depo. I think it might be a good place to -- to break
18  for lunch.
19  MR. PRINCE: Okay.
20  MR. TABESH: Thanks.
21  THE WITNESS: Okay.
22  THE VIDEOGRAPHER: Off the record, 11:52.
23  (Lunch recess.)
24  THE VIDEOGRAPHER: We're back on the record at
25  1:17.

**Page 59**

1  BY MR. TABESH:
2  Q. Okay. Now, I believe earlier you had testified
3  that the most recent increase for rates paid to foster care
4  providers is to be implemented in 2008; is that correct?
5  A. I don't think I said -- I don't think I said -- I
6  don't think we talked about the implementation date.
7  Q. Okay. Is your understanding --
8  A. That's my understanding, yes.
9  Q. Now, do you know when the rate increase was before
10  that?
11  A. I believe it was 2001.
12  Q. Okay. And were you chief of FRCB when that last
13  increase was implemented?
14  A. I was the chief of foster care rates at that time.
15  Q. Why haven't there been any increases from 2001
16  until 2008?
17  MR. PRINCE: Objection; foundation. Calls for
18  speculation.
19  THE WITNESS: I guess I'm not sure what you're
20  asking in terms of why haven't there been.
21  BY MR. TABESH:
22  Q. Okay. I'm going to introduce in another exhibit.
23  It is a printout of the statute entitled California --
24  California Welfare and Institution Code Section 11460.
25  ///

**Page 60**

1  (Deposition Exhibit 4 was marked for
2  identification.)
3  BY MR. TABESH:
4  Q. Now, I'm not going to ask you if you're familiar
5  with this document -- this specific document. Are you
6  familiar with this statute?
7  A. Yes.
8  MR. PRINCE: Well, I'm gonna interpose an
9  objection here. To the extent you're gonna ask her
10  questions about the statute, the statute speaks for itself.
11  And she's not here to interpret a statute for you, she's
12  here as a percipient witness. And with that you may go
13  ahead and ask questions, but I will further object if you
14  ask her something that asks for an interpretation or a
15  legal conclusion about this document.
16  BY MR. TABESH:
17  Q. Okay. Now, under section B of the statute it says
18  "Care and supervision includes food, clothing, shelter,
19  daily supervision, school supplies, the child's personal
20  incidentals, liability insurance with respect to the child
21  and reasonable travel to the child's home for visitation."
22  Now, are the payments that your department makes
23  to foster care providers intended to cover these costs?
24  MR. PRINCE: Well, I'm gonna make the same
25  objection. I will instruct the witness not to answer here,

**Page 61**

1  but you're asking her for an interpretation of a statute,
2  and that's not the reason she's here today. She's not here
3  as the person most knowledgeable or to speak to the
4  specific statutory interpretation.
5  MR. TABESH: Well, to the extent that her job
6  duties described implementing the state and federal laws
7  and regulations, I think she can testify as to her
8  understanding of, you know, what the payments are intended
9  to cover and whether it's reflected.
10  MR. PRINCE: She can testify as to her
11  understanding, not as a position of speaking for the
12  department in terms of policy vis-a-vis the statute.
13  BY MR. TABESH:
14  Q. Sure. Based upon your understanding are the
15  payments made to foster care providers intended -- intended
16  to cover care and supervision as defined in section B of
17  the statute?
18  A. Based on my understanding, the payments are
19  designed -- these -- these are allowable cost categories
20  for payments, so that's different from when you say
21  designed to cover.
22  Q. Okay. What do you mean by allowable cost
23  categories?
24  A. This is what AFDC-FC money may be spent on.
25  Q. Does your department -- or do you or anyone -- do

1  you or anyone under your supervision -- does you or anyone
2  under your supervision do any studies to determine whether
3  any of these particular -- whether the payments made to
4  foster care providers are sufficient to cover any of these
5  particular categories?
6      MR. PRINCE: Well, foundation, ambiguous,
7  compound, but you may answer if you have an understanding.
8      THE WITNESS: Have we -- can you just ask me that
9  again? Have we done any --
10 BY MR. TABESH:
11     Q. Sure. Do -- did -- do you or anyone you supervise
12 do any studies to determine whether the payments that you
13 make to foster care providers cover, for example, the cost
14 of food?
15     A. Neither myself nor my staff have ever done such a
16 study.
17     Q. And how about -- how about with respect to
18 clothing?
19     A. Neither my nor my staff have done studies on any
20 of these items.
21     Q. So on no particular item did you or your staff do
22 any studies to --
23     A. (Affirmative nod.)
24     Q. Okay. Are you familiar with the term foster care
25 maintenance payments?

                                                          62

1      A. Yes.
2      Q. What is your understanding of what foster care
3  maintenance payments are?
4      MR. PRINCE: Well, again, I'll interpose the same
5  objection as before that Ms. Dupuy can give you her
6  understanding. But it's not -- she's not here to speak for
7  the department in an official capacity on that issue.
8  She's here as a percipient witness.
9      MR. TABESH: Understood. Just asking for her
10 understanding.
11     THE WITNESS: It's my understanding that foster
12 care maintenance payments are designed to provide a
13 provider with resources to provide care and supervision to
14 a child in foster care.
15     MR. TABESH: I'm going to introduce another
16 exhibit.
17     (Deposition Exhibit 5 was marked for
18 identification.)
19 BY MR. TABESH:
20     Q. This is entitled -- well, 42 USCS Section 675.
21 Definitions. And I will direct you to page two under 4
22 (A). It provides -- well, have you -- are you familiar
23 with this statute?
24     A. Yes, I've seen the statute.
25     Q. And under 4 (A) it provides a definition of foster

                                                          63

1  care maintenance payments. And if you could look at that
2  definition, and if you compare it to the care and
3  supervision of section B of --
4      MR. PRINCE: Well, I'm gonna object here and
5  instruct the witness not to answer. You are asking her to
6  make a conclusion comparing two statutes. That's entirely
7  improper. That's not the role here today. And this even
8  goes beyond the -- your previous questions about her
9  understanding. This statute speaks for itself.
10     MR. TABESH: Well, I mean, her duty in her job is
11 to implement state and federal policies. And if these are
12 the policies that she's under a duty to implement then I
13 think I'm entitled to her understanding of how it's --
14     MR. PRINCE: I absolutely disagree about that.
15 You're asking her to make a conclusion based on a statute
16 that speaks for itself and it has its own significance, and
17 that is not appropriate here and I will instruct her not to
18 answer this.
19     MR. TABESH: Well, if -- I mean, is it part of
20 your job to -- to implement federal and state law?
21     MR. PRINCE: Well, she's already answered that
22 question. Yes, it is, but it is not her duty to interpret
23 state or federal statutes such as this. Now, we can go
24 around on this. If you want to seek a -- a motion to
25 compel, then, that's fine. But I'm gonna instruct her not

                                                          64

1  to answer this question. It's improper.
2  BY MR. TABESH:
3      Q. Do you know what the California Necessities Index
4  is?
5      A. It's a cost of -- it's a cost of living index
6  indicator. I'm not an expert on it.
7      MR. PRINCE: He just asked you if you knew what it
8  was, not to explain it.
9      MR. TABESH: All right. I'm going to introduce a
10 new exhibit.
11     (Deposition Exhibit 6 was marked for
12 identification.)
13 BY MR. TABESH:
14     Q. This is section 11461 of the Welfare --
15 California Welfare and Institutions Code. And I will
16 direct you to page two under (d) (1) (A). It says, "the
17 schedule of basic rates in subdivision (a) shall be
18 adjusted by the percentage changes in the California
19 Necessities Index."
20     A. I'm sorry. I lost you. Can you say where again?
21     Q. I'm sorry. It's page two under (d) (1) capital
22 letter (A).
23     A. Just beginning with the --
24     Q. Yeah.
25     A. Okay.

                                                          65

**Page 66**

1  Q. It says, "Beginning with the 1991 to '92 fiscal
2  year the schedule of basic rates in subdivision
3  (A) shall" --
4      THE REPORTER: Slower, please.
5      MR. TABESH: -- "shall be adjusted by the
6  percentage changes in the California Necessities Index,
7  computed pursuant to the methodology described in Section
8  11453, subject to the availability of funds."
9  BY MR. TABESH:
10  Q. Now, during the time when you were chief of the
11  FRCB, were rates paid to foster care providers increased
12  based on changes in the California Necessities Index?
13      MR. PRINCE: Well, vague as to foster care
14  providers, and foundation. If you have an understanding of
15  the question you may -- you may answer it.
16      THE WITNESS: It's my understanding that, yes,
17  they were increased.
18  BY MR. TABESH:
19  Q. Increased between 2000 --
20  A. You said during my tenure.
21  Q. Okay. From the period -- from 2001 up until the
22  most recent increase, excluding the most resent increase in
23  2008.
24      MR. PRINCE: Not in the form of the question.
25      THE WITNESS: I'm not sure what --

**Page 67**

1  BY MR. TABESH:
2  Q. Were any adjustments in the rates paid to foster
3  care providers made based on percentage changes in the
4  California Necessities Index from 2001 until 2007?
5      MR. PRINCE: Well, again, objection; lack of
6  foundation, asking for speculation, and it's an ambiguous
7  question. It's also compound. You may answer it.
8      THE WITNESS: To my knowledge the rates were
9  increased in 2001.
10  BY MR. TABESH:
11  Q. Okay. And that's the -- but after 2001 -- between
12  -- after -- after that increase and before the 2008
13  increase were any other increases made based on changes in
14  the California Necessities Index?
15      MR. PRINCE: Well, it mischaracterizes her
16  testimony. She said rates were changed. I don't think she
17  said anything about rates being changed based on the
18  California Necessities Index. Maybe --
19      MR. TABESH: Right, that's what I'm asking.
20      THE WITNESS: Rates were increased in 2001. To
21  be honest with you, I don't remember if that was a CNI
22  increase or another increase.
23  BY MR. TABESH:
24  Q. Does your department do any evaluation of whether
25  the costs of living are increasing on a year by year basis?

**Page 68**

1      MR. PRINCE: Asked and answered. Also vague as to
2  "cost of living." She's already answered with respect to
3  the various categories in the previous questions you asked
4  her specific to the California statute.
5  BY MR. TABESH:
6  Q. Well, okay. I guess my question is, it says in
7  the statute the schedule of basic rates shall be adjusted
8  by the percentage changes in the California Necessities
9  Index. Now, does your department do that on a annual
10  basis?
11      MR. PRINCE: Well --
12      THE WITNESS: Do we do what?
13  BY MR. TABESH:
14  Q. Do you evaluate whether rates should be changed
15  based on changes in the CNI?
16      MR. PRINCE: She's testified already to that fact
17  in the negative. She said rates have been increased but
18  without being specific to the California Necessities Index.
19      THE WITNESS: Repeat your question one more time
20  just so I make sure I understand.
21  BY MR. TABESH:
22  Q. On a -- I just -- just to -- to clarify, the
23  California Necessities Index, and your understanding was
24  that it is a cost of living index, it's for cost of living.
25  Is that -- is that -- is that correct?

**Page 69**

1      MR. PRINCE: Form of the question. And I think
2  she's already tes -- well --
3      THE WITNESS: Yes. I said it was some measure of
4  cost of living something.
5      MR. TABESH: Okay. And then --
6      THE WITNESS: I don't -- I don't -- I'm not an
7  expert in what the CNI is.
8  BY MR. TABESH:
9  Q. Okay. But the California Necessities Index is
10  specifically cited in -- in this statute?
11  A. Correct.
12  Q. And it is -- is it your -- is it one of your
13  duties to implement the -- this statute?
14  A. Yes, it's my responsibility to implement what's
15  statutorily mandated.
16  Q. And if the statute says shall be adjusted by the
17  percentage changes in the California Necessities Index, I
18  just want to confirm, does your department adjust the
19  percentage changes in the California Necessities Index on a
20  annual basis?
21      MR. PRINCE: Okay. I'm gonna object to the
22  question on the same basis as before. You're asking her to
23  interpret a statute. You're asking for her to make a legal
24  conclusion and I will instruct her not to answer this
25  question because it's not appropriate given her role here

**Page 70**

1  as a percipient witness.
2      MR. TABESH: She has to have some sort of
3  understanding of -- if her duty is to implement the statute
4  she has to have some understanding of how to do that.
5      MR. PRINCE: Well, I -- I -- I disagree with your
6  characterization. And the statute speaks for itself. And
7  -- and the question you just posed to me was not the same
8  one you posed to her. And if you want to have the -- the
9  question read back maybe we can --
10     MR. TABESH: All right. Can you read the question
11 back, please?
12     THE REPORTER: No.
13     MR. TABESH: You can't read the question back?
14     THE REPORTER: No.
15 BY MR. TABESH:
16     Q. Do you ever refer to the California Necessities
17 Index in carrying out your duties? During the period of
18 2001 to 2007 did you refer to the California Necessities
19 Index in carrying out your duties of implementing state and
20 federal laws?
21     A. What do you mean did I refer to it?
22     Q. Did it -- did the California Necessities Index
23 play a role in any decision you made in terms -- with
24 respect to setting rates for foster care providers?
25     MR. PRINCE: Well, that mischaracterizes her

**Page 71**

1  testimony. She's testified that it's the legislature that
2  sets the rates, not her department.
3      MR. TABESH: So...
4      MR. PRINCE: So the question is meaningless.
5  There's no foundation for your premise that she or her
6  department sets the rates.
7  BY MR. TABESH:
8      Q. And do -- do --
9      THE VIDEOGRAPHER: Excuse me. I have to change
10 tapes.
11     This is the end of videotape number two at 1:36.
12     (Off the record.)
13     THE VIDEOGRAPHER: We're back on the record, 1:37.
14 This is beginning of videotape number three.
15     (Deposition Exhibit 7 was marked for
16 identification.)
17     MR. PRINCE: That's probably the one that the
18 reporter is gonna want. If you just have another copy I'll
19 give that back to you.
20     MR. TABESH: We can make a copy if you want.
21     MR. PRINCE: That's okay. I'll give this one back
22 to you.
23 BY MR. TABESH:
24     Q. All right. Do you recognize this document?
25     A. Yes.

**Page 72**

1      Q. And what is it?
2      A. It's a Declaration of myself.
3      Q. Did you prepare this document?
4      A. Yes.
5      MR. PRINCE: Well, and -- and I'll add here, as
6  her counsel, I assisted in the preparation of this
7  document. So to the extent you're going to ask any
8  questions about the preparation of that, there's privilege
9  involved there, but you may go ahead and ask around that.
10 BY MR. TABESH:
11     Q. Okay. It's my understanding that this document
12 was prepared for the purposes of the litigation with the
13 alliance group and which is not -- which is not this case,
14 the California Alliance of Child and Family Services versus
15 Wagner and Ault.
16     MR. PRINCE: Again, the document speaks for itself
17 as to the case it was filed in.
18 BY MR. TABESH:
19     Q. Now, if you turn to paragraph seven, you describe
20 -- well, what do you describe in paragraph seven?
21     MR. PRINCE: Again, paragraph seven is -- is
22 stated here, it speaks for itself. If you have any
23 specific questions other than asking for a vague narrative
24 of what you described in paragraph seven.
25     MR. TABESH: Well, can -- I just want to know if

**Page 73**

1  she can just give me an introduction of what she's
2  attempting to describe in paragraph seven. And I can get
3  to more specific questions after that.
4      MR. PRINCE: Well, I think it would be helpful if
5  you went to a specific question now because, again, the
6  paragraph talks about what it talks about.
7  BY MR. TABESH:
8      Q. All right. You talk about annual -- lines 11 and
9  12 -- annual CNI-based rate increases for group homes would
10 become a discretionary item in the state budget process.
11     What did you mean by annual CNI rate increases?
12     A. What I meant is if there was a rate increase it
13 would be a discretionary item in the state budget process
14 subject to the legislature making that determination.
15     Q. So, when you talk about discretionary that's
16 specific to the state legislature?
17     A. Yes.
18     Q. Is there any discretion exercised on the part of
19 you or anyone you supervise in this process?
20     A. No.
21     Q. Okay. If you'd please turn -- turn to paragraph
22 ten. Now this is referring to Welfare and Institutions
23 Code Section 11462(g)(2). And I will provide you a copy of
24 that.
25     Introduce the next exhibit, which is California