

**EDMUND G. BROWN JR.**  
*Attorney General*

**State of California**  
**DEPARTMENT OF JUSTICE**

455 GOLDEN GATE AVENUE, SUITE 11000
SAN FRANCISCO, CA 94102-7004

Public: (415) 703-5500
Telephone: (415) 703-5749
Facsimile: (415) 703-5480
E-Mail: George.Prince@doj.ca.gov

April 1, 2008

The Hon. William H. Alsup
Judge of the United States District Court
Phillip Burton United States Courthouse
450 Golden Gate Avenue, 16th Floor
San Francisco, CA 94102-3434

Re:   California State Foster Parent Association, et al. v. Wagner
      United States District Court, Northern District of California, Case No. C075086JL

Dear Judge Alsup:

      This letter responds to Dara Tabesh's letter of March 14, 2008, as revised by his letter of March 27, 2008, regarding the instructions not to answer questions given by the undersigned during the deposition of Sheilah Dupuy of the California Department of Social Services (DSS) on March 4, 2008.

      Ms. Dupuy was noticed for deposition by normal means of an individual deposition notice. She was not noticed for deposition by means of a person-most-knowledgeable notice, and was thus not produced by DSS to speak on policy or practice matters as such: she was a percipient witness. Moreover, Ms. Dupuy is not an attorney. Accordingly, when Mr. Tabesh asked and continued to ask Ms. Dupuy to opine on the meaning of various statutes, it was my view that such questions were improper and thus I did instruct Ms. Dupuy not to respond to some, though not all, of those questions. As Mr. Tabesh states in his letter to you, he was not prevented from asking Ms. Dupuy about the implementation of the statutes by DSS. (March 27, 2008 letter, page three, under "Meet and Confer..." heading.)

      Mr. Tabesh also makes reference to the fact that Ms. Dupuy provided written testimony about implementation of the statutes in an "analogous case", *California Alliance of Child and Family Services v. Allenby*, United States District Court, Northern District of California, case no. C 06 4095 MHP.[1] We submit that providing declaratory testimony in support of a motion for

---

[1] Judge Patel recently issued her Memorandum & Order in that case, finding in favor for defendants after considering the parties' cross-motions for summary judgment. A copy of that decision is attached to this letter as Exhibit A.

Northern District of California
April 1, 2008
Page 2

summary judgment, or providing additional declaratory testimony as Ms. Dupuy did when Judge Patel ordered defendants to provide supplemental information on matters she believed to be pertinent to her consideration of the issues, differs from a percipient witness being asked what a statute means during a deposition. Ms. Dupuy's declaratory testimonial statements in the *Alliance* case had as their focus points DSS's (1) efforts to implement the foster care group homes program and (2) interaction with the federal government as to those programs. Her testimony did *not* focus providing opinions as to what the statutes meant.

     Mr. Tabesh insists that the instructions to Ms. Dupuy to not answer questions were improper, citing Rule 30 (d)(1) of the Federal Rules of Civil Procedure (March 27, 2008 letter, at page one). We refer the Court to Rule 30 (d)(4) of the Federal Rules, which effectively allows for adjournment of a deposition to seek direction from the Court as to the scope of examination. As Mr. Tabesh notes, the undersigned invited him to seek the Court's intervention as to a motion to compel. While this does not precisely fit Rule 30 (d)(4)'s definition of seeking a limiting instruction, neither counsel for DSS nor the Ms. Dupuy had advance notice that plaintiff would be seeking to pose questions as to the meaning of statutes at the legal heart of the case. Had this been known – for example, if plaintiff had provided a deposition notice stating that it intended to question Ms. Dupuy about what the operative statutes "meant" – defense counsel could have sought a protective order in advance. As it was, plaintiff's counsel's surprise posing of questions about the meaning of statutes left defense counsel with no means other than instructing the witness not to answer.

     We thank the Court for this opportunity to respond to Mr. Tabesh's letters.

                                Sincerely,

                                GEORGE PRINCE
                                Deputy Attorney General

For    EDMUND G. BROWN JR.
         Attorney General

40235830.wpd

**EXHIBIT A**

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

CALIFORNIA ALLIANCE OF CHILD AND
FAMILY SERVICES,

    Plaintiff,

v.

CLIFF ALLENBY and MARY AULT,

    Defendants.

No. C 06-04095 MHP

**MEMORANDUM & ORDER**
Re: Cross-Motions for Summary
Judgment

On June 30, 2006 plaintiff California Alliance of Child and Family Services ("California Alliance") filed a complaint against Cliff Allenby, Interim Director of the California Department of Social Services ("CDSS"), in his official capacity, and Mary Ault, Deputy Director of the Children and Family Services Division of CDSS ("CFS"), in her official capacity, alleging that defendants violated the foster care provider reimbursement provisions of the Child Welfare Act ("CWA"), 42 U.S.C. sections 670–79b. Now before the court are the parties' cross-motions for summary judgment. The court has considered the parties' arguments fully, and for the reasons set forth below, the court rules as follows.

BACKGROUND

I.    Federal Law

The CWA establishes a cooperative federal-state program that assists states in meeting the costs of providing foster care to children. Pursuant to this federal spending clause legislation, the federal government and the state governments share the cost of providing funds for licensed third

parties (*e.g.*, group homes) that care for these children. The CWA and related federal regulations require states receiving federal aid to provide foster care for a child when a court has determined that it is necessary under applicable law that the child be removed from his or her home and placed in out-of-home care. See, e.g., 42 U.S.C. §§ 670–79b.

The CWA requires that states participating in the cooperative program provide "foster care maintenance payments" on behalf of eligible children to child-care institutions, including group homes. 42 U.S.C. §§ 671(a)(2), 672(b)(2); 45 C.F.R. § 1356.21(a). "The term 'foster maintenance payments' means payments to cover the cost of (and the cost of providing) food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance with respect to a child, and reasonable travel to the child's home for visitation." 42 U.S.C. § 675(4)(a). "In the case of institutional care, such term shall include the reasonable costs of administration and operation of such institution as are necessarily required to provide the items described in the preceding sentence." Id.

To become eligible for federal funding, a state must submit a plan for financial assistance to the Secretary of the U.S. Department of Health and Human Services ("DHHS") for approval. As a prerequisite for DHHS approval, the submitting state must agree, among other conditions, to administer its foster care program pursuant to the CWA, related regulations, and policies promulgated by the Secretary of the DHHS. Id. § 671(a), (b); 45 C.F.R. §§ 233.110, 1355.21, 1356.20, 1356.21. Pursuant to the CWA, a state must designate a state agency to administer and/or supervise the administration of the approved state plan. 42 U.S.C. § 671(a)(2). The state must also amend its approved plan by appropriate submission to the Secretary of the DHHS whenever, among other instances, necessary to comply with alterations to the CWA and/or federal regulations or policies. 45 C.F.R. § 1356.20(e)(1).

II.     California Law

For all relevant periods, the CDSS has been the state agency responsible for submitting the California state plan to the Secretary of the DHHS for approval. Cal. Welf. & Inst. Code §

2

1    11460(a). Subsequent to approval, the CDSS receives federal funding intended to cover a portion of
2    the foster care maintenance payment made to group homes on behalf of eligible children. See
3    generally id. § 11462. Over the past seventeen years, the California scheme described below has
4    never been rejected by the DHHS.

5          California law states that "[f]oster care providers shall be paid a per child per month rate in
6    return for the care and supervision of the AFDC-FC child placed with them." Id. § 11460(a).
7    Further, "care and supervision" is defined as "food, clothing, shelter, daily supervision, school
8    supplies, a child's personal incidentals, liability insurance with respect to a child, and reasonable
9    travel to the child's home for visitation." Id. § 11460(b). Although this is largely similar to the
10   definition of "foster care maintenance payments" found in the CWA, it does not include the "(and
11   the cost of providing)" language found in the federal law. Compare id. with 42 U.S.C. 675(4)(a).

12         CDSS uses a Rate Classification Level ("RCL") system, which incorporates the requirements
13   above, to establish payment rates for foster care group home programs. See generally Cal. Welf. &
14   Inst. Code § 11462. The RCL system, therefore, also incorporates all of the relevant federal
15   statutory considerations except the "cost of providing" language. The RCL system was
16   implemented during the 1990-91 fiscal year. The CDSS, through the CFS, assigns group home
17   programs to one of fourteen levels (i.e., RCLs)[1] and all of the group home programs with the same
18   RCL receive the same payment rate based on the standardized schedule of rates set forth in state
19   law.[2]

20         The initial standardized schedule of foster care rates for the 1990-91 fiscal year was
21   developed using 1985 calendar year costs. This schedule must be increased each fiscal year in
22   tandem with the California Necessity Index ("CNI"). Id. § 11462(c). The CNI is a weighted
23   average of increases in various necessary costs of living for low-income consumers, including food,
24   clothing, fuel, utilities, rent, and transportation. Id. § 11453(a). State law, however, allows the CNI
25   increase to be circumvented in certain situations. Specifically, "[b]eginning with the 2000-01 fiscal
26   year, the standardized schedule of rates shall be adjusted annually by an amount equal to the CNI
27   computed pursuant to section 11453, *subject to the availability of funds*." Id. § 11462(g)(2)
28

3

1  (emphasis added).

3  III.    Factual Background[3]

Since the 1990-91 fiscal year, the standardized schedule of foster care rates established under the RCL system has been increased by approximately 27 percent, whereas the CNI has increased approximately 59 percent. Concurrently, the increase in actual costs that some group homes incur to care for and supervise children exceeded 27 percent. The last increase in the standardized schedule of foster care rates under the RCL system was in July, 2001.

Since 2001, however, the CDSS has not conducted any annual reviews of rates set forth in the RCL system. Dupuy Supp. Dec., ¶ 9. Specifically, the CDSS only re-evaluates the rate schedule when it is provided with funding increases. Id., ¶ 10. The CDSS does, however, provide the legislature with annual reports, entitled "New Foster Care Group Home Requirements/Increases in Industry's Costs" for use by the legislature in its decision-making process. Id., Exh's. A–E.

The percentage of actual costs that group homes recoup through the RCL system has diminished over time due, in part, to (1) an increase in the actual costs associated with food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance with respect to a child, and reasonable travel to the child's home for visitation, and (2) "new" costs that group homes must incur to satisfy added federal, state and county requirements.

LEGAL STANDARD

Summary judgment is proper when the pleadings, discovery and affidavits show that there is "no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those which may affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute as to a material fact is genuine if there is sufficient evidence for a reasonable jury to return a verdict for the nonmoving party. Id. The party moving for summary judgment bears the burden of identifying those portions of the pleadings, discovery and affidavits that demonstrate the absence of a genuine issue of material

4

1  fact. Celotex Corp. v. Cattrett, 477 U.S. 317, 323 (1986). On an issue for which the opposing party
2  will have the burden of proof at trial, the moving party need only point out "that there is an absence
3  of evidence to support the nonmoving party's case." Id.
4      Once the moving party meets its initial burden, the nonmoving party must go beyond the
5  pleadings and, by its own affidavits or discovery, "set forth specific facts showing that there is a
6  genuine issue for trial." Fed. R. Civ. P. 56(e). Mere allegations or denials do not defeat a moving
7  party's allegations. Id.; Gasaway v. Nw. Mut. Life Ins. Co., 26 F.3d 957, 960 (9th Cir. 1994). The
8  court may not make credibility determinations, and inferences to be drawn from the facts must be
9  viewed in the light most favorable to the party opposing the motion. Masson v. New Yorker
10 Magazine, 501 U.S. 496, 520 (1991); Anderson, 477 U.S. at 249.

12 DISCUSSION
13     Plaintiff argues that the federal statute is mandatory because it requires that payments for
14 items enumerated in the CWA shall be made. 42 U.S.C. §§ 672(a)(1) ("[e]ach State with a plan
15 approved under this part *shall* make foster care maintenance payments on behalf of each child who
16 has been removed from the home of a relative . . . ." (emphasis added)). As noted above, California
17 has an approved plan under the CWA. Therefore, in order to receive federal funds, California has a
18 mandatory duty to make foster care maintenance payments. California, however, does not increase
19 the maintenance payments with cost of living increases when funds for the same are not available.
20 Plaintiff's argument thus boils down to the fact that payments to foster care providers do not always
21 increase in tandem with the CNI. This issue—whether failing to increase foster care payments
22 according to cost of living increases is a violation of the CWA—is an issue of first impression in this
23 Circuit.
24     The State argues that its system for administering and implementing the foster care program
25 is in compliance with federal law because the system was approved by the DHHS. Moreover, in the
26 RCL's seventeen years of existence, the system has never been rejected by the DHHS. The agency's
27 approval, however, is not dispositive.[4] The CWA's criteria "are sufficiently detailed to put the State

5

on notice and to permit a court to review whether the State has based its reimbursement on those statutory criteria." <u>Missouri Chid Care Ass'n v. Martin</u>, 241 F. Supp. 2d 1032, 1044 (W.D. Mo. 2003); see also <u>Orthapedic Hospital v. Belshe</u>, 103 F.3d 1941, 1496 (9th Cir. 1997) (holding that federal courts do not defer to the state to answer whether state law is consistent with federal law). Thus, the court must determine whether the State based its reimbursement standard on the statutory criteria mandated by the federal statute.

In <u>Martin</u>, the district court held that when determining reimbursement rates for foster care providers, "the State is obligated to have a process for determining rates that takes into account the statutory criteria mandated by the CWA." 241 F. Supp. 2d at 1045. In this case, the State has presented uncontroverted evidence that "[i]n fiscal year 1990-91, each [foster care] provider submitted data on rate, costs, and staffing levels from the prior fiscal year that substantiated the RCL at which its program would enter the flat rate system." Dupry Dec., ¶ 8. This evidence, in conjunction with the California statute implementing the CWA that largely mirrors the CWA's language, convinces the court that the State took the statutory criteria mandated by the CWA into account.

The court also concludes that the lack of the "cost of providing" language in the California statute does not compel an alternate outcome. The <u>Martin</u> court found that the State "need only be in substantial compliance with the CWA." <u>Martin</u>, 241 F. Supp. 2d at 1046 n.7. Here, the State is in substantial compliance with the CWA because its statute largely mirrors the language in the CWA. The court's holding is further buttressed by plaintiff's failure to present any evidence that the State's initial rate determination, in 1990-91, did not take the CWA factors into account.

The court is aware that over time, given a multitude of years with budgetary constraints, the standard rate schedule could become greatly out of synch with the costs of items enumerated in the CWA. In that case, the rate may very well fall to a level that does not satisfy the State's obligation to "have a process for determining rates that takes into account the statutory criteria mandated by the CWA." <u>Martin</u>, 241 F. Supp. 2d at 1045. Currently, the RCL system provides payments at 127% of its 1990-91 levels, whereas the CNI is at 159% of its 1990-91 levels. As discussed above, the initial

RCL reflected the costs faced by foster care providers. Therefore, today the RCL provides for at least 80% of the costs associated with the items enumerated in the CWA. Consequently, the process for determining foster care payment rates is still substantially compliant with the statutory criteria outlined in the CWA.[5]

Plaintiff next argues that the CWA requires *actual* costs of foster care be paid by the State. In response, the State argues that the CWA nowhere mentions actual costs. It is clear that foster care maintenance payments are to include the costs of certain enumerated items, including the costs of "reasonable travel to the child's home for visitation." 42 U.S.C. § 675(4)(a). In the case of institutional providers, however, the statute goes on to state that "such term shall include the reasonable costs of administration and operation of such institution as are necessarily required to provide [the enumerated items]."[6] Id. Thus, though the statute mentions reasonable costs, it is silent about actual costs. Without explicit statutory authorization or any other evidence in support, the court cannot find the requisite statutory intent to provide payments of actual costs.

Finally, plaintiff argues that there is no lack of funds exception to the CWA and thus the State's budgetary considerations are not an acceptable excuse to avoid increasing payments in line with CNI. Plaintiff cites Blanco v. Anderson, 39 F.3d 969 (9th Cir. 1994), in support. Blanco is inapposite because it dealt with the weekday closings of county welfare offices. It held that the welfare office must be available by phone, on regular working days, to address life threatening emergencies. In this context, it stated that "[l]ack of resources and lack of bad faith on the part of the agency officials [are] no excuse for failing to provide the plaintiffs their statutory entitlements." Id. at 973 (internal quotation omitted). The case at bar is distinguishable since plaintiff has not cited any emergency situation nor any regulation, as in Blanco, that prohibits the State from taking budgetary considerations into account. See id. (citing to a regulation requiring arrangements to assist applicants and recipients in obtaining medical care and services in emergency situations on a 24-hour basis, 7 days a week).

Though plaintiff argues there's no lack of funds exception in the CWA, plaintiff ignores the fact that the CWA does not prohibit taking budgetary considerations into account. Plaintiff claims a

7

violation of federal law, but is unable to point to any federal statute that compels cost of living increases for payments made to foster care providers. Instead, plaintiff chooses the portions of the State statute that support its position and ignores the rest. Indeed, the lack of funds exception is in the same State statute that guarantees the CNI increases. It is disingenuous for plaintiff to argue that CNI increases are mandatory when the latter half of the very clause that provides for the increases allows budgetary considerations to make the increases discretionary.

The <u>Martin</u> court, which is more on point here, stated that the "State may take into consideration budget considerations when setting its reimbursement methodology." 241 F. Supp. 2d at 1046. This court is persuaded that the <u>Martin</u> court was correct. As stated above and in <u>Martin</u>, while availability of funds cannot be the *only* consideration when setting reimbursement methodology it may be a consideration. Here, the State statute's language provides the methodology for determining the rates and adjustments to them and it makes the "resultant amounts" subject to budgetary considerations. The court cannot say that the State's actions are arbitrary or capricious. Indeed, the State has provided for CNI increases on numerous occasions over the past seventeen years.

In sum, with respect to institutional providers, the State's methodology in determining foster care payments must consider the costs of the items enumerated in the federal statute. <u>See</u> 42 U.S.C. § 675(4)(a). The methodology must also consider the reasonable costs of the administration and operation of such institutions. <u>Id.</u> In addition, the State may account for budgetary considerations as long as payment levels remain in substantial compliance with the costs to be incurred. Since the California scheme takes the appropriate statutory considerations into account and is in substantial compliance with the CWA, federal law has not been violated. Nevertheless, it is worth repeating that without further increases over time, the California system may well be in violation of federal law.

The court recognizes the compelling needs of children dependent on group homes and foster care. The court also is aware of the State of California's budgetary woes. Certainly, it is well known that other governmental departments within the State vociferously lobby for more funds, some with

greater success than others, some with more compelling claims than others. But, nothing could be more compelling than the needs of the State's children. Although CDSS may be correct in interpreting section 11462(g)(2) as pegging the need for adjustments of rates to availability of funds, conducting an annual review demonstrating the disparity between the adjusted rate provided by the statute with the amount actually being paid may serve the Department and the Legislature well in showing they are shortchanging the State's neediest children. It behooves the CDSS to adhere to its mandate to protect and care for these children and to vigorously fight for the funds necessary to discharge the Department's responsibility.

CONCLUSION

For the foregoing reasons, plaintiff's motion for summary judgment is DENIED and defendants' motion for summary judgment is GRANTED.

IT IS SO ORDERED.

Dated: 3/11/2008

MARILYN HALL PATEL
United States District Court Judge
Northern District of California

9

**ENDNOTES**

1.  The RCL is based on the group home program's number of "points." The number of points is based principally on: 1) the number of "paid/awake" hours worked per month by child care and social work staff; 2) the qualifications of the staff; and 3) the hours of mental health treatment services provided. The total number of points generated equates to a specific RCL and corresponding payment rate.

2.  Two group homes, however, have grandfathered-in rates of reimbursement.

3.  Unless otherwise noted, the facts are taken from the Amended Joint Statement of Undisputed Facts ("JSUF"), dated September 12, 2007. See Docket No. 41. For a general overview and background regarding the parties and the proceedings in this action, see the court's memorandum and order denying defendants' motion to dismiss. Docket No. 24.

4.  Chevron U.S.A., Inc. v. Natural Resources Defense Council Inc., 467 U.S. 837, 843 (1984), is not applicable here since no federal agency is interpreting federal statutes. No definition of the CWA's requirements as defined by the DHHS is in question.

5.  This is further buttressed by the fact that plaintiff has not presented any evidence that group homes are going out of business.

6.  Since plaintiff represents institutional providers only, only the institutional provider aspect of 42 U.S.C. section 675(4)(a) is discussed.