United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA STATE FOSTER PARENT ASSOCIATION, CALIFORNIA STATE CARE PROVIDERS ASSOCIATION, AND LEGAL ADVOCATES FOR PERMANENT PARENTING,<br><br>Plaintiffs,<br><br>v.<br><br>JOHN A. WAGNER, Director of the CALIFORNIA DEPARTMENT OF SOCIAL SERVICES, in his official capacity, MARY AULT, Deputy Director of the CHILDREN AND FAMILY SERVICES DIVISION OF THE CALIFORNIA DEPARTMENT OF SOCIAL SERVICES, in her official capacity,<br><br>Defendants. | No. C 07-05086 WHA<br><br>**ORDER GRANTING IN PART PLAINTIFFS' MOTION TO COMPEL** |

**INTRODUCTION**

In this action concerning foster-care rates in California, plaintiffs move to compel production of all documents listed in defendants' privilege log. The documents at issue are six legislative analyses completed by the California Department of Social Services, which addressed proposed changes to basic rates paid to foster care providers. Defendants have refused to produce these documents, arguing that they are protected by the deliberative-process privilege. After careful consideration of the documents and the parties' arguments, this order finds that the DSS analyses are subject to the deliberative-process privilege. Applying the eight-factor balancing test used in this Circuit, this order concludes that plaintiffs' need for

disclosure outweighs defendants' interest in confidentiality. Given that the documents do contain highly sensitive material not relevant to plaintiffs' claims — namely, lists of the proponents and opponents of the proposed bills — such material shall be redacted. Accordingly, plaintiffs' motion to compel is **GRANTED IN PART**.[1]

## STATEMENT

This action is brought on behalf of licensed foster parents, who allege that the state of California has failed to pay foster-care rates in compliance with the Child Welfare Act. The California Department of Social Services is the agency charged with enforcement of the Child Welfare Act and administration of the foster-care rate structure. Defendants in this action are John Wagner, director of DSS, and Mary Ault, deputy director of the Children and Family Services Division of DSS.

The documents in question are six legislative analyses, which evaluated proposed legislation that would have increased foster-care rates in California. According to the bill number for the proposed bill addressed in each analysis, the rate-increases were to impact the following fiscal years:

(i)   AB 2481: 2007–08, 2008–09, 2009–10, 2010–11.

(ii)  AB 2043: 1999–2000.

(iii) AB 1820: 1999–2000, 2000–01, 2001–02.

(iv)  AB 1330: 2002–03, 2003–04, 2004–05, 2005–06.

(v)   AB 1235: 2001–02.

(vi)  AB 278:  2001–02.

There are two types of legislative analyses at issue here — "bill analyses" and "enrolled bill reports" (collectively, "DSS analyses"). Bill analyses evaluate proposed bills before they

---

[1] In their letter brief dated July 8, 2008, plaintiffs requested the production by defendants of any "enrolled bill reports" pertaining to proposed legislation that would have increased foster-care rates. Apparently, plaintiffs first learned of enrolled bill reports in the declaration of Patricia Huston, deputy director of the DSS Office of Legislation, dated June 30, 2008. It was plaintiffs' understanding that the documents at issue were "bill analyses" — not "enrolled bill reports." Plaintiffs were of the belief that defendants had not produced any enrolled bill reports or listed such documents on their privilege log. *In camera* review of the documents, however, reveals that two of the six legislative analyses in question (those addressing proposed bills AB 1820 and AB 1235) are in fact enrolled bill reports. Thus, plaintiffs' request has been resolved by this order.

2

1  are decided upon by the state legislature. They are compiled by the DSS Office of Legislation
2  based on the opinions and recommendations of DSS staff from various intra-departmental
3  divisions. When such analyses are completed, they are submitted to the DSS Director's Office
4  for approval. Once the bill analysis is approved and signed by the DSS Director's Office, it is
5  then submitted to the California Health and Human Services Agency, the agency that
6  oversees DSS. HHS considers the bill analysis, either agreeing or disagreeing, and forwards the
7  analysis, with comments, to the Governor's office. The Governor's office reviews the bill
8  analysis and HHS's position, before formulating its own position. Whatever the Governor
9  decides becomes the official position of DSS (Huston Decl. ¶¶ 5–10).

10  By contrast, enrolled bill reports are documents produced by the DSS Office of
11  Legislation after both houses of the state legislature have passed a bill. These documents
12  analyze the bill in its final form and recommend to the Governor whether to sign or veto the bill
13  (Huston Decl. ¶ 13).

14  Defendants have asserted the deliberative-process privilege with respect to six DSS
15  analyses, listing each document on their privilege log. Plaintiffs originally requested production
16  of the DSS analyses in a letter brief dated June 9, 2008. Defendants filed a reply letter brief on
17  June 23. Oral argument on this matter was held on June 24, during which defendants submitted
18  the disputed documents for *in camera* review. Additional briefing by both parties concluded on
19  July 10.

**ANALYSIS**

1.  **DELIBERATIVE-PROCESS PRIVILEGE.**

22  Defendants have invoked the deliberative-process privilege as to the six DSS analyses
23  at issue. The deliberative-process privilege shields from public disclosure confidential
24  inter-agency memoranda on matters of law or policy. *Nat'l Wildlife Fed'n v. U.S. Forest Serv.*,
25  861 F.2d 1114, 1116 (9th Cir. 1988). In so doing, it "allow[s] agencies freely to explore
26  possibilities, engage in internal debates, or play devil's advocate without fear of public
27  scrutiny." *Assembly of State of Cal. v. U.S. Dep't of Commerce*, 968 F.2d 916, 920

3

1   (9th Cir. 1992). In order to be protected by the deliberative-process privilege, "a document
2   must be both (1) predecisional or antecedent to the adoption of agency policy and
3   (2) deliberative, meaning it must actually be related to the process by which policies
4   are formulated." *United States v. Fernandez*, 231 F.3d 1240, 1246 (9th Cir. 2000).[2]

### A.     Predecisional.

A document must be either predecisional *or* antecedent to agency policy in order to fall under the deliberative-process privilege. A "predecisional" document is one "prepared in order to assist an agency decisionmaker in arriving at his decision," and may include "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." *Maricopa Audubon Soc'y v. U.S. Forest Serv.*, 108 F.3d 1089, 1093 (9th Cir. 1997). Moreover, "the agency must identify a specific decision to which the document is predecisional." *Id.* at 1094.

Plaintiffs point out that DSS does not have decisional authority regarding the subject matter of the analyses in question, *i.e.*, foster-care rates. This much is true. Plaintiffs proceed to argue that the analyses are not predecisional because they do not precede an *agency* decision — DSS and HHS do not make the relevant decision here. Rather, plaintiffs highlight defendants' point that the relevant decision is made in the Governor's office.[3] The term "agency decisionmaker" is indeed present in the Ninth Circuit definition of "predecisional" as stated above. Plaintiffs, however, cite no authority stating that the deliberative-process privilege cannot apply to documents produced by an agency, which precede a decision made by the state executive. In fact, the Eastern District was confronted with precisely this situation and ruled that the documents at issue *were* predecisional. *L.H. v. Schwarzenegger*, 2007 WL 2009807, *4 (E.D. Cal. 2007). Specifically, it was held that budget-change proposals ("BCP's") prepared by the Division of Juvenile Justice were predecisional since they were antecedent to the Governor's approval of the final budget, which was deemed the

---

[2] Unless otherwise stated, all internal citations are omitted from quoted authorities in this order.

[3] Hence plaintiffs concede that the DSS analyses are in fact antecedent to a specific decision.

4

1  relevant decision. *Ibid.* Likewise, the documents at issue here are non-binding legislative
2  analyses ultimately sent to the Governor, who then makes a budgetary decision. This order
3  finds that the DSS analyses are predecisional.

### B.  Deliberative.

The next issue is whether the DSS analyses are deliberative. A predecisional document is a part of the deliberative process if "the disclosure of [the] materials would expose an agency's decision-making process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions." *Carter v. U.S. Dep't of Commerce*, 307 F.3d 1084, 1089 (9th Cir. 2002). "[P]redecisional materials are privileged to the extent they reveal the mental processes of decision-makers." *Id.* at 1090.

Plaintiffs argue that the DSS analyses are not deliberative because they are the final views of the agency. As such, they do not inaccurately reflect or prematurely disclose the views of the agency. This order disagrees. The DSS analyses do not amount to policies themselves, as reflected by their non-binding, analytic nature. Rather, the relevant policy is established by the Governor in the form of a budgetary decision. The Governor's policy then becomes the official policy of DSS (Huston Decl. ¶ 10).

A similar argument was considered and rejected in *L.H.* In that decision, the plaintiffs contended that the relevant decisions were the BCP's themselves and that they therefore were not predecisional but rather embodiments of final agency decisions. *L.H.*, 2007 WL 2009807 at *4  While plaintiffs advance their argument in the "deliberative" context and call the DSS analyses "final *views* of the agency," the same logic applies. Just as the relevant decision is made by the Governor (as plaintiffs themselves state), so too is the relevant view or policy.

This order now turns to the tests applied by the Ninth Circuit in determining whether or not a document is deliberative within the meaning of the deliberative-process privilege. The distinction between factual and deliberative materials has survived in this Circuit as a useful tool. *Assembly*, 968 F.2d at 921. This distinction is not one of mutually-exclusive extremes; instead, it forms a continuum. In applying this analytic tool, *Assembly* found that computer tapes containing census data fell closer to fact and were thus unprivileged. *Id.* at 922;

5

1  *See also Carter*, 307 F.3d at 1090–91 (discussing *Assembly* and finding that
2  statistically-adjusted census data were not deliberative). These decisions did recognize,
3  however, that even factual data can be deliberative when they divulge the reasoning process
4  through which the data were derived or which shapes a sensitive decision. *Assembly*,
5  968 F.2d at 922.

6  By contrast, *National Wildlife*, which preceded the two above-cited decisions, decided
7  that a better tool was what it termed the "process-oriented" or "functional" test. This tool
8  focuses on whether the document in question was a part of the deliberative *process*. That is,
9  "even if the content of a document is factual, if disclosure of the document would expose the
10 decision-making process itself to public scrutiny by revealing the agency's evaluation and
11 analysis of the multitudinous facts, the document would nonetheless be exempt from
12 disclosure." Moreover, "the document is considered to be part of the deliberative process as
13 long as it is . . . actually related to the *process* by which policies are formulated" *Nat'l Wildlife*,
14 861 F.2d at 1118 (emphasis in original). This decision found that draft forest plans and
15 draft environmental impact statements were deliberative because they represented the opinions
16 and recommendations of agency employees on factors that would serve as contributions in the
17 decision-making calculus. *Id.* at 1122.

18 Under either test, this order finds that the DSS analyses are deliberative. *In camera*
19 review of the documents reveals that they fall toward the "deliberative" end of the
20 "factual-deliberative" continuum. Each DSS analysis consists of the following sections:
21 (i) a summary of the proposed legislation and its purpose; (ii) a recommendation and
22 supporting arguments; (iii) a legislative history and program background; (iv) an analysis
23 which evaluates the economic, administrative, and fiscal impacts of the proposed legislation and
24 weighs the pros and cons; and (v) a list of the proposed bill's proponents and opponents.[4]
25 In addition, several of the DSS analyses contain information regarding similar legislation in
26 other states. Most of the factual data present in these documents are heavily interwoven in

---

[4] The sections listing the proponents and opponents of the proposed bills shall be redacted, for the reasons discussed below.

6

analysis and bear on the agency's reasoning process. As discussed above, the documents contain recommendations and opinions, which contribute to decisions and policies formed by HHS and the Governor. In short, the DSS analyses are predominantly just what their name suggests — *analyses*, that are part of a deliberative process. As such, they qualify as deliberative under either the "process-oriented" or "factual" tests.[5]

Because the DSS analyses are both predecisional and deliberative, they fit within the protective realm of the deliberative-process privilege. This finding does not, however, end the inquiry as to whether or not these documents are discoverable.

### C.   Qualified Privilege.

The deliberative-process privilege is a qualified one. "A litigant may obtain deliberative materials if his or her need for the materials and the need for accurate fact-finding over-ride the government's interest in non-disclosure." *F.T.C. v. Warner Communications, Inc.*, 742 F.2d 1156, 1161 (9th Cir. 1984). The Ninth Circuit has considered the following factors when balancing the need for disclosure against the need for confidentiality: (i) relevance of the evidence; (ii) the availability of other evidence; (iii) the government's role in the litigation; and (iv) the extent to which disclosure would hinder frank and independent discussion regarding contemplated policies and decisions. *Ibid.* Other factors that may be considered include: (v) the interest of the litigant, and ultimately society, in accurate judicial fact-finding; (vi) the seriousness of the litigation and the issues involved; (vii) the presence of issues concerning alleged government misconduct; and (viii) the federal interest in the enforcement of federal law. *North Pacifica, LLC v. City of Pacifica*, 274 F. Supp. 2d 1118, 1122 (N.D. Cal. 2003) (Chen, Mag.). Furthermore, the deliberative-process privilege should be "strictly confined within the narrowest possible limits consistent with the logic of its principles." *Ibid.*

---

[5] Under the deliberative-process privilege, facts are only protected to the extent that they are so interwoven with deliberative material as to render the two inseparable. *Fernandez*, 231 F.3d at 1247. Before making this inquiry in greater detail, this order will first consider whether plaintiffs' need for the disputed documents surpasses defendants' interest in non-disclosure. If it does, then the documents are exempt from the privilege and will be discoverable. *See F.T.C. v. Warner Communications, Inc.*, 742 F.2d 1156, 1161 (9th Cir. 1984).

7

Defendants attempt to distinguish those decisions where documents were exempt from the deliberative-process privilege based on this eight-factor balancing test. For example, defendants argue that in *Sanchez v. Johnson*, 2001 WL 1870308, *6–7 (N.D. Cal. 2001) (Spero, Mag.), the budget-change proposals at issue were fact-based documents different from the legislative analyses that plaintiffs seek to compel here. This argument is unconvincing for two reasons. *First*, defendants' characterization of this decision is not accurate. *Sanchez* noted that the BCP's contained "detailed facts and *analysis*" *Id.* at *7 (emphasis added). Likewise, *L.H.*, a more recent decision also involving BCP's, described the documents as "narrative explanations" including "detailed analysis." *L.H.*, 2007 WL 2009807 at *1 n.2. *Second*, as stated earlier, the factual nature of a document (while a useful tool) is not dispositive for the purpose of determining whether the deliberative-privilege process applies.

### *(1)    Relevance.*

The gravamen of plaintiffs' complaint is that the state of California has violated the Child Welfare Act by failing to increase foster-care rates in conformity with rising costs. The documents in dispute are centrally relevant to plaintiffs' claims to the extent they contain detailed facts and analysis compiled by DSS and considered by the Governor as to whether or not these rates should have been increased. The analyses provide important information concerning the adequacy of state funding for foster parents, the issue which lies at the heart of this litigation.

In a similar context, *Sanchez* found that BCP's were "highly relevant" to the plaintiffs' claims insofar as "they contain[ed] detailed facts and analysis concerning the adequacy of funding for various programs for the disabled, which, in turn, b[ore] directly on whether the State's expenditures on community care [were] reasonable and sufficient . . ." *Sanchez*, 2001 WL 1870308 at *7. Likewise, *L.H.* held that BCP's including detailed analysis of the financial burdens of providing parole services were relevant to the due-process and ADA claims of a class of parolees. *L.H.*, 2007 WL 2009807 at *1 n.2.

Defendants argue that the DSS analyses are irrelevant because the Governor and state legislature are the final decision-makers as to foster-care rates. By defendants own admission,

however, the analyses consist of advice, opinions, and recommendations which contribute significantly to the final decision concerning foster-care rates. Indeed, such a position is necessary to defendants' argument that the documents are predecisional and deliberative, and that production of said documents would severely chill agency discussion. Defendants cannot have it both ways. This order deems the facts and analysis of the disputed documents highly relevant to the matter at hand.

That said, the documents do include highly sensitive material that is not relevant to plaintiffs' claims — namely, the lists of proponents and opponents of the proposed bills. This material, however, is contained in stand-alone sections and can easily be redacted so that only the core relevant material, plus sufficient context to understand it, will be produced.

### *(2)  Availability of Comparable Evidence From Other Sources.*

The documents in question are detailed analyses completed by DSS — the agency responsible for the enforcement of the Child Welfare Act and the administration of the rate structure for foster parents (Wagner Decl. ¶ 2). While some of the factual information contained in the analyses may be reproducible elsewhere, it is likely that the quality and persuasiveness of such evidence will be substantially inferior to that produced by the agency charged with enforcing and administering the programs at issue in this litigation. *See Sanchez*, 2001 WL 1870308 at *7. Indeed, defendants have not demonstrated that plaintiffs would be able to obtain comparable analyses elsewhere. This factor weighs heavily in favor of disclosure. *See North Pacifica*, 274 F. Supp. 2d at 1124 (noting that this factor is "perhaps the most important factor in determining whether the deliberative-process privilege should be overcome").

### *(3)  Government's Role in the Litigation.*

Obviously, as defendant, the government plays a prominent role in this litigation. In *Newport Pacific, Inc. v. County of San Diego*, 200 F.R.D. 628, 640 (S.D. Cal. 2001), the Southern District held that the "nature of the allegations and the role of the government in the litigation itself . . . tip[ped] the scales in favor of disclosure." That decision involved allegations similar to those advanced here — namely, that a government body had violated

9

federal and state law, specifically by failing to approve a major use permit. *Id.* at 629–30. *Newport Pacific* exposes the fallacy of defendants' argument that the government is entitled to keep its predecisional deliberations confidential because it is defending this action, not prosecuting it. Thus, the government's role in this litigation militates toward disclosure.

### *(4)   Chilling of Agency Discussion.*

Defendants rely on a declaration by Patricia Huston, deputy director of the DSS Office of Legislation, for the proposition that the candid exchange of views by DSS staff would be "severely curtailed if their contents were subject to public scrutiny during the deliberative process or thereafter" (Huston Decl. ¶ 17). In the context of BCP's, *L.H.* noted that such concerns may be mitigated by issuing a protective order or having the documents disclosed under seal. *L.H.*, 2007 WL 2009807 at *7. *Sanchez* reached a similar conclusion when it held that production of BCP's "intrude[d] minimally, and without prejudice, into agency deliberations." *Sanchez*, 2001 WL 1870308 at *4 n.7. *Sanchez* also noted that at that time, thirty-two states made similar documents part of the public record without any "chilling effect." *Id.* at *7. Defendants fail to adequately distinguish the DSS analyses from the BCP's at issue in *L.H.* and *Sanchez*. This order finds both decisions persuasive. In short, defendants' concerns regarding the frankness of agency discussion does not weigh strongly against disclosure and can be mitigated.

### *(5)   Interest in Judicial Fact-finding*
### *And Seriousness of Litigation and Issues.*

Of course, the desirability of accurate fact-finding weighs in favor of disclosure. Moreover, the issue in this litigation is whether the state of California has complied with federal law in making monthly payments to those who provide foster care for abused and neglected children. Plaintiffs contend that foster parents in California are currently paid less per month than the monthly cost of boarding a dog in a kennel. Defendants would be hard-pressed to argue that a serious issue is not at stake in this litigation. The seriousness of the issue involved magnifies the interest of the Court and society in accurate fact-finding. *See L.H.*, 2007 WL 2009807 at *8. These two factors push toward disclosure.

10

### *(6)* *Issues of Alleged Government Misconduct And Federal Interest In Enforcement of Federal Law.*

Plaintiffs do not allege any misconduct by defendants other than failure to increase foster-care rates in compliance with the Child Welfare Act. As such, federal interest in the enforcement of federal law is clearly at play here. Defendants' argument that this interest does not turn on the impressions and views of DSS staff is unpersuasive for the reasons set forth above. In sum, these remaining factors favor disclosure. *See L.H.*, 2007 WL 2009807 at *8.

### CONCLUSION

For the foregoing reasons, the deliberative-process privilege applies to the six DSS analyses. Applying the eight-factor balancing test, however, this order finds that plaintiffs' need for disclosure overrides defendants' interest in confidentiality. Plaintiffs' motion to compel is **GRANTED IN PART**. The lists of proponents and opponents of the proposed bills contained in the DSS analyses are highly sensitive and irrelevant to plaintiffs' claims. Accordingly, this material shall be redacted. Defendants shall produce the six DSS analyses, less the redactions, to plaintiffs under seal no later than **AUGUST 1, 2008, AT NOON**.

**IT IS SO ORDERED.**

Dated: July 23, 2008

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE