1  CHILDREN'S ADVOCACY INSTITUTE
   University of San Diego School of Law
2  Robert C. Fellmeth (CA SBN 49897)
   Edward Howard (CA SBN 151936)
3  Christina McClurg Riehl (CA SBN 216565)
   Elisa D'Angelo Weichel (CA SBN 149320)
4  5998 Alcala Park
   San Diego, California  92110
5  Telephone: 619.260.4806
   Facsimile: 619.260.4753
6  cpil@sandiego.edu

7  MORRISON & FOERSTER LLP
   Kimberly N. Van Voorhis (CA SBN 197486)
8  Marc David Peters (CA SBN 211725)
   Richard S. Ballinger (CA SBN 223655)
9  755 Page Mill Road
   Palo Alto, California  94304-1018
10 Telephone: 650.813.5600
   Facsimile: 650.494.0792

11

12 MORRISON & FOERSTER LLP
   Steve Keane (CA SBN 247588)
13 Adrianne E. Marshack (CA SBN 253682)
   12531 High Bluff Drive, Suite 100
   San Diego, California  92130-2040
14 Telephone: 858.720.5100
   Facsimile: 858.720.5125

15

16 **Attorneys for Plaintiffs**

17              UNITED STATES DISTRICT COURT

18            NORTHERN DISTRICT OF CALIFORNIA

19               SAN FRANCISCO DIVISION

20 California State Foster Parent Association,        Case No.  C 07-5086 WHA
   California State Care Providers Association, and
21 Legal Advocates for Permanent Parenting,          **PLAINTIFFS' NOTICE OF**
                                                     **MOTION AND MOTION FOR**
22                 Plaintiffs,                       **SUMMARY JUDGMENT;**
                                                     **MEMORANDUM OF POINTS**
23        v.                                         **AND AUTHORITIES IN SUPPORT**
                                                     **THEREOF**
24 JOHN A. WAGNER, Director of the California
   Department of Social Services, in his official   Date:    October 9, 2008
25 capacity; MARY AULT, Deputy Director of the       Time:    8:00 a.m.
   Children and Family Services Division of the      Ctrm:    Courtroom 9, 19th Floor
26 California Department of Social Services, in her   Judge:   William H. Alsup
   official capacity,
27                                                       **PUBLIC VERSION**
                   Defendants.
28

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM
OF POINTS AND AUTHORITIES IN SUPPORT THEREOF  Case No. C 07-5086 WHA
pa-1279666

# TABLE OF CONTENTS

Page

NOTICE OF MOTION AND MOTION .................................................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................................................ 2

I.      INTRODUCTION AND SUMMARY OF ARGUMENT ................................................ 2

II.     STATEMENT OF FACTS .............................................................................................. 4

      A.    California, Through The CDSS, Agreed To Administer Its Foster Care
            Program Under The Federal Child Welfare Act, Requiring It To Make
            Foster Care Maintenance Payments To California's Foster Parents ...................... 4

      B.    CDSS Concedes And The Uncontested Evidence Confirms That
            California's Foster Care Maintenance Payments Are Substantially
            Insufficient To Cover The Costs Mandated By The Child Welfare Act ................ 5

      C.    CDSS Admits And The Uncontroverted Evidence Confirms That
            California's Foster Care Maintenance Payments Are Based Solely On State
            Budgetary Concerns And Do Not Cover—Or Even Relate To—The
            Expenses Required By The Child Welfare Act ...................................................... 8

      D.    CDSS Agrees And the Uncontested Evidence Confirms That the State's
            Failure To Pay Foster Parents As Required By The Child Welfare Act Has
            Resulted In A Shortage Of Willing Foster Parents, Relegating Children To
            Costlier And Less Nurturing Group Homes ........................................................ 12

      E.    Paying California's Foster Parents As Required By The Child Welfare Act
            Will Reduce Total State And Federal Expenditures ........................................... 13

III.    ARGUMENT .................................................................................................................. 14

      A.    By Not Making Foster Care Maintenance Payments As Required By The
            Child Welfare Act, The State Of California Violates Federal Law. ..................... 14

      B.    Defendants Admit That There Exist No Genuine Issues Of Material Fact
            Regarding California's Failure To Cover The Costs Mandated By The
            Child Welfare Act .............................................................................................. 16

      C.    The Court Should Grant Declaratory and Injunctive Relief to Correct
            Defendants' Continuing Violation of 42 U.S.C. § 672 ...................................... 18

IV.     CONCLUSION .............................................................................................................. 19

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM
OF POINTS AND AUTHORITIES IN SUPPORT THEREOF -- Case No. C 07-5086 WHA

-i-

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

Cal. Alliance of Child & Family Servs. v. Allenby ("Alliance I"),
    459 F. Supp. 2d 919 (N.D. Cal. 2006) .................................................. 14

California Alliance of Child and Family Services v. Allenby, et al.,
    No. C 06-04095 MHP ..................................................................... 3

Cupolo v. Bay Area Rapid Transit,
    5 F. Supp. 2d 1078 (N.D. Cal. 1997) ............................................. 15, 19

Ekloff v. Rodgers,
    443 F. Supp. 2d 1173 (D. Ariz. 2006) ................................................. 19

In re Elizabeth M.,
    158 Cal. App. 4th 1551 (Ct. App. 2008) ............................................... 7

In re S.C.,
    138 Cal. App. 4th 396 (Ct. App. 2006) ................................................. 7

Missouri Child Care Ass'n v. Martin,
    241 F. Supp. 2d 1032 (W.D. Mo. 2003) ............................................... 19

Moreland v. Las Vegas Metro. Police Dep't,
    159 F.3d 365 (9th Cir. 1998) ........................................................... 16

Societe de Conditionnement v. Hunter Eng'g Co.,
    655 F.2d 938 (9th Cir. 1981) ........................................................... 18

Withrow v. Concannon,
    942 F.2d 1385 (9th Cir. 1991) ................................................. 15, 16, 19

**STATUTES**

28 U.S.C.
    § 2201(a) ................................................................................. 18

42 U.S.C.
    §§ 670-679 ................................................................................ 14
    § 671 ................................................................................... 4, 14
    § 672 ......................................................................... 14, 15, 18
    § 675 .................................................................................. passim
    § 1983 ................................................................................ 15, 16
    § 1988 .................................................................................... 18

Cal. Welf. & Inst. Code
    § 11229 ................................................................................................................ 5
    § 11460 ................................................................................................................ 5
    § 11461 ............................................................................................................. 5, 6
    § 11462 ........................................................................................................... 5, 14

Child Welfare Act, 42 U.S.C.
    § 670, *et. seq.* ................................................................................................. 1

45 C.F.R. §§ 233 ..................................................................................................... 4

45 C.F.R. § 1355 .................................................................................................. 16

45 C.F.R. § 1356 ............................................................................................... 4, 14


**RULES**

Fed. R. Civ. P. 36 ............................................................................................ 16, 17

Fed. R. Civ. P. 56 ........................................................................................ 1, 16, 18

Fed. R. Civ. P. 57 ................................................................................................ 18

## TABLE OF DEPONENTS AND DECLARANTS

| Deponent Name | Recent Positions/Titles |
|---|---|
| Patricia Aguiar | Former Mgr. Foster Care Policy Bureau (1994 – 1999)<br>Former Foster Care Branch Chief (1999 – 2006) |
| Wesley Beers | Former Chief of Adoptions Branch (1999 – 2004)<br>Former Child Welfare Services Operation and Evaluation Branch Chief (2004 – July 2006) |
| Sheilah Dupuy | Chief of the Children Services Operations Bureau (October 2007 – Present) |
| Glenn Freitas | Former Branch Chief of Foster Care Audits and Rates Branch (2003 – November 2006)<br>Branch Chief of Children's Services Operations and Evaluation Branch (November 2006 – Present) |

| Declarant | Recent Positions/Titles |
|---|---|
| Jill Duerr Berrick | Co-Director, Center for Child and Youth Policy, University of California Berkeley<br>Director, Center for Social Services Research, University of California Berkeley<br>*Served Expert Report in Support of Plaintiffs on 8/12/08* |
| Diane Depanfilis | 2008 – Present Professor<br>2000 – 2008 Associate Professor<br>2006 – Present Director, Ruth H. Young Center for Families and Children<br>2005 – Present Associate Dean for Research,<br>University of Maryland School of Social Work<br>*Served Expert Report in Support of Plaintiffs on 8/12/08* |
| Phil Johnson | Econ One Research, Inc.,<br>*Served Expert Report in Support of Plaintiffs on 8/12/08* |
| Greg Lim | Former DSS Associate Governmental Program Analyst to Staff Services Mgr. I |
| Frank Mecca | Executive Director of the County Welfare Directors Association of California |
| Jean Ross | Founder and Executive Director of California Budget Project |
| Lois Raap | Licensed Foster Parent |
| Shaaron Schuemaker | Licensed Foster Parent |
| John Wagner | Director, California Dept. Health & Human Services |

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF
pa-1279666

iv

# NOTICE OF MOTION AND MOTION

TO: JOHN A. WAGNER, Director of the California Department of Social Services, in his official capacity; MARY AULT, Deputy Director of the Children and Family Services Division of the California Department of Social Services, in her official capacity, AND THEIR ATTORNEY OF RECORD:

PLEASE TAKE NOTICE THAT on October 9, 2008, at 8:00 a.m. in the Courtroom of the Honorable William H. Alsup, located at 450 Golden Gate Avenue, San Francisco, California, Plaintiffs California State Foster Parent Association, California State Care Providers Association, and Legal Advocates for Permanent Parenting (collectively, "Plaintiffs" or "Foster Parents") by and through their counsel, will move and hereby do move, pursuant to Fed. R. Civ. P. 56, for summary judgment that defendants, John A. Wagner, Director of the California Department of Social Services, in his official capacity; Mary Ault, Deputy Director of the Children and Family Services Division of the California Department of Social Services,[1] in her official capacity (collectively, "Defendants" or "the State") have failed to comply with the Child Welfare Act, 42 U.S.C. § 670, *et. seq.*

Foster Parents' motion is based on this notice of motion and motion, and the memorandum of points and authorities and declarations filed concurrently herewith.

---

[1] Mary Ault has been succeeded by Greg Rose as Deputy Director.

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF -- Case No. C 07-5086 WHA
pa-1279666

1

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION AND SUMMARY OF ARGUMENT

The State of California made a deal with the federal government when it elected to participate in the federal foster care program for abused and neglected children:  In return for receiving federal funds, the State agreed to administer its foster care program in accordance with the Federal Child Welfare Act ("CWA"), Title IV-E of the Social Security Act, which requires participating states to reimburse foster parents for at least the basic costs of food, shelter, clothing, supervision, school supplies, personal incidentals, insurance, and home visits.  The same federal law also requires that foster children be placed in the "least restrictive," most family-like setting possible.  But the State of California is not upholding its end of the bargain.

California delegated its federal obligations under the CWA to its Department of Social Services ("CDSS"), and CDSS has categorically failed to meet them.  Indeed, as CDSS concedes and the uncontested evidence shows:

- California's reimbursements are too low to cover the costs of providing food, shelter, clothing, supervision, school supplies, personal incidentals, insurance, and home visits, forcing California's foster parents to make up the difference by paying with their own personal funds.

- California has never tried to calculate what it actually costs foster parents to provide food, shelter, clothing, supervision, school supplies, personal incidentals, insurance, and home visits to the abused and neglected children in their care.

- The reimbursements paid to foster parents in California are based entirely on budgetary concerns, regardless of and without analysis or regard for whether or not those reimbursements pay for the expenses federal law requires be covered as a condition of receiving federal money.

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF
pa-1279666

2

1    Not surprisingly, the increasing inadequacy of California's reimbursement rates is hurting

2    the State's overall foster care program by discouraging individuals who might otherwise be

3    willing to serve as foster parents from opening their home to the State's children. The evidence

4    on this point is abundant, and the State agrees. For example, the State concedes that:

- There is a direct relationship between the adequacy of the reimbursements under federal law and the number of Californians willing to become foster parents.

- Foster parents are the best, most family-like foster care placement option.

- A decrease in the number of foster parents means that more foster children will endure in institutional care instead of the "least restrictive" setting.

- Alternate placements for abused and neglected children if no foster parent is available cost far more than the preferred placement of foster parents.

- It costs more to fail to abide by federal law than it would to comply.

Faced with rising costs and inaction by the CDSS, a number of group foster homes filed a lawsuit in this Court on June 30, 2006 (*California Alliance of Child and Family Services v. Allenby, et al.*, No. C 06-04095 MHP), arguing that the State's methodology for determining reimbursements rates for **group foster homes** violated the CWA. Although the Court in that case ruled that California's methodology for determining reimbursement rates for group homes did not violate the CWA, it cautioned CDSS and the State that "*they are shortchanging the State's neediest children*" and that "*[i]t behooves the CDSS to adhere to its mandate to protect and care for these children and to vigorously fight for the funds necessary to discharge the Department's responsibility*." *Cal. Alliance of Child & Family Servs. v. Allenby* ("*Alliance II*"), No. C 06-04095 MHP, 2008 WL 686860, at *6 (N.D. Cal. Mar. 12, 2008) (emphasis added). Unfortunately, CDSS has not lobbied the Legislature for adequate reimbursements, despite this plea from the federal court.

Plaintiffs brought the present action on behalf of California's foster parents to redress the State's ongoing refusal to meet its federal obligation to foster parents. Unlike plaintiffs in the *Alliance* action, Plaintiffs here do not challenge California's methodology for determining rates— for there is none. **CDSS admits it has no methodology for determining payments to foster parents.** Here, Plaintiffs seek an order compelling the CDSS to meet its federal obligation to

1   reimburse the State's foster parents for basic expenses incurred for the benefit of foster children.

2   Such an order is well within the province of the Court and can only help a statewide program that

3   fails to meet the needs of its beneficiaries and the requirements of federal law.  Plaintiffs' motion

4   should be granted.

5   **II.    STATEMENT OF FACTS**

6           **A.    California, Through The CDSS, Agreed To Administer Its Foster Care
                    Program Under The Federal Child Welfare Act, Requiring It To Make
7                   Foster Care Maintenance Payments To California's Foster Parents.**

8           Congress enacted the CWA in 1980 to address the national need for providing funds to

9   care for children who are dependents of the state because their parents have abused or neglected

10  them.  A primary goal of the CWA is promoting the "best interest" and "safe and proper care" for

11  each child.  42 U.S.C. §§ 675(1), (5).  In furtherance of those aims, the CWA establishes a

12  cooperative federal-state program that assists states in meeting the costs of providing foster care.

13  Under this program, federal and state governments share the costs of providing funds to licensed

14  third parties (volunteer foster parents and institutional group homes) that care for these children.

15  (*See* Depuy Dep., Declaration of Kimberly N. Van Voorhis ("Van Voorhis Decl.") Ex. 1 75:8-17

16  (federal government and state each pay half).)  To receive federal funding under this program, a

17  state must agree to administer its foster care program pursuant to the CWA, under which the state

18  shall make "foster care maintenance payments" to foster parents.  42 U.S.C. § 671; 45 C.F.R.

19  §§ 233.110, 1355.21, 1356.21.  "Foster care maintenance payments" are defined by the CWA as

20  "payments to cover the cost of (and the cost of providing)" each of the following:

21      • food,

22      • clothing,

23      • shelter,

24      • daily supervision[2],

25      • school supplies,

26  _____

27           [2] "Daily supervision" includes licensed childcare for working foster parents.  45 CFR
    § 1355.20.  (*See* Declaration of Marc D. Peters ("Peters Decl.") Ex. A.)
28

1   • a child's personal incidentals,

2   • liability insurance with respect to a child, and

3   • reasonable travel to a child's home for visitation.

4   42 U.S.C. § 675(4)(A).

5   　　The State of California agreed to administer its foster care program pursuant to the CWA

6   and willingly accepts federal funding to cover a portion of the required maintenance payments to

7   foster parents. (*See* Van Voorhis Decl. Ex. 2 at 5-6.) CDSS is the state agency that receives the

8   federal funding, and is responsible for administering California's foster care program in

9   compliance with the CWA. (*See* Declaration of John A. Wagner ("Wagner Decl.") ¶¶ 2-3; Van

10  Voorhis Decl. Ex. 2 at 5-6.) Cal. Welf. & Inst. Code §§ 11229, 11460(a), 11461. CDSS is "the

11  single organizational unit" charged with the duty of "establishing rates in [California's foster

12  care] program." Cal. Welf. & Inst. Code § 11460(a). (Wagner Decl. ¶ 2; *see also* Van Voorhis

13  Decl. Ex. 2 at 1-2.) Foster care maintenance payments are made to foster parents through the

14  relevant county placement agency. Cal. Welf. & Inst. Code § 11460(a).

15　　**B.    CDSS Concedes And The Uncontested Evidence Confirms That
       California's Foster Care Maintenance Payments Are Substantially
16      Insufficient To Cover The Costs Mandated By The Child Welfare Act.**

17  　　California's monthly foster care maintenance payment rates were established by state

18  legislation in 1989 and have been increased from time to time since then.[3] Cal. Welf. & Inst.

19  Code § 11461. After a 5 percent increase at the start of this year, California currently pays foster

20  parents the following amounts as total reimbursements for the expenditures listed in section

21  675(4)(A):

22  • $446 per month for children ages 0 – 4;

23  • $485 per month for children ages 5 – 8;

24  • $519 per month for children ages 9 – 11;

25

26  　　[3] It is unclear how the original 1991 rates were determined. As discussed in Section C
    below, CDSS admits it is aware of no studies or investigations regarding the real costs incurred
27  by foster parents. The reimbursement rates for foster group homes, in contrast, were originally
    determined by actual 1985 group home costs. *See* Cal. Welf. & Inst. Code § 11462.
28

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM          5
OF POINTS AND AUTHORITIES IN SUPPORT THEREOF
pa-1279666

- $573 per month for children ages 12 – 14; and

- $627 per month for children ages 15 – 19.

(*See* Van Voorhis Decl. Ex. 3 at 2.)

Acknowledging that these expenses rise over time, the State Legislature provided that California's rates should be "adjusted by the percentage changes in the California Necessities Index, … subject to the availability of funds." Cal. Welf. & Inst. Code § 11461. The California Necessities Index ("CNI") is a "weighted average changes for food, clothing, fuel, utilities, rent, and transportation for low-income consumers." *Id.* § 11453. Between 2001 and 2008, the CNI increased by 24.9 percent.[4] (*See* Van Voorhis Decl. Ex. 4 at 7-8.) The uncontested evidence shows that had it tracked the CNI between 2001 and 2008, California's monthly rates by 2008 should have been approximately $100 per month higher than they are: $531 for children 0 – 4; $577 for children 5 – 8; $617 for children 9 – 11; $682 for children 12 – 14; and $745 for children 15 – 20. (*Id.*) Unfortunately, California's legislature never once adjusted its schedule of basic rates during that time. Cal. Welf. & Inst. Code § 11461(d). But even if it had, simply tracking the CNI for rate increases *still* would not have been enough, for the CNI itself understates the cost increases facing foster parents for the covered expenses. (*See* Berrick Decl. Ex. A ¶¶ 25-26.)

Defendants do not disagree that California's legislative foster care maintenance payments have fallen far behind the increasing cost of living; indeed, they freely admit that the rates do not cover the expenses mandated by the CWA. (Freitas Dep., Van Voorhis Decl. Ex. 5 55:13-17, 56:12-17 ("there were not appropriations always for the cost of living …").

---

[4] Other indicators likewise reflect steeply increasing costs of living: The U.S. Department of Agriculture estimated in 2005 that the average family earning between $43,400 and $73,100 per year spends approximately $11,551.67 per year, per child. This amounts to $962.64 per child per month as a nationwide average. (*See* Van Voorhis Decl. Ex. 4 at 9.) According to the California Budget Project's October 2007 Report (*Making Ends Meet: How much does it cost to raise a family in California?*), a single person in California needs an additional income of at least $25,857 in order to care for two children, or $1077.38 per child per month. (*See* Declaration of Jean Ross ("Ross Decl.") Ex. A at 5, 8 (assumes two children).)

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF
pa-1279666

6

1    *see also* Berrick Decl. Ex. A

2    ¶¶ 16-26 (California rates are not sufficient).)  Not surprisingly, California's rates fall well below

3    the national averages, and the State does not disagree with this evidence. (*See* Depanfilis Decl.

4    Ex. A ¶ 40; Van Voorhis Decl. Ex. 6 at 39; *Id.* Ex. 15 (admitting RFA No. 53).)

5        A recent study, which estimated the actual costs incurred by California foster parents for

6    the expenditures to be reimbursed under the CWA, and which the State does not dispute, provides

7    further support for the gross disparity between the rates California does pay and the rates it is

8    required to pay.  *Hitting the MARC: Establishing Foster Care Minimum Adequate Rates for*

9    *Children* ("MARC Report"), published in 2007, documents a study by the University of

10   Maryland School of Social Work, Children's Rights, and the National Foster Parent Association.

11   (*See* Van Voorhis Decl. Ex. 6.)  Foster parents' average costs were calculated by analyzing

12   consumer expenditure data reflecting the costs of caring for a child; identifying and accounting

13   for additional costs particular to children in foster care; and applying a geographic cost-of-living

14   adjustment, thereby developing specific rates for each of the 50 states and the District of

15   Columbia.  (*Id.* at 19-28; *see also* Depanfilis Decl. Ex. A ¶¶ 16-39.)  The study did not include

16   travel or child care expenses because of the case-to-case variability of those costs, so it therefore

17   underestimated the total reimbursable costs incurred by foster parents. (*See, e.g.*, Van Voorhis

18   Decl. Ex. 6 at 39.)  ***Excluding travel and child care expenses***, the MARC Report showed that the

19   minimum adequate California reimbursement rates are:  $685 for children ages 0 – 4; $785 for

20   children ages 5 – 13; and $861 for children ages 14 – 18.  (*Id.*)

21       Average travel and child care expenses may be calculated as follows:

22   • The Center for Social Services Research at the University of California at
23     Berkeley reports data showing that in 2006 California's foster children were
       placed an average of at least 6.14 miles from their homes.[5]  (*See* Van Voorhis
24     Decl. Ex. 7 (http://cssr.berkeley.edu/cwscmsreports/Cohorts/distance/
       distanceFrameset.asp?yr=2006&data=data).)  Foster care plans in California
25     frequently include weekly home visits (*see, e.g.*, *In re Elizabeth M.*, 158 Cal. App.
       4th 1551, 1553 (Ct. App. 2008); *In re S.C.*, 138 Cal. App. 4th 396, 416-17 (Ct.
26     App. 2006)), or approximately four visits per month.  Therefore, foster children

27       [5] This average excludes children for whom the distance is unknown and caps the
28   maximum distance at 11 miles.

making four reasonable round-trip home visits, based on the numbers from 2006 placements, travel about 49.12 miles each month. Multiplying the monthly miles by the 2008 federal mileage rate of $0.505 per mile (*see* Rev. Proc. 07-70) yields an average monthly travel expense of approximately $25 per foster child.

- The California Budget Project's October 2007 Report found that statewide average monthly costs for child care in California were $1,093 for two children (one in full-time care and another in after-school care), or an average of $547 per child per month. (*See* Ross Decl. Ex. A at 8, 16.)

Based on the foregoing, the total average monthly reimbursable expenses under the CWA incurred by foster parents in California are summarized below:

| Child's Age | MARC Rates | Travel for Home Visits | Total Minimum Adequate CA Rate (no child care) | Child Care | Total Minimum Adequate CA Rate (child care) |
|---|---|---|---|---|---|
| 0 – 4 | $685 | $25 | **$710** | $547 | **$1,257** |
| 5 – 13 | $785 | $25 | **$810** | $547 | **$1,357** |
| 14 – 18 | $861 | $25 | **$886** | $547 | **$1,433** |

C. **CDSS Admits And The Uncontroverted Evidence Confirms That California's Foster Care Maintenance Payments Are Based Solely On State Budgetary Concerns And Do Not Cover—Or Even Relate To— The Expenses Required By The Child Welfare Act.**

Plaintiffs deposed or obtained sworn declarations from numerous current and former State officials in this case, including, for example, John Wagner, the Director of CDSS; Patricia Aguiar, the former Foster Care Branch Chief and a Manager of the Foster Care Policy Bureau; Wesley Beers, former Child Welfare Services Bureau Chief and Chief of the Foster Care Rates Bureau and Policy Bureau; Glenn Freitas, Branch Chief of the Foster Care Audits and Rates Branch; and Sheilah Dupuy, former Chief of the Children Services Operations Bureau.[6] These officials consistently testified that California's maintenance payments to foster parents are determined exclusively by the State Legislature as part of its budget-making process, and that the reimbursement rates are driven solely by budgetary concerns. (*See* Wagner Decl. ¶ 4 (rates "are

---

[6] *See* Table of Deponents and Declarants, *supra* page iv for a more detailed description of all declarants cited in this brief, including the State officials deposed and their positions within CDSS; *see also* Defendants' initial disclosures (Van Voorhis Decl. Exs. 8 & 9) identifying Beers, Depuy, Aguiar, Freitas, and Defendant Wagner.

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF
pa-1279666

8

1    set by the California State Legislature"); Van Voorhis Decl. Ex. 1 46:20-21 (CDSS "did not set

2    rates for foster family homes"), 47:14-15 ("rates are specified in statute"), 76:19-20 (same);

3    Aguiar Dep., Van Voorhis Decl. Ex. 10 53:18-24 (rates set in statute), 103:13-104:4 (same),

4    111:6-11 (same); Beers Dep., Van Voorhis Decl. Ex. 11 59:6-8, 77:7-9, 82:21-25, 96:8-20, 97:2-

5    13; *id.* Ex. 10 111:3-23 (whether to grant cost-of-living increase "are budgetary decisions made –

6    made at the Capitol"), 117:2-12 ("that's part of the budgetary process"); *id.* Ex. 5 45:6-12 ("to the

7    extent that the state's budget allows for that"), 45:17-20 ("if revenues allow the state to construct

8    its budget such that there are sufficient revenues to cover all its expenditures and this is one of the

9    expenditures").) CDSS even acknowledges without alarm that budgetary concerns motivate a

10   current effort to *reduce* California's rates even further. (See *id.* Ex. 5 89:24-90:13.)

11          CDSS also admits to playing no role in determining the reimbursement rates paid to foster

12   parents. (See *id.* Ex. 11 67:18-68:20 (CDSS's role is "not in setting the rates.").) CDSS admits

13   that it does not, for example, testify or otherwise advise the legislature as to whether the rates are

14   adequate. (See *id.* Ex. 10 100:12-17, 104:14-16; *id.* Ex. 1 80:8-15, 100:3-11, 101:20-102:1,

15   104:20-25.) And, while CDSS may sometimes comment on proposed legislation, the uncontested

16   evidence shows that CDSS does not itself propose rates to the Legislature. (See *id.* Ex. 11 59:11-

17   14 (CDSS prepares analysis of proposed legislations and provides input), 76:20-22 (CDSS never

18   recommended particular set of rates); *id.* Ex. 5 30:10-17 (CDSS staff never tried to initiate

19   legislation to increase rates); *see* .                    CDSS further concedes that it has

20   no plan for determining rates paid to foster parents. (Van Voorhis Decl. Ex. 10 107:19-20 ("we

21   did not have a comprehensive rate restructuring proposal. It was just so complicated, you know,

22   complex that we hadn't reached that goal yet.").) Instead, CDSS simply implements whatever

23   rates are set by the Legislature. (*Id.* Ex. 11 96:19-20 (CDSS has "no authority to implement

24   anything beyond what the state legislature authorizes"), 102:7-103:15 (same); *id.* Ex. 1 69:14-15

25   ("it's my responsibility to implement what's statutorily mandated"), 73:15-20 (no discretion to

26   pay other than amounts set by legislature), 102:2-21 (same).)

27          Apparently CDSS does nothing at all to ensure that California's foster care maintenance

28   payments are high enough to meet the federal requirements: It does not track or analyze

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM
OF POINTS AND AUTHORITIES IN SUPPORT THEREOF
pa-1279666

9

California's rates. (*Id.* Ex. 11 70:19-71:2, 74:4-6.) It does not review the sufficiency of California's rates to cover the required federal itemized costs. (*Id.* at 76:23-77:1, 77:11-17, 81:8-17, 83:10-12; *id.* Ex. 1 62:11-20.) It has not participated in any study nor collected any data regarding the actual costs incurred by foster parents for covering the expenses itemized in 42 U.S.C. § 675(4)(A).[7] (*See id.* Ex. 10 43:6-11, 110:16-111:2, 111:24-114:1; *id.* Ex. 11 117:9-16; *id.* Ex. 5 40:25-41:18.)

Yet CDSS is well-aware that California's legislative rates are not sufficient. (*Id.* Ex. 5 56:12-17 ("certainly I recognized that there was not – there were not appropriations always for the cost of living increase")                    ) CDSS admits that it has received complaints that the rates have fallen behind the costs of living.[8] (Van Voorhis Decl. Ex. 10 114:10-15; *id.* Ex. 5 39:13-19, 44:16-22.) Even CDSS's own employees, such as the former CDSS manager responsible for rates policy, have expressed concern within the department that the rates were inadequate. (Declaration of Greg Lim ¶ 3; Van Voorhis Decl. Ex. 5 57:23-58:18 (Lim believes rates inadequate); *see also id.* at 55:7-24 (staff generally concerned rates insufficient).) But staff members' personal and professional opinions regarding the adequacy of California's rates are considered "not relevant" to CDSS's operations. (Van Voorhis Decl. Ex. 10 48:19-49:1, 49:20-50:19; *see also id.* Ex. 11 119:19-120:3 (didn't "operate on feelings … the rate was what the rate was").) Staff members are not authorized to report the shortcomings to the federal government. (*Id.* Ex. 5 68:25-70:6.) Likewise, no one who "wanted to keep their job" would express any concerns directly to the state legislature. (*Id.* Ex. 11 63:7-18; 64:22-65:3.) CDSS's official policy is to keep such opinions within the department. (*Id.* at 64:8-10, 65:4-13.) Nearly one year since the filing of this action, that policy has not changed, for Defendant Wagner admits that the CDSS still has not bothered to "evaluate[] the need to increase or decrease [the

---

[7] Although the department has reviewed rates paid to foster *group homes*, no such inquiry was made regarding payments to foster families. (*See id.* Ex. 10 52:15-53:10; *id.* Ex. 1 108:10-18; *id.* Ex. 5 60:21-61:2.)

[8] Because the CDSS does not bother itself with the adequacy of payments to foster parents, it tells citizens to take their concerns to the State Legislature. (*See* Van Voorhis Decl. Ex. 11 81:2-6.)

1   basic rates] nor … collected information regarding the sufficiency of rates or otherwise

2   functioned as a decisionmaker on [the] subject." (Wagner Decl. ¶ 4.)

3      Far from advocating for rates that would cover the required expenses (*see* Van Voorhis

4   Decl. Ex. 10 123:14-16 ("We don't advocate for rate increases…. our role is not advocacy")),

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM
OF POINTS AND AUTHORITIES IN SUPPORT THEREOF
pa-1279666

11

**D.     CDSS Agrees And the Uncontested Evidence Confirms That the State's Failure To Pay Foster Parents As Required By The Child Welfare Act Has Resulted In A Shortage Of Willing Foster Parents, Relegating Children To Costlier And Less Nurturing Group Homes.**

There is no question that foster parent placements (as opposed to group homes) are preferred by Congress: federal law requires that children be placed in the "least restrictive," most family-like setting possible. 42 U.S.C. § 675(5). (Van Voorhis Decl. Ex. 10 124:14-20, 125:5-9; *id.* Ex. 11 129:25-130:8.) Defendants agree. (Van Voorhis Decl. Ex. 11 128:5-129:5, 129:25-130:8; *id.* Ex. 5 32:22-33:1; Berrick Decl. Ex. A ¶¶ 46-51.) Indeed, uncontested studies routinely show that children placed with foster families have more positive outcomes (including increased likelihood of adoption, reunification with families, staying in same neighborhood and school, and placement near siblings) than children placed in other settings. (Berrick Decl. Ex. A ¶¶ 27, 49.)

Still, the number of foster parents in the State of California are plummeting and more and more children are being relegated to the costlier group homes, as the State concedes.[9] For example, there is no dispute that California counties have experienced an average decline of 30 percent in licensed foster family homes. (*See* Berrick Decl. Ex. A ¶ 14.) Sacramento, Santa Clara, San Mateo, and Sonoma counties report losses as high as 45 to 50 percent, and San Bernardino County reports a decline of 61 percent. (*See* Declaration of Frank Mecca ("Mecca Decl.") Ex. A at 3.) In 2007, fewer than 7,000 children were placed in foster family homes; but in 2000, more than 14,000 children were placed in foster family homes. (Van Voorhis Decl. Exs. 12 & 13.) (http://cssr.berkeley.edu/CWSCMSreports/Pointintime/fostercare/childwel/grids/data/grid_sXrsum_jan2008_0.html, http://cssr.berkeley.edu/CWSCMSreports/Pointintime/fostercare/childwel/grids/data/grid_sXrsum_jan2001_0.html).) Because the difference between foster parents' actual costs and the amount

---

[9] Certified foster family agencies and institutional group homes are intended to be the placements of last resort as both are intended for children and youth who need a higher level of therapeutic service. (*See* Berrick Decl. Ex. A ¶¶ 41-44.) As one might expect, these placements are costlier than foster family homes because they entail additional costs for administration and social services. (*See* Van Voorhis Decl. Ex. 12 128:5-130:8; Berrick Decl. Ex. A ¶ 44; Johnson Decl. Ex. A ¶¶ 13-14.)

1   the CDSS pays California's volunteer foster parents comes directly out of the foster parents'

2   pockets (*see* Berrick Decl. Ex. A ¶¶ 27-36), these people simply can't afford to care for the

3   State's children.  (Declaration of Lois Raap ¶¶ 6-7; Declaration of Shaaron Schuemaker ¶¶ 4-6.)

13   Berrick Decl. Ex. A ¶¶ 41-45; Johnson Decl. Ex. A ¶¶ 6-7 (describing the causal link between

14   increased payments and an increased supply of foster parents, resulting in less unnecessary group

15   home placements).)  The CWA requires participating states to offer foster children the "least

16   restrictive" setting possible (42 U.S.C. § 675(5)).  California's present "group home shifting"

17   regime ignores this requirement entirely.

18        **E.**      **Paying California's Foster Parents As Required By The Child Welfare Act Will Reduce Total State And Federal Expenditures.**

19        Increasing California's insufficient child care maintenance payments to cover the

20   mandatory costs would encourage—and in many cases enable—people to serve their community

21   by becoming foster parents to the State's dependent children.

22

24        ; *id.* Ex. B; Berrick Decl. Ex. A ¶¶ 41-45; Johnson Decl. Ex. A ¶¶ 6-7.)  Although

25   it may sound counterintuitive, increased reimbursement rates for foster parents will actually

26   *decrease* the total amount of money spent on foster care.

27        By law, the cost of alternative placements (foster family agencies and group homes)

28   *always* exceeds the cost of foster family placements.  *See* 42 U.S.C. § 675(4)(A) (reimbursements

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF
pa-1279666

13

1  to group homes cover same expenses as for foster parents *plus* administration and operation

2  costs); Cal. Welf. & Inst. Code § 11462. (Johnson Decl. Ex. A ¶¶ 8, 13-14.) If, for example,

3  foster parent rates were increased a mere 20 percent (along with the corresponding reduction in

4  unnecessary placements of children in group homes), the State would realize a net savings of

5  approximately $28.4 million per year after five years, with a total net savings over the first five

6  years of approximately $62 million. (*See* Johnson Decl. Ex. A ¶¶ 29-30, 12.) Plaintiffs'

7  summary judgment motion not only puts the State in compliance with federal law, it also makes

8  practical sense.

9  ## III.    ARGUMENT

10  ### A.    By Not Making Foster Care Maintenance Payments As Required By The Child Welfare Act, The State Of California Violates Federal Law.

11  California made a bargain with the federal government for the benefit of foster children

12  and foster parents, and it has failed to do its part. The CWA established a cooperative federal-

13  state program, under which the federal government shares the costs of care for children removed

14  from their homes by the state. 42 U.S.C. §§ 670-679b. Although participation is optional, states

15  that do participate *must* comply with the federal requirements of the CWA. 42 U.S.C. § 671. In

16  particular, these states "*shall* make foster care maintenance payments" on behalf of eligible

17  children to individuals who care for the children—namely foster parents. 42 U.S.C. § 672(a)

18  (emphasis added); *see also* 42 U.S.C. §§ 671(a)(2)-(3), 672(b)(1), 675(4); 45 C.F.R.

19  § 1356.21(1); *Cal. Alliance of Child & Family Servs. v. Allenby* ("*Alliance I*"), 459 F. Supp. 2d

20  919, 925 (N.D. Cal. 2006) (noting that the CWA "imposes an absolute" and "mandatory" duty on

21  participating states to make the specified "foster care maintenance payments" to foster care

22  providers).

23  Defendants concede that California does *not* make the required payments, and they do not

24  dispute that the differences between the real expenses foster parents incur and California's current

25  monthly reimbursement rates, as reflected below, are significant:

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF
pa-1279666

14

| Age of Child | Actual Average Cost[10] (excluding child care) | California Reimbursement Rate | Shortfall as Percentage of Actual Average Cost |
|---|---|---|---|
| 0 – 4 | $710 | $446 | 37% |
| 5 – 8 | $810 | $485 | 40% |
| 9 – 11 | $810 | $519 | 36% |
| 12 – 14 | $810 | $573 | 29% |
| 15 – 20 | $886 | $627 | 29% |

When a federal child welfare statute requires that participating states "shall" perform mandatory and specified action, nothing short of full compliance satisfies the state's obligation. *Withrow v. Concannon*, 942 F.2d 1385, 1387 (9th Cir. 1991) ("it is no comfort [to recipients] to be told that there is no federal remedy because the state is in 'substantial compliance' with the federal requirements").[11] California's inadequate foster care maintenance payments are no exception. In fact, because the requirements of the CWA are mandatory, the Foster Parents are within their rights under 42 U.S.C. § 1983 to compel the State to make these payments as required by 42 U.S.C. § 672. (*See* Order, Docket No. 26.) *See, e.g.*, *Cupolo v. Bay Area Rapid Transit*, 5 F. Supp. 2d 1078, 1085 (N.D. Cal. 1997) (injunction requiring state agency to comply with federal ADA obligation not overly intrusive).

In this case, CDSS admits that California's rates are driven solely by state budgetary concerns and that they bear no relationship to the actual expenses incurred by California's foster parents, which CDSS does not bother to track or calculate in any event.

---

[10] *See* Section II.C., *supra*.

[11] In *Withrow*, the Ninth Circuit held that Oregon's "substantial compliance" with the federal Aid to Families with Dependent Children, Food Stamp, and Medicaid programs was no defense to plaintiffs' claims that defendants failed to issue timely decisions as required by governing federal statutes and regulations. 942 F.2d at 1386–88 (reversing summary judgment and remanding). Although *Withrow* addressed whether a state agency was required to provide fair hearings required by federal law, the question of whether a state may frustrate the federal rights of beneficiaries to a federal-state program is closely analogous to the facts here.

PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF
pa-1279666

15

asserting in depositions that it does nothing other than ministerially implement the will of the Legislature. The result of CDSS's failure to follow (or even try to follow) federal law, as the uncontroverted evidence demonstrates, is precisely the consequence federal law seeks to avoid; namely, children are placed in institutions instead of family homes, and families are not given the means to provide the baseline standard of living for these abused and neglected children. Without question, Defendants do not comply with the CWA and the effects of this non-compliance are wide-reaching. Relief under §1983 is appropriate and essential.[12]

**B.  Defendants Admit That There Exist No Genuine Issues Of Material Fact Regarding California's Failure To Cover The Costs Mandated By The Child Welfare Act.**

Summary judgment is required if there exist no genuine issues of material fact and the moving party is entitled to judgment under the governing legal principles. *Moreland v. Las Vegas Metro. Police Dep't*, 159 F.3d 365, 369 (9th Cir. 1998); *see also* Fed. R. Civ. P. 56(c) (court should grant summary judgment when the pleadings, discovery and affidavits show "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law"). As a discovery device, Requests for Admission provide a useful tool for establishing the nonexistence of an "issue of material fact" with respect to relevant factual matters. *See* Fed. R. Civ. P. 36(a)(3) (factual matters deemed admitted unless party to whom requests are propounded serves timely denial or objection).

As established in the Statement of Facts above, there is no genuine dispute of fact that the State of California has not complied with the CWA. CDSS concedes that it has not. This concession is buttressed by the fact that, as a legal matter, by admitting all of the factual matters

---

[12] "Substantial compliance" or "substantial conformity" is not the test here. "Substantial conformity" is merely a regulatory measure of states' performance under certain federal welfare programs, including the CWA. 45 C.F.R. §§ 1355.36, 1355.34; *see also Withrow*, 942 F.2d at 1387. To the extent Defendants raise the issue of "substantial conformity," however, Plaintiffs caution them to do so carefully, because a finding by this Court that Defendants' inadequate foster care maintenance payments constitute a "failure to achieve substantial conformity" with the requirements of the CWA could trigger a Department of Health and Human Services inquiry and withholding of federal funds. *See* 45 C.F.R. § 1355.36(b) (discussing "funds to be withheld due to a finding that the State is not operating in substantial conformity").

1   described in Plaintiffs' First Set of Requests for Admission, Defendants have precluded

2   themselves from arguing otherwise.[13]  Defendants have **admitted** at least the following:

3   • In 2001, the basic rates paid to foster parents were not sufficient to cover the
        average costs incurred by foster parents for providing the reimbursable expenses
4       itemized in the CWA (RFA No. 25);

5   • In 2008, the basic rates paid to foster parents are not sufficient to cover the average
        costs incurred by foster parents for providing the reimbursable expenses itemized
6       in the CWA (RFA No. 27);

7   • The facts pertaining to California in the MARC Report are accurate (RFA No. 53);

8   • Since 1991, the changes in the CNI has been an understated measure of the change
        in average costs incurred by foster parents for providing the reimbursable expenses
9       itemized in the CWA (RFA No. 29);

10  • Since 1990, no data has been collected by or for CDSS regarding the actual costs
        incurred by foster parents for providing the reimbursable expenses itemized in the
11      CWA (RFA Nos. 3-11);

12  • Since 1990, CDSS has not prepared a study, analysis, or report regarding whether
        the basic rates paid to foster parents were sufficient to cover the actual costs
13      incurred by foster parents for providing the reimbursable expenses itemized in the
        CWA (RFA No. 13);

14
    • The outcome measures for foster children placed in family foster home settings are
15      more positive (fewer incidences of arrests, use of public welfare programs,
        homelessness, ill health, and unemployment) than the outcome measures for
16      children placed in group homes (RFA No. 55);

17  • Increases in compensation for family foster care providers increases the supply of
        such providers (RFA No. 58);
18
    • Decreases in compensation for family foster care providers decreases the supply of
19      such providers (RFA No. 59);

20  • The number of family foster care providers has decreased since 2001 (RFA No.
        60);
21
    • The number of family foster care providers has decreased more on a percentage
22      basis than the number of foster children (RFA No. 61);

23          Defendants' affirmative defenses are no bar to summary judgment.  Plaintiffs propounded

24  a series of contention interrogatories to discover facts supporting Defendants' defenses.  (*See* Van

25

26          [13] Foster Parents' First Set of Requests for Admissions to Defendants are attached as
    Exhibit 15 to the declaration of Kimberly Van Voorhis.  Defendants admitted each and every one
27  of Plaintiffs' RFAs when they did not timely deny or object to any of them.  (*See* Van Voorhis
    Decl. Ex. 15.)  Fed. R. Civ. P. 36(a)(3).
28

1    Voorhis Decl. ¶ 18, Ex. 17.)  Because Defendants did not identify any facts in answer to those

2    interrogatories, there is no genuine dispute here either.  (*Id.*)  Summary judgment should be

3    granted.

4           **C.      The Court Should Grant Declaratory and Injunctive Relief to Correct
                      Defendants' Continuing Violation of 42 U.S.C. § 672.**
5
            Because the undisputed evidence shows that Defendants do not make foster care
6
     maintenance payments to foster parents as required by the CWA, Plaintiffs are entitled to
7
     summary judgment in their favor.  *See* Fed. R. Civ. P. 56.  Plaintiffs respectfully request the
8
     following relief:
9
                 •   That the Court enter declaratory judgment holding that Defendants have violated
10                   and continue to violate 42 U.S.C. § 672 by failing to pay foster parents the
                     statutory amounts (costs of (and the costs of providing) food, clothing, shelter,
11                   daily supervision, school supplies, a child's personal incidentals, liability
                     insurance with respect to a child, and reasonable travel to a child's home for
12                   visitation).

13               •   That the Court grant interim injunctive relief and order Defendants to increase
                     monthly per-child payments to foster parents to the amounts stated in the MARC
14                   Report, plus $25 for reasonable travel for home visitation, plus an additional $547
                     to working parents who enroll the foster child in licensed child care.
15
                 •   That the Court order Defendants to publish, and present to this Court for approval,
16                   a new schedule of rates sufficient to cover the statutory itemized costs with a
                     proposed plan and methodology for future annual review, comment, adjustment,
17                   and republication of such rates so that Defendants' payments to foster parents may
                     be expected to cover the statutory expenses in the future.
18
                 •   That the Court grant permanent mandatory injunctive relief and order Defendants
19                   to comply with their obligations under 42 U.S.C. § 672 to pay to foster parents
                     amounts sufficient to cover the requisite itemized costs.
20
                 •   That the Court order Defendants to pay Plaintiffs' full costs and reasonable
21                   attorneys' fees in bringing this action pursuant to 42 U.S.C. § 1988.

22          There is no question that such relief is within the Court's power.  The Declaratory

23   Judgment Act provides that this Court may "declare the rights and other legal relations" of the

24   parties "whether or not further relief is or could be sought."  28 U.S.C. § 2201(a); *see also* Fed. R.

25   Civ. P. 57.  Declaratory relief promotes judicial efficiency by allowing parties to avoid incurring

26   liability for future acts thereby avoiding a multiplicity of actions between the parties.  *Societe de*

27   *Conditionnement v. Hunter Eng'g Co.*, 655 F.2d 938, 943 (9th Cir. 1981).  The Court likewise

28   has jurisdiction to order mandatory injunctive relief, requiring Defendants to comply with federal

1    law. *See Ekloff v. Rodgers*, 443 F. Supp. 2d 1173, 1182 (D. Ariz. 2006) ("The permanent

2    injunction enjoins the State, its administering agencies and those parties that contract with the

3    administering agencies to provide necessary medical services" in accord with federal Medicaid

4    law); *Missouri Child Care Ass'n v. Martin*, 241 F. Supp. 2d 1032, 1046-47 (W.D. Mo. 2003)

5    (declaratory and injunctive relief granted); *see also Withrow*, 942 F.2d at 1388 ("An injunction

6    requiring adherence [to federal law], however, imposes no inappropriate obligation on the state,"

7    such an injunction "'merely seeks to prevent the defendants from shirking their responsibilities

8    under [the federal Act]'") (quoting *Haskins v. Stanton*, 794 F.2d 1273, 1277 (7th Cir. 1986)).

9         The relief that Plaintiffs seek will not impose an excessive burden on Defendants, because

10    it only requires Defendants to comply with their existing federal obligations. Because the

11    permanent relief requested is narrowly tailored to ameliorate the future harm to Plaintiffs and

12    leaves it to Defendants to determine how they will comply and continue to comply with the

13    requirements of the CWA, there is likewise no risk of any unwarranted federal intrusion into

14    California's affairs. *See, e.g., Cupolo*, 5 F. Supp. 2d at 1085 (injunction requiring state agency to

15    comply with federal ADA obligation not overly intrusive).

16    **IV.   CONCLUSION**

17         For the reasons stated herein, Plaintiffs respectfully request that this Court grant judgment

18    in their favor and order the requested relief.

19

20    Dated: September 11, 2008            MORRISON & FOERSTER LLP

21

22                          By:   _____

23                             Kimberly N. Van Voorhis

24                           Attorneys for Plaintiffs

                            California State Foster Parent

25                           Association, California State Care

                            Providers Association, and Legal

26                           Advocates For Permanent Parenting

27

28