**IN THE UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

California State Foster Parent Association,
California State Care Providers Association,
and Legal Advocates for Permanent
Parenting,

    Plaintiffs,

vs.

JOHN A. WAGNER, Director of the California
Department of Social Services, in his official
capacity; MARY AULT, Deputy Director of
the Children and Family Services Division of
the California Department of Social Services,
in her official capacity,

    Defendants.

Case No. **C-07 5086**

**EXPERT REPORT OF PHILLIP M. JOHNSON, PH.D.**

**ECON ONE RESEARCH, INC.**

August 12, 2008

**Experience and Qualifications**

1.      My name is Phillip M. Johnson.  I am an economist employed by Econ One Research, Inc. ("Econ One"), an economic research and consulting firm with offices in Los Angeles, Sacramento, Houston, and Washington, D.C.  I have a doctoral degree in economics from the University of California at Los Angeles and a bachelor's degree in economics from California State University at Northridge.  I was formerly an Assistant Professor of Economics at Instituto Tecnológico Autónomo de México (ITAM).

2.      Since joining Econ One in 2000, I have worked extensively on the analysis of markets and the assessment of economic damages, including the calculation of damages in antitrust, intellectual property, and breach of contract matters.  I have previously submitted expert declarations to federal court.  A more detailed summary of my training, past experience, and prior testimony is shown in Exhibit 1.

3.      Econ One is contributing, without compensation, the time spent by myself and by research staff on this project.  My normal and customary rate is $275 per hour and billing rates for staff who assisted on this matter range from $105 to $155.  Econ One is being reimbursed for out-of-pocket expenses.  In preparing my analysis, I have reviewed publicly available documents listed in Exhibit 2.

**Assignment**

4.      I have been asked by Plaintiffs to evaluate the change in the real value of payments made by the State of California to foster family homes (FFHs) because of California's failure to make cost-of-living adjustments to FFH reimbursement rates from 2002 to 2007.  Plaintiffs also asked that I evaluate the utilization of California's major out-of-home foster programs, including foster

family agencies (FFAs) and group homes, for the placement of foster children in California during this period.

5.      Finally, Plaintiffs asked me to calculate the impact on the State's cost from a proposed 20 percent increase in 2009 FFH reimbursement rates under scenarios that take into account various estimates from Plaintiffs of the resulting decrease in the placement of foster care entries into alternative foster programs.[1]  For the first scenario ("Scenario A"), Plaintiffs asked that I assume that the rate increase returns the out-of-home foster program utilization proportions to those of 2002.  For the second ("Scenario B"), Plaintiffs asked that I assume that the rate increase results in a 50 percent increase in FFH placements, drawn equally from FFAs and group homes.  For the third scenario ("Scenario C"), Plaintiffs asked me to evaluate a scenario that allows for a 25 percent increase in FFH placements and draws 75 percent of the incremental FFH placements from FFAs and 25 percent from group homes.


**Summary of Conclusions**


6.      I have calculated that the real purchasing power of reimbursements to care providers in the California FFH program in 2008 has declined 19.3 percent since 2001.  Economic theory would predict that such a decrease in real reimbursement rates would result in fewer families accepting FFH placements than would have done so, had those rates kept pace.  Economic theory would also predict that an increase in reimbursements will result in relatively more

---

[1] According to my calculations, since the July 2001 rate increase of 4.85%, the CNI has increased by 30 percent, and accounting for the January 2008 rate increase of 5 percent, an increase in foster care maintenance payments of 24 percent would be required to return rates to the 2001 level when adjusted for increases in the CNI.  Further, to return rates to the 1991-1992 level when adjusted for increases in the CNI, foster care maintenance payments would have to be increased by 26.6 percent.

families accepting FFH placements than otherwise would and that the greater the increase in reimbursements, the larger the effect in increasing FFH providers.

7.     Indeed, FFH placements declined substantially during the period during which California was not making cost-of-living adjustments (2002-2007), both in absolute numbers and as a percentage of out-of-home placements. Placements into the State's alternative placement programs, FFAs, and group homes have increased over the same period.

8.     The costs to the State of California of the alternative placement options (FFAs and group homes) substantially exceed the cost of FFH placements.  Given California's obligation to provide foster care to children in need of it, a shortage of FFHs results in some children being placed in more expensive settings that provide services that may not be needed by many children. Thus, the continuing shortage of FFHs increases California's total foster care program cost.  To the extent that the decline in the real reimbursement rate to FFHs contributes to the shortage of FFH providers, low reimbursements to FFHs actually increase California's total cost of foster care programs.

9.     I understand that Plaintiffs argue that, FFH providers are entitled to as much as a 40 to 80 percent increase in FFH reimbursement rates to cover the actual costs for the care and supervision of a foster child.  However, I was asked to calculate costs or savings arising only from the shift in placements arising from a smaller 20 percent increase.  For Scenario A, in which the rate increase returns the out-of-home foster care program utilization proportions to those of 2002, I estimate that this increase in FFH payments would have the net effect of reducing California's total payments to foster care providers by $1.8 million in the first year and by $160 million over five years.  See Exhibit 3, Column 1.  For Scenario B, in which the rate increase results in a 50 percent increase in FFH placements, drawn equally from FFAs and group homes, I estimate that this increase in FFH payments would have the net effect of reducing California's total

payments to foster care providers by $7.7 million in the first year and $309 million over five years.  See Exhibit 3, Column 2.

10.     For Scenario C, in which the rate increase results in a 25 percent increase in FFH placements and draws 75 percent of the incremental FFH placements from FFAs and 25 percent from group homes, I estimate that even under this scenario, the FFH payment increase still would have a net effect of reducing California's total expenditures on foster care by $62 million over five years, though there would be a net cost of $2.8 million in the first year.     See Exhibit 3, Column 3.

**Background**

11.     Foster care programs in the State of California provide care to children who are out of parental care, typically because of abuse or neglect.[2]  As I understand it, California is obligated under federal law to provide care for children who require it.  Sometimes care for such children can be provided by relatives, but often it cannot.  Under the California foster care system, there are a number of options for the care of children outside of the homes of their families or relatives.   Out-of-home foster care is typically provided through one of three programs: FFHs, FFAs, and group homes.[3]

12.     FFHs are family homes licensed by the State of California.  Each home cares for no more than six children.[4]  These homes are not intended to provide care to children who need intensive care due to severe emotional or physical problems, although FFHs do often provide care for children with modest

[2] See, Foster, Lisa K., "Foster Care Fundamentals: An Overview of California's Foster Care System," December 2001.
[3] See, e.g., California Alliance of Child and Family Services, "Foster Care and Adoptions in California: Fact Sheet."
[4] See, e.g., California Alliance of Child and Family Services, "Foster Care and Adoptions in California: Fact Sheet," p.22.

problems that can be accommodated in a family home environment. FFH placements can provide a family environment at a relatively low cost. Currently, foster parents are reimbursed between $446 and $627 per child per month for basic services.[5] I estimate that the average reimbursement to foster parents for basic care is $507 per child per month.[6] However, some families are reimbursed more for children with special needs (such as disabilities); a recent study by the California Legislative Analyst's Office ("LAO") put total average reimbursement at $728 per child per month.[7]

13.    FFAs differ from FFHs in several regards.[8] FFAs were intended to provide a higher level of care to children with emotional or behavioral problems. Although basic reimbursement for FFA placements is similar to FFH placements, FFAs receive substantial additional "required minimum fees" for administrative and social work services. Consequently, total average reimbursement rates are much higher, ranging from $1,589 to $1,865 per child per month.[9] Thus, there is a substantial cost difference to the State of California between these two types of programs. The current average reimbursement of $1,850 estimated by the California Legislative Analyst's Office for an FFA placement is $1,122 more than that for a FFH placement.[10]

14.    Group homes typically provide many more services than FFHs or FFA.[11] They are intended to provide care for children who have more serious emotional or behavioral problems, and thus require more services and a more restrictive environment. The settings for group homes range from family-like

[5] See Department of Social Services, "All County Letter No. 08-01," January 17, 2008, p.2.
[6] Calculation is a weighted average based on the numbers of children in FFHs by age category. See http://cssr.berkeley.edu/ucb_childwelfare/.
[7] See http://www.lao.ca.gov/analysis_2008/health_ss/hss_anl08011.aspx.
[8] See, e.g., California Alliance of Child and Family Services, "Foster Care and Adoptions in California: Fact Sheet," p.23.
[9] See Department of Social Services, "All County Letter No. 08-01," January 17, 2008, p.3.
[10] See http://www.lao.ca.gov/analysis_2008/health_ss/hss_anl08011.aspx.
[11] See, e.g., California Alliance of Child and Family Services, "Foster Care and Adoptions in California: Fact Sheet," p.23.

homes to larger institutional facilities. Basic reimbursement for group home placements is based on the level of services provided by the group (called "the rate classification level" or "RCL") rather than the services needed by the child. As a result, costs for group home care are typically much higher than for FFH or FFA care, ranging from $1,486 to $6,694 per child per month.[12] Indeed, the California Legislative Analyst's Office reported a total average reimbursement of $5,311 per child per month for children in group homes, almost $4,600 more than an FFH placement.[13]

**The Decline of Foster Family Homes in California and its Consequences**

15.    Between 1998 – 2002 and 2007 a substantial change has occurred in California foster care. From 1998 – 2002, FFHs were the predominant placements utilized in the State of California for out-of-home foster care. See Exhibit 4. During that time, 52 percent of children entering out-of home foster care were placed into FFHs. In 2007, of the 22,525 children entering out-of-home foster care in California, only 28 percent went into FFHs.[14] See Exhibits 4, 5, and 6. Between 1998 – 2002 and 2007, the share of children placed into FFAs has increased from 37 to 58 percent and the share of children placed into group homes has increased from 11 to 14 percent.

16.    I understand that the proximate cause of the declining number of FFH placements in California is a shortage of families willing to provide such placements.[15]

---

[12] See Department of Social Services, "All County Letter No. 08-01," January 17, 2008, p.6.

[13] See http://www.lao.ca.gov/analysis_2008/health_ss/hss_anl08011.aspx.

[14] See http://cssr.berkeley.edu/ucb_childwelfare/.

[15]  See, http://www.lao.ca.gov/analysis_2002/health_ss/healthss_17_Foster_care_anl02.htm, http://www.usatoday.com/news/nation/2007-10-02-fosterchildren_n.htm and California Alliance of Child and Family Services, "Foster Family Agencies: Fact vs. Myth."

17.    An important factor in the decision to be a foster parent is the cost of providing care.  Between 1998 and 2002, the FFH reimbursement rate was adjusted annually to reflect changes in the cost of living.[16]  Since 2001, this reimbursement rate has been increased only once, in January 2008.  In 2002, foster parents received between $425 and $597 (based on the age of the child) for the care they provided, while, as noted above, in 2008 the rates were raised to between $446 and $627.[17]  During this period, however, the growth in the cost of caring for a child in California has outpaced the increase in the reimbursement amount.  The California Necessities Index (CNI) is a measure of the cost of basic goods in California.  According to CNI, the cost of basic goods in California increased by 30 percent between 2001 and 2008.  Thus, despite the increase of 5 percent in the nominal FFH reimbursement rate in 2008, over the last seven years the real reimbursement rate has actually declined by more than 19 percent since 2001.  See Exhibit 7.

18.    Such a decline should be expected to impact the number of families willing to provide foster care, particularly as FFH reimbursements, even at their intended levels, would only just cover the basic costs of caring for a child.  According to a 2007 U.S. Department of Agriculture Survey, the monthly average cost of raising a child in the region of the U.S. that includes California is about $1,000 per child per month, depending on age and family income.[18]  The FFH reimbursement rates for basic care (excluding added increments for special needs) are roughly half that amount.  As a result, due to the increasing inability of FFH reimbursements to cover expenses, many families are likely to be unable to afford to serve as foster parents.[19]

---

[16] See "CNI vs. Rate Summary", Communication from Counsel.
[17] See Department of Social Services, "All County Letter No. 08-01," January 17, 2008, pp.1-2.
[18] See http://www.cnpp.usda.gov/Publications/CRC/crc2007.pdf, p.19.
[19] See e.g., "Lawsuit Seeks Fair Rate for Foster Parents," *San Jose Mercury News*, Oct. 17, 2007 and http://www.metroactive.com/papers/metro/10.12.00/fosterparents-0041.html.

19.    Indeed, a 2007 report co-authored by the County Welfare Directors Association of California noted that the decline in the real foster care reimbursement rate was a "key barrier to recruiting and retaining family caregivers."[20]    Others also have recognized the potential impact of low reimbursement rates on the provision of FFHs.    In an analysis of budget proposals for the 2008-2009 fiscal year, the California Legislative Analyst's Office noted that reduced rates of reimbursement could lead to a "decrease in the supply of care providers."[21]

20.    A recent study of children entering foster care in different states found that basic reimbursement rates do have an effect on the number of children that are placed in foster family homes rather than group homes. Although the authors did not study FFA placements, the study did find that the effect of a $100 increase in payments to foster family providers was to decrease placements into group homes by 28.7 percent.[22]    An equivalent way to state the results is that lower reimbursements to foster family providers increase placements into group homes.

21.    As fewer FFH placements are available with the decline in FFH providers, California is forced to place more children into FFA and group homes—the two more expensive alternatives.    Thus, the low reimbursement rates provided by the State to FFH providers may lead the State to spend *more* on foster care than it otherwise would.

22.    Indeed, California budget data provide some support for the presence of this effect.    Although the total number of children in California's

---

[20] See County Welfare Directors Association of California and Legal Advocates for Permanent Parenting, "No Family, No Future," May 2007, p.1.    See also, Goldsmith, California Department of Social Services, Bill Analysis, Bill Number AB 2043, February 18, 1998.
[21] See http://www.lao.ca.gov/analysis_2008/health_ss/hss_anl08011.aspx.
[22] See Duncan, Brian and Laura Argys, "Economic Incentives and Foster Care Placement," *Southern Economic Journal*, Vol. 74, No. 1, 2007, pp.114-142.

foster program declined by more than 22 percent between 2002 and 2008,[23] the annual budget allocation for foster care during this period appears to have increased slightly, from $1.5 billion in fiscal year 2002 to $1.6 to $1.7 billion for the fiscal years 2003 – 2006.[24]  It appears likely that some portion of this increase is due to the change in the composition in care, given that, as noted above, the State did not increase the FFH reimbursements between 2001 and 2007.

**The Net Impact on California Foster Care Costs of an Increase in FFH Reimbursements**

23.     In this section, I assess the net impact on California's cost of providing foster care from a hypothetical increase in FFH reimbursements. Such an increase would affect the State's total cost of providing care in two ways. First, there will be a reduction in payments made to the two more expensive programs—FFA and group homes—as more of the new entrants to foster care will instead be placed in less expensive FFHs.   Second, there would be an increase in payments made to all FFH providers.

24.     I have been asked by Plaintiffs to estimate what the net impact on the State's cost would be if the reimbursement rate to FFH providers were increased by 20 percent in 2009 and then adjusted annually with cost-of-living adjustments based on the CNI.  Such an increase in FFH reimbursements would be sufficient to return the FFH providers to 97 percent of the real value of reimbursements in 2001.[25]  Using this assumption, I was asked to consider three scenarios.

25.     Scenario A's assumptions correspond to an approximate return to the situation that prevailed in 2002, prior to the 2008 adjustment of 5 percent.  Of

---

[23] See http://cssr.berkeley.edu/ucb_childwelfare/.

[24] See http://www.lao.ca.gov.

[25] Note that this estimation does not assume that in 2001 reimbursements were sufficient to cover the cost of providing care.  The data suggest that they were not.

placements into out-of-home foster care, 46.6 percent went to an FFH, 41.1 percent went to an FFA, and 12.3 percent went to a group home. See Exhibit 6.

26.      The effect of this first scenario on foster care placements is shown in Exhibit 8.  As a result of the increase in reimbursements and the change in placements, the cost of the State's foster care program will be impacted in two ways.  First, more children entering into foster care will be placed into FFHs rather than into FFAs or a group homes (the full effect on placements is phased in over five years).  See Exhibit 8.  This effect will result in lower total reimbursement expenditures by the State than otherwise would have occurred.

27.      The average time in foster care was reported to be 39 months,[26] so much of the savings will occur in the years after the initial placement.  For simplicity, I incorporate savings from placing children into lower cost FFHs for just the first three years of a child's stay in foster care (incorporating the rate at which these children will exit).  Second, all FFH placements (incremental FFH placements and those that would have occurred anyway) will be reimbursed in 2009 at 120 percent of the current rate.[27]  That rate then grows with the CNI in the following years.[28]  These two effects are combined to calculate the total effect over five years.  See Exhibit 9.  The net impact is a reduction in foster care program costs, meaning savings can be achieved relative to the status quo by increasing payments to FFH providers as fewer children will need to be placed into higher cost FFA and group homes.  The net savings are $1.8 million in the

---

[26] Foster Care: Change a Lifetime, "Facts About Children in Foster Care in California," http://childrendutyfuture.org/Issue_Papers/CA-Facts-FCM071.pdf.

[27] The number of FFH placements that will receive this increment is estimated by the current number of FFH placements plus the number of incremental FFH placements and accounting for the number of these children that will exit foster care each year.  The figure calculated here overstates the incremental cost (and thus understates State savings) because of the way the exits of the incremental placements into FFHs are modeled.  Children exit foster care throughout the year, however, these incremental FFH placements are assumed to exit only at the end of each year.  This assumption results in a figure for children in FFH care that is higher that would actually be the case, and consequently the analysis overestimates the cost of payments on behalf of these children.

[28] Future adjustments to the CNI are estimated by the historical average over 1998-2008.

first year (2009) and the savings grow to $62.5 million by the fifth year of the policy (2013). The total net savings over 5 years is $160 million.[29]

28.     Under Scenario B, I was asked to assume that, as a result of an increase in reimbursements, new FFH placements grow by 50 percent over the course of five years. I have further been asked to assume that of this increase in FFH placements, half come in place of group home placements and half in place of FFA placements. The results, utilizing the same methodology as in Scenario A, described above, are presented in Exhibit 10 and Exhibit 11. The net impact is a reduction in foster care program costs, meaning a savings can be achieved relative to the status quo by increasing payments to FFH providers as fewer children will need to be placed into higher cost FFA and group homes. The net savings are $7.7 million in the first year (2009) and the savings grow to $119.1 million by the fifth year of the policy (2013). The total net savings over 5 years is $309 million.

29.     For Scenario C, I have been asked to assume that as a result of the 20 percent increase in the FFH reimbursement rate, FFH placements of new entrants into foster care will grow by 25 percent. I have further been asked to assume that of this increase in FFH placements, 25 percent come in place of group home placements and 75 percent in place of FFA placements.

---

[29] Additional savings may be derived from the policy changes discussed if 1) the stays in foster care of the additional children placed in FFHs is lower than they would have been in FFAs or group homes, or 2) if the proportion of the additional children placed in FFHs coming from group homes can be increased by moving children currently in group homes into FFHs as well as new entrants.

30.     The results, again utilizing the same methodology, are presented in Exhibit 12 and Exhibit 13.  For Scenario C, the program will have a net cost of $2.8 million in the first year but by the 5th year there will be net savings of $28.4 million per year.   The total net savings over the first five years would be $62 million.

Dated:   August 12th, 2008

Phillip M. Johnson, Ph.D.



**PHIL JOHNSON, Ph.D.**
*Economist*
**Sacramento, California**
**Tel: 916 576 0366**

**EDUCATION**

Ph.D. in Economics, University of California, Los Angeles, 1997

M.A. in Economics, University of California, Los Angeles, 1993

B.A. Economics, California State University, Northridge, 1991
*cum laude*

**PROFESSIONAL EXPERIENCE**

2000-Present    Econ One Research, Inc., Sacramento, California
                *Economist*

- Perform analysis of economic issues involving intellectual property, antitrust and corporate governance.

- Manage projects, work with clients and supervise research teams.

- Prepare or assist other testifying experts in preparing reports, declarations and other materials in litigation, arbitration and consulting projects.

- Assist clients with discovery, interrogatories, document requests and preparation for opposing expert examination.

- Review public and discovery documents, construct databases and analyze data and review deposition testimony.

Phil Johnson
*Economist*
Page 2

1997-2000          <u>ITAM</u>, Mexico City
                   *Assistant Professor*

- Conducted research in microeconomics. Topics included strategic interaction of price and quality choice in complementary goods markets, innovation, and social institutions.

- Designed and taught courses in Intermediate and Advanced Microeconomics to undergraduates.

- Administrative activities included faculty recruiting and conference organization.


**PAPERS**

"Reasonable Royalty Damages and License Structure," Econ One Newsletter, Spring 2007.

"Lost Profits Damages When Infringement Raises the Patentee's Prices," *ABA IPL Newsletter*. With Tessie Su.

"A Suprising Result From Patent Infringement: Price Accretion Instead of Price Erosion," Econ One Newsletter, Spring 2005.

"Patent Damages and Price Erosion", Econ One Newsletter, Fall 2003.

"Evolution and Information in a Gift-Giving Game," *Journal of Economic Theory,* Volume 100, 2001. With David Levine and Wolfgang Pesendorfer.

"Quality-Improving Innovations in Markets with Complementary Goods." With Tessie Su and Tridib Sharma.

"Mergers, Alliance and Welfare in Differentiated Markets with Complementarity." With Tessie Su and Tridib Sharma.

"Evolution and Information in a Prisoners' Dilemma." With David Levine and Wolfgang Pesendorfer.

"The Stability of Monetary Institutions as a Social Institution."

Phil Johnson
*Economist*
Page 3

## SUMMARY OF PRIOR ENGAGEMENTS

- *Montana Food Distributors Assoc. v. International Outsourcing Services et al.,* In a case involving allegations of anticompetitive behavior and fraud by coupon processors. Prepared preliminary damages analysis. Assist expert retained to provide testimony regarding class certification, analysis of relevant markets, competitive effects, and damages. Manage case, assist in conducting analysis, directing staff, drafting reports. 2008 – present.

- *DealerTrack v. RouteOne, et al.* In a patent infringement case involving credit application aggregation systems in automotive sales. Analyzed lost profits and reasonable royalty damages and issues relating to the commercial success of the patented features of the products. Assisted in drafting damages and rebuttal reports. 2007 – present.

- *Silvaco v. Cypress Semiconductor.* In a theft of trade secrets case involving the major provider of credit and charge cards. Analyzed lost profits and unjust enrichment. Provided expert declarations relating to the analysis of defendant's data. 2007 – present.

- *Amex v. MasterCard, Visa, et al.* In a monopolization case involving the major provider of credit and charge cards. Assisted in analyzing damages issues and assisted in drafting damages and rebuttal reports. 2007 – 2008.

- *M.I., LLC v. Halliburton Energy Services, Inc.* In an attempted monopolization case involving the alleged misuse of patent on certain deepwater oil drilling fluid technology. Analyzed relevant market and damages issues. 2007 – 2008.

- *In re: Kdur Antitrust Litigation.* In a monopolization case branded and generic drugs. Assisted in drafting the report and analyzed relevant market and impact issues. 2006 – 2007.

Phil Johnson
*Economist*
Page 4

- *In re: Tricor Direct Purchaser Antitrust Litigation.* In a monopolization case involving branded and generic drugs. Assisted in drafting the report and analyzed relevant market and impact issues. 2006 – 2007.

- *In re: Nifedipine Antitrust Litigation.* In a monopolization case involving branded and generic drugs. Assisted in drafting the report and analyzed relevant market and impact issues. 2006 – 2007.

- *Columbus Drywall, et al. v. Masco Corporation.* In a price fixing conspiracy case alleged to involve a major buyer. Assisted in drafting liability report, including the analysis of economic issues relating to buyer power and buyer and manufacturer incentives as well as the analysis of inferential liability issues. 2006 – present.

- *Synopsys v. Magma.* In a patent infringement case, analyzed lost profits, reasonable royalties and unjust enrichment. 2005 – 2007.

- *The Regents of the University of California v. Monsanto.* In a patent infringement case, analyzed reasonable royalties and license structure. 2005 - 2006.

- *Pixion v. PlaceWare.* In a trade secret and patent infringement case, analyzed reasonable royalties and unjust enrichment. 2004 – 2005.

- *Novell, Inc.* Assisted counsel for Novell in a mediation with Microsoft in analyzing damages from Microsoft's alleged anticompetitive behavior in the workgroup operating system market. 2003 – 2004.

- *Affymetrix v. Agilent.* In a breach-of-contract arbitration. Analyzed damages. 2004

- *France Telecom v. Novell.* In a copyright infringement case. Analyzed lost reasonable royalties. 2003 – 2004.

- *rBST, University of California, San Francisco.* Analyzed the value of bovine growth hormone technology in the milk

Phil Johnson
*Economist*
Page 5

market to assist a patentee in a potential license negotiation. 2004.

- *DOS Class v. Microsoft.*  Assisted plaintiffs' expert in the analysis of defendant's damages models. 2003.

- *CATC v. Catalyst.* In a trade dress and copyright infringement case. Analyzed lost profits and reasonable royalties. 2002 – 2003.

- *IFPC Shareholders v. AT&T et al*.  Analyzed the option value of a lost business opportunity due to a breach of contract. 2002.

- *Martha Chapman v. El Paso Energy Corporation.*  Analyzed the nature and extent of control of El Paso Natural Gas by its parent El Paso Energy Corporation.  2001.

- *In re: Flat Glass Antitrust.*  Analyzed liability and damages issues for a price-fixing case, including industry analysis, entry barriers, concentration, firms' conduct and facilitating industry practices. 2000 – 2005.

- *In re: Methionine Antitrust Litigation.*  Analyzed class certification issues for a price-fixing case, including industry analysis, market structure and the impact of the alleged conspiracy on pricing. 2000 – 2001.

- Analyzed markets in various industries to evaluate potential allegations of price fixing conspiracies.

Exhibit 2

## List of Documents Reviewed

**Pleadings/Orders**

Complaint for Declaratory Judgment and Permanent Injunctive Relief 42 U.S.C § 1983.

**Publicly Available Documents**

California Alliance of Child and Family Services, "Foster Family Agencies: MYTH Versus FACT."
  <http://www.cacfs.org/files/advocacy/FFASMythVsFact.doc>.
California Alliance of Child and Family Services, "Group Homes for Foster Children Fact Sheet."
  <http://www.cacfs.org/files/advocacy/GroupHomeFactSheet.doc>.
California Alliance of Child and Family Services, "Foster Care and Adoptions in California Fact Sheet."
  <http://www.cacfs.org/files/advocacy/FosteCareAdoptionsFactSheet.doc>.
California Alliance of Child and Family Services, "Foster Family Agency Fact Sheet."
  <http://www.cacfs.org/files/advocacy/FFAFactSheet.doc>.
California Department of Social Services, "All County Letter No. 08-01," January 17, 2008.
  <http://www.dss.cahwnet.gov/getinfo/acl08/08-01.pdf>.
California Department of Social Services, "All County Letter No. 05-24," September 22, 2005.
  <http://www.dss.cahwnet.gov/getinfo/acl05/pdf/05-24.pdf>.
Children's Rights, National Foster Parent Association, University of Maryland School of Social Work,
  "Hitting the M.A.R.C., Establishing Foster Care, Minimum Adequate Rates for Children," October 2007.
  <http://www.childrensrights.org/pdfs/MARC/MARCSummaryReport.pdf>.
County Welfare Directors Association of California, "No Family, No Future," May 2007.
  <http://www.cwda.org/downloads/FamCarePolicyRep.pdf>.
Doyle, Joseph J. and H. E. Peters, "The Market for Foster Care: An Empirical Study of the Impact
  of Foster Care Subsidies," *Review of Economics of the Household* , Vol. 5, No. 4, pp. 329-351, December 2007.
  <http://web.mit.edu/~jjdoyle/OldFiles/www/fcare2007_doyle_peters.pdf>.
Duncan, B. and L. Argys, "Economic Incentives and Foster Care Placement," *Southern Economic Journal* ,
  Vol. 74, No. 1, pp. 114-142, 2007.
Foster Care Change in Lifetime, "Facts About Children in Foster Care in California."
  <http://childrendutyfuture.org/Issue_Papers/CA-Facts-FCM071.pdf>.
Foster, Lisa, "Foster Care Fundamentals: An Overview of California's Foster Care System," California State Library,
  December 2001.  <http://www.library.ca.gov/crb/01/08/01-008.pdf>.
Goldsmith, California Department of Social Services, Bill Analysis, Bill Number AB 2043, February 18, 1998.
Legislative Analyst's Office, "Analysis of the 2008-09 Budget Bill: Health and Social Services."
  <http://www.lao.ca.gov/analysis_2008/health_ss/hss_anl08011.aspx>.
Legislative Analyst's Office, "Children's Services and Foster Care Overview," March 16, 2005.
  <http://www.lao.ca.gov/handouts/socservices/2005/Childrens_Services_112205.pdf>.
Leyton, Jenna, "They Deserve a Family," Children's Advocacy Institute, University of San Diego School of Law,
  May 2007.  <http://www.cwda.org/downloads/CAIReport.pdf>.
U.S. Department of Health and Human Services, Administration of Children and Families, "The AFCARS Report,
  Preliminary FY 2006 Estimates as of January 2008 (14)."
  <http://www.acf.hhs.gov/programs/cb/stats_research/afcars/tar/report14.htm>.
http://cssr.berkeley.edu/ucb_childwelfare/
http://www.lao.ca.gov/

**Other Documents**

CNI vs. Rates Chart
Foster Care Rates Group Home Facility Listing Table from California Alliance of Child and Family Services,
  December 1, 2006.

Exhibit 3

# Impact of FFH Payment Increase on
# State of California Foster Care Program Cost
# 2009 - 2013

|  | Net Savings | | |
|---|---|---|---|
|  | Scenario A | Scenario B | Scenario C |
|  | (Dollars) | | |
|  | (1) | (2) | (3) |
| 2009 | $ 1,780,887 | $ 7,717,304 | $ (2,766,925) |
| 2010 | 15,401,502 | 31,261,592 | 3,859,855 |
| 2011 | 32,237,596 | 60,872,702 | 12,386,325 |
| 2012 | 48,023,691 | 90,178,614 | 20,590,013 |
| 2013 | 62,480,859 | 119,107,099 | 28,354,920 |
| Total | $ 159,924,534 | $ 309,137,311 | $ 62,424,188 |

Sources: Col. (1): See Exhibit 9.
Col. (2): See Exhibit 11.
Col. (3): See Exhibit 13.

Privileged and Confidential

Econ One
8/12/2008

Exhibit 4

**Placements of Children into California's Out-of-Home Foster Care Programs**





Source:   http://cssr.berkeley.edu/ucb_childwelfare.

Privileged and Confidential

Exhibit 5



Source: http://cssr.berkeley.edu/ucb_childwelfare.

Privileged and Confidential

Exhibit 6

## Placements of Children into Out-of-Home Foster Care Programs
## 1998-2007

| | FFH | | FFA | | Group Homes | | Total |
|---|---|---|---|---|---|---|---|
| | (Number) | (Percent) | (Number) | (Percent) | (Number) | (Percent) | (Number) |
| | | (1)/(7) | | (3)/(7) | | (5)/(7) | (1)+(3)+(5) |
| | (1) | (2) | (3) | (4) | (5) | (6) | (7) |
| 1998 | 10,804 | 55.2 % | 6,083 | 31.1 % | 2,702 | 13.8 % | 19,589 |
| 1999 | 9,839 | 54.3 | 6,384 | 35.2 | 1,913 | 10.5 | 18,136 |
| 2000 | 10,704 | 52.9 | 7,586 | 37.5 | 1,945 | 9.6 | 20,235 |
| 2001 | 10,090 | 49.4 | 8,260 | 40.5 | 2,066 | 10.1 | 20,416 |
| 2002 | 10,154 | 46.6 | 8,967 | 41.1 | 2,686 | 12.3 | 21,807 |
| 2003 | 9,647 | 43.6 | 9,070 | 41.0 | 3,416 | 15.4 | 22,133 |
| 2004 | 8,650 | 38.2 | 10,800 | 47.7 | 3,204 | 14.1 | 22,654 |
| 2005 | 7,626 | 32.7 | 12,413 | 53.2 | 3,303 | 14.2 | 23,342 |
| 2006 | 6,908 | 29.5 | 13,151 | 56.2 | 3,330 | 14.2 | 23,389 |
| 2007 | 6,271 | 27.8 | 13,147 | 58.4 | 3,107 | 13.8 | 22,525 |
| **Total (1998-2002)** | **51,591** | **51.5 %** | **37,280** | **37.2 %** | **11,312** | **11.3 %** | **100,183** |
| **CAGR (1998-2007)** | | | | | | | **1.6 %** |

Source: http://cssr.berkeley.edu/ucb_childwelfare.

Privileged and Confidential

Econ One
8/12/2008

Exhibit 7

# FFH Reimbursement Rate
## Nominal vs. Real
## 2001 - 2008

| Year | CNI Adjustment (Percent) | CNI Index 2001 Base | Average Reimbursement Rate (Dollars) | | Real Reimbursement as a % of 2001 (Percent) | Real Decline Since 2001 |
| | | | Nominal | Real | | |
| | | | | (3) / [ (2) / 100 ] | (4) / (A4)*100 | 1 - (5) |
| | (1) | (2) | (3) | (4) | (5) | (6) |
| A. 2001 | 5.3 % | 100.0 | $ 505 | $ 505 | 100.0 % | 0.0 % |
| B. 2002 | 3.7 | 103.7 | 505 | 487 | 96.4 | 3.6 |
| C. 2003 | 3.5 | 107.3 | 505 | 471 | 93.2 | 6.8 |
| D. 2004 | 2.8 | 110.3 | 505 | 458 | 90.7 | 9.3 |
| E. 2005 | 4.1 | 114.8 | 505 | 440 | 87.1 | 12.9 |
| F. 2006 | 3.8 | 119.1 | 505 | 424 | 84.0 | 16.0 |
| G. 2007 | 3.7 | 123.5 | 505 | 409 | 81.0 | 19.0 |
| H. 2008 | 5.3 | 130.0 | 530 | 408 | 80.7 | 19.3 |
| **Average** | **4.0 %** | | | | | |

Source: Col. (1): CNI vs. Rates Chart.
　　　Col. (3), Rows (A)-(G): California State Department of Social Services, "All County Letter No. 05-24"
　　　　　<http://www.dss.cahwnet.gov/getinfo/acl05/pdf/05-24.pdf>.
　　　Col. (3), Row (H): California State Department of Social Services, "All County Letter No. 08-01"
　　　　　<http://www.dss.cahwnet.gov/getinfo/acl08/08-01.pdf>.

Note: Col (3) numbers are the basic rate averaged across all age groups.

Privileged and Confidential

Econ One
8/12/2008

Exhibit 8



**Actual and Projected Placements of Children into California's
Out-of-Home Foster Care Programs**

**Scenario A**

| | 2013 |
|---|---|
| FFH: | 46.6% |
| FFA: | 41.1% |
| Group Homes: | 12.3% |

Source: 1998-2007: (Actual - Solid Lines),  http://cssr.berkeley.edu/ucb_childwelfare.
2008-2013: (Projections - Dashed Lines).

Privileged and Confidential

Econ One
8/12/2008

Exhibit 9

# Forecasted Impact of Foster Family Home Payment Increase on Foster Placements
## Scenario A

| Year | FFH Share of Placements | Savings (Cost) from Rate Increase | Savings (Cost) from Increased FFH Share of Placements | Net Savings (Cost) |
|------|------|------|------|------|
| | (Percent) | (Dollars) | | |
| | (1) | (2) | (3) | (2)+(3) (4) |
| 2008 | 27.8 % | | | |
| 2009 | 31.6 | $ (9,288,368) | $ 11,069,255 | $ 1,780,887 |
| 2010 | 35.3 | (13,635,270) | 29,036,772 | 15,401,502 |
| 2011 | 39.1 | (19,569,119) | 51,806,714 | 32,237,596 |
| 2012 | 42.8 | (27,286,503) | 75,310,194 | 48,023,691 |
| 2013 | 46.6 | (37,020,721) | 99,501,580 | 62,480,859 |
| **Total** | | | | **$ 159,924,534** |

Privileged and Confidential

Exhibit 10



**Actual and Projected Placements of Children into California's
Out-of-Home Foster Care Programs**

**Scenario B**

Source: 1998-2007: (Actual - Solid Lines),  http://cssr.berkeley.edu/ucb_childwelfare.
2008-2013: (Projections - Dashed Lines).

Privileged and Confidential

Econ One
8/12/2008

Exhibit 11

# Forecasted Impact of Foster Family Home Payment Increase on Foster Placements
## Scenario B

| Year | FFH Share of Placements | Savings (Cost) from Rate Increase | Savings (Cost) from Increased FFH Share of Placements | Net Savings (Cost) |
|------|---|---|---|---|
| | (Percent) | (Dollars) | | |
| | | | | (2)+(3) |
| | (1) | (2) | (3) | (4) |
| 2008 | 27.8 % | | | |
| 2009 | 30.6 | $ (9,017,148) | $ 16,734,452 | $ 7,717,304 |
| 2010 | 33.4 | (12,755,818) | 44,017,410 | 31,261,592 |
| 2011 | 36.2 | (17,696,849) | 78,569,551 | 60,872,702 |
| 2012 | 39.0 | (23,982,919) | 114,161,532 | 90,178,614 |
| 2013 | 41.8 | (31,788,918) | 150,896,017 | 119,107,099 |
| **Total** | | | | **$ 309,137,311** |

Privileged and Confidential

Exhibit 12



**Actual and Projected Placements of Children into California's
Out-of-Home Foster Care Programs**

Scenario C

Source: 1998-2007: (Actual - Solid Lines),  http://cssr.berkeley.edu/ucb_childwelfare.
2008-2013: (Projections - Dashed Lines).

Exhibit 13

# Forecasted Impact of Foster Family Home Payment Increase on Foster Placements
## Scenario C

| Year | FFH Share of Placements | Savings (Cost) from Rate Increase | Savings (Cost) from Increased FFH Share of Placements | Net Savings (Cost) |
|---|---|---|---|---|
| | (Percent) | (Dollars) | | |
| | (1) | (2) | (3) | (2)+(3) (4) |
| 2008 | 27.8 % | | | |
| 2009 | 29.2 | $ (8,623,089) | $ 5,856,164 | $ (2,766,925) |
| 2010 | 30.6 | (11,481,142) | 15,340,996 | 3,859,855 |
| 2011 | 32.0 | (14,979,973) | 27,366,298 | 12,386,325 |
| 2012 | 33.4 | (19,195,701) | 39,785,714 | 20,590,013 |
| 2013 | 34.8 | (24,210,299) | 52,565,219 | 28,354,920 |
| **Total** | | | | $ 62,424,188 |