```
 1                  UNITED STATES DISTRICT COURT
 2                 NORTHERN DISTRICT OF CALIFORNIA
 3                     SAN FRANCISCO DIVISION
 4
 5   California State Foster Parent    )  Case No. C 07 5086 WHA
     Association, California State     )
 6   Care Providers Association, and   )  ORIGINAL
     Legal Advocates for Permanent     )
 7   Parenting,                        )
                                       )
 8              Plaintiffs,            )
                                       )
 9         vs.                         )  DEPOSITION OF
                                       )
10   JOHN A. WAGNER, Director of the   )  SHEILAH DUPUY
     California Department of Social   )
11   Services, in his official         )
     capacity; MARY AULT, Deputy       )
12   Director of the Children and      )
     Family Services Division of the   )
13   California Department of Social   )
     Services, in her official         )
14   capacity,                         )
                                       )
15              Defendants.            )
     _____)
16
17         TAKEN ON:  TUESDAY, MARCH 4, 2008
18         TAKEN AT:  400 CAPITOL MALL, SUITE 2600
                      SACRAMENTO, CALIFORNIA
19
           REPORTER:  KEVIN C. ADAMS-CARTER
20                    CSR NUMBER 8468
21
22
23
24
25
                                                               1
```

1  supervised would review those applications, make sure that
2  we had documentation necessary to ensure state and federal
3  eligibility according to our regulations, request
4  additional information if needed, and then establish the
5  rates.
6      Q.  Now, when you say make sure they had documentation
7  for state and federal eligibility, what kind of
8  documentation are you referring to?
9      A.  For example, providers are required to be
10 non-profit organizations in California, so we would ask for
11 proof of their non-profit status.
12     Q.  Can you think of more examples?
13     A.  For a group home rate setting providers were
14 responsible for projecting out the level of care and
15 services they intended to provide.
16     Q.  Was there any documentation specific for foster
17 family homes?
18         MR. PRINCE:  Objection; foundation.  You may
19 answer.
20         THE WITNESS:  The staff that I supervised did not
21 set rates for foster family homes.
22 BY MR. TABESH:
23     Q.  Is that -- is that true through your entire time
24 you were foster rates bureau chief, 2001 to 2007?
25         MR. PRINCE:  Objection, vague.

46

1          THE WITNESS:  As the bureau chief, is that what
2     you asked?
3     BY MR. TABESH:
4          Q.  Well, during your -- during the time period of
5     2001 to 2007.
6          A.  Yes, that's correct.
7          Q.  Do you know who was responsible for setting rates
8     for foster family homes during that time period?
9          A.  The counties.  I -- the -- the rate structure for
10    foster family homes is specified in statute.
11         Q.  Uh-huh.
12         A.  And it varies according to the age of the child.
13              I mean, I'd like to correct that.  I guess, in my
14    ==mind the counties don't even set the rates.==  ==Again,== ==the==
15    ==rates are specified in statute;== ==therefore,== ==if you're a==
16    county placing in a foster family home and you have a child
17    of a certain age, that rate is -- is already established.
18         Q.  Well, in paragraph six where you write "I
19    supervise a group of individuals responsible for setting
20    rates for group homes and foster family agencies," what do
21    you mean by "foster family agencies"?
22         A.  A foster family agency is a -- trying to think how
23    to describe it -- it's a non-profit organization, at least
24    in California, that certifies foster family homes to
25    provide services to children placed in out-of-home care.

                                                              47

1  you or anyone under your supervision -- does you or anyone
2  under your supervision do any studies to determine whether
3  any of these particular -- whether the payments made to
4  foster care providers are sufficient to cover any of these
5  particular categories?
6          MR. PRINCE:  Well, foundation, ambiguous,
7  compound, but you may answer if you have an understanding.
8          THE WITNESS:  Have we -- can you just ask me that
9  again?  Have we done any --
10 BY MR. TABESH:
11     Q.  Sure.  Do -- did -- do you or anyone you supervise
12 do any studies to determine whether the payments that you
13 make to foster care providers cover, for example, the cost
14 of food?
15     A.  Neither myself nor my staff have ever done such a
16 study.
17     Q.  And how about -- how about with respect to
18 clothing?
19     A.  Neither my nor my staff have done studies on any
20 of these items.
21     Q.  So on no particular item did you or your staff do
22 any studies to --
23     A.  (Affirmative nod.)
24     Q.  Okay.  Are you familiar with the term foster care
25 maintenance payments?

62

1    MR. PRINCE: Form of the question. And I think
2 she's already tes -- well --
3    THE WITNESS: Yes. I said it was some measure of
4 cost of living something.
5    MR. TABESH: Okay. And then --
6    THE WITNESS: I don't -- I don't -- I'm not an
7 expert in what the CNI is.
8 BY MR. TABESH:
9    Q. Okay. But the California Necessities Index is
10 specifically cited in -- in this statute?
11    A. Correct.
12    Q. And it is -- is it your -- is it one of your
13 duties to implement the -- this statute?
14    A. Yes, it's my responsibility to implement what's
15 statutorily mandated.
16    Q. And if the statute says shall be adjusted by the
17 percentage changes in the California Necessities Index, I
18 just want to confirm, does your department adjust the
19 percentage changes in the California Necessities Index on a
20 annual basis?
21    MR. PRINCE: Okay. I'm gonna object to the
22 question on the same basis as before. You're asking her to
23 interpret a statute. You're asking for her to make a legal
24 conclusion and I will instruct her not to answer this
25 question because it's not appropriate given her role here

69

1    she can just give me an introduction of what she's
2    attempting to describe in paragraph seven.  And I can get
3    to more specific questions after that.
4            MR. PRINCE:  Well, I think it would be helpful if
5    you went to a specific question now because, again, the
6    paragraph talks about what it talks about.
7    BY MR. TABESH:
8        Q.  All right.  You talk about annual -- lines 11 and
9    12 -- annual CNI-based rate increases for group homes would
10   become a discretionary item in the state budget process.
11           What did you mean by annual CNI rate increases?
12       A.  What I meant is if there was a rate increase it
13   would be a discretionary item in the state budget process
14   subject to the legislature making that determination.
15       Q.  So, when you talk about discretionary that's
16   specific to the state legislature?
17       A.  Yes.
18       Q.  Is there any discretion exercised on the part of
19   you or anyone you supervise in this process?
20       A.  No.
21       Q.  Okay.  If you'd please turn -- turn to paragraph
22   ten.  Now this is referring to Welfare and Institutions
23   Code Section 11462(g)(2).  And I will provide you a copy of
24   that.
25           Introduce the next exhibit, which is California

73

1      Q.  Well, for example, does the federal government
2  provide any funds?
3      A.  For a foster care maintenance payment, yes.
4      Q.  Okay.
5      A.  The federal government pays a share of a foster
6  care maintenance payment for an otherwise federally
7  eligible child.
8      Q.  And how much does the federal government pay, what
9  percentage?
10     A.  On a federally eligible child they would pay 50
11 percent.
12     Q.  And what percentage would the state pay?
13     A.  The state and counties split the remaining 50
14 percent.
15     Q.  Do you know what the division is?
16     A.  ~~60/40.~~ [handwritten: 60% County / 40% State]
17     Q.  60/40.
18     MR. TABESH:  Take a five-minute break so I can get
19 this questioning correct.
20     MR. PRINCE:  Okay.
21     THE VIDEOGRAPHER:  Off the record.  1:45.
22     (Brief recess.)
23     THE VIDEOGRAPHER:  We're back on the record at
24 1:56.
25     (Ms. Davis rejoined the proceedings.)

75

```
 1   BY MR. TABESH:
 2       Q.  All right.  So previously I think you testified
 3   that the legislature sets the rates for payments to foster
 4   care providers.
 5       A.  I think we were talking -- I thought we were
 6   talking about who appropriates the funds because you said
 7   what does the funds mean.
 8       Q.  Right.  Well, even before that.  Like starting a
 9   new line of questioning.  Just want to establish that, you
10   know -- okay, well -- who -- who sets the -- who sets the
11   rates for payments to the foster care -- foster family
12   homes?
13           MR. PRINCE:  Vague as to time.  Talking about
14   current time or historically or --
15           MR. TABESH:  Between 2001 and 2007.
16           MR. PRINCE:  Ambiguous.  That's a six-year time
17   frame.  I mean, if it hasn't changed and you can answer it
18   that's fine.
19           THE WITNESS:  The rates for foster family homes
20   are established in statute.
21   BY MR. TABESH:
22       Q.  In statute.  Does your organization provide any
23   input to the legislature as to whether rate changes are
24   necessary?
25           MR. PRINCE:  Asked and answered.
```

                                                                76

```
 1            THE WITNESS:  I would need to know what it -- what
 2   it is, as well as when you say you have never been asked,
 3   meaning myself, my staff?
 4   BY MR. TABESH:
 5       Q.  You or your staff been asked to -- been asked by
 6   the legislature -- well, no, I guess that's a little bit
 7   different question.
 8            Have -- have you or your staff ever come forward
 9   with information to the legislature indicating that the
10   amount of reimbursement for care and supervision of foster
11   children is insufficient in any way?
12            MR. PRINCE:  Well, objection; foundation and
13   assumes facts.  You may answer.
14            THE WITNESS:  Well, neither myself nor my staff
15   would provide or has provided testimony to the legislature.
16   BY MR. TABESH:
17       Q.  Any written documents?
18            MR. PRINCE:  Aside from what she's already
19   testified about in terms of the SB 370 reports?
20            MR. TABESH:  Yes.
21            THE WITNESS:  I believe there was one other
22   report to the legislature on foster family home/foster
23   family agency placements.
24            MR. TABESH:  Excuse me.  I'm getting some cell
25   phone-type interference.  I don't know if anyone's got one
```

80

```
 1        Q.  Would this fall under --
 2        A.  I -- I don't know.
 3        Q.  Okay.  Have you ever sat in on any legislative
 4   hearings con -- regarding rate increases paid to foster
 5   care providers?
 6        A.  I don't recall sitting in in any hearings
 7   regarding rate increase.
 8        Q.  Have you ever read any hearing transcripts on --
 9   about rate increases to foster care providers?
10        A.  I don't remember ever seeing any legislative
11   transcripts.
12        Q.  Do you have any understanding of how the
13   legislature sets the rates for foster care parents on -- on
14   what information it bases its decisions on?
15        A.  Repeat your question.
16        Q.  Do you have an un -- well, do you have an
17   understanding of how the legislature sets the rates for
18   reimbursements of payments to foster care parents?
19        A.  If this is my personal understanding of the
20   budgetary process, my understanding of the budgetary
21   process is the legislature considers the various programs
22   underneath its responsibility.  Whether it's health,
23   education, foster care, any other program, they take a look
24   at the existing budget that's in place, they decide, based
25   on public testimony and testimony of others, whether
```