# They Deserve a Family

*Higher Foster Family Home Rates Could Lead to
Better Outcomes, Including More Adoptions,
for California's Foster Children*





## Children's Advocacy Institute
### UNIVERSITY OF SAN DIEGO SCHOOL OF LAW

WRITTEN BY JENNA LEYTON

MAY 2007

# Children's Advocacy Institute

UNIVERSITY OF SAN DIEGO SCHOOL OF LAW

## CAI Council for Children

Gary Redenbacher, Chair
Gary Richwald, MD, MPH, Vice-Chair
Robert L. Black, MD
John Goldenring, MD, MPH
Louise Horvitz, MSW, PsyD
Hon. Leon S. Kaplan

James McKenna
Thomas A. Papageorge
Blair Sadler
Gloria Perez Samson
Alan Shumacher, MD
Owen Smith

## CAI Staff

**Robert Fellmeth** *Executive Director*
*Price Professor of Public Interest Law*

**Elisa Weichel** *Administrative Director*
**Ed Howard** *Senior Counsel*
**Christina Riehl** *Staff Attorney*
**Melanie Delgado** *Staff Attorney*
**Kriste Draper** *Equal Justice Works Fellow*
**Kathy Self** *Executive Assistant*
**Marissa Martinez** *Executive Assistant*
**Lillian Clark** *Executive Assistant*
**Christina Falcone** *Executive Assistant*

## CAI Contact Information

5998 Alcalá Park ◆ San Diego, California 92110
Phone: (619) 260-4806 ◆ Fax: (619) 260-4753

717 K Street, Suite 509 ◆ Sacramento, CA 95814
Phone: (916) 444-3875 ◆ Fax: (916) 444-6611

info@caichildlaw.org ◆ www.caichildlaw.org

## About the Children's Advocacy Institute

The University of San Diego School of Law's Children's Advocacy Institute (CAI) was founded in 1989 to improve the health, safety, and well-being of children. CAI advocates in the legislature to make laws, in the courts to interpret laws, before administrative agencies to implement laws, and before the public to educate and build support for laws to improve the status of children. In addition to its advocacy program, CAI operates an academic program, providing a combination of classroom instruction and clinical training in child advocacy to USD law students.

## About the Report

This report was researched and written by Jenna Leyton, a third-year student at the USD School of Law participating in the Child Advocacy Clinic offered through USD's Children's Advocacy Institute.

© 2007 by the Children's Advocacy Institute.

# They Deserve a Family

### *Higher Foster Family Home Rates Could Lead to Better Outcomes, Including More Adoptions, for California's Foster Children*



**Children's Advocacy Institute**

## Table of Contents

Executive Summary .................................................................................................................i

I.     Low Family Foster Care Rates Lead to Poorer Outcomes ........................................................1

II.     Higher Family Foster Care Rates Lead to More Adoptions .....................................................3

III.     Current Foster Family Home Rates Are Inadequate .................................................................5

IV.     California's Efforts to Address the Needs of Foster Youth .......................................................9

V.     CAI's Proposal ........................................................................................................... 11

VI.     The Ongoing Fight for Family Foster Care Rate Increases: The Time to Act is Now! ...... 16

VII.     Conclusion .................................................................................................................. 17

Endnotes .................................................................................................................................. 18

*This page intentionally left blank.*

FP000004

# Executive Summary

When children are removed from their homes due to abuse or neglect, every effort is made to place them with a relative or non-related extended family member. In some cases, however, kinship placement is not available, and foster and/or adoptive homes become the next best and most suitable placements for these children.

Foster families provide care and supervision to foster children and are an important alternative to placing children in more costly institutional settings such as group homes. Foster parents also work in partnership with county social workers, helping to identify and resolve the ongoing needs of children, and facilitating their receipt of important mental and medical services.

Unfortunately, the State's efforts to recruit, retain and support these caregivers is woefully inadequate. California has not increased reimbursement rates for foster family home placements since 2001 despite a legislative mandate to do so and a 24.9% increase in the cost of living since that time.

## Foster Placement Matters

The biggest challenge currently facing the State's foster care system is the necessity of finding stable, appropriate placements for all foster children, regardless of their background or special needs.

Research indicates that children who grow up in stable, consistent family environments fare much better than those who suffer disruptions in placement or are placed in settings with a high turnover of adult supervisors. Current statistics indicate, however, that of the nearly 80,000 children in California's foster care system, fewer than 50% are placed with relatives or in stable foster family homes. Sadly, these numbers suggest that a large number of foster youth are placed in institutional settings.

## California Must Act to Protect Its Most Vulnerable Citizens

Given the current shortcomings of California's foster care system, legislators have not only the opportunity, but also the duty, to act on behalf on the State's children. It is absolutely imperative that basic foster care rates be raised. Even a modest increase in the monthly stipend paid to foster parents would both decrease the likelihood of foster children being "bounced around" to multiple foster homes and increase the likelihood that such children will be placed geographically near to their biological siblings.

Despite recent legislative efforts to address the needs of foster youth, no recent action on the part of California's lawmakers specifically provides increased financial assistance for foster parents. Thus, legislators must take additional steps to make the goal of providing appropriate, loving foster care placements for all foster children a reality.

i

**CAI's Proposal: Increase Foster Family Home Availability**

The Children's Advocacy Institute (CAI) is proposing that California take three crucial steps in an effort to improve outcomes for foster youth. Under CAI's proposal, the Legislature would (1) increase basic foster care rates by 25%, (2) establish a new office within the Department of Social Services (DSS) dedicated solely to recruiting and retaining foster parents, and (3) create a community college certification program aimed at preparing individuals to properly care for foster children with varying backgrounds and needs.

CAI believes that each of these steps is essential to ensuring that the supply of quality foster family homes within the State becomes and remains constant, thereby allowing children who were once abused and neglected to enjoy some degree of stability and normality in their lives.

**AB 324 (Beall) Is a Step in the Right Direction**

AB 324 (Beall) is similar to CAI's proposal in that it seeks to raise California's basic family foster care rates and increase foster parent recruitment and retention. As amended March 22, 2007, AB 324 would increase the reimbursement rate for children in family foster care by 5% effective January 1, 2008, require future increases through the 2011–12 fiscal year based on percentage changes in the CNI; and create within DSS the Foster and Adoptive Parent Recruitment, Retention, and Support Program aimed at encouraging the recruitment and retention of quality foster caregivers.

Although the proposed rate increases under AB 324 would not completely compensate for the State's previous failure to raise rates in accordance with the 25% CNI increase that occurred between 2001 and 2007, CAI recognizes that the bill puts California on the road to ensuring high quality family foster care placements, more placement choices, and better adoption prospects. Therefore, CAI strongly supports AB 324.

**Expected Long-Term Benefits for Foster Placements and Adoption Prospects**

CAI is confident that an increase in basic foster care rates accompanied by greater efforts to recruit and retain foster parents will precipitate various positive effects, including the following:

► *Less foster care "drift" (multiple placements).* Fewer foster children will be "bounced around" to multiple foster homes in geographically distant locations, instead enjoying more stable placements with local "high quality" foster parents.

► *A decrease in group home placements.* Fewer foster children will be forced to endure the psychological stress and development delays that tend to plague children placed in institutional settings.

► *More kin placements and adoption.* Under the State's Adoption Assistance Program, subsidies provided to certain adoptive parents are directly tied to basic foster care rates. Thus, higher foster care rates will not only augment the supply of foster parents, but will also increase available adoption assistance, the adoption rate, and the State's likelihood of receiving federal adoption incentive funds, which can be channeled back into the foster care system.

FP000006

## I. LOW FAMILY FOSTER CARE RATES
## LEAD TO POORER OUTCOMES

As of January 1, 2006, California had 77,723 children in foster care.[1] Of these nearly 78,000 children, only 47% have been placed with relatives or in foster family homes;[2] only 46.8 % have been placed in foster homes with all of their siblings;[3] and only 2.5% have attained "pre-adopt" status.[4]  The biggest challenge currently facing the foster care system is finding stable, appropriate placements for all foster children, regardless of their background and/or special needs. Researchers have documented the value of children growing up in stable families with consistent caregivers, and developmental theory suggests that children fare much better with stable family caregivers than when raised in institutional settings where staff members work in shifts and frequently change jobs.[5]

Out-of-home placement is typically associated with numerous disruptions in attachment relationships. These losses and lack of permanence undermine a child's attempt to form a secure attachment with a primary caregiver.[6] The more changes in caregivers children in foster care experience, the more likely they are to exhibit oppositional behavior. Disruptions in attachment relationships can also lead to Reactive Attachment Disorder of Infancy, or other disorders in which the child exhibits severe disturbances in relationships with caregivers.[7] Moreover, psychiatric emergencies among children in foster care are often precipitated by disruptions in their attachment relationships with foster parents.[8]

Unfortunately, current foster care rates in California are set too low to generate a sufficient supply of loving family foster care parents able to give all foster children a stable home life. Instead, a large number of these children, who have already suffered the trauma of being separated from their biological parents (and often siblings as well), are bounced around to multiple foster homes or are put in more expensive, and far less personal, group home placements. Additionally, because many California counties do not have an adequate supply of foster care to meet demand, they have increasingly placed foster children in geographically distant counties. Out-of-county placements are difficult for officials to monitor and can complicate efforts to provide children with needed services and family visitation, including with siblings.[9]

According to a 2003 study performed by the Little Hoover Commission, during the year 2000, 43% of foster care children entering the system that year were moved three or more times, while 11% were moved five or more times.[10]  Sadly, studies show that children with multiple placements are more likely to incur higher mental health costs than children in more secure placements.  Foster care placement volatility is strongly associated with greater child hostility and behavioral problems, and children without significant problems typically fare better in a single kinship or foster family placement.[11] Moreover, children in less stable placements are more likely to have higher medical costs in general.[12] Put simply, children have much better outcomes if their family lives are stable, regardless of the overwhelming influence of poverty and other associated risk factors.[13]

With respect to group homes, children placed in these institutions are often unable to form a consistent relationship with a caregiver and are at serious risk for developmental problems and long-

1

term personality disorders.[14]  Group homes are often a less ideal placement for many foster children, as they do not provide the same "family" environment that may promote stability and/or "normalcy" in the child's life. In fact, research indicates that adults who were placed in group homes as adolescents have lower educational attainment, lower employment probabilities, and report lower self-esteem and happiness than similar adults raised in foster family homes.[15] According to Elizabeth Bartholet,[16] an attorney, writer, and Public Interest Professor of Law at Harvard University, "worldwide, the experience with institutions over the years has proved almost uniformly disastrous for children. Numerous studies demonstrate the harm children suffer when they are raised without the intensely loving attachments that characterize healthy family relationships. New evidence has surfaced in recent years as children have been adopted from orphanages abroad, and doctors and research scientists have begun to document the permanent damage many of them have suffered by virtue of their early deprivation."[17]

Moreover, group home placements are typically more expensive, meaning that the state may expend unnecessary funds in the long run simply because there is an insufficient supply of foster family homes.[18]  Stretched funds ultimately mean less money going into adequate training, monitoring and supervision of parents already within the system.

In light of these outcomes, it is imperative that basic foster care rates be raised so that more individuals become willing — and able — to care for these children, thus increasing the overall supply of foster family homes. Essentially, a larger supply of foster family homes would lead to less foster care drift (*i.e.*, multiple placements) and a greater opportunity for foster children to be placed in the same foster home as their biological siblings.  However, as is explained below, these would not be the only benefits of a rate increase.



2

## II. HIGHER FAMILY FOSTER CARE RATES LEAD TO MORE ADOPTIONS

Because the basic foster care rate is tied to payments provided through California's Adoption Assistance Program, and because a relatively large percentage of adopted children are adopted by their foster parents, an increase in the basic foster care rate would stimulate adoptions as well, in turn improving the State's chance of once again collecting federal adoptive incentive monies.

**Federal Adoptive Incentive Funds.** In 1997, Congress passed the Adoptions and Safe Families Act (ASFA), which required states to move quickly to find permanent homes for children in foster care. In addition, ASFA provided annual bonuses to states that increased their adoptions from one year to the next. Reauthorized in 2003 as the Adoption Promotion Act, this legislation currently authorizes $43 million in performance-based incentives for states that are successful in increasing the number of children, age nine and older, who are adopted.[19]

In the past, California had success in collecting these federal bonuses, receiving $17.6 million for increasing adoptions by 140% in 2000 and another $4.38 million in 2001.[20] In recent years, however, the number of adoptions has declined to the point where the State is no longer eligible to receive these incentive funds. Moreover, the federal incentive funds received for increasing adoptions in certain years were not passed through to the counties for the following fiscal year. Instead, these funds were given to the counties *in lieu of* state general funds, resulting in a loss to the counties because they could not receive matching funds from the federal government for state expenditures.[21]

Ironically, the stagnation of the State's efforts to encourage adoption comes at a time when the incentive to provide as much funding as possible to counties to promote this goal can be most clearly linked to the benefits derived from providing greater funds to foster parents.

According to a study performed by the U.S. Department of Health and Human Services' Administration for Children and Families, approximately 51.5% of adopted children in California are adopted by their foster parent(s).[22] However, these adoptions do not come without their own monetary incentives. That is, a very large percentage[23] of individuals who make the transition from foster parent to adoptive parent are able to do so because they receive adoption subsidies through the Adoption Assistance Program.

**Adoption Assistance Program (AAP).** The AAP was established in 1982 to provide monthly cash grants to parents who adopt children who have at least one of the following characteristics, which are considered barriers to adoption:[24]

> (1) adoptive placement without financial assistance is unlikely because of membership in a sibling group that should remain intact, or by virtue of race, ethnicity, color, language, age of three years or older, or parental background of a medical or behavioral nature that can be determined to adversely affect the development of the child.

3

(2) adoptive placement without financial assistance is unlikely because the child has a mental, physical, emotional, or medical disability that has been certified by a licensed professional competent to make an assessment and operating within the scope of his or her profession.

Adoptive parents receive these grants until their child is 18 years of age or until age 21 if the child has a chronic condition or disability that requires extended assistance and the adopted children remain eligible for Medi-Cal benefits as long as their adoptive parents are receiving an Adoption Assistance grant on their behalf.

Under this program, adoptive parents may receive up to the same amount of money they would have received had they simply been foster parents providing a foster family home. Although the total AAP amount provided for each individual child is negotiated based upon the needs of the child and the circumstances of the adoptive family, any increase in basic foster care rates would also theoretically increase the maximum amount that children could receive through AAP as well.

Thus, based on the current structure of federal and state adoption incentives and subsidies, an increase in basic foster care rates would have a cyclical effect: not only would higher rates increase the initial supply of foster parents, but they would also increase AAP rates, thereby spurring more adoptions. A higher adoption rate would, in turn, increase the State's likelihood of receiving federal adoption incentive monies, which could then be channeled back into the system to provide additional foster care funding and/or supports.



4

<div style="border:1px solid black; text-align:center">

## III. CURRENT FOSTER FAMILY HOME RATES ARE INADEQUATE

</div>

Unfortunately, the basic rate that the state of California currently pays to foster family home parents is *wholly inadequate* to promote the major goals of placement stability and adoption.

**California's Foster Care Rate Structure**. California's foster care rate system is currently comprised of two separate funding sources: federal and state. Most of California's children (over 80%) are eligible and receive federal funding. Children who are not federally eligible are served under the state program with state general funds. The primary difference between federal and state foster care programs is that children who receive federal funds must meet specific income and other eligibility criteria that link them to the Temporary Assistance for Needy Families (TANF) program.

►*Federal Funding: Title IV-E.* Title IV-E is a subpart of Title IV of the federal Social Security Act. This program provides federal reimbursement to states for the costs of children placed in foster homes or other types of out-of-home care under a court order or voluntary placement agreement. Title IV-E benefits are an individual entitlement for qualified children who have been removed from their homes.[25]

There are two major concepts within the Title IV-E program that determine whether federal reimbursement can be claimed for a child: e*ligibility* and *reimbursability*. Some children in care are not eligible, some are eligible but not reimbursable, and some are both eligible and reimbursable. A child must be eligible in order to be reimbursable. The determination of IV-E eligibility and reimbursability for the child allows the state to claim federal IV-E reimbursement for the child's maintenance costs. Title IV-E eligibility also allows the state to obtain federal reimbursement for administrative and training costs associated with the child.

Initial IV-E *eligibility* is based on information obtained when the child is initially removed from his or her home and the child welfare agency obtains legal responsibility for the child. Generally, the home from which the child was removed must have received Aid to Families with Dependent Children (AFDC—now TANF) benefits in the month the removal petition was filed or in any of the six months prior, or would have received such benefits had an application been filed.[26] That is, states receive federal Title IV-E funding only for children whose *biological* families would have been eligible for AFDC as the program existed July 16, 1996.[27] Once a child is determined initially eligible, IV-E eligibility must be re-determined annually for the child over the duration of the out-of-home care episode.

If a child is determined not eligible, then the child is IV-E ineligible for the duration of the out-of-home care episode. If a child returns home for more than six months or if the agency's legal responsibility ends while the child is home, a new episode begins when the child re-enters out-of-home care and a new IV-E eligibility determination must be conducted.

FP000011

The child must be determined IV-E eligible *and reimbursable* for the state to claim IV-E reimbursement for the maintenance costs of the child. The agency managing the child's case and the court must meet certain IV-E procedural requirements for the child to be reimbursable. Additionally, the child's placement must be with a reimbursable provider or facility to claim IV-E reimbursement and the care provider must also be licensed in a timely manner for the child's maintenance costs to be reimbursable.[28]

Federal reimbursement is provided at different rates for (1) maintenance payments to foster families, covering the costs of shelter, food, and clothing; (2) placement and administrative costs, including case management, eligibility determinations, licensing and court preparation; and (3) training for staff and foster parents.[29]

▶ ***Federal Funding: Title IV-B.*** Title IV-B of the federal Social Security Act is another source of foster care funding. In fact, programs authorized by Title IV-B are the most flexible source of dedicated child welfare funds. While states must match Title IV-B funds with a 25% share of nonfederal funding, the law does not impose any federal income or other eligibility restrictions on which families may be served with these funds.

Subpart I of title IV-B, known as the "Child Welfare Services Program," authorizes matching grants to states for a broad array of child welfare services. Subpart I funding is discretionary, meaning that actual funding levels are determined by the annual appropriations process.[30]

Funding under Subpart II of Title IV-B, entitled "Promoting Safe and Stable Families," may be used for four broad types of services: (1) prevention, (2) family preservation, (3) time-limited reunification, and (4) adoption promotion and support. This program is a capped state entitlement, meaning that states are entitled to their specific share of annual funding. Subpart II also has a discretionary component which is subject to the annual appropriations process.[31]

▶***Federal Funding: Title XX.*** A related source of federal funding for foster youth is Title XX of the Social Security Act, also referred to as the Social Services Block Grant (SSBG). This is a capped entitlement program through which states are given block grant funds to help them achieve a wide range of social policy goals.[32] The main purpose of Title XX is to provide assistance to states to help them furnish services aimed at (1) achieving or maintaining economic self-support to prevent, reduce, or eliminate dependency; (2) achieving or maintaining self-sufficiency, including reduction or prevention of dependency; (3) preventing or remedying neglect, abuse, or exploitation of children and adults unable to protect their own interests, or preserving, rehabilitating or reuniting families; (4) preventing or reducing inappropriate institutional care by providing for more community-based care, home-based care, or other forms of less-intensive care; etc.[33]

States are given wide discretion to determine the services to be provided and the groups that may be eligible for services. The law also allows states to use their allotment for staff training, administration, planning, evaluation and purchasing technical assistance in developing, implementing or administering the State social services plan.[34]

Unfortunately, the SSBG entitlement ceiling, or "cap," has been cut back in recent years, meaning that states have received less funding from this source. For instance, while California

received $286.5 million in 1994, that amount has declined in each subsequent year,[35] and in 2007, the State is slated to receive only $206 million.[36]

▶ **State Funding.** "State funding" involves expenditures by both the State itself and by individual counties. That is, each county has a mandated share-of-cost (match requirement) for both federal and state funds. For children receiving federal foster care funding through Title IV-E, federal funds account for 50% of the total funding while state funds account for 20% and county funds for the last 30%. For children who do not qualify for federal funding, the state provides approximately 40% of the foster care funds while the county provides 60%.[37]

**Current Foster Care Rates.** The actual amount of money foster care providers receive depends on whether the child is placed in a group home, a foster family agency home,[38] or in a foster family home (FFH).

Funding for group homes[39] is governed by Welfare and Institutions Code §11462.[40] All group homes are placed in one of 14 Rate Classification Levels (RCLs) using a point system that is designed to measure the intensity of the program based upon the ratio of children to child care and social work staff, taking into consideration the education, experience, training, and professional qualifications of the group home staff. All group home programs in the same RCL are paid the same foster care rate. Monthly group home rates per child currently range from $1,454 for RCL 1 to $6,371 for RCL 14.[41]

Funding for FFHs is governed by Welfare and Institutions Code §11461. Per that section, basic rates were established in 1989 for five age groups of foster children (0–4, 5–8, 9–11, 12–14, and 15–20). The current monthly rates paid to foster care families per child are as follows:

| Age of child | Basic Foster Family Home Monthly Rate[42] |
|:---:|:---:|
| 0–4 | $ 425 |
| 5–8 | $ 462 |
| 9–11 | $ 494 |
| 12–14 | $ 546 |
| 15–20 | $ 597 |

However, in addition to setting basic rates, §11461 also requires that "beginning with the 1991–92 fiscal year, the schedule of basic rates…shall be adjusted by the percentage change in the California Necessities Index,…subject to the availability of funds."[43] Regrettably, California has failed to increase these basic rates since July 2001[44] while the California Necessities Index (CNI) has increased by 24.9% since that time.[45]

Prior to 2001, basic foster care rates were increased at irregular intervals over the previous decade, receiving a 12% increase in the 1990–91 fiscal year, no increases between the 1991–92 and 1996–97 fiscal years, a 6% increase in the 1997–98 fiscal year, and adjustments based on the percentage increase in the CNI each fiscal year between 1997–98 and 2000–01. Although rates were increased in the 1990s, the statutorily contemplated cost-of-living adjustment was not provided between the 1990–91 and 1997–98 fiscal years,[46] and the State has continued to ignore inflationary increases during the past six years, as the Legislature has effectively disregarded the plight of foster parents attempting to cover the basic costs of raising their foster children.

FP000013

Had basic foster family home rates been increased each year for the past six years, ultimately reflecting the 24.9% CNI increase between 2001–02 and 2007–08, the current rate structure would be as follows:

| Age of child | Basic Foster Family Home Monthly Rates (stagnant since 2001) | Basic Foster Family Home Monthly Rates If Annual CNI Increases Had Occurred Since 2001[47] |
|---|---|---|
| 0–4 | $ 425 | $ 531 |
| 5–8 | $ 462 | $ 577 |
| 9–11 | $ 494 | $ 617 |
| 12–14 | $ 546 | $ 682 |
| 15–20 | $ 597 | $ 745 |

As these numbers illustrate, current *actual* rates need to be increased by more than $100 per month for every age group of children in order to properly account for recent increases in the cost of living.

**The Gap Between Actual Payments and Actual Need**.  Theoretically, foster care payments are based on costs of board and care (*i.e.*, "maintenance payments"). These payments are intended to cover the cost of providing food, clothing, daily supervision, school supplies, personal incidentals, liability insurance for the child, and reasonable travel to the child's home for visitation, when appropriate.[48] The basic foster care rate is not intended to cover medical and dental expenses, mental health treatment services, educational instruction, or any other activity that is not included in the narrow definition of "allowable" costs, as other government programs are supposed to provide these tangential services. In reality, however, current foster care payments are set so low in relation to the actual cost of living that foster parents often end up paying out of pocket just to provide their foster children with food, clothing, shelter and other essentials. Because basic foster care rates have not kept pace with inflation, many families are no longer financially able to take foster children into their homes.

As the data summarized in the table below indicates, the average California family has difficulty making ends meet:

| | Average Monthly Expenses, Statewide* | Monthly Income at Current Minimum Wage ($7.50/hr) | Monthly Income at Estimated Average Hourly Rate in California ($15.14/hr)** |
|---|---|---|---|
| **Single Parent Family** | $4,499 | $1,200 | $2,422 |
| **Two Parent Family (One Wage Earner)** | $3,677 | $1,200 | $2,422 |
| **Two Parent Family (Two Wage Earners)** | $5,327 | $2,400 | $4,845 |

*\* Source of Average Monthly Expense Data: California Budget Project, "Making Ends Meet: How Much Does It Cost to Raise a Family in California?" (revised November 2005) (available at http://www.cbp.org/pdfs/2005/0509mem.pdf).  Estimates are based on two child households.*
*\*\* Source of Estimated Average Hourly Rate in California in: Housing California, Frequently Asked Questions (available at http://www.housingca.org/about/faqs/).*

Adding another child to an already-financially strained household does not make sense for most families, as current foster care rates are well below the actual amount needed to raise a child.  The U.S. Department of Agriculture estimates that the average family earning between $43,400 and $73,100 per year spends approximately $11,551.67 per year, per child.[49]

8

However, under the current rate scheme, that family would receive only $6,057.60 per child per year in foster care monies, meaning that they would need an additional $5,494.07 per year (or $457.84 per month) to fully cover the cost of caring for an additional child.  It is important to note that these figures reflect only the marginal cost of raising a child. To the extent that adding another child to the family unequivocally involves additional overhead expenses, the numbers presented are actually underestimates of the true cost of raising that child.

Though the numbers vary slightly for different ages of children and for families with different incomes (see below),[50] the overall result is essentially the same: because basic foster family home rates have remained constant while the cost of living has continued to rise, the stagnant rates are effectively *annual rate cuts*.

| | Estimated Average Annual Expenditures on a Child by Two-Parent Families, 2005[51] | Average Annual Foster Monies Received per Child | Annual Difference | Monthly Increase in Foster Care Rate Needed to Make Up the Difference |
|---|---|---|---|---|
| Before-tax income: less than $43,400 | $8,653.33 | $6,057.60 | $2,595.73 | **$216.31** |
| Before-tax income: $43,400 to $73,100 | $11,551.67 | $6,057.60 | $5,494.07 | **$457.84** |
| Before-tax income: more than $73,100 | $16,323.33 | $6,057.60 | $10,265.73 | **$855.48** |

Source: U.S. Department of Agriculture, Center for Nutrition Policy and Promotion, "Expenditures on Children by Families, 2005," Publication Number 1528-2005 (available at http://www.cnpp.usda.gov/Publications/CRC/crc2005.pdf).

As the data above indicates, an increase of only a few hundred dollars per month would allow low- to mid-income families to cover the basic costs of raising additional children, thereby decreasing the possibility that such children will endure multiple placements, be placed with families geographically distant from their biological homes, or be placed in more expensive group homes.

---

## IV.  CALIFORNIA'S EFFORTS TO ADDRESS THE NEEDS OF FOSTER YOUTH

---

The California Legislature has recently taken *some* steps to address the needs of foster youth. For example, the 2006–07 Budget Act provides the following general foster care-related funds:[52]

► $111.5 million ($72 million General Fund) to support and strengthen the Outcomes and Accountability System to improve safety, permanency and well-being outcomes for children and youth in foster care or risk of foster care placement;

►$9.9 million General Fund to promote the successful transition of foster youth to adulthood by expanding Transitional Housing programs and scholarships for higher education;

► $8.2 million General Fund to improve the coordination and delivery of educational services for children and youth in foster care;

9

▶ $8 million General Fund in 2006–07 to enhance the ability of relatives to care for foster children by expanding the Kin-GAP program and ensuring relatives who become guardians for youths with special needs receive comparable financial support as that received by foster parents and homes; and

▶ $7.9 million ($4 million General Fund) to increase adoptions of children and youth in foster care, with a specific focus on encouraging adoption of older and hard-to-place youth.

Additionally, California is slated to spend another $35.5 million to participate in the Title IV-E Waiver Demonstration Project. Currently, most of the federal money that comes into California through the Title IV-E program is spent on maintaining children already in foster care. Under this waiver, up to 20 counties in California will have a large pool of federal money to spend on innovative services that will theoretically keep families together. Previously, Title IV-E funds could be used only when a child was actually removed from his or her home and placed in foster care. This waiver allows California to spend these same funds to help families already receiving certain services avoid the removal of a child from the home. Examples of services include, but are not limited to, early intervention services, crisis intervention services, intensive child welfare services, and permanency services.[53]

Counties that choose to participate in the program will receive federal monies to provide direct services to children and their families, *regardless of their Title IV-E eligibility or placement status.*[54] Counties will thereby have more flexibility to provide the innovative services to children and families "at risk" and will have a guaranteed budget over the next five years. Those counties that choose not to participate will be bound by the current federal rules that allow for expenditure of funds only when the child is very likely to be removed from the home.[55]

Unfortunately, none of the recent budget allocations or programs aimed at improving the foster care system actually increases the basic rate paid to foster care parents. Although the allocated monies may improve tangential services (*e.g.*, education, adoption, transition to adulthood, etc.), the basic foster care rate will remain the same, meaning that the supply of foster care parents is in jeopardy as the cost of living continues to rise.

Similarly, instead of providing more money to foster parents, the Title IV-E Waiver Demonstration Project works indirectly by preventing children from being placed in the foster care system, period. While the Project *may* help to alleviate a foster parent shortage by reducing the number of children that enter the foster care system in the first place, it remains to be seen whether this will actually be the case. Given the fact that California's foster care system is large and disjointed, the goal of providing innovative services in a coordinated, comprehensive fashion will likely be difficult to achieve. Additionally, creating new programs and services aimed at preserving families will also take an indeterminate amount of time.

The Title IV-E Waiver Demonstration Project is also risky from a financial standpoint in that it provides a capped allocation for the federal government's share of foster care funds. If foster care caseloads increase, less federal money will be available, per capita. Although the capped allocation includes a two percent annual growth increase, this percentage will not necessarily keep pace with increases in the actual cost of providing services.

FP000016

## V. CAI's Proposal

**P**art 1: Raise the Basic Foster Care Rate.  The Children's Advocacy Institute (CAI) proposes that the California Legislature increase current basic foster family home rates by 25%, effective January 1, 2008. CAI additionally proposes that the rates be increased each there year thereafter in accordance with the percentage increase in the CNI.

CAI believes—and research shows—that such a rate increase would have a significant impact on the supply of foster family homes in California.  In a study entitled *"Economic Incentives and Foster Care Placement,"* researchers from the University of Colorado at Denver concluded that the amount of financial compensation provided has a statistically significant effect on a family's willingness to take in a foster child. Using data on children entering foster care in 1998, the researchers found that a $100 increase[56] in the basic monthly foster care payment would reduce the probability that a child would be placed in a group home by 6.7%, with more children instead going to non-relative foster homes. The $100 increase would also increase the stability of foster care by decreasing the average number of placements of the average foster child by 15%.[57]

Similarly, a 2005 publication entitled *"The Market for Foster Care: An Empirical Study of the Impact of Foster Care Subsidies"*[58] used a mathematical model to argue that the relationship between foster care subsidies and the quantity of foster care services supplied depends on whether the subsidy is above or below the "market clearing rate." That is, the supply of foster care providers is positively associated with foster care placements up to the rate at which supply equals demand. Because the amount of most states' subsidies is far less than the market clearing rate, there is excess demand and a shortage of supply in the foster care market. All in all, the study found that higher subsidies increase the participation of families as foster parents.[59]

While it is true than an insufficient supply of foster care homes is not completely due to low foster care rates, economic concerns *are* one of many factors associated with foster care parents leaving the system. Studies have consistently shown that most foster parents are in the low to lower middle income ranges.[60] However, contrary to popular belief, most people do not choose to become foster parents "for the money." In fact, a 1990s study showed that only 7.2% of foster parents wanted to foster as a way to increase their family's income. In contrast, nearly one quarter of those surveyed responded that their reason for leaving the foster care system was economic in nature.[61]

**Part 2: Create an Office Within the Department of Social Services Dedicated Solely to Recruiting and Retaining Foster Parents.**  CAI believes that increasing basic foster care rates is not enough. Rather, the state must take steps to actively seek out new foster parents and ensure that those parents who are already "in the system" receive the information and supports necessary to allow them to continue caring for foster children.

In fact, not only would such efforts be beneficial, but they are mandated by law. Per Welfare and Institutions Code §11461.1, "it is the intent of the Legislature to ensure quality care for children who are placed in foster family homes.  Therefore, the State Department of Social Services is directed to work with counties, foster parent associations, representatives of the community colleges, representatives of foster youth organizations, legislative staff members, and other interested parties

11

concerning training requirements, experience, and retention of foster parents and the capacity of foster homes." Despite this legislative mandate, however, the State is not currently doing enough to attract and retain foster parents.

According to the National Foster Parent Association, as many of 60% of new foster parents quit in the first 12 months, and the primary reason given is lack of support, communication, or response from the foster care system.[62] Moreover, research indicates that fewer foster family placements fail when foster parents receive extensive training before their first placement experiences.[63] Foster parents may need guidance in how to effectively respond to the needs of their foster children, and the more opportunities foster parents have to make *informed* decisions about the children's needs, the more likely it is that they will feel confident in their abilities to continue providing a secure base for the children in their care.[64]

Additional supports, *along with* funding increases, can go a long way in aiding foster parent retention efforts. For instance, the Oregon State Children's Services Division conducted a study of 72 foster families in order to determine the effects of enhanced support and training of foster parents on retention and outcomes for children. They divided the participating families into three groups: Group 1 received enhanced support and training plus an increased payment of $70/month; Group 2 received the $70 but did not receive the increase in services; and Group 3 received no extra support.[65]

Compared to the state average of 40% discontinuation of foster care, the results reflected the positive effect of the additional incentives. Of participating families, only 9.6% of Group 1, 14.3% of Group 2, and 25.9% of Group 3 discontinued care.[66]

The results of the above study suggest that additional non-monetary supports must go hand in hand with a basic foster care rate increase, and together they have the potential to magnify the ability of the state and counties to find stable, appropriate placements for foster children.

In light of the above data, CAI proposes that the new foster family home recruitment and retention office within DSS be charged with the following main tasks:

►assessing and reporting on the existing supply of foster family homes;

►researching and reporting on where supply increases in foster family homes are most needed;

►maintaining information about adoption/guardianship successes among foster family care providers;

►creating and budgeting for public service announcements aimed at encouraging individuals to become foster parents;

►assisting other agencies and organizations in publicizing children eligible for adoption;

►working with community colleges to develop additional courses which would provide certification for foster parents (particularly those who agree to care for children with disabilities);

12

FP000018

►helping to educate foster family providers about opportunities for adoption as well as opportunities for additional foster care training and compensation; and

►helping to educate foster parents about opportunities for their foster children with regard to Social Security benefits, services provided through the Individuals with Disabilities Education Act (IDEA), post-emancipation services, and other similar opportunities.

**Part 3: Develop a Community College Certification Program Aimed At Preparing Individuals to Properly Care for Foster Children with Varying Backgrounds and Needs.** CAI proposes establishment of a training and certification program for licensed foster family care providers to achieve the designation of skilled certified family foster care provider.

CAI believes one of the shortfalls of the current foster care system is that, in addition to being grossly underpaid, foster care providers are treated as though they are providing a gratuitous community service rather than as professionals who are a necessary component of the foster care system and a critical key to ensuring the health and well-being of *our* children.  Adequate compensation should be paid to individuals who are appropriately trained for the role they will play as foster care providers.

As mentioned above, fewer foster family placements fail when foster parents receive adequate training before their first placement experience.[67] Foster care youth provide greater challenges than the typical child.  Studies suggest that 58% of young children in foster care have serious health problems and 30% of foster children have severe emotional, behavioral, and developmental problems, including conduct disorders, depression, difficulty in school and impaired social relationships.[68] Specific education and training are needed to address these intense needs.

Beyond the increased health and emotional needs of foster children, foster parents must be prepared to address the cultural needs of foster youth.  Children of color comprise approximately 60% of all children in care while the majority of foster parents are white.[69] These cultural differences, when adequately addressed through training, can lead to greater placement stability.

Beyond the placement stability that will be gained when foster parents are adequately trained, studies show that foster children living in homes that provide a higher quality child-rearing environment function at higher levels in respect to their cognitive, social, and emotional development.[70] This higher quality environment will come from professionals trained on how to specifically provide for foster children.

To encourage increased, extensive, training of foster parents, a higher stipend should be paid to foster parents who complete the training program.  This higher stipend acknowledges the foster parent as a professional with the ability to provide quality care.

**Expected Results.**  CAI believes that an increase in the State's basic foster care rates and greater efforts to recruit and retain foster parents will lead to a greater supply of foster family homes, which in turn will have several trickle down effects, including the mitigation of foster care drift, the stimulation of adoption, and greater overall stability in the lives of California's foster youth.

► *Less Foster Care Drift.*  By increasing foster care rates and making a greater effort to recruit and retain foster parents, the State will effectively lessen foster care drift. That is, fewer foster

children will be bounced around to multiple foster homes in geographically distant locations, and more foster youth will instead enjoy stable placements with local families.[71] A larger number of willing foster parents will also give foster children a greater chance of being placed with parents of the same race and ethnicity,[72] and strengthened communication between foster parents and foster care workers/agencies will ensure that foster parents are better prepared to care for their foster children.



While an increase in the basic foster care rate will necessitate increased State expenditures, this cost would be partially offset by the savings that would result not only from a decrease in the current high mental health and medical costs associated with foster care drift, but also from an increased ability to shift some children currently residing in expensive group homes to less expensive foster family homes.

►*Fewer Group Home Placements.* Using data from the Adoption and Foster Care Analysis and Reporting System, combined with data on state foster care subsidy levels from the Child Welfare League of America, researchers at the University of Colorado at Denver have concluded that group home placements become increasingly unlikely as foster care subsidy levels rise. Specifically, the model they used suggests that a mere $100 increase in the basic monthly foster care payment would reduce the probability of placement in a group home by 6.7%.[73] Since there are currently 6,729[74] foster children residing in group homes in California, a 6.7% decrease would mean that approximately 451 children would be moved from group homes to foster family homes. Based on the current average FFH rate plus $100[75] and the average group home rate,[76] this shift would save the state over $1.4 million per month.[77] As noted, this savings is based on a $100 increase in foster care payments; an even larger rate increase has the potential to magnify these savings, thus generating additional funds that could be re-channeled back into the newly-created DSS recruitment and retention office or spent on other foster-care related services.

From a mental health standpoint, an increase in foster family home placements means that fewer foster children will be forced to endure the psychological stress and development delays that tend to plague children placed in institutional settings.

►*More Kin Placements and Adoptions.* Finally, since the AAP and Kin-GAP rates are also tied to basic foster care rates, an increase in these rates would mean that more foster children will be placed with relatives and/or later adopted.

14

As previously discussed, an increase in basic foster care rates will have a cyclical effect by augmenting (1) the supply of foster parents, (2) available AAP subsidies, (3) the adoption rate, and (4) the State's likelihood of receiving federal adoption incentive funds which can be channeled back into the foster care system.

Notwithstanding adoption, an increase in basic foster care rates will also aid those children who are placed with relative caregivers but who are unable to be adopted for whatever reason. Kin-Gap is a California payment program designed to support foster children who have been placed in long-term foster-care with a relative caregiver.  The program provides relative caregivers who are either unable or unwilling to adopt the child with another option for caring for the child in a permanent placement in the relative's home.

The Kin-Gap program provides monthly payments, per child, to a relative caregiver at the same basic foster care rate paid to other licensed foster parents in the county.  Thus, as with AAP, any change in the basic foster care rate would also increase the maximum amount that caregivers could receive through Kin-Gap.



15

---

# VI.   THE ONGOING FIGHT FOR FAMILY FOSTER CARE RATE INCREASES: THE TIME TO ACT IS NOW!

---

The fight to raise basic family foster care rates has been a long and ongoing struggle.  For example, CAI introduced legislation in 1999—SB 949 (Speier)—aimed at increasing basic foster care rates by 5% annually, granting additional compensation for the provision of foster care services to special needs foster children, establishing a training and certification program for licensed family foster care providers, and developing a statewide strategic plan for the recruitment of foster family home providers and adoptive parents. Despite receiving 35 "yes" votes and only 1 "no" vote on the Senate floor, this measure died in the Assembly Appropriations Committee without a vote.

Since that time, the plight of foster parents has become even more dire, as basic family foster care rates have remained stagnant over the past six years, effectively becoming rate *cuts* when significant increases in the cost of living are taken into account.

AB 324 (Beall) is similar to CAI's proposal in that it seeks to raise California's basic family foster care rates and increase foster parent recruitment and retention.  That bill would amend § 11461 of the Welfare and Institutions Code in its attempt to provide critical support to foster and adoptive parents and relatives caring for abused and neglected children. In order to achieve this goal, the bill would do the following (as amended March 22, 2007):

> ► increase the reimbursement rate for children in family foster care by 5% effective January 1, 2008, and require future increases through the 2011–12 fiscal year based on percentage changes in the CNI; and

> ►create within the Department of Social Services the Foster and Adoptive Parent Recruitment, Retention, and Support Program aimed at encouraging the recruitment and retention of quality foster caregivers. Funding for this program would come from a $25 million appropriation from the State's General Fund, $5 million of which would be used at the state level to promote skills development, education, and training, and to facilitate caregiver participation in these programs.

Although the proposed rate increases under AB 324 would not completely compensate for the State's previous failure to raise rates in accordance with the 25% CNI increase that occurred between 2001 and 2007, CAI recognizes that the bill puts California on the road to ensuring high quality family foster care placements, more placement choices, and better adoption prospects. Therefore, CAI strongly supports AB 324.

FP000022

## VII. CONCLUSION

**T**he time for *meaningful* change for foster children is now. The Legislature must fulfill its duty to California's foster youth by raising basic family foster care rates and taking additional steps to ensure that all foster children have the opportunity to enjoy loving, stable foster homes (and the prospect of adoption) instead of group home placements. These children need parents, not supervisors. Let's give these children a real family, a real home, and a real opportunity for success in life.



17

## Endnotes

[1] Center for Social Services Research, "July 1, 2006 Children in Child Welfare Supervised Foster Care by Placement Type" *University of California at Berkeley* (2006) (available at http://cssr.berkeley.edu/CWSCMSreports/Pointintime/ fostercare /childwel/ frequencies/data/CWf_PA0_jan2006_0.html).

[2] Id.

[3] Center for Social Services Research, "Siblings in Child Welfare Supervised Foster Care on July 1, 2006" *University of California at Berkeley* (2006) (available at  http://cssr.berkeley.edu/CWSCMSreports/Pointintime/fostercare/childwel/ sibsResponse.asp?data=data&crit=00&county=s&point=jul2006).

[4] Center for Social Services Research, "July 1, 2006 Children in Child Welfare Supervised Foster Care by Placement Type" *University of California at Berkeley* (2006) (available at http://cssr.berkeley.edu/CWSCMSreports/Pointintime/ fostercare/childwel/frequencies/data/CWf_PA0_jan2006_0.html).

[5] Little Hoover Commission, "Still in Our Hands: A Review of Efforts to Reform Foster Care in California," (February 2003) (available at http://www.lhc.ca.gov/lhcdir/168/report168.pdf).

[6] Beth Troutman, Ph.D., Susan Ryan, M.A. and Michelle Cardi, M.A., "The Effects of Foster Care Placement on Young Children's Mental Health," University of Iowa Hospitals and Clinics (available at http://www.medicine.uiowa.edu/ icmh/archives/reports/Foster_Care.pdf).

[7] Id.

[8] Id.

[9] Little Hoover Commission, "Now in Our Hands:  Caring For California's Abused and Neglected Children (Report #152, August 1999) (available at http://www.lhc.ca.gov/lhcdir/report152.html).

[10] Id.

[11] Lee Doran and Lucy Berliner, "Placement Decisions for Children in Long-term Foster Care: Innovative Practices and Literature Review," *Washington State Institute for Public Policy* (February 2001) (available at http://depts.washington.edu/ hcsats/pdf/research/placementdecisionsinovativepractices.pdf).

[12] PR Newswire story, "For Foster Children, Unstable Placements are Linked to Higher Healthcare Costs" (available at http://www.prnewswire.com/cgi-bin/stories.pl?ACCT=109&STORY=/www/story/05-03-2004/0002165410& EDATE").

[13] Brenda Jones Harden, PhD., "Safety and Stability for Foster Children: A Developmental Perspective" *Children, Families, and Foster Care* (available at http://www.futureofchildren.org/information2826/information_show.htm? doc_id=209543).

[14] North America Council on Adoptable Children, "There is A  Better Way—Executive Summary" (available at http://www.nacac.org/exec_summaries/better_way.html).

[15] Brian Duncan, Laura Argys, *Economic Incentives and Foster Care Placement,"* Department of Economics, University of Colorado at Denver (available at http://econ.cudenver.edu/bduncan/Fostercare.pdf).

[16] Elizabeth Bartholet joined the faculty of Harvard Law School in 1977. She spent much of the ten years prior to 1977 doing civil rights litigation, first with the NAACP Legal Defense Fund and later as founder and director of the Legal Action Center, a public interest law firm in New York City. At Harvard, she has specialized in family law issues with a particular focus on child welfare, adoption, and reproductive technology.

[17] Elizabeth Bartholet, "Nobody's Children," *Abuse and Neglect, Foster Drift, and the Adoption Alternative*, pg. 60. Beacon Press Books, Boston, MA (1999).

[18] Dara Colwell, "Foster Freeze." *Metro* (October 12-18, 2000) (available at http://www.metroactive.com/papers/ metro/10.12.00/fosterparents-0041.html).

[19] California Performance Review, "HHS09 Finding Permanent Homes for Foster Children" (available at http://cpr.ca.gov/report/cprrpt/issrec/hhs/hhs09.htm).

[20] Id.

[21] Id.

[22] U.S. Department of Health and Human Services—Administration for Children and Families, "Prior Relationships of Adoptive Parent(s) to Child October 1, 2003 to September 30, 2004" (September, 2006) (available at http://www.acf. dhhs.gov/programs/cb/stats_research/afcars/statistics/relationship06.htm).

[23] Up to 89%, according to a June 2006 AFCARS Report (available at http://www.acf.dhhs.gov/programs/cb/stats _research/afcars/tar/report11.htm).

[24] Welfare and Institutions Code §16120 (2007).

[25]  Wisconsin Department of Health and Family Services, "Title IV-E Foster Care and Adoption Assistance Program" (available at http://www.dhfs.wisconsin.gov/children/TitleIV-E/index.htm).

FP000024

26  Maryland Department of Human Resources "Title IV-E Foster Care & Adoption Assistance" (available at http://www.dhr.state.md.us/ssa/pdfs/4efact.pdf).

27  Kasia O'Neill Murray, "The Child Welfare Financing Structure" (available at http://pewfostercare.org/research /docs/MurrayPaper2.pdf).

28  Id.

29  Id.

30  Id.

31  Id.

32  Ways and Means Committee Greenbook, "Section 10—Title XX Social Services Block Grant" (2003) (available at http://waysandmeans.house.gov/media/pdf/greenbook2003/Section10.pdf).

33  Id.

34  Id.

35  Id.

36  Child Welfare League of America, "2006 Legislative Hot Topics—Social Services Block Grant" (available at http://www.cwla.org/advocacy/2006legpriorities03.htm).

37  Id.

38  In some instances, children are placed through Foster Family Agencies (FFAs), which have a slightly different funding structure. FFAs are nonprofit organizations that recruit foster parents, certify them for participation in the program, and provide them with training and support services.  There are two types of FFA programs, "treatment foster care or therapeutic foster care," and "nontreatment foster care." An agency providing treatment service to a child has determined that the child has services needs which cannot be provided in an available family home, would require group home placement if the child was not referred to an FFA, and can be met by the program offered by the FFA to which the child is being referred. In contrast, a FFA providing nontreatment services certifies a home for placement of a child pending the adoption of the child by that family.  FFA treatment rates are established by using the basic rate for the Foster Family Home (FFH) plus a set increment for the special needs of the child, a maximum amount for social work activities, and a percentage for administration, recruitment and training. The FFA nontreatment rates are established by using only the basic rate of the FFH and a specialized care rate when appropriate. For more information, see http://www.childsworld.ca.gov/FosterFami_345.htm.

39  Group homes may vary from small, home-like environments to large institutional-type facilities.

40  Welfare and Institutions Code §11462 (2007).

41  California Alliance, "Group Homes for Foster Children Fact Sheet" (available at http://www.cacfs.org/advocacy/ docs/GroupHomeFactSheet.doc).  See also California Department of Social Services, "All County Letter No. 04-24" (September 22, 2005) (available at http://www.dss.cahwnet.gov/getinfo/acl05/pdf/05-24.pdf).

42  This is the rate applicable to children place in licensed or approved family homes (FFHs) with a capacity of six of less, or in a home of a relative or nonrelated legal guardian, or the approved home of a nonrelative extended family member. California Department of Social Services, "All County Letter No. 05-24" (September 22, 2005) (available at http://www. dss.cahwnet.gov/getinfo/acl05/pdf/05-24.pdf).

43  Welfare and Institutions Code §11461 (d)(1)(A) (2007).

44  In July 2001, basic rates were increased by 4.85%.

45  As calculated by the Children's Advocacy Institute.

46  Senate Health and Human Services Committee Analysis, AB 1330 (June 2001) (available at http://info.sen.ca.gov/ pub/01-02/bill/asm/ab_1301-1350/ab_1330_cfa_20010625_155436_sen_comm.html).

47  As calculated by the Children's Advocacy Institute.

48  Kasia O'Neill Murray, "The Child Welfare Financing Structure" (available at http://pewfostercare.org/research/ docs/MurrayPaper2.pdf).

49  These figures are based on calculations for the entire "urban West." The actual numbers in California might be higher, thereby indicating an even greater gap between foster care rates and the amount needed to raise a child. U.S. Department of Agriculture, Center for Nutrition Policy and Promotion, "Expenditures on Children by Families, 2005" (Publication Number 1528-2005) (2005) (available at http://www.cnpp.usda.gov/Publications/CRC/crc2005.pdf).

50  Although the nominal cost of raising a child increases annually each year, the cost per child does decrease slightly for families with more than one child.

51  Supra note 49.

52  California's Enacted Budget, 2006–07: Foster Care and Child Welfare Services Improvements (available at http://www.ebudget.ca.gov/Enacted/BudgetSummary/HHS/8878538.html).

53  Department of Health and Human Services: Administration for Children and Families, "Waiver Authority" (March 2006) (available at http://www.childsworld.ca.gov/res/pdf/CAwaiverTermsandConditions.pdf).

19

[54] Id.

[55] Title IV-E Child Welfare Demonstration Project: Questions and Answers (available at http://dcfs.co.la.ca.us/ TitleIVE/documents/Title%20IV-E%20Waiver%20Approval%20Q%20&%20A.pdf).

[56] A $100 increase is just slightly less than the equivalent of a 25% increase in current foster care rates in California.

[57] Brian Duncan, Laura Argys, *Economic Incentives and Foster Care Placement*, Department of Economics, University of Colorado at Denver (available at http://econ.cudenver.edu/bduncan/Fostercare.pdf).

[58] Joseph J. Doyle Jr. and H. Elizabeth Peters, "The Market for Foster Care: An Empirical Study of the Impact of Foster Care Subsidies" (July 2005) (available at http://www.mit.edu/~jjdoyle/fcare2005.pdf).

[59] Id.

[60] CASAnet Resources, "The Impact of Financial Compensation, Benefits and Supports on Foster Parent Retention and Recruitment" (posted on 4/99) (available at http://www.casanet.org/library/foster-care/finance.htm#preliminary).

[61] Id.  Note that other reasons given for leaving the foster care system included poor communication with the foster care worker, insensitivity of the agency to foster family needs, and lack of training and other supports.

[62] Id.

[63] Maureen C. Smith, "Foster Parents and the Home Environment: One Way to Assess the Quality of Foster Care Placements" (2001) (available at http://www.csus.edu/calst/government_affairs/reports/fostercare.pdf).

[64] Beth Troutman, Ph.D., Susan Ryan, M.A. and Michelle Cardi, M.A., "The Effects of Foster Care Placement on Young Children's Mental Health," University of Iowa Hospitals and Clinics (available at http://www.medicine.uiowa.edu/ icmh/archives/reports/Foster_Care.pdf).

[65] Id.

[66] Id.

[67] Maureen C. Smith, "Foster Parents and the Home Environment: One Way to Assess the Quality of Foster Care Placements" (2001) (available at http://www.csus.edu/calst/government_affairs/reports/fostercare.pdf).

[68] *Supra* note 60.

[69] Id.

[70] *Supra* note 67.

[71] *Supra* note 57.

[72] Id.

[73] Id.

[74] UC Berkeley Center for Social Services Research, "Children in Child Welfare Supervised Foster Care by Placement Type" (July 1, 2006) (available at http://cssr.berkeley.edu/CWSCMSreports/Pointintime/fostercare/childwel/ frequencies/data/CWf_PA0_jan2006_0.html).

[75] A $100 monthly increase is roughly equivalent to a 25% increase in California's basic foster care rate.

[76] California Department of Social Services, "All County Letter No. 05-24" (September 22, 2005) (available at http://www.dss.cahwnet.gov/getinfo/acl05/pdf/05-24.pdf).

[77] (451 x $3,912.29) – (451 x ($504.80 + $100)) = $1,491,677.99.

FP000026

# Fast Facts About Foster Care in California

► Of the 78,000 children in California's foster care system, less than half are placed with relatives or in foster family homes.

► Almost half of foster children are moved three or more times during their first year in foster care.

► Children with multiple placements are more likely to incur higher mental health and medical costs then children placed in loving, stable foster family homes.

► Foster care placement volatility is strongly associated with greater child hostility and behavioral problems.

► Research shows that children have much better outcomes if their family lives are stable.

► Children placed in group homes often lack the opportunity to form a consistent relationship with a caregiver and are at serious risk for developmental problems and long-term personality disorders.

► Adults who had been placed in group homes as adolescents have lower educational attainment, lower employment probabilities, and report lower self-esteem and happiness than similar adults raised in foster family homes.

► Studies show a positive correlation between the basic foster care rates paid to foster parents and the supply and quality of foster family homes.

► Today's basic foster care rates were established by California lawmakers in 1989, and have not kept pace with statewide increases in the cost of living. Rates have stayed stagnant while there has been a 25% increase in the California Necessities Index — which covers food, clothing, utilities, rent, and transportation.

► An increase in basic foster care rates and greater efforts to recruit and retain foster parents will lead to a greater supply of foster family homes. Fewer foster children would be placed in less nurturing, more expensive group homes, avoiding the psychological stress and developmental delays that tend to plague children in such institutionalized settings.

For more information on these facts,
please contact the Children's Advocacy Institute.





