Page 1

1              UNITED STATES DISTRICT COURT
2            NORTHERN DISTRICT OF CALIFORNIA
3               SAN FRANCISCO DIVISION
   ---------------------------------------
4  California State Foster Parent      )
5  Association, California State       )
6  Care Providers Association, and     )
7  Legal Advocates for Permanent       )
8  Parenting,                          )
9              Plaintiffs,             )
              vs.                      ) No. C 07 5086 WHA
10 JOHN A. WAGNER, Director of the     )
11 California Department of Social     )
12 Services, in his official           )
13 capacity; MARY AULT, Deputy         )
14 Director of the Children and        )
15 Family Services Division of the     )
16 California Department of Social     )
17 Services, in her official           )
18 capacity,                           )
19             Defendants.             )
   ---------------------------------------
20      Videotaped deposition of WESLEY BEERS,
21      at 400 Capitol Mall, Suite 2600,
22      Sacramento, California, commencing at
23      10:46 a.m., Wednesday, April 16, 2008,
24      before Kevin C. Adams-Carter, CSR No. 8468.
25 PAGES 1 - 138

Page 36

1    speculation. You may answer.
2            THE WITNESS: I don't recall any specific
3    conversation.
4    BY MR. KEANE:
5        Q.  How about foster family home rates?
6        A.  Correct.
7        Q.  Does -- or should I say -- I should say did the
8    Operations and Evaluations Branch, when you were there,
9    have any responsibilities related to training foster
10   parents?
11       A.  No.
12       Q.  What about certification of foster parents?
13       A.  No.
14       Q.  What about retention of foster parents?
15       A.  No.
16       Q.  What branch would have dealt with those issues?
17           MR. PRINCE: Objection; assumes facts. Calls for
18   conjecture. You may answer.
19           THE WITNESS: It could have been either of the --
20   the Protection of Family Support Branch or the Permanency
21   Branch.
22   BY MR. KEANE:
23       Q.  Was the Operations and Evaluations Branch
24   responsible for filing anything with the federal government
25   when you were there?

Page 59

1  says effective on such and such a date, the basic rate will
2  change by 12 percent. So potentially if I were in charge
3  of foster care policy at that time I would have generated a
4  letter and a reg change to convey that information to the
5  counties.
6      Q.  And how would that have -- how would that percent
7  change have come about?
8      A.  State legislation.
9      Q.  And would DSS have had any input to that
10 legislation?
11     A.  DSS, through the administration, would prepare
12 analysis of proposed legislation or proposed budget actions
13 and would, within the department, have the opportunity to
14 provide that input to the legislature.
15     Q.  So DSS would have prepared analysis of proposed
16 rate increase legislation?
17         MR. PRINCE:  Objection; foundation, calls for
18 conjecture.  You may answer.
19         THE WITNESS:  The department regularly did
20 analysis of proposed legislation.
21 BY MR. KEANE:
22     Q.  Which -- which branch or division of DSS would
23 have been responsible for preparing analysis -- preparing
24 analysis of proposed legislation as it related to increases
25 in foster care rates?

Page 64

BY MR. KEANE:

Q. Okay. So are you saying that if someone within the DSS had proposed to the state legislature legislation to increase foster care rates they would have lost their job?

MR. PRINCE: Objection; hypothetical, calls for conjecture, foundation. You may answer.

THE WITNESS: Yeah, what I'm saying is officially there is no communication directly from the department to the legislature. It goes through the administration.

BY MR. KEANE:

Q. But who would have -- who would have come down on an employee who made -- made a proposal to increase foster care rates to the legislature?

MR. PRINCE: Objection; hypothetical, calls for speculation, no foundation.

THE WITNESS: It -- I -- I don't have a specific way of responding to that.

BY MR. KEANE:

Q. Well, what did you mean -- when you said not if they value their job?

A. What I meant is if someone went to the legislature and said we want to raise rates, put in a bill, that wasn't the administration's position and the administration didn't want to do that, then that would certainly jeopardize that

Page 1

```
 1              UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF CALIFORNIA
 3                SAN FRANCISCO DIVISION
     ---------------------------------------
 4   California State Foster Parent      )
 5   Association, California State       )
 6   Care Providers Association, and     )
 7   Legal Advocates for Permanent       )
 8   Parenting,                          )
 9              Plaintiffs,              )
          vs.                            ) No. C 07 5086 WHA
10   JOHN A. WAGNER, Director of the     )
11   California Department of Social     )
12   Services, in his official           )
13   capacity; MARY AULT, Deputy         )
14   Director of the Children and        )
15   Family Services Division of the     )
16   California Department of Social     )
17   Services, in her official           )
18   capacity,                           )
19              Defendants.              )
     ---------------------------------------
20        Videotaped deposition of WESLEY BEERS,
21        at 400 Capitol Mall, Suite 2600,
22        Sacramento, California, commencing at
23        10:46 a.m., Wednesday, April 16, 2008,
24        before Kevin C. Adams-Carter, CSR No. 8468.
25   PAGES 1 - 138
```

Page 65

1    person's career.  They have no authority.  The only one
2    that has authority to deal with the legislature officially
3    is the governor's office.
4         Q.  Okay.  But what about not going to the state
5    legislature but proposing it within DSS to supervisors, for
6    example?
7              MR. PRINCE:  Objection; foundation.
8    BY MR. KEANE:
9         Q.  Is that something that was ever done, to your
10   knowledge?
11        A.  We would go through budget drills every year in
12   terms of what are needs in the program.  And so, they were
13   -- always be conversations within the department.
14        Q.  Did any of those conversations involve the
15   adequacy of foster care maintenance payments?
16             MR. PRINCE:  Objection; vague.
17             THE WITNESS:  I -- I don't recall any direct
18   meetings, conversations, on that subject.  That's not to
19   say they didn't occur or that I didn't participate in
20   discussions, but I don't have a direct recollection of any
21   conversation on -- on rates.  We're going back 20 years
22   now, so --
23   BY MR. KEANE:
24        Q.  Okay.  If you could take a look at Exhibit 6
25   again, paragraph (a).  Do you see at the end of the

Page 67

1   with the legal service that we get these statutes from.
2           And if you look at section (a) of the statute, at
3   the end of the paragraph it says "Click here to view
4   image." The image is a table that appears in the statute.
5   And so, the table you have to printout as a separate
6   document which is 6-A. So 6-A is part of this statute.
7           MR. PRINCE: Can you indicate as to what date this
8   is current and/or when it was printed and whether this is
9   again from your Deering's code?
10          MR. KEANE: Sure. This is directly from the same
11  code that's represented in Exhibit 6. If you were to enter
12  that citation in Lexis you would retrieve this very
13  document that's Exhibit 6. You would not see the table
14  unless you click where it says "Click here to view image,"
15  which I did this morning, and it gives you the image that
16  shows up as what I've introduced as Exhibit 6-A.
17  BY MR. KEANE:
18      Q.  So my question is, you see at the end of paragraph
19  (a) in Exhibit 6, the per child month rates in the
20  following schedule shall be in effect for the period July
21  1st, 1989 through December 31st, 1989. You see that,
22  correct?
23      A.  Yes.
24      Q.  Okay. And what follows that in the statute is
25  Exhibit 6-A, the table in Exhibit 6-A. So take a look at

1      6-A for a second just to look at the two columns.
2           A.   Okay.
3           Q.   Do you know where these numbers came from?
4           A.   No.
5           Q.   Have you ever seen these numbers before?
6           A.   I'm sure I have.
7           Q.   Do you know whether any part of DSS had any role
8      in proposing these numbers?
9           A.   I do not.
10          Q.   To the best of your recollection, what was your
11     position at DSS in the 1988 time frame?
12          A.   I think I was either in Foster Care Rates or
13     Foster Care Policy Bureaus, one of those two.
14          Q.   So do you think either of those bureaus would have
15     had input in setting these initial rates?
16               MR. PRINCE:  Objection; foundation, calls for
17     speculation.   You may answer.
18               THE WITNESS:  Not -- not in setting the rates.  We
19     would have a role in implementing the rates through
20     statute.
21     BY MR. KEANE:
22          Q.   Would it surprise you if you found out that these
23     rates had been set by the legislature without any
24     involvement from DSS whatsoever?
25               MR. PRINCE:  Objection; argumentative, foundation,

Page 70

1           (Deposition Exhibit 13 was marked for
2      identification.)
3      BY MR. KEANE:
4           Q.   Are you familiar with this document?
5           A.   I'm familiar with the format and the type of
6      document, not this one specifically.
7           Q.   How would you characterize what this document is?
8           A.   It's an all county letter issued by the Department
9      of Social Services, related to the subject matter of foster
10     care and kinship assistant payments.
11          Q.   And do you see the table at the bottom with the
12     rates for family homes?
13          A.   Yes.
14          Q.   Does that refresh your recollection of the
15     ballpark rates that were paid to family home -- foster
16     family homes?
17          A.   Yeah, I accept that that's what the rates were
18     during that period of time.
19          Q.   Okay.  Are you aware that between 2001 and 2008
20     these rates did not increase?
21          A.   No.
22          Q.   You're not aware of that?
23          A.   No.
24          Q.   Was your -- was it your understanding that the
25     rates did increase?

Page 65

1    person's career. They have no authority. The only one
2    that has authority to deal with the legislature officially
3    is the governor's office.
4        Q. Okay. But what about not going to the state
5    legislature but proposing it within DSS to supervisors, for
6    example?
7        MR. PRINCE: Objection; foundation.
8    BY MR. KEANE:
9        Q. Is that something that was ever done, to your
10   knowledge?
11       A. We would go through budget drills every year in
12   terms of what are needs in the program. And so, they were
13   -- always be conversations within the department.
14       Q. Did any of those conversations involve the
15   adequacy of foster care maintenance payments?
16       MR. PRINCE: Objection; vague.
17       THE WITNESS: I -- I don't recall any direct
18   meetings, conversations, on that subject. That's not to
19   say they didn't occur or that I didn't participate in
20   discussions, but I don't have a direct recollection of any
21   conversation on -- on rates. We're going back 20 years
22   now, so --
23   BY MR. KEANE:
24       Q. Okay. If you could take a look at Exhibit 6
25   again, paragraph (a). Do you see at the end of the