Page 67

1    with the legal service that we get these statutes from.
2            And if you look at section (a) of the statute, at
3    the end of the paragraph it says "Click here to view
4    image." The image is a table that appears in the statute.
5    And so, the table you have to printout as a separate
6    document which is 6-A. So 6-A is part of this statute.
7            MR. PRINCE: Can you indicate as to what date this
8    is current and/or when it was printed and whether this is
9    again from your Deering's code?
10           MR. KEANE: Sure. This is directly from the same
11   code that's represented in Exhibit 6. If you were to enter
12   that citation in Lexis you would retrieve this very
13   document that's Exhibit 6. You would not see the table
14   unless you click where it says "Click here to view image,"
15   which I did this morning, and it gives you the image that
16   shows up as what I've introduced as Exhibit 6-A.
17   BY MR. KEANE:
18       Q.  So my question is, you see at the end of paragraph
19   (a) in Exhibit 6, the per child month rates in the
20   following schedule shall be in effect for the period July
21   1st, 1989 through December 31st, 1989. You see that,
22   correct?
23       A.  Yes.
24       Q.  Okay. And what follows that in the statute is
25   Exhibit 6-A, the table in Exhibit 6-A. So take a look at

Page 68

```
1      6-A for a second just to look at the two columns.
2           A.  Okay.
3           Q.  Do you know where these numbers came from?
4           A.  No.
5           Q.  Have you ever seen these numbers before?
6           A.  I'm sure I have.
7           Q.  Do you know whether any part of DSS had any role
8      in proposing these numbers?
9           A.  I do not.
10          Q.  To the best of your recollection, what was your
11     position at DSS in the 1988 time frame?
12          A.  I think I was either in Foster Care Rates or
13     Foster Care Policy Bureaus, one of those two.
14          Q.  So do you think either of those bureaus would have
15     had input in setting these initial rates?
16               MR. PRINCE:  Objection; foundation, calls for
17     speculation.  You may answer.
18               THE WITNESS:  Not -- not in setting the rates.  We
19     would have a role in implementing the rates through
20     statute.
21     BY MR. KEANE:
22          Q.  Would it surprise you if you found out that these
23     rates had been set by the legislature without any
24     involvement from DSS whatsoever?
25               MR. PRINCE:  Objection; argumentative, foundation,
```

1           (Deposition Exhibit 13 was marked for
2      identification.)
3      BY MR. KEANE:
4           Q.   Are you familiar with this document?
5           A.   I'm familiar with the format and the type of
6      document, not this one specifically.
7           Q.   How would you characterize what this document is?
8           A.   It's an all county letter issued by the Department
9      of Social Services, related to the subject matter of foster
10     care and kinship assistant payments.
11          Q.   And do you see the table at the bottom with the
12     rates for family homes?
13          A.   Yes.
14          Q.   Does that refresh your recollection of the
15     ballpark rates that were paid to family home -- foster
16     family homes?
17          A.   Yeah, I accept that that's what the rates were
18     during that period of time.
19          Q.   Okay.  Are you aware that between 2001 and 2008
20     these rates did not increase?
21          A.   No.
22          Q.   You're not aware of that?
23          A.   No.
24          Q.   Was your -- was it your understanding that the
25     rates did increase?

1        A.   I don't recall one way or the other.  Didn't keep
2   track of it.
3        Q.   Okay.  Is -- would the schedule of basic rates
4   have been something you needed to look at or refer to in
5   your position at DSS -- in any of your positions at DSS?
6        A.   Yes, it would be a fact.  These are the rates that
7   are paid for out-of-home care for, you know, for these type
8   of children in this type of placement.
9        Q.   Okay.  So from 2001 until you retired, it wouldn't
10  have been uncommon for you to refer to this schedule of
11  basic rates?
12           MR. PRINCE:  Objection; mischaracterizes
13  testimony.  You may answer.
14           THE WITNESS:  I would refer to them if needed -- I
15  would know they -- where to find them if I needed to.
16  BY MR. KEANE:
17       Q.   Okay.  Under what circumstances would you have
18  needed to refer to them?
19       A.   Just questions that came up.  It -- it could be
20  whatever -- whatever form the need was.  I -- I can't
21  recall anything specific.  But I -- I would know where to
22  get them or who to find them from.
23       Q.   Which branch within DSS has the responsibility for
24  setting these rates?
25           MR. PRINCE:  Objection; foundation,

1   Finance's analysis. And the administration may or may not
2   take any kind of position.
3       Q.  Okay. I appreciate that tour.
4           All right. Do you recall any analyses of foster
5   family home rates during your tenure at DSS?
6       A.  I don't recall anything specific.
7       Q.  Within the Child and Youth Permanency Branch would
8   it have been a particular bureau that would have been
9   responsible for such an analysis?
10      A.  In this particular organization it would more than
11  likely have been the permanency policy, though, you know,
12  support services could -- could have been involved. It --
13  again, depending on a subject matter within the -- the
14  program, they can reach out and get specific information,
15  but it depends on what the bill's about.
16      Q.  But you don't recall any specific analysis of --
17  or even hearing about any specific analysis of foster
18  family home rates?
19      A.  I'm -- I'm sure that conservatively I've looked at
20  several thousand bill analyses during my time. I don't
21  recall any specifics.
22      Q.  Okay. On this org chart, 11-2, Permanency Policy
23  Bureau lists K. Gunderson --
24      A.  Karen.
25      Q.  -- Karen Gunderson as acting -- would that be

1  BY MR. KEANE:
2      Q.  Okay.  Now, you said at the time of your
3  retirement the Permanency Policy Bureau would have been the
4  subdivision within DSS most likely to have performed any
5  analysis of foster family home rates.
6      A.  That would be my recollection.
7      Q.  What about before that time period, specifically
8  from -- specific in the time period going back to 2001.  So
9  between 2001 and 2006, would there have been another
10 subdivision that would have filled that role?
11     A.  I don't recall when this organization was set up.
12 It was set up sometime during Silvia Pizzini's term as
13 deputy.  And I don't recall the specific time frame when
14 that -- that occurred.  Prior to Silvia Pizzini there was a
15 Foster Care Branch, and that branch would have been
16 responsible for foster care issues.
17     Q.  Including, potentially, analyses of foster family
18 home rates?
19     A.  Correct.
20     Q.  Did you personally ever recommend a particular set
21 of foster care maintenance payment rates?
22     A.  Not to my recollection.
23     Q.  Did you ever personally investigate the adequacy
24 of foster care maintenance payment rates?
25          MR. PRINCE:  Objection; vague.  You may answer.

1          THE WITNESS:  No.  No.
2     BY MR. KEANE:
3          Q.  Did you ever supervise staff in the setting of
4     foster care maintenance rates?
5          MR. PRINCE:  Objection; foundation.  You may
6     answer.  Also assumes facts.
7          THE WITNESS:  I don't believe I ever supervised
8     anybody in setting the rates.  Rates are set by the
9     legislature.
10    BY MR. KEANE:
11         Q.  Did you ever supervise staff in investigating the
12    adequacy of foster care maintenance payment rates?
13         A.  I don't recall specific --
14         MR. PRINCE:  Objection; foundation and assumes
15    facts.  You may answer.
16         THE WITNESS:  I don't recall the -- a specific
17    incidence.
18         MR. KEANE:  Okay.  Let me introduce Exhibit 14.
19         (Deposition Exhibit 14 was marked for
20    identification.)
21    BY MR. KEANE:
22         Q.  Exhibit 14 is Defendants' Rule 26 Initial
23    Disclosure, Supplemental Set.  Have you ever seen this
24    document?
25         A.  I don't recall it.  This --

1   Go ahead.
2           THE WITNESS:  They would get a response that
3   these are the -- the approved rates as approved by the
4   legislature, and that -- frequently we would advise people
5   if they were concerned about those things to contact the
6   legislature.
7   BY MR. KEANE:
8       Q.  Did you ever supervise staff in the investigation
9   of the adequacy of foster care maintenance payments rates?
10          MR. PRINCE:  Objection; asked and answered.
11          THE WITNESS:  I certainly don't recall that.
12  BY MR. KEANE:
13      Q.  Are you aware of any DSS investigation of the
14  adequacy of foster care maintenance payments rates?
15          MR. PRINCE:  Objection; asked and answered.
16          THE WITNESS:  I don't -- I don't specifically
17  recall any.
18  BY MR. KEANE:
19      Q.  Would it surprise you if you learned that DSS had
20  never done an investigation to the adequacy of foster care
21  maintenance payments?
22          MR. PRINCE:  Objection, argumentative, foundation,
23  assumes facts.
24          THE WITNESS:  I wouldn't be surprised or not.  I
25  don't -- I mean, I don't recall anything related to -- to

Page 82

1  that.
2  BY MR. KEANE:
3       Q.   What's your understanding of how the rate setting
4  process works for increases in foster family home rates?
5            MR. PRINCE:  Objection as to when in time.
6            THE WITNESS:  So increases to a family rate?  Is
7  that what you're asking?
8  BY MR. KEANE:
9       Q.   Foster family home rates, yeah.
10      A.   I'm really not aware of a -- a specific process.
11      Q.   Are you aware of those rates ever having been
12 increased?
13      A.   I'm aware there were COLAs from time to time.  I
14 can't recall specifically what dates, but I know there have
15 been COLAs in the past.
16      Q.   And by that you mean cost of living adjustments?
17      A.   Yeah.  Correct.
18      Q.   So you don't recall the specific years that those
19 COLA adjustments took place?
20      A.   No.
21      Q.   What's your understanding of why a COLA adjustment
22 would take place in some years and not others?
23           MR. PRINCE:  Objection; foundation.
24           THE WITNESS:  Yeah, I -- like I say, the
25 legislature approves the budget and I implement the budget.

Page 83

```
 1    In my -- in my job I would implement the budget or the
 2    decisions made in the budget.
 3    BY MR. KEANE:
 4        Q.   So DSS wouldn't have any input one way or the
 5    other about annual COLA increases in the rates?
 6        A.   I didn't say that.  I said that I specifically
 7    didn't have or recall a role in that discussion other than
 8    as I said before, we would provide analysis to the budget
 9    process and to legislation.
10        Q.   Okay.  But you don't recall any such analysis on
11    the adequacy of foster family home rates, correct?
12        A.   I don't recall.
13             MR. PRINCE:  Objection; asked and answered.
14    BY MR. KEANE:
15        Q.   So the rate setting process for increases, for
16    COLA increases in foster family home rates, as you
17    understand it that process is essentially subject to the
18    vagaries of the legislature?
19             MR. PRINCE:  Objection; vague, and argumentative,
20    and foundation.  But go ahead and answer.
21             THE WITNESS:  The decisions on the -- on the
22    rates, to my understanding and knowledge, is made as part
23    of the annual budget process.
24    BY MR. KEANE:
25        Q.   But without any formal participation by DSS,
```