Page 96

1    Q.   What's your understanding of why the foster family
2    home rates have not increased with the CNI as mandated by
3    this statute?
4    A.   My understanding is that the legislature hasn't
5    passed legislation to increase the rate as the rest of the
6    sentence says, "subject to availability of funds."  But
7    that's just my understanding.
8    Q.   But isn't this statute, Section 11461, a state
9    statute that DSS is required to implement?
10       MR. PRINCE:  Objection; calls for a legal
11   conclusion and an opinion, foundation, and assumes facts.
12   You may answer.
13       THE WITNESS:  Yeah, my understanding is when the
14   budget is passed every year the legislature provides
15   specific statute to support the budget.
16   BY MR. KEANE:
17       Q.  And then DSS would just implement that
18   legislation?
19       A.  DSS has no authority to implement anything beyond
20   what the state legislature authorizes.
21       Q.  Right.  So if the state legislature authorizes an
22   increase in the foster family home rates, DSS would
23   implement that in a way that you've already discussed,
24   through ACLs, ACINs?
25       A.  If that's what the budget required that's -- the

1    department would implement what the budgets requires.
2        Q.  So, in your understanding, the extent of DSS's
3    implementation of Section (d)(1)(a) of the statute is to
4    follow the lead of the legislature?
5        A.  Well --
6            MR. PRINCE:  Objection.  Again, you're asking for
7    an opinion and a legal conclusion.  Asked and answered.
8            THE WITNESS:  Yeah, within my authority I only
9    have authority to implement what the budget authorizes as
10   it would relate -- in those times where I was responsible
11   for a -- a -- a particular area related to foster care
12   rates, my responsibility would be implement what the budget
13   document and authorizing statute provided for.
14   BY MR. KEANE:
15       Q.  So you said you're not aware that the CNI
16   increases every year, correct?
17           MR. PRINCE:  Asked and answered.
18           THE WITNESS:  I'm saying that as -- as we sit
19   here, if the CNI increases, it increases.  I don't know if
20   it increases every year.  I -- I don't track that.  It --
21   it very well could increase.  I don't -- that's not my job
22   to keep track of the CNI -- or wasn't my job.
23   BY MR. KEANE:
24       Q.  I'll introduce document 17.  Unfortunately, I only
25   have three of those so you guys want to look --

1    specific section and implementing it.  I can say that the
2    department, through the budget process, would identify
3    relevant statute and would recommend through the budget
4    process what was viewed as required, and then the budget
5    process would take over as I've described earlier.
6    BY MR. KEANE:
7        Q.  So when you were at DSS did DSS have any role in
8    initiating a proposal for increases in foster family home
9    rates?
10            MR. PRINCE:  Objection; asked and answered.
11            THE WITNESS:  Yeah, I can't speak for DSS.  I can
12   speak for myself in that if -- if in my capacity in -- in
13   jobs related to that I would have done everything I could
14   to meet and comply with any requirements that were imposed
15   on the department.
16   BY MR. KEANE:
17       Q.  But meet and comply with requirements as opposed
18   to initiate a dialogue on your own or on the -- on behalf
19   of your branch?
20            MR. PRINCE:  Objection; assumes facts, and I think
21   it's been asked and answered.  But you can answer.
22            THE WITNESS:  Yeah.  I -- I believe that my
23   responsibility would be to pursue whatever legislative
24   requirements were placed on the department and, you know,
25   identify those and attempt to follow through with what they

1  requested.
2  BY MR. KEANE:
3       Q.  So by -- by pursue legislative requirements do you
4  mean legislative requirements that would arise periodically
5  in the forms of legislation or statutory requirements that
6  already exist?
7            MR. PRINCE:  Objection; vague, ambiguous,
8  unintelligible.  You may answer.
9            THE WITNESS:  Both.  I -- I'm -- I'm not able to
10 recall specific instance, but if there's a legislative
11 report that was put into legislation in the previous year
12 that said by such and such a date the department would
13 provide this information or take this action, then it would
14 be my job to follow through with that as a -- as an
15 example.
16           MR. KEANE:  Okay.  Introducing document 18.
17           (Deposition Exhibit 18 was marked for
18 identification.)
19 BY MR. KEANE:
20      Q.  Have you seen this document before?
21      A.  Yes.  I peeked to the last page, so --
22      Q.  Sure.  How would you characterize this document,
23 what it is?
24      A.  Appears to be a rate letter to the county based on
25 state law change.

1   increase.
2   BY MR. KEANE:
3       Q.   What's your understanding of why that increase
4   only happened on that one occasion, not every year?
5           MR. PRINCE:  Objection; foundation.  You may
6   answer.
7           THE WITNESS:  I -- I don't have any recollection.
8   BY MR. KEANE:
9       Q.   Was there anything preventing DSS from proposing
10  an increase such as the one called for in Section (d)(1)(B)
11  on an annual basis when you were at DSS?
12          MR. PRINCE:  Objection; calls for speculation,
13  assumes facts, foundation.
14          THE WITNESS:  Yeah, I can't speak for what DSS
15  could or couldn't have done.
16  BY MR. KEANE:
17      Q.   So when you directed staff to prepare ACL 99-107,
18  which is Exhibit 18, you did that solely in response to a
19  legislative enactment, correct?
20      A.   That appears to be the purpose.
21      Q.   Do you recall any discussions taking place while
22  you were at DSS on why the rate increase, such as the one
23  announced in this ACL 99-107, why that rate increase wasn't
24  happening on an annual basis?
25      A.   I don't recall any specific conversations.

Page 117

1  maintenance payments are to cover.  During your tenure at
2  DSS are you -- were you aware of any branch or subdivision,
3  bureau, any component of DSS that calculated the cost of
4  food, for example?  We'll go through them one by one.  Food
5  to a foster child.
6         MR. PRINCE:  Objection; foundation.
7         THE WITNESS:  Am I aware -- am I aware of what?
8  BY MR. KEANE:
9      Q.  Are you aware -- do you recall any calculation
10 done by any branch of DSS, any component of DSS, any
11 calculation of the cost of providing food to a foster child
12 in California?
13     A.  I do not recall.
14     Q.  And I'm gonna assume that's true for the other
15 items.
16     A.  Yes.
17     Q.  In your understanding was it anyone's
18 responsibility in the Child and Family Services Division to
19 calculate these costs?
20     A.  I do not recall a specific area or assignment to
21 track that level of detail in the basic rate.
22     Q.  What about any -- any other part of DSS?
23     A.  I -- I don't recall any -- any specific
24 assignments related to that.
25     Q.  So --

Page 119

1    A.  Do I believe they can be?
2    Q.  Yeah.
3        MR. PRINCE: Objection; foundation. And it's
4  argumentative and it's not relevant. Go ahead.
5        THE WITNESS: I believe that the rate is set
6  through a legislative process. And I'm not privy to all of
7  the considerations that the legislature makes in
8  determining what the appropriate rate is.
9  BY MR. KEANE:
10   Q.  And was that your feeling when you were employed
11 at DSS?
12   A.  Yes.
13   Q.  Okay. While you were employed at DSS, did you
14 feel that the foster care maintenance payments adequately
15 compensated parents for the cost of caring for foster
16 children?
17       MR. PRINCE: Objection; vague, foundation, assumes
18 facts. It's not germane and it's argumentative.
19       THE WITNESS: So the question is did I feel that
20 this was adequate -- an adequate payment?
21       MR. KEANE: M-hm.
22       THE WITNESS: I actually tried not to operate on
23 feelings. I -- I operated on what the statute gave me
24 authority to pursue. I would provide input as within our
25 ability to understand. And so, I -- I didn't operate on a

1   feeling basis on the rate.  It was -- the rate was what the
2   rate was and we provided that information and the counties
3   implemented it.
4   BY MR. KEANE:
5       Q.  I don't mean feeling in a personal capacity, I
6   mean feeling in terms of the responsibilities of your job.
7   Do you feel, based on what you were required to do at DSS,
8   that the compensation given to foster parents was adequate?
9          MR. PRINCE:  Same objections in addition to asked
10  and answered.
11         THE WITNESS:  Yeah, you're -- you're putting it in
12  a context that wasn't how I would approach the rate
13  system.  You know, the rate system provides different
14  levels of payments that are eligible, that can pay for
15  eligible activities across a wide range of -- of different
16  placement options.  And that's how I approached the job as
17  in terms of making sure that the authorized payment was
18  available and able to be used for the activities it was
19  intended.
20  BY MR. KEANE:
21      Q.  While you were employed by DSS were you aware of
22  any legislative advocates who advocated on behalf of foster
23  parents?
24      A.  Yes.
25      Q.  What were the circumstances of that?

1    anything. And those go through a process that evaluates
2    the -- the need and capacity of everything. And it's
3    reviewed in multiple places and a decision is made on
4    whether it's needed or appropriate.
5        Q. Okay. So in your experience while working at DSS
6    did you think there were advantages to having more foster
7    homes available to foster children?
8        MR. PRINCE: Objection; foundation, assumes
9    facts. You can go ahead and answer it.
10       THE WITNESS: My program bent was to try and
11   provide services to prevent out-of-home placement. Once
12   you get into out-of-home placement our priority, according
13   to state law, was always to the lowest possible placement
14   that would meet the needs of the child. So in that context
15   we were always pushing to try and achieve those
16   programmatic outcomes.
17   BY MR. KEANE:
18       Q. What do you mean by "lowest possible placement"?
19       A. Well, in the hierarchy of placement, foster
20   parents -- well, first -- well, foster parents, Kin-GAP
21   parents, whatever level in a family environment, that's the
22   lowest and most homelike. Then you go up to foster family
23   homes, which are more intensive. And then you get into the
24   group home. So there's -- there's different levels of
25   placement. So in -- in terms of priority, a family-like

1  setting is the highest priority. But there's a huge fiscal
2  incentive for counties to meet -- place in family homes
3  anyway because their share of costs of group homes are --
4  are very high, so they have every incentive to try and meet
5  that placement need.
6      Q.  And what are the advantages to having the lowest
7  possible placement? Why were you pushing for that?
8      A.  Well, as I said, I was actually pushing for not
9  removing. But state law is -- is clear that that's our
10 priority.
11     Q.  What are the advantages?
12     A.  That the child is in a home-like setting instead
13 of a non- or more institutional setting.
14     Q.  And why would that be an advantage?
15         MR. PRINCE: Objection; germane. Go ahead and
16 answer it.
17         THE WITNESS: Well, I -- I don't know how to
18 answer it in any more detail. It's a home versus an
19 institution.
20 BY MR. KEANE:
21     Q.  Well, I'm trying to get you to just spell out the
22 specifics of why it's better for a child to be in that
23 environment.
24     A.  And -- and, really, I'm not qualified to answer
25 specifically. Programmatically we viewed a family setting

1   as in the best interest of a child.  That priority has been
2   established through federal and state law, and it's based
3   on -- I assume on -- in addition to practical knowledge,
4   it's -- it's, you know, what social workers and -- and
5   psychologists and those people would believe is -- is the
6   best interest of the child.  And those are the operational
7   statutes, best interest of the child, lowest -- lowest
8   level of placement.
9       Q.  Okay.  Last exhibit, Number 20.
10          (Deposition Exhibit 20 was marked for
11  identification.)
12  BY MR. KEANE:
13      Q.  Have you ever seen that document?
14      A.  I think so.  Or I think we contributed to it.  I
15  think this is produced by the -- it's off their web page or
16  something.
17      Q.  So how would you characterize what this document
18  is?
19      A.  This -- this was a document that we were
20  requested to submit to -- to the feds or ACF as part of the
21  child welfare reviews.  They liked our quality assurance
22  system that we were implementing in California.
23      Q.  So the document is about the California child and
24  family review system, correct?
25      A.  Yeah, it -- it's about that system and how we are

Page 135

1  effective way of trying to get to real solutions.
2      Q.  And the increase in rates was not a significant
3  component of that, correct?
4          MR. PRINCE:  Asked and answered.
5          THE WITNESS:  I'm saying that an increase in rates
6  certainly could have been raised.  And the information
7  would be compiled and put forth and the legislature would
8  be -- and all the players would be aware of it.  But I
9  don't recall when I was involved that that was identified
10 as the -- the key reason for program performance in -- in
11 counties or -- you know, failure to meet objectives.  It
12 could have certainly been raised.  I'm not saying that.
13 BY MR. KEANE:
14     Q.  Yeah, I wasn't asking if it was a key reason, just
15 if it was significant or not.
16     A.  My -- my recollection is that that was not a
17 prevailing theme in any of the SIPs.  I -- I think the SIPs
18 were much more focused and operational on how people
19 achieve performance.  And they probably focused more on --
20 on unmet training needs and services that could be
21 provided.
22     Q.  Okay.  I think you've testified that during your
23 career at DSS you don't recall any conversations --
24 personal conversations that you had about the inadequacy of
25 foster care maintenance payments; is that correct?

1          MR. PRINCE:  That's correct, he so testified.

2          THE WITNESS:  Yes.

3          MR. KEANE:  Okay.  No further questions.

4          MR. PRINCE:  Thank you.

5          MR. KEANE:  Thank you for your time.

6          THE VIDEOGRAPHER:  We're going off the record at

7    3:25.

8          This is the end of tape number four and the end of

9    the deposition.

10

11          (The deposition concluded at 3:25 p.m.)

12

13

14

15

16

17

18

19

20

21

22

23

24

25