# IN THE UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA

California State Foster Parent Association,
California State Care Providers Association, and
Legal Advocates for Permanent Parenting,

    Plaintiffs,

vs.

JOHN A. WAGNER, Director of the California
Department of Social Services, in his official
capacity; MARY AULT, Deputy Director of the
Children and Family Services Division of the
California Department of Social Services, in her
official capacity,

    Defendants.

Case No. C-07 5086

# EXPERT REPORT OF DIANE DEPANFILIS, PH.D, M.S.W.

August 12, 2008

## QUALIFICATIONS

1.      I am Diane DePanfilis, Associate Dean for Research, and Director of the Ruth H. Young Center for Families & Children at the University of Maryland School of Social Work, a position I have held since 2006. I have been a professor at the University of Maryland since 2008 and an Associate Professor there since 2000. My business address is: University of Maryland, School of Social Work, 525 West Redwood Street, Baltimore, Maryland 21201. A copy of my curriculum vitae is attached as Exhibit A to this report.

2.      In 1996, earned a Ph.D. in Social Work from the University of Maryland, Baltimore. In 1982, I earned an M.S.W. in Social Work from the University of Wisconsin-Milwaukee. In 1973, I earned a B.A. in Sociology from Villa Maria College.

3.      At the University of Maryland, I teach social work practice and child welfare research courses in the Master's of Social Work program and research seminars in the doctoral program. A list of the classes I have taught is found in Exhibit A to this report.

4.      I have also served in several other capacities at the University of Maryland. From 2000-2006, I served as co-director of the Center for Families, an interdisciplinary partnership between the schools of social work and medicine and the department of pediatrics. From 2002-2006, I served as the Director of the Institute for Human Services Policy. From 2002-2006, I was the Assistant Dean for Research at the School of Social Work.

5.      Over the past 30 years I have provided child welfare services at the local level as a caseworker, supervisor, and administrator; worked as a consultant at the national level conducting program evaluations and providing training and technical assistance to social workers and other disciplines; and conducted extensive studies related to the delivery of child protective services and the prevention of child maltreatment. I am also a co-editor of the Handbook on Child Protection Practice and a former president of the American Professional Society on the Abuse of Children.

6.      I have served as an expert witness and/or consultant in six other litigations, listed on my curriculum vitae. Of those, five settled, and one is pending. In three of those I was deposed. In none did I testify at trial.

7.      My participation in this case, including preparation of this expert report, is, has been, and will remain on a pro bono basis. I am only compensated for any out-of-pocket expenses I incur within the scope of my duties as an expert and consultant in this matter.

## SCOPE OF ENGAGEMENT

8.      Plaintiffs have asked me to provide my expert opinion on the methodology my project partners and I used in the studies that were published in an October 2007 Report entitled "HITTING THE M.A.R.C.: Establishing Foster Care Minimum Adequate Rates for Children" ("MARC Report"). Attached as Exhibit B to this report is a true and correct copy of the MARC Report. Plaintiffs also asked me to highlight results of the MARC Report studies as they pertain to the State of California.

9.      While I explain these methodologies below, they are also described in detail, along with all of the studies' conclusions, in a separate document entitled "HITTING THE M.A.R.C.: Establishing Foster Care Minimum Adequate Rates for Children" – Technical Report ("MARC Technical Report"). Attached as Exhibit C to this report is a true and correct copy of the MARC Technical Report. Citations to the MARC Technical Report are included where applicable.

10.     I base my opinions on my years of experience in foster care policy, teaching, independent research and analysis, as well as the time and effort I spent working on the MARC Report. In the MARC Report studies, which took over two years from planning to publication, I was the principal investigator. I helped design the study, made sure that methods were correctly implemented, supervised analysts, and participated in the analysis and writing of the MARC Report. If called upon to testify about the MARC Report, I am qualified to do so.

11.     The opinions stated in this report are preliminary and are subject to change based upon, among other things, ongoing discovery. I may rely upon additional information that

comes to my attention after the date of this report and amend my opinions accordingly to the extent permitted by the court. I have agreed to provide expert testimony (by deposition, at trial, or otherwise) based upon this Expert Report and attached exhibits. I may also be called upon to comment on, and to provide expert testimony in response to, any future reports or expert testimony offered by either party. I expect that I will review reports by other experts submitted in this matter.

## OBJECTIVES OF THE MARC REPORT STUDIES

12.     The MARC Report presents the first-ever calculation of the real expenses of caring for a child in foster care in the United States. It systematically demonstrates the rates of support for children in foster care are far below what is needed to provide basic care for children in nearly every state in the nation, including California. As explained below in ¶ 40, foster care rates must be raised by over 50%[1] in California to reach what the project partners have termed "the Foster Care MARC," *i.e.*, the Minimum Adequate Rates for Children.

13.     This study was conducted in order to estimate the costs associated with providing basic care to a child in foster care in the United States in the hopes that states would adopt the proposed "Foster Care MARC."

14.     Absent a more precise guideline—now provided by the Foster Care MARC—a few jurisdictions have tied their foster care rates to estimates of the costs of raising (non-foster-care) children produced by the U.S. Department of Agriculture (USDA)[2] based on data from the Consumer Expenditure Survey (CES) administered by the Bureau of Labor Statistics (BLS).[3]

---

[1] Specifically, according to this study, California must raise its foster care maintenance payments by 61%, 59%, and 44% for children of average age of 2, 9, and 16, respectively, for an average increase of 54.7% required to meet the Foster Care MARC in California.

[2] Lino, M., *Expenditures on Children by Families, 2005*, Washington D.C.: U.S. Department of Agriculture, Center for Nutrition Policy and Promotion (2006). Retrieved May 27, 2007, from http://www.cnpp.usda.gov/Publications/CRC/crc2005.pdf ("Lino Study").

[3] National Association of Public Child Welfare Administrators, *Basic Family Foster Care Maintenance Rates Survey: Summary of Findings*, survey conducted and report prepared by NAPCWA, for Children's Rights (2007).

However, the USDA estimates are an imperfect basis for foster care rates because they include categories of expenditures that would not typically be included in a foster care rate such as mortgage or rent, health care and school tuition.  Foster care payments are typically not intended to cover a foster parent's mortgage or rent; health care for children in foster care is covered through Medicaid; and children in foster care typically attend public school.  In addition to the USDA estimates being over-inclusive of such expenses, the USDA estimates do not include certain costs that are particular to children in foster care.  For example, the USDA estimates do not include the costs of the additional wear and tear on household items that occurs due to the particular needs and behaviors of children in foster care, given the trauma they have experienced; or property and liability insurance costs related to caring for these children.

15.    The objectives of the study were as follows:

- Operationally define the basic needs of a child in foster care as guided by federal regulations.

- Locate the most appropriate data sources for estimating costs to meet each of these needs and build appropriate data files with these data.

- Construct multivariate models to estimate the costs associated with caring for children in foster care of varying ages in the U.S.

- Identify geographic cost-of-living variations and construct adjustment formulas based on these geographical differences.

- Based on the models and the geographical adjustments, calculate foster care minimum adequate rates for children (the Foster Care MARC) for the 50 states and the District of Columbia that should be adopted by child welfare systems.

**METHODOLOGY**

16.    The first step[4] of the study was to define the categories of allowable expenditures as established in the Title IV-E Maintenance Payment Program of the Social Security Act, which are (1) food, (2) clothing, (3) shelter, (4) daily supervision, (5) school supplies, (6) personal incidentals, (7) liability insurance, and (8) transportation associated with visits with the child's

---

[4] For further discussion, *see* MARC Technical Report at 19-20.

biological family.[5] These categories provided the basic framework for the calculation of minimum adequate rates for children.

17.    These categories only include expenses for which states would be eligible to receive federal funding under the federal Title IV-E Maintenance program.

18.    Nevertheless, there exist several categories of expenditures for which states would not be eligible to receive federal funding under the federal Title IV-E Maintenance program,[6] including the cost of travel to administrative and judicial reviews and health care appointments, funds to purchase an entire basic wardrobe, which some children need when they enter foster care,[7] the costs of preparing a home to meet the needs of the child such as initial furnishings or safety features (e.g., window guards),[8] and the cost of full-time child care for the working foster parent.  Further, while it is an allowable category of expenditure under federal law, the study also excluded an average expense for travel for the purpose of a child's visitation with his or her biological family.  While these expenses were not included in the Foster Care MARC, I believe that the state should reimburse foster parents for the actual costs of raising foster children.

19.    The second step,[9] after the cost categories were clearly defined, was to do a secondary data analysis using data obtained from the CES from the years 2002-2004.[10]  These

---

[5] *See* 42 U.S.C.S. § 675(4)(A).

[6] Though for these categories of expenditures—as well as others—alternate sources of funding may be available as separate payments.

[7] A number of states, including California, provide an initial clothing allowance to address this issue.

[8] These items must be installed before the child is placed in the home and while the foster parents should be reimbursed for those expenses, they would not be included in a monthly foster care rate tied to a particular child.

[9] For further discussion, *see* MARC Technical Report at 20-22.

[10] The CES is a national study of household buying habits, family earnings and household characteristics conducted by the Bureau of Labor Statistics (BLS) (U.S. Department of Labor, 2002; 2003; 2004).  The CES collects data from family members using both a quarterly interview survey and a one-week diary survey focusing on consumer units (generally a family dwelling within a household).  Information is collected about the families' annual income and expenditures and includes classifications by income, age, consumer unit size and other

data reflect all of the expenditures that families incur during the course of a year. The interview survey data are collected in independent quarterly questionnaires of approximately 7,500 households.

20.      Information was used from questions in the interview survey regarding the sample households' monthly expenditures related to food, shelter, clothing, transportation, daily supervision of children and entertainment. Families with before tax family incomes no less than $40,000 and no greater than $100,000 were selected to be included in these analyses. This group was chosen to represent at least 200% and no more than 500% of the federal poverty level for a family of four. 200% of the federal poverty level or $40,000 was selected at the low end based on the assumption that it would be difficult to meet the needs of a family of four in most locations in the country for less than this amount. The upper end of the range was selected because calculating average expenses from a group including very wealthy families would not be considered reasonable or appropriate for the purpose of estimating foster care rates.

21.      In the CES, data are collected from each consumer unit on a quarterly basis. For these analyses, data on families who were in four consecutive quarterly surveys were used to avoid needing to impute missing data.

22.      The only families included in the calculation were families with some children, but with two or fewer child-years in the consumer unit. "Child-years" rather than children were used as children could have moved in and out of the house over the course of a year. Most of the families had either one or two children for the entire year. The reason for excluding families with more than two children is that the expenditure patterns are likely different as children may share and pass along resources. Those assumptions cannot be made when reimbursing a foster

---

demographic characteristics of consumer units. The samples include the total non-institutionalized population of the United States. The CES is the same data source used by the USDA to produce its annual report on the costs of raising a child. However, the figures released each year by the USDA are based on earlier calculations using 1990-1992 CES data, adjusted for inflation. The project partners decided to use the more current CES data from 2002-2004, as these data reflect more current spending patterns, and also inflation-adjusted these data to 2006.

family for the costs of caring for a single child. The reason for excluding families with zero children is that adults likely allocate resources for their own needs in ways that are much different than resources for the needs of their children.

23.     For families with no more than two children, the average expenditure per family member (for expense categories such as food and utilities) or the average expenditure per child (*e.g.*, children's clothing) was calculated. The calculated values were used in a multivariate regression analysis including indicators of having one or more children ages birth-4, 5-13, and 14-18. The results from the multivariate analysis were used to predict expenditures as a function of having children of different ages (birth-4, 5-13 and 14-18). The data were inflation-adjusted using the general consumer price index to the price level of the second half of 2006 (the most recent half year available).

24.     1422 families with 2 or fewer child-years were included in the sample. The analyses were weighted with weights provided by the BLS so that the results would be nationally representative. 10% of the families in the study sample had incomes below $43,901. Only 10% of the families had incomes above $89,179, and 50% of the families had incomes ranging from $49,906 to $77,914.

25.     These data were obtained on a CD-ROM from which summary statistics were generated and multivariate data analysis was performed. Based on the previously defined components of care (*e.g.*, food, clothing), data files were constructed with the most appropriate cost variables to match each defined category. Data analyzed included family composition, family income and expenditures in categories including: food, utilities, gas and motor oil, video games, toys and hobbies, school supplies, baby sitting and day care, children's clothing, fees and admissions, linens, coin-operated laundry and dry cleaning.

26.     The third step[11] in calculating the Foster Care MARC took into account the varying needs of children in different age groups. For example, it is easy to recognize that the

---

[11] For further discussion, *see* MARC Technical Report at 22.

needs of and expenses generated by a 2-year-old are different from those of a 14-year-old. Based on age-appropriate needs and expenses, adequate rates were calculated for three age groups: children ages birth-4, 5-13 and 14-18. States typically report their foster care rates for children age 2, 9 and 16, which are the mid-points of the age categories utilized for this project.

27.    The fourth step[12] in calculating the Foster Care MARC involved adjusting for the special needs of foster children. Caring for a child in foster care generates additional expenses beyond the basic costs of caring for a child who is not in foster care.[13] Given the trauma they have experienced, children in foster care often have particular needs and behaviors that cause increased wear and tear on household items and the need to clean, fix or replace these items more frequently than in households without children in foster care. For example, foster parents may need to replace bedding or do laundry more frequently as a result of a child's bed wetting. They may also have increased utility bills due to extra laundry and needing to leave lights on at night because children are afraid of the dark, or higher phone bills due to children needing to maintain contact with family and friends who may not live locally.

28.    The Foster Care MARC calculation increased certain cost estimates from the CES data to account for these issues, based on the findings of a study by McHugh.[14] In this study, focus groups with foster parents were conducted to understand the costs associated with caring for children in foster care. Based on the foster parent reports, McHugh customized estimates of the cost of caring for non-foster children to more accurately reflect the costs of caring for children in foster care. Many of the adjustments in the McHugh study reflect added wear and tear or damage to household items including appliances, furniture, linens, towels, beds and

---

[12] *Id.*

[13] McHugh, M., *The Costs of Caring: A Study of Appropriate Foster Care Payments for Stable and Adequate Out of Homecare in Australia*, Sydney, Australia: Social Policy Research Center, University of New South Wales (2002) ("McHugh Study").

[14] *Id.*

bedding.  To adjust for wear and tear, lifetimes of some items regularly used by children in care were reduced, while costs for added cleaning of carpets and soft furnishings were increased.

29.    The fifth step[15] in calculating the Foster Care MARC, then, was to calculate the amount of each of the eight cost categories in the following ways.

30.    **Food**: The United States Department of Health and Human Services ("USDHHS") provides no guidance on the cost of food for children in foster care.  The USDA analysis of the CES data defined food expenditures for an average family as including "food, nonalcoholic beverages purchased at grocery, convenience and specialty stores including purchases with food stamps; dining at restaurants; and household expenditures on school meals."[16]  The food category of the Foster Care MARC was based on the expenditures of a middle-income family on food for children of different ages, as identified in the CES.  This estimate was then increased by 10%, following the multiplier used by McHugh,[17] to adjust for added costs associated with behavioral issues of foster children related to, for example, hoarding food or additional nutritional needs.

31.    **Clothing**: The USDHHS provides no guidance on the cost of clothing for children in foster care.  The USDA analysis of the CES data defined clothing expenditures as "children's apparel such as diapers, shirts, pants, dresses, and suits; footwear; and clothing services such as dry cleaning, alterations and repair and storage."[18]  The clothing category of the Foster Care MARC was based on the expenditures of middle-income families on clothing, coin-operated laundry and dry cleaning as identified in the CES (utility expenses for laundry done at home is reflected in the "shelter category").  The CES estimate for costs of clothing items for children within different age groups were doubled to account for wear and tear and replacement of lost

---

[15] For further discussion, *see* MARC Technical Report at 23-28.

[16] Lino Study at 2.

[17] McHugh Study.

[18] Lino Study at 2.

items. Following McHugh, costs of coin-operated laundry were increased by 50% to adjust for added cleaning costs, consistent with the adjustment to utility costs. No adjustment was made to the cost of dry cleaning, as it is not expected that the clothes of children in foster care are frequently dry cleaned.

32.    **Shelter**: The USDHHS provides no guidance on the cost of shelter for children in foster care. The USDA analysis of the CES data defines housing expenditures as "shelter (mortgage interest, property taxes, or rent; maintenance and repairs; and insurance), utilities (gas, electricity, fuel, telephone and water) and house furnishings and equipment (furniture, floor coverings and major and small appliances)."[19] In a study of the cost of caring for children in foster care, McHugh included the additional costs of "wear and tear" damage to household goods and increased utilities usage.[20] The shelter category of the Foster Care MARC was based on per-child expenditures of middle-income families on utilities, furniture, appliances and household linens as identified in the CES.  Following McHugh, the CES estimate for costs of utilities was increased by 50% to adjust for added costs associated with increased uses of water, electricity, phone, gas/oil and other utilities. The CES estimate for costs of household items including furniture, appliances and linens was doubled to adjust for extra wear and tear. It should be noted that the Foster Care MARC does not include costs related to mortgage or rent, as foster parents are typically expected to maintain their homes independent of the foster care payment.

33.    **Daily Supervision**: The USDHHS lists allowable and non-allowable expenses under the daily supervision category. Allowable expenses include child care when the child is not in school and when the foster parent is working. This can be supplemented when a child has "greater than usual needs."[21]  Recreation is only allowable where "it clearly substitutes for

---

[19] *Id.* at 2.

[20] McHugh Study.

[21] U.S. Department of Health and Human Services, *Child Welfare Policy Manual*, ACYF-CB-PIQ-86-04 (8/20/86).

otherwise necessary daily supervision." However, foster care reimbursement for daily supervision is "not intended to include reimbursement in the nature of a salary for the exercise by the foster family parent of ordinary parental duties."[22] The USDA analysis of the CES data combines child care and educational expenses, including "daycare tuition and supplies; babysitting, and elementary and high school tuition, books and supplies."[23] The vast majority of children in foster care attend public school and thus school tuition would not be provided through the foster care rate. The daily supervision category of the Foster Care MARC reflects the expenditures of middle-income families on occasional baby sitting or other child care in the home or in the home of someone else, based on the CES, and one week of residential summer camp for ages 5-18. Given that children in foster care often have behavioral issues, older children in foster care, even teenagers, typically require supervision. Thus, the daily supervision portion of the Foster Care MARC includes babysitting costs for children of all ages. The babysitting expenses in the CES for children ages birth-4 were used as a base and adjusted to estimate the costs of occasional babysitting for older children. Cost estimates for occasional babysitting for children ages 5-13 and 14-18 were derived by calculating 40% of the expenses of the birth-4 age group for 9 months of the year to account for the need for supervision after school or on weekends during the school year and 100% for 3 months when children are on summer vacation. Additional costs associated with one week of residential camp were added to the daily supervision costs for children ages 5-18. According to the American Camp Association, the mean weekly cost for independent non-profit residential camps is $590.[24]

34.     **School Supplies**: The USDHHS provides no guidance on the cost of school supplies for children in foster care. The USDA analysis of the CES data includes this item under

---

[22] U.S. Department of Health and Human Services, *Child Welfare Policy Manual*, ACYF-CB-A-82-01 (4/30/82).

[23] Lino Study at 2.

[24] Allison McMunn, American Camp Association, personal communication, April 23, 2007.

child care and educational expenses.[25]   The school supplies category of the Foster Care MARC

reflects the expenditures of middle-income families on books, recreational lessons and other

school supplies, as identified in the CES.  Recreational lessons reflect the expense of providing

children in foster care with "normalizing" childhood experiences such as after-school sports or

creative arts activities, which are particularly important for children who may have been

traumatized or isolated by their experiences of abuse and neglect and placement in foster care.[26]

Following McHugh, the CES estimate for costs of books and other school supplies was doubled

to adjust for wear and tear.

     35.    **Personal Incidentals**: The USDHHS considers a range of items to fall under

personal incidentals.  These include: "personal hygiene, cosmetics, over the counter medications

and special dietary food; infant and toddler supplies; fees related to activities, such as Boy/Girl

scouts; special lessons . . . and miscellaneous items."[27]   In addition, USDHHS considers

"reasonable and occasional cost of tickets, admission fees for sporting events, entertainment or

cultural events, dues for clubs"[28] as allowable expenses.  The federal government limits what can

be included in this category such that it cannot be the default category for all "extra" items, even

if the extra items result in the foster parents incurring additional expenses.  The USDA analysis

of the CES data includes "personal care items, entertainment and reading materials" as

miscellaneous expenses.[29]   The CES documentation points to the limitations of the survey for

this type of data and suggests that these incidentals may be between 5% and 15% of total

---

[25] Lino Study.

[26] Fong, R., Schwab, J., & Armour, M., *Continuity of Activities and Child Well-Being of Foster Care Youth*, 28(11) Children and Youth Services Review at 1359-74 (2006).

[27] U.S. Department of Health and Human Services, Child Welfare Policy Manual, 7/6/05.

[28] U.S. Department of Health and Human Services, Child Welfare Policy Manual, ACYF-CB-PIQ-97-01, 3/4/97.

[29] Lino Study.

expenditures on the child.[30]  Mark Lino's work on the USDA estimates suggested that these could be valued at approximately 15% of all other expenses.[31]  These same procedures were followed in this study; therefore, personal incidentals were estimated as 15% of the other expenses.  The top end of the range was used to reflect that expenses for these items for foster care children are likely to be among the most costly (*e.g.*, need to be replaced more often due to moves or disruptions).  Additionally, this estimate is based on the total expenditures on a child, which have been adjusted to reflect the increased costs of caring for a child in foster care. Therefore, the costs of personal incidentals also reflect this adjustment.  The personal incidentals category of the Foster Care MARC reflects the expenditures of middle-income families on their children for reading materials, videos, toys, hobbies, gas and motor oil, fees and admissions, as identified in the CES, and an additional 15% of other costs to reflect the cost of personal hygiene items, cosmetics, over the counter medications and other miscellaneous items.  Following McHugh, the CES estimates for costs of reading materials video games, toys and hobbies were doubled to adjust for wear and tear.

36.    **Liability and Property Insurance**: The USDHHS has provided states with different options regarding liability insurance.  These include "considering insurance for foster parents as a direct foster care maintenance cost or as an administrative cost of foster care maintenance program under Title IV-E."[32]  The USDA analysis of the CES data includes insurance under housing expenses, however, it provides no guidance regarding the cost of insurance for foster parents, since the USDA analysis of expenses is not specific to foster parents.  Some states include payment for insurance coverage in the monthly foster care payment to parents; others provide protection through a separate insurance mechanism.  In addition, some

---

[30] U.S. Department of Labor, Bureau of Labor Statistics, 2004, Consumer Expenditure Interview Survey Public Use Microdata Documentation (October 18, 2006).

[31] Lino Study.

[32] U.S. Department of Health and Human Services, Child Welfare Policy Manual, ACYF-CB-PIQ-82-04, 1/29/82.

states require foster parents to carry insurance and provide coverage only for claims that have previously been denied. The project partners agreed that foster parents should be provided with both liability and property insurance, which should include coverage for damages by the child in foster care to the foster parent's home or property, harm by a child in foster care to the property or person of another party and claims by the child in foster care and/or their birth parents. The CES does not include any data on the costs of this kind of insurance. Therefore, an insurance company that provides this kind of insurance, Foster Parent Professionals, Inc., was contacted and provided the rate estimates for foster parent liability and property insurance.[33] The liability insurance offered by Foster Parent Professionals, Inc. provides the following coverage for foster parents of children under the age of 18: (1) protection in the event a foster child is injured while in the care of a foster parent and the foster parent is sued by the child's natural parents or guardian; (2) protection from claims for bodily injury or property damage to the person or property of another because of an act of the foster child; (3) personal injury liability coverage for such things as a libel, slander, false arrest, wrongful eviction and alienation of the affection of the foster child from his/her parent; (4) incidental malpractice liability coverage for the foster parent's failure to provide needed medical care, therapy, diet or other special needs of the foster child.[34] The property damage coverage protects against damage to the foster parent's own property caused by a foster child and occurring while the foster child is in the care and custody of the foster parent. Excluded from coverage is property damage: (1) to property used for business pursuits; (2) arising out of the use of aircraft, auto or watercraft; or (3) which was intentionally caused. Each claim is interpreted on a case-by-case basis. 'Intention' is appraised, keeping in mind the child's chronological and mental ages, with actions of younger and less competent children being less likely to be considered intentional. The estimates provided by

---

[33] Bonnie Eshbaugh, Foster Parent Professionals, Inc., personal communication, August 17, 2006.

[34] *Id.*

Foster Parent Professionals, Inc. were incorporated into the Foster Care MARC and adjusted for costs of living. It should be noted that the estimates provided were based on policies sold to child welfare agencies, not to individual foster parents, and thus, the project partners believe the estimates reflect a more conservative calculation of actual costs than if an individual foster parent were to purchase such insurance.

37.     **Reasonable Travel to the Child's Home for Visitation**: The USDHHS allows "reasonable travel to the child's home for visitation." However, the USDHHS provides no guidance on how to define reasonable. The costs of transporting a child in foster care to visit with his or her family can vary significantly. In some cases, a foster parent may walk across the street to take a child to visit with his or her parents. In other cases, transportation might take the form of a subway or bus ride. In yet other circumstances, a foster parent may have to drive a child 90 miles for a visit. And finally, in some jurisdictions, caseworkers or case aides—not foster parents—provide this transportation for children in foster care. Due to this significant variability, the Foster Care MARC does not include this cost category

38.     The sixth step[35] in calculating the Foster Care MARC involved adjusting the costs of care in each of the reimbursable categories to specifically reflect geographical differences. The costs for the 48 contiguous United States were calculated based on the state cost-of-living indices for 2003 developed by the Inter-University Consortium for Political and Social Research.[36] These relative costs-of-living were applied to the inflation-adjusted amounts that were used in the analyses.

39.     States may—and should—choose to reimburse foster parents at higher rates in consideration of factors that were not possible to consider in these analyses. Foster parents should be reimbursed for their actual expenditures.

---

[35] For further discussion, *see* MARC Technical Report at 36.

[36] Berry, W., Fording, R., & Hanson, R., An Updated Cost of Living Index for the American States: 1960-2003 (2004), Retrieved May 27, 2007, from http://webapp.icpsr.umich.edu/.

## RESULTS

40.     As of October 2007, California was well-below the Foster Care MARC, and well-below the national average when measured as the percentage increase necessary to meet the Foster Care MARC:

| Child's Age | Foster Care Rates | | | Foster Care MARC | | | Increase Necessary to reach the Foster Care MARC | | |
|---|---|---|---|---|---|---|---|---|---|
| | 2 | 9 | 16 | 2 | 9 | 16 | 2 | 9 | 16 |
| California | 425 | 494 | 597 | 685 | 785 | 861 | 61% | 59% | 44% |
| National Average | 488 | 509 | 568 | 629 | 721 | 790 | 29% | 41% | 39% |

41.     Indeed, it is likely that California's failure to provide foster care maintenance payments commensurate with the cost of living in California plays a significant impact in the 30% decline in the number of licensed foster homes in the past ten years. This is particularly troubling given that California has the largest number of children in foster care of any state in the nation.

42.     California's Annual Cost Expenditures by Cost Subcategories are as follows:

| Child's Age Range | Food | | | Shelter | | | School Supplies | | |
|---|---|---|---|---|---|---|---|---|---|
| | 0-4 | 5-13 | 14-18 | 0-4 | 5-13 | 14-18 | 0-4 | 5-13 | 14-18 |
| California expenditures (in dollars) | 2335 | 2586 | 2905 | 2400 | 2500 | 2702 | 37 | 118 | 147 |
| National Average expenditures (in dollars) | 2143 | 2373 | 2666 | 2202 | 2294 | 2480 | 34 | 108 | 135 |

| Child's Age Range | Daily Supervision | | | Clothing | | | Personal Incidentals | | |
|---|---|---|---|---|---|---|---|---|---|
| | 0-4 | 5-13 | 14-18 | 0-4 | 5-13 | 14-18 | 0-4 | 5-13 | 14-18 |
| California expenditures (in dollars) | 236 | 773 | 773 | 1006 | 1014 | 1214 | 2101 | 2326 | 2482 |
| National Average expenditures (in dollars) | 217 | 709 | 709 | 923 | 931 | 1114 | 1928 | 2134 | 2278 |

16

(Continued from chart on previous page)

| Child's Age Range | Liability and Property Damage Insurance | | |
|---|---|---|---|
| | 0-4 | 5-13 | 14-18 |
| California | 108 | 108 | 108 |
| National Average | 99 | 99 | 99 |

It is difficult to imagine that over the course of a year less than these amounts would be spent by a foster parent on any of these cost categories.

Dated: August 12, 2008

_____

Dr. Diane DePanfilis, Ph.D., M.S.W.

17