

# HITTING THE M.A.R.C.

## Establishing Foster Care
## Minimum Adequate Rates for Children

Children's Rights • National Foster Parent Association • University of Maryland School of Social Work

This report provides a brief description of how the Foster Care MARC was calculated. A more detailed description is provided in the technical report, which is available at www.childrensrights.org, www.nfpainc.org and www.family.umaryland.edu.

# HITTING THE M.A.R.C.

## Establishing Foster Care
## Minimum Adequate Rates for Children

**October 2007**





# Acknowledgments

This project to establish Foster Care Minimum Adequate Rates for Children (the "Foster Care MARC") was developed and implemented by Children's Rights in collaboration with the Ruth H. Young Center (RYC) for Families and Children at the University of Maryland School of Social Work and the National Foster Parent Association (NFPA). The project partners are grateful for the generous support provided by the Annie E. Casey Foundation, the Ira W. DeCamp Foundation and the Joseph Leroy and Ann C. Warner Fund. This project would not have been possible without the support of these three foundations and we applaud their commitment to children in foster care and their families. As we thank them for their support, we also acknowledge that the findings and conclusions presented in this report are those of the project partners alone and do not necessarily reflect the opinions of these foundations.

The project is directed by Julie Farber, M.S.W., director of policy at Children's Rights, in collaboration with Diane DePanfilis, Ph.D., M.S.W., director of the RYC, and Karen Jorgenson, M.A., executive director of the NFPA.

The primary authors of this report are Diane DePanfilis, Ph.D., M.S.W., and Clara Daining, Ph.D., M.S.W., of the RYC; Kevin D. Frick, Ph.D., M.A., of the Johns Hopkins Bloomberg School of Public Heath, Department of Health Policy and Management; and Julie Farber, M.S.W., and Lisa Levinthal, J.D., M.P.A., of Children's Rights.

The project partners wish to acknowledge the significant contributions to the project made by:

- Associates of the RYC, including Howard Dubowitz, M.D., M.S. (University of Maryland School of Medicine, Department of Pediatrics); Jim Kunz, Ph.D., M.A., M.S.W.; and Priscilla Ryder, Ph.D., M.P.H.

- Former NFPA Project Manager Dianne Kocer, M.A.

- The National Association of Public Child Welfare Administrators (NAPCWA), specifically Director Anita Light and Senior Research Analyst Pat Shapiro

- Former Children's Rights' Director of Policy Madelyn Freundlich, LL.M., J.D., M.S.W. and former Policy Analyst Emily Joyce Oakes, M.S.W.

The project benefited significantly from the advice and counsel of an advisory group that included public child welfare agency representatives, foster parents, researchers, a pediatrician, advocates and others. We thank these advisory group members for their time and guidance throughout the course of the project. It should be noted that this report presents the views of the project partners

only and does not necessarily reflect the views of individual advisory group members or their organizations. Advisors included the following:

**Richard P. Barth, University of Maryland School of Social Work.** We give special thanks to Dr. Barth, who served as a member of the advisory board when he was at the University of North Carolina, Chapel Hill. During the course of the project, Dr. Barth became Dean of the University of Maryland School of Social Work and, thus, the project benefited significantly from his general guidance.

**Mary Ault**
California Department of
Social Services

**Roy Block**
Foster Parent, Texas

**Marc Cherna**
Allegheny County Department of
  Human Services

**Ken Deibert**
Idaho Department of Health & Welfare

**Susan Dreyfus**
Alliance for Children and Families

**Barbara Eaton**
California Department of Social Services

**Ramona Foley**
Oregon Department of Human Services

**Mel Gravely**
Foster Parent, Ohio

**Kevin George**
Oregon Department of Human Services

**Betty Hastings**
Foster Parent, Tennessee

**Bette Hoxie**
Foster Parent, Maine

**Mary Ann Judge**
Casey Family Services

**Kary Ledbetter**
Foster Parent, Idaho

**Cindy Lewis**
Monroe County Department of
  Social Services, New York State

**Emily Jean McFadden**
Grand Valley State University,
  School of Social Work

**Bonnie McNulty**
Foster Parent, Colorado

**Chris Morrison**
Indiana Foster Care and
  Adoption Association

**Sarah Morrison**
Center for the Study of Social Policy

**Mary Nelson**
Iowa Department of Human Services

**Nancy Rollins**
New Hampshire Department of
  Health & Human Services

**Randall Ruth**
Foster Parent, Minnesota

**John Sciamanna**
Child Welfare League of America

**Linda Shill**
California Department of Social Services

**Linda Smith**
Oklahoma Department of
   Human Services

**Matt Stagner**
Chapin Hall Center for Children
   (formerly of the Urban Institute)

**Moira Szilagyi**
Pediatrician
American Academy of Pediatrics,
   Task Force on Foster Care
Associate Professor of Pediatrics,
   University of Rochester
Medical Director of Starlight Pediatrics

**Millicent Williams**
Child Welfare League of America

Finally, the project benefited from input provided by Judith Eveland of the Maryland Department of Human Resources, and Duane St. Clair, a Maryland foster parent and also a representative of the NFPA.

States and localities should move quickly to adopt the Foster Care MARC. Further, laws and policies should be established at the federal and state levels that ensure adequate foster care rates going forward. Abused and neglected children in government custody have the right to receive appropriate care while in foster care and, ultimately, to grow up in a permanent family. By establishing foster care rates that cover actual costs, children can receive necessary care and have happier and more normal childhoods, child welfare systems may be better able to maintain a stable pool of foster parents and children can have better chances of growing up in permanent families.

**Julie Farber, M.S.W.**
Director of Policy,
Children's Rights

**Marcia Robinson Lowry, J.D.**
Executive Director,
Children's Rights

**Karen Jorgenson, M.A.**
Executive Director,
National Foster
Parent Association

**Diane DePanfilis, Ph.D., M.S.W.**
Director, Ruth H. Young Center
for Families and Children,
University of Maryland
School of Social Work

Hitting the MARC: Establishing Foster Care Minimum Adequate Rates for Children

# Table of Contents

Acknowledgments ................................................................................................................. v

Executive Summary ............................................................................................................. 1

Hitting the MARC ............................................................................................................. 10

    I. Background .................................................................................................................. 10

        A. Survey of Jurisdictions on How They Currently Set Rates ................................ 11

        B. Relevant Legal Precedent ................................................................................... 12

    II. Purpose and Objectives ............................................................................................ 12

    III. Methodology: How the Foster Care MARC Was Calculated ................................. 13

        A. Overview of Approach ....................................................................................... 13

        B. Calculation of Specific Cost Categories ............................................................ 14

    IV. Conclusion .............................................................................................................. 17

References ........................................................................................................................... 18

Hitting the MARC: Establishing Foster Care Minimum Adequate Rates for Children

X

# Executive Summary

This report presents the first-ever calculation of the real expenses of caring for a child in foster care in the United States. It systematically demonstrates that rates of support for children in foster care are far below what is needed to provide basic care for these children in nearly every state in the nation. On average, across the U.S., current foster care rates must be raised by 36 percent in order to reach the Foster Care Minimum Adequate Rates for Children (the "Foster Care MARC") calculated through this project. In some states, rates are less than half of what it actually costs to care for a child in foster care.

On any given day, there are more than half a million children in foster care in the U.S., the majority of whom have entered care due to abuse and neglect by their parents. Three-fourths of them are placed by the government with foster parents who open their homes to care for these vulnerable children and almost one-fifth are placed in group homes and institutions.

State and local child welfare systems are obligated by federal law to provide payments to foster parents to "cover" the expenses of caring for these children, such as food, clothing and school supplies. These payments are typically funded with a combination of federal, state and local dollars. However, there is no federally required minimum rate and, until now, there has been no standardized calculation of exactly how much it costs to care for a child in foster care.

States and localities have complete discretion in setting their foster care rates. In fact, current monthly rates range from $226 in Nebraska to $869 in the District of Columbia. Differences in the cost of living in various parts of the country and some individual state policies regarding separate reimbursement for certain expenses may account for a portion of the difference. However, the range is far too wide to be completely explained by those factors. Indeed, a number of states report using no particular methodology to determine their rates. Low among myriad state and local budget priorities, foster care rates in many states do not appear to be based on a real assessment of children's basic needs.

Thus, it is no surprise that foster parents and other advocates routinely report that current rates fall far short of the actual costs of providing care. And, if foster parents are not financially able to pick up the shortfall by paying out of their own pockets for expenses that the state or locality is legally obligated to cover, then children may do without.

There is evidence that inadequate foster care rates negatively affect foster parent recruitment and retention, which can set off a chain reaction of negative consequences for children. When a child welfare system cannot maintain an adequate pool of foster homes, children may be more likely to be

placed in institutional settings or shuttled from one foster placement to another, an unstable situation that can decrease their chances of ever having a permanent home.

This report does what most state and local child welfare systems have failed to do. It establishes Foster Care Minimum Adequate Rates for Children (the "Foster Care MARC") based on an analysis of the real costs of providing care. The Foster Care MARC is based on expenditures that are allowable under the Title IV-E Foster Care Maintenance Program of the Social Security Act, which defines foster care maintenance payments as covering the cost of providing food, clothing, shelter, daily supervision, school supplies, personal incidentals, insurance and travel for visitation with a child's biological family.

The Foster Care MARC sets a basic foster care rate.[1] It was calculated by analyzing consumer expenditure data reflecting the costs of caring for a child; identifying and accounting for additional costs particular to children in foster care; and applying a geographic cost-of-living adjustment, in order to develop specific rates for each of the 50 states and the District of Columbia. The Foster Care MARC includes adequate funds to meet a child's basic physical needs and cover the costs of "normalizing" childhood activities, such as after-school sports and arts programs, which are particularly important for children who have been traumatized or isolated by their experiences of abuse and neglect and placement in foster care.

The Foster Care MARC provides a benchmark superior to the U.S. Department of Agriculture (USDA) estimates of the costs of raising children, upon which some states have relied to set their rates. USDA estimates are an imperfect match for setting foster care rates because they include expenses that are not typically part of a foster care rate, such as mortgage or rent, health care and education, and they exclude other expenses particular to the care of children in foster care.

The national average of the Foster Care MARC is $629 per month for 2-year-olds,[2] $721 per month for 9-year-olds and $790 per month for 16–year-olds, compared to the current national average rates of $488 per month for 2-year-olds, $509 per month for 9-year-olds and $568 per month for 16-year-olds.

It should be noted that the Foster Care MARC does not include the cost of transporting a child to visit with his or her biological family or the cost of full-time child care for working foster parents. Given the variability in these expenditures from case to case, states and localities should reimburse foster parents based on their actual expenditures, in addition to the Foster Care MARC.

It should also be noted that the Foster Care MARC excludes expenses related to the cost of travel to administrative and judicial reviews and health care appointments. These expenses are also variable

---

[1]   This project developed an estimate of the basic costs associated with caring for a child in foster care. The Foster Care MARC does not include, for example, the additional costs of meeting the special needs of a child with a physical disability or medical condition. Foster care rates for children with these kinds of special needs are typically called "therapeutic foster care rates." Although this project did not calculate therapeutic foster care rates, the Foster Care MARC provides a basic rate to which estimates of the costs of meeting children's special needs can be added to determine adequate therapeutic foster care rates.

[2]   The Foster Care MARC was calculated for children ages birth-4, 5-13 and 14-18. States typically report their foster care rates for children ages 2, 9 and 16, which are the midpoints of the age categories used for this project.

and, in addition, are not reimbursable to states under the federal Title IV-E Maintenance program, which provided the framework for the calculation of the Foster Care MARC. However, these costs are reimbursable under other federal funding mechanisms, including the Title IV-E Administration Program and the Title XIX Medicaid Program. Here again, states should reimburse foster parents for their actual travel expenses for these purposes, in addition to the Foster Care MARC.

The Foster Care MARC should be quickly adopted by states and localities across the nation and these rates should be applied regardless of whether foster homes are directly supervised by a public child welfare agency or by private providers under contract with a public agency. Therapeutic foster care and adoption subsidy rates should also be informed by the Foster Care MARC and adjusted accordingly.

The federal government should improve the inadequate system of foster care payment by establishing minimum allowable foster care rates and requiring annual cost-of-living adjustments to those rates. As a first step toward achieving this goal, the federal government should require states to submit their methodology for calculating foster care rates as part of their foster care state plans, which are subject to federal approval. Finally, the federal government must strengthen its own commitment to foster care funding.

Certainly low foster care rates are not the only factors negatively affecting foster parent recruitment and retention, the well-being of children in foster care and children's chances of growing up in a permanent home. Low rates are among a number of significant systemic problems—for example, high caseworker caseloads—that may contribute to poor life outcomes for these children and which must be addressed. It is also critical that adequate funding and services are available to strengthen families and prevent children from entering foster care in the first place. However, when children cannot remain safely at home and do enter foster care, they must receive appropriate care, which requires adequate foster care rates.

By establishing foster care rates that cover actual costs, children can receive necessary care and have happier and more normal childhoods, child welfare systems may be better able to maintain a stable pool of foster parents and children can have better chances of growing up in permanent families.

The tables below provide a comparison of the Foster Care MARC against current rates.

## Table 1: Foster Care MARC Compared to Current Foster Care Rates
### (Alphabetical by State)

| | Current Foster Care Rates[3] | | | Foster Care MARC[4,5]<br><br>Note:<br>The Foster Care MARC does not include travel and child care expenses. Foster parents should be reimbursed for their actual expenses for these activities, **in addition to the Foster Care MARC.** | | | To hit the Foster Care MARC, current rates must be increased by:[5] | | |
|---|---|---|---|---|---|---|---|---|---|
| **Child's Age:** | **2** | **9** | **16** | **2** | **9** | **16** | **2** | **9** | **16** |
| **US Average:** | **488** | **509** | **568** | **629** | **721** | **790** | **29%** | **41%** | **39%** |
| Alabama | 410 | 434 | 446 | 567 | 650 | 712 | 38% | 50% | 60% |
| Alaska[7,8] | 652 | 580 | 688 | 629 | 721 | 790 | *** | 24% | 15% |
| Arizona | 793 | 782 | 879 | 606 | 695 | 762 | *** | *** | *** |
| Arkansas | 400 | 425 | 475 | 558 | 639 | 701 | 39% | 50% | 48% |
| California | 425 | 494 | 597 | 685 | 785 | 861 | 61% | 59% | 44% |
| Colorado | 348 | 392 | 423 | 659 | 755 | 828 | 89% | 93% | 96% |
| Connecticut | 756 | 767 | 834 | 756 | 866 | 950 | 0% | 13% | 14% |
| Delaware | 517 | 517 | 517 | 625 | 716 | 785 | 21% | 38% | 52% |
| Dist. of Columbia | 869 | 869 | 940 | 629 | 721 | 790 | *** | *** | *** |
| Florida | 429 | 440 | 515 | 579 | 664 | 728 | 35% | 51% | 41% |
| Georgia | 416 | 471 | 540 | 588 | 674 | 738 | 41% | 43% | 37% |
| Hawaii | 529 | 529 | 529 | 629 | 721 | 790 | 19% | 36% | 49% |
| Idaho | 274 | 300 | 431 | 602 | 689 | 756 | 120% | 130% | 75% |
| Illinois | 380 | 422 | 458 | 661 | 757 | 830 | 74% | 79% | 81% |
| Indiana | 760 | 760 | 760 | 630 | 722 | 791 | *** | *** | 4% |
| Iowa | 454 | 474 | 525 | 626 | 717 | 786 | 38% | 51% | 50% |
| Kansas | 603 | 603 | 603 | 628 | 720 | 789 | 4% | 19% | 31% |
| Kentucky | 599 | 599 | 660 | 569 | 652 | 715 | *** | 9% | 8% |
| Louisiana | 380 | 365 | 399 | 567 | 649 | 712 | 49% | 78% | 78% |
| Maine | 548 | 577 | 614 | 686 | 786 | 862 | 25% | 36% | 40% |
| Maryland | 735 | 735 | 750 | 628 | 720 | 789 | *** | *** | 5% |
| Massachusetts | 490 | 531 | 616 | 766 | 878 | 962 | 56% | 65% | 56% |

*(continues)*

4

| | Current Foster Care Rates[3] | | | Foster Care MARC[4,5]<br><br>Note:<br>The Foster Care MARC does not include travel and child care expenses. Foster parents should be reimbursed for their actual expenses for these activities, **in addition to the Foster Care MARC.** | | | To hit the Foster Care MARC, current rates must be increased by:[6] | | |
|---|---|---|---|---|---|---|---|---|---|
| **Child's Age:** | **2** | **9** | **16** | **2** | **9** | **16** | **2** | **9** | **16** |
| **US Average:** | **488** | **509** | **568** | **629** | **721** | **790** | **29%** | **41%** | **39%** |
| Michigan | 433 | 433 | 535 | 646 | 740 | 812 | 49% | 71% | 52% |
| Minnesota | 585 | 585 | 699 | 661 | 758 | 830 | 13% | 29% | 19% |
| Mississippi | 325 | 355 | 400 | 555 | 636 | 697 | 71% | 79% | 74% |
| Missouri | 271 | 322 | 358 | 627 | 719 | 788 | 131% | 123% | 120% |
| Montana | 515 | 475 | 572 | 598 | 685 | 751 | 16% | 44% | 31% |
| Nebraska | 226 | 359 | 359 | 636 | 729 | 799 | 181% | 103% | 123% |
| Nevada | 683 | 683 | 773 | 638 | 731 | 801 | *** | 7% | 4% |
| New Hampshire | 403 | 439 | 518 | 724 | 830 | 910 | 80% | 89% | 76% |
| New Jersey | 553 | 595 | 667 | 751 | 860 | 943 | 36% | 45% | 41% |
| New Mexico | 483 | 516 | 542 | 600 | 688 | 754 | 24% | 33% | 39% |
| New York | 504 | 594 | 687 | 721 | 826 | 906 | 43% | 39% | 32% |
| North Carolina | 390 | 440 | 490 | 630 | 722 | 792 | 62% | 64% | 62% |
| North Dakota | 370 | 418 | 545 | 584 | 669 | 734 | 58% | 60% | 35% |
| Ohio | 275 | 275 | 275 | 635 | 727 | 797 | 131% | 164% | 190% |
| Oklahoma | 365 | 430 | 498 | 557 | 639 | 700 | 53% | 49% | 41% |
| Oregon | 387 | 402 | 497 | 642 | 735 | 806 | 66% | 83% | 62% |
| Pennsylvania | 640 | 640 | 640 | 671 | 770 | 844 | 5% | 20% | 32% |
| Rhode Island | 438 | 416 | 480 | 723 | 828 | 908 | 65% | 99% | 89% |
| South Carolina | 332 | 359 | 425 | 576 | 660 | 723 | 73% | 84% | 70% |
| South Dakota | 451 | 451 | 542 | 633 | 726 | 795 | 40% | 61% | 47% |
| Tennessee | 627 | 627 | 737 | 574 | 658 | 722 | *** | 5% | *** |
| Texas | 652 | 652 | 652 | 557 | 638 | 700 | *** | *** | 7% |
| Utah | 426 | 426 | 487 | 634 | 726 | 796 | 49% | 70% | 63% |
| Vermont | 475 | 528 | 584 | 705 | 808 | 886 | 48% | 53% | 52% |
| Virginia | 368 | 431 | 546 | 605 | 694 | 760 | 64% | 61% | 39% |
| Washington | 374 | 451 | 525 | 657 | 753 | 826 | 76% | 67% | 57% |

*(continues)*

Hitting the MARC: Establishing Foster Care Minimum Rates for Children

| | Current Foster Care Rates[3] | | | Foster Care MARC[4,5]<br><br>Note:<br>The Foster Care MARC does not include travel and child care expenses. Foster parents should be reimbursed for their actual expenses for these activities, **in addition to the Foster Care MARC.** | | | To hit the **Foster Care MARC, current rates must be increased by:**[6] | | |
|---|---|---|---|---|---|---|---|---|---|
| **Child's Age:** | **2** | **9** | **16** | **2** | **9** | **16** | **2** | **9** | **16** |
| **US Average:** | **488** | **509** | **568** | **629** | **721** | **790** | **29%** | **41%** | **39%** |
| West Virginia | 600 | 600 | 600 | 561 | 643 | 705 | *** | 7% | 17% |
| Wisconsin | 317 | 346 | 411 | 648 | 743 | 814 | 104% | 115% | 98% |
| Wyoming | 645 | 664 | 732 | 608 | 696 | 763 | *** | 5% | 4% |

[3]  States' current foster care rates were collected during the period from April 2007 through July 2007. The sources for states' current rates were the National Resource Center for Family-Centered Practice and Permanency Planning, http://www.hunter.cuny.edu/socwork/nrcfcpp/downloads/foster-care-maintenance-payments.pdf, and communications with state child welfare systems.

[4]  The Foster Care MARC does not include the cost of transporting a child to visit with his or her biological family or the cost of full-time child care for working foster parents. Given the variability in these expenditures from case to case, states and localities should reimburse foster parents based on their actual expenditures, in addition to the Foster Care MARC. The Foster Care MARC also excludes the cost of travel to administrative and judicial reviews and health care appointments. These expenses are also variable and are not reimbursable to states under the federal Title IV-E maintenance program, which provided the framework for the calculation of the Foster Care MARC. However these costs are reimbursable under other federal funding mechanisms, such as Title IV-E Administration and Title XIX Medicaid. States should reimburse foster parents for their actual travel expenses for these purposes.

[5]  The Foster Care MARC was calculated for children ages birth-4, 5-13 and 14-18. States typically report their foster care rates for children ages 2, 9 and 16, which are the mid-points of the age categories used for this project.

[6]  *** indicates that a state's current foster care rate is higher than the Foster Care MARC. These states should be commended for establishing adequate rates.

[7]  Since there were no cost-of-living adjustments available for Alaska, the District of Columbia and Hawaii, the Foster Care MARC reported for these states and DC is the national average Foster Care MARC.

[8]  For all but three states, the current foster care rate reflected in this table is the state-established minimum rate. Alaska, New York and Pennsylvania do not have a statewide minimum. For these states, the table includes the rate for the most populous region (Anchorage, New York Metro Area and Philadelphia).

## Table 2: Hitting the Foster Care MARC
(States Listed from Best to Worst, Alphabetical within Categories)

| | Current Foster Care Rates[9] | | | Foster Care MARC[10,11]<br><br>Note:<br>The Foster Care MARC does not include travel and child care expenses. Foster parents should be reimbursed for their actual expenses for these activities, **in addition to the Foster Care MARC.** | | | To hit the **Foster Care MARC, current rates must be increased by:**[12] | | |
|---|---|---|---|---|---|---|---|---|---|
| **Child's Age:** | **2** | **9** | **16** | **2** | **9** | **16** | **2** | **9** | **16** |
| **US Average:** | **488** | **509** | **568** | **629** | **721** | **790** | **29%** | **41%** | **39%** |
| **Hitting the MARC** | | | | | | | | | |
| Arizona | 793 | 782 | 879 | 606 | 695 | 762 | *** | *** | *** |
| Dist. of Columbia[13] | 869 | 869 | 940 | 629 | 721 | 790 | *** | *** | *** |
| **Missing the MARC: Must Raise Rates by up to 25% for at Least One Age Group** | | | | | | | | | |
| Alaska[13, 14] | 652 | 580 | 688 | 629 | 721 | 790 | *** | 24% | 15% |
| Connecticut | 756 | 767 | 834 | 756 | 866 | 950 | 0% | 13% | 14% |
| Indiana | 760 | 760 | 760 | 630 | 722 | 791 | *** | *** | 4% |
| Kentucky | 599 | 599 | 660 | 569 | 652 | 715 | *** | 9% | 8% |
| Maryland | 735 | 735 | 750 | 628 | 720 | 789 | *** | *** | 5% |
| Nevada | 683 | 683 | 773 | 638 | 731 | 801 | *** | 7% | 4% |
| Tennessee | 627 | 627 | 737 | 574 | 658 | 722 | *** | 5% | *** |
| Texas | 652 | 652 | 652 | 557 | 638 | 700 | *** | *** | 7% |
| West Virginia | 600 | 600 | 600 | 561 | 643 | 705 | *** | 7% | 17% |
| Wyoming | 645 | 664 | 732 | 608 | 696 | 763 | *** | 5% | 4% |
| **Missing the MARC: Must Raise Rates by 26% to 50% for at Least One Age Group** | | | | | | | | | |
| Arkansas | 400 | 425 | 475 | 558 | 639 | 701 | 39% | 50% | 48% |
| Georgia | 416 | 471 | 540 | 588 | 674 | 738 | 41% | 43% | 37% |
| Hawaii | 529 | 529 | 529 | 629 | 721 | 790 | 19% | 36% | 49% |
| Kansas | 603 | 603 | 603 | 628 | 720 | 789 | 4% | 19% | 31% |
| Maine | 548 | 577 | 614 | 686 | 786 | 862 | 25% | 36% | 40% |
| Minnesota | 585 | 585 | 699 | 661 | 758 | 830 | 13% | 29% | 19% |
| Montana | 515 | 475 | 572 | 598 | 685 | 751 | 16% | 44% | 31% |

*(continues)*

Hitting the MARC: Establishing Foster Care Minimum Rates for Children

| | Current Foster Care Rates[9] | | | Foster Care MARC[10,11] Note: The Foster Care MARC does not include travel and child care expenses. Foster parents should be reimbursed for their actual expenses for these activities, **in addition to the Foster Care MARC.** | | | To hit the **Foster Care MARC, current rates must be increased by:**[12] | | |
|---|---|---|---|---|---|---|---|---|---|
| **Child's Age:** | **2** | **9** | **16** | **2** | **9** | **16** | **2** | **9** | **16** |
| **US Average:** | **488** | **509** | **568** | **629** | **721** | **790** | **29%** | **41%** | **39%** |
| New Jersey | 553 | 595 | 667 | 751 | 860 | 943 | 36% | 45% | 41% |
| New Mexico | 483 | 516 | 542 | 600 | 688 | 754 | 24% | 33% | 39% |
| New York | 504 | 594 | 687 | 721 | 826 | 906 | 43% | 39% | 32% |
| Pennsylvania | 640 | 640 | 640 | 671 | 770 | 844 | 5% | 20% | 32% |
| **Missing the MARC: Must Raise Rates by 51% to 75% for at Least One Age Group** | | | | | | | | | |
| Alabama | 410 | 434 | 446 | 567 | 650 | 712 | 38% | 50% | 60% |
| California | 425 | 494 | 597 | 685 | 785 | 861 | 61% | 59% | 44% |
| Delaware | 517 | 517 | 517 | 625 | 716 | 785 | 21% | 38% | 52% |
| Florida | 429 | 440 | 515 | 579 | 664 | 728 | 35% | 51% | 41% |
| Iowa | 454 | 474 | 525 | 626 | 717 | 786 | 38% | 51% | 50% |
| Massachusetts | 490 | 531 | 616 | 766 | 878 | 962 | 56% | 65% | 56% |
| Michigan | 433 | 433 | 535 | 646 | 740 | 812 | 49% | 71% | 52% |
| North Carolina | 390 | 440 | 490 | 630 | 722 | 792 | 62% | 64% | 62% |
| North Dakota | 370 | 418 | 545 | 584 | 669 | 734 | 58% | 60% | 35% |
| Oklahoma | 365 | 430 | 498 | 557 | 639 | 700 | 53% | 49% | 41% |
| South Dakota | 451 | 451 | 542 | 633 | 726 | 795 | 40% | 61% | 47% |
| Utah | 426 | 426 | 487 | 634 | 726 | 796 | 49% | 70% | 63% |
| Vermont | 475 | 528 | 584 | 705 | 808 | 886 | 48% | 53% | 52% |
| Virginia | 368 | 431 | 546 | 605 | 694 | 760 | 64% | 61% | 39% |
| **Missing the MARC: Must Raise Rates by 76% to 100% for at Least One Age Group** | | | | | | | | | |
| Colorado | 348 | 392 | 423 | 659 | 755 | 828 | 89% | 93% | 96% |
| Illinois | 380 | 422 | 458 | 661 | 757 | 830 | 74% | 79% | 81% |
| Louisiana | 380 | 365 | 399 | 567 | 649 | 712 | 49% | 78% | 78% |
| Mississippi | 325 | 355 | 400 | 555 | 636 | 697 | 71% | 79% | 74% |
| New Hampshire | 403 | 439 | 518 | 724 | 830 | 910 | 80% | 89% | 76% |
| Oregon | 387 | 402 | 497 | 642 | 735 | 806 | 66% | 83% | 62% |
| Rhode Island | 438 | 416 | 480 | 723 | 828 | 908 | 65% | 99% | 89% |

*(continues)*

| | Current Foster Care Rates[9] | | | Foster Care MARC[10,11]<br><br>**Note:**<br>The Foster Care MARC does not include travel and child care expenses. Foster parents should be reimbursed for their actual expenses for these activities, **in addition to the Foster Care MARC.** | | | To hit the **Foster Care MARC, current rates must be increased by:**[12] | | |
|---|---|---|---|---|---|---|---|---|---|
| **Child's Age:** | **2** | **9** | **16** | **2** | **9** | **16** | **2** | **9** | **16** |
| **US Average:** | **488** | **509** | **568** | **629** | **721** | **790** | **29%** | **41%** | **39%** |
| South Carolina | 332 | 359 | 425 | 576 | 660 | 723 | 73% | 84% | 70% |
| Washington | 374 | 451 | 525 | 657 | 753 | 826 | 76% | 67% | 57% |
| **Missing the MARC: Must Raise Rates by more than 100% for at Least One Age Group** | | | | | | | | | |
| Idaho | 274 | 300 | 431 | 602 | 689 | 756 | 120% | 130% | 75% |
| Missouri | 271 | 322 | 358 | 627 | 719 | 788 | 131% | 123% | 120% |
| Nebraska | 226 | 359 | 359 | 636 | 729 | 799 | 181% | 103% | 123% |
| Ohio | 275 | 275 | 275 | 635 | 727 | 797 | 131% | 164% | 190% |
| Wisconsin | 317 | 346 | 411 | 648 | 743 | 814 | 104% | 115% | 98% |

---

[9]  States' current foster care rates were collected during the period from April 2007 through July 2007. The sources for states' current rates were the National Resource Center for Family-Centered Practice and Permanency Planning, http://www.hunter.cuny.edu/socwork/nrcfcpp/downloads/foster-care-maintenance-payments.pdf, and communications with state child welfare systems.

[10]  The Foster Care MARC does not include the cost of transporting a child to visit with his or her biological family or the cost of full-time child care for working foster parents. Given the variability in these expenditures from case to case, states and localities should reimburse foster parents based on their actual expenditures, in addition to the Foster Care MARC. The Foster Care MARC also excludes the cost of travel to administrative and judicial reviews and health care appointments. These expenses are also variable and are not reimbursable to states under the federal Title IV-E maintenance program, which provided the framework for the calculation of the Foster Care MARC. However these costs are reimbursable under other federal funding mechanisms, such as Title IV-E Administration and Title XIX Medicaid. States should reimburse foster parents for their actual travel expenses for these purposes.

[11]  The Foster Care MARC was calculated for children ages birth-4, 5-13 and 14-18. States typically report their foster care rates for children ages 2, 9 and 16, which are the mid-points of the age categories used for this project.

[12]  *** indicates that a state's current foster care rate is higher than the Foster Care MARC. These states should be commended for establishing adequate rates.

[13]  Since there were no cost-of-living adjustments available for Alaska, the District of Columbia and Hawaii, the Foster Care MARC reported for these states and DC is the national average Foster Care MARC.

[14]  For all but three states, the current foster care rate reflected in this table is the state-established minimum rate. Alaska, New York and Pennsylvania do not have a statewide minimum. For these states, the table includes the rate for the most populous region (Anchorage, New York Metro Area and Philadelphia).

# Hitting the MARC

## I. Background

As of 2005, there were 512,000 children living in foster care in the United States.[i,15] Foster care services, including payments to foster parents for caring for children, are supported by a combination of federal, state and local funding.[ii] The Title IV-E federal foster care program of the Social Security Act pays a portion of the states' costs to provide care for maltreated children removed from welfare-eligible homes. The program's funding is structured as an "uncapped" entitlement; therefore, any qualifying expenditure will be partially reimbursed by the federal government to the states without limit.[iii]

Title IV-E of the Social Security Act defines foster care maintenance payments as "payments to cover the cost of (and the cost of providing) food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance with respect to a child and reasonable travel to the child's home for visitation."[iv] There is significant variability among states in the monthly payments provided to foster parents for the care of children in foster care and in the methods, if any, that states use to determine the amount of those payments. Basic foster care rates vary from $226 a month in the state of Nebraska[v] to $869 a month in the District of Columbia.[vi]

Foster parents and other advocates routinely report that current rates do not cover actual costs and there is some evidence that inadequate rates negatively affect foster parent recruitment and retention, which may, in turn, affect the achievement of permanency for children in foster care. Some research has found that, as a result of low rates, children in foster care may not always receive the care they need and community members may be deterred from becoming or remaining foster parents.[vii] A study by the United States Department of Health and Human Services (USDHHS) Office of the Inspector General found that foster parents incur expenses that exceed foster care rates and often pay out of their own pockets to meet children's needs.[viii] This study found that the additional financial strain placed upon foster parents causes them to consider no longer fostering.[ix]

Recent media reports also support these findings.[x] For example, California, which has the largest number of children in foster care of any state in the nation,[xi] has reported a 30 percent decline in the number of licensed foster homes in the past ten years, attributed at least in part to low foster care reimbursement rates.[xii] Other states have reported a shortage of family foster homes, including

---

[15]  Reference citations, denoted by Roman numerals, are provided in endnotes beginning on page 18.

Louisiana, where the foster care rate has not been increased in 11 years,[xiii] and Wisconsin, which has the fourth-lowest rate in the nation.[xiv]

A reasonable hypothesis is that children in child welfare systems that lack adequate numbers of foster homes may be more likely to experience multiple placements and be placed in institutional facilities,[xv] which are significantly more expensive than family foster homes. The experience of multiple placements has been shown to negatively affect a child's wellbeing[xvi] and to decrease a child's chances of being adopted.[xvii] In fact, 60 percent of children who are adopted from foster care are adopted by their foster parents.[xviii] Thus, placement in a stable foster home is a critical factor in a child's chances of being adopted when family reunification efforts fail.

Placement instability may also affect a child's chances at family reunification, as multiple placement moves may reduce the chances that children will visit consistently with their biological families. Frequent visiting between children in foster care and their biological parents has been shown to increase the likelihood of reunification.[xix] Achieving permanency not only is beneficial for the wellbeing of children, but also results in substantial government savings over long-term foster care.[xx]

Certainly, low foster care rates are not the only factors affecting foster parent recruitment and retention, the well-being of children in foster care and children's chances of growing up in a permanent home. Low rates are among a number of significant systemic problems—for example, high caseworker caseloads—that may contribute to poor life outcomes for these children. Other factors inhibiting recruitment and retention cited by foster parents include limited caseworker support, inadequate services for the children placed in their homes, poor training and caseworker turnover.[xxi] All of these systemic issues must be addressed, in addition to raising rates to appropriate levels.

Differences in the cost of living among various parts of the country, as well as some individual state policies regarding separate reimbursement for certain expenses, may account for a portion of the difference among foster care rates across the nation. However, the range is too wide to be completely explained by those factors. Indeed, many states do not report any particular method for calculating their foster care rates.[xxii]

## A. Survey of Jurisdictions on How They Currently Set Rates

In 2007, for the purpose of informing this project, the National Association of Public Child Welfare Administrators (NAPCWA) surveyed child welfare agencies in the 50 states and a number of counties to collect information on their foster care rate-setting methodologies.[16] Twenty-six jurisdictions responded, including 21 states and five counties. Of these, only 14 jurisdictions documented some basis for calculating their foster care rates. The remaining 12 did not report any methodology. Only three out of the 26 responding jurisdictions reported having a policy requiring periodic review of the adequacy of their foster care rates.

---

[16]   A copy of the NAPCWA report is available at www.childrensrights.org.

Absent a more precise guideline—now provided by the Foster Care MARC—a few jurisdictions have tied their foster care rates to estimates of the costs of raising (non-foster care) children produced by the U.S. Department of Agriculture (USDA)[xxiii] based on data from the Consumer Expenditure Survey (CES) administered by the Bureau of Labor Statistics (BLS).[xxiv] However, the USDA estimates are an imperfect basis for foster care rates because they include categories of expenditures that would not typically be included in a foster care rate such as mortgage or rent, health care and school tuition. Foster care payments are typically not intended to cover a foster parent's mortgage or rent; health care for children in foster care is covered through Medicaid; and children in foster care typically attend public school. In addition to being over-inclusive of such expenses, the USDA estimates do not include certain costs particular to children in foster care. For example, the USDA estimates do not include the costs of the additional wear and tear on household items that occurs due to the particular needs and behaviors of children in foster care, given the trauma they have experienced; property and liability insurance costs related to caring for these children; or the costs of transporting children to visits with their biological families and to administrative reviews and court hearings.

## B. Relevant Legal Precedent

In 2003, a Missouri federal court ordered the state to develop a methodology for determining foster care reimbursement rates as a result of a lawsuit brought by the Missouri Child Care Association. The court found the state's method of setting payments, which was based on available funds in the state's budget rather than children's needs, violated federal law. The court ordered the state to develop a methodology for determining foster care maintenance payments based on the statutory criteria contained in federal law. The foster care rate at issue in this case was for residential facilities and not for foster homes, but the court's analysis is instructive on the question of how the adequacy of foster care rates can and cannot be determined. In 2003, a Georgia federal court ruled that children in foster care have the legal right to have their needs met through adequate foster care maintenance payments.

# II. Purpose and Objectives

The purpose of this project was to estimate the costs associated with providing basic care to a child in foster care in the United States in order to determine adequate foster care rates.

The objectives were as follows:

- Operationally define the basic needs of a child in foster care as guided by federal regulations.
- Identify the most appropriate data sources for estimating the costs of meeting the needs of children in foster care.
- Construct models to estimate the costs of caring for children of various ages in foster care.
- Identify geographic cost-of-living variations.
- Calculate foster care minimum adequate rates for children (the Foster Care MARC) for the 50 states and the District of Columbia that should be adopted by child welfare systems.

# III. Methodology: How the Foster Care MARC Was Calculated

This section provides a brief description of how the Foster Care MARC was calculated. A more detailed description is provided in the technical report, available at www.childrensrights.org, www.nfpainc.org, and www.family.umaryland.edu.

## A. Overview of Approach

The Foster Care MARC was calculated by analyzing consumer data reflecting typical U.S. family expenditures to care for their children; identifying and incorporating additional costs particular to children in foster care; and applying a geographic cost-of-living adjustment, to develop specific rates for each of the 50 states and the District of Columbia.

### Costs of Caring for a Child in the United States

The Consumer Expenditure Survey (CES), a national study of household expenditures conducted by the Bureau of Labor Statistics of the United States Department of Labor, was the data source used to estimate the basic expenses of caring for a child in the United States.[17, 18] The calculation of the Foster Care MARC was based on the expenditures of middle-income families on their children. Expenditures on children by families living in poverty and very wealthy families were purposefully excluded from the analysis because their expenditures would not provide a reasonable basis for determining foster care rates. Cost estimates from the CES data were matched to the expenditures allowable under the Title IV-E Foster Care Maintenance Program of the Social Security Act.

The calculation of the Foster Care MARC took into account the varying needs of children in different age groups, recognizing, for example, that the needs of and expenses generated by a 2-year-old are different from those of a 14-year-old. Based on age-appropriate needs and expenses, adequate rates were calculated for three age groups: children ages birth-4, 5-13 and 14-18. States typically report their foster care rates for children ages 2, 9 and 16, which are the midpoints of the age categories used for this project.

### Identifying Additional Costs Particular to Children in Foster Care

Caring for a child in foster care generates additional expenses beyond the basic costs of caring for a child who is not in foster care.[xxv] Given the trauma they have experienced, children in foster care often have particular needs and behaviors that cause increased wear and tear on household items and the need to clean, fix or replace these items more frequently than in households without children in foster care. For example, foster parents may need to replace bedding or do laundry more

---

[17]   The CES is the same data source used by the USDA to produce its estimates of raising a child in the United States. However, the analysis conducted for this project addresses the deficiencies of the USDA estimates for the purpose of setting foster care rates, as noted above.

[18]   CES data from 2002-2004 were used. These were the most recent data available at the time the analysis was conducted. These estimates were then inflation-adjusted to 2006.

frequently as a result of a child's bed wetting. They may also have increased utility bills due to extra laundry and needing to leave lights on at night because children are afraid of the dark, or higher phone bills due to children needing to maintain contact with family and friends who may not live locally. The Foster Care MARC calculation increased certain cost estimates from the CES to account for these kinds of issues, based on the findings of another study estimating these increased costs.[xxvi]

Foster parents may also incur the cost of purchasing liability and property insurance to cover loss and damage that may occur due to children's behaviors. The Foster Care MARC includes the cost of purchasing such insurance. However, it should be noted that the project partners take the position that this function should actually be handled by the child welfare system, rather than foster parents having to purchase insurance on their own in the private market.

Finally, foster parents may incur the costs of transporting a child in foster care to his or her biological family's home for the purpose of visitation and to multiple medical and mental-health appointments, as well as the costs of transporting themselves and the child to administrative reviews and court hearings. The Foster Care MARC does not include these travel expenses because they can vary widely from child to child; thus, foster parents should be reimbursed for their actual expenses for these activities, in addition to the Foster Care MARC. It should be noted that child care for the working foster parent is also not included in the Foster Care MARC because the need for child care varies from foster home to foster home. Here again, foster parents should be reimbursed for their actual expenses for these activities, in addition to the Foster Care MARC.

### Cost-of-Living Adjustment

The Foster Care MARC was adjusted to reflect the cost-of-living index in different states, producing individual rates for each state and the District of Columbia.[xxvii]

## B. Calculation of Specific Cost Categories

This section provides an explanation of how each of the eight cost categories was calculated to ultimately produce the Foster Care MARC.

### Food

The food category of the Foster Care MARC was based on the expenditures of middle-income families on food for their children, as identified in the CES. This estimate was then increased by 10 percent to account for the additional costs that can result from behavioral issues of children in foster care, such as hoarding food or having additional nutritional needs.

### Clothing

The clothing category of the Foster Care MARC was based on the expenditures of middle-income families on clothing, shoes and coin-operated laundry for their children, as identified in the CES (utility expenses for laundry done at home is reflected in the "shelter" category). The CES estimate of costs for clothing and shoes was then doubled and the cost of coin-operated laundry was

increased by 50 percent to reflect the additional wear and tear, replacement for lost items and need for more frequent laundry that typically result from the particular circumstances and needs of children in foster care.

It should be noted that the Foster Care MARC is intended to cover regular ongoing expenses related to clothing and does not include funds to purchase an entire new wardrobe, which some children in fact need when they enter foster care. A number of states provide an initial clothing allowance to address this issue. States that do not provide an initial clothing allowance should do so.

## Shelter

The shelter category of the Foster Care MARC was based on the per-child expenditures of middle-income families on utilities, furniture, appliances and household linens, as identified in the CES. Expenditures on utilities were then increased by 50 percent to account for increased use of water, phone, oil/gas, electricity and other utilities. The expenses related to wear and tear on household items, including furniture, appliances and household linens, were doubled to reflect the need for more frequent repair and replacement of these items.

It should be noted that the Foster Care MARC does not include costs related to mortgage or rent, as foster parents are typically expected to be able to maintain their homes independently of the foster care payment. In addition, the Foster Care MARC does not include the costs of preparing a home to meet the needs of the child such as initial furnishings or safety features (e.g., window guards). These items must be installed before the child is placed in the home and, while foster parents should be reimbursed for those expenses, they would not be included in a monthly foster care rate tied to a particular child.

## Daily Supervision

The daily supervision category of the Foster Care MARC reflects the expenditures of middle-income families on occasional babysitting, based on the CES, and one week of summer camp for children ages 5-18.[xxviii] Additional expenditures to cover the costs of babysitting for older children were included in the Foster Care MARC to account for the fact that children in foster care often have behavioral issues and require more supervision than other children.

It should be noted that the Foster Care MARC does not include the cost of full-time child care for the working foster parent. The project partners take the position that foster parents should be reimbursed for their actual expenses for regular child care, in addition to the Foster Care MARC. Although it is reasonable to calculate, for example, average food costs for a child, it is not reasonable to calculate and include in the monthly rate an average of daily child care costs, given that some foster parents work full-time and some do not work.

## School Supplies

The school supplies category of the Foster Care MARC reflects the expenditures of middle-income families on books, recreational lessons and other school supplies, as identified in the CES. The expenditures on books and supplies were then doubled to account for additional wear and tear due

15

to the particular circumstances and needs of children in foster care. Recreational lessons reflect the expense of providing children in foster care with "normalizing" childhood experiences such as after-school sports or creative arts programs, which are particularly important for children who have been traumatized or isolated by their experiences of abuse and neglect and placement in foster care.[xxix]

### Personal Incidentals

The personal incidentals category in the Foster Care MARC reflects the expenditures of middle-income families on their children for reading materials, videos, toys, hobbies, gas and motor oil, fees and admissions, as identified in the CES, and an additional 15 percent[xxx] of other costs to reflect the cost of personal hygiene items, cosmetics and over-the-counter medications. CES estimates of the costs of reading materials, video games, toys and hobbies were doubled to account for additional wear and tear due to the needs and behaviors of children in foster care.

### Liability and Property Insurance

The insurance category of the Foster Care MARC includes the costs of purchasing liability and property insurance, based on estimates from Foster Parent Professionals, Inc., an insurance company that provides this type of insurance.[xxxi]

Liability insurance coverage includes (1) protection in the event a foster child is injured while in the care of a foster parent and the foster parent is sued by the child's natural parents or guardian; (2) protection from claims for bodily injury or property damage to the person or property of another because of an act of the foster child; (3) personal injury liability coverage for such things as libel, slander, false arrest, wrongful eviction and alienation of the affection of the foster child from his or her parent; and (4) incidental malpractice liability coverage for the foster parent's failure to provide needed medical care, therapy, diet or other special needs of the foster child. Property insurance provides coverage for the foster family's property against damage caused by the child in foster care.[xxxii] Property insurance excludes damage that was intentionally caused.

It should be noted that the cost estimates included in the Foster Care MARC were based on policies sold to child welfare agencies, not to individual foster parents, and thus they are likely a conservative calculation of what the costs would be if an individual foster parent were to purchase such insurance.

As noted above, although this expense was included in the Foster Care MARC, the project partners take the position that this function should actually be handled by the child welfare system, rather than foster parents having to purchase insurance on their own in the private market.

### Travel to the Child's Home for Visitation

The Foster Care MARC does <u>not</u> include the cost of transporting a child to visit with his or her biological family because these costs can vary significantly. In some cases, a foster parent may walk across the street to take a child to visit with his or her parents. In other cases, transportation might take the form of a subway or bus ride. In yet other circumstances, a foster parent may have to drive a child 90 miles for a visit. And finally, in some jurisdictions, caseworkers or case aides—not foster

16

parents—provide this transportation for children in foster care. An average calculation of these expenses would underpay some foster parents and overpay others.

Instead, it is the strong recommendation of the project partners that foster parents be reimbursed for the actual cost of their transportation related to visitation, which may include expenses related to transport by car, taxi, subway, bus or other means.

It should also be noted that the Foster Care MARC does not include expenses related to travel to administrative and judicial reviews and health-care appointments. These expenses are also highly variable from child to child. Furthermore, they are not reimbursable to states under the federal Title IV-E Maintenance program, which provided the framework for the Foster Care MARC calculation. However, these travel costs are reimbursable under other federal funding mechanisms, including Title IV-E Administration and Title XIX Medicaid. Here again, states should reimburse foster parents for their actual travel expenses for these purposes and pursue available federal funding to support these expenses.

Finally, it should be noted that travel costs incurred by foster parents associated with the daily provision of basic care to a child (i.e., general travel expenses not specific to visitation, administrative and judicial reviews or medical visits) are included in the personal incidentals portion of the Foster Care MARC.

# IV. Conclusion

The Foster Care MARC should be quickly adopted by states and localities across the nation. These rates should be applied regardless of whether foster homes are directly supervised by a public child welfare agency or by private providers under contract with a public agency. Therapeutic foster care and adoption subsidy rates should also be informed by the Foster Care MARC and adjusted accordingly.

The federal government should improve the inadequate system of foster care payment by establishing minimum allowable foster care rates and requiring annual cost-of-living adjustments to those rates. As a first step to achieving this goal, the federal government should require states to submit their methodology for calculating foster care rates as part of their foster care state plans, which are subject to federal approval. Finally, the federal government must strengthen its own commitment to foster care funding.

By establishing foster care rates that cover actual costs, children can receive necessary care and have happier and more normal childhoods, child welfare systems may be better able to maintain a stable pool of foster parents and children can have better chances of growing up in permanent families.

Hitting the MARC: Establishing Foster Care Minimum Adequate Rates for Children

# References

[i]    U.S. Department of Health and Human Services, Administration for Children and Families, Children's Bureau. (2006). *AFCARS report: Preliminary FY2005 estimates as of September 2006.* Retrieved May 25, 2007, from http://www.acf.HHS.gov/programs/cb/stats_research/afcars/tar/report13.htm.

[ii]   Murray, K. O. (undated). *The child welfare financing structure.* Retrieved May 26, 2007, from http://pewfostercare.org/research/docs/MurrayPaper2.pdf; Scarcella, C.A, Bess, R., Zielwski, E., & Geen, R. (2006). *The cost of protecting vulnerable children V: Understanding state variation in child welfare financing.* Washington, DC: The Urban Institute; U.S. Department of Health and Human Services, Office of the Assistant Secretary for Planning and Evaluation (2005). *Federal foster care financing: How and why the current funding structure fails to meet the needs of the child welfare field.* Retrieved May 27, 2007 from http://aspe.hhs.gov/hsp/05/fc-financing-ib/.

[iii]  Social Security Act, as amended by the Child and Family Services Improvement Act, effective October 1, 2006, Section 472[42 U.S.C. 672].

[iv]   Social Security Act, as amended by the Child and Family Services Improvement Act, effective October 1, 2006, Section 472[42 U.S.C. 672]; Section 475, 4A. [42 U.S.C. 675].

[v]    National Resource Center for Family Centered Practice and Permanency Planning (2007). *Foster care maintenance payments.* Retrieved May 26, 2007, from http://www.hunter.cuny.edu/socwork/nrcfcpp/info_services/foster-care.html.

[vi]   Child and Family Services. (2007) *Proposed new foster care rates effective January 1, 2007, Foster care rates effective January 1, 2006 – December 31, 2006.* Washington, D.C.: author.

[vii]  Chamberlain, P. & Moreland, S. (1992). Enhanced services and stipends for foster parents: Effects on retention rates and outcomes for children. *Child Welfare 75,* 387-402; Doyle J. & Peters E. (2003). *The market for foster care: An empirical study of the impact of foster care subsidies.* Retrieved May 14, 2007, from www.mit.edu/~jjdoyle/_web.pdf; Doyle, J. (2005). *Can't Buy Me Love? Subsidizing the care of related children.* Cambridge, MA: MIT Sloan School of Management and NBER; U.S. Department of Health and Human Services, Office of Inspector General. (2002). *Retaining foster parents.* Washington, D.C.: author.

[viii] U.S. Department of Health and Human Services, Office of Inspector General. (2002). *Retaining foster parents.* Washington, D.C.: author.

ix    ibid.

x     Lin, J. "Fewer families welcome foster kids: Reports blame state's low reimbursement rates as cost of living rises"  *The Sacramento Bee*, May 22, 2007; Garcia, E. "California's foster parents demand a raise." *San Jose Mercury News*, May 23, 2007.

xi    Child Welfare League of America, National Data Analysis System, *Number of Children in Out-of-Home Care, for Years 2000-2004*. Retrieved June 18, 2007, from http://ndas.cwla.org/data_stats/access/ predefined/Report.asp?ReportID=379.

xii   Lin, J. "Fewer families welcome foster kids: Reports blame state's low reimbursement rates as cost of living rises." *The Sacramento Bee*, May 22, 2007.

xiii  Haag, D. "Foster care program seeks help, homes." *The Shreveport Times*, May 14, 2007.

xiv   Associated Press. "State sees drop in number of foster homes." *Gazette Extra*, June 12, 2007.

xv    US Department of Health and Human Services, Office of the Inspector General. (2002). *Recruiting foster parents*. Washington, DC: author.

xvi   Rubin, D., O'Reilly, A., Luan, X., & Localio, A. R. (2007).  The Impact of Placement Stability on Behavioral Well-being for Children in Foster Care. *Pediatrics, 119 (2)*, 336-344; Sedlak, A. & Broadhurst, D. (1993). *Study of Adoption Assistance Impact and Outcomes: Final Report*.  Washington D.C. Westat, Inc. Administration for Children and Families, United States Department of Health and Human Services.

xvii  Testa, M. (2003).  *Instability in Foster Care*.  Urbana-Champaign: Children and Family Research Center School of Social Work, University of Illinois.

xviii U.S. Department of Health and Human Services, Administration for Children and Families, Children's Bureau. (2006).  *AFCARS report: Preliminary FY2005 estimates as of September 2006*. Retrieved May 25, 2007, from  http://www.acf.hhs.gov/programs/cb/stats_research/afcars/tar /report13.htm.

xix   Davis, I., Landsverk, J., Newton, R., & Ganger, W. (1996).  Parental visiting and foster care reunification.  *Children and Youth Services Review, 18* (4/5), 363-382.

xx    Barth, R.P., Lee, C.K. Wildfire, J. & Guo, S. (2006). A comparison of the governmental costs of long-term foster care and adoption.  *Social Service Review, 80* (1), 127-158.

xxi   Denby, R., Rindfleisch, N., & Bean, G. (1999).  Predictors of foster parents' satisfaction and intent to continue to foster.  *Child Abuse & Neglect, 23* (3), 287-303; Rhodes, K., Orme, J., & Buehler, C. (2001). A comparison of family foster parents who quit, consider quitting, and plan to continue fostering. *Social Service Review, 75* (1), 85-113; U.S. Department of Health and Human Services, Office of Inspector General.  (2002). *Retaining foster parents*. Washington, D.C.: author.

xxii  National Resource Center for Family Centered Practice and Permanency Planning (2007). *Foster care maintenance payments*.  Retrieved May 26, 2007, from http://www.hunter.cuny.edu/socwork/nrcfcpp/ info_services/foster-care.html; National Association of Public Child Welfare Administrators.  (2007).

*Basic Family Foster Care Maintenance Rates Survey: Summary of Findings.* Survey conducted and report prepared by NAPCWA, for Children's Rights.

[xxiii]  Lino, M. (2006). *Expenditures on children by families, 2005.* Washington, D.C.: U.S. Department of Agriculture, Center for Nutrition Policy and Promotion, Retrieved May 27, 2007, from http://www.cnpp.usda.gov/Publications/CRC/crc2005.pdf.

[xxiv]  National Association of Public Child Welfare Administrators. (2007). Basic *Family Foster Care Maintenance Rates Survey: Summary of Findings.* Survey conducted and report prepared by NAPCWA, for Children's Rights.

[xxv]  McHugh, M. (2002). *The costs of caring: A study of appropriate foster care payments for stable and adequate out of home care in Australia.* Sydney, Australia: Social Policy Research Center, University of New South Wales.

[xxvi]  The increases to the CES were based on the findings from McHugh, M. (2002). *The costs of caring: A study of appropriate foster care payments for stable and adequate out of home care in Australia.* Sydney, Australia: Social Policy Research Center, University of New South Wales.

[xxvii]  The Foster Care MARC was adjusted based on a state cost-of-living index for the 48 contiguous states. The U.S. average minimum adequate foster care rate was used for Alaska, Hawaii and the District of Columbia because state cost-of-living adjustments for those jurisdictions are not available.

[xxviii]  The cost of one week of residential summer camp is based on the average weekly cost of a independent non-profit residential camp according to the American Camp Association. Allison McMunn, American Camp Association, personal communication, April 23, 2007.

[xxix]  Fong, R., Schwab, J., & Armour, M. (2006). Continuity of activities and child well-being of foster care youth. *Children and Youth Services Review,* 28 (11), 1359-1374.

[xxx]  This follows the methodology used by the USDA. Lino, M. (2006). *Expenditures on children by families, 2005.* Washington D.C. U.S. Department of Agriculture, Center for Nutrition Policy and Promotion, Miscellaneous Publication No. 1528-2005.. Retrieved May 27, 2007, from http://www.cnpp.usda.gov/Publications/CRC/crc2005.pdf.

[xxxi]  Bonnie Eshbaugh, Foster Parent Professional, Inc., personal communication, August 17, 2006.

[xxxii]  Bonnie Eshbaugh, Foster Parent Professional, Inc., personal communication, November 17, 2006.



www.childrensrights.org



www.nfpainc.org



www.family.umaryland.edu