United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA STATE FOSTER PARENT ASSOCIATION, CALIFORNIA STATE CARE PROVIDERS ASSOCIATION, AND LEGAL ADVOCATES FOR PERMANENT PARENTING,<br><br>Plaintiffs,<br><br>v.<br><br>JOHN A. WAGNER, Director of the CALIFORNIA DEPARTMENT OF SOCIAL SERVICES, in his official capacity, MARY AULT, Deputy Director of the CHILDREN AND FAMILY SERVICES DIVISION OF THE CALIFORNIA DEPARTMENT OF SOCIAL SERVICES, in her official capacity,<br><br>Defendants. | No. C 07-05086 WHA<br><br>**ORDER RE CROSS-MOTIONS FOR SUMMARY JUDGMENT; ORDER VACATING PRE-TRIAL CONFERENCE** |

**INTRODUCTION**

In this civil rights action, a group of non-profit organizations representing California foster parents assert that the rates California pays to foster parents to aid in the costs of foster care violate plaintiffs' rights under the federal Child Welfare Act because those rates are too low. Plaintiffs seek a declaration that California's rates violate the Child Welfare Act and injunctive relief. The parties filed cross-motions for summary judgment. For the reasons stated below, plaintiffs' motion for summary judgment is **GRANTED IN PART** and **DENIED IN PART**, and defendants' motion for summary judgment is **DENIED**.

**STATEMENT**

Since 1980, the Child Welfare Act ("Act"), 42 U.S.C. 670 *et seq*., has provided federal funding to the states for the provision of "foster care and transitional independent living programs . . . and adoption assistance for children with special needs." *Id*. at § 670. The Act established a regime whereby the federal and state governments share the cost of foster care programs. It made federal appropriations conditionally available to states that have foster care programs which satisfy certain criteria.

Plaintiffs California State Foster Parent Association, California State Care Providers Association, and Legal Advocates for Permanent Parenting are non-profit corporations that represent the interests of foster parents who provide care and supervision to children in California's foster care program. In this lawsuit, they allege that the California Department of Social Services, the state agency charged with administering California's foster care program, is failing to satisfy its obligations under the federal Child Welfare Act. The parties agree that this case poses but one issue: "Do the foster care payment rates paid to foster parents by California violate the requirement of the federal Child Welfare Act and/or its implementing regulations?" Except as indicated, the operative facts are uncontested.

In order to be eligible to receive federal funding, states must have in place a plan for foster care and adoption assistance which satisfies certain statutory criteria and which has been approved by the Secretary of the United States Department of Health and Human Services ("HHS"). This case concerns one specific requirement. Section 671(a)(1) states: "[i]n order for a State to be eligible for payments under this part, it shall have a plan approved by the Secretary which -- (1) provides for foster care maintenance payments in accordance with section 672 of this title." In turn, Section 672 mandates that "[e]ach State with a plan approved under this part shall make foster care maintenance payments on behalf of each child" placed into the foster care program. *See also* 45 C.F.R. 1356.20-1356.22. The Act defines the term "foster care maintenance payments" as "payments to cover the cost of (and the cost of providing) food, clothing, shelter, daily supervision, school supplies, a child's personal

incidentals, liability insurance with respect to a child, and reasonable travel to the child's home for visitation." *Id*. at § 675(4)(A).

The Act evinces a clear preference for foster parents rather than institutional care, where practicable. Section 675(5) requires states to have procedures for assuring that "each child has a case plan designed to achieve placement in a safe setting that is the least restrictive (most family like) and most appropriate setting available."

California has a foster care plan approved by HHS and receives federal appropriations under the Act. The California Department of Social Services ("CDSS") is the state agency charged with administering California's foster care program. Cal. Welf. & Inst. Code § 11460(a). CDSS is responsible for submitting California's foster care plan to HHS for approval and for receiving and allocating the federal funding. California submitted its most recent plan to HHS in 2007 and the agency approved the portion of the plan regarding foster family home rates (Williams Decl. ¶ 16). California's plans have never been rejected by HHS (*ibid*.). *See also California Alliance of Child and Family Services v. Allenby*, 2008 WL 686860 (N.D. Cal. 2008) (Patel, J.).

California law provides that "[f]oster care providers shall be paid a per child per month rate in return for the care and supervision of the AFDC-FC child placed with them." Cal. Welf. & Inst. Code § 11460(a). The term "care and supervision" is defined by legislation: "'Care and supervision' includes food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance with respect to a child, and reasonable travel to the child's home for visitation." *Id*. at § 11460(b). California's rate schedule is set by legislation which details a specific rate schedule for 1989 and prescribes certain adjustments to those rates in subsequent years. Cal. Welf. & Inst. Code § 11461(a). Section 11461 further provides that "[b]eginning with the 1991-92 fiscal year, the schedule of basic rates . . . shall be adjusted by the percentage changes in the California Necessities Index, computed pursuant to the methodology described in Section 11453, *subject to the availability of funds*." *Id*. at 11461(d)(1)(A) (emphasis added). California's current schedule of basic rates per month for family homes is as follows: $446 for ages 0-4; $485 for ages 5-8; $519 for ages 9-11; $573 for

3

1  ages 12-14; $627 for ages 15-19 (Van Voorhis Exh. 3 at 2, citing DHSS All County Letter No.
2  08-01).

3     Plaintiffs allege that California is failing to meet is obligations under the Child Welfare
4  Act to provide adequate "foster care maintenance payments" to foster parents. Plaintiffs
5  marshal studies indicating that the rates California pays to foster parents fall short of covering
6  the cost of providing the items enumerated in the definition of "foster care maintenance
7  payments" by 29–40 percent, depending on the age of the child. These figures are based only
8  on consumer expenditure data and do not include child care or travel expenses, and therefore
9  the actual shortfall, plaintiffs allege, may therefore be even greater. Plaintiffs also point to
10 evidence indicating that, when determining its foster care payment rates, California does not
11 even consider the actual cost of providing the enumerated items. Indeed, the state's rates are set
12 by the California legislature. CDSS, the department charged with administering the state's
13 foster care program, plays no role in the process of setting rates and has no discretion to pay
14 rates beyond those set by the legislature. CDSS does not track the cost of providing the service
15 descriptions in the Act or analyze the sufficiency of California's rates.[1]

16    Plaintiffs also offer testimony that, contrary to the Child Welfare Act's goal of
17 encouraging foster children to be placed in the least restrictive and most family-like setting
18 possible, the decrease in the real value of the state's foster care maintenance payments has led
19 to reduced participation in the program by foster parents. Basic economic logic would predict
20 this result. Plaintiffs argue, moreover, that the low level of the state's rates actually has a
21 *negative* impact on the state's budget. The low rates reduce participation by foster parents and
22 therefore increase the need for institutional care. Institutional care, plaintiffs assert, is by

---

[1] Plaintiffs sent defendants requests for admission that, *inter alia*, "since 1990, there has not been any data collected by or for DSS regarding the actual costs incurred by foster parents for providing [food, clothing, shelter, daily supervision, school supplies, liability insurance, reasonable travel] to foster children placed in their home" (RFA Nos. 4–11), and that "in 2008, the basic rates paid to foster parents are not sufficient to cover the average costs incurred by foster parents to provide" the items listed in the Act (RFA No. 27) (Van Voorhis Exh. 15). Defendants failed to respond and therefore, by operation of Rule 36(a)(3), are deemed to have admitted the matters therein. Defendants' counsel now replies that "[t]he lack of response to those documents was due to the oversight of the undersigned, and should not evince affirmative admissions by defendants" (Opp. at 6 n.11). In any event, defendants offer no evidence of their own tending to disprove the matters they were requested to admit, whereas plaintiffs have produced substantial evidence in support of these allegations.

4

definition more costly to the state than care by foster parents, irrespective the level at which the state sets its foster care payment rates. That is, an increase in the state's rates, plaintiffs argue, would not only better satisfy the Act's mandate to place foster children in "the least restrictive (most family like) . . . setting available," but could actually *save* the state money by inducing more foster parents to enter the program and thus reducing the need for (more expensive) institutional care options. Again, defendants offer no factual rebuttal to this evidence.

Plaintiffs filed this Section 1983 action in October 2007 alleging that CDSS deprives plaintiffs, and the foster parents they represent, of rights secured by the Child Welfare Act. Plaintiffs contend that California's basic foster care rates do not comply with the Act because those rates are too low. Plaintiffs seek a declaratory judgment establishing that California's rates violate the Act and permanent injunctive relief.

In November 2007, defendants moved to dismiss the lawsuit on the grounds that plaintiffs have no private right of action under Section 1983 to enforce the Child Welfare Act. "In legislation enacted pursuant to the spending power, the typical remedy for state noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State." *Gonzaga University v. Doe*, 536 U.S. 273, 280 (2002) (citation omitted). Where plaintiffs assert a violation of federal *right*, rather than merely a violation of federal *law*, however, plaintiffs have a right of action under Section 1983. *Id.* at 282. *See also Ball v. Rogers*, 492 F.3d 1094, 1103 (9th Cir. 2006); *Price v. City of Stockton*, 390 F.3d 1105, 1110–11 (9th Cir. 2004). The Supreme Court recognizes that federal spending-clause legislation "explicitly conferr[ing] specific monetary entitlements upon the plaintiffs" creates such a right. *Gonzaga University*, 536 U.S. at 280 (citing *Wilder v. Virginia Hospital Assn.*, 496 U.S. 498 (1990)). In a January 2008 order, therefore, this Court denied defendants' motion to dismiss, finding that the Child Welfare Act contains the rights-creating language necessary to confer upon plaintiffs a private right of action under Section 1983 (Dkt. No. 26).

Now that the discovery period is complete, both sides seek summary judgment.

**ANALYSIS**

5

The parties agree that "[t]here is but one issue in this action:  Do the foster care payment rates paid to foster parents by California violate the requirement of the federal Child Welfare Act and/or its implementing regulations?" (Defendant's Br. at 3; Plaintiff's Opp. at 2).

As stated, the Act mandates that "[e]ach State with a plan approved under this part *shall* make *foster care maintenance payments* on behalf of each child" placed into the foster care program.  42 U.S.C. 672 (emphasis added).  Those payments are defined as "payments to *cover the cost of* (and the cost of providing)" several enumerated items.  *Id*. at § 675(4)(A) (emphasis added).  The parties offer conflicting interpretations.  Plaintiffs contend that the uncontested evidence establishes that defendants are in violation of the Act because California's rates to not "cover" the cost of the enumerated items, as the Act requires (Reply at 4).  Defendants, in contrast, emphasize that "the federal government does not prescribe a particular system for payment of costs for children placed in foster family homes, nor does it set any particular method for determining how costs are to be measured, set, or calculated" (Opp. at 3).

No appellate decisions address this issue.  This Court is aware of only two decisions in the district courts addressing the adequacy of a state's foster care maintenance payments. *California Alliance of Child and Family Services v. Allenby*, 2008 WL 686860 (N.D. Cal. 2008) (Patel, J.); *Missouri Child Care Association v. Martin*, 241 F. Supp. 2d 1032 (W.D. Mo. 2003) (Laughrey, J.).  Those decisions interpreted the Act similarly but reached different outcomes.

*First*, both decisions agreed that the Act's mandatory language imposes a binding obligation on states that accept federal funding to make foster care maintenance payments. *California Alliance*, 2008 WL 686860 at * 3 ("California has an approved plan . . . .  Therefore, in order to receive federal funds, California has a mandatory duty to make foster care maintenance payments"); *Missouri Child Care Assn.*, 241 F. Supp. 2d at 1044 ("[t]he definition of foster care maintenance payment[s] is incorporated into 42 U.S.C. § 672 . . . and that provision is mandatory").  *Second*, the two decisions also agreed that, because the Act defines "foster care maintenance payments" to mean payments that "cover" the cost of certain enumerated items, the Act imposes a requirement on states to consider the cost of those items when setting rates:  "[the Act's] list of factors is . . . sufficiently detailed to put the State on

6

notice and to permit a court to review whether the State has based its reimbursement on those statutory criteria . . . . At a minimum, the State is obligated to have a process for determining rates that takes into account the statutory criteria mandated by the [Act]." *Missouri Child Care Assn.*, 241 F. Supp. 2d at 1044–45. *See also California Alliance*, 2008 WL 686860 at * 4 (agreeing). *Finally*, the two decisions both found that the Act obligates only "substantial compliance," rather than exact compliance, with the Act's mandates regarding foster care maintenance payments. *Missouri Child Care Assn.*, 241 F. Supp. 2d at 1046 n.7 ("While it is true that Missouri need only be in substantial compliance with the [Act], a failure to even consider the relevant statutory factors cannot be substantial compliance"); *California Alliance*, 2008 WL 686860 at * 4 (agreeing that the state must only be in "substantial compliance"). Similarly, both agree that states can take budgetary considerations into account but that budgetary considerations can not be the only factor in states' rate-setting determinations. *California Alliance*, 2008 WL 686860 at * 5 (discussing and agreeing with *Missouri Child Care Association* in this regard).[2]

*Missouri Child Care Association* required no further analysis. The decision explained that "[a]t this stage of the litigation, MCCA is only asking the State to use the required criteria for determining reimbursement rates." *Missouri Child Care Assn.*, 241 F. Supp. 2d at 1044. The decision concluded that "there is no factual dispute on this issue. Missouri bases its reimbursement rates on budget considerations, not the factors mandated by the [Act]." *Id*. at 1046. The decision therefore found the state to be in violation of the Act.

*California Alliance*, in contrast, found no violation. The Court analyzed California's reimbursement rates for group homes or institutional foster care providers, rather than the rates

---

[2] Plaintiffs urge a different conclusion, claiming that the Act requires "full" or "actual" compliance rather than mere "substantial compliance" (Br. at 15). The *Missouri Child Care Association* and *California Alliance* decisions offered little explanation for their adoption of "substantial compliance" as the standard. This order notes, however, that HHS, the federal agency charged with administering the Act, interprets the standard to be "substantial compliance." *See, e.g.*, 45 C.F.R. 1355.39, 1356.71(c)(5). Although the Court has found no regulation adopting a "substantial compliance" standard specifically for the states' foster care maintenance payments, HHS certainly contemplates the standard of compliance generally to be substantial compliance rather than exact compliance. Moreover, a contrary result could generate logistical problems insofar as not every state undertakes a uniform analysis of the cost of providing the enumerated foster care services against which courts could measure exact compliance.

7

for foster parents at issue in the present case. The decision concluded that California's institutional reimbursement rates substantially complied with the Act. Under California law, foster care group homes, like foster parents, are reimbursed for "care and supervision." Cal. Wel. & Inst. Code § 11460(a). That term was (and is) defined to include "food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance with respect to a child, and reasonable travel to the child's home for visitation." *Id*. at § 11460(b). For group homes, however, unlike foster parents, "care and supervision shall also include reasonable administration and operational activities necessary to provide the items listed in this subdivision." *Id*. at § 11460(b)(1).

*California Alliance* concluded that California's rates had in fact been set with adequate consideration of the cost factors enumerated in the Child Welfare Act. *First*, the rate structure for group homes had originally been set based on actual data establishing the providers' rates, costs and staffing levels. *Second*, California's above-quoted definition of "care and supervision" substantially mirrors the Child Welfare Act's definition of foster care maintenance payments. The rates, the decision found, were therefore based upon the Act's criteria. The decision also found that the *level* of California's group home rates substantially complied with the Act. The decision acknowledged that California's rate provision provided for a cost of living adjustment only "subject to the availability of funds," Cal. Welf. & Inst. Code § 11462(g)(2), and that the state's rates had failed to keep up with the pertinent cost-of-living measure, the "California Necessity Index."[3] The decision concluded, however, that California was nevertheless substantially in compliance with the Act because its rates had originally been based on the cost of the enumerated items and its rates continued to "provide[] for at least 80% of the costs associated with the items enumerated in the [Child Welfare Act]." *California Alliance*, 2008 WL 686860 at * 4. The decision, however, cautioned that,

> over time, given a multitude of years with budgetary constraints, the standard rate schedule could become greatly out of synch with the costs of items enumerated in the [Act]. In that case, the rate may very well fall to a level that

---

[3] The California Necessities Index "means the weighted average changes for food, clothing, fuel, utilities, rent, and transportation for low-income consumers." Cal. Welf. & Inst. Code § 11453. It is calculated by the Department of Finance according to the steps set forth in Section 11453.

8

> does not satisfy the State's obligation to "have a process for determining rates that takes into account the statutory criteria mandated by the [Act]."

*Ibid.* (quoting *Missouri Child Care Association*). The decision therefore acknowledged (at least implicitly) that the Act's mandate with respect to foster care maintenance payments includes both a procedural and a substantive component: procedurally, the state must take the enumerated cost factors into account, and substantively, the state's rates may not fall too far out of line with the cost of providing those items.

Although *California Alliance* found no violation on its record, the same is not necessarily indicated on our record. On the record now before the Court, California's reimbursement rates for foster parents differ from the group-home rates address in *California Alliance* in at least three critical respects. *First*, plaintiffs assert that the foster-parent rates, unlike the group-home rates, were *never* set with consideration to the cost of the Act's mandatory cost factors and instead were originally, and have always been, set *only* based on budgetary considerations (Plaintiff's Br. at 5 n.3 and 8–9). The legislation setting forth California's rate schedule for group homes specifically states that those rates were based on data concerning the cost of providing foster care services. Cal. Welf. & Inst. Code § 11462. In contrast, the provision establishing the rates for foster parents at issue in this case includes no explanation of how the rate structure was set. *Id.* at § 11461. Defendants offer no explanation of how the state's rates were originally (or are now) set and whether the cost of the Act's enumerated foster care services were (or are) in fact considered. Defendants contend instead that "California has an acceptable methodology, and it is set forth in statute: [California's] Welfare and Institutions Code section 11460, which applies to all foster care providers . . . recites the specific cost categories that are to be included in California's foster care rate structures, and these mirror the Act's cost categories" (Reply at 2) (citing Cal. Wel. & Inst. Code § 11460(b)). Although Section 11460, which defines the "care and supervision" for which foster care providers are to be paid, does provide a list of reimbursable foster care services and that list does substantially mirror the Act's list, defendants fail to explain *how* California's rate process ensures that those costs are covered or whether California's rates *in fact* cover those costs. As stated, the record demonstrates that California's Department of

9

1  Social Services is the agency solely responsible for administering the state's foster care
2  program. California's foster care payment rates, however, are set exclusively by the state
3  legislature. As in *Missouri Child Care Association*, defendants offer no evidence suggesting
4  that California's rate schedule, when originally enacted or at any time thereafter, were in any
5  way based on the cost categories in California's Section 11460(b) or in the Child Welfare Act.

*Second*, although *California Alliance* concluded that California's coverage rate — which the decision found to be at least 80% — constituted substantial compliance, it emphasized an important distinction between group-home rates and foster-parent rates:

> Plaintiff next argues that the [Act] requires actual costs of foster care be paid by the State . . . . It is clear that foster care maintenance payments are to include the costs of certain enumerated items . . . . In the case of institutional providers, however, the statute goes on to state that "such term shall include the reasonable costs of administration and operation of such institution as are necessarily required to provide [the enumerated items]." *Id*. Thus, though the statute mentions reasonable costs, it is silent about actual costs.

*California Alliance*, 2008 WL 686860 at * 5. The quoted text regarding "reasonable costs" applies only to group home reimbursement rates and is inapposite to foster parent rates. In contrast, although it is true that the Act does not specifically mention "actual" costs or require exact compliance with any particular calculation of costs, "[i]t is clear that foster care maintenance payments are to include the costs of certain enumerated items." *Ibid*.

*Third*, plaintiffs' evidence indicates that California's foster parent rates have fallen further out of line with the cost of providing the enumerated items than had the institutional rates addressed in *California Alliance*. As stated, plaintiffs' evidence purports to establish that California's foster parent rates have fallen 29 to 40 percent or more below the cost of providing the enumerated items, depending on the age of the child. Defendants do not challenge this evidence.

This order finds that these distinctions are dispositive. Here, as in *Missouri Child Care Association*, "there is no factual dispute . . . . [the state] bases its reimbursement rates on budget considerations, not the factors mandated by the [Act]." *Missouri Child Care Assn.*, 241 F. Supp. 2d at 1044. As *California Alliance* explained, "[i]t is clear that foster care maintenance payments are to include the costs of certain enumerated items," and defendants have offered no

10

1   evidence whatsoever indicating that they do. Although the definition set forth in Section
2   11460(b) mentions certain foster care costs, defendants point to nothing indicating that the
3   process by which California's rates are set actually considers those costs or that California's
4   rates "cover" those costs, however that term is interpreted.

5   For these reasons, plaintiffs' motion is granted insofar as plaintiffs argue that defendants
6   are in violation of the Act by setting rates without consideration of the Act's mandatory cost
7   factors. Plaintiffs motion, however, is denied insofar as plaintiffs assert that defendants must be
8   in exact compliance with its particular measure of child welfare maintenance payments. This
9   order need not further broach the vexing question of what precisely "substantial compliance"
10  entails in this context and whether, if California had a rate-setting process in place that
11  adequately considered the Act's mandatory cost factors, the shortfalls that plaintiffs posit of 29
12  to 40 percent or more might nevertheless violate the Act.

13  Defendants raises several arguments in support of a contrary result. Defendants
14  emphasizes first and foremost that "the federal government does not prescribe a particular
15  system for payment of costs for children placed in foster family homes, nor does it set any
16  particular method for determining how costs are to be measured, set, or calculated" (Opp. at 3).
17  Defendants similarly emphasize that the Act nowhere requires states to pay the "actual" costs of
18  providing foster care (Opp. at 8). The Act *does* prescribe, however, that California "*shall* make
19  foster care maintenance payments," 42 U.S.C. 672 (emphasis added), which are "payments to
20  *cover* the cost of (and the cost of providing)" specific child care costs. *Id*. at § 675(4)(A)
21  (emphasis added). The Act does not set foster care payment rates, and it does not prescribe *how*
22  states are to cover the listed foster care costs, but it does mandate that states *cover* those costs.
23  Defendants fail to offer a theory as to how their rate system is designed to cover the listed costs
24  or to offer evidence suggesting that their rates do in fact cover those costs. As this order reads
25  their briefings, defendants in fact concede that their rates do not cover the mandatory foster care
26  costs and proceed merely to argue that "even if California's payment rates for foster parents are
27  insufficient to cover the actual costs of the enumerated item categories set forth in the Act, that
28  does not result in a violation of the Act" (Reply at 2; Defendant's Br. at 8). To accept

11

defendants sweeping claim would be to hold that any state payment greater than zero dollars will satisfy the Act. This order declines to so hold, because defendants' contention is contrary to the plain language of the Act. Defendants are simply incorrect insofar as they argue that the Act sets forth no federal standard regarding the rate-setting process. The act requires not only a payment, but a "foster care maintenance payment."

Defendants next argue that California's rates are adequate because HHS has never rejected California's Title IV-E State Plan (Opp. at 5). As *California Alliance* explained, however, "[t]he agency's approval . . . is not dispositive" because "*Chevron U.S.A., Inc. v. Natural Resources Defense Council Inc.*, 467 U.S. 837, 843 [] (1984), is not applicable . . . no federal agency is interpreting federal statutes. No definition of the [Act's] requirements as defined by the []HHS is in question." *California Alliance*, 2008 WL 686860 at * 4 and n.4. Moreover, defendants fail to establish that HHS even analyzes and considers the adequacy of states' foster care payment rates as a factor when approving or rejecting states' plans.

Finally, defendants assert that "a difference of opinion about what the appropriate payment schedule or amount might be . . . does not an issue of fact create" (Opp. at 7). The Court is generally quite sympathetic to the need to defer to the legislature over mere honest differences of opinion. The present record admits of no such honest difference of opinion. Plaintiffs have made a strong factual record. Defendants have not, retreating to extreme constructions of the Act to try to prevail. Given the one-sided record, plaintiffs must prevail.

**CONCLUSION**

For all of the above-stated reasons, plaintiffs' motion for summary judgment is **GRANTED** in part and **DENIED** in part. Defendants' motion for summary judgment is **DENIED**. In the Court's view, this order ends the case. Judgment will be entered in ten calendar days unless a party shows cause why the Court should not do so. The pre-trial conference scheduled for October 27, 2008, is hereby **VACATED**.

**IT IS SO ORDERED.**

Dated: October 21, 2008

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE