United States District Court
For the Northern District of California

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CALIFORNIA STATE FOSTER PARENT ASSOCIATION, CALIFORNIA STATE CARE PROVIDERS ASSOCIATION, AND LEGAL ADVOCATES FOR PERMANENT PARENTING,<br><br>Plaintiffs,<br><br>v.<br><br>JOHN A. WAGNER, Director of the CALIFORNIA DEPARTMENT OF SOCIAL SERVICES, in his official capacity, MARY AULT, Deputy Director of the CHILDREN AND FAMILY SERVICES DIVISION OF THE CALIFORNIA DEPARTMENT OF SOCIAL SERVICES, in her official capacity,<br><br>Defendants. | No. C 07-05086 WHA<br><br>**ORDER RE DEFENDANTS' REQUEST FOR RECONSIDERATION OF ORDER ON CROSS-MOTIONS FOR SUMMARY JUDGMENT** |

**INTRODUCTION**

In this civil rights action, a group of non-profit organizations representing California foster parents assert that the rates California pays foster parents to aid in the cost of foster care violate plaintiffs' rights under the federal Child Welfare Act because those rates are too low. Plaintiffs seek a declaration that California's rates violate the Child Welfare Act and injunctive relief. The parties filed cross-motions for summary judgment. In an October 21 order, plaintiffs' motion was granted in part and denied in part, and defendants' motion was denied. Defendants subsequently requested that the Court withhold the entry of judgment and

reconsider that ruling based on newly provided evidence. For the below-stated reasons, defendants' request is **DENIED** and the ruling of the October 21 order is reaffirmed. Judgment will be entered.

## STATEMENT

Plaintiffs, non-profit corporations that represent the interests of California foster parents, allege that the California Department of Social Services ("CDSS"), the state agency charged with administering California's foster care program, is failing to satisfy its obligations under the federal Child Welfare Act ("Act"), 42 U.S.C. 670 *et seq.*, to provide adequate "foster care maintenance payments" to foster parents. Specifically, plaintiffs alleged that defendants have failed to satisfy the federal mandate that, as a condition to receiving federal funds under the Act, states "shall make foster care maintenance payments on behalf of each child" placed into the foster care program. 42 U.S.C. 672. The Act defines the term "foster care maintenance payments" as "payments to cover the cost of (and the cost of providing) food, clothing, shelter, daily supervision, school supplies, a child's personal incidentals, liability insurance with respect to a child, reasonable travel to the child's home for visitation, and reasonable travel for the child to remain in the school in which the child is enrolled at the time of placement." *Id.* at § 675(4)(A).[1]

Plaintiffs filed this Section 1983 action in October 2007 alleging that CDSS deprives plaintiffs, and the foster parents they represent, of rights secured by the Child Welfare Act by paying rates to foster parents that are too low. Plaintiffs seek a declaratory judgment establishing that California's rates violate the Act and injunctive relief. After the close of the discovery period, the parties cross-moved for summary judgment.

Following a hearing on the motion, an October 21 order granted plaintiffs' motion in part and denied it in part, and denied defendants' motion. The order substantially agreed with two prior district court decisions, *California Alliance of Child and Family Services v. Allenby*, 2008 WL 686860 (N.D. Cal. 2008) (Patel, J.) and *Missouri Child Care Association v. Martin*,

---

[1] The Act was amended on October 6, 2008, to add the phrase "and reasonable travel for the child to remain in the school in which the child is enrolled at the time of placement."

2

241 F. Supp. 2d 1032 (W.D. Mo. 2003) (Laughrey, J.), that the Act's mandate is as follows (Order at 6–7):

> *First*, both decisions agreed that the Act's mandatory language imposes a binding obligation on states that accept federal funding to make foster care maintenance payments . . . . *Second*, the two decisions also agreed that, because the Act defines "foster care maintenance payments" to mean payments that "cover" the cost of certain enumerated items, the Act imposes a requirement on states to consider the cost of those items when setting rates: "[the Act's] list of factors is . . . sufficiently detailed to put the State on notice and to permit a court to review whether the State has based its reimbursement on those statutory criteria . . . . At a minimum, the State is obligated to have a process for determining rates that takes into account the statutory criteria mandated by the [Act]" . . . . *Finally*, the two decisions both found that the Act obligates only "substantial compliance," rather than exact compliance, with the Act's mandates regarding foster care maintenance payments . . . . Similarly, both agree that states can take budgetary considerations into account but that budgetary considerations can not be the only factor in states' rate-setting determinations.

After reviewing the record, the order concluded, *inter alia*, that "defendants offer[ed] no evidence suggesting that California's rate schedule, when originally enacted or at any time thereafter, [was] in any way based on the cost categories in California's Section 11460(b) or in the Child Welfare Act" (Order at 10).

The October 21 order indicated that the ruling on the cross-motions for summary judgment ended the case and that judgment would be entered unless a party were to show cause why judgment should not be entered. Defendants now seek to make such a showing. In response to the order's invitation to show cause, defendants filed a request that the court consider certain reports relevant to the history of California's rate-setting process. Plaintiffs filed a request for leave to respond to defendants' filing and a response, arguing that defendants' newly cited documents do not alter the analysis of the October 21 order on the cross-motions for summary judgment.[2]

## ANALYSIS

As the October 21 order on the cross-motions for summary judgment explained, "the Act's mandate with respect to foster care maintenance payments includes both a procedural and

---

[2] As stated in the Court's November 13 scheduling order, plaintiffs' request for leave to file a response is granted.

3

1    a substantive component: procedurally, the state must take the enumerated cost factors into
2    account, and substantively, the state's rates may not fall too far out of line with the cost of
3    providing those items." The order ruled that defendants failed to satisfy the procedural prong,
4    because "[d]efendants offer[ed] no explanation of how the state's rates were originally (or are
5    now) set and whether the cost of the Act's enumerated foster care services were (or are) in fact
6    considered." The order therefore held that "plaintiffs' motion [was] granted insofar as plaintiffs
7    argue[d] that defendants [were] in violation of the Act by setting rates without consideration of
8    the Act's mandatory cost factors. Plaintiff's motion, however, [was] denied insofar as plaintiffs
9    assert[ed] that defendants must be in exact compliance with [their] particular measure of child
10   welfare maintenance payments" (Order at 9–11). Defendants' latest filing provides no basis for
11   reconsideration of that ruling.

12   In support of their request for reconsideration, defendants submit a declaration of Greg
13   Rose, the Deputy Director of the Children and Family Services Division of CDSS, and a copy
14   of a report dated June 1981 entitled "Foster Care Rate Setting, Report to the Legislature" (Rose
15   Exh. 1). Mr. Rose explains that the report was prepared by CDSS and was the culmination of a
16   study on alternate rate-setting options initiated in 1979. The report referenced the Child
17   Welfare Act's foster care cost categories and, after discussing alternate rate-setting procedures,
18   it proposed a schedule of rates based on the age of the foster child. That schedule, Mr. Rose
19   explains, is identical to the schedule adopted by the California Legislature in 1982 legislation
20   (Rose Decl. ¶ 9; Rose Exh. 1 at 4, 15). Defendants argue, therefore, that the October 21 order
21   incorrectly found that California's rate schedule was *never* set, when originally enacted or at
22   any time thereafter, based on consideration of the federal cost categories.

23   The 1981 report was never before brought to the Court's attention. This is not a
24   situation, therefore, where in the exercise of reasonable diligence defendants did not know of
25   the facts on which they now rely, nor where new facts have emerged, nor a "manifest failure by
26   the Court to consider material facts" presented to it. Civil Local Rule 7-9(b).

27   Moreover, the report was not produced to plaintiffs, despite discovery requests to which
28   it would have been responsive (Pl. Response at 1, listing the discovery requests). Defendants,

4

1  therefore, may not rely on the report in their case-in-chief absent a showing of good cause
2  (Supplemental Order, Dkt. No. 13 ¶ 15). The foregoing are each dispositive. Regardless,
3  defendants' newly submitted materials do not necessitate reconsideration of the October 21
4  ruling.

5       *First*, defendants' evidence suggests, at most, that legislation enacted in 1982 adopted a
6  rate schedule based the recommendations of the 1981 report. California's current rate schedule
7  was adopted *in 1989*. The rate schedule promulgated in 1989 was slightly higher (initially,
8  roughly nine percent across-the-board) than the schedule proposed in the 1981 report, but
9  defendants offer no evidence suggesting that a (roughly) nine-percent increase resulted in a rate
10 schedule that "covered" the necessary costs, nor that the 1989 rate schedule was set with
11 consideration of the Child Welfare Act costs. Defendants, therefore, still have submitted no
12 evidence that California's *current* rate schedule, when originally enacted or at any time
13 thereafter, was set with consideration of the Act's mandatory cost items.

14      *Second*, the 1981 report itself did not indicate that the rates recommended therein were
15 intended to "cover" the Act's enumerated foster care costs, and it is unclear whether the
16 proposed rate schedule was in any way based on, or set with consideration of, the Act's specific
17 costs. The report cited the Act's definition of "foster care maintenance payments" only in
18 passing (identifying it as "proposed regulations resulting from passage of the [Act]"). The
19 report's rate schedule was evidently based on data borrowed from the United States Department
20 of Agriculture — the report identified the rate schedule as being "based on updated 1970 USDA
21 cost information" (Rose Exh. 1, App. D, at 103). The report's proposed rate schedule was
22 simply the average of two USDA rate schedules, a "Low Cost Plan" and a "Moderate Cost
23 Plan." The report explained that "[t]he payments under [the Moderate Cost] plan could be
24 expected to eliminate financial subsidy [sic] by foster parents" (*id*. at 104). In contrast, the
25 report explained, the Low Cost Plan "reflect[ed] the cost of raising a child on a low-cost budget
26 and could require some subsidy by foster parents." The report proposed a rate schedule that
27 was simply the "midpoint" — the average — of the low-cost and moderate-cost plans. That
28 rate schedule, the report explained, would "reduce," but evidently not eliminate, the financial

5

subsidy by foster parents. The report listed under "disadvantages" of that alternative: "[c]ould lose some foster parents if their rates are frozen for more than a year or two" (*id*. at 104A).

Based on that analysis, the report concluded with no further explanation that its proposed rates "reasonably approximate[d] family foster care costs in California, and [would] place foster parents on a more nearly equal financial footing with institutional foster care providers, whose rates [were] based on actual costs" (Rose Exh. 1 at 15). It is unclear whether child care costs and the "financial subsidy" addressed in the report were the Act's enumerated costs or some other measure of costs, and the report did not purport to propose rates that would cover those costs or eliminate that financial subsidy. The report's recommendations for foster parents stand in contrast to those for institutional providers, whose rates *were* "based on actual costs."[3]

*Third*, even assuming *arguendo* that the 1981 report established that the proposed rates were based on the Act's foster care costs and adequately "covered" those costs at the time the report was published, defendants fail to establish that California's rates still cover, or have any relevant relation to, the mandatory cost items today. Defendants have not even attempted to make such a showing. The Child Welfare Act mandates not merely that rates originally, or at some time in the past, covered the listed child welfare costs, but rather that California's foster care payments "cover the cost of (and the cost of providing) [the listed child care costs]." 42 U.S.C. 675(4)(A). Evidence that rates originally bore some relation to the Act's foster care costs may be useful background information but would not alone establish that rates continue to cover, or bear any meaningful relation to, those costs nearly thirty years later. The October 21 order explained that the interpretation of the Act defendants urged in their motion for summary judgment would have meant that any foster care payments greater than zero dollars would satisfy the Act. Under defendants' revised theory, consideration of the mandated costs at any

---

[3] The system recommended for *institutional*-care providers, unlike that for foster parents, included mechanisms for collecting cost data and set rates with relation to that data (Rose Exh. 1 at iii, 16). As stated in the October 21 order, the cost-based approach for *institutional* providers survived in the 1989 rate-setting legislation. Cal. Welf. & Inst. Code § 11462(c) (explaining the cost studies upon which rates for institutions were originally based). The provision setting California's rates for foster parents contains no such indication. *Id*. at § 11461.

6

point in time would suffice for all time; that is, any payments not less than the proposed 1981 rates would always satisfy the Act — forever. This order declines to accept such an extreme interpretation.

The Ninth Circuit ruled in an analogous situation that states must consider the criteria set forth in the statute and set rates that bear a reasonable relationship to that criteria. *Orthopaedic Hosp. v. Belshe*, 103 F.3d 1491, 1496 (9th Cir. 1997). *Belshe* explained that,

> [t]o do this, the Department must rely on responsible cost studies, its own or others', that provide reliable data as a basis for its rate setting . . . . The Department cannot know that it is setting rates that are consistent with [the statutory criteria] without considering the costs of providing such services.

*Ibid*. The same is true here. The Act mandates that states must set rates that "cover" (1) the cost of, and (2) the cost of providing, several listed foster-care services. The state cannot know that it has set rates that "cover" those costs if it has not considered those costs and set rates in relation to them, and it cannot have done that if it has no evidentiary basis by which to assess those costs.

The record in this case indicates that California's rates are not based on the statutory criteria; in fact, it indicates that California has *no* mechanism in place to ensure that it is meeting that federal obligation. It does not track foster care costs; it does not analyze the adequacy of its rates; and it has no mechanism for making adjustments to rates that may be needed. Even with defendants' newly provided evidence, the record indicates that the state has not considered the statutory criteria or analyzed the sufficiency of California's rates at least since 1981, if ever, and it offers no indication that California's rates ever "covered" the statutory costs. The Act certainly did not vest with the courts the role of collecting data regarding foster care costs and setting appropriate foster care rates in the first instance. Because the record indicates that the state does not consider the Act's mandatory foster care service costs and set rates with relation to those costs, the state has failed meet its obligation to pay rates that "cover the cost of (and the cost of providing)" the listed services. 42 U.S.C. 671(a), 672(a)(1).

7

This order does not conclude that the state must adopt any particular method for analyzing the statutory costs or for setting rates. A wide range of procedures likely exist by which the state could discharge is obligations under the Act. Although the statute affords the states substantial discretion, however, that discretion does not render the statute unenforceable by courts. *Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, 529 (1990).

As explained in the October 21 order, plaintiffs' motion was and remains granted insofar as plaintiffs argue that defendants are in violation of the Act by setting rates without consideration of the Act's mandatory cost factors, but the motion is denied insofar as plaintiffs assert that defendants must be in exact compliance with their particular measure of child welfare maintenance payments.

## CONCLUSION

For the above-stated reasons, this order declines to revise the October 21 order's ruling granting plaintiffs' motion for summary judgment in part and denying it in part, and denying defendants' motion for summary judgment. This case is over at the District Court. The accompanying judgment will therefore be entered.

**IT IS SO ORDERED.**

Dated: December 4, 2008

WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE